# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SOLENEX LLC, | ) | Civil Case No. 13-00993 (RJL) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| S.M.R. JEWELL, *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Steven J. Lechner, D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiff

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

I.    LEGAL BACKGROUND ............................................................................ 1

    A.    Mineral Leasing Act....................................................................... 1

    B.    The National Environmental Policy Act ........................................ 4

    C.    The National Historic Preservation Act......................................... 5

II.   FACTUAL BACKGROUND ....................................................................... 8

ARGUMENT ....................................................................................................... 18

I.    THIS COURT CAN REVIEW SOLENEX'S CLAIMS OF
    UNREASONABLE DELAY ...................................................................... 18

II.   DEFENDANTS HAVE UNREASONABLY DELAYED LIFTING THE
    SUSPENSION OR COMPLETING ADMINISTRATIVE ACTION
    REGARDING SOLENEX'S APD ............................................................. 21

    A.    No Fathomable "Rule Of Reason" Justifies Defendants'
        30-Year Delay.................................................................................. 22

    B.    Defendants' Delay Is Unreasonable In Light Of The MLA And
        Congress's Intent That The Nation's Oil And Gas Resources
        Be Developed.................................................................................. 25

    C.    The Interests At Stake Weigh Heavily In Favor Of A Ruling
        That Defendants' Delay Is Unreasonable ....................................... 27

    D.    Defendants Cannot Seriously Argue That Other Activities
        Have A Higher Or Competing Priority............................................ 32

    E.    Defendants' Bad Faith Conclusively Proves That Their Delay
        Is Unreasonable.............................................................................. 32

III.  BECAUSE DEFENDANTS' DELAY IS UNREASONABLE AS
    A MATTER OF LAW, THIS COURT MUST COMPEL DEFENDANTS
    TO ACT ...................................................................................................... 38

CONCLUSION.................................................................................................... 39

CERTIFICATE OF SERVICE ................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

(* denotes cases primarily relied upon)

**<u>Page</u>**

<u>**Cases**</u>

*Amber Resources Co. v. United States*,
    538 F.3d 1358 (Fed. Cir. 2008)..........................................................................................16

*In re American Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004).............................................................................19, 21, 22

*Apache Survival Coal. v. United States*,
    21 F.3d 895 (9th Cir. 1994) ...............................................................................................6

*Atl. & Gulf Stevedores, Inc. v. Donovan*,
    274 F.2d 794 (5th Cir. 1960) .............................................................................................18

*Baltimore Gas and Elec. Co. v. Natural Resources Def. Council, Inc.*,
    462 U.S. 87 (1983)................................................................................................................4

*In re Barr Labs., Inc.*,
    930 F.2d 72 (D.C. Cir. 1991)............................................................................27, 33, 38

*BioDiversity Conservation Alliance v. BLM*,
    608 F.3d 709 (10th Cir. 2010) ...........................................................................................3

*Blackfeet Nations v. United States*,
    81 Ct. Cl. 101 (1935) ..........................................................................................................8

*Bryant v. Yellen*,
    447 U.S. 352 (1980)...........................................................................................................31

*Califano v. Sanders*,
    430 U.S. 99 (1977).............................................................................................................18

*California Co. v. Udall*,
    296 F.2d 384 (D.C. Cir. 1961)............................................................................20, 29, 30

*Century Exploration New Orleans, LLC v. United States*,
    745 F.3d 1168 (Fed. Cir. 2014)........................................................................................25

*Common Cause v. Fed. Election Comm'n*,
    692 F. Supp. 1397 (D.D.C. 1988) ...................................................................................33

*Connecticut Trust for Historic Preservation v. ICC*,
    841 F.2d 479 (2d Cir. 1988)...............................................................................................6

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ............................................................... 24

*\*Cutler v. Hayes,*
    818 F.2d 879 (D.C. Cir. 1987)............................................... 19, 22, 31, 32

*Deering Milliken, Inc. v. Johnston,*
    295 F.2d 856 (4th Cir. 1961) ............................................................... 18

*Forest Guardians v. Babbitt,*
    174 F.3d 1178 (10th Cir. 1999)............................................................ 38

*Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.,*
    252 F.3d 246 (3d Cir. 2001)................................................................... 6

*Griffin & Griffin Exploration, LLC v. United States,*
    No. 10-638L, 2014 WL 2199269 (Fed. Cl. 2014) ................................. 3, 27

*Gulf Oil Corp. v. Morton,*
    493 F.2d 141 (9th Cir. 1973) ............................................................... 20

*Harvey v. Udall,*
    384 F.2d 883 (10th Cir. 1967) ........................................................... 1–2

*Heckler v. Chaney,*
    470 U.S. 821 (1985)............................................................................ 28

*Her Majesty the Queen in Right of Ontario v. EPA,*
    912 F.2d 1525 (D.C. Cir. 1990)............................................................ 22

*ICC v. Jersey City,*
    322 U.S. 503 (1944)....................................................................... 34, 35

*Illinois Commerce Comm'n v. ICC,*
    848 F.2d 1246 (D.C. Cir. 1988)......................................................... 6, 34

*Kashkool v. Chertoff,*
    553 F. Supp. 2d 1131 (D. Ariz. 2008) ................................................. 32

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) ................................................................ 5

*Leo Sheep Co. v. United States,*
    440 U.S. 668 (1979)............................................................................ 31

*Lujan v. Nat'l Wildlife Federation,*
   497 U.S. 871 (1990)................................................................ 18

*Lynch v. United States,*
   292 U.S. 571 (1934)................................................................ 27

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
   485 U.S. 439 (1988)................................................................ 37

*MCI Telecommunications Corp. v. FCC,*
   627 F.2d 322 (D.C. Cir. 1980)................................................ 23, 28

*Marathon Oil Co. v. Lujan,*
   937 F.2d 498 (10th Cir. 1991) ............................................... 30

*Marsh v. Oregon Natural Res. Council,*
   490 U.S. 360 (1989)................................................................ 34

*Midwest Gas Users Ass'n v. FERC,*
   833 F.2d 341 (D.C. Cir. 1987)................................................ 22–23

*Mobil Oil Exploration & Producing Se., Inc. v. United States,*
   530 U.S. 604 (2000)................................................................ 21, 27

*\*Mountain States Legal Foundation v. Andrus,*
   499 F. Supp. 383 (D. Wyo. 1980) ......................................... 10, 25, 30

*Mountain States Legal Foundation v. Hodel,*
   668 F. Supp. 1466 (D. Wyo. 1987) ........................................ 2

*Muwekma Tribe v. Babbitt,*
   133 F. Supp. 2d 30 (D.D.C. 2000) ......................................... 25, 28

*Nader v. FCC,*
   520 F.2d 182 (D.C. Cir. 1975)................................................ 27

*Nat'l Cong. of Hispanic Am. Citizens (El Congreso) v. Marshall,*
   626 F.2d 882 (D.C. Cir. 1979)................................................ 33

*Nat'l Trust for Historic Pres. v. Blanck,*
   938 F. Supp. 908 (D.D.C. 1996)............................................. 6

*Nat'l Trust for Historic Pres. v. Blanck,*
   203 F.3d 53 (D.C. Cir. 1999) ................................................. 6

*Nevada v. Dep't of Energy*,
  457 F.3d 78 (D.C. Cir. 2006) ............................................................... 5

*New York v. NRC*,
  681 F.3d 471 (D.C. Cir. 2012) .............................................................. 4

*Nollan v. California Coastal Comm'n*,
  483 U.S. 825 (1987) ............................................................................. 37

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) .......................................................................... 19, 20

*Oglala Sioux Tribe v. U.S. Army Corps of Engineers*,
  537 F. Supp. 2d 161 (D.D.C. 2008) ..................................................... 6

*Park County Res. Council, Inc. v. U.S. Dep't of Agric.*,
  817 F.2d 609 (10th Cir. 1987) ................................................... 29, 30, 31

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) ............................................................................. 31

*Pierce v. Underwood*,
  487 U.S. 552 (1988) ............................................................................. 38

*Potomac Elec. Power Co. v. ICC*,
  702 F.2d 1026 (D.C. Cir. 1983) ....................................................... 19, 27

*Potomac Elec. Power Co. v. ICC.*,
  705 F.2d 1343 (D.C. Cir. 1983) ........................................................... 19

*Public Citizen Health Research Grp. v. Commissioner, FDA*,
  740 F.2d 21 (D.C. Cir. 1984) ....................................................... 18, 20, 38

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................. 4

*Rocky Mountain Oil & Gas Ass'n v. Watt*,
  696 F.2d 734 (10th Cir. 1982) ............................................................. 28

*Rumsfeld v. Freedom NY, Inc.*,
  329 F.3d 1320 (Fed. Cir. 2003) ........................................................... 20

*Salmon River Concerned Citizens v. Robertson*,
  32 F.3d 1346 (9th Cir. 1994) ............................................................... 5

*Sierra Club v. Thomas,*
   828 F.2d 783 (D.C. Cir. 1987) ............................................................... 18, 19

*Sims v. Ellis,*
   972 F. Supp. 2d 1196 (D. Idaho 2013) ................................................. 32

*Smith v. Illinois Bell Tel. Co.,*
   270 U.S. 587 (1926) ............................................................................... 28

*Sun Oil Co. v. United States,*
   572 F.2d 786 (Ct. Cl. 1978) ................................................................... 30

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   605 F. Supp. 2d 263 (D.D.C. 2009) ...................................................... 4

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   616 F.3d 497 (D.C. Cir. 2010) ............................................................... 4

*\*Telecomms. Research & Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) ................................................................ *passim*

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton,*
   433 F.3d 852 (D.C. Cir. 2006) ............................................................... 31

*Tummino v. Von Eschenbach,*
   427 F. Supp. 2d 212 (E.D.N.Y. 2006) ................................................... 32, 33

*U.S. Women's Chamber of Commerce v. U.S. Small Bus. Admin.,*
   1:04-CV-01889, 2005 WL 3244182 (D.D.C. 2005) ............................. 31, 32

*Union Oil Co. of California v. Morton,*
   512 F.2d 743 (9th Cir. 1975) ................................................................ 20

*In re United Mine Workers of Am. Int'l Union,*
   190 F.3d 545 (D.C. Cir. 1999) ............................................................... 22

*United Nuclear Corp. v. United States,*
   912 F.2d 1432 (Fed. Cir. 1990) ............................................................. 37

*United States v. 162.20 Acres of Land, More or Less, Etc.,*
   639 F.2d 299 (5th Cir. 1981) ................................................................ 6

*United States v. Jenks,*
   129 F.3d 1348 (10th Cir. 1997) ............................................................ 33

*United States v. Kipp*,
    369 F. Supp. 774 (D. Mont. 1974) .......................................................................... 8

*United States v. Monsanto*,
    491 U.S. 600 (1989) ............................................................................................... 38

*Utah Int'l Inc. v. Andrus*,
    488 F. Supp. 962 (D. Utah 1979) ...................................................................... 22, 27

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ............................................................................................. 4, 34

*Vill. of Los Ranchos De Albuquerque v. Marsh*,
    956 F.2d 970 (10th Cir. 1992) .............................................................................. 29

*W. Org. of Res. Councils v. BLM*,
    591 F. Supp. 2d 1206 (D. Wyo. 2008) .................................................................. 3

*Waterford Citizens' Assoc. v. Reilly*,
    970 F.2d 1287 (4th Cir. 1992) ............................................................................... 6

*Western Energy Alliance v. Salazar*,
    10-CV-237F, 2011 WL 3738240 (D. Wyo. 2011) .............................................. 26

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................. 5

**Administrative Decisions**

*Brigham Oil & Gas, LP*,
    181 IBLA 282 (2011) ........................................................................................... 26

**Statutes**

29 Stat. 321 (1896) ....................................................................................................... 8

The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ......................................... 18

    5 U.S.C. § 551(13) ............................................................................................. 18

    5 U.S.C. § 555(b) ......................................................................................... 18, 22

    5 U.S.C. § 702 .................................................................................................... 18

    5 U.S.C. § 704 .................................................................................................... 18

5 U.S.C. § 706(1) ................................................................................ *passim*

16 U.S.C. § 161 ................................................................................... 8

The National Historic Preservation Act, 16 U.S.C. §§ 470–470x-6 ......................... *passim*

    16 U.S.C. § 470f ........................................................................... 6

The Mining and Minerals Policy Act of 1970

    30 U.S.C. § 21(a) .......................................................................... 29

The Mineral Leasing Act of 1920, 41 Stat. 437 (1920), 30 U.S.C. §§ 181–287 ......... *passim*

    30 U.S.C. § 181 ........................................................................... 2

    30 U.S.C. § 191 ........................................................................... 30

    30 U.S.C. § 209 ........................................................................... 2, 20

    30 U.S.C. § 226(a) ........................................................................ 2

    30 U.S.C. § 226(a)(1)(A) ................................................................. 2

    30 U.S.C. § 226(d) ........................................................................ 2

    30 U.S.C. § 226(e) ........................................................................ 2, 25

    30 U.S.C. § 226(g) ........................................................................ 3

    30 U.S.C. § 226(k) ........................................................................ 2

    30 U.S.C. § 226(p)(2) ..................................................................... 26

The National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.* ........................... *passim*

    42 U.S.C. § 4331(a) ....................................................................... 5, 28

    42 U.S.C. § 4332(2)(C) ................................................................... 4

The 1980 Energy Security Act ................................................................... 8

    42 U.S.C. § 8801 .......................................................................... 3

    42 U.S.C. § 8855 .......................................................................... 8

The Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005).............. 26, 29

    42 U.S.C. § 15921(a) ............................................................................. 26

42 U.S.C. § 13401(1) .................................................................................. 4

43 U.S.C. § 1701(12) ................................................................................. 29

Mont. Code Ann. § 17-3-240 ...................................................................... 30

**<u>Regulations</u>**

36 C.F.R. § 800.2(c) ................................................................................... 7

36 C.F.R. § 800.3(b) ............................................................................. 6–7, 24

36 C.F.R. § 800.4 ...................................................................................... 34

36 C.F.R. § 800.4(a) .................................................................................. 36

36 C.F.R. § 800.4(a)(1) ........................................................................... 7, 36

36 C.F.R. § 800.4(b) ................................................................................... 7

36 C.F.R. § 800.4(c) ................................................................................... 7

36 C.F.R. § 800.4(c)(2) ............................................................................... 7

36 C.F.R. § 800.5(a) ................................................................................... 7

36 C.F.R. § 800.6 ....................................................................................... 7

36 C.F.R. § 800.7 ....................................................................................... 7

36 C.F.R. § 800.16(d) ................................................................................. 7

36 C.F.R. § 800.16(y) ................................................................................. 6

40 C.F.R. § 1500.1 ..................................................................................... 5

40 C.F.R. § 1500.2(c) .............................................................................. 5, 24

40 C.F.R. § 1500.4 ..................................................................................... 5

40 C.F.R. § 1500.5 ..................................................................................... 5

40 C.F.R. § 1501.3 ................................................................................... 5

40 C.F.R. § 1501.4(b) .............................................................................. 4

40 C.F.R. § 1501.4(c) ............................................................................... 5

40 C.F.R. § 1501.4(e) ............................................................................... 5

40 C.F.R. § 1508.9 ................................................................................... 4, 5

43 C.F.R. § 3101.1–2 ............................................................................... 2

43 C.F.R. § 3107.1 ................................................................................... 25

**Other Authorities**

BLACK'S LAW DICTIONARY (9th ed. 2009) .................................................. 20, 38

Ezekiel J. Williams and Steven K. Imig, *Energy Development On National
Forest System Lands*, 57 RMMLF-INST 6-1 (2011)..................................... 3

James B. Martin, *The Interrelationships of the Mineral Lands Leasing Act, the
Wilderness Act, and the Endangered Species Act: A Conflict in Search of
Resolution*, 12 Envtl. L. 363 (1982)........................................................... 11

Justin Stolte, *The Energy Policy Act of 2005: The Path to Energy Autonomy?*,
33 J. Legis. 119 (2006) ............................................................................. 30

Karolyn King Nelson, *Takings Law West of The Pecos:  Inverse
Condemnation of Federal Oil and Gas Lease Rights*, 37 Nat. Resources J. 253
(1997).................................................................................................... 27

Office of Inspector General, *Onshore Oil and Gas Permitting, U.S.
Department of the Interior* (Report No. CR-EV-MOA-0002-2013, June 2014),
available at http://www.doi.gov/oig/reports/upload/CR-EV-MOA-0003-
2013Public.pdf....................................................................................... 29, 30

Senate Subcommittee of the Committee on Interior and Insular Affairs, *The
Investigation of Oil and Gas Lease Practices*, 84th Cong., 2nd Sess. 2 (1957) ......... 2

U.S. Dep't of Justice, *Attorney General's Manual on the Administrative
Procedure Act* (1947).............................................................................. 19

U.S. Department of the Interior, *Onshore Oil and Gas Leasing Policy Review*
(1979).................................................................................................... 11

## INTRODUCTION

Plaintiff, Solenex, LLC owns federal oil and gas lease M-53323, which covers 6,247 acres in Montana.  In 1983, and in full compliance with all applicable statutes and regulations, Solenex's predecessor submitted an application for permit to drill ("APD") a single exploratory well to test and evaluate the natural gas potential of an extremely promising geologic structure.  Although the APD has been approved four times over the intervening 30 years, the proposed well has yet to be spudded.  Instead, the lease and the approved APD remain in suspension solely because of intentional and egregious delay by federal agencies.

On June 28, 2013, Solenex filed this case against the Secretary of the Interior, the Secretary of Agriculture, the Director of the Bureau of Land Management ("BLM"), the Chief of the Forest Service, and other federals officials seeking to compel agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1).  Specifically, Solenex seeks an order compelling Defendants to immediately lift their suspension of M-53323 and Solenex's approved APD and allow operations to commence, effective July 1, 2015.  Postponing the effective date is necessary because, under the approved APD, operations may only be conducted from July 1 through November 30.  As demonstrated below, Defendants' unconscionable delay justifies the requested relief.

## I.     LEGAL BACKGROUND.

### A.     The Mineral Leasing Act.

The Mineral Leasing Act of 1920 ("MLA"), 41 Stat. 437 (1920), as amended, 30 U.S.C. §§ 181–287, was the first act that provided for the leasing of the Nation's minerals.  The specific purpose of the MLA is "'to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States *through private enterprise*.'"  *Harvey v. Udall*, 384 F.2d

883, 885 (10th Cir. 1967) (quoting Senate Subcommittee of the Committee on Interior and Insular Affairs, *The Investigation of Oil and Gas Lease Practices*, 84th Cong., 2nd Sess. 2 (1957)) (emphasis added).  To accomplish this purpose, the MLA vests the Secretary of the Interior, acting through the BLM, with the authority to issue leases covering oil and gas deposits "and lands containing such deposits owned by the United States, including those in national forests . . . ."  30 U.S.C. §§ 181, 226(a); *Mountain States Legal Foundation v. Hodel*, 668 F. Supp. 1466, 1469 (D. Wyo. 1987) (noting that the Secretary has delegated his authority to the BLM).  A lease grants the lessee the "exclusive right" to drill for, mine, extract, remove, and dispose of all the oil and gas in the leased lands together with the right to build and maintain necessary improvements thereon. *See* 43 C.F.R. § 3101.1–2.  This exclusive right "shall be for a primary term of 10 years" and "shall continue so long after its primary term as oil and gas is produced in paying quantities[.]"[1] 30 U.S.C. § 226(e).  This exclusive right is conditioned "upon the payment of a royalty at a rate of not less than 12.5 percent in amount or value of the production removed or sold from the lease."[2]  30 U.S.C. § 226(a)(1)(A).  "[F]or the purpose of encouraging the greatest ultimate recovery" and in the "interest of conservation," the Secretary may issue a "suspension of operations and production" for a lease.  30 U.S.C. § 209.  During such a suspension, the obligation to pay rentals or minimum royalties shall be suspended and the term of the lease "shall be extended by adding any suspension period thereto."  *Id.*

---

[1] The MLA allows the primary term to be extended under limited circumstances, but only for specific periods and specific reasons, such as two years if good faith drilling operations are being conducted at the end of the 10-year primary term.  30 U.S.C. § 226(e); *see also* 30 U.S.C. § 226(k).

[2] Prior to the drilling of a well capable of producing in paying quantities, a lessee must pay annual rentals during the primary term.  30 U.S.C. § 226(d).  After a paying well is drilled, but before the well is placed into production, a lessee must pay minimum royalties in lieu of rentals of not less than the applicable rental rate.  *Id.*

In 1987, Congress provided the Secretary of Agriculture, acting through the Forest Service, statutory authority to manage surface-disturbing activities on lands leased under the MLA within the national forests:

> The Secretary of the Interior, or for National Forest lands, the Secretary of Agriculture, shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter, and shall determine reclamation and other actions as required in the interest of conservation of surface resources. No permit to drill on an oil and gas lease issued under [the MLA] may be granted without the analysis and approval by the Secretary concerned of a plan of operations covering proposed surface-disturbing activities within the lease area.

30 U.S.C. § 226(g). In short, the Forest Service administers surface-disturbing activities, while the BLM administers subsurface or "downhole" activities, such as drilling, casing, and completion operations. Ezekiel J. Williams and Steven K. Imig, *Energy Development On National Forest System Lands*, 57 RMMLF-INST 6-1, 6-21 to 6-22 (2011). Thus, before commencing drilling operations on national forest lands, a lessee must submit an APD to the BLM and concurrently submit a surface use plan to the Forest Service. The surface use plan must be approved by the Forest Service before the BLM can approve the APD.[3] *Griffin & Griffin Exploration, LLC v. United States*, No. 10-638L, 2014 WL 2199269, *2 (Fed. Cl. 2014). Despite this dual authority, Congress intended both agencies to perform their duties in an expeditious manner. *See* 42 U.S.C. § 8801 (Congress declaring that "the dependence of the United States on imported petroleum and natural gas must be reduced by all economically and environmentally feasible means . . . ."); 42 U.S.C. § 8855 ("It is the intent of Congress that the Secretary of Agriculture shall process

---

[3] After approval of the surface use plan by the Forest Service, the BLM may deny the APD, approve the APD as submitted, or approve the APD subject to conditions of approval that are consistent with the lease terms, to ensure environmental protections, safety, conservation of resources, and/or reclamation. *See W. Org. of Res. Councils v. BLM*, 591 F. Supp. 2d 1206, 1235 (D. Wyo. 2008) *aff'd sub nom. BioDiversity Conservation Alliance v. BLM*, 608 F.3d 709 (10th Cir. 2010).

applications for leases of National Forest System lands and for permits to explore, drill, and develop resources on land leased from the Forest Service, notwithstanding the current status of any plan being prepared under [the National Forest Management Act of 1976]."); 42 U.S.C. § 13401(1) (It is a "goal of the United States . . . to strengthen national energy security by reducing dependence on imported oil . . . .").

### B.   The National Environmental Policy Act.

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, is a procedural statute designed to foster informed decision-making that does not impose any substantive requirements. *Baltimore Gas and Elec. Co. v. Natural Resources Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983). Instead, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989); *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) ("NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)); *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 271–72 (D.D.C. 2009), *aff'd* 616 F.3d 497 (D.C. Cir. 2010).

Whenever an agency proposes a "major Federal action," NEPA generally requires that the agency prepare an environmental impact statement ("EIS"). 42 U.S.C. § 4332(2)(C). All "major Federal actions," however, do not require a full-blown EIS. In order to determine whether an EIS is required, an agency may prepare an environmental assessment. 40 C.F.R. §§ 1501.4(b), 1508.9. An environmental assessment is a "concise public document" that "briefly" describes the proposal, examines alternatives, considers impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. If, based upon the environmental

4

assessment, the agency concludes there will not be any significant environmental impact, it may issue a Finding of No Significant Impact, obviating the need to prepare an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9; *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355–56 (9th Cir. 1994).  When an agency provides a full and fair discussion of environmental impacts in a NEPA document, the agency has satisfied NEPA by taking the requisite "hard look" at environmental consequences.  *Lands Council v. McNair*, 537 F.3d 981, 1000–01 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

More importantly, agencies shall not hide behind NEPA to avoid making decisions, even decisions they may dislike.  *See* 40 C.F.R. § 1500.5 (listing methods by which agencies "shall reduce delay"); 40 C.F.R. § 1500.4 (listing methods by which agencies "shall reduce excessive paperwork"); 40 C.F.R. § 1500.1 ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action"); 40 C.F.R. § 1500.2(c) (mandating that agencies "[i]ntegrate the requirements of NEPA with other planning and environmental review procedures required by law . . . so that all such procedures run concurrently rather than consecutively"); *see also* 42 U.S.C. § 4331(a) (national policy "to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, *and fulfill the social, economic, and other requirements of present and future generations of Americans*" (emphasis added)).

### C.    The National Historic Preservation Act.

The National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470–470x-6, is designed to identify potential conflicts between federal undertakings and historic properties and to provide a mechanism for attempting to resolve any purported conflicts.  Section 106 of the NHPA

requires that an agency having jurisdiction over an undertaking "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register."[4]  16 U.S.C. § 470f.  Like NEPA, the NHPA is a strictly procedural statute that neither confers a substantive right nor dictates a particular outcome.  *See Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 252 (3d Cir. 2001) ("The NHPA is a procedural statute designed to ensure that, as part of the planning process for properties under the jurisdiction of a federal agency, the agency takes into account any adverse effects on historical places from actions concerning that property."); *Oglala Sioux Tribe v. U.S. Army Corps of Engineers*, 537 F. Supp. 2d 161, 173 (D.D.C. 2008) ("'The case law in this and other circuits holds that an agency's duty to act under the NHPA . . .  is procedural in nature.'" (quoting *Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996), *aff'd* 203 F.3d 53 (D.C. Cir. 1999))).

Instead, the NHPA simply requires agencies to "stop, look, and listen" before proceeding with an undertaking.  *Illinois Commerce Comm'n v. I.C.C.*, 848 F.2d 1246, 1261 (D.C. Cir. 1988); *see Waterford Citizens' Assoc. v. Reilly*, 970 F.2d 1287, 1291 (4th Cir. 1992) ("Congress did not intend [Section 106] to impose general obligations on federal agencies to affirmatively protect preservation interests."); *Connecticut Trust for Historic Preservation v. ICC*, 841 F.2d 479, 484 (2d Cir. 1988) ("NHPA require[s] only that agencies acquire information before acting."); *United States v. 162.20 Acres of Land, More or Less, Etc.*, 639 F.2d 299, 302 (5th Cir. 1981) ("[Section 106] neither . . . forbid[s] the destruction of historic sites nor command[s] their preservation.").  As with NEPA, agencies cannot hide behind NHPA to avoid making decisions. *See Apache Survival Coal. v. United States,* 21 F.3d 895, 906 (9th Cir. 1994) ("[T]he [NEPA and

---

[4] An "undertaking" occurs when a federal agency funds or provides necessary approval for a project, activity, or program.  *See* 36 C.F.R. § 800.16(y).

NHPA] statutory schemes are closely related."); 36 C.F.R. § 800.3(b) (mandating that agencies "coordinate the steps of the section 106 process, as appropriate, with the overall planning schedule for the undertaking and with any reviews required under other authorities such as [NEPA]").

When an undertaking is proposed, Section 106 triggers a multi-step process. The first step is the agency must identify the parties entitled to be consulted and invite them to join the consultation process as "consulting parties."[5]  36 C.F.R. 800.2(c).  Second, the agency, in consultation with the SHPO, must establish an "area of potential effects."[6]  36 C.F.R. § 800.4(a)(1).  Third, the agency shall identify historic properties within the area of potential effects through application of the National Register criteria.  36 C.F.R. §§ 800.4(b) and (c). Fourth, if the agency and the SHPO determine that a property meets the National Register criteria, the property shall be considered eligible for the National Register.  36 C.F.R. § 800.4(c)(2).  Fifth, as to eligible properties within the area of potential effects, the agency, in consultation with SHPO and any affected Indian tribes, shall determine whether the undertaking will cause any adverse effects to the eligible property, after considering the views of the other consulting parties.  36 C.F.R. § 800.5(a).  Sixth, if an adverse effect is found, the agency, in consultation with the SHPO, consulting parties, and affected Indian tribes shall develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate the adverse effect.  36 C.F.R. § 800.6.  Finally, if mitigation is not possible, the head of the

---

[5] "Consulting parties" generally include the state historic preservation officer ("SHPO"), permit applicants, local governments, and Indian tribes that may attach religious or cultural significance to public lands slated for the proposed undertaking.  36 C.F.R. § 800.2(c).

[6] The area of potential effects "means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist."  36 C.F.R. § 800.16(d).

agency may approve the undertaking after following additional procedural steps.  36 C.F.R. §
800.7.

## II.   FACTUAL BACKGROUND.

On September 26, 1895, the Blackfeet Tribe ceded approximately 400,000 acres along the
western boundary of its reservation in Montana to the United States ("ceded strip").  29 Stat. 321,
353–57(1896); *Blackfeet Nations v. United States*, 81 Ct. Cl. 101, 114 (1935); Plaintiffs' Statement
of Material Facts ¶ 1.[7]  As to the ceded strip, the Blackfeet Tribe reserved limited use rights, such
as the right to cut and remove timber, and hunting and fishing rights.  PSOF ¶ 2.

In 1910, the northern two-thirds of the ceded strip became the eastern half of Glacier
National Park.  16 U.S.C. § 161*; see generally United States v. Kipp*, 369 F. Supp. 774, 775–77 (D.
Mont. 1974).  The remaining one-third became part of the Rocky Mountain Division of the Lewis
and Clark National Forest.  PSOF ¶ 3.  Specifically, these lands are managed as the "RM-1 unit,"
and are commonly referred to as the Badger-Two Medicine area, after two streams in the area.
PSOF ¶ 3.  The RM-1 unit is generally bounded on the west by the Continental Divide and the
Flathead National Forest, on the north by the Great Northern Railroad, U.S. Highway 2, and
Glacier National Park, on the east by the Blackfeet Reservation and private and state lands, and on
the south by the Helena National Forest.  PSOF ¶ 3.

By 1980, the Lewis and Clark National Forest had a backlog of over 200 oil and gas lease
applications, some of which had been pending since 1971.  PSOF ¶ 4.  To alleviate this backlog
and in an effort to comply with the 1980 Energy Security Act, 42 U.S.C. § 8855, the Forest
Service prepared an environmental assessment ("EA") for oil and gas leasing on non-wilderness
lands in the Lewis and Clark National Forest ("Leasing EA").  PSOF ¶ 5.  In preparing the

---

[7] Plaintiff's Statement of Material Facts ("PSOF") is filed concurrently herewith.

Leasing EA, the Forest Service acknowledged, *inter alia*:  (1) that hydrocarbons on the Lewis and Clark National Forest are likely to be found as natural gas; and (2) it generally takes "*from 2 to 10 years after lease issuance before natural gas becomes available to consumers*."  PSOF ¶ 6. (emphasis added).

On February 18, 1981, the Forest Service approved the Leasing EA by issuing a Record of Decision and Finding of No Significant Impact.  PSOF ¶ 9.  Based on the analysis and evaluation contained in the Leasing EA, the Forest Service adopted Alternative 3, which provided for recommending to the BLM that leases be issued with standard stipulations, and, if necessary, special stipulations to adequately protect other resources.  PSOF ¶ 8.  For lease applications or portions thereof located in areas that could not be adequately protected, the applications would be denied or issued with "no surface occupancy" restrictions.  PSOF ¶ 8. Although the Record of Decision was an appealable decision, no appeals were filed.  PSOF ¶ 9.

On May 24, 1982, the BLM issued Sidney M. Longwell Lease M-53323, which covers approximately 6,247 contiguous acres in the RM-1 unit.[8]  PSOF ¶¶ 11–13.  M-53323 became effective on June 1, 1982.  PSOF ¶ 13.  The leased acres are part of the ceded strip and are basically surrounded by the Lewis and Clark National Forest, although the Great Northern Railroad, U.S. Highway 2, and Glacier National Park form the west boundary, and private lands form part of the north boundary.  PSOF ¶ 13.  No protests of the issuance of the M-53323 were filed.  PSOF ¶ 13.

M-53323 was "issued for a period of ten (10) years . . . pursuant and subject to the provisions of the Mineral Leasing Act and subject to all rules and regulations of the Secretary of the Interior now or hereafter in force when not inconsistent with and express and specific

---

[8] Mr. Longwell was 44 years old when M-53323 was issued; he is now 76 years old.  PSOF ¶ 12.

provisions herein, which are made a part hereof."  PSOF ¶ 14.  Importantly, M-53323 granted

Mr. Longwell the:

> [E]xclusive right and privilege to drill for, mine, extract, remove and dispose of
> all of the oil and gas deposits, except helium gas, in the lands leased, together
> with the right to construct and maintain thereupon, all works, buildings, plants,
> waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks,
> pumping stations, or other structures necessary to the full enjoyment thereof, for
> a period of 10 years, and so long thereafter as oil and gas is produced in paying
> quantities . . . .

PSOF ¶ 15.  M-53323 also included extensive stipulations for the protection of the surface,

wildlife habitat, endangered and threatened species, and cultural resources.  PSOF ¶¶ 19–21.

On June 2, 1983, Mr. Longwell assigned Lease M-53323 to America Petrofina Company

of Texas, and others (collectively and individually referred to as "Fina").  The BLM approved

this assignment on December 9, 1983, effective July 1, 1983.  PSOF ¶ 22.  In making this

assignment, Mr. Longwell reserved a production payment, which would be paid out of a

percentage of the value of the oil and gas produced from the leased lands.  *Id*.

On or about October 18, 1983, and in full compliance with all relevant statutes and

regulations, Fina submitted an APD to drill the Federal South Glacier #1-26 well on M-53323 in

Section 26, T30N, R13N, PMM, Glacier County, MT.  PSOF ¶ 23.  The proposed well site is in

the north end of the RM-1 unit, approximately 2 miles from private land, approximately 3 miles

southeast of the Great Northern Highway, Glacier National Park, and U.S. Highway 2, and

approximately 9 miles southwest of East Glacier, Montana.  PSOF ¶ 23.  Specifically, Fina

proposed drilling a 13,510-foot exploratory well to test and evaluate oil and gas potential of the

geologic structure known as the Northern Disturbed Belt of the Western Overthrust Belt.[9]  PSOF

---

[9] "The Western Overthrust Belt is a geological formation extending from Alaska into Mexico
and which crosses the states of Montana, Idaho, and Wyoming . . . ."  *Mountain States Legal
Foundation v. Andrus*, 499 F. Supp. 383, 386 (D. Wyo. 1980).  "Estimates of the potential of the

¶¶ 23, 26.  Along with the APD, Fina submitted a surface use plan.  PSOF ¶ 24.  The surface use

plan, *inter alia*, proposed three alternative access routes to the well site, all of which would be 14

feet wide with a maximum grade of 6 percent and be approximately 6 miles in length.[10]  *Id*.

In November 1983, the BLM and the Forest Service began reviewing the proposed APD

and surface use plan under NEPA, the NHPA, and other applicable statutes.[11]  PSOF ¶ 28.

Around this time, the Blackfeet Tribe passed a resolution expressing its desire to join with Forest

Oil Corporation to develop the oil and gas resources in the ceded strip.  PSOF ¶ 29.

In January 1985, the Forest Service and the BLM finalized a joint environmental

assessment for the surface use plan and the APD.  PSOF ¶ 30.  The conclusion of the two

agencies was that the proposed project, as limited by the lease stipulations and the additional

conditions of approval imposed by the agencies, should be approved because the proposed

surface use and drilling activities could be performed without causing a significant

environmental impact.  *Id*.  Importantly, activities under the APD and surface use plan would

not affect the Blackfeet Tribe's reserved rights in the RM-1 unit and "no religious site or

activities were identified in the project area . . . ."  *Id*.

---

northern extension of the Overthrust Belt through western Montana for undiscovered recoverable
oil and gas resources have been as high as 10 billion barrels of oil and 100 trillion cubic feet of
natural gas."  *Id*.; *see* PSOF ¶ 26.  The Overthrust Belt "is typified by a geology so complex that
the 'movement of a potential well site only a few hundred feet can make the difference between
a dry hole and a new discovery.'"  James B. Martin, *The Interrelationships of the Mineral Lands
Leasing Act, the Wilderness Act, and the Endangered Species Act:  A Conflict in Search of
Resolution*, 12 Envtl. L. 363, 397 (1982) (quoting U.S. Department of the Interior, *Onshore Oil
and Gas Leasing Policy Review* 34–35 (1979)).

[10] Fina also submitted a cultural resource inventory report, prepared by Historical Research
Associates, that documented the pedestrian survey for cultural resources performed on the well
site and the three proposed access routes.  PSOF ¶ 25.  No cultural resources were located during
the survey.  *Id*.

[11] Because Fina did not propose any production activities, a separate NEPA process would be
conducted once production activities were proposed.  PSOF ¶ 23.

On January 31, 1985, the BLM issued a Record of Decision and Finding of No
Significant Impact approving the APD, based upon the environmental assessment and the Forest
Service's approval of the surface use plan.  PSOF ¶ 31. Importantly, the BLM's approval of the
APD was subject to Fina abiding by all lease stipulations and the additional mitigation measures
that were imposed as conditions of approval.  *Id*.

In March 1985, the BLM's approval of the APD was appealed to the Interior Board of
Land Appeals ("IBLA").  PSOF ¶ 32.  On August 9, 1985, the IBLA set aside the BLM's
decision and remanded with instructions for the BLM to further consider four issues.  PSOF ¶
33.

On August 16, 1985, in light of the IBLA's decision, Fina requested a suspension of
operations and production for M-53323, to toll the running of the primary term while the BLM
addressed the remanded issues.  PSOF ¶ 34.  On November 13, 1985, the BLM granted the
suspension, effective October 1, 1985.[12]  PSOF ¶ 35.

In June 1986, the Forest Plan for the Lewis and Clark National Forest was approved.
PSOF ¶ 37.  The 1986 Forest Plan established goals, management direction, and resource
standards and stipulations to minimize effects of oil and gas related activity on the Rocky
Mountain Division of the Lewis and Clark National Forest, including the RM-1 unit where M-
53323 is located.  *Id*.  In approving the Forest Plan, the Forest Service specifically concluded that
exploration for oil and gas should continue in the RM-1 unit because of these protective
measures.  *Id*.  The Forest Service also concluded that this area would continue to be managed
for oil and gas, wildlife, range, and semi-primitive recreational uses because such uses would not

---

[12] As demonstrated below, Defendants have repeatedly suspended M-53323 since October 1,
1985.  Because M-53323 has been suspended for 28 years and counting, M-53323 is still in its
ten-year primary term.  *See* PSOF ¶¶ 35–36, 61–71.

infringe on the Blackfeet Tribe's reserved rights in the area.  *Id*.  Importantly, the Forest Service concluded that the RM-1 unit was not eligible for wilderness designation because of these reserved rights.  FS1095.  *Id*.

On April 13, 1987, after addressing the remanded issues, the Forest Service and the BLM reapproved the surface use plan and the APD, respectively.  PSOF ¶ 38.  The approvals were expressly subject to Fina abiding by the all the lease stipulations and conditions of approval imposed by the agencies in their 1985 decision.  *Id*.

The BLM's decision to reapprove the APD was appealed to the IBLA.  PSOF ¶ 39.  The BLM, however, refused to defend its decision.  PSOF ¶¶ 40–41.  Instead, at the urging of the Forest Service, the BLM moved for a voluntary remand.  *Id*.  On July 31, 1987, the IBLA granted the BLM's motion, vacated the approved APD, and remanded for further action.  PSOF ¶ 42.

On February 23, 1988, notice was published in the *Federal Register* that the Forest Service had decided to combine the NEPA analysis for Fina's APD with an APD submitted by Chevron on a lease it owned approximately six miles away from M-53323.  PSOF ¶ 44.  Chevron's lease was also within the RM-1 unit.  *Id*.

On December 4, 1990, after all the public comments were considered, a voluminous and comprehensive Final EIS for the Fina and Chevron APDs was issued.  PSOF ¶¶ 45–46.  On February 19, 1991, based upon the Final EIS, the Forest Service and the BLM issued a joint Record of Decision, approving Fina's surface use plan and APD.[13]  PSOF ¶ 47.  This was the third time approval had been granted.  *Id*.  Importantly, activities conducted under the approved

---

[13] Decisions on Chevron's surface use plan and APD were deferred.  PSOF ¶ 48.

surface use plan and APD would not affect cultural resources or Blackfeet Tribe's reserved rights.  *Id*.

The BLM's approval of the APD was appealed to the IBLA.[14]  PSOF ¶ 52. The BLM, however, again refused to defend; choosing to move for a voluntary remand.  PSOF ¶ 53.  On August 5, 1991, the IBLA granted the BLM's motion, dismissed the appeals without prejudice, and remanded in accordance with the BLM's request.  PSOF ¶ 54.  After the remand, the BLM reversed its own decision approving the APD and chose to conduct its own independent study of the surface related issues, even though it had previously adopted the Forest Service's approval of the surface use plan.  PSOF ¶55.

Seventeen months later, after the BLM had completed another review of the surface-related issues, the APD was approved for the fourth time, this time by the Assistant Secretary, Department of the Interior.  PSOF ¶¶ 57–58.  This approval was again subject to Fina complying with all lease stipulations and additional mitigation measures that were imposed as conditions of approval.  *Id*. ¶ 58.  Importantly, authorized activities would not affect any identified cultural resources or the Blackfeet Tribe's reserved rights.  *Id*.

On June 4, 1993, after a change in administrations, the new Secretary of the Interior, Bruce Babbitt, suspended the approved APD for one year.  PSOF ¶ 61.  The stated purpose for this suspension was in aid of proposed legislation because a bill, S. 853, had been introduced regarding the RM-1 unit.  *Id*.  Despite Congress never seriously considering the proposed legislation, one-year suspensions were again imposed in both 1994 and 1995.  PSOF ¶¶ 61–63.

---

[14] Around the same time, the Forest Service received appeals regarding its approval of Fina's surface use plan.  PSOF ¶ 51.  The Blackfeet Tribe appealed on, *inter alia*, its belief that it still owned the mineral resources in the ceded strip.  *Id*.  The Tribe did not appeal on the ground that the area had religious and/or cultural significance.  *Id*.  The Forest Service denied all of the appeals.  *Id*.

14

In spring of 1996, the Forest Service, through further analysis of Chevron's APD, concluded that there was a purported traditional cultural district ("TCD") that covered approximately 90,000 acres in the RM-1 unit.  PSOF ¶ 64.  Fina's proposed well site was outside the purported TCD, although a portion of the TCD, as originally drawn, overlapped a small segment of Fina's proposed access route where it crossed private land on the north-end of the RM-1 unit.  *Id.*  Because the Forest Service allegedly had to seek a determination from the Keeper of the National Register as to whether the purported TCD was eligible for listing on the National Register, the BLM suspended M-53323 for another year, effective July 1, 1996.  PSOF 64–65.

By April 18, 1997, the Forest Service had not secured a determination as to the eligibility of the purported TCD.  PSOF ¶¶ 66–67.  Based upon the Forest Service's failure, the BLM suspended M-53323 for another year, effective July 1, 1997.  *Id.*

On May 21, 1997, the Forest Service finally submitted a nomination form to the Keeper of the National Register for a formal determination of eligibility of the purported TCD, which was referred to as the Badger-Two Medicine TCD.  PSOF ¶ 68.  The Forest Service advised the Keeper that the Blackfeet Tribe fully agreed with the proposed boundary of the TCD.  *Id.*

On November 25, 1997, the Keeper sent a letter to the Forest Service requesting additional information regarding the inclusion of the private lands and modern structures in the proposed TCD.  PSOF ¶ 69.  Three months later, the Forest Service advised the Keeper that it agreed that the boundaries of the proposed TCD should be modified to eliminate the private lands.  *Id.* ¶ 70.  The Forest Service further advised that the Blackfeet Tribe had agreed to this modification.  *Id.*.  Finally, the Forest Service advised the Keeper that it would submit a modified nomination package by the fall/winter of 1998.  *Id.*

On July 15, 1998, because of the Forest Service's continued failure to move the NHPA process along, the BLM suspended M-53323 again, effective July 1, 1998.  PSOF ¶ 71.  Perhaps recognizing that there was no end in sight, the BLM made this suspension indefinite, *i.e.*, until the Forest Service completed the NHPA process.  *Id*.

On April 5, 1999, Fina—understandably fed up with the endless delay—assigned M-53323 back to Mr. Longwell.  PSOF ¶ 72.  When Mr. Longwell later assigned the lease to Solenex (PSOF ¶84), Solenex acquired all rights in M-53323 and to the approved APD.  *Amber Resources Co. v. United States*, 538 F.3d 1358, 1378 (Fed. Cir. 2008) (assignee of a federal oil and gas lease steps into the shoes of its assignor).

In late January 2000, the Forest Service finally submitted to the Keeper the updated documentation with the necessary modifications that the Forest Service promised to provide by the fall/winter of 1998.  PSOF ¶ 73.  The Forest Service, however, neglected to submit the complete package and had to supplement its submission on April 5, 2001.  *Id*.  On May 25, 2001, the Keeper advised the Forest Service that its documentation was again insufficient.  PSOF ¶ 74.  In December 2001, the Forest Service finally submitted the proper documentation and the Keeper determined the purported TCD eligible on January 31, 2002.  PSOF ¶ 76–77.

Over twenty months later, the Forest Service finally hosted a consulting party meeting under Section 106 of the NHPA.  PSOF ¶¶ 78, 81, 82–83.  Although the Blackfeet Tribe had agreed to the boundaries of the purported TCD, which excluded the proposed well site and access route, they now suggested that the purported TCD should be expanded.  PSOF ¶¶ 68, 70, 85–86.  After giving the Blackfeet Tribe time to create new information, the Forest Service then suspended the consulting party process in January 2004.  PSOF ¶¶ 82–83, 85.

In January 2014, after this lawsuit was filed, the Forest Service finally hosted another consulting party meeting.  PSOF ¶¶ 104–106.  During the ten years between consulting party meetings, the Forest Service did very little while paying the Blackfeet Tribe and consultants to generate study after study in a purported effort to justify expanding the boundary of the purported TCD.  PSOF ¶¶ 86–88.  The first study, completed in 2006, determined that approximately 29,000 acres in the north end of the RM-I unit should be added to the purported TCD.  PSOF ¶ 87.  These acres embraced the entirety of M-53323.  *Id*.  Notwithstanding that the purported TCD now covered approximately 120,000 acres and the entirety of M-53323, the Forest Service did not seek to reconvene the consulting parties to complete the Section 106 process.  PSOF ¶¶ 87–88.  Instead, the Forest Service waited until two more studies were completed, which recommended that the purported alleged TCD be expanded to embraced approximately 165,000 acres.  PSOF ¶¶ 88.  Even after these studies were completed, the Forest Service still did nothing; instead, the Forest Service commissioned another study to consolidate all the previous studies.  PSOF ¶ 88, 94.  After this study was completed in December 2012, the Forest Service still did nothing, until it received a letter from Solenex advising that it may seek judicial review of the decades-long delay.  PSOF ¶¶ 96–97.

Although the Forest Service has now held two consulting party meetings in 2014, Solenex is still no closer to exercising its rights under M-53323 and the approved APD.  PSOF ¶¶ 104–112.  The Forest Service estimates that the Section 106 process could stretch into 2015.  PSOF ¶ 107.  No matter the outcome of that process, the Forest Service has stated that it will initiate another NEPA process because the previous analyses it completed in 1985, 1987, 1991, and 1993, are purportedly stale.  PSOF ¶¶ 107, 111.  If history is any indication, Solenex may be looking at another 30 years before it can exercise its valuable lease rights.

## ARGUMENT

## I.  THIS COURT CAN REVIEW SOLENEX'S CLAIMS OF UNREASONABLE DELAY.

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., a person "suffering legal wrong" or "adversely affected or aggrieved" by "final agency action" is entitled to judicial review.  5 U.S.C. §§ 702, 704; *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882 (1990) (To obtain judicial review under the APA, a plaintiff must challenge "final agency action"). "Agency action" is defined as, *inter alia*, the "failure to act."  5 U.S.C. § 551(13).  An agency's failure to act either constitutes final agency action for purposes of the APA, or is an exception to the final agency action requirement.  *See Sierra Club v. Thomas*, 828 F.2d 783, 792–94 (D.C. Cir. 1987) ("agency inaction may represent effectively final agency action that the agency has not frankly acknowledged"); *Public Citizen Health Research Grp. v. Commissioner, FDA*, 740 F.2d 21, 30–32 (D.C. Cir. 1984) (suggesting judicial review of agency delay under 5 U.S.C. § 706(1) is an exception to the final agency action requirement).

More importantly, the APA mandates that "[w]ith due regard for the convenience and necessity of the parties . . . and within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).  "This is no precatory declaration."  *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856, 861 (4th Cir. 1961), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  It is a mandate made enforceable by 5 U.S.C. § 706(1), which requires that reviewing courts "*shall* . . . compel agency action unlawfully withheld or unreasonably delayed . . . ."  5 U.S.C. § 706(1) (emphasis added).  Together, "[t]hese provisions give courts authority to review ongoing agency proceedings to ensure that [agencies] resolve the questions in issue within a reasonable time."  *Pub. Citizen Health Research Grp.*, 740 F.2d at 32; *Atl. & Gulf Stevedores, Inc. v. Donovan*, 274 F.2d 794, 802 (5th Cir. 1960) (Congress provided in

[5 U.S.C. § 706(1)] that Courts may review the inaction of an agency and specifically "compel agency action unlawfully withheld or unreasonably delayed.  And enforcement may be by a mandatory injunction." (footnotes omitted)).  Indeed,

> [T]here must be a "rule of reason" to govern the time limit to administrative proceedings.  Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans.

*Potomac Elec. Power Co. v. I.C.C.*, 702 F.2d 1026, 1034 (D.C. Cir. 1983), *supplemented*, 705 F.2d 1343 (D.C. Cir. 1983).

The duty to "compel agency action unlawfully withheld or unreasonably delayed" provided by 5 U.S.C. § 706(1) is a restatement of "existing judicial practice" at the time of the APA's passage under which courts issued "[o]rders in the nature of a writ of mandamus . . . to compel an administrative agency to act," *or* "to compel an agency or officer to perform a ministerial or non-discretionary act."  U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act*, 108 (1947) (citations omitted); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63–64 (2004) ("*Southern Utah*").  Granted, mandamus-type relief "is an extraordinary remedy reserved for extraordinary circumstances."  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004).  Yet, "[a]n administrative agency's unreasonable delay presents such a circumstance because it signals the "'breakdown of regulatory processes.'"  *Id.* (*quoting Cutler v. Hayes*, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987)).  Thus, mandamus-type relief is available when an agency has refused to perform a statutory duty or has unreasonably delayed in doing so.  *Sierra Club v. Thomas*, 828 F.2d at 793–94.  In the words of the Supreme Court, a claim under 5 U.S.C. § 706(1) may proceed "where a plaintiff asserts that an agency failed to take a

*discrete* agency action that it is *required to take*." *Southern Utah*, 542 U.S. at 64 (emphasis in original).

M-53323 has been suspended for over 28 years and there is no end in sight.  In granting the Secretary the authority to suspend a lease, Congress did not intend for the Secretary to suspend a lease permanently.  Indeed, a suspension may be granted only "for the purpose of encouraging the greatest ultimate recovery of" oil and gas.  30 U.S.C. § 209.  A permanent suspension results in no recovery.  Thus, a suspension may only be temporary.  BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "suspension" as "[t]he act of *temporarily* delaying, interrupting, or terminating something") (emphasis added); *Union Oil Co. of California v. Morton*, 512 F.2d 743, 750 (9th Cir. 1975) ("We therefore conclude that an *open-ended suspension* of the right granted [a lessee under the Outer Continental Shelf Lands Act] . . . would be a pro tanto cancellation of its lease.") (emphasis added); *Gulf Oil Corp. v. Morton*, 493 F.2d 141, 146–49 (9th Cir. 1973) (Outer Continental Shelf Lands Act lease contemplates and requires drilling so that repeated suspensions would at some point become unlawful).  Therefore, Defendants have a duty to lift the suspension on M-53323 and allowed Solenex to commence operations.

Similarly, to the extent Defendants may have to satisfy other statutes before lifting the suspension, Defendants have a statutory and contractual duty to complete those actions expeditiously.  *See California Co. v. Udall*, 296 F.2d 384 (D.C. Cir. 1961) (The MLA was intended to promote wise development of oil and gas resources and to obtain for the public reasonable financial returns on assets belonging to the public through private enterprise); *Rumsfeld v. Freedom NY, Inc*., 329 F.3d 1320, 1330 (Fed. Cir. 2003) (the United States is bound by the covenant of good faith and fair dealing when it enters into contracts).  Indeed, the exclusive right to drill for and develop the oil and gas granted by M-53323 is worthless without

20

the reciprocal duty on the part of Defendants to timely perform their statutory and contractual obligations. *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 620–21 (2000) (the federal government had a duty to timely consider a lessee's exploration plan, otherwise the bargain was illusory).

Accordingly, Defendants have failed to take a discrete action that they are required to take, whether that action is lifting the suspension or satisfying other statutes so that the suspension may be lifted. Therefore, Solenex has properly stated a claim for relief under 5 U.S.C. § 706(1) and this Court may review Solenex's claims of unreasonable delay.

## II.   DEFENDANTS HAVE UNREASONABLY DELAYED LIFTING THE SUSPENSION OR COMPLETING ADMINISTRATIVE ACTION REGARDING SOLENEX'S APD.

Before issuing an order under 5 U.S.C. § 706(1), this Court must determine whether Defendants have unreasonably delayed agency action. "There is no per se rule as to how long is too long to wait for agency action." *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). Thus, whether a delay is unreasonable is generally judged by application of the six factors outlined in *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*").

The factors are:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir.1999) (quoting *TRAC*, 750 F.2d at 80 (citations omitted)).[15]  Application of these factors demonstrates that Defendants cannot meet their heavy burden of proving their 30-year delay is reasonable.  *See Cutler*, 818 F.2d at 898 ("The agency must justify its delay to the court's satisfaction.").

> **A.    No Fathomable "Rule Of Reason" Justifies Defendants' 30-Year Delay.**

In an effort to exercise the rights granted under M-53323, Solenex's APD was properly submitted in 1983.  PSOF ¶23.  Although the APD has been approved four times (1985, 1987, 1991, and 1993), Solenex and its predecessors have been denied the ability to exercise their valuable lease rights for over 30 years.  PSOF ¶¶ 31, 38, 47, 58.  This delay is solely attributable to Defendants' eternal foot-dragging.  On its face, a 30-year delay is unconscionable and unreasonable as a matter of law.[16]  *Pub. Citizen Health Research Grp.* 740 F.2d at 34 ("In some circumstances agency delay may be so egregious that it constitutes unreasonable delay for APA purposes as a matter of law."); *see* PSOF ¶ 57 (the BLM conceding in 1992 that the "decisions concerning the Fina well have been delayed long enough"); *Id.* ¶ 75 (the BLM admitting that by 2001 the delay was unreasonable and extraordinary).  Indeed, Congress was not thinking about the geologic time scale when it mandated that agencies conclude matters within a "reasonable time."  5 U.S.C. § 555(b).  Thus, "a reasonable time for agency action is typically counted in weeks or months, not years."  *In re Am. Rivers*, 372 F.3d at 419; *see Midwest Gas Users Ass'n v.*

---

[15] These factors are not "ironclad," but are intended to provide "useful guidance in assessing claims of agency delay."  *TRAC*, 750 F.2d at 80.

[16] The longest agency delay ever upheld by any court may have been nine years.  *See Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1527 (D.C. Cir. 1990) (agency's nine-year delay in promulgating regulations regarding acid rain not unreasonable in light ongoing statutory program to study effects of acid rain); *Utah Int'l Inc. v. Andrus*, 488 F. Supp. 962, 974 (D. Utah 1979) (Department of the Interior's nine-year delay in processing lease application not unreasonable in light of "court injunctions and other factors beyond the Department's control.").

*FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987) ("[T]his court has stated generally that a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'" (quoting *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980)).

Even if one were to look at the time that has elapsed since the APD was last approved in 1993, the delay is unconscionable and unreasonable.  *See* PSOF ¶ 58.  On June 3, 1993, shortly before the suspension was going to be lifted in light of the APD being approved in January of that year (PSOF ¶ 58), then-Secretary of the Interior, Bruce Babbitt, continued the suspension for one year purportedly in aid of proposed legislation.[17]  PSOF ¶ 61.  Following that questionable suspension, similar suspensions were imposed in 1994 and 1995.  PSOF ¶¶ 62–63.  Then in 1996, the BLM imposed another one-year suspension to give the Forest Service time to complete a suspicious NHPA process.  PSOF ¶¶ 64–65.  When it became evident that the end of that process was nowhere in sight, the BLM indefinitely suspended M-53323 in 1998.  PSOF ¶¶ 68–71.

It is now 2014, and the NHPA process is in its 18th year.  PSOF ¶¶ 64–65, 104–112.  In passing the NHPA, Congress did not intend it to be a "full employment act" for government bureaucrats and their consultants.  Nor did Congress intend the NHPA to be a tool by which agencies could try to kill projects through endless process.  More egregiously, even if the Forest Service were to complete its extraordinarily long NHPA process, it then intends to initiate

---

[17] The proposed legislation, S. 853, would suspend oil and gas activities in the RM-1 unit while the area was studied for wilderness designation.  PSOF 61.  The area, however, had no chance to be designated wilderness because of the Blackfeet Tribe's reserved rights.  *See* PSOF ¶ 27.  Thus, S. 853 and Secretary Babbitt's suspension were simply ploys to delay the exercise of the rights granted under M-53323.

another NEPA process.[18]  PSOF ¶ 111.  Yet, Defendants have gone through the NEPA process

for the APD four times over the past thirty years.[19]  PSOF ¶¶ 31, 38, 47, 58.  If history is any

indication, it will take 3–4 years to complete another NEPA process, at considerable expense to

the taxpayers.  *See* PSOF ¶¶ 46, 58 (3 years to complete an EIS for Fina's and Chevron's APDs).

Any decision issued at the conclusion of that process will most likely trigger administrative

appeals and, possibly, judicial review.  Appeals and litigation could tack on another five years.

Assuming the Forest Service and the BLM do not botch this NEPA process (as they have in the

past), the best case scenario is that Solenex may be able to exercise its lease rights around 2023.

By that time, Mr. Longwell will be in his mid-80s.  *See* PSOF ¶ 12.

In short, there is no realistic end in sight to the ongoing 30-year delay and no fathomable

"rule of reason" can justify Defendants' extraordinary delay.  Thus, the first *TRAC* factor

demonstrates that Defendants have unreasonably delayed as a matter of law.  *In re Core

Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (noting the first *TRAC* factor is the most

important).

---

[18] Solenex is not suggesting that more NEPA is required, but the Forest Service's seemingly
piecemeal approach is extremely disturbing.  40 C.F.R. § 1500.2(c) (mandating that agencies
"[i]ntegrate the requirements of NEPA with other planning and environmental review procedures
required by law . . . so that all such procedures run concurrently rather than consecutively"); 36
C.F.R. § 800.3(b) (mandating that agencies "coordinate the steps of the section 106 process, as
appropriate, with the overall planning schedule for the undertaking and with any reviews
required under other authorities such as [NEPA]").  This seemingly piecemeal approach also
suggests bad faith.  *See* Part II-E, *infra*.
[19] In addition to the four NEPA processes conducted specifically for the APD, the Forest Service
also prepared a comprehensive EIS for the 1986 Forest Plan, which fully analyzed the effects of
oil and gas development on the Lewis and Clark National Forest, with specific attention paid to
oil and gas development within the RM-1 unit.  PSOF ¶ 19.

**B.**    **Defendants' Delay Is Unreasonable In Light Of The MLA And Congress's Intent That The Nation's Oil and Gas Resources Be Developed.**

The second *TRAC* factor indicates that the statutory scheme established by Congress may provide a "timetable or other indication of the speed" in which it expects the agency to act. *TRAC*, 750 F.2d at 80.  Although there is not a specific timetable in the MLA for processing an APD,[20] Congress passed the MLA to facilitate development of the Nation's oil and gas resources.  *Mountain States Legal Foundation*, 499 F. Supp. at 392 (ruling that the Secretary must administer the MLA so as to provide "incentive for" private companies to invest their time and money into developing the Nation's oil and gas resources).  Congress did not envision over 30 years elapsing before a lessee could exercise the rights granted in a federal oil and gas lease.[21]

Indeed, this is evident by the 10-year primary term:

> Competitive and noncompetitive leases issued under this section shall be for a primary term of 10 years[.] . . .  Each such lease shall continue so long after its primary term as oil or gas is produced in paying quantities.  Any lease issued under this section for land on which . . . actual drilling operations were commenced prior to the end of its primary term and are being diligently prosecuted at that time shall be extended for two years and so long thereafter as oil or gas is produced in paying quantities.

30 U.S.C. § 226(e).  By providing for a 10-year primary term, Congress believed that this was sufficient time for a lessee to demonstrate good faith by spudding a well.  *See* 43 C.F.R. § 3107.1 (indicating that drilling operations must be conducted in good faith at the end of the primary term to extend that term).  Good faith is a two-way street.  *Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014) (recognizing implied covenant of good faith

---

[20] The absence of a statutory deadline does not give Defendants "an open-ended time frame." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 39 (D.D.C. 2000).

[21] Defendants' 30-year delay sends a clear signal to the oil and gas industry to focus its attention on developing state and private resources.

25

and fair dealing in federal oil and gas leases).  Thus, 10 years is ample time for federal agencies to comply with all other applicable laws, including NEPA and the NHPA.

This conclusion is supported by the Energy Policy Act of 2005 ("EPAct"), Pub. L. No. 109-58, 119 Stat. 594 (2005), through which Congress further sought to facilitate oil and gas production from the public lands.  *Western Energy Alliance v. Salazar*, 10-CV-237F, 2011 WL 3738240, *2 (D. Wyo. 2011) ("Congress enacted the Energy Policy Act of 2005 (EPAct), in part to expedite oil and gas development within the United States.").  For example, to ensure timely action on APDs, Congress mandated that the Secretary of the Interior and the Secretary of Agriculture "ensure expeditious compliance" with all applicable environmental and cultural resources laws.  42 U.S.C. § 15921(a).  By mandating "expeditious compliance," Congress did not envision decades of delay.

Congress also amended the MLA to impose statutory time deadlines on the BLM relating to the processing of APDs.  Specifically, 30 U.S.C. § 226(p)(2) requires the BLM to process an APD in thirty days or provide to the lessee "a list of actions that need to be taken by the agency to complete compliance with applicable law together with timelines and deadlines for completing such actions."[22]  This amendment to the MLA reflects the importance Congress placed on the timely processing of APDs.  Indeed, as explained by the IBLA:

> [C]ompliance with the non-discretionary duty to act on an APD within 30 days of receipt of a complete APD was considered by Congress to be critical to ensuring a greater degree of predictability in APD processing, in order that the operator could appropriately plan its drilling activity, thereby, inter alia, satisfying contractual commitments to rig operators and others, preventing drainage from adjacent lands, and ensuring the viability of affected private and Federal leases.

*Brigham Oil & Gas*, *LP*, 181 IBLA 282, 287 (2011) (internal quotations omitted).

---

[22] Solenex has repeatedly requested that Defendants provide a timeline for when it could exercise its lease rights.  PSOF ¶¶ 89–93.  These requests have been repeatedly ignored.  *Id*.

In sum, Congress did not intend for lessees to have to wait decades before being able to exercise their lease rights.  Thus, Defendants' 30-year delay is unreasonable in light Congress's intent regarding the speed in which it wanted Defendants to comply with environmental statutes and to process APDs.[23]  Thus, the second *TRAC* factor demonstrates that Defendants have unreasonably delayed as a matter of law.

### C.  The Interests At Stake Weigh Heavily In Favor Of A Ruling That Defendants' Delay Is Unreasonable.

The third and fifth *TRAC* factors are generally considered together because they both consider the competing interests at stake.  *TRAC*, 750 F.2d at 80; *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991) (noting *TRAC*'s third factor "overlaps" with the fifth).  The importance of Solenex's interests cannot be underestimated.  Leases issued under the MLA constitute a contract and convey valuable property interests and rights that are protected by the Fifth Amendment to the United States Constitution.  *Mobil Oil*, 530 U.S. at 609 (oil and gas lease issued under Outer Continental Shelf Lands Act constituted a contract); *Griffin & Griffin Exploration*, 2014 WL 2199269 at *6 (lease issued under the MLA is a contract); *Lynch v. United States,* 292 U.S. 571, 579 (1934) ("[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment"); Karolyn King Nelson, *Takings Law West of The Pecos:  Inverse Condemnation of Federal Oil and Gas Lease Rights*, 37 Nat. Resources J. 253, 258 (1997) ("Oil and gas leases, including federal leases, are a unique hybrid of contract and real property rights."); *id*. at 259 (noting that the exclusive right to drill "is bargained for and is an

---

[23] Defendants' egregious delay is also a slap in the face to all Americans.  *See Potomac Elec. Power Co.*, 702 F.2d at 1034 ("[q]uite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities"); *Utah Int'l Inc.*, 488 F. Supp. at 974 ("The public has a generalized interest in having administrative matters resolved in an orderly fashion by agencies . . . ."); *Nader v. FCC*, 520 F.2d 182, 207 (D.C. Cir. 1975) (excessive delay indicates that an agency may be on the verge of "losing its ability to effectively regulate at all.").

essential element of the lease").  Because of the valuable contract and property rights involved, the refusal or failure of Defendants to discharge their statutory responsibilities in a timely manner also implicates due process concerns.  *See Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 590–92 (1926) (ruling that unreasonably protracted agency proceedings can be a denial of due process); *MCI Telecommunications Corp.,* 627 F.2d at 341 (the "delay in the resolution of administrative proceedings can also deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires."); *see also Heckler v. Chaney*, 470 U.S. 821, 851 (1985) (Marshall, J., concurring) (noting that "governmental refusal to act could have just as devastating an effect upon life, liberty, and the pursuit of happiness as coercive governmental action.").

It is anticipated that Defendants may argue that Solenex's interests are not deserving of protection because they are merely "economic."[24]  *TRAC*, 750 F.2d at 80 ("delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"); *but see Muwekma Tribe*, 133 F. Supp. 2d at 39 (noting nexus between human welfare and economic interests); 42 U.S.C. § 4331(a) (Congress indicating there is a nexus between general welfare and economic conditions).  This argument would be unavailing because Congress has recognized the important of Solenex's economic interests:

> It is the stated public policy of the United States to make public lands, including national forest land, available for mineral [exploration] in an effort to reduce our energy dependence on foreign sources and to protect our national security.

---

[24] Solenex's economic interests are not only based upon the possibility of future profits.  *See* PSOF ¶ 11 (indicating out-of-pocket expenses that have been incurred).  Unreasonably delaying the exercise of lease rights injures Solenex, and all lessees, because of the necessary up-front investments.  *See Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 742–43 (10th Cir. 1982) (ruling that uncertainty over the ability to drill inflicts economic injury on federal oil and gas lessees because of the substantial investment that must be made before deciding to drill an exploratory well).

*Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987),

*overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970

(10th Cir. 1992).  Indeed, this national policy is reflected in the title of the MLA: "An Act *To*

*promote* the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain."  41

Stat. 437 (1920) (emphasis added); *see California Co.*, 296 F.2d at 388 ("The public does not

benefit from resources that remain undeveloped, and the Secretary must administer the [MLA] so

as to provide some incentive for development.").  This national policy is further reflected in the

Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21(a), wherein Congress stressed that it

was in the country's best interest to "foster and encourage private enterprise in . . . the orderly

and economic development of domestic [oil and gas] resources . . . ." *See* 43 U.S.C. § 1701(12)

(Congress declaring it to be a national policy that "the public lands be managed in a manner

which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber

from the public lands including implementation of the Mining and Minerals Policy Act of 1970 .

. . as it pertains to the public lands[.]").  It is undisputed that interminable delays, such as that

being experienced by Solenex, frustrates the national policy because ultimately wells may not be

drilled, resulting in lost production and royalties.  Office of Inspector General, *Onshore Oil and*

*Gas Permitting, U.S. Department of the Interior*, at 1 (Report No. CR-EV-MOA-0002-2013,

June 2014), available at http://www.doi.gov/oig/reports/upload/CR-EV-MOA-0003-

2013Public.pdf (last checked July 2, 2014) ("Inspector General Report").  In short, Defendants'

30-year delay turns the national policy "on its head."

　　　In any event, Solenex's interests are not the only economic interests at stake.  The local

workforce has an economic interest because of the high-paying jobs that will be created if

Solenex can move forward on its approved APD.  *See* 119 Stat. 594 (2005) (EPAct titled:  "An

Act To ensure jobs for our future with secure, affordable, and reliable energy.");  PSOF ¶ 59.

Consumers have an economic interest in a low energy costs.  Justin Stolte, *The Energy Policy Act of 2005: The Path to Energy Autonomy?*, 33 J. Legis. 119, 120 (2006) (noting Congress passed EPAct in response to rising energy prices).  Taxpayers have an economic interest because Solenex will pay into the Treasury a 12½ percent royalty on the value of the production.  PSOF ¶ 16; *see California Co.*, 296 F.2d at 388 (The MLA "was intended to . . . obtain for the public a reasonable financial return . . . .");  Inspector General Report at 3 (The "onshore oil and gas program is a significant revenue source for the Federal Government averaging $3 billion in annual royalties since [FY] 2011.").  The State of Montana and the local governments have an economic interest because fifty percent of all money the Treasury receives will be returned to Montana, 30 U.S.C. § 191, for state and local governmental services.  Mont. Code Ann. § 17-3-240.

Even if only Solenex's economic interest were considered, Defendants lack a legitimate interest that could justify their decades-long delay.  *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991) ("Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform.");  *cf. Sun Oil Co. v. United States*, 572 F.2d 786, 801 (Ct. Cl. 1978) (It is an implied condition of every contract with the government that neither party will do anything to prevent, hinder or delay contract performance.).  Granted, Defendants have an interest in ensuring compliance with all applicable environmental laws.  *See Park County*, 817 F.2d at 620 ("NEPA . . . reflects an important public policy of this nation . . . .").  But Defendants' interest in complying with environmental laws cannot trump Solenex's valuable lease rights or Congress's intent in passing the MLA.  *See Mountain States Legal Foundation*, 499 F. Supp. at 392 (Congress did not intend for the

Secretary of the Interior to effectively withdraw large areas of land from mineral exploration and development based solely on preservation concerns); *Park County,* 817 F.2d at 620 ("[T]he hybrid goal for this nation is to encourage the development of domestic oil and gas production while at the same time ensuring that such development is undertaken with an eye toward environmental concerns.").

Moreover, at this point, any asserted interest in complying with environmental laws would be disingenuous because of the extraordinary length of Defendants' delay. Defendants have been allegedly trying to comply with NEPA and the NHPA for over 30 years. Compliance with NEPA and the NHPA is not rocket science.[25] These are very simple procedural statutes. In passing these statutes, Congress did not intend for federal agencies to frustrate the purpose of other statutes, such as the MLA, or defeat valuable property rights through endless study. *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) (the analysis "must end at some point, or NEPA simply becomes a tool to stall new projects indefinitely" (internal quotations omitted)); *cf. Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001) ("Government authorities . . . may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.").

Accordingly, the third and fifth *TRAC* factors weigh heavily in favor of a ruling that Defendants' delay is unreasonable as a matter of law. *See Cutler*, 818 F.2d at 898 ("Economic harm is clearly an important consideration and will, in some cases, justify court intervention."); *U.S. Women's Chamber of Commerce v. U.S. Small Bus. Admin.*, 1:04-CV-01889, 2005 WL 3244182, *17 (D.D.C. 2005) ("The fact that the interests the plaintiff seek to advance are purely

---

[25] Indeed, more challenging endeavors have been completed in much shorter periods of time. *Leo Sheep Co. v. United States*, 440 U.S. 668, 677 (1979) (transcontinental railroad built in 4 years), *Bryant v. Yellen*, 447 U.S. 352, 358 (1980) (Hoover Dam built in 6 years).

economic, however, does not diminish other indications that the defendants' delay is

unreasonable, nor does it preclude a finding of unreasonable delay under the APA."); *Sims v.*

*Ellis*, 972 F. Supp. 2d 1196, 1206–08 (D. Idaho 2013) (Mining claimant's economic interest in

acquiring a patent under the Mining Law justified an order requiring the BLM to act on the

patent application within 30 days).

### D.   Defendants Cannot Seriously Argue That Other Activities Have A Higher Or Competing Priority.

The fourth *TRAC* factor provides that a court should consider the effect of expediting

delayed action on agency activities of a higher or competing priority.  *TRAC*, 750 F.2d at 80.

Solenex's APD was submitted in 1983.  Defendants cannot seriously argue they have activities

of a higher or competing priority.  Indeed, "heads should roll," if Defendants have other

unfinished tasks that have been gathering dust for over 30 years.  Therefore the fourth *TRAC*

demonstrates that Defendants' delay is unreasonable as a matter of law.[26]  *See U.S. Women's*

*Chamber of Commerce*, 2005 WL 3244182, *18 (fourth *TRAC* factor weighed in favor of finding

unreasonable delay because the agency could not identify any activities having higher or

competing priorities).

### E.   Defendants' Bad Faith Conclusively Proves That Their Delay Is Unreasonable.

Under the sixth *TRAC* factor, "[i]f the court determines that the agency [has] delay[ed] in

bad faith, it should conclude that the delay is unreasonable."  *Cutler*, 818 F.2d at 898; *Tummino*

---

[26] This is especially true considering that Solenex is not asking to be placed at the head of the line—it is at the head of the line!  *See Kashkool v. Chertoff*, 553 F. Supp. 2d 1131, 1145 (D. Ariz. 2008) ("Plaintiff is not "cut[ting] in line," he has been patiently waiting in line for nearly six years without any indication that he is nearing the front of the line.  This Court will not deny relief to Plaintiff whose application has been unreasonably delayed merely because there may be others . . . whose applications have perhaps also been unreasonably delayed." (alteration in original)); *but see In re Barr Labs.*, 930 F.2d at 75 ("a judicial order putting [the petitioner] at the head of the queue simply moves all others back one space and produces no net gain.").

*v. Von Eschenbach*, 427 F. Supp. 2d 212, 231 (E.D.N.Y. 2006) ( "[A] delay that is the result of bad faith—that is, a delay for improper reasons—is a delay that is per se unreasonable."). Bad faith is generally defined "as singling someone out for bad treatment or demonstrating an utter indifference to a congressional deadline . . . ." *In re Barr Labs.*, 930 F.2d at 76. Here, the evidence of Defendants' bad faith is crystal clear.[27]

First, the overall length of the delay—30 years and counting— alone demonstrates bad faith. *See Tummino*, 427 F. Supp. 2d at 232 (a five-year delay "raises questions about the good faith of the [agency]."). Any suggestion that Defendants have been acting in good faith all these years would not pass the "straight-face test." *Nat'l Cong. of Hispanic Am. Citizens (El Congreso) v. Marshall*, 626 F.2d 882, 890 (D.C. Cir. 1979) (suggesting that the agency must prove that its delay was in good faith). This is especially true considering that Defendants have approved the APD 4 times. *See* PSOF 31, 38, 47, 58. Yet, the BLM refused to defend two of its own approvals (1987 and 1991); instead voluntarily asking to do more studying. PSOF ¶¶ 41, 53. The work that went into those approvals, however, was paid for by the taxpayers. Thus, the BLM's "flip-flopping of its position . . . resulted in an enormous waste of . . . resources." *United States v. Jenks*, 129 F.3d 1348, 1352 (10th Cir. 1997) (internal quotation omitted). Moreover, the BLM's "inability to take a firm but fair stand . . . for whatever reason tends only to erode confidence in its decision-making process, and undermine the perceived legitimacy of [that process]." *Id*. As a result, the BLM's actions suggest—if not prove—bad faith.

---

[27] Even if this Court were to determine there is an absence of bad faith, that would not mean Defendants' delay is reasonable. *TRAC*, 750 F.2d at 80 (A court "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" (internal quotation omitted)) ; *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1397, 1400 (D.D.C. 1988) ("an agency's good faith does not preclude a conclusion that action has been unreasonably delayed").

Second, the length of time Defendants have been purportedly trying to comply with the NHPA—18 years and counting—demonstrates bad faith.[28]  In merely asking agencies to consider the effects of undertakings on historic properties, Congress did not intend for the process to take nearly two decades.  Indeed, the NHPA is merely a "stop, look, and listen" statute.  *Illinois Commerce Comm'n*, 848 F.2d at 1261.  It was not designed to provide an excuse for an agency to stop and study *ad nauseum* until, perhaps, the project proponent gives up.

It is anticipated that Defendants will argue that their extraordinary NHPA delay is justified because "new" evidence allegedly kept coming to light.  This argument would not hold water.  Even if the so-called new evidence were legitimate,[29] at some point an agency must close the record and make a decision.  As explained by the Supreme Court, "otherwise" agency decision-making would become "intractable," because the agency would always be waiting for "updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 373 (1989).  Indeed, "[a]dministrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated."  *ICC v. Jersey City*, 322 U.S. 503, 514 (1944).

---

[28] Five of those years (1996–2001) were wasted while the Forest Service sought a determination of eligibility from the Keeper.  PSOF ¶¶ 64–74.  Such a determination is not necessary to complete the Section 106 process.  36 C.F.R. § 800.4.  Taking five years to acquire such a determination demonstrates either inefficiency or incompetence.  Both scenarios suggest bad faith.

[29] The boundaries of the alleged TCD were confirmed by the Keeper in 2002.  PSOF ¶ 77.  At that time, the boundaries of the TCD did not overlap with either the proposed well site or the access route.  *Id*. ¶ 77.  The Blackfeet Tribe agreed to those boundaries.  PSOF ¶¶ 68, 70.  Only after Mr. Longwell expressed continued interest in drilling, did the Tribe suddenly change position, which purportedly prompted more studies.  PSOF ¶¶ 82–83, 85.  The Tribe's change in position and new-found concern for the area are questionable considering it previously wanted to exploit the mineral wealth in RM-1 unit for its own financial gain.  PSOF ¶ 29, *see Vermont Yankee*, 435 U.S. at 553 ("administrative proceedings should not be a game or a forum to engage in unjustified obstructionism").

If an agency could justifiably delay a decision every time so-called "new" evidence arose, "there would be little hope that the administrative process could ever be consummated . . . ." *Id.*

Third, that the Forest Service did not reconvene the consulting parties until after this lawsuit was filed demonstrates bad faith. By 2006, the Forest Service had a recommendation that the purported TCD should be expanded to include approximately 30,000 additional acres in the north end of the RM-I unit, including the entirety of M-53323.[30] PSOF ¶¶ 87–88. Factoring in this recommendation, the purported TCD would encompass approximately 120,000 acres. *See id.* Considering the massive size of 120,000 acres (155 square miles), there is no reason why the Forest Service could not have reconvened the consulting parties to assess the effects, if any, of the proposed well and access route in 2006. Indeed, the area of potential effects, as originally determined by the Forest Service, encompassed only approximately 5,000 acres, or 4 percent of the newly expanded TCD. PSOF ¶ 83. But, instead of reconvening the consulting parties, the Forest Service spent the next 6 years (2006–2012) doing additional studies at taxpayer expense. PSOF ¶¶ 87–94. To make matters worse, after those studies were completed, the Forest Service took no further action until June 2013, after Solenex advised it intended to seek judicial review. PSOF ¶ 96. Since then, the Forest Service's actions have continued to proceed at a glacial pace because it did not hold a consulting party meeting until January 29, 2014. PSOF ¶ 106. In short, the Forest Service simply squandered 7–8 years, which demonstrates bad faith.

Fourth, the Forest Service's bad faith is further confirmed by its actions in expanding that area of potential effects to approximately 165,000 acres. *See* PSOF ¶ 102. In 2003, the Forest Service determined that the area of potential affects was approximately 5,000 acres. PSOF ¶ 83. This determination was based upon the proposed activities and scientific factors. *Id.* At the

---

[30] In making this argument, Solenex is not conceding the validity of the purported TCD or that the boundaries of the purported TCD should be expanded to overlap M-53323.

January 29, 2014, consulting party meeting, the Forest Service advised that the area of potential effects had expanded to approximately 5,700 acres to include the entire access route.  PSOF ¶ 105.  This determination was also based upon the proposed activities and scientific factors.  *See* PSOF ¶¶ 83, 105.  Based upon the revised area of potential effects, the consulting parties began considering the possible effects of the proposed well and access route on the purported TCD. PSOF ¶ 105.

At the April 3, 2014, consulting party meeting, however, the Forest Service advised that it had expanded the area of potential effects to include the entire purported TCD, *i.e.*, 165,000 acres.[31]  PSOF ¶ 108.  This nearly 2,800 percent increase was not based upon a change in the proposed activities or scientific factors; instead, the Forest Service simply expanded the area of potential effects because of purported religious concerns expressed by the Blackfeet Tribe. PSOF ¶¶ 106, 108.  The southern boundary of the purported TCD, as expanded, is over 20 miles from the proposed well site.  PSOF ¶ 108.  It is physically impossible for the proposed activities to have an effect on anything that far away.[32]  By allowing the Tribe to unilaterally dictate the size of the area of potential effects based upon purported religious reasons, the Forest Service has turned the entire consulting party process into a charade and has essentially ceded the land back

---

[31] In so doing, the Forest Service rendered the January 29, 2014 consulting party meeting a waste of taxpayers' dollars and Solenex's time and money.  *See* PSOF ¶ 106.  The Forest Service also violated the Section 106 process by allowing the purported TCD to dictate the size of the area of potential effects.  Under the Section 106 regulations, the area of potential effects is determined *first,* based upon scientific factors.  36 C.F.R. § 800.4(a).  Then, based upon this area of potential effect, a determination must be made as to whether any historic properties "within the area of potential effects" may be affected.  36 C.F.R. § 800.4(a)(1).  In other words, the Forest Service put the cart (the purported TCD) before the horse (the area of potential effects).  In short, the Forest Service is sabotaging the Section 106 process.

[32] If one well could have an effect 20 miles away, one would expect the Tribe to have imposed a 20-mile-wide, no-drilling zone on the southwest boundary of Reservation to avoid potentially affecting the purported TCD.  That has not occurred because the Tribe would lose potential royalties.  *See* PSOF ¶ 109 (Blackfeet Tribe seeking to encourage oil and gas companies to drill on the Reservation).

to the Tribe.  Yet, the Supreme Court has ruled that, notwithstanding the purported religious

significance of public lands, a tribe cannot dictate the uses of those lands.  *Lyng v. Nw. Indian*

*Cemetery Protective Ass'n*, 485 U.S. 439, 447–53 (1988); *cf. United Nuclear Corp. v. United*

*States*, 912 F.2d 1432, 1433–38 (Fed. Cir. 1990) (federal government's conferral to a tribe of

veto power over the exercise of lease rights effectuated a taking).

Fifth, that Defendants have allowed thousands of other lessees to leapfrog Solenex

further demonstrates bad faith.  Solenex's APD was properly submitted in 1983, yet the proposed

well is no closer to being drilled than it was over 30 years ago.  In the meantime, Defendants

have approved over 2,500 APDs and allowed over 2,000 wells to be spudded on federal leases in

Montana.  PSOF ¶¶ 113–114.  It is hard to imagine a worse example of singling someone out for

bad treatment.[33]

Finally, Defendants' bad faith is demonstrated by their suggestion that Solenex pay off

the Tribe.  PSOF ¶ 110 (BLM suggesting that Solenex pay the Tribe $5 million in order to be

allowed to drill); *see* PSOF ¶ 109 (Tribe indicating that it would welcome drilling on the

Reservation).  This proves the illegitimacy of Defendants' delay.  *See Nollan v. California*

*Coastal Comm'n*, 483 U.S. 825, 837 (1987) (conditioning the issuance of a building permit on

the granting of a public easement is not a legitimate state interest, but simply "an out-and-out

plan of extortion." (quotation omitted)).  Accordingly, because of the overwhelming evidence of

Defendants' bad faith, the sixth *TRAC* factor proves that Defendants' delay is unreasonable as a

matter of law.

---

[33] That Solenex has been singled out for bad treatment is also demonstrated by the lightning
speed in which the Forest Service approved the construction of NorthWest Corporation's
pipeline through the RM-1 unit and M-53323.  PSOF ¶ 80.

### III.    BECAUSE DEFENDANTS' DELAY IS UNREASONABLE AS A MATTER OF LAW, THIS COURT MUST COMPEL DEFENDANTS TO ACT.

All six *TRAC* factors prove that Defendants' delay is unreasonable.  In fact, the evidence of unreasonable delay is staggering.  Thus, this Court should rule that Defendants' delay is unreasonable as a matter of law.  *Pub. Citizen Health Research Grp.,* 740 F.2d at 34 ("In some circumstances agency delay may be so egregious that it constitutes unreasonable delay for APA purposes as a matter of law.").

Once unreasonable delay is established, the APA requires that a reviewing court "*shall . . . compel agency action . . . .*" 5 U.S.C. § 706(1) (emphasis added).  "[W]hen a statute uses the word 'shall,' Congress has imposed a mandatory duty on the subject of the command."  *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989), *Pierce v. Underwood*, 487 U.S. 552, 569–70 (1988)); BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "shall" as "[h]as a duty to" or "is required to" and noting that "[t]his is the mandatory sense that drafters typically intend and that courts typically uphold.").  Thus, by using the word "shall" in 5 U.S.C. § 706(1), "Congress has stated unequivocally that courts must compel agency action unlawfully withheld or unreasonably delayed."  *Forest Guardians*, 174 F.3d at 1187; *but see In re Barr Labs.*, 930 F.2d at 75 ("a finding that delay is unreasonable does not, alone, justify judicial intervention").

Here, Defendants' egregious delay justifies an order compelling Defendants to immediately lift the suspension of M-53323 and the approved APD and allow Solenex to commence operations, effective July 1, 2015.  Postponing the effective date is necessary because, under the approved APD, operations may only be conducted from July 1 through November 30.  PSOF ¶¶ 21, 58.  In the alternative, and to the extent there remains any administrative action to complete, this Court should order Defendants to:  (1) identify any and all actions that have to be completed; (2)

expeditiously complete all actions; and (3) lift the suspension of M-53323 and the approved APD and allow Solenex to commence operations on July 1, 2015.

Solenex further recommends that this Court order the Secretary of the Interior and the Secretary of Agriculture to jointly issue the decision lifting the suspension and allowing operations to commence.  This will prevent Solenex from being further delayed by administrative appeals. *See* PSOF ¶ 58 (BLM asking that the Secretary approve the APD to avoid any further delay caused by administrative appeals).  Finally, Solenex recommends that this Court retain jurisdiction over this matter until Solenex is able to exercise its lease rights.  *See TRAC*, 750 F.2d at 81 (retaining jurisdiction until completion of administrative proceedings).

## CONCLUSION

For the foregoing reasons, this Court should enter summary judgment in favor of Solenex because there is no genuine issue of material fact and Solenex is entitled to judgment as a matter of law.  In addition, because Defendants' delay is unreasonable as a matter of law, Solenex is entitled to an order compelling Defendants to immediately lift the suspension of M-53323 and the approved APD and allow Solenex to commence operations, effective July 1, 2015.

DATED this 7th day of July 2014.

Respectfully submitted,

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2014, I electronically filed the foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

/s/ Steven J. Lechner       
Steven J. Lechner
