# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SOLENEX LLC, | ) | Civil Case No. 13-00993 (RJL) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| S.M.R. JEWELL, *et al*., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to LCvR. 7(h)(1), Plaintiff, Solenex LLC, hereby sets forth the material facts as to which it contends there is no genuine issue.[1]

1.     On September 26, 1895, the Blackfeet Tribe ceded approximately 400,000 acres along the western boundary of its Reservation in Montana to the United States ("ceded strip"). *See* 29 Stat. 321, 353–57 (1896).  On June 10, 1896, this Agreement was ratified by Congress. 29 Stat. at 357; *see generally Blackfeet Nations v. United States*, 81 Ct. Cl. 101, 114 (1935).

2.     As to the ceded strip, the Blackfeet Tribe made the following limited reservation:

[T]he right to go upon any portion of the lands hereby conveyed so long as the same shall remain public lands of the United States, and to cut and remove therefrom wood and timber for agency and school purposes, and for their personal uses for houses, fences, and all other domestic purposes: *And provided further*, That the said Indians hereby reserve and retain the

---

[1] These facts are largely supported by documents provided by Defendants.  The Forest Service documents are bates-stamped as "FS000000" and the BLM documents are bates-stamped as "HC00000."  Although this is not an administrative record review case, the parties have agreed to provide this Court with an appendix containing those documents cited or otherwise relied upon in their respective memoranda.  *See* LCvR 7(n)(1).  This appendix will be provided to the Court within 14 days of the parties' final memorandum.  *See* LCvR 7(n)(2).

> right to hunt upon said lands and to fish in the streams thereof so long as
> the same shall remain public lands of the United States under and in
> accordance with the provisions of the game and fish laws of the State of
> Montana.

29 Stat. at 354.

3.      In 1910, the northern two-thirds of the ceded strip became the eastern half of

Glacier National Park.  16 U.S.C. § 161; *see generally United States v. Kipp*, 369 F. Supp. 774,

775–77 (D. Mont. 1974).  The remaining one-third, located south of the Great Northern Railroad

and U.S. Highway 2, became part of the Rocky Mountain Division of the Lewis and Clark

National Forest.  Specifically, these lands are managed as the RM-1 unit of the Lewis and Clark

National Forest, and are commonly referred to as the Badger-Two Medicine area, after two

streams in the area.  FS001091–93.  The RM-1 unit is generally bounded on the west by the

Continental Divide and the Flathead National Forest, on the north by the Great Northern

Railroad, U.S. Highway 2, and Glacier National Park, on the east by the Blackfeet Reservation

and private and state lands, and on the south by the Helena National Forest.  FS001193

(depicting RM-1 unit in light blue).

4.      By 1980, the Lewis and Clark National Forest had a backlog of over 200 oil and

gas lease applications, some of which had been pending since 1971.  FS001203.  Over 85 percent

of those applications were for lands within the Rocky Mountain Division of the Lewis and Clark

National Forest.  *Id*.

5.      To alleviate this backlog of applications and in an effort to comply with the 1980

Energy Security Act, 42 U.S.C. § 8855, the Forest Service prepared an environmental assessment

2

("EA") for oil and gas leasing on non-wilderness lands administered by the Lewis and Clark

National Forest ("Leasing EA").[2]  FS001203.

6.      In preparing the Leasing EA, the Forest Service acknowledged, *inter alia*,

    a.      Hydrocarbons on the Lewis and Clark National Forest are likely to
            be found as natural gas.

    b.      It generally takes "from 2 to 10 years after lease issuance before
            natural gas becomes available to consumers."

Leasing EA at 5.

7.      In the Leasing EA, the Forest Service considered six alternatives for making

recommendations on leasing non-wilderness portions of the Lewis and Clark National Forest.

Leasing EA at 31–32.  These alternatives ranged from denying all lease applications to leasing

all applied for lands with appropriate stipulations to protect surface resources.  *Id.*

8.      The Forest Service selected Alternative 3.  Leasing EA at 61.  Under this

Alternative:

    a.      Leases with surface occupancy would be issued only for accessible
            areas that could be protected.

    b.      Lease denial or issuance of a no-surface occupancy ("NSO") lease
            would be recommended when an application is located entirely
            within an area that cannot be adequately protected.

    c.      Leases partially located in areas that cannot be protected would
            receive a NSO stipulation for those areas.

    d.      All leases would be subject to the standard stipulations (listed in
            Appendix A of the Leasing EA); additional stipulations (listed in
            Appendix B of the Leasing EA), and the surface use guidelines in
            Sections 6C and 6D of the Leasing EA;

    e.      After lease issuance, any proposed oil and gas activities would be
            analyzed under NEPA as required.

---

[2] A copy of the Leasing EA will be provided in the parties' appendix.

Leasing EA at 61.

9.      On February 18, 1981, the Forest Service issued a Decision Notice and Finding of No Significant Impact, approving the implementation of Alternative 3.  Leasing EA (first two pages).  Adversely affected parties had 45 days to file an appeal.  FS001204.  No appeals were filed.  *Id*.

10.     On June 9, 1981, based upon the Leasing EA, the Forest Service grouped 6,247 acres from expiring leases to form lease tract NW-21 for the upcoming lease drawing. HC00897–98.

11.     On April 6, 1982, the BLM advised Sidney M. Longwell that his application for lease tract NW-21 obtained a priority at the lease drawing.  Declaration of Sidney M. Longwell ¶ 3.[3]  The BLM further advised that the application would become an offer to lease upon Mr. Longwell's payment of the first year's rental in the amount of $1 per acre, *i.e.*, $6,247.00.  *Id*.; HC00895.

12.     On May 24, 1982, the BLM issued federal oil and gas lease M-53323 to Sidney M. Longwell.[4]  HC00884–94; FS001193.  Mr. Longwell was 44 years old when M-53323 was issued; he is now 76 years old.  Longwell Decl. ¶¶ 5, 15.

13.     M-53223 became effective on June 1, 1982, and covers 6,247 contiguous acres in Glacier and Flathead Counties, Montana.  *See* HC00884–94.  These acres are part of the ceded strip and are basically surrounded by the Lewis and Clark National Forest, although the Great Northern Railroad, U.S. Highway 2, and Glacier National Park form the west boundary, and private lands form part of the north boundary.  FS001193 (depicting RM-1 unit and M-53323);

---

[3] The Declaration of Sidney M. Longwell ("Longwell Decl.") is attached hereto as Exhibit 1.

[4] A readable copy of M-53323 will be provided in the parties' appendix.

*see also* 2014 BLM Map (depicting M-53323).[5]  No protests were filed challenging the BLM's issuance of M-53323.  FS002104.

14.    Lease M-53323 provides:

This oil and gas lease is issued for a period of ten (10) years . . . pursuant and subject to the provisions of the Mineral Leasing Act and subject to all rules and regulations of the Secretary of the Interior now or hereafter in force when not inconsistent with any express and specific provisions herein, which are made a part hereof.

HC00885.

15.    Section 1 of Lease M-53323 granted the:

[E]xclusive right and privilege to drill for, mine, extract, remove and dispose of all of the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil and gas is produced in paying quantities . . . .

HC00885.

16.    Section 2(d) of Lease M-53323 obligates the lessee to pay rentals and royalties to the United States.  HC00885.  Prior to "discovery," Section 2 requires the payment of rental of $1 per acre for the first five years and $3 per acre for the second five years.  HC00885.  After "discovery," a minimum royalty of $1 per acre or a royalty of 12½ percent of the value of the production is due.  HC00885.

17.    Section 2(j) obligates the lessee to "exercise reasonable diligence in drilling and producing the wells herein provided for unless consent to *suspend operations temporarily* is granted by the lessor . . . . ."  HC00885 (emphasis added).

---

[5] A copy of the 2014 BLM Map will be provided in the parties' appendix.

18.     Section 2(q) obligates the lessee "to take such reasonable steps as may be needed to prevent operations on the leased lands from unnecessarily" damaging the surface, natural resources and improvements, including objects of historic value.  HC00885.

19.     Lease M-53323 is subject to standard stipulations for the protections of the surface, cultural and paleontological resources, endangered and threatened species, esthetics, etc. HC00886, HC00889.

20.     Lease M-53323 is also subject to a surface disturbance stipulation and a stipulation for land under the jurisdiction of the Department of Agriculture.  HC00887–88.

21.     In accordance with the Leasing EA, M-53323 is also subject to the following special stipulations:

a.      Eighteen percent of the leased acreage is subject to a NSO stipulation, including a NSO stipulation within 400 feet of the Summit Campground;

b.      Forty-eight percent of the lease is subject to a surface use timing stipulation for elk winter range.  Under this stipulation, surface occupancy for pre-production activities, such as drilling, would be allowed only from May 1 to December 1.

c.      Fifty-seven percent of the lease is subjected to a limited surface use stipulation, which strictly controls surface use or occupancy within identified areas.

d.      One hundred percent of the lease is subject to an activity coordination stipulation, which allows the imposition of special time and space conditions to be imposed on activities for the protection of threatened and endangered species.

HC00890–93.

22.     On June 2, 1983, Mr. Longwell assigned Lease M-53323 to America Petrofina Company of Texas (25%), Petrofina Delaware, Inc. (25%), and AGIP Petroleum Company, Inc. (50%) (hereinafter collectively and individually referred to as "Fina").  HC00865–66; Longwell

Decl. ¶ 7.  The BLM approved this assignment on December 9, 1983, effective July 1, 1983. HC00865.  In making this assignment, Mr. Longwell reserved a production payment "to be paid out of five percent of ninety-five percent (5% of 95%) of the value of all the oil and gas which is produced and sold from lands covered by the lease . . . ."  Longwell Decl. ¶ 7.

23.     On or about October 18, 1983, and in full compliance with all relevant statutes and regulations, Fina submitted an application for permit to drill ("APD") the Federal South Glacier #1-26 well on M-53323 in Section 26, T30N, R13N, PMM, Glacier County, MT. FS000001–2.  The proposed well site is in the north end of the RM-1 unit, approximately 2 miles from private land, approximately 3 miles southeast of the Great Northern Highway, Glacier National Park, and U.S. Highway 2, and approximately 9 miles southwest of East Glacier, Montana.  FS000047; 2014 BLM Map.  Specifically, Fina proposed drilling a 13,510-foot exploratory well.  FS00001–2.  Because Fina did not propose any production activities, a separate NEPA analysis would be conducted once production activities were proposed. FS000051.

24.     Concurrently, Fina submitted a surface use plan that would be followed if the APD were approved.  FS000007–11.  The surface use plan, *inter alia*, proposed three alternative access routes to the well site, all of which would be 14 feet wide with a maximum grade of 6 percent and be approximately 6 miles in length.  FS000007–8.

25.     Fina also submitted a cultural resource inventory report, prepared by Historical Research Associates, that documented the pedestrian survey for cultural resources performed on the well site and the three proposed access routes.  FS000020–28.  No cultural resources were located during the survey.  *Id.*

26.     The area of the proposed well site has a very high potential for discovery of

natural gas and a somewhat lesser potential for discovery of oil.  FS000163–64.  Specifically,

> The proposed well site is situated within the Northern Disturbed Belt[,] which is a
> local portion of the Western Overthrust Belt.  The Western Overthrust Belt is a
> north-south trending geologic province which has yielded substantial amounts of
> oil and gas in southwestern Alberta for decades.  (Proven reserves of natural gas
> in the Alberta portion of the Overthrust Belt exceed 15 trillion cubic feet). . . .
> [T]he Overthrust Belt has yielded major discoveries of oil and gas in Utah and
> Wyoming."

* * *

> The USGS has estimated that as much as a billion barrels of undiscovered crude
> oil and 25 trillion cubic feet of natural gas may be recovered from the Montana
> portion of the Overthrust Belt.

*Id*.

27.     The area of the proposed well site and access road was designated by Forest

Service as a roaded area subject to multiple use management, and was determined not suitable

for wilderness designation.  FS00359.  Major uses in the project area included automobile traffic

(viewing), snowmobiling, livestock grazing, hunting, and firewood gathering.  FS000129,

FS000153.

28.     In November 1983, the BLM and the Forest Service began reviewing the

proposed APD and surface use plan under NEPA and other applicable statutes.  FS000032.

29.     On December 2, 1983, the Blackfeet Tribal Business Council unanimously

approved Resolution 94-84,[6] which provides:

> The Blackfeet Tribal Business Council is desirious [sic] of entering into a
> joint venture agreement with Forest Oil Corporation to acquire any and all
> rights to the surface and minerals within the Ceded Strip area as identified
> in all Treaties, Presidential Proclamations and other documents between
> the Blackfeet Tribe and the Congress of the United States[.]

---

[6] A copy of Resolution 94-84 will be provided in the parties' appendix.

That Resolution further provides:

> That the Blackfeet Tribal Business Council and Forest Oil Corporation
> will join efforts to take all necessary actions to secure the Blackfeet
> Tribe's right to explore and to develop hydrocarbons in the Ceded Strip
> area[.]

30.     In January 1985, the Forest Service and the BLM finalized a joint environmental assessment for the APD and surface use plan.  FS000031–354.  The conclusion of the two agencies was that the proposed project, as limited by the lease stipulations and the additional conditions of approval imposed by the agencies, should be approved because the proposed drilling activities could be performed without causing a significant environmental impact.  FS000032–36.  Importantly, activities under the APD and surface use plan would not affect the Blackfeet Tribe's reserved rights in the RM-1 unit and "no religious site or activities were identified in the project area . . . ."  FS000171–173.

31.     On January 31, 1985, the BLM issued a Record of Decision and Finding of No Significant Impact approving the APD based upon the joint environmental assessment.  FS000032–34.   Importantly, the approval was subject to Fina abiding by the extensive mitigation measures identified in the environmental assessment that were imposed as conditions of approval.   FS000035–36; FS000205–214 (listing conditions of approval).

32.     In March 1985, the BLM's approval of the APD was appealed to the Interior Board of Land Appeals ("IBLA").  *See* FS000358.

33.     On August 9, 1985, the IBLA rejected most of the appeal issues.  *Glacier–Two Medicine Alliance*, 88 IBLA 133 (1985).[7]  However, the IBLA set aside the BLM's decision and

---

[7] The IBLA's decision is reproduced at FS000355–378, and will be provided in the parties' appendix.

remanded with instructions for the BLM to further consider four issues.  *Glacier–Two Medicine Alliance*, 88 IBLA at 150–55.

34.     On August 16, 1985, in light of the IBLA's decision, Fina requested a suspension of operations and production for M-53323, to toll the running of the primary term.  HC00855–56.

35.     On November 13, 1985, the BLM suspended operations and production on Lease M-3323, effective October 1, 1985.  HC00849.

36.     On May 15, 1986, the BLM advised Fina that there would be six years and eight months remaining on the 10-year primary term of M-53323 when the suspension is lifted. HC00843.

37.     In June 1986, the Forest Plan for the Lewis and Clark National Forest was approved.  The 1986 Forest Plan established goals, management direction, and resource standards and stipulations to minimize adverse effects of oil and gas related activity on the Rocky Mountain Division of the Lewis and Clark National Forest, including the RM-1 unit where M-53323 is located.  FS001083, FS001103, FS001106–07.  In approving the 1986 Forest Plan, the Forest Service specifically concluded that exploration for oil and gas should continue because of these protective measures.  FS001091–93.  The Forest Service also concluded that the RM-1 unit would continue to be managed for oil and gas, wildlife, range, and semi-primitive recreational uses because such uses would not infringe on the Blackfeet Tribe's reserved rights in the area.  FS001092.  Importantly, the Forest Service concluded that the RM-1 unit area was not eligible for wilderness designation because of these reserved rights.  FS001095.

38.     On April 13, 1987, after addressing the remanded issues, the Forest Service and the BLM approved the surface use plan and APD for the second time.  FS1109–1119.  In so

doing, the agencies considered the 1986 Forest Plan and its accompanying environmental impact statement, in which the Forest Service thoroughly considered the environmental effects of oil and gas exploration and development in the RM-1 unit.  *See id*.  The approvals were expressly subject to Fina abiding by all the lease stipulations and conditions of approval imposed by the agencies in their 1985 decision.  *Id*.

39.     The BLM's decision to reapprove the APD was appealed to the IBLA.  *See* FS001120.

40.     On July 10, 1987, the Forest Service asked the BLM to move the IBLA for a voluntary remand so that the Forest Service could further study the issues raised on appeal. FS001120.

41.     On July 28, 1987, based upon the Forest Service's request, the BLM filed a motion for a voluntary remand of its decision to approve the APD.  *See* FS001121.

42.     On July 31, 1987, the IBLA granted the BLM's motion and vacated the BLM's decision approving the APD and remanded to the BLM for further action.  FS001121.

43.     On August 14, 1987, the BLM advised Fina that the suspension would remain in effect until the completion of an additional environmental study.  FS001122.

44.     On February 23, 1988, notice was published in the *Federal Register* that the Forest Service decided to combine the study for Fina's APD with an APD submitted by Chevron on a lease it owned approximately six miles away from M-53323.  53 Fed. Reg. 5290 (Feb. 23, 1988); FS001123.  Chevron's lease is also within the RM-1 unit.  FS001193, FS004000; *see also* 2014 BLM Map (depicting Chevron's lease and all the other existing leases and existing wells in the RM-1 unit).  The notice further provided that a draft environmental impact statement ("EIS")

was expected to be released for public comment within 12 months, and that a Final EIS was expected by April 1989.  FS001123.

45.     On October 23, 1989, Notice of Availability of the draft EIS was published in the *Federal Register*.  54 Fed. Reg. 43188 (October 23, 1989).[8]  The notice solicited comments and advised that the draft EIS:

> [A]nalyzes the impacts of proposed drilling applications submitted by Chevron USA, near Badger Creek, and Fina Oil and Chemical Company, near Hall Creek.  Based on the issues and concerns identified during the scoping process, the DEIS focuses on impacts to water resources, air quality, Glacier National Park resources, adjacent Bob Marshall and Great Bear Wilderness, the Badger-Two Medicine Roadless area, wildlife and fisheries (including the grizzly bear), vegetation, outdoor recreation and visual resources, archaeological resources, Blackfeet Tribe reserved rights and traditional religious practices, local economic and social conditions, including public health and safety associated with the drilling proposals.
>
> The analysis addresses 33 combinations of alternatives, including roaded access, helicopter mobilization of the drilling projects, and no action.  The EIS also addresses each of the exploration proposals independently.  The EIS preferred alternative is to permit the exploration projects, utilizing roaded access and mitigation requirements that minimize adverse environmental effects.

*Id*. at 43188–89.

46.     On December 4, 1990, after all the comments were considered, a comprehensive and voluminous Final EIS for the Fina and Chevron APDs was issued.  FS001165–1189 (Summary and Table of Contents for Final EIS).

47.     On February 19, 1991, the BLM and Forest Service issued a joint Record of Decision approving Fina's surface use plan and APD for the third time.  FS002148–2183.  Importantly, activities under the surface use plan and the APD would not affect cultural resources or the Blackfeet Tribe's reserved rights.  FS002166–2167.

---

[8] A copy of this *Federal Register* notice will be provided in the parties appendix.

48.     A decision on Chevron's APD was deferred pending further study under Section 106 of the National Historic Preservation Act ("NHPA").  *See* FS002149.

49.     On March 6, 1991, the BLM notified Fina that the APD was approved subject to compliance with all lease stipulations and additional mitigation measures that were imposed as conditions of approval.  FS002185–90.  These conditions of approval included measures to protect cultural resources.  FS002190.  Finally, the BLM advised that no activities could occur prior to July 1, 1991.  FS002185.

50.     On March 8, 1991, notice that the Forest Service and the BLM had approved Fina's surface use plan and APD was published in the *Federal Register*.  56 Fed. Reg. 9935 (March 8, 1991).[9]

51.     Around April 1991, the Forest Service received appeals, including an appeal from the Blackfeet Tribe, regarding the approved surface use plan.  The Tribe appealed on, *inter alia*, its belief that it still owned the mineral resources in the ceded strip.  HC00999–1005.  The Tribe did not appeal on the ground that the area had religious and/or cultural significance.  HC00999–1005.  The Forest Service denied all of the appeals.  FS002301.

52.     Around April 1991, the BLM also received requests for state director review of the BLM's approval of the APD.  FS002301.  These requests were denied.  *Id.*  Appeals were then filed with the IBLA.  *Id.*

53.     On July 18, 1991, the BLM once again moved for a voluntary remand.  HC01281; FS002301.

54.     On August 5, 1991, the IBLA granted the BLM's motion for voluntary remand, dismissed the appeal without prejudice, and remanded for further proceedings.  FS002192.

---

[9] A copy of this *Federal Register* notice will be provided in the parties' appendix.

55.     On August 30, 1991, the BLM reversed its decision approving the APD and

began its own independent study of the surface-related issues, even though it had previously

adopted the Forest Service's approval of the surface use plan.  HC00072–73.

56.     In January 1992, a cultural study was initiated in association with the analysis for

Chevron's APD.  HC00078.

57.     On December 4, 1992, after the BLM completed its independent study of the

surface-related issues regarding Fina's APD and surface use plan, the BLM asked for secretarial-

level approval of Fina's APD because of the unreasonable delay that had already occurred:

> We would like to get the issues involved in this case resolved once and for all.
> *The decisions concerning the Fina well have been delayed long enough.*  A timely
> resolution would benefit all parties involved, including the applicant, the Federal
> government, the appellants and the American taxpayers.  We would like the
> Secretary to render the final decision for the Fina ROD, thereby allowing all
> remaining issues to be addressed in Federal District Court.

HC01742–73 (emphasis added).

58.     On January 14, 1993, the Assistant Secretary of the Department of the Interior

issued a Record of Decision approving Fina's APD.  FS002294–2326.  This was the fourth time

the APD had been approved.  This Record of Decision allowed:

> Fina to build 4.5 miles of access road on National Forest Land to drill a
> single exploratory well to determine if geologic structures contain
> accumulations of oil and/or natural gas.  If the well is dry, the access road
> and well pad will be reclaimed to as near natural conditions as possible.
> Should the well encounter commercial quantities of oil and/or gas,
> additional environmental analysis will be conducted.
>
> The approval of the [surface use plan] includes a strict set of mitigation
> measures that will minimize the impacts of the project on other surface
> resources and Forest users.

FS002296.  This approval was again subject to Fina complying with all lease stipulations,

mitigation and monitoring requirements, and additional mitigation measures that were imposed

14

as conditions of approval.  *See* FS002319–2326.  The conditions of approval limited activities

from July 1 through November 30 each year, to minimize the effects on wildlife.  FS002324.

These conditions of approval included measures to protect cultural resources.  FS002326.

Importantly, activities under the approved APD and surface use plan would not affect any

identified cultural resources or the Blackfeet Tribe's reserved rights:

> I agree with the Forest Supervisor's finding that alternative A2 will result
> in no effect to identified sites or properties that are eligible for listing on
> the National Register of Historic Places.  The identification effort for
> historic properties included a literature review, field inventory, and
> interviews with Blackfeet Traditionalists.  The interviews did not result in
> the identification of any properties having significance as traditional
> cultural properties as defined by the National Historic Preservation Act.
> These efforts, taken as a whole, resulted in a determination that no
> properties included on or eligible for inclusion to the National Register of
> Historic Places would be affected by the proposed action.  The Montana
> State Historic Preservation Office commented on the identification effort
> and further stated that they had no information which disputed this
> finding.  Compliance with the implementing regulations of Section 106 of
> the National Historic Preservation Act has, therefore, been completed.
>
> Like the Forest Supervisor, I also recognize that the area is used by some
> members of the Blackfeet Tribe for religious purposes and for other uses,
> including the exercise of rights reserved in the Agreement of 1896.  Past
> use includes motorized access for hunting, wood cutting and recreation.
> Other uses of the area include motorized winter recreation by
> snowmobiles.  Not until 1988, with implementation of the Forest Travel
> Plan, were vehicle restrictions imposed in the area.  As stated in the FEIS
> (Chapter IV-150), Blackfeet traditionalists view all action alternatives as
> negatively impacting their culture and religion.  However, they have been
> reluctant to discuss any specific potential effects caused by the project to
> the practice and belief in their traditional religion (FEIS, Chapter IV-152).
> I have considered what actions could be undertaken to reduce the impact
> of the project on traditional practitioners.  Mitigation measures that will
> minimize visual, auditory, and physical changes have been developed and
> are included in Appendix A of this ROD.
>
> In case traditional practitioners choose to use the area around the wellsite
> regardless of the disturbance, notice will be made in local newspapers of
> planned drilling activity.  This will enable religious practitioners to plan
> their activities so they can be conducted at locations and during time
> periods when the effects of the project are not evident.

> Visual intrusions which might affect traditional religious practices will be minimized by employing a professional landscape architect to review all project location plans and to develop mitigation measures.
>
> In summary, I concur with the Forest Supervisor's decision to allow roaded access to the wellsite, recognizing that there may be some unavoidable impacts to traditional religious practitioners.  I agree with the Forest Supervisor's determination that this decision does not change a person's freedom of religious belief.  Mitigation measures that limit access and reduce noise levels will help to reduce project impacts on those who choose to practice traditional religion in the general area of the well site.

FS002313–14.

59.     Activities under the approved APD and surface use plan would also benefit the

local economy with jobs and increased taxes.

> Ten local workers in addition to about 40 short-term local employees will be needed during the life of the project.
>
> * * *
>
> As stated by Blaine, Pondera and Glacier county governments (FEIS, Appendix P), the project will help alleviate depressed economic conditions and provide economic stability in northern Montana. . . .  Local communities and counties will benefit from direct expenditures by Fina and through increased taxes on equipment associated with exploration activities.

FS002314.

60.     On February 5, 1993, notice was published in the *Federal Register* that the BLM

had issued a Record of Decision, dated January 14, 1993, approving Fina's APD.  58 Fed. Reg.

7241 (Feb 5, 1993).[10]  That notice further provided: "This decision, with concurrence from

Interior's assistant secretary for land and minerals, constitutes final agency action for the

Department of the Interior."  *Id.*

---

[10] A copy of this *Federal Register* notice will be provided in the parties' appendix.

61.     On June 4, 1993, after a change in administrations, Secretary of the Interior, Bruce Babbitt, acknowledged that FINA had an approved APD to drill a single exploratory well. FS002352.  Despite this approved APD, Secretary Babbitt advised Fina that a suspension of operations and production was issued for M-53323, effective June 30, 1993.  *Id*.  The stated purpose for this withdrawal was in aid of proposed legislation (S. 853) regarding the RM-1 unit. *Id*.  Secretary Babbitt further advised that the suspension would remain in effect for one year. FS002353.

62.     On May 4, 1994, although no action had been taken on any proposed legislation regarding the RM-1 unit, M-53323 was suspended for another year.  HC00825.

63.     On May 19, 1995, although no action had been taken on any proposed legislation regarding the RM-1 unit, M-53323 was suspended for another year.  FS002412.

64.     On May 17, 1996, the Forest Service wrote to the BLM advising that the Forest Service had received a final cultural study from its contractor.  HC00820.  The study identified a purported traditional cultural district ("TCD") that may be eligible for listing on the National Register.  *Id*.  The boundaries of the purported TCD apparently overlapped with Fina's proposed access route near the South Fork of the Two Medicine River.  *Id*.  The Forest Service advised that it needed a consensus on the recommendation from the SHPO and the affected tribes before an assessment of effects, if any, from Fina's proposal could begin.  *Id*.  In light of these developments, the Forest Service requested that the BLM suspend M-53323 again.  *Id*.

65.     On June 11, 1996, based upon the Forest Service's request, the BLM advised Fina that a suspension of operations and production was issued for M-53323, effective July 1, 1996. FS002423.  The BLM further advised that the suspension would remain in effect for one year. *Id*.

66.     On February 18, 1997, the Forest Service advised the BLM that within the next two months it would submit a nomination form to the Keeper of the National Register for a concurrence of the boundaries of the purported TCD and for a formal determination of eligibility.  FS002425.  The Forest Service further advised that this process would not be completed before the current suspension would terminate on June 30, 1997, and, thus another suspension may be warranted.  *Id*.

67.     On April 18, 1997, the BLM advised Fina that the Forest Service's NHPA review process would not be complete by the end of the current suspension and, thus, another suspension of M-53323 was necessary, effective July 1, 1997.  FS002431.  The BLM further advised that the suspension would last for one year.  *Id*.

68.     On May 21, 1997, the Forest Service submitted a nomination form to the Keeper for a formal determination of eligibility of the purported TCD, referred to as the Badger-Two Medicine TCD.  FS005882–84.  The Forest Service advised that the Blackfeet Tribe fully agreed with the boundary of the purported TCD.  FS005883.  Importantly, the proposed well site was outside the boundary of the purported TCD, although part of the TCD overlapped a segment of the proposed access route where it crossed private land along the northwest side of the RM-1 unit.  FS005882–83.

69.     On November 25, 1997, the Keeper sent a letter to the Forest Service requesting additional information regarding the inclusion of the private lands and modern structures in the purported TCD.  FS003442.

70.     On March 4, 1998, the Forest Service advised the Keeper that it agreed the boundaries of the proposed TCD should be modified to eliminate the private lands.  FS005886–87.  The Forest Service further advised that the Blackfeet Tribe had agreed to this modification.

FS005887; *see also* FS003802.  Finally, the Forest Service advised the Keeper that it would submit a modified nomination form by fall/winter of 1998.  FS005887.

71.     On July 15, 1998, the BLM advised Fina that another suspension was issued for M-53323, effective July 1, 1998, and that the suspension would "remain in effect until conclusion of the historic property review under Section 106 of the National Historic Preservation Act."  FS002438.

72.     On April 5, 1999, Fina, fed up with the Defendants' endless delay, assigned M-53323 back to Mr. Longwell.  Longwell Decl. ¶ 8.  The BLM approved this assignment on June 15, 2000, effective July 1, 2000.  *Id*.

73.     On January 31, 2000, the Forest Service submitted to the Keeper the updated nomination form with the boundary modifications, which the Forest Service had promised to provide in fall/winter 1998.  FS005888, FS005889 (map depicting modifications).  The Forest Service, however, neglected to submit all the necessary materials and had to supplement its submission on April 5, 2001.[11]  *See* FS005925.

74.     On May 25, 2001, the Keeper advised the Forest Service that the documentation submitted was insufficient to make a determination of eligibility.  F005922–23.

75.      On October 11, 2001, in response to a congressional inquiry, the BLM advised: "[w]e recognize that environmental reviews, and administrative and judicial review processes have extended resolution of action on Mr. Longwell's APD *way beyond any reasonable time line*."  FS002775–76 (emphasis added).  The BLM further advised:  "[w]e realize that an attempt to reach closure on this case has taken many years and share Mr. Longwell's frustration *with the extraordinary delays* involved in the process."  *Id*. (emphasis added).

---

[11] A copy of the Forest Service's April 5, 2001 letter will be provided in the parties' appendix.

76. On December 14, 2001, the Forest Service finally responded to the Keeper's May 25, 2001 conclusion that the Forest Service's documentation was insufficient by providing a clarifying explanation. FS005924–25.

77. On January 31, 2002, the Keeper determined that approximately 90,000 acres of the RM-1 unit were eligible for listing on the National Register as the Badger-Two Medicine TCD. FS005733 (purported TCD depicted in blue); FS005839 (purported TCD outlined in black, also showing location of approved well site as "Hall Creek APD Site" and Chevron's proposed well site). The purported TCD covered approximately the entire southern part of the RM-1 unit. *See* FS002997, FS005733. Importantly, the proposed well site and access route for the approved APD were both outside the purported TCD, although a branch of the TCD overlapped a portion of M-53323. FS005839.

78. On February 22, 2002, the Forest Service advised Mr. Longwell that the Keeper had determined that the TCD was eligible for listing on the Nation Register. FS002791. The Forest Service further advised that it was "now able to proceed with the assessment of effects" regarding the approved APD. *Id.* Finally, the Forest Service advised Mr. Longwell that he could become a consulting party for the upcoming Section 106 process. *Id.* Yet, on April 12, 2002, in response to an inquiry by Mr. Longwell, the Forest Service stated that the Forest Service "had not budgeted or scheduled for any of [its] workforce to work" on any of the issues surrounding the approved APD in Fiscal Year 2002. FS002808–2810.

79. On April 19, 2002, in response to an inquiry by Mr. Longwell, the BLM confirmed that the approved APD was still valid. FS002811. The BLM also advised that no activity of M-53323 could occur until the suspension was lifted. *Id.* The BLM further advised that the delay in lifting the suspension was the fault of the Forest Service. *Id.*

80.     In June 2003, the Forest Service began the scoping process for NorthWestern Corporation's proposal to construct a 12-inch gas pipeline parallel to its existing 8-inch gas pipeline along the northwest boundary of the RM-1 unit of the Lewis and Clark National Forest. The new pipeline would be buried 30 feet south of an existing line and would cross approximately 3 miles of the Lewis and Clark National Forest and approximately 2 miles of M-53323.  One year later, in June 2004, the Forest Service issued a Decision Notice and Finding of No Significant Impact approving construction of the NorthWestern Corporation's pipeline.[12] Importantly, the construction of the pipeline "w[ould] not have an adverse effect on any known or listed or eligible historic places."  Decision Notice and Finding of No Significant Impact at 15–17.  In fact, consultation with the Blackfeet Tribe "identified no properties of traditional cultural interest to the tribe on the pipeline route or temporary construction sites."  *Id*.

81.     On June 25, 2003, the Forest Service acknowledged Mr. Longwell as a consulting party under Section 106 of the NHPA.  FS002875.

82.     On or about September 15, 2003, the Forest Service hosted a Section 106 consulting party meeting in Choteau, Montana.  Mr. Longwell could not attend because he was in the hospital, although he had his consulting geologist represent his interest at the meeting. Longwell Decl. ¶ 9; FS003772–3787 (meeting minutes).

83.     During the September 15, 2003 consulting party meeting, the Forest Service explained that, under the Section 106 regulations, the area of potential effects of the proposed well and access route had to be determined.  FS003775–3778.  As explained by the Forest Service, the alleged TCD could be affected by the proposal in three ways:  visual, atmospheric, and audible.  FS003776.  Based upon these factors, the Forest Service determined that area of

---

[12] A copy of the Decision Notice and Finding of No Significant Impact will be provided in the parties' appendix.

potential effects consisted of approximately 5,000 acres in the immediate vicinity of the access road and the well site.  FS003743 (2003 map depicting area of potential effects).

84.   In 2004, Mr. Longwell formed Solenex LLC, a Louisiana limited liability corporation.  Longwell Decl. ¶10.  Mr. Longwell is the Manager of Solenex.  *Id*.  On July 9, 2004, Mr. Longwell assigned M-53323 to Solenex, and the BLM approved the assignment, effective February 1, 2005.  *Id*.

85.   On February 6, 2004, the Forest Service suspended the consulting party process because of purportedly new information it received from the Blackfeet Tribe regarding the northern end of the RM-1 unit, i.e., the area where M-53323 is located.  FS004066–4067.

86.   On August 5, 2004, the Forest Service wrote a letter to the consulting parties advising that it had issued contracts for an additional study to determine whether the TCD should be expanded to include the area of the approved APD.  FS004217–18.  The Forest Service further advised that the Blackfeet Tribe was going to be paid to assist on this study.  *Id*.  The Forest Service advised that the study was expected by early summer of 2005.  *Id*.

87.   In March 2006, a boundary adjustment study was finalized that recommended the purported TCD be expanded to include the entire north end of the RM-1 unit, including all of M-53323.  FS005617–5618.  Despite this recommendation, the Forest Service failed to reinitiate the Section 106 consulting party process.  Instead, the Forest Service commissioned more studies.  FS005617–5618.

88.   In 2006–2007 and 2008–2009, two more studies were conducted to purportedly determine whether other lands should be included in the TCD.  *See generally* FS005617–22.  These studies were focused on the Mowitch Basin, Birch Creek, and the Beaver Lake areas.  *Id*.  None of these areas are within 12 miles of the proposed well site.  *See* FS005733 (depicting the

Mowitch Basin area in red, the Birch Creek area in purple, and the Beaver Lake are in yellow); *see also* 2014 BLM Map (depicting proposed well site, RM-1 unit outline in blue, and expanded boundaries of alleged TCD in purple). The studies recommended that the alleged TCD be expanded to include these areas. FS005617–5622. Despite these recommendations, the Forest Service still failed to reinitiate the Section 106 consulting party process. Instead, the Forest Service commissioned another study to consolidate all the previous studies into one study. *See generally* FS005608–22.

89.     On October 28, 2010, Solenex requested that the Forest Service provide it an update and a timeline for when it could commence drilling. FS002983. On November 17, 2010, in response to Solenex's inquiry, the Forest Service confirmed that since 2006 it had been recommended that the purported TCD be expanded to overlap all of M-53323. FS002982. The Forest Service failed to provide Mr. Longwell with the requested timeline. *Id*.

90.     In April 15, 2011, Solenex sent a letter to the Forest Service reminding the Forest Service that M-53323 was a valid contract, the approved APD remains valid, and that Solenex wished to commence drilling. Longwell Decl. ¶11; *see* FS002989.

91.     On May 27, 2011, the Forest Service responded to Solenex's April 15, 2011 letter advising that M-53323 is located in an area "potentially eligible for listing as a Traditional Cultural District on the National Register of Historic Places." FS002989. The Forest Service further represented that it was preparing a determination of eligibility to submit to the state historic preservation officer ("SHPO") for a concurrence. *Id*.

92.     On February 16, 2012, Solenex sent a letter to the Forest Service expressing a desire to develop M-53323 under the approved APD and again requesting a timeline for when drilling operations may commence. FS003007. Solenex further explained:

> [I]t is important to proceed with development of this lease based on the amount of drilling activity in the area, including that on the nearby Blackfeet reservation, as well as the need to develop domestic energy resources on both public and private lands as outlined by President Obama in his State of the Union Address.

*Id*.

93.     On March 27, 2012, in response to Solenex's February 16, 2012 letter, the Forest Service advised that M-53323 is located in an area "potentially eligible for listing as a Traditional Cultural District on the National Register of Historic Places." FS002994. Like it did in its May 27, 2011 letter, the Forest Service represented that it was preparing a determination of eligibility to submit to the SHPO for a concurrence. *Id*. As demonstrated below, the Forest Service did not seek this concurrence until June 2013, after Solenex gave notice of its intent to seek judicial review. *See* ¶¶ 96, 99–100, *infra*.

94.     In December 2012, the final study to expand the boundaries of the purported TCD (prepared with the assistance of the Blackfeet Tribe), was accepted by the Forest Service. FS005608–5622, FS005800.

95.     Between January 2013 and May 23, 2013, Defendants took no action toward completing the purported NHPA process or lifting the suspension on Solenex's approved APD. *See* FS005800, FS005801–5803, FS005806, FS005810.

96.     On May 21, 2013, counsel for Solenex sent letters to the BLM and the Forest Service describing the extraordinary delay and advising that Solenex would seek judicial review if the suspension of the approved APD were not lifted in 30 days. FS004604–4605.

97.     By May 23, 2013, the BLM and the Forest Service had both received copies of Solenex's demand letter. FS004593–4594, FS004604–4605.

98.     On June 7, 2013, after receiving Solenex's notice of intent to sue, the Forest Service transmitted the 2012 study to the Blackfeet Tribal Business Council asking whether the Council concurred with the proposed boundary expansion.  FS004467.

99.     On June 18, 2013, the Forest Service responded to Solenex's notice of intent to sue, suggesting that the 2012 study had already been transmitted to the SHPO.  FS003001.  The Forest Service further advised that it would be reconvening the consulting parties following the eligibility determination by the SHPO.  *Id.*

100.     On June 20, 2013, the Forest Service transmitted the 2012 study to the SHPO asking whether the SHPO concurred with the proposed boundary expansion.   FS006010.

101.     On July 23, 2013, the SHPO concurred with the Forest Service's proposal to expand the boundaries of the purported TCD to include approximately 165,000 acres. FS004620; *see* 2014 Forest Service Map (outlining the expanded TCD in red); 2014 BLM Map (outlining the expanded TCD in purple).[13]

102.     On August 1, 2013, the Blackfeet Tribe concurred with the Forest Service's proposal to expand the boundaries of the purported TCD to include approximately 165,000 acres. FS004620.

103.     On August 21, 2013, the Forest Service advised Solenex that it had received concurrence from the SHPO and the Blackfeet Tribe regarding the expanded boundaries of the purported TCD.  The Forest Service further advised that the next step in the Section 106 process would entail convening the consulting parties to determine the effects of the proposed drilling operations and to develop, if necessary, possible mitigation measures.  FS003005.

---

[13] A copy of the 2014 Forest Service Map will be provided in the parties' appendix.

104.     On January 29, 2014, the Forest Service hosted a consulting party meeting in Great Falls, Montana.  Counsel for Solenex attended in person and Mr. Longwell participated by telephone because a winter ice storm had closed the Baton Rouge airport.  Longwell Decl. ¶ 12; FS004752–61.

105.     At the January 29, 2014 consulting party meeting, the Forest Service explained that the purpose of the meeting was to assess the adverse effects, if any, that the proposed undertaking (*i.e.*, the approved APD) would have on the expanded TCD.  FS004757.  The Forest Service explained that, to make this assessment, an area of potential effects was identified.  FS004757–58.  The area of potential effects was determined by the area of direct and indirect affects that may be caused by potential ground disturbance, and visual, noise, and olfactory effects of the activities conducted under the approved APD.  *Id.*  As determined by the Forest Service, the area of potential effects covered approximately 5,700 acres in the immediate vicinity of the proposed access route and drill site.  FS004743 (area of potential effects outlined in blue); FS004667 (area of potential effects outlined in blue; alleged expanded TCD outlined in black).  As explained by the Forest Service, because the area of potential effects had been determined, the consulting parties could now assess any adverse effects as outlined in 36 C.F.R. § 800.5(a).  FS004758.

106.     At the January 29, 2014 meeting, Joe Large, consulting geologist for Solenex, advised that drilling technology has significantly improved since the APD was first submitted in 1983.  The drilling time could be reduced to one month, as opposed to 8 months.  FS004756.  Mr. Large further advised that:  (a) between 1954 and 2013, at least 19 wells were drilled on the Blackfeet Reservation within 7 miles of the purported TCD; (b) between 1960 and 1980, hundreds of miles of seismic lines were run within the purported TCD; and (c) in 1963 Phillips

Petroleum Company drilled two wells in the purported TCD within seven miles of Solenex's proposed well site.  FS004715–16.

107.    On March 21, 2014, the Forest Service advised the consulting parties that another meeting was scheduled for April 3, 2014, and that, if necessary, another meeting may be held in June 2014.  FS004765.  The Forest Service also advised that between July 2014 and January 2015, the Forest Service would consult with the SHPO and the Blackfeet Tribe regarding a proposed effects determination.  *Id*.  If they ultimately determined that adverse effects were possible, then another NEPA process may be initiated to assess the possible adverse effects. FS004766.

108.    On April 3, 2014, the Forest Service hosted another consulting party meeting in Great Falls, Montana.  Mr. Longwell attended in person, along with consulting geologist Joe Large, and counsel for Solenex.  FS004786.  At that meeting, the Forest Service advised that the area of potential effects had been increased to include all 165,000 acres (258 square miles) of the purported TCD.  FS004774.  The Forest Service advised that this decision was based upon the following religious reasons provided by the Blackfeet Tribe:

> The Badger-Two Medicine is one of the last cultural and religious bastions where the Blackfeet find spiritual enlightenment as well as much needed food and medicine and they, the Blackfeet, are inalienably and inextricably connected to the land and its relativity to each and every resource found in the district.  As all things are connected in the Blackfoot worldview, then what is destroyed or desecrated in one place can potentially affect other places in untold and negative ways.  The entire district possesses spiritual and religious power for the Blackfeet and this power can be affected negatively by secular activity.

FS004848.  The Forest Service further advised that the official position of the Blackfeet Tribe is that no oil and gas exploration could occur within the expanded TCD.  FS004774, FS004829– 4830 (Blackfeet tribal representative stating "We continue to believe that ANY oil and gas

exploration venture by Solenex will negatively and cumulatively affect the religious and cultural quality of the expanded district.").

109.    At the April 3, 2014 meeting, the Blackfeet tribal representative advised that "the Tribe is not going to move from the position of no drilling." FS004778.  Importantly, this no drilling position applies only to the drilling on Forest Service lands or drilling directionally from private lands to produce natural gas underlying Forest Service lands.  FS04778.  The Blackfeet tribal representative further advised that there is no opposition to drilling on the Reservation. FS004781.

110.    At the April 3, 2014 meeting, the BLM suggested that road access and drilling may be approved if Solenex were to pay the Blackfeet $5,000,000.  FS004782; Longwell Decl. ¶¶ 13–14.

111.    Before the April 3, 2014 meeting concluded, the Forest Service also advised that, notwithstanding the outcome of the consulting party process, more NEPA would have to be completed before drilling could ever occur.  FS004781.

112.    Following the April 3, 2014 meeting there has been no effort on the part of the Forest Service to schedule another consulting party meeting.  Longwell Decl. ¶ 16.  Instead, the Forest Service has been purportedly discussing "adverse effects" with the Blackfeet Tribe.  *Id*.

113.    From Fiscal Year 1985 through Fiscal Year 2013, excluding Fiscal Year 2005, the BLM approved over 2,800 APDs for federal leases in Montana (available at

http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE _PROTECTION_/energy/oil___gas_statistics/data_sets.Par.65795.File.dat/numberofapdsapprov ed.pdf (last checked July 3, 2014)).[14]

_____

[14] A copy of this BLM spreadsheet will be provided in the parties' appendix.

114.     From Fiscal Year 1985 through Fiscal Year 2013, excluding Fiscal Year 2005,

over 2,100 wells were spudded on federal leases in Montana (available at

http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE

_PROTECTION_/energy/oil___gas_statistics/data_sets.Par.36209.File.dat/numberofwellboresst

artspud.pdf (last checked July 3, 2014)).[15]

115.     Solenex is ready, willing, and able to drill the proposed well.  Longwell Decl. ¶

18.

DATED this 7th day of July 2014.


Respectfully submitted,

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiff

---

[15] A copy of this BLM spreadsheet will be provided in the parties' appendix.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2014, I electronically filed the foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

/s/ Steven J. Lechner

Steven J. Lechner

# **<u>Exhibit 1</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOLENEX LLC, | ) |
| | ) Civil Case No. 13-00993 (RJL) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| S.M.R. JEWELL, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF SIDNEY M. LONGWELL IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Sidney M. Longwell, declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following information is true and correct to the best of my knowledge and belief:

1.  I was born on April 21, 1938 in Baton Rouge, Louisiana.

2.  I currently reside in Baton Rouge, Louisiana.

3  On or about April 6, 1982, the Bureau of Land Management ("BLM") advised me that my application for lease tract NW-21 obtained a priority in the simultaneous oil and gas lease drawing.  The BLM further advised that the application would become an offer to lease upon my payment of the first year's rental in the amount of $1 per acre, *i.e.*, $6,247.00.

4.  On May 24, 1982, after I had paid the first year's rental, the BLM issued to me federal oil and gas lease M-53323.  The lease became effective on June 1, 1982.

5.  I was 44 years old when I was issued M-53323.

6.      M-53323 granted me the "exclusive right and privilege to drill for, mine, extract, remove and dispose of all of the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil and gas is produced in paying quantities . . . ."

7.      On June 2, 1983, I assigned M-53323 to America Petrofina Company of Texas (25%), Petrofina Delaware, Inc. (25%), and AGIP Petroleum Company Inc. (50%) (hereinafter collectively and individually referred to as "Fina"). The BLM approved this assignment on December 9, 1983, effective July 1, 1983. In making this assignment, I reserved a production payment that was to be "paid out of five percent of ninety-five percent (5% of 95%) of the value of all the oil and gas which is produced and sold from lands covered by the lease."

8.      On April 5, 1999, Fina, fed up with Defendants' endless delay, assigned M-53323 back to me. The BLM approved this assignment on June 15, 2000, effective July 1, 2000.

9.      Between 1999 and 2004, I diligently sought to exercise the rights granted to me by M-53323 and the approved APD. For example, in November 2002, I traveled to Great Falls, Montana for a meeting with the Forest Service and the BLM. This meeting was held at the Holiday Inn in Great Falls. The purpose for the meeting was to demonstrate my desire to exercise my lease rights under the approved APD and to determine if there was a way to facilitate matters. In 2003, with great trepidation, but with the hope that it would facilitate matters, I also agreed to become a consulting party. Although I could not attend the September 2003 consulting party meeting because I was in the hospital, I had my consulting geologist, Bill Hansen, attend to represent my interests. As the subsequent eleven years indicate, my efforts

2

were for naught.  Further evidence of my diligent efforts is in the records of the Forest Service and the BLM.

10.     In 2004, I formed Solenex LLC, a Louisiana limited liability corporation.  I am the Manager of Solenex.  On July 9, 2004, I assigned M-53323 to Solenex, and the BLM approved the assignment, effective February 1, 2005.

11.     Since 2004, Solenex has diligently sought to exercise the rights granted by M-53323 and the approved APD.  For example, Solenex has repeatedly written to the Forest Service and the BLM expressing its desire to exercise its lease rights through the approved APD.  Most of these letters are in the records of the Forest Service and the BLM.  One letter that appears to be missing is a letter Solenex sent to the Forest Service on April 15, 2011.  In that letter Solenex reminded the Forest Service that M-53323 is a valid lease, the approved APD remains valid, and that Solenex "wish[es] to commence drilling."  The letter further provides "[i]f there is a reason why [Solenex] cannot commence drilling activity, please advise . . . within the next 30 days."  A copy of this letter is attached hereto as Exhibit A.  On May 27, 2011, the Forest Service responded to Solenex's April 15, 2011 letter advising that M-53323 is located in an area "potentially eligible for listing as a Traditional Cultural District on the National Register of Historic Places."  The Forest Service further advised that the APD will remain in suspension until the NHPA process was completed.  The Forest Service further represented that it was preparing a determining of eligibility to submit to the SHPO for its concurrence.  A copy of this letter is attached hereto as Exhibit B.  The Forest Service, however, did not seek the SHPO's concurrence for two more years.

12.     On January 28, 2014, I was prepared to travel to Great Falls, Montana for the consulting party meeting schedule for January 29, 2014.  Unfortunately, a winter ice storm

3

closed the Baton Rouge airport and surrounding airports, so I was could not attend in person. I did participate in the meeting via telephone.

13.     I was able to attend the next consulting party meeting on April 3, 2014, in Great Falls, Montana. What I took away from that meeting is that the Blackfeet Tribe does not want Solenex to exercise its lease rights on Forest Service lands, but it would welcome Solenex drilling on the Reservation. This indicates to me that the whole issue is a question of money. This was confirmed when the BLM suggested that, if Solenex paid the Tribe $5 million, Solenex could then exercise its lease rights. In my opinion, this is a blatant attempt at extortion.

14.     In April 2014, I received a 2013 brochure published by the Blackfeet Nation advertising oil and gas development opportunities on the Blackfeet Reservation. A copy of this brochure is attached hereto as Exhibit C. In my opinion, this brochure further demonstrates that the issue is about money for the Tribe, not about the purported effects of drilling one exploratory well on M-53323.

15.     On April 21, 2014, I turned 76 years old. I have now been waiting over 30 years to see the proposed well drilled.

16.     On June 17, 2014, I emailed the Forest Service to inquire about the next consulting party meeting. On June 25, 2014, the Forest Service responded and there were no immediate plans for another consulting party meeting. Instead, the Forest Service advised that it was "articulating adverse effects" with the Blackfeet Tribe. The Forest Service further advised that it hoped to discuss another consulting party meeting "within a couple of months." In short, the Forest Service is still dragging its feet.

4

17.     Since M-53323 was issued, I estimate that Solenex and I have spent over $35,000 in seeking to develop the lease.  This does not include the $10,000 bond that Solenex and I have posted since Fina assigned the lease back to me.

18.     Solenex is ready, willing, and able to drill the proposed well.

DATED this **7th** day of July 2014.

Sidney M. Longwell
SOLENEX LLC

# **Exhibit A**

April 15, 2011

Lesley W. Thompson, Supervisor
Lewis & Clark National Forest
P. O. Box 869
Great Falls, Mt. 59403-0869

RE:  Federal Oil/Gas Lease M 53323

Dear Mr. Thompson,

    1.  The above referenced lease is a valid lease.

    2.  The above referenced lease is a binding contract between Solenex L.L.C. and the U. S. government.

    3.  The Application for a Permit to Drill on the above-referenced lease has been approved and remains valid.

    4.  **I wish to commence drilling.**

If there is a reason why I cannot commence drilling activity, please advise me of such within the next 30 days.

Sincerely

Sidney M. Longwell

cc:    Secretary Tom Vilsack, U. S. Dept. of Agriculture
        Leslie Weldon; U. S. Forest Service
        Congressman Denny Rehberg
        Congressman William Cassidy

# **Exhibit B**



| United States Department of Agriculture | Forest Service | Lewis and Clark National Forest | 1101 15th Street North P.O. Box 869 Great Falls, MT 59403-0869 406 791-7700 FAX 406 731-5302 |

File Code: 2820
Date: May 27, 2011

Sidney Longwell
Solenex LLC.
821 East Lakeview Drive
Baton Rouge, LA 70810

Dear Mr. Longwell,

On April 18 we received a letter from you in which you expressed your desire to commence with drilling operations on the lease (Federal Lease # M53323) that Solenex L.L.C. holds within the Badger Two Medicine area on the Lewis and Clark National Forest (LCNF). In preparing our response to your letter we reviewed the history of analysis and court decisions relevant to this lease.

Your letter expresses a belief that there is currently an approved and valid Application for a Permit to Drill (APD) for this lease. This APD had been issued following the completion of an Environmental Assessment in 1985 and an Environmental Impact Statement in 1991. Following the issuance of the APD, the National Wildlife Federation and six other groups sued the Forest Service challenging approval of the APD. Pursuant to the Court's decision on this litigation, the APD was suspended while the LCNF gathered information and analyzed the traditional, and cultural significance of the Badger-Two Medicine area to the Blackfeet Tribe, in accordance with Section 106 of the National Historic Preservation Act. This analysis determined that the area in which your lease lies is potentially eligible for listing as a Traditional Cultural District (TCD) in the National Register of Historic Places.

The determination that the area in which the lease is located is potentially eligible for listing as a Traditional Cultural District constitutes significant new information relevant to environmental impacts that will need to be analyzed. The APD will remain in suspension until this process is completed. Thus, Solenex L.L.C. does not have authorization to proceed with drilling.

The LCNF is preparing a determination of TCD eligibility to submit to the Montana State Historic Preservation Officer (SHPO) for concurrence or additional comment.

There are several alternatives that you could pursue while the LCNF goes through the process to determine eligibility and listing for the TCD. If you wished to proceed with developing this lease, you could pursue drilling from adjacent private land. If you are amenable to considering drilling in another geographic location, please let us know and we will help to outline the steps and identify other agencies that would need to be involved to explore opportunities to exchange the Solenex lease for another federal lease. Another option would be to take advantage of provisions in the 2006 tax relief bill that would apply to this lease by relinquishing the lease.



When we get a response from SHPO regarding the TCD eligibility, we will inform you of their determination and advise you our next steps.

Sincerely,


/s/ Lesley W. Thompson
LESLEY W. THOMPSON
Forest Supervisor

# **<u>Exhibit C</u>**

# Blackfeet Nation

## Blackfeet Indian Reservation
### MONTANA

# Oil & Gas Development Opportunities



# Oil and Gas Development Opportunities on the Blackfeet Indian Reservation, Montana

Bob Just, Petroleum Geologist, Ron Lloyd, Petroleum Geologist
Paula Mohseni, Petroleum Geologist
**Assistant Secretary – Indian Affairs, Division of Energy and Mineral Development**

## Introduction

The Blackfeet Indian Reservation is located in Glacier and Pondera Counties, Montana. It lies within the southern end of the Alberta Basin and contains three distinct geologic provinces: the Disturbed Belt in the west, a foreland basin in the middle, and the Sweetgrass Arch in the east (see Figure 1). Current play types vary with geologic province (refer to Figure 2), where Cretaceous sands and Greenhorn-equivalent targets exist in the structurally complex Disturbed Belt while older, fractured zones of Devonian/Mississippian age (such as the Bakken and Three Forks) exist in the central and eastern portions.

### New Oil and Gas Plays Developing

A few years ago, there was new exploration activity by several oil companies. Three companies leased a large portion of the reservation, although two have recently withdrawn. The reason for the leasing activity is that the Bakken Shale, known for the oil boom occurring in North Dakota and Montana, is present on the reservation.

The Devonian-Mississippian Bakken Shale is a widespread, organic-rich marine source rock. It is a known prolific



**Figure 1.** General structure map of the Blackfeet Reservation, showing major fields and fault systems. (Map from the Division of Energy and Mineral Development Publication, Oil and Gas Atlas of American Indian Reservations, *Anderson et al. 1997.*)

producer in the Williston Basin (North Dakota and eastern Montana) and has produced hundreds of thousands of barrels due to the use of hydraulic fracturing technology and horizontal drilling. Recently three exploration companies, Rosetta Resources, Newfield Exploration, and Anschutz Corp. actively pursued developing the Bakken fractured shale-oil



**Figure 2** Schematic of the many different oil and gas play types tht exist on the Blackfeet Reservation. (Map from the Division of Energy and Mineral Development Publication, Oil and Gas Atlas of American Indian Reservations, Anderson et al. 1997.)



**Figure 3:** Basemap of the Blackfeet Indian Reservation showing locations of recently drilled Cone and Bakken formations by Anschutz, Newfield and Rosetta.  A detailed summary of the well completion and production results are shown on Table,I, page 7-8.

play concept on the Blackfeet Reservation.  The Exshaw Shale is considered the age- and facies-equivalent of the Bakken in Alberta Basin (Figure 4). The Exshaw is commonly referred to as the Bakken by most operators in the Alberta Basin.

Another developing play on the Blackfeet Reservation that was recently explored by Anschutz Corp. is the Upper Cretaceous Cone Member of the Marias River Shale. The Cone, depending on locality, is part of the Greenhorn, Second White Specks, and Belle Fourche units.

## Exploration History

**Rosetta Resources.** Rosetta Resource had leased 286,000 net acres in Alberta Basin and has been actively exploring the basin's potential since 2008. They have drilled three vertical test wells on different portions of their acreage. Two wells were drilled on strike 28 miles apart, and one well was drilled 8 miles downdip, refer to Figure 5. Also shown on the figure are the many seismic lines that the DEMD stores for the Tribe.  Rosetta used the seismic data in their lease area to

**Figure 5.** Bakken exploration activity and seismic lines on the Blackfeet Reservation. Landslide Butte and Gunsight areas are outlined in green.



Bakken/Exshaw Exploration Activity - Blackfeet Reservation

determine locations of their wells (an interpretation of one of these lines at Rosetta's Landslide Butte area is shown in Figure 6).

Although the Bakken was considered their primary objective, Rosetta reported "*oil-saturated and over-pressured Banff, Bakken and Three Forks intervals, and an oil-saturated Nisku section*" (*source:* Rosetta website). Based on the results from the three delineation wells, Rosetta estimates the original oil in place (OGIP) between 13 and 15 million barrels oil equivalent (BOE) per square mile. Rosetta had then planned to drill eight additional vertical tests across their acreage to better determine reservoir properties. Eventually horizontal wells were to be used for development.

Rosetta's Tribal Riverbend W 07-4H (7-36N-9W) and Tribal Riverbend 12-13H (12-37N-9W), located in the Landslide Butte Area, and their Tribal Gunsight 31-16H (31-34N-6W), located in the Gunsight Area, are shown in Figures 5 along with seismic lines supplied by DEMD. The seismic lines in which Rosetta used to determine the location of their wells are interpreted in Figures 6. It is known that the Tribal Gunsight 31-16H was spud in August 2009 and drilled to a total depth of 9,206 feet with a 4,100' lateral. Although information on the #31-16H has been difficult to obtain,



**Figure 4.** Extent of Bakken/Exshaw Shales and similar ages and facies in the northern Rocky Mountain region (from Fred R. Meissner, Jane Woodward, and J. L. Clayton, 1984).

field sources have indicated that the well was hydraulically frac'd and oil was recovered. However the well was plugged and abandoned on July 27, 2012.

**Newfield Exploration.** In late 2009, Houston-based Newfield Exploration reached an agreement with the Blackfeet tribe for approximately 156,000 net acres. The company currently holds 224,000 net acres on the eastern portion of the reservation. Newfield's agreement with the tribe required the drilling of eight exploratory wells by the end of 2010 and at least one deep well per year. According to Grinnell Day Chief, Director of the Tribe's Oil and Gas Department, "*this agreement was the largest oil exploration and development agreement ever signed by the Tribe*".

Newfield's play strategy was similar to Rosetta's, with plans to drill vertical and horizontal wells to evaluate the potential of the Bakken, Three Forks, Nisku, and Lodgepole (Banff equivalent). The horizontal tests will evaluate the Bakken at true measured depths between 9,100' and 10,042'. The Peacemaker 1-5H, a 9,166' horizontal test, is part of their multiwall program. The active drillsite is located in 5-33N-6W, approximately a half-mile southeast of Rosetta's Tribal Gunsight #31-16H. The Peacemaker was completed in Nisku and produced 141 BO, 358 mcfg and 661 BW through June, 2011. The well is apparently shut-in. Three newly staked locations are within nine miles of the Peacemaker 1-5H and include the Sheriff #1-11H, nw-ne 11-33N-7W; the Old West #1-9-16H, se-sw 9-33N-7W; and the Land Run #1-26H, nw-ne 26-34N-8W.

The Sheriff #1-11H location is two miles southwest of the Bugbee #1 (se-sw 6-33n-6w), a dry hole with good oil shows in the Devonian. The Bugbee was perforated in the Three Forks (5,028' to 5,030') and swabbed up to 10 gallons of oil per hour. The well was abandoned in 1958. The Sheriff well was completed in Nisku and produced 6,914 BO, 21 MMcfg, and 35 MBO through October 2011.

Approximately a quarter-mile southeast of the Bugbee #1 is the Miller Tribal #1 (nw-ne 7-33N-6W), which is considered the opener for Cadmus Field. Before being abandoned in 1954, the Miller Tribal #1 produced 1,173 BO from the Three Forks at a vertical depth near 4,735'. The Cut Bank and the Madison also had oil and gas shows.

Newfield's Old West #1-9-16H and the Land Run #1-26H locations are about two miles from Arco's South Cutbank Creek #1X-6 (ne-nw 6-33N-7W). The South Cutbank Creek #1X-6 was drilled to 5920' (Duperow) and abandoned in 1986. A DST recovered 3,669.3' of mud, 30' of mud and gas-cut oil, and 65' of oil- and gas-cut mud from the Sun River (5,409' to 5,413'). The Old West well was plugged and abandoned September 27, 2012 without a horizontal leg being drilled. The permit for the Land Run well was allowed to expire.

**Anschutz Exploration Corp.:**  Anschutz Exploration Corp. was one of the first companies to lease a large part of the Blackfeet Reservation (refer to Figure 3). Anschutz, whose leases lie along the western margin of the reservation, is primarily targeting Upper Cretaceous reservoirs - presumably the Cone Cretaceous Member of the Marias River Shale.  Figure 7 highlights drilling activity and seismic lines for the Willow Creek and East Glacier exploration areas. Interpreted seismic lines are shown in Figures 8 and 9.

Anschutz's Willow Creek 1-14H was drilled to 8,916' in the northwestern portion of the reservation (shown in the Willow Creek Area – Figure 7). The well was cored in the Bow Island section (8,075 to 8,135). Details on the core are not known. The well was abandoned November 2008.

Approximately ten miles northwest of the Willow Creek 1-14H, Anschutz has staked the Pasiley 1-4H (4-37N-13W). This location is about a half-mile north of the bottom-hole location of Conwest Exploration's Blackfeet #1 (Figure 9), a 8,645' dry hole abandoned in September 1994. IHS

Energy reports that 4 inches of oil were recovered in a DST in the Blackfeet #1. The tested interval and other details are not stated.  The Paisley was spudded February 12, 2012.  No additional information is available on the state website.

On the southwest portions of Anschutz's leasehold (shown in the East Glacier Area – Figure 7), Anschutz drilled the Two Medicine 1-11H (11-31N-12W) as a twin to Rainbow Resources  Two Medicine 1-11H. Rainbow Resources well was drilled to a total depth of 9,514 and was completed in November 1980. The well produced 2,712 BO from its completion to December 1982 from the Greenhorn. Anschutz completed their 11,500' twin in September 2009. The well produced 295 BO from the Greenhorn and is now listed as a dry hole/temporarily abandoned.  The well was plugged



**Rosetta Resources Exploration Locations**
**Horizontal Bakken/Three Forks**
**Landslide Butte Area**

**Figure 6.** Seismic section interpretation showing Rosetta Resources' exploration locations for the horizontal Bakken/Three Forks play, Landslide Butte Area, Blackfeet Reservation.



**Figure 7.** Cone Member exploration activity and seismic lines for the Blackfeet Reservation. Willow Creek and East Glacier areas are outlined in blue.

wells were completed in 2012. The White Calf 1-3 (Sec. 3 30N 10W) produced 688 BO, 16,217 Mcfg, 9,660 BW in 3 months, 2012. The White Calf 1-31-31-10 (Sec. 31 31N 10W) produced 686 BO, 366 Mcfg, 9,066 BW in 4 months in 2012.

Another well in the East Glacier area is the Southwest Browning1-28H- 31-10 (Sec. 28 31N 10W) which was spudded October 28, 2011. Some difficulty was encountered in drilling and completing the well. Also in the area the Mallard 1-14H-31-12 (Sec 14 31N 12W) was spudded 1/9/2012. Another well in the same section, Mallard 2-14-33-12 spudded May 28, 2012. A well six miles west of the previous wells, Mallard 1-14-33-13 was permitted November 13, 2012.

A number of additional wells are permitted in the southwest area in the vicinity of the previous drilled wells.

back and the Cone Calcareous Member was perforated in the vertical portion of the well bore. It has produced 1,590 BO, 2,991 Mcfg, and 3,375 BW in 11 months in 2012.

About three miles north and five miles northeast of the Two Medicine 1-11H, Anschutz staked the Two Medicine 1-2H (sw 2-31N-12W) and the Two Medicine 2-2H (se 2-31N-12W), respectively. These locations were less than 6 miles east of two marginal oil wells, the Two Medicine #1-3 and the Federal #2-3. The Two Medicine #1-3 produced 25,993 BO intermittently from 1/1981 to 9/2008 from the Greenhorn. The Federal 2-3 produced 3,071 BO from 1/1998 to 12/2009. Production was from the Blackleaf and later from Greenhorn. Both locations were permitted in April 2009. The Two Medicine 1-2 [not H] produced 4,755 BO, 457 Mcfg, and 5,411 BW through October 2012. The original permit for the Two Medicine 2-2H was allowed to expire, but the well has been re-permitted.

In the southernmost portion of Anschutz's acreage, also labeled within the East Glacier area of Figure 7, Anschutz completed three wells in Sun River Dolomite including the White Calf 1-4 (Sec. 4 30N 10W). The well was completed in Sun River Dolomite and produced 176 BO, 4953 Mcfg, 924 BW, during 2 months in late 2010. Two



Line 661-2_psm: Anschutz Proposed Drilling Location

**Figure 8**. Seismic section interpretation showing Anschutz's White Calf 1-4 Location.

# SUMMARY OF WELL ACTIVITY
(updated October 23, 2013)

## NEWFIELD

Newfield filed 16 permits.

Two completed wells currently shut-in.

- Peacemaker 1-5H (Sec. 5 33N 6W) completed in Nisku, produced 141 BO, 358 Mcfg, 601 BW. 3 months, 2011.
- Sheriff 1-11H (Sec. 11 33N 7W) completed in Nisku, produced 6,905 BO, 21,362 Mcfg, 33,886 BW, 10/2010 – 10/2011.  Last production, 10/2011, reported 201 BO that month. Intent to abandon filed October, 2013.

Five other wells drilled:

- Tribal Lulu Parr1-8 (Sec. 8 33N 8W), requested horizontal permit, and tight hole status, 12/28/2012, results? No well file available. Intent to abandon filed October 2013.
- Tribal Sacred Pipe 1-21 (Sec. 21 35N 9W), P&A, 10/19/2011. Completed, no well file available.
- Tribal Buffalo Jump 1-28 (Sec. 28 35N 11W), P&A, 9/13/2012. Completed, no well file available.
- Old West 1-9-16H (Sec. 9 33N 7W) P&A, 9/27/2012, not drilled horizontally. Cored Lodgepole-Banff-Exshaw-Bakken-Three Forks, TD in pC. Core Lab plug analyses.
- Tribal Rumney 1-21H (Sec. 21 37N 11W), P&A, 9/14/2012.  Plugging record shows perfs in Middle Bakken, Nisku, Duperow.

Nine other permitted wells were not drilled.

## ANSCHUTZ

Seven wells competed in Cone Calcareous Member:

- Two Medicine 1-2 (Sec.2 31N12W) 10,327 BO, 2,252 Mcfg, 6,783 BW, 12/2010 - 8/2013. (Originally a horizontal permit.)
- Two Medicine 1-11H (Sec. 11 31N 12W) 1,641 BO, 3,036 Mcfg, 3,710 BW, 12/2011 – 2/2013. Vertical completion? 2009. Produced 295 BO from Greenhorn, 4 months, 2009. Drilled lateral in Cone Member, plug back lateral, drill second?  To be P&A.
- Two Medicine 2-3 (Sec. 3 31N 12W) 3,062 BO produced 2009-2011. To be P&A.
- SW Browning 1-8H (Sec. 8 32N 11W) 5,738 BO, 5,923 Mcfg, 6,133 BW, 9/2011 – 6/2013. 523,470 lb. 30/50 ISP, 16,546 bb. X-linked gel, 19,859 bbl breaker. , IP 100 BO, 210 BW.  Cone member was cored.
- Pine Ridge 2-26H-36-13 (Sec 26 36N 13W) 12,789 BO, 6,932 Mcfg, 6,939 BW, 10/2011 – 8/2013.  Cut a number of faults. In and out of zone.
- Flat Iron 1-8-32-12, (Sec. 8 32N 12W) Vertical well.    5,877 BO, 1,519 Mcfg, 32 BW, 11/2012 – 8/2013. 12 BOPD last month of production. No well file available.
- Paisley 1-4-37-13 (Sec/ 4 37N 13W)     168 BO, 318 Mcfg, 17 BW, 3-5/2013.  To be P&A.  No well file available.

Three wells competed in Sun River Dolomite. (No well files available.)

- White Calf 1-3 (Sec. 3 30N 10W) Produced 688 BO, 16,217 Mcfg, 9,660 BW, summer 2012.  To be P&A.
- White Calf 1-4 (Sec. 4 30N 10W) Produced 176 BO, 4953 Mcfg, 924 BW, 2 months, 2010. In October and November, 2011, well produced 693 BW. To be P&A.
- White Calf 1-31-31-10 (Sec. 31 31N 10W) Produced 686 BO, 366 Mcfg, 9,066 BW, 4 months, summer 2012. To be P&A.

One well completed in Bakken:

Pine Ridge 1-26 (Sec. 26 36N 13W) 2,556 Mcfg, 514 BW in 2 mo., 2012. (No well file available.)

Eight wells are to be plugged, including a 1980 Greenhorn well, Two Medicine 1-3, which was an attempted unsuccessful Cone Completion, 2011.

Twelve permitted wells were not drilled.

# ROSETTA

Rosetta permitted 26 new wells for the Bakken Formation in the project. Eight permitted wells were not drilled, the permits having expired or will shortly. Results of those drilled wells are as follows:

- Brandvold 35-09-25-05 (Sec. 25 38N 9W) 21 BO, 90 Mcfg, 225 BW in 2 months, 2011. Plugged and abandoned 5/17/2012.
- Gage 3606-19-01 (Sec. 19 36N 6W) 107 BO, 2,613 Mcfg, 736 BW in 3 months, 2011.  Intent to abandon was approved.
- Glacier Farms 3207-22-12 30 BO, 1,760 Mcfg, 263 BW in 3 months, 2011. Plugged and abandoned 5/14/2012
- Little Rock Coulee 27-16H Sec. 27 35N 7W) 3 BO, 148 Mcfg, 320 BW in 3 months, 2011. Plugged and abandoned 3/2/2012.
- Little Rock Coulee 3507-27-16H, Sec. 27 35N 7W, 1910 BO, 27,384 Mcfg, 1936 BW, in 4 mo. 2012.
- Simonson 3608-34-01 (Sec. 34 36N 8W) 1,123 BO, 1,150 Mcfg, 575 BW in 5 months, 2011. Core analysis on website. Intent to abandon filed 4/11/2012.
- Simonson Farms 3608-34-01HB (Sec. 34 36N 8W) 2,207 BO, 8,263 Mcfg, 1,135 BW in 6 months, 2011-12. Plugged and abandoned 8/14/2012.
- Tribal Big Rock 29-13H (Sec. 29 37N 6W) 107 BO, 1013 Mcfg, 583 BW 3 months 2011. Plugged? No record on website.
- Tribal Big Rock 3706-29-13H (Sec. 29 37N 6W) No production reported.  Plugged and abandoned 10/2/2012.
- Tribal Coyote Springs 3406 18-16H, Sec. 18 34N 6W, 916 BO, 14,307 Mcfg, 4,637 BW in 5 mo. 2012.
- Tribal Gunsight 31-16H (Sec. 31 34N 6W)   No completion data filed. No production reported.  Plugged and abandoned 7/27/2012.
- Tribal Gunsight S 12-15V (Sec 12 32N 7W) 87 BO, 1,915 Mcfg, 377 BW in first 3 mo. 2011.  Plugged and abandoned 5/16/2012.
- Tribal Love Rock 3607-18-16H (Sec. 18 36N 7W) Drilled, not completed. Intent to abandon filed 7/25/2013.
- Tribal Riverbend 12-13H (Sec. 12 37N 9W) Drilled, completed, no production reported.  Plugged and abandoned 5/26/2011.
- Tribal River Bend 3609-07-04H, Sec. 7 36N 9W, 7193 BO, 29231 Mcfg, 3032 BW, 10 mo. in 2012.
- Tribal River Bend 3709-12-13H, Sec. 12 37N 9W, 5547 BO, 48,595 Mcfg, 4037 BW, in 8 mos. 2012.
- Tribal Riverbend W 07-4H (Sec. 7 36N 9W) No completion or production data reported. Plugged and abandoned 5/25/2011.
- Turvey 3406-07-14 (Sec. 7 34N 6W) 180 BO, 217 Mcfg, 974 BW in 3 months, 2011.  It was apparently a Middle Bakken/Banff attempted completion. Plugged and abandoned 5/17/2012.

Rosetta took over operations of two 3800-foot gas wells in 2009:

- Wave Chalk Buttes 1-27 (Sec. 27 36N 8W).  No production or other information was reported. Intent to abandon 7/25/2012.
- Wave Landslide Butte 4-4 (Sec. 8 36N 8W) Plugged and abandoned 8/17/2010. No production was reported.

*Source: Montana Board of Oil and Gas Conservation*

## For more information about the Blackfeet Nation and access to geology and geophysical data, please contact:



### Blackfeet Nation

Blackfeet Indian Reservation

Grinnell Day Chief
Director, Oil and Gas Office
(406) 338-7521 x2179
Email: grinnelldaychief@yahoo.com

Blackfeet Nation
P.O. Box 850
Browning, MT 59417



### Division of Energy and Mineral Development

Bob Just      (720) 407-0611
Petroleum Geologist
Email: bob.just@bia.gov

Robert Anderson      (720) 407-0602
Branch Chief / Geophysicist
Email: robert.anderson@bia.gov

13922 Denver West Parkway, Ste. 200
Lakewood, CO  80401