IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SOLENEX LLC,                          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )
                                      )     Case No. 13-993-RJL
                                      )
S.M.R. JEWELL, Secretary              )
U. S. Department of the Interior, *et al.*,  )
                                      )
                Defendants.           )

**MEMORANDUM OF POINTS AND AUTHORIES IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Solenex LLC ("Plaintiff") brings this action seeking an order from this Court compelling

S.M.R. Jewell, Secretary of the U.S. Department of the Interior, *et al.*, ("Federal Defendants") to

immediately lift a suspension of an Application for a Permit to Drill ("APD") on federal oil and

gas Lease M-53323 in Montana.  Plaintiffs' Brief ("Pl.'s Br.") 1.  Plaintiff argues that the agency

action it requests has been "unlawfully withheld or unreasonable delayed" under Section 706(1)

of the Administrative Procedure Act ("APA").  5 U.S.C. § 706(1). *Id.*  Plaintiff, however, is not

entitled to any of the relief it seeks.

As an initial matter, Federal Defendants move for summary judgment because Plaintiff

has no valid cause of action under the judicial review provisions of the APA.[1] the Court lacks

subject matter jurisdiction over Plaintiff's claims. Under Section 701(a)(2) of the APA "agency

action [that] is committed to agency discretion by law" is excepted from judicial review.  5

---

[1] Although the requirements of the judicial review provisions of the APA are not viewed as jurisdictional in this circuit, a plaintiff must meet these requirements in order to bring a valid claim challenging agency action under the APA. *See Trudeau v. FTC*, 456 F.3d 178, 184-85 (D.C. Cir. 2006).

U.S.C. § 701(a)(2). Plaintiff has not identified any non-discretionary duty established by statute that the Federal Defendants have failed to take in this case. It cannot do so because the action Plaintiff seeks to compel – the lifting of a suspension of an APD - is action that Congress has committed absolutely to the discretion of the U.S. Bureau of Land Management ("BLM") and the U.S. Forest Service ("Forest Service"). This Court, therefore, lacks subject matter jurisdiction over Plaintiff's claim and should grant the Federal Defendants' motion to dismiss.

Even if the Court were to find that this is not a matter vested in agency discretion, the Court should grant the Federal Defendants' motion for summary judgment because BLM and the Forest Service have not unreasonably delayed action on the suspension of the APD. As explained below, BLM and the Forest Service have been working diligently to address the complex issues surrounding this lease. The lease is in an area of cultural and religious significance to the Blackfeet Tribe and the agencies have been working to balance their responsibilities under the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470–470x-6, with their authorities under the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181-196. Unfortunately, it has been a time-consuming process but one where progress has been consistent, and the Federal Defendants are required to complete the process before making any further decisions regarding the APD. In the context of the complete factual circumstances in this case, . Plaintiff's unreasonable delay claims are without merit, and summary judgment should be entered for Federal Defendants.

I.      **STATUTORY BACKGROUND**

   A.      **MLA**

Under the MLA, Congress provided for leasing of these mineral rights, with title to the lands to remain in the federal government. 30 U.S.C. § 193 ("deposits of [certain minerals] . . .

shall be subject to disposition only in the form and manner provided in this chapter"); *Andrus v. Shell Oil Co.*, 446 U.S.657, 659 (1980).  As the Supreme Court has noted, the Mineral Leasing Act confers "broad powers on the Secretary as leasing agent for the Government."  *Chapman v. Sheridan-Wyoming Coal Co.*, 338 U.S. 621, 627 (1950).  *See also Udall v. Tallman*, 380 U.S. 1, 4 (1965) (referring to the Secretary's "broad power to issue oil and gas leases on public lands"). The MLA authorizes the Secretary of the Interior to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter . . . ."  30 U.S.C. § 189.  Pursuant to this authority, Interior has promulgated regulations codified at 43 C.F.R. Part 3100.

In 1987, Congress amended the MLA with the Federal Onshore Oil and Gas Leasing Reform Act of 1987, 30 U.S.C. § 226.  That Act provides that the Secretary of Agriculture, acting through the Forest Service, and the Secretary of the Interior, acting through the BLM, with complementary regulatory authority over oil and gas exploration and development on National Forest System lands.  Section 226(g) provides in pertinent part:

> The Secretary of the Interior, or for National Forest lands, the Secretary of Agriculture, shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter, and shall determine reclamation and other actions as required in the interest of conservation of surface resources. No permit to drill on an oil and gas lease issued under this chapter may be granted without the analysis and approval by the Secretary concerned of a plan of operations covering proposed surface-disturbing activities within the lease area.

30 U.S.C. § 226(g).  On National Forest System lands, the Forest Service has ultimate authority to regulate all surface-disturbing activities.  30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1; 36 C.F.R. §§ 228.107(b)(2) and 228.108(a) and (f). For leases on National Forest System lands, the Forest Service must approve the Surface Use Plan of Operations prior to BLM making a decision on an APD that would allow any surface disturbing activities.  30 U.S.C. § 226(g); 43 C.F.R. §

3162.3-1(h)   BLM can approve the APD as submitted, approve the APD subject to conditions, or deny the APD. 43 C.F.R. § 3162.3-1

B.   **NHPA**

The NHPA is essentially a procedural statute which requires federal agencies to engage in consultation, often accomplished in conjunction with the National Environmental Protection Act ("NEPA") process, to take into account the effect of federal undertakings on historic properties and traditional cultural properties.  16 U.S.C. § 470f.  This consultation requirement for federal undertakings is often referred to as the Section 106 process.  "Undertaking" is defined, in relevant part, as "a project, activity, or program . . . including . . . those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(v).  Oil and gas leasing has been determined to be a federal undertaking for purposes of Section 106.  *See, e.g., Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1151-53 (D. Mont. 2004).  Thus, NHPA requires the federal action agency, *e.g.*, BLM, to effectuate the consultation process and ensure that the appropriate entities are involved in the process.  States participate in the process through their State Historic Preservation Officers ("SHPOs"), who consult to identify historic properties, evaluate their significance, and formulate measures to protect significant properties.  Within reservation boundaries, tribal governments and Tribal Historic Preservation Officers ("THPOs") perform the functions of the SHPO.  If an undertaking may affect properties of "religious and cultural significance," on or off a reservation, the BLM must consult with interested tribes. 16 U.S.C. § 470a(d)(6)

The NHPA has been amended several times but it was significantly amended in 1992, including provisions for tribal engagement and consultation. Those changes are described in the

Advisory Council on Historic Preservation's *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook* (2012):

    a. "Amended in 1992, the National Historic Preservation Act of 1966 (NHPA) is the basis for tribal consultation in the Section 106 review process. The two amended sections of NHPA that have a direct bearing on the Section 106 review process are:

        i. Section 101(d)(6)(A), which clarifies that properties of religious and cultural significance to Indian tribes may be eligible for listing in the National Register of Historic Places; and

        ii. Section 101(d)(6)(B), which requires that federal agencies, in carrying out their Section 106 responsibilities, consult with any Indian tribe that attaches religious and cultural significance to historic properties that may be affected by an undertaking."

## II.    FACTUAL BACKGROUND

### A.  Lease History

On June 1, 1982, the BLM issued Sidney M. Longwell Lease M-53323, which covers approximately 6,247 acres in the Lewis and Clark National Forest in Montana.  Federal Defendants' Statement of Material Facts ("DSOMF") 1. The lease was in an area commonly referred to as the Badger-Two Medicine area.  In 1983, Mr. Longwell assigned Lease M-53323 to American Petrofina Company of Texas, which later became Fina Oil and Chemical Company, and others (collectively "Fina").  DSOMF 2.

On November 18, 1983, BLM received Fina's APD for the Federal South Glacier #1-26 well on Lease M-53323 near Hall Creek in Section 26, T30N., R.13W, PMM, i.e., approximately two miles south of U.S. Highway 2. DSOMF 2.  In 1985, BLM approved Fina's APD.  DSOMF 3.

BLM's decision to approve the APD was appealed by ten parties to the Interior Board of Land Appeals ("IBLA"), and in 1985, the IBLA set aside BLM's decision and remanded the case to BLM to analyze four issues, including the cumulative effect of future logging in the area,

consideration of the possible effect of a discovery of an archaeological site on road location, the ability to close the road to all but drilling-related activity, and the completion of a law enforcement plan before authorizing any activity.  DSOMF 3.

At Fina's request, BLM suspended operations and production on Lease M-53323, effective October 1, 1985. DSOMF 4.

In 1987, after addressing the remanded issues, the BLM issued a Decision Notice and Finding of No Significant Effect, thereby reactivating Fina's APD. BLM's decision was again appealed to the IBLA, and based on issues raised in that appeal, BLM moved for a remand of its decision. The IBLA granted BLM's motion and vacated and remanded BLM's decision for further action.  DSOMF 5.

BLM informed Fina in August 1987 that the lease suspension would remain in effect to allow additional environmental analysis.  DSOMF 6.

A Draft EIS for Fina's APD was available for public comment in late 1989, and a Final EIS was issued in December 1990.  On February 19, 1991, the Forest Service and the BLM issued a joint Record of Decision ("ROD") approving Fina's Surface Use and Operating Plan, conditioned upon Fina's adoption of mitigation measures included as Conditions of Approval and approving the APD.  DSOMF 8-9.

BLM's decision was again appealed to the IBLA .  DSOMF 12.  In August 1991, the IBLA again granted BLM's motion for a remand.  BLM then commenced and completed a study of the surface-related issues.  DSOMF 12.

On January 15, 1993, Fina's APD was approved. DSOMF 12.

In 1999, Fina assigned its record title interest in Lease M-53323 to Mr. Longwell, effective July 1, 2000.  DSOMF 13.

On July 15, 2004, BLM received an assignment transferring record title interest in Lease M-53323 from Mr. Longwell to Solenex LLC. DSOMF ___

**B. District Court Action**

In April 1993, seven groups filed a complaint in U.S. District Court for the District of Montana challenging the APD approval decision.  Among other counts, the litigation contended that the Forest Service and BLM violated the American Indian Religious Freedom Act of 1978 by lack of consultation with Blackfeet traditional and religious leaders and was without proper consideration of the area's religious and cultural significance to the Blackfeet.  Also, that studies were not undertaken as required by the National Historic Preservation Act.  DSOMF 15

Also, in April 1993, Senator Max Baucus of Montana introduced S. 853, which, if enacted, would mandate a review of the Badger-Two Medicine area in accordance with the Wilderness Act and the special provisions of his bill.  DSOMF 16

Then Secretary of the Department of the Interior suspended activities on Lease M-53323 for a period of one year, effective June 30, 1993, to allow time for Congress to consider S. 853 and to maintain the status quo during the interim.  The U.S. District Court stayed further proceedings in the federal lawsuit until May 1994.  DSOMF 18.

In response to a February 1994 request from Senator Baucus to the Secretary of the Department of the Interior, Interior extended the moratorium on oil and gas drilling in the Badger-Two Medicine area through June 30, 1995, and BLM suspended Fina's lease activities through June 30, 1995.  The U.S. District Court stayed further proceedings in the federal lawsuit until May 1, 1995.  DSOMF 19.

In April 1995, Senator Baucus introduced S. 723, the Badger-Two Medicine Protection Act, which would prohibit surface disturbance on existing oil and gas leases in the area until Congress

determines otherwise.  In May 1995, an Assistant Secretary of the Department of the Interior then suspended activities on Lease M-53323 for a period of one year, effective June 30, 1995. The district court proceedings were stayed until June 30, 1996.  DSOMF 20.

In June 1996, BLM suspended activities on Lease M-53323 for a period of one year, effective June 30, 1996, to allow review and deliberation of National Register eligibility determination of the Badger-Two Medicine area.  The district court proceedings were likewise stayed until June 30, 1997.  But, in March 1997, the district court terminated the lawsuit without prejudice to the rights of the parties to reopen the case to obtain a final determination.  The case has not been reopened.  DSOMF 22.

### C.  The NHPA Process

Cultural and religious issues were raised consistently during the lifetime of this lease.  For example, the 1991 ROD notes approximately 190 comments and a petition with about 9,000 signatures were received on the Final EIS.  Of particular focus of extensive consultation efforts was the discussion of traditional cultural and religious issues or concerns.  Numerous meetings were held with Tribal representatives, intended to elicit information about traditional, cultural, or religious practices to meet AIRFA and NHPA requirements. The 1990 FEIS notes that the Fina drilling proposal is "unequivocally opposed by the Blackfeet traditionalists."  The FEIS summarizes interviews and other information gathered or incorporated as part of the analysis of effects to Blackfeet Traditional Culture and Religion.  Appendix R in the FEIS chronicles meetings and correspondence regarding cultural concerns between 1972-1990.  DSOMF 10.

In response to these concerns, in April 1997, BLM suspended activities on Lease M-53323 for a period of one year, effective June 30, 1997, to allow continued review of the historic property.  DSOMF 23.

8

On May 21, 1997 the Forest Service submitted documentation in compliance with 36 C.F.R. § 800.4(c)(2) for a formal Determination of Eligibility (DOE) for the Badger-Two Medicine Traditional Cultural District ("TCD") to the Keeper of the National Register of Historic Places based on the 1993 Greiser and Greiser study. The Forest Service sought concurrence from the Keeper as no concurrence had been obtained from the SHPO. The Forest Service, in its letter to the Keeper, acknowledged that some Blackfeet were opposed to the boundary identified and believed the entire Badger-Two Medicine area was sacred. DSOMF 32.

In late 1997, the Keeper of the National Register of Historic Places sought clarification from the Forest Service on the intended boundaries for the determination of eligibility area and whether a single historic district or multiple properties should be considered. Clarification requests, additional research, and responses continued throughout 2001. DSOMF 33.

To allow time for the completion of the historic property review, in July 1998, BLM suspended activities on Lease M-53323, effective July 1, 1998, with the suspension to remain in effect until the conclusion of the historic property review under Section 106 of the National Historic Preservation Act. The suspension continues in place. DSOMF 24

In January 11, 2001, 36 C.F.R. § 800 regulations became effective. Those regulations outline a greater level of participation in the NHPA process by Tribes and members of the public. On January 31, 2002, the Keeper of the National Register determined the Badger-Two Medicine Blackfoot TCD, as delineated at that time, was eligible for listing in the National Register of Historic Places under Criteria A and B in the area of Ethnic History: Native American. The Keeper determined that about 90,000 acres were eligible for listing. DSOMF ___

On February 22, 2002, the Forest Service advised Mr. Longwell that the Keeper had determined that the Badger-Two Medicine TCD was eligible for listing on the National Register

and that the Forest Service was now able to proceed with the assessment of effects regarding his proposal.  That letter provided information regarding the regulatory steps involved in completing the NHPA Section 106 process.  The letter documents a meeting between the Forest Service, BLM and the Blackfeet Council to work on various aspects of the Traditional Cultural District and related Section 106 reviews and highlighted the proposed drilling as one of the first topics requiring consultation.  DSOMF 36.

In early March 2002, the Forest Service initiated efforts to identify issues and costs associated with the analysis and possible NEPA documents needed to lift the suspension of Mr. Longwell's APD.  DSOMF 37.

Once the Keeper had determined the TCD was eligible for listing, on April 12, 2002 the Forest Service wrote Mr. Longwell to update and respond to his March 12, 2002 letter. The Forest Service letter deals specifically with the NEPA process, and in particular, with procedures for complying with 40 C.F.R. § 1502.9  regarding consideration of new information or changed conditions that may have a bearing on a NEPA decision and that would warrant a supplement to the final Environmental Impact Statement including consideration of the new listing of the Canada lynx as threatened under the Endangered Species Act and the addition of seven animal and seventeen plant species to the Forest Service sensitive species list. The letter goes on to discuss issues and next steps that the Forest Service is taking associated with the Section 106 process and consulting party involvement, including Solenex.  DSOMF 38.

On April 19, 2002, in response to questions from Mr. Longwell, the BLM confirmed the approved APD was still valid and that no activity could commence until the suspension was terminated.  The BLM also advised that the termination of the suspension is involved with

cultural heritage issues and other requirements of NEPA that are being addressed by the Forest Service, as discussed in their April 12, 2002 letter. DSOMF 39.

Throughout the late spring and summer of 2002, the Forest Service continued work to identify issues and costs associated with the analysis and possible NEPA documents needed to lift the suspension of Mr. Longwell's APD. DSOMF 40.

In November 2002, the Forest Service had funds required to begin the NEPA process necessary to lift the suspension of Mr. Longwell's APD. DSOMF 41

In June 2003, the Lewis & Clark Forest Supervisor formally initiated a review through a Supplemental Information Report of new information related to the 1991 Final EIS and ROD for the Longwell drilling proposal.  DSOMF 42

On June 25, 2003, the Forest Service accepted Mr. Longwell as a consulting party in the ongoing analysis of his lease in the Badger-Two Medicine Area.  DSOMF 43

In July 2003, the Lewis & Clark Forest Supervisor sent a letter to consulting parties for the proposed Longwell exploratory well, asking for information on the proposed Area of Potential Effects ("APE") boundaries.  Consulting parties included: the Independent Petroleum Association of Mountain States, Sidney Longwell, the Blackfeet Tribe, the National Trust for Historic Preservation, the Superintendent of Glacier National Park, and the Montana SHPO. DSOMF 44.

On September 15, 2003, the Forest Service convened a consulting party meeting to review history of proposal, roles of consulting parties, and initial perspectives on potential effects of proposed drilling including a proposed preliminary APE.  Invited consulting parties included the Chairman of Blackfeet Tribe, the Blackfeet Cultural Director, the Supervisor of Glacier National Park, the National Trust for Historic Preservation, Sidney Longwell, the Independent Petroleum

Association of Mountain States, and the Montana SHPO.  Mr. Longwell was unable to attend the meeting but his geologist, Bill Hanson, was present.  The Archeologist assisting in the 106 process identified the draft APE and three potential effects to the Cultural District; visual, atmospheric, and audible.   The Forest Service, at the September 15, 2003 consulting party meeting, noted that the area drawn on the map shown at that time as the APE was preliminary and could change if new information was provided.  Tribal representatives at the meeting expressed concerns that the determined Badger-Two Medicine Blackfoot TCD took out a number of significant areas, that the entire Badger-Two Medicine should be included in the Cultural District and that the tribe supports the Cultural District but not the current boundaries.  A tribal representative also pointed out rationale for changing tribal viewpoints, "The new committee has more knowledge."  There was discussion that the APE was not accurate.  Concerns included adding the road corridor to the APE and that more tribal members should have been interviewed to identify effects.  DSOMF 45.

From October 2003 through February 2004, the Forest Service collected additional information from the Blackfeet Tribe.  DSOMF 46.

On February 6, 2004, the Forest Supervisor sent a letter to consulting parties providing an update on the Longwell drilling proposal.  The letter notes that the Forest has completed a review of the information requested of the parties and that additional input indicated that National Forest System lands north of the eligible Badger-Two Medicine Blackfoot TCD may be the subject of traditional use sufficient to warrant further evaluation.  The letter states the Section 106 consultation process would be suspended while the Forest Service worked with the Blackfeet Tribe on these evaluations.  The letter also notes that the follow-up work would take into the next calendar year, and the reasons for this timeframe include acquiring funding, preparing contract

estimates/award, field season, and to follow tribal protocols for gathering this data. It also notes

that findings will be presented to the Keeper of the National Register for determination, and that

consulting parties will be notified when the NHPA process will be resumed.  DSOMF 47.

The Forest Service wrote a letter dated August 5, 2004 to the consulting parties advising that

it had issued several contracts for an additional ethnographic study.  The investigations were

necessary to determine whether or not the Badger-Two Medicine Blackfoot Traditional Cultural

District overlaps with the proposed APD.   The Blackfeet Tribe, through a contract with the

Blackfeet Community College, was being hired to select and facilitate the participation of the

Blackfeet Elders, provide access to Tribal archives, and to work with Dr. Zedeno in the research.

The letter stated a final product from the research was expected by "early next summer."

DSOMF 49

In 2004, NHPA regulations 36 CFR Part 800 were amended implementing the 1992

amendments of the NHPA dealing with tribal engagement and consultation and consideration of

traditional cultural properties and districts (based on Bulletin 38).  DSOMF 50

From August 2004 through December 2005, the ethnographic report was drafted, peer

reviewed, and reviewed by the Blackfeet Tribe.  During the fall of 2005 the ethnographic

contract was modified to include additional work. DSOMF 51

On May 13, 2005, in the midst of the work referenced above, the Blackfeet Tribe asked the

Forest Service, "On the basis of the report and the briefing, I would like to state the wishes of the

tribe regarding the specific format that a nomination of the adjusted Badger-Two Medicine

Traditional Cultural District should follow. It is in our best interest to submit a single district

nomination that integrates all the portions of the Blackfeet Unit, including the watersheds of the

South Folk of the Two Medicine River, Badger Creek, and Birch Creek.  I am aware that the

current format of the District nomination is a "Multiple Property" nomination.  The Blackfeet Tribe would like to change this format to a "Single District" nomination, which best captures the Blackfeet worldview and traditional use of the area."  DSOMF 52.

On January 27, 2006, the Forest Service responded to Mr. Longwell, as requested by the BLM in a December 14, 2005 letter from the BLM to Forest Service.  The letter states that the Forest asked the ethnographic contractor for additional information prior to finalizing the ethnographic report.  The agency expected the report to be finalized by the end of February 2006 and would then consult with the SHPO regarding eligibility of properties.  The agency anticipated these steps to occur in March and April 2006 and noted the Forest would convene consulting parties, if necessary, once those steps were completed.  DSOMF 53.

On March 31, 2006, the ethnographic study titled "Badger-Two Medicine Traditional Cultural District, Montana: Boundary Adjustment Study" by Dr. Maria Nieves Zedeno was submitted to the Forest Service.  This report identified additional lands north of the current Badger-Two Medicine Blackfoot TCD that should be considered for inclusion in the District. This report notes that the Blackfeet Tribe asked that additional studies be conducted in order to fully document the traditional cultural significance of areas excluded from the original Badger-Two Medicine TCD boundaries.  DSOMF 54.

In addition to the report, the contractor submitted National Register of Historic Places registration forms. The agency provided comments on the report and forms, and in June 2006 the final ethnographic report was accepted by the Forest Service which incorporated suggested edits provided by the agency.  DSOMF 55.

In August 2006, the Forest Service conducted a field review of the Badger-Two Medicine Blackfoot TCD with the goal of reviewing and discussing the proposed District.  Participants

included the USDA Liaison for the Advisory Council on Historic Preservation, the Regional

Tribal Relations Specialist, Regional and Forest Archaeologists and line officers for the Lewis

and Clark National Forest.  DSOMF 56.

In October 2006, the Forest Service received Montana State Historic Preservation Office

comments on this report. Their suggested comments led to adjustments in the proposed

boundary.  DSOMF 57.

In 2006-2007, The Blackfeet Tribe contracted studies for an ethnographic review of other

lands in the Badger-Two Medicine that were not currently included in the Badger-Two Medicine

Blackfoot Traditional Cultural District.   As stated in a later report ("Badger-two Medicine

Traditional Cultural District, Lewis and Clark National Forest, Montana, Boundary Expansion

Study," Zedeno and Murray, Revised December 12, 2012) (F2-0060; FS005617), "During the

course of this first study (i.e. 2006 study) it became increasingly clear to the Blackfeet Tribal

Historic Preservation Officer (THPO) that Mowitch Basin (LCNF) and Birch Creek (LCNF and

BMW [Bob Marshall Wilderness] should be incorporated into the TCD as well.  This effort

resulted in the first of two reports entitled "Blackfeet Sacred Sites along the Birch Creek

Watershed" (Zedeno et al. 2007).  DSOMF 58.

On December 20, 2006, Public Law 109-432 was passed (G-0027; FS006271-6282),

withdrawing the Rocky Mountain Front, including the Badger-Two Medicine, from entry under

the mining laws and from disposition under the mineral leasing laws, subject to valid existing

rights.  The law established a tax incentive for existing leaseholders to enter into a conservation

sale or transfer of mineral interests to an eligible entity (e.g. an organization operated primarily

for conservation purposes).  Solenex was provided the opportunity to take advantage of the

provisions of this law (see G-0028; FS006283 letter from Senators Baucus and Tester urging

leaseholders to relinquish leases in the Badger-Two Medicine, noting strong opposition to drilling from the Blackfeet Nation).  DSOMF 59.

On October 18, 2007, the Forest Service responded to a letter from Representative Jindal (on behalf of Solenex) in which the agency provides a status of the Solenex lease. (D-0072; FS002967-2969).  The letter notes that the Tribe brought forth compelling information related to original Badger-Two Medicine Blackfoot TCD boundaries that triggered the need for additional data collection by the Forest Service to address possible effects to the Badger-Two Medicine Blackfoot TCD from the drilling proposal.  It outlines several of the studies that have taken place, including the 2006 ethnographic report, and notes that the Tribe had initiated ethnographic reports on the remainder of the Badger-Two Medicine area.  It states that "The tribe forwarded a report on the Birch Creek area to us earlier this year (2007).  The tribe plans to review the existing [Badger-Two Medicine Blackfoot TCD] in light of this new information."  DSOMF 60.

A Lewis and Clark National Forest Annual Report for 2008 Projects conducted under the Northern Region Programmatic Agreement for Cultural Resources notes that "Heritage resource tribal consultation and coordination for 2008 was concentrated primarily with the Blackfeet . . . . Ongoing ethnographic study by the Tribe is targeting additional lands proximate to this District and along the Rocky Mountain Front."  DSOMF 61.

In 2008, the THPO obtained a grant to complete an ethnographic study for the Middle and South Forks of Birch Creek (LCNF) and the Middle Fork of the Flathead River (Bob Marshall Wilderness), and Badger Canyon (LCNF) among other traditional use areas in public and private lands.  This resulted in a report titled "Blackfeet Sacred Land Recovery" (Zedeno et al, 2008) DSOMF 62.

The ethnographic studies completed in 2006, 2007, and 2008 contributed to information used to determine the scope and extent of the Badger-Two Medicine TCD.  Much of the information was provided by the Blackfeet Tribe. DSOMF 63.

The Lewis and Clark National Forest 2009 Annual Heritage Report notes that during this time, the Forest was also involved in travel management planning for the Badger-Two Medicine and in consultation with the Tribe on these efforts (see also Tribal Resolution 159-2008, providing Blackfeet Tribal position on travel management in the Badger-Two Medicine during the travel management analysis process).  DSOMF 64.

On November 17, 2010, the Forest Service replied to Sidney Longwell noting that the expanded Badger-Two Medicine TCD resulting from the 2006 ethnographic study resulted in inclusion of the well site location and additional areas of his lease.  It notes that the agency had not yet initiated formal National Register listing proceedings for the Badger-Two Medicine TCD, but would notify consulting parties, including Mr. Longwell, when that occurred.  DSOMF 65.

In a letter dated May 27, 2011, the Forest Service notified Mr. Longwell that it was preparing a determination of the Badger-Two Medicine TCD eligibility.  DSOMF 66.

In August 2011, the Forest Service entered into an Agreement for a review and compilation of all existing and new information pertaining to the Badger-Two Medicine TCD and to complete a National Register determination of eligibility for the TCD.  DSOMF 67.

On March 27, 2012, the Forest Service replied to a February 21, 2012 letter from Mr. Longwell notifying him the agency was preparing a determination of eligibility for the Badger-Two Medicine Blackfoot TCD to submit to the SHPO for concurrence or additional comment. The letter also noted other alternatives available to Mr. Longwell while the Forest was going

through the eligibility process, including consideration of an alternative well site location outside

the Badger-Two Medicine TCD (on private lands) or taking advantage of the provisions of the

Tax Releif & Health Care Act of 2006, P.L. 109-432, 120 Stat. 2922.  DSOMF 68.

A draft of the report was received on May 31, 2012 and comments were provided to the

contractor on July 6, 2012. DSOMF69.

In December 2012, the report titled "Badger-Two Medicine Traditional Cultural District,

Lewis and Clark National Forest, Montana, Boundary Expansion Study, Revised (Zedeno, et al

2012) was submitted to the Forest Service.  This report evaluated the body of previous studies

(four ethnographic and two archival studies) and made a case for expanding the TCD to include

lands on the Flathead National Forest (Beaver Lake) and the South Fork Two Medicine (northern

portion of the Badger-Two Medicine), Mowitch Basin, and Birch Creek identified in previous

studies to encompass approximately 163,305 acres.  DSOMF 70.

In May 2013, the Forest Service met with the Blackfeet THPO and informed them that the

final report had been received and that they would be consulted in the near future regarding

boundary adjustments. DSOMF 71.

In June 2013, the Forest Service submitted the report to SHPO and to the Blackfeet Tribe.

The Forest Service sought a concurrence determination of eligibility of the expanded Badger-

Two Medicine Blackfoot TCD from the SHPO and the THPO.  DSOMF 72

On July 22, 2013, the Forest Service received concurrence from the SHPO that the boundary

expansion study meets TCP guidance from the National Park Service.  On August 1, 2013, the

Forest Service received concurrence from the Blackfeet THPO on the expanded Badger-Two

Medicine Blackfoot TCD boundaries. DSOMF 73-74.

On August 21, 2013, the Forest Service updated Mr. Longwell, informing him that concurrence of the Badger-Two Medicine Blackfoot TCD boundary had been obtained and the Forest Service would proceed to set up a meeting of consulting parties.  Scheduling difficulties with all parties and the government furlough precluded a meeting until January 2014.  DSOMF 75.

On November 5, 2013, the Forest Service sent a letter to consulting parties, providing them an update of the ongoing Section 106 process and requesting their participation in a meeting to discuss potential effects on the TCD by the proposed drilling and seek possible mitigation measures, if necessary.  A meeting was proposed for mid-January 2014. DSOMF 76.

On January 29, 2014 a consulting party meeting was held in Great Falls, Montana.  Parties, including consulting parties, attending included Mountain States Legal Foundation (representing leaseholder, Sidney Longwell), RPM (geological contractor for Solenex), Blackfeet THPO, Montana SHPO, Glacier National Park, Western Energy Alliance, Forest Service – Lewis and Clark National Forest, and a Glacier County Commissioner.  DSOMF 77.

The purpose of the consulting party meeting was to re-initiate consultation according to NHPA Section 106; to make an assessment of adverse effects as outlined in 36 C.F.R. § 800.5(a) for the Badger-Two Medicine Blackfoot TCD.  A meeting scheduler was sent out to schedule a follow-up consulting party meeting in late March or early April. DSOMF 78.

On February 6, 2014, the Forest Service sent a letter to SHPO and THPO asking for their review and comment on the National Register of Historic Register Form for the Badger-Two Medicine TCD and the APE delineation as presented during the January 29, 2014 consulting party meeting.  As the Badger-Two Medicine Blackfoot TCD was expanded to include the entire

Solenex lease, the APE was also expanded to include the entire access route and a ¼ mile buffer. DSOMF 79.

On February 7, 2014, drafts of the consulting party meeting notes were provided to participants for review.  The notes included the discussion of rationale for increasing the size of the APE to include the well site access road, which was not part of the original APE delineation. A map of the increased APE boundary was included as an attachment. The APE was based on the specific area of potential ground disturbance, visual, noise, and olfactory effects. DSOMF 80.

On February 24, 2014, the SHPO responded to the Forest Service request for review and comment on the Badger-Two Medicine Blackfoot TCD Nomination form and the proposed Solenex APE.  They stated the Forest Service had adequately documented the eligibility of the TCD under National Register criteria and that the proposed boundary expansion was warranted. With regard to the APE, they stated "With regard to the proposed Area of Potential Effects while we do not disagree with the APE for the direct ground disturbance activities as proposed, we recommend further consultation and consideration of indirect and cumulative effects . . . . [W]e believe there is the very likely potential for effects to values and characteristics of the larger entity: the Traditional Cultural District as a whole."  Bodily Decl. ¶ 19.

On February 28, 2014, the THPO responded to the Forest Service request for review and comment on the Badger-Two Medicine Blackfoot TCD Nomination form and proposed Solenex APE.  The letter states: "[W]e strongly support the USFS decision to expand the boundaries of the Badger-Two Medicine Cultural District."  They go on to state: "Government to Government consultation with the Blackfeet Tribe must continue in regard to the proposed Solenex APE.  We absolutely must not lose what little we have left in terms of spiritual power; on the contrary, we must renew efforts to protect and revitalize cultural knowledge and practices and are inextricably

connected with each and every resource found within the APE . . . . While we do not agree with the APE as far as direct ground disturbance activities are considered, we find that there are untold cultural and spiritual impacts that cannot be mitigated in the same way as physical impacts."  Bodily Decl. ¶ 19

On February 25, 2014, the SHPO certified (on National Register of Historic Places Registration Form 10-900) that the expanded Badger-Two Medicine Blackfoot TCD met National Register Criteria. Bodily Decl. ¶ 16

On March 12, 2014, the THPO signed the National Register of Historic Places Registration Form 10-900 certifying that the expanded Badger-Two Medicine Blackfoot TCD met National Register Criteria.  Bodily Declar. ¶ 14

On April 3, 2014, the second consulting party meeting was held in Great Falls, Montana. Meeting objectives included: defining and explaining the Area of Potential Effects and an assessment of adverse effects by applying the criteria of adverse effects as outlined in 36 CFR 800.5(a).   Parties, including consulting parties, attending included Mountain States Legal Foundation, RPM (geological contractor for Solenex), Solenex (Leaseholder, Sidney Longwell), Blackfeet THPO, Montana SHPO, Glacier National Park, Forest Service – Lewis and Clark National Forest, a Glacier County Commissioner, and Glacier-Two Medicine Alliance.  DSOMF 86.

On April 14 and April 16, 2014, the Forest Service sent letters to the SHPO and THPO with documentation and justification for defining the Area of Potential Effects as the entire expanded Badger-Two Medicine Blackfoot TCD and asking for concurrence on the expanded APE.  Bodily Decl. ¶ 23

On April 24, 2014, the Forest Service received concurrence from the SHPO on the expanded APE.  Bodily Decl. ¶ 23

On April 30, 2014 final meeting notes (and attachments) of the consulting party meeting were provided to participants.  On May 5, 2014, the Keeper of the National Register made a formal determination of eligibility for inclusion in the National Register of Historic Places for the expanded Badger-Two Medicine Blackfoot TCD.  Bodily Decl. ¶ 15

On May 16, 2014, the Forest Service received concurrence from the THPO on the expanded APE.  Bodily Decl. ¶ 23

Based on the consulting party meetings, the Forest Service is now determining whether an adverse effect is found under 36 C.F.R. § 800.4(d)(2).  The Forest Service informed Mr. Longwell by email on June 25, 2014, that the Forest Service archaeologist Mark Bodily was specifically working with the THPO to articulate adverse effects and once that was completed and provided to the consulting parties there would be discussion as to any interest of the consulting parties in further meeting to resolve adverse effects.  Bodily Decl. ¶ 29

## III.   ARGUMENT

### A.   Under § 701(a)(2) of the APA and the Supreme Court's decision in *SUWA*, the action which Plaintiff seeks to compel is action committed to agency discretion by law.

The decision to lift the suspension of the APD is vested in the agencies' discretion by law, and therefor Plaintiff has no right of action under the judicial review provisions of the APA. In its unanimous opinion in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55 (2004), the Supreme Court addressed whether the APA provision authorizing courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), extends to specific BLM land management functions.  In concluding that it did not, the Supreme Court identified two important prerequisites for judicial review under the APA: (1) the action allegedly withheld be a *discrete*

agency action, and (2) the action must be one that the agency is legally *required to take*.  *SUWA*, 542 U.S. at 63.  These prerequisites have not been satisfied by Plaintiff in this case.

Plaintiffs in *SUWA*, in express reliance on APA § 706(1), sought injunctive relief for BLM's supposed failure to regulate off-road vehicle ("ORV") use in wilderness study areas ("WSAs").  They argued that this failure violated a statutory "non-impairment" mandate: that is, a requirement that BLM manage WSAs in a manner "so as not to impair [their] suitability . . . for preservation as wilderness."  43 U.S.C. § 1782(c).  The Court noted initially that the APA defines agency action principally by example.  It sets forth a list of five categories of actions with respect to which an aggrieved party might seek judicial review: specifically, agency rules, orders, licenses, sanctions, or relief.  5 U.S.C. § 551(13).  As the Court explained, all are "circumscribed, discrete agency actions," and are defined at 5 U.S.C. § 551.  542 U.S. at 62.  The Court then construed the phrase "failure to act" as meaning a failure to take one of these five discrete agency actions and concluded: "The important point is that a 'failure to act' is properly understood to be limited, as are the other items in 5 U.S.C. § 551(13), to a *discrete* action."  *Id.* at 63 (emphasis in original).

An action sought to be compelled must not only be "discrete," but must also be one that an agency is legally required to take, a notion inherited from pre-APA practice under the All Writs Act, 28 U.S.C. § 1651 (encompassing the writ of mandamus), and preserved in the APA's authorization for courts to "compel agency action unlawfully withheld."  5 U.S.C. § 706(1); *SUWA*, 542 U.S. at 63.  The Court explained that "[t]he mandamus remedy was normally limited to enforcement of 'a specific unequivocal command,' [or] the ordering of a 'precise, definite act . . . about which [an official] had no discretion whatever.'"  *Id.* (citations omitted).

Accordingly, the *SUWA* court concluded that a claim for failure to act may only proceed

where a plaintiff asserts that "an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64 (emphasis in original). Applying these principles to SUWA's claim that BLM had violated the WSA non-impairment mandate, the court concluded that this requirement – while "mandatory as to the object to be achieved," *id.* at 66 – leaves BLM a "great deal of discretion in deciding how to achieve it." *Id.* It does not mandate exclusion of ORVs, because some ORV use in certain areas may not "impair the suitability" of the area for preservation as wilderness. 43 U.S.C. § 1782(c)). Clearly, Congress entrusted BLM with the authority to apply its expertise and make judgments as to what use of the land might impair its suitability for formal wilderness designation.

Here, Plaintiff argues that BLM and the Forest Service have unreasonably delayed lifting the suspension of lease activities authorized under Plaintiff's approved APD. Pl.'s Br. 21-39. Plaintiff seeks an order immediately lifting the suspension. Under the Supreme Court's ruling in *SUWA*, such relief is unavailable because Plaintiff has failed to demonstrate that the agencies have failed to take any action that they were legally required to take.

Plaintiff's only allegation that the MLA imposes a discrete, non-discretionary duty for the agency to act is a citation to the Section 209 of the MLA that provides in relevant part:

> The Secretary of the Interior, for the purpose of encouraging the greatest ultimate recovery of coal, oil, gas, oil shale, gilsonite (including all vein-type solid hydrocarbons), phosphate, sodium, potassium and sulfur, and in the interest of conservation of natural resources, is authorized to waive, suspend, or reduce the rental, or minimum royalty, or reduce the royalty on an entire leasehold, or on any tract or portion thereof segregated for royalty purposes, **whenever in his judgment** it is necessary to do so in order to promote development, or **whenever in his judgment** the leases cannot be successfully operated under the terms provided therein.. . . .

30 U.S.C. § 209 (emphasis added). The language of the statute specifically authorizes the Secretary to suspend lease activities whenever in his judgment it is necessary to do so to

accomplish the purposes of the MLA.   This is the same type of "broad statutory mandate" that the Supreme Court found was not reviewable under the APA.  *SUWA*, 54 U.S. at 66-67. Furthermore, the BLM's implementing regulations provide that "[s]uspensions will terminate when they are no longer justified in the interest of conservation, when such action is in the interest of the lessor, or as otherwise stated by the authorized officer in the approval letter."  43 C.F.R. § 3165.1(c).  The 1998 suspension stated that the suspension will stay in effect until the conclusion of the historic property review under Section 106 of the NHPA.  Since that condition has not been met, BLM has no duty to lift the suspension.

Plaintiff has not identified a single section of the MLA that requires the agencies to take discrete action on the suspension in any way.  Nor does the Plaintiff identify any regulatory provision that establishes a discrete duty to act.  In fact, Plaintiff acknowledges that BLM's regulations provide for a range of decisions that that the agency can take on an APD.  Pl.'s Br. 3 n. 3.  Plaintiff simply fails to cite to any provisions in either the regulations or the MLA itself to support its theory that the law imposes a mandatory duty to take any action related to the suspension of lease activities under the approved APD.  The Court therefore, lacks subject matter jurisdiction and should grant Federal Defendants' motion to dismiss.

**B.     Even if the Court Were to Find That This Matter Is Not Committed to Agency Discretion by Law, BLM and the Forest Service Have Not Unreasonably Delayed Action on the Suspension of the APD.**

In determining whether there has been an unreasonable delay under the APA, 5 U.S.C. § 706(1), courts consider the following factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake, (4) the court should consider the effect of expediting delayed action on

agency activities of a higher or competing priority, (5) the court should also take into account the nature and extent of the interests prejudiced by delay, and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.' "

*Telecomms. Research & Action Ctr. v. FCC (TRAC)*, 750 F.2d 70, 80 (D.C. Cir 1984).

Plaintiff spends the majority of its brief arguing that application of the *TRAC* factors show that the BLM and Forest Service have unreasonably delayed lifting the suspension of the APD.  Pl.'s Br. 21-39.  These arguments, however, rely on Plaintiff's selective recitation of the facts.  A full review of all the relevant facts show, in fact, that the BLM and the Forest Service have worked diligently to carry out their Section 106 consultation responsibilities under the NHPA and  have made consistent progress up to and including the present time.

In this case, the Forest Service must comply with the NHPA implementing regulations at 36 C.F.R. Part 800 to take into account the effect of the APD on historic properties. Since 1993, the Forest Service has worked with the Blackfeet Tribe to establish the boundaries of the entire area of religious and cultural significance to the Tribe. As noted above, between 1987 and 1996 when the District Court case was dismissed, many of the decisions related to the APD that BLM or the Forest Service made were subjected to administrative and judicial appeals.  DSOMF 3-22. In addition, from 1997 until 2012, the Forest Service repeatedly attempted to get a boundary determination under NHPA for the Badger-Two Medicine TCD.  DSOMF 32-69.

It was not until December 12, 2012, that the Forest Service received an ethnological report, incorporating all previous studies that established the comprehensive boundary for the Badger-Two Medicine Traditional Cultural District. After receiving the study, the Forest Service sent a letter to the SHPO and the THPO seeking consensus on the eligibility of the expanded boundaries.  On July 22, 2013, the SHPO concurred with the expanded boundaries and on August 1, 2013, the THPO concurred.  And, on May 5, 2014, the Keeper of the National Register

made a determination of eligibility for the expanded Badger-Two Medicine Blackfoot TCD.

Bodily Decl. ¶ 15

The Forest Service then consulted with the SHPO and the THPO on the APE for the

APD.  Bodily Decl. ¶ 19, 20. Concurrence for the APE was received from the SHPO on April 24,

2014 and from the THPO on May 16, 2014. Bodily Decl. ¶ 23 The Forest Service held two

meeting with the consulting parties including Plaintiff.  Based on those meetings, the Forest

Service is currently determining whether there will be an adverse effect on the Badger-Two

Medicine Traditional Cultural District from activities associated with the APD.  Consultation on

that issue is proceeding at this time.

When the *TRAC* factors are considered in light of this full recital of the facts, it is clear

that the BLM and the Forest Service have not unreasonably delayed action on lifting the

suspension of lease activities authorized under the approved APD.  The Forest Service is

proceeding to comply with its responsibilities under the NHPA, and since the establishment of

the boundaries of the Badger-Two Medicine TCD, it has moved expeditiously to complete the

consultation.  Once the consultation is complete, the Forest Service and the BLM will consider

next steps on the suspension of the APD.  This Court should deny Plaintiff's motion for

summary judgment, grant Federal Defendants' cross-motion for summary judgment and allow

the agencies to continue their decision making process under the applicable statutes.

## V.     Conclusion

For the foregoing reasons, Federal Defendants respectfully request that their motion to

dismiss be granted and the Plaintiff's action be dismissed with prejudice, because Plaintiff has

failed to identify a discrete agency action that BLM and the Forest Service are required to take

under the MLA or the MLA's implementing regulations.  In the alternative, the Court should

grant Federal Defendants' cross-motion for summary judgment because there has been no unreasonable delay in lifting the suspension or allowing lease activities authorized by the approved APD.

Dated: August 25, 2014

Respectfully submitted,

SAM HIRSCH
Acting Assistant Attorney General

/s/ Ruth Ann Storey
Ruth Ann Storey
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0493
ruth.ann.storey@usdoj.gov

Counsel for Federal Defendants