IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOLONEX LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | )   Case No. 13-993-RJL |
| S.M.R. JEWELL, Secretary | ) |
| U.S. Department of the Interior, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**BRIEF OF *AMICUS CURIAE*
BLACKFEET TRIBE OF THE BLACKFEET INDIAN RESERVATION
IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

MELODY L. MCCOY
U.S. Dist. Ct. CO 0043
K. JEROME GOTTSCHALK
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-7776
mmccoy@narf.org

September 2, 2014

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................................ i

**IDENTITY AND INTEREST OF *AMICUS*** ............................................................................. 1

**INTRODUCTION** ......................................................................................................................... 2

      **A.  The Tribe Has Important Interests In The Badger-Two Medicine Area Which Must Be Protected And Studies Undertaken Are Essential To A Proper Understanding And Protection Of Those Rights.** ................................................................... 2

      **B.  Federal Law and Policy and International Standards Require That The Tribe's Interests Be Taken Into Account And Protected.** ............................................................ 4

      **C.  The Tribe, Along With Defendants, Has Worked On Timely Development Of Information Necessary To Defendants' Decision-Making.** ..................................................... 6

**CONCLUSION** ............................................................................................................................ 10

## TABLE OF AUTHORITIES

### CASES

*Choate v. Trapp*, 224 U.S. 665 (1912)..................................................................................3

*Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439 (1988).........................4

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ...................................3

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1985) ...................................................................3

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)................................................................1

*United States v. Peterson*, 121 F. Supp. 2d 1309 (D. Mont. 2000) ...................................................3

*Washington v. Washington State Commercial Passenger Fishing Vessel Association*,
443 U.S. 658 (1979)................................................................................................................3

### STATUTES

16 U.S.C. §§ 470-470X-6 .......................................................................................................4

25 U.S.C. § 71..........................................................................................................................2

42 U.S.C. § 1996......................................................................................................................5

42 U.S.C. §§ 4331 *et seq.*........................................................................................................4

Pub. L. 102-575, 106 Stat. 4600 (1992)...................................................................................5

Pub. L. 109-432, 120 Stat. 2922 (2006)...................................................................................2

Act of June 10, 1896, 29 Stat. 321 .......................................................................................1, 3

Agreements of December 28, 1886 and January 21, 1887, ratified by Congress on May 1, 1888,
25 Stat. 113 ..............................................................................................................................3

Treaty of October 17, 1855, 11 Stat. 736 ................................................................................2

### ADMINISTRATIVE MATERIALS

Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous Peoples  (2010), http://www.state.gov/documents/organization/184099.pdf ................................5

Executive Order 13175, November, 6, 2000 ...........................................................................5

**OTHER**

United Nations Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc. A/RES/61/295 (Sept. 13, 2007) ........................................................................................5, 6

**IDENTITY AND INTEREST OF *AMICUS***

The Blackfeet Tribe of the Blackfeet Indian Reservation (Tribe) is a federally-recognized tribe whose sovereignty predates that of the United States itself. *Cf. Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978). The Tribe originally occupied a large reservation encompassing most of the northern part of present State of Montana, but which has been reduced to the current 1.5 million acre reservation adjacent to Lewis and Clark National Forest and Glacier National Park.

Since the beginning of time, the Northern Rocky Mountains have been a special place, both culturally and spiritually, to the Blackfeet people. However, under the press of settlement in the westward expansion and the discovery of gold in the area, the Tribe was forced to negotiate with the United States what is known as the 1895 Agreement. This Agreement, which included the cession by the Tribe of certain rights in an area referred to as the Badger Two Medicine, and other areas now within Lewis and Clark National Forest and Glacier National Park (sometimes called the Ceded Strip), was ratified by Congress by the Act of June 10, 1896, 29 Stat. 321. In that Agreement, the Tribe, at minimum, reserved its existing rights to access the Badger-Two Medicine for cultural, religious and other purposes, and to hunt, fish, and gather timber there, rights which it has held since time immemorial.

Plaintiff seeks to drill an exploratory well in a portion of the Badger-Two Medicine area. Plaintiff's proposed activities pose a grave danger to the rights which the Tribe holds in that culturally and spiritually important area and the Tribe seeks to ensure that its rights are protected through the required federal processes in which the Tribe, Plaintiff, Defendants and others are engaged, but which Plaintiff wishes to abort.[1]

---

[1] Supporting the Tribe's concerns are numerous environmental groups and other entities as well as Congress, which, subject to existing rights, has closed the area to future oil and gas development. Pub. L.

1

INTRODUCTION

The Tribe's amicus brief supports Defendants' Cross Motion for Summary Judgment And Opposition To Plaintiff's Motion For Summary Judgment. The Tribe adopts both of Defendants' arguments – that there is no discrete obligation toward Plaintiff which Defendants are required to take, and even if there were, there has been no undue delay in addressing Plaintiff's request. Rather than repeat Defendants' arguments, the Tribe details its interest in the lands at issue, the requirement that its interests be adequately considered, and the facts surrounding its efforts, in conjunction with Defendants, to get those interests adequately considered and protected. The Tribe's discussion clears up certain misconceptions in Plaintiff's Memorandum, and in the process demonstrates the soundness of Defendants' arguments.

**A. The Tribe Has Important Interests In The Badger-Two Medicine Area Which Must Be Protected And Studies Undertaken Are Essential To A Proper Understanding And Protection Of Those Rights.**

The Tribe has entered into treaty relations with the United States on several occasions.[2] Even after 1871, when the ordinary treaty process with tribes was ended by legislation, 25 U.S.C. § 71, the Tribe continued to negotiate with the United States and enter into agreements in all respects the equivalent of treaties.[3] The 1895 Agreement, ratified by the Act of June 10, 1896, 29 Stat. 321, is one such agreement and is central to the Tribe's interest in the present action.

---

109-432, 120 Stat. 2922, 3050 (2006). This congressional action undercuts Plaintiff's suggestion that previous suspensions to allow for congressional consideration were ploys. Plaintiff's Memorandum In Support of Motion for Summary Judgment (Plaintiff's Memorandum) at 23, fn 17. The legislation is confirmation of the special nature of the area, and the need to preserve it.

[2] *See, e.g.,* Treaty of October 17, 1855, 11 Stat. 736 (establishing Blackfeet Reservation).

[3] Agreements of December 28, 1886 and January 21, 1887, ratified by Congress on May 1, 1888, 25 Stat. 113 (1888 Agreement).

The 1895 Agreement, after ceding to the United States certain interests in land, including the Badger-Two Medicine area, provides:[4]

> That said Indians shall have, and do hereby reserve to themselves, the right to go upon any portion of the lands hereby conveyed so long as the same shall remain public lands of the United States, and to cut and remove therefrom wood and timber for agency and school purposes, and for their personal uses for houses, fences, and all other domestic purpose: *And provided further*, That the said Indians hereby reserve and retain the right to hunt upon said lands and to fish in the streams thereof so long as the same shall remain public lands of the United States….

This Agreement is essentially a contract between two sovereign nations. *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 675-76 (1979). In interpreting the Agreement, "standard principles of statutory interpretation do not have their usual force…." *Cf. Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). Treaties and statutes are to be interpreted as they would have "been understood by the Indians." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Choate v. Trapp*, 224 U.S. 665 (1912) (agreement and statute); *United States v. Peterson*, 121 F. Supp. 2d 1309, 1315 (D. Mont. 2000) (canons designed to recognize the government's unique Indian trust relationship).

The principle that treaties are to be understood as the Indians would have understood them is of special importance here. Plaintiff complains of "study after study", "endless study" and "study *ad nauseam*" Plaintiff's Memorandum at 35, 43, 46. These studies are crucial to understand the meaning to the Tribe of its rights reserved in the Badger-Two Medicine and the larger 1895 Agreement area. The Supreme Court has noted the clash of western and Native American paradigms. *Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439, 473 (1988) (dissent) (noting "…yet another stress point in the longstanding conflict between two

---

[4] It has been the consistent position of the Tribe that the Agreement was not a permanent cession and that the Tribe retains ownership of the area. The Tribe retains at a minimum the rights set forth above. Letter Earl Old Person, Tribal Chair, December 9, 1993 to Forest Supervisor. FS 003246-247.

disparate cultures – the dominant Western culture, which views land in terms of ownership and use, and that of Native Americans, in which concepts of private property are not only alien, but contrary to a belief system which holds land sacred").[5]  As indicated by the studies, the Tribe's reserved rights have deep spiritual and cultural meaning to the Blackfeet and the rights would have been understood to encompass the complex system of beliefs and practices associated with those activities.  FS 005466-5605; FS 005606; FS 005608-0005729.

**B.  Federal Law and Policy and International Standards Require That The Tribe's Interests Be Taken Into Account And Protected.**

The federal government is required by federal law and policy, including its trust obligations, to take the Tribe's rights into account.  Plaintiff acknowledges as much when noting that federal law and policy attempt to ensure "fully informed and well-considered" decision making and "to create and maintain conditions under which man and nature can exist in productive harmony".  Plaintiff's Memorandum at 4-5, discussing the National Environmental Policy Act (NEPA), 42 U.S.C. §§4331 *et seq.*  In addition, Plaintiff acknowledges that federal law and policy must take into account effects on areas eligible for inclusion in the National Register of Historic Places and specifically must consult with affected Indian Tribes both in determining if there are any adverse effects and if so, what alternatives are available.  Plaintiff's Memorandum at 6-7, discussing the National Historic Preservation Act (NHPA), 16 U.S.C. §§470-470X-6.  This is all part of what is known as the Section 106 process which was amended in 1992 to provide for participation by Indian tribes and clarified that properties of religious and cultural significance to Indian tribes may be eligible for listing in the National Register of Historic Places.  Pub. L. 102-575, 106 Stat. 4753-65 (1992).  These requirements are buttressed

---

[5]  The difference in viewpoints is reflected in the Plaintiff's disparaging characterization of the Tribe's religious concerns as "purported".  Plaintiff's Memorandum at 36.

by other laws and instruments. The American Indian Religious Freedom Act, 42 U.S.C. § 1996 provides:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

*See also* Executive Order 13175, November, 6, 2000 (requiring consultation with tribes and United States Department of Agriculture internal policy on tribal consultation). DR-1350-002, 2013.

These policies have been recognized at the international level as well. In 2007, the United Nations adopted the Declaration on the Rights of Indigenous Peoples. United Nations Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc. A/RES/61/295 (Sept. 13, 2007). President Obama announced United States' endorsement of the Declaration in 2010. Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous Peoples (2010), http://www.state.gov/documents/organization/184099.pdf. At this time, 150 Nations have now endorsed the Declaration as "providing the minimum standards for the survival, dignity and well-being of the indigenous peoples of the world." U.N. Declaration at Article 43. Article 25 of the Declaration provides that "Indigenous peoples have the right to maintain and strengthen their distinctive spiritual relationship with their traditionally owned…lands, territories, waters…and other resources and to uphold their responsibilities to future generations in this regard." Article 18 recognizes the right of Indigenous peoples to participate in decision-making affecting them and Article 19 provides that "States shall consult and cooperate in good faith with the indigenous peoples concerned through their own

representative institutions in order to obtain their free, prior, and informed consent before adopting and implementing legislative or administrative measures that may affect them."

The Tribe thus has rights which must, under federal law and policy and international standards, be taken into account and protected. Plaintiff objects to the fact that the Tribe and the federal government are taking those rights seriously and doing the underlying work necessary to see that those rights are protected as required by law.

**C. The Tribe, Along With Defendants, Has Worked On Timely Development Of Information Necessary To Defendants' Decision-Making.**

Plaintiff alleges that the Tribe's concern about the Badger-Two Medicine area is new-found and raised solely for delay and that it has agreed to previous boundaries for a Traditional Cultural District (TCD) and then delayed matters by urging their expansion. Plaintiff's Memorandum at 34, fn 29. The facts are to the contrary. The Tribe has always been concerned about development in the entire 1895 area and the potential adverse effects that development might have on the Tribe's retained rights, and has worked diligently with Defendants to provide the necessary understanding of the Tribe's rights.[6] On December 20, 1983, when notified of an application for permit to drill in the ceded area, the Tribe wrote to the Forest Supervisor of the Lewis and Clark National Forest (in which the relevant lands are located) in part as follows:

> It is the Blackfeet Tribe's position that this area is critical elk, deer, and moose wintering range and that the proposed drilling application should be subjected to a thorough environmental impact statement. We feel this kind of exploratory activity and the subsequent road building, etc., that go with it would be extremely detrimental to our hunting rights within the "Ceded Strip". This development would disrupt migration routes, big game wintering areas, and ultimately change the **entire area**. (emphasis supplied).
> 
> Therefore, the Blackfeet Tribe is adamantly opposed to the proposed drill site in the "Ceded Strip" and hereby requests that the Lewis & Clark Forest Supervisor

---

[6] Plaintiff references a Tribal Resolution expressing interest in possible economic opportunity in the ceded area. Plaintiff's Memorandum at 34, fn 29. Plaintiff does not identify any actual development undertaken by the Tribe.

implement an environmental impact statement, which would adequately address our reserved hunting rights guaranteed under the Agreement of 1895.

HC 15375.

On May 16, 1984, in regard to the Application for Permit to Drill (APD) at issue here, the Tribe wrote to the forest supervisor and joined in the comments of the Montana Wilderness Association raising numerous broad arguments as to why the APD should be denied at the time. HC 04131; 14126-04128. On April 5, 1985, in the first of several IBLA appeals concerning Plaintiff's APD, the Tribe filed a brief making four arguments against the granting of the permit, all related to concerns over tribal rights in the area. Argument IV, for example, was titled:

> THE APPROVAL OF THE APPLICATION FOR PERMIT TO DRILL SHOULD BE REVERSED BECAUSE THE EFFECT OF THE DECISION ON THE RESERVED RIGHTS OF THE BLACKFEET TRIBE WAS INADEQUATELY CONSIDERED.

HC 06653, 06656.

In 1993, the Tribe passed Resolution 89-93 referencing the Tribe's access, hunting, fishing, and timbering rights in the Badger-Two Medicine, the use of the area to "actively practice their religious, cultural and traditional rights in the area commonly known as the Badger/Two Medicine area" and its longstanding and continuing opposition to development of the area "until the issues relating to the issuance of permits can be re-examined in light of the effect of such development on the religious, cultural and traditional rights of the Blackfeet Tribe and its members." HC 01705-06. Thus, the Tribe has been acting to protect its interests in the entire Badger-Two Medicine area from the beginning. This position has been consistent throughout.

After the 1992 amendments to the NHPA and its Section 106 process to include Tribes and tribal areas, on December 9, 1993, the Tribe wrote to the Forest Supervisor, supporting in

principle the designation of a TCD (while stressing it could not diminish any rights under the 1895 Agreement). In referring to a 1993 study setting forth proposed boundaries the Tribe stated: "While we agree with the recommendation in the report as far as it goes, the Blackfeet Tribal Business Council believes that the entire RM-1 Unit should be designated as a Blackfeet Traditional Cultural District and that additional interviews should be undertaken before the report is finalized." FS 003246-247. In addition, a letter dated January 8, 2004, from the former forest supervisor to the Tribe makes clear that the Tribe never viewed previous versions of the TCD boundaries as final and adequate. She states the following, in part, about a meeting with the Tribe to discuss previous proposed boundaries:

> The purpose of the meeting was to gain concurrence from the Blackfeet Nation to proceed with the submission of the eligibility determination request to the Keeper of the National Register of Historic Places.
> I distinctly remember that the Council in general and the Elders in particular were not comfortable with the notion of a convoluted boundary that did not include the entirety of the Badger-Two Medicine….
> …I fully understood that the Blackfeet Council and Elders believed the whole area should be included (albeit willing to exclude private lands) but were concurring because this would begin the formal recognition process of the significance and potentially the ownership of this very special land.

FS 004027-29.

Thus, from the beginning, the Tribe has indicated that the boundaries of the TCD should include all of the Badger-Two Medicine region.

A March 5, 2002 letter from the Forest Service to the Tribal Chair responded to the question about who started the nomination process for the TCD. The response was that the question of eligibility as a TCD was raised in May of 1997 "in response to a legally mandated agency review for oil and gas proposals…We are very interested in continuing this close coordination with the Council as we consider a potential to list the district and avenues to protect traditional values." FS 003528-531. The letter also looked into grant opportunities for oral

8

histories to document traditional uses of the Badger-Two Medicine area. *Id*. at 003529. In an April 12, 2002 letter, the forest service informed the Tribal Chair that the APD is an "undertaking" subject to review under the NHPA. "Under the new regulations, Tribes are specifically identified as participants in the Cultural Resource Review also known as the Section 106 Review." The letter explains, "Under NHPA, federal agencies must identify historic and cultural sites, consult with others, develop an area of potential effect and if there are adverse effects, develop mitigation measures." FS 003590-591.

The Tribe was concerned from early on about the inadequacy of the studies performed and had a report done dated January 4, 2004 which demonstrated the inadequacy of the previous studies. FS 005235-005328. A 2004 Tribal Resolution called for additional study of the area to define the TCD, along with a handwritten memo expressing concern that sufficient time was needed to do the study so as to avoid weaknesses of previous studies. FS 004225-228. Funding became available to do further study of the area and the resulting studies justify including the entire Badger-Two Medicine area in a TCD. See studies at FS 005466-5605; FS 005606; FS 005608-0005729. A 2005 Resolution calls for the "entire Badger Two Medicine area [to] be nominated to the National Registry of Historic Places as a Blackfeet Traditional Cultural District and Ethnographic Cultural Landscape." FS 004243-45.

These documents demonstrate a long series of Tribal actions and decisions that totally undercut the Plaintiff's arguments about newly-manufactured tribal concerns and allegations that the Tribe changed its mind about the proposed boundaries. In addition, the record shows clearly the validity and sincerity of the Tribe's concerns. The record is replete with evidence of the importance of the Badger-Two Medicine to the Tribe, and its constant efforts to protect its rights

there. It is notable that Plaintiff does not take issue with the substance of the studies done.[7] Plaintiff simply does not like that federal law and policy protect the interests which those studies reflect.

## CONCLUSION

Plaintiff disparages the Tribe's rights in the Badger-Two Medicine area and suggests that any purported interests are recently manufactured. The Tribe has shown these arguments to be false. The Tribe has treaty rights to the area which are the very life-blood of its people. The Tribe has consistently fought to protect these interests and has diligently pursued protection of its rights. The parties have been involved in the very complicated regulatory review process and given the complexity of the process and the importance of the issues, there has not been undue delay in proceeding.

For these reasons, Defendants' Cross Motion For Summary Judgment should be granted and Plaintiff's Motion For Summary Judgment should be denied.

Respectfully submitted this 2nd day of September, 2014,

*/s/ Melody L. McCoy*
MELODY L. MCCOY
U.S. Dist. Ct. CO 0043
K. JEROME GOTTSCHALK
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-7776
mmccoy@narf.or

---

[7] The 1993 case filed in U.S. District Court for the District of Montana challenging the APD approval decision, HC 01162-82, was stayed for almost four years before it was administratively terminated in March 1997. FS 002292. The District Court issued these stays because of secretarial suspensions for further study on potential wilderness designations and State of Montana lease suspensions to study potential NHPA TCD designations. See e.g. HC01147-48, 01152-53. The District Court's decision to stay proceedings to allow for the completion of these studies, is further evidence of the reasonableness of additional study.

## CERTIFICATE OF SERVICE

I hereby certify that, on September 2, 2014, I electronically transmitted the foregoing BRIEF OF *AMICUS CURIAE* BLACKFEET TRIBE OF THE BLACKFEET INDIAN RESERVATION IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT to the Clerk of the Court, using the ECF system for filing and transmittal of a Notice of Electronic Filing to the ECF registrants in this case.

*/s/ Melody L. McCoy*