IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SOLENEX, LLC,                              )
                                          )
          Plaintiff,                      )     CV No. 13-993-RJL
                                          )
                                          )     Washington, D.C.
       vs.                                )     June 10, 2015
                                          )     2:40 p.m.
SALLY JEWELL, ET AL.,                     )
                                          )
          Defendants.                     )
_____)


TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:            Steven James Lechner
                              MOUNTAIN STATES
                              LEGAL FOUNDATION
                              2596 South Lewis Way
                              Lakewood, CO 80227-2705
                              (303)292-2021
                              lechner@mountainstateslegal.com




For the Defendants:           Ruth Ann Storey
                              U.S. DEPARTMENT OF JUSTICE
                              Land & Natural Resources Division
                              Ben Franklin Station
                              P.O. Box 7611
                              Washington, D.C. 20044-1420
                              (202)305-0493
                              ruth.ann.storey@usdoj.gov

APPEARANCES CONTINUED:

Court Reporter:                  William P. Zaremba, RMR, CRR
                                 U.S. Courthouse
                                 333 Constitution Avenue, NW
                                 Room 6511
                                 Washington, D.C. 20001
                                 (202)354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S

 2            DEPUTY CLERK:  All rise.  Please be seated and

 3   come to order.

 4            Your Honor, we have civil action 13-993, Solenex,

 5   LLC, versus Sally Jewell, et al.

 6            I would ask that counsel please approach the

 7   lectern and identify yourselves for the record.

 8            MR. LECHNER:  Steve Lechner for Solenex.

 9            THE COURT:  Welcome.

10            MS. STOREY:  Ruth Ann Storey for the federal

11   defendants.

12            THE COURT:  Welcome.

13            All right, counsel, we'll hear argument on the

14   cross-motions.  Plaintiff will go first, 20 minutes;

15   government, 20 minutes; and then ten minutes each for

16   rebuttal.

17            MR. LECHNER:  May it please the Court, my name is

18   Steve Lechner, and I represent plaintiff, Solenex, LLC.

19            Sidney Longwell, the manager of Solenex, is not

20   able to be here today because he's in the hospital

21   recovering from surgery.  However, with me at counsel table

22   is Sonny Cranch, who is a member of Solenex.

23            I'd also like to thank this Court for granting

24   Solenex the time to explain why defendants'

25   three-decades-long delay should be brought to an end
```

1          In 1982, defendants issued a federal oil and gas

2    lease to Mr. Longwell.  When the lease was issued,

3    Mr. Longwell was 44.  Today, he is 77.

4          In 1983, Mr. Longwell assigned the release to FEMA

5    in exchange for a production payment.  That same year, FEMA

6    submitted an application for permit to drill, one

7    exploratory well on the lease.

8          Your Honor, I also brought a map of the area if

9    you would like to be -- if you'd like to see it.  I also

10   brought a folded copy, and provided a copy to Ms. Story to

11   put in the record.  It gives a little better -- it's bigger.

12          THE COURT:  Yeah.

13          MR. LECHNER:  People can see it.

14          Anyway, the proposed well site is about two miles

15   from private land, approximately three miles from the Great

16   Northern Railroad, Glacier National Park at U.S. Highway 2.

17          The proposed access road and the well pad would

18   disturb less than 23 acres of the 6,200-acre lease.

19          Although defendants have approved the APD four

20   times, most recently in 1993, APD, application for permit to

21   drill, and the APD is still approved today, the well has not

22   been drilled because defendants have held the lease in

23   suspension since 1985.

24          THE COURT:  Yeah, you're going to have to be a

25   little bit more specific as to who's doing what, because we

1    have multiple cabinet departments and multiple agencies

2    involved here; and if you say the government, it's just not

3    clear.

4             Now, the drilling permit is issued by Interior,

5    right?

6             MR. LECHNER:  Correct.

7             THE COURT:  Did they get a fee for that?

8             MR. LECHNER:  Do they get a fee?

9             THE COURT:  Yes.  Do they collect lease -- like

10   some kind of a payment per year or per month?

11            MR. LECHNER:  The BLM collects -- well,

12   I don't know what the agency is now, but the Department of

13   Interior collects rentals and royalties from the lessee.

14   The Department of Interior issued the lease, they collect

15   rentals and royalties; however, since the lease has been in

16   suspension since '85, they're not collecting anything.

17            THE COURT:  Okay.  So since '85, they've not

18   collected anything.  All right.

19            MR. LECHNER:  It's been in suspension.  The APD

20   was submitted in '83.

21            And the Department of Interior, who ultimately

22   calls the final shots on whether drilling can occur, the

23   Department of Interior has approved the APD four times:

24   '85, '87, '91, and most recently, 1993.  And it's still

25   approved.  It's still an approved permit to drill that's in

1    existence today, but the lease is suspended.  All production

2    operations on the lease have been suspended by the Secretary

3    of Interior, waiting for the Forest Service to purportedly

4    comply with the National Historical Preservation Act and

5    NEPA.  Forest Service -- the lease is on Forest Service

6    land.  So the Forest Service manages the surface.

7         THE COURT:  Forest Service is part of the Interior

8    Department, is it not?

9         MR. LECHNER:  No.  They're part of the Department

10   of Agriculture.

11        THE COURT:  The Department of Agriculture.

12   So we've got two different cabinet departments feuding with

13   one another?

14        MR. LECHNER:  I don't know if they're feuding

15   or -- well, that's --

16        THE COURT:  Conspiring?

17        MR. LECHNER:  Conspiring.

18        But the certain --

19        THE COURT:  I thought you might like that word

20   better.

21        MR. LECHNER:  The Forest Service manages the

22   service.  The BLM issues the lease, collects rents and

23   royalties, and handles everything downhole, the actual

24   drilling of the well and the completion of the well, the

25   testing of the well.

1          So the APD has been approved four times, most

2    recently, '93.  But no drilling has occurred because of the

3    30-year suspension.  The suspension is issued by the

4    Secretary of Interior.  And he issues the suspension for the

5    Forest Service to comply with the National Historic

6    Preservation Act and NEPA.

7          But that excuse rings hollow, because nothing

8    takes 30 years to accomplish, if one wants to get the job

9    done.  I mean, we put a man on the moon in less time.

10          The APA mandates that federal agencies conclude

11    matters within a reasonable time, 5 U.S.C. 555(b).  The APA

12    also mandates or makes this mandate judicially enforceable

13    in 5 U.S.C. 7061, which requires the Courts compel agency

14    action unlawfully withheld where unreasonably delayed.

15          Pursuant to 7061, Solenex has two claims for

16    relief:  One, defendants, okay, Secretary of Interior has

17    unreasonably delayed in lifting the suspension; and, two,

18    here I'm going to throw the Secretary of Agriculture under

19    the bus.  Secretary of Agriculture, the Forest Service, has

20    unreasonably delayed completing any administrative action

21    they need to complete.

22          These two claims for relief are subject to

23    judicial review under the APA.

24          THE COURT:  So by that, you mean the Forest

25    Service?

1          MR. LECHNER:  Forest Service --

2          THE COURT:  Is the Forest Service the ones that

3   can't get their act together?

4          MR. LECHNER:  Mostly, yes, Your Honor.

5          THE COURT:  So they're -- either, they're dragging

6   their feet or they're incompetent or both?

7          MR. LECHNER:  Both.

8          THE COURT:  Okay.

9          MR. LECHNER:  And, you know, since 1996, they

10  asked the Secretary of Interior to suspend the lease so they

11  can complete the National Historic Preservation Act work.

12  That's 1996.

13          THE COURT:  What's their excuse as to why it's

14  taking so long?  Forest Service, that is.

15          MR. LECHNER:  You'll have to ask Ms. Storey, but

16  mostly --

17          THE COURT:  That's a decade.

18          MR. LECHNER:  They keep studying it.

19          THE COURT:  Studying it?

20          MR. LECHNER:  They keep studying it.

21          They think it has cultural significance.

22          So frankly, they've generated four cultural

23  surveys over the intervening 18 years.

24          From 1996 to 2002, the Forest Service created a

25  90,000-acre traditional culture district.  This was in --

1          THE COURT:  What's that, a traditional culture

2     district?  Never heard of that before.

3          MR. LECHNER:  It's something under the National

4     Historic Preservation Act.

5          THE COURT:  They made that up?  Did Congress

6     create that?  Or did they just make it up as a regulatory

7     agency?

8          MR. LECHNER:  I think it's in the statute,

9     National Historic Preservation Act.

10          THE COURT:  All right.

11          MR. LECHNER:  16 U.S.C. 470(f) something.

12          THE COURT:  Okay.

13          MR. LECHNER:  So anyway, they created -- at the

14     end of 2002, they had a 90,000-acre traditional cultural

15     district.  So they could move forward on Solenex's --

16     you know, finalizing the work on Solenex's APD.

17          But then they realized that the 90,000-acre TCD

18     didn't include Solenex's well site.  So then they spent the

19     next three years studying, performing another study,

20     cultural survey or whatever they call it.  And then they

21     added 30,000 acres to the traditional culture district,

22     bringing it up to 120,000 acres, completely encompassing

23     Solenex's lease.

24          But did they -- they stop studying, then, and

25     completed the National Historic Preservation Act process?

1   No.

2            THE COURT:  What year did they stop doing that?

3            MR. LECHNER:  I think, they finally stopped in

4   2012 studying.  And at the end of 2012, they had

5   165,000-acre TCD.  But the -- the thing is that after 2006,

6   they had 120-acre TCD around Solenex's lease.  That was

7   plenty.  They had it completely covered.  They could have

8   done their --

9            THE COURT:  That's about as big as Rhode Island,

10  isn't it, 120,000 acres?

11           MR. LECHNER:  I don't --

12           THE COURT:  You're from the West.  You wouldn't

13  know that.

14           MR. LECHNER:  Yes.  Rhode Island is -- if it's 50

15  square miles, it's bigger than Rhode Island.

16           THE COURT:  Yeah.

17           MR. LECHNER:  But even though they had the TCD

18  covering Solenex's lease, they still didn't do anything till

19  they started six more years studying stuff way south of the

20  lease, way south of the drill site that had, that had, could

21  not be affected by the drilling.

22           But at the end of 2012, December of 2012, they had

23  this 165,000-acre TCD.

24           Did they do anything yet?  No.

25           They didn't do anything until we filed notice of

1  intent to sue saying, we're going to sue you.  Then they

2  started working.  And that was -- we finally sued them in

3  June of 2013.

4          And since then, they have done things with no

5  sense of urgency, and we see no light at the end of the

6  tunnel.  And that's why I'm here today.  That's why Solenex

7  is here.

8          THE COURT:  Now, this is a case of first

9  impression, is it not?  I mean, you aren't able to find any

10  cases where federal court anywhere had granted the kind of

11  relief that you're seeking as a result of a failure on the

12  part of a couple of agencies to do what they're supposed to

13  do within a specific period of time?

14          MR. LECHNER:  With respect to an oil and gas

15  lease, this is a case of first impression.

16          THE COURT:  Right.

17          MR. LECHNER:  With compelling agency action that's

18  been unreasonably delayed, there's plenty of cases out of

19  the D.C. Circuit I cited in my brief.  The one I like

20  specifically is out of the D.C. Circuit, 1975, and that's

21  Nader versus FCC, where the D.C. Circuit agreed with the

22  petitioner in that case and said, nine years should be

23  enough time for an agency to decide almost any issue.

24  So that's at 520 F.2d 206.  So with respect to the 30-year

25  suspension, I mean, we're 21 years past that.

1          With respect to the 18-year National Historic

2   Preservation Act process, we're double that.

3          And I have not found -- the longest delay that I

4   could find that was upheld was nine years.  And the only

5   reason that was upheld -- there are two cases.

6          One was upheld because Congress was looking at

7   passing legislation, vis-a-vis acid rain.

8          And the other one, the defendants, federal

9   agencies, had a defense because they had been enjoined by a

10  court order, so they couldn't complete the work.

11         But that's the longest agency delay that's ever

12  been sustained.  And here, we're, like I said, we're 21

13  years over that.

14         The purpose of the Mineral Leasing Act was to

15  provide an incentive for private enterprise to develop the

16  nation's natural resources.

17         Here, the defense delay has completely thwarted

18  the purpose of the Mineral Leasing Act, and, therefore,

19  their delay is unreasonable as a matter of law.

20         When I go back, I'm sure Ms. Storey is going to

21  argue that this court doesn't have -- that Solenex's claims

22  are not subject for judicial review.  First, she's going to

23  argue that this is committed to agency discretion by law.

24  Well, that, under the APA, is a very narrow exception.

25  There's very few exceptions for that, because the APA

1    presumes there's going to be judicial review.

2            The exceptions include agency non-enforcement,

3    allocation of funds from lump-sum appropriations,

4    complicated foreign matters.  And when statutes are drawn in

5    such broad terms, there's no law for the judge to apply.

6            This case doesn't fall within any of those

7    exceptions, plus the Mineral Leasing Act provides ample law

8    for this court to apply.

9            Even though Congress has granted the secretary

10   limited authority to suspend leases in section 39 of the

11   Mineral Leasing Act, in the interest of conversation, that

12   authority is not committed as secretary's discretion by law,

13   because numerous courts, including the D.C. Circuit in

14   Copper Valley, have interpreted section 39 of the Mineral

15   Leasing Act.

16           Copper Valley.  Getty Oil is out of the District

17   of Wyoming.  Hoyl was out of the Tenth Circuit.

18           Moreover, in the Ninth Circuit, on two occasions,

19   has interpreted the ability of the secretary to suspend

20   offshore leases in Gulf Oil and Union Oil.

21           And, importantly, though Ninth Circuit cases, the

22   Ninth Circuit stressed that only Congress can permanently

23   prevent drilling, because doing so exposes the United States

24   to damages for breach of contract and/or takings claim.

25   Then later in Union Oil, they said the secretary is not

1    allowed to issue an indefinite suspension.

2          Here, the last suspension order that was issued

3    was in 1998, and it said that the suspension would continue

4    until the National Historic Preservation Act process was

5    complete.  That's a complete open-ended suspension, and now

6    we are 17 years past that and there's still no end in sight.

7    So there's clearly -- the authority to issue suspensions is

8    not committed agency discretion by law.

9          Second, the government is going to argue, well,

10   under the Supreme Court's decision in Norton versus Southern

11   Utah, which interpreted 5 U.S.C 706 of the APA, Solenex

12   hasn't -- doesn't have a right to -- hasn't stated a claim

13   for relief for unreasonable delay.

14         Well, this is not true.  Supreme Court in Norton

15   said, you can only bring an unreasonable-delay case if

16   there's discrete agency action that the agency is required

17   to take.  Here we have discrete agency action.  That would

18   be lifting the suspension -- lifting the suspension would be

19   an order, which is defined as agency action under the APA.

20         THE COURT:  Yeah, but what is it?

21   You're questioning the failure on the part of the Forest

22   Service to complete its task.

23         MR. LECHNER:  That's --

24         THE COURT:  That's what you're questioning,

25   the Forest Service, because, presumably, if they completed

1  their task, the Secretary of Agriculture would be in a

2  position, then, to make a decision on lifting the stay.

3  If they have completed the task in such a way,

4  hypothetically, that it showed there would be no harm in any

5  way to this area, the historically sensitive area, then

6  presumably, the Secretary of Interior would lift the stay.

7  On the other hand, if they conclude in the opposite

8  direction, presumably, he wouldn't lift the stay.

9            So isn't really the focus of what you're seeking

10  for relief the dragging of the feet of the Forest Service,

11  the Forest Service's apparent inability to complete its

12  task?

13            MR. LECHNER:  That's my second claim for relief.

14            Solenex's first claim for relief is to lift the

15  suspension because it's been in place for 30 years.

16            THE COURT:  But they're interrelated, aren't they?

17  I mean, you can't have one without the other.

18            MR. LECHNER:  Well, I think if a Court were to

19  find unreasonable delay, that, by necessity, would prove

20  that the suspension is not in the interest of conservation

21  hearing; therefore, the suspension is unlawful and it could

22  be lifted.

23            THE COURT:  Why would a court do that?  That makes

24  no sense.

25            MR. LECHNER:  Because a 30-year delay is -- well,

1    it shocks the conscience.

2         And you can't -- it cannot -- they can issue a

3    suspension in the interest of conservation.  But you

4    can't --

5         Nothing takes 30 years; and, therefore, it's not

6    in the interest of conservation, it's to deny Solenex's

7    valuable lease rights.  So I do think that the suspension

8    could be lifted.

9         At a minimum, like you said, Your Honor, the

10   Forest Service must complete any action.  We're not really

11   sure all the action they want is -- well, we have the

12   National Historic Preservation Act.  Then we might do a NEPA

13   process after that.  So we're looking for further delay,

14   because once they finish the cultural stuff, then they're

15   going to do NEPA again.

16        THE COURT:  What's this cultural stuff consist of,

17   interviewing some folks?

18        MR. LECHNER:  I don't know, because most of the

19   cultural studies that they have provided me have been

20   redacted, so I don't really know what's in them.

21        THE COURT:  Excuse me?  Redacted?

22        MR. LECHNER:  Redacted.

23        THE COURT:  National security purpose?

24   What's going on?

25        Did you ask them?

1          MR. LECHNER:  We're not sure.  The Forest Service

2    is supposed to get me an answer on that, because they're

3    only allowed to redact something if the Secretary of

4    Interior allows them to.  And they haven't run it past the

5    Secretary of Interior.  But most --

6          THE COURT:  Now, wait a minute.  Forest Service is

7    in the Agriculture Department.  Wouldn't the Secretary of

8    Agriculture be the one who has to authorize the redactions?

9          MR. LECHNER:  No.  Sorry, Your Honor.

10         But the keeper of the National Register is in the

11   Department of Interior.  The keeper makes the decisions

12   about culturally significant properties.

13         So really, I don't know what's going on, but

14   evidently the Blackfeet think that this is a religious area.

15   They did cede it back to the United States over 100 years

16   ago and -- but it's religious now, and, basically, they're

17   exercising -- they've been granted a religious servitude on

18   this area.

19         THE COURT:  Where the drilling would take place?

20         MR. LECHNER:  And where the drilling would take

21   place, even though it's -- they ceded the land back.

22   They reserved hunting and fishing and gathering rights.

23   But now the Forest Service is pretty much capitulating

24   whatever the Blackfeet demand.

25         THE COURT:  Well, why wouldn't it be in their

1   interest, then, to just wrap it up, finish the report, and

2   just have that as the basis for a failure to lift the

3   suspension?  I don't know what the --

4          MR. LECHNER:  You mean, wrap it up and issue the

5   report and say no drilling?

6          THE COURT:  Well, if you're correct that the

7   Blackfeet tribe believes that this is in some way violative

8   of a religiously protected area, then why wouldn't it be in

9   the interest of the Forest Service to just put that in their

10  conclusion, hand that conclusion over to the Secretary of

11  the Interior, and then have that as the basis for not

12  lifting the suspension?  And then it would be done.

13         MR. LECHNER:  Well, yeah, I could at least

14  challenge that.

15         THE COURT:  Exactly.

16         MR. LECHNER:  But I can't do anything because --

17  I can't do that, because we don't have "final agency

18  action."  That's why we're here on an unreasonable-delay

19  case.

20         THE COURT:  Do you think that's intentional?

21  Do you think they're trying to avoid that?

22         MR. LECHNER:  I think it speaks for itself.

23  18 years to complete the National Historic Preservation Act.

24         It answers the question.  Nobody --

25         THE COURT:  If it looks like a duck, waddles like

1  a duck, quacks like a duck, it's a duck, right?

2          MR. LECHNER:  I think so.

3          THE COURT:  Basically, that's what this is?

4          MR. LECHNER:  I mean, especially this national

5  historic preservation, it's just a procedural statute.

6  They're only supposed to stop, look and listen before going

7  forward with undertakings.  And here, they've basically just

8  stopped.

9          THE COURT:  So what would you have the Court do,

10 impose a timetable on the Forest Service, impose a timetable

11 on the Secretary of Agriculture?

12         What do you want me to do?  Besides say that it's,

13 you know, not right; it's inconsistent with the APA.

14         MR. LECHNER:  Well, I want the Court to find as a

15 matter of law that they have unreasonably delayed.  And then

16 under 706(1), the Courts can compel agency action.

17         And I would, one --

18         THE COURT:  Compel it when?

19         MR. LECHNER:  I would order the secretary to

20 immediately lift the -- Secretary of Interior to immediately

21 lift the suspension so Solenex can exercise its lease rights

22 on July 1, 2015.

23         In the alternative and to the extent that this

24 Court finds that there is any administrative action to

25 complete, we would like the Court to order defendants, all

1   of them, whoever has something to do, most of it's the

2   Forest Service's work, but I don't want them to start hiding

3   behind Department of Interior, if they got something to do.

4   I mean, we don't even know exactly everything that needs to

5   be done.

6           And this is really frustrating, because in the

7   Energy Policy Act of 2005, Congress mandated a 30-day

8   deadline for processing APDs, or give the lessee an

9   explanation of what needs to be done and deadlines when it

10  was going to be completed.

11          And this is a mandate from Congress in 2005 to

12  expedite production from federal lands.  And they have --

13  it's been ten years and they have failed to acknowledge that

14  mandate.  And we don't have that information.

15          Plus, Congress also, you know -- if you can't get

16  it done because you have to comply with NEPA, the Natural

17  Historic Preservation Act, do it expeditiously.  Congress

18  put "expeditiously" in the statute, which means quickly.

19  And it's been ten years since Congress passed that act.

20          And the defendants are oblivious to that mandate

21  from Congress.  And that provides the rule of reason under

22  the track factors for an unreasonable delay.  Congress said

23  "expeditiously."  It's been ten years, Congress has spoken;

24  therefore, they have unreasonably delayed as a matter of

25  law.

1          Going back to my alternative relief, if there's

2    anything that needs to be done, we would want a list of that

3    within two weeks of everything that needed to be done, and

4    we want it done by the end of this year.  And we want it

5    signed, those decisions signed by the Secretary of Interior,

6    the Secretary of Agriculture, so we don't have to fool

7    around with any administrative appeals.  So hopefully, we

8    can start commencing operations on July 1st, two thousand --

9          THE COURT:  What about an appeal of this Court's

10   decision to do that, if I were so inclined?

11         How long do you think a D.C. Circuit Appeal is

12   going to take?  Do you want to guess?

13         MR. LECHNER:  Probably --

14         THE COURT:  A year.

15         MR. LECHNER:  Faster than the Ninth Circuit.

16         THE COURT:  A year, at least.

17         MR. LECHNER:  Well, I have to have something,

18   Your Honor.  I mean, if I have to defend your decision on

19   appeal, I'll do it.

20         THE COURT:  Uh-huh.

21         MR. LECHNER:  But right now, Solenex has been in a

22   30-year limbo.

23         THE COURT:  Hmm.  See, it's Kafkaesque.

24         MR. LECHNER:  Pretty much.

25         But thank you, Your Honor.

```
 1              THE COURT:  All right.  We'll talk to the Justice
 2   Department now.
 3              MS. STOREY:  Thank you, Your Honor.
 4              I'm Ruth Ann Storey representing the federal
 5   defendants in this case.
 6              THE COURT:  You're with the Lands Division?
 7              MS. STOREY:  Yes.
 8              THE COURT:  Department of Natural Resources?
 9              MS. STOREY:  It's now Environment/Natural
10   Resources.
11              THE COURT:  Yeah.  It used to be Lands when I was
12   there.
13              MS. STOREY:  That's right.
14              THE COURT:  Now, it's Environment/Natural
15   Resources.
16              MS. STOREY:  Right.  And I was with the section
17   that used to be general litigation and is now natural
18   resources.
19              THE COURT:  Wonderful.
20              MS. STOREY:  So we have name changes all the way
21   around.
22              THE COURT:  There we go.
23              MS. STOREY:  Yeah.
24              Your Honor, at the center of this controversy is
25   an oil and gas lease that is in an area of significant
```

1    religious and cultural concern for the Blackfeet tribe.

2            THE COURT:  Okay.

3            MS. STOREY:  Because of that location, the federal

4    agencies involved in these decisions -- and that would be

5    the Bureau of Land Management and the Forest Service, must

6    comply with Section 106 of the National Historic

7    Preservation Act.  That section establishes a process that

8    is not entirely within the control of the federal agencies.

9            The required input and concurrence of that section

10   involves the plaintiff, the tribe, the state historic

11   preservation officer, the keeper of the Register of Historic

12   Places, and the Advisory Council on Historic Preservation.

13           Plaintiffs allege that federal agencies have

14   unlawfully withheld or unreasonably delayed lifting a

15   suspension of operations and production from their oil and

16   gas lease.

17           Contrary to plaintiff's assertions --

18           THE COURT:  Now, hold on a second.

19           MS. STOREY:  Okay.

20           THE COURT:  He said a minute ago that they have

21   been working on this National Historic Preservation Act

22   project, that is, the Forest Service, since '95.

23           MS. STOREY:  That's --

24           THE COURT:  Is that accurate or inaccurate?

25           MS. STOREY:  Well, I think that's a selective

1    rendition of the facts.

2              THE COURT:  All right.

3              What -- you tell me when you think they started --

4    when the Forest Service started working on whether or not

5    this -- whether or not this -- the drilling in this

6    particular area that they have a lease for would in some way

7    have a negative effect under the National Historic

8    Preservation Act.

9              MS. STOREY:  Yes, Your Honor.

10             What happened is from 1985 when the application

11   for permit to drill was first approved --

12             THE COURT:  Uh-huh.

13             MS. STOREY:  -- through 1997 --

14             THE COURT:  Right.

15             MS. STOREY:  -- every decision that the Bureau of

16   Land Management made related to the application permit to

17   drill was challenged either before the Interior Board of

18   Land Appeals or District Court in Montana.

19             In 1997, the Forest Service determined that in

20   order for them to approve surface occupancy related to the

21   APD, they had to comply with the Natural Historic

22   Preservation Act.  So that process began back in 1997.

23             THE COURT:  All right.  So that's eight years to

24   figure this out.

25             Now, how come they haven't gotten this figured out

1    in eight years?  What's the problem?

2              MS. STOREY:  Your Honor, again, this is a process

3    that is not entirely within control of the federal agencies.

4              THE COURT:  Well, let's break that down now.

5              MS. STOREY:  Okay.

6              THE COURT:  Let's start with the Forest Service.

7              MS. STOREY:  Right.

8              THE COURT:  What is it that's not in their

9    control?

10             MS. STOREY:  Well, in 1997, they went to the

11   keeper of the Register of Historic Places to determine

12   whether or not the traditional cultural area, and that is a

13   term defined by the statute, was eligible for listing on the

14   Register of Historic Places, because that's what triggers

15   what they call the consultation process of Section 106.

16             THE COURT:  That was in '97?

17             MS. STOREY:  That was in '97.

18             THE COURT:  And who does that person work for, the

19   person that went to that?  The keeper of the flame?

20             MS. STOREY:  That's within the Department of

21   Interior.

22             THE COURT:  Department of Interior.

23             So they should have had a meeting that probably

24   should have taken about an hour or so.  And then they should

25   have had an answer to that question probably within a few

1   days.

2              MS. STOREY:  Well, actually, it took them -- the

3   keeper asked for some additional information about the

4   boundaries.

5              One of the issues that has been front and center

6   of this controversy all along is how big the traditional

7   cultural area would be and what the boundaries would be.

8              So the keeper asked for some additional

9   information about the boundaries.  The Forest Service

10  provided that information.

11             THE COURT:  How long did it take to get that

12  information?

13             MS. STOREY:  They finally made a decision in 2002.

14             THE COURT:  Wait a minute.  That's five years.

15             MS. STOREY:  Right.

16             THE COURT:  Are you telling me it took the Forest

17  Service five years to figure out what the boundaries were?

18             MS. STOREY:  Yes.

19             THE COURT:  Five years?

20             MS. STOREY:  Yeah.

21             They have to do ethnographic studies.  They have

22  to figure out what activities take place on the -- within

23  the boundaries; what artifacts are there; what activities

24  the tribe uses them for, whether they'd be cultural or

25  religious.

1              And then the keeper has to consider those and make

2     a decision.  And that decision was made in 2002.

3              THE COURT:  What is the decision this keeper

4     person is trying to make?

5              MS. STOREY:  Whether or not the area is eligible

6     for listing on the Register of Historic Places, because

7     that's what triggers the Section 106 consultation process.

8              THE COURT:  So what if it is, then what happens

9     next?

10              MS. STOREY:  Then the Forest Service has to gather

11    together what are called the consulting parties; those are

12    the parties -- that any party that has an interest.  That

13    would include the plaintiffs, and it would include members

14    of the Blackfeet tribe.  It would include the state historic

15    preservation officer.

16              And consult with them as to whether or not the

17    proposal, in this case, the drilling of a well, would have

18    adverse effects on the traditional cultural area.

19              THE COURT:  Adverse in what respect?

20              MS. STOREY:  If it would adversely affect the

21    qualities for which the area was designated a traditional

22    cultural area.

23              So in this case, that would be the activities that

24    the Blackfeet tribe participate in in this area, whether

25    they be religious, including ceremonies, meditations; or

1   whether it be cultural, such as hunting.

2          THE COURT:  Hunting's cultural?

3          MS. STOREY:  Yes.

4          THE COURT:  So if the drilling of a well would

5   have an adverse effect on the hunting ability of the tribe,

6   that would be some kind of an interference with their

7   practice of their culture?

8          MS. STOREY:  Yes.

9          THE COURT:  Hmm.

10          MS. STOREY:  So then what happens is, if there is

11  a determination that there is an adverse effect, then the

12  consulting parties get together to determine whether or not

13  that adverse effect could be avoided or minimized through

14  mitigation.  So is there something that can be done in the

15  drilling of the well to either avoid or mitigate this

16  adverse effect?

17          So in 2002, the boundaries -- or the keeper

18  indicated that the traditional cultural area was eligible

19  for listing on the register.

20          From 2002 to 2008, several things happened that

21  informed the traditional cultural area boundary issues.

22          The boundaries were controversial from the very

23  beginning.  And between 2002 and 2008, there were three

24  separate ethnographic studies that were completed, and the

25  Forest Service conducted a field study.

1          THE COURT:  Well now, the boundaries extend lots

2     of miles from the site of where the drilling is supposed to

3     occur, isn't that not correct?

4          MS. STOREY:  The original boundaries were smaller.

5     There have been an expansion of the boundaries that was

6     approved in 2012, and that does way very much exceed the

7     area of where the drilling is.

8          THE COURT:  I mean, the area that they would have

9     permission to drill in is a relatively discrete area, is it

10    not?  Isn't it like, I can't remember the exact amount, but

11    isn't it like five or ten square miles or something like

12    that?

13         MS. STOREY:  It is.  But one of the things that

14    they consider in determining whether or not they're adverse

15    effects are the impacts of noise, smell, visual disturbance

16    on the activities that the Blackfeet conduct within this

17    area.

18         THE COURT:  So this is a 160,000 acres area, is it

19    not?

20         MS. STOREY:  It is.

21         THE COURT:  And the area that they want to drill

22    it in is like five square -- it's like five square miles.

23         MS. STOREY:  But the entire area has been

24    designated traditional cultural area.

25              So impacts on any part of the area could cause

1    adverse effects on the area.

2              THE COURT:  Even though it's 100 miles away?

3              MS. STOREY:  Well, the entire -- I mean, it's

4    within the entire area.

5              THE COURT:  Explain that to me.

6              MS. STOREY:  Okay.  The additional cultural

7    area -- the activities that the Blackfeet tribe participate

8    in are in the entirety of the traditional cultural area.

9    So if you're impacting the area, even a small part of it, it

10   still could be an adverse impact, because you're impacting

11   that part of the area.

12             THE COURT:  Hmm.

13             So when are they going to reach a final decision

14   on this?

15             MS. STOREY:  Well, in 2012, the keeper expanded

16   the boundaries of the traditional cultural district.

17   And then the Forest Service began the consultation process.

18             They held two meetings with the consulting

19   parties, including the plaintiffs.

20             THE COURT:  How far apart?

21             MS. STOREY:  They were both held in 2014.

22             THE COURT:  Well, that doesn't tell me much.

23             Weeks apart?  Months apart?

24             MS. STOREY:  They were several months apart.

25             THE COURT:  Okay.

1          MS. STOREY:  They held two meetings.

2          They then determined that the impacts of the

3     proposed drilling would have an adverse effect.  When they

4     made that determination under the statute, they have to

5     notify the Advisory Council on Historic Preservation, and

6     determine -- excuse me.  Let me back up.

7          At those two meetings also under discussion was

8     potential mitigation for the adverse effect.  The parties

9     were unable to reach any agreement on potential mitigation.

10     So that triggered a notification to the Advisory Council on

11     Historic Preservation.

12          They then participated in a following meeting that

13     happened earlier this year.  Again, there was no -- there

14     was no agreement on potential mitigation to avoid or

15     minimize the impacts.

16          THE COURT:  So when are they going to make a final

17     decision?

18          MS. STOREY:  Well, now under the statute what

19     happens is the Advisory Council on Historic Preservation

20     will make a recommendation to the parties as to what the

21     mitigation should be.  And there are two results that can

22     happen from that.  That's basically the end of the process.

23          And either the parties agree to mitigation or the

24     Forest Service terminates consultation and moves forward.

25          THE COURT:  Which means what?

1           MS. STOREY:  Which means they then determine

2  whether or not -- the first thing they'll have to do is

3  review their existing NEPA compliance to see if it's still

4  accurate.  And then they'll make a recommendation either to

5  lift or not the lift the suspension.

6           THE COURT:  So we'll finally have a final agency

7  decision?

8           MS. STOREY:  We should.

9           THE COURT:  Yeah.

10          And will that be within a matter of months from

11  now?

12          MS. STOREY:  It depends on what they determine,

13  how they determine whether or not their NEPA compliance is

14  still adequate.

15          THE COURT:  Why wouldn't it be?

16          MS. STOREY:  It was done -- the NEPA compliance

17  was done back in the 1990s, and there's been a lot of

18  information that's been generated since then.

19          THE COURT:  Information about what?

20          MS. STOREY:  About the values and resources of the

21  traditional culture area.  There have been four studies that

22  have been done since the NEPA work was done.

23          THE COURT:  Studies as to what kinds of things?

24          MS. STOREY:  The resources.  The cultural

25  resources within the traditional cultural area.

 1            THE COURT:  Give me some examples.

 2            MS. STOREY:  There could be artifacts.

 3    There could be, again, religious significance to certain

 4    areas.

 5            THE COURT:  I thought NEPA was concerned with the

 6    environmental condition of the area.

 7            MS. STOREY:  It also looks at the cultural

 8    resources?

 9            THE COURT:  The cultural resources.  Under NEPA?

10            MS. STOREY:  Uh-huh.

11            THE COURT:  What section of NEPA is that?

12            MS. STOREY:  I'm sorry, I don't have my NEPA regs

13    with me, but I'm happy to provide that to the Court.

14            THE COURT:  Yes.  Do a follow-up letter on that.

15    I've never heard of NEPA being used to enforce cultural

16    resources.  That's --

17            MS. STOREY:  Actually, what, I think -- and I

18    probably misspoke on that.  Generally what happens is the

19    106 --

20            THE COURT:  Oh.

21            MS. STOREY:  -- compliance is done as part of the

22    NEPA document.

23            THE COURT:  Say that again.

24            MS. STOREY:  The 106 compliance is done as part of

25    the NEPA document.

 1              THE COURT:  Now, that's a different -- that's the

 2    National Historic Preservation Act.

 3              MS. STOREY:  Yes.  That's correct.

 4              THE COURT:  That is concerned with cultural

 5    artifacts.

 6              But not NEPA.  NEPA has nothing to do with

 7    cultural artifacts.

 8              MS. STOREY:  It's the human environment.

 9              THE COURT:  Yes.

10              So why can't we get the NEPA thing wound up in the

11    next couple months?

12              MS. STOREY:  Your Honor, they have to review it to

13    determine if it's still accurate.  I can't make that

14    decision.  That's a decision for the deciding officials at

15    the department.

16              THE COURT:  Who's running this project?

17              MS. STOREY:  At the Forest Service and the Bureau

18    of Land Management.

19              THE COURT:  Do you know who the people are who are

20    running this thing?

21              Doesn't sound like there's a lot of leadership

22    being exercised.

23              MS. STOREY:  Well, Your Honor, again, a lot of

24    this -- I mean, the National Historic Preservation Act is

25    unique in that the agencies don't really have control over

```
1    some of the decision-makers and some of the concurrence and

2    input that they need to have, including the tribe, the state

3    preservation officer --

4              THE COURT:  I see.

5              MS. STOREY:  -- and the advisory council.

6              THE COURT:  So basically your position is, this is

7    all reasonable.  This is multiple agencies acting in a

8    reasonable manner, not dragging their feet.  There's no

9    inappropriate delay that's going on here.  It's all

10   perfectly reasonable, right?

11             MS. STOREY:  Well, there are -- they're moving

12   consistently and reasonably forward to try and get this

13   accomplished.

14             They've made a lot of progress in the last couple

15   years.

16             THE COURT:  You mean after the suit was filed?

17             MS. STOREY:  No.  I mean, beginning in 2011 when

18   the boundaries were finally established.

19             THE COURT:  I see.

20             So what's your sense of when this will be brought

21   to a head?

22             MS. STOREY:  Your Honor, I don't have a timeline

23   for that.

24             THE COURT:  The final agency action?

25             MS. STOREY:  I don't have a timeline.
```

1          THE COURT:  Well, why shouldn't this Court set a

2     timeline?  That might have a salutary benefit to everyone

3     involved; the agencies; obviously, the plaintiff; and move

4     this thing forward.

5          MS. STOREY:  Your Honor, I think that the agencies

6     are acting in good faith to do what they need to do, and I

7     think that they will do it as expeditiously as they can.

8          I don't think they need a court's direction to do

9     that.

10         THE COURT:  You don't?  Twenty-eight years is a

11    long time.

12         MS. STOREY:  It is a long time.

13         THE COURT:  I'll even take judicial notice of

14    that.

15         It's a long, long time.

16         MS. STOREY:  But I --

17         THE COURT:  You don't think this Court has any

18    authority to do anything here, right?  That's your position.

19         MS. STOREY:  I didn't say you didn't have any

20    authority to do that -- to do it.  I said that --

21         THE COURT:  What do I have authority to do, in

22    your opinion?

23         MS. STOREY:  I do not believe that it would be

24    appropriate for this Court to order a lifting of the

25    suspension.  I certainly do not disagree that you have the

```
1    authority to order a timeline.

2              THE COURT:  And a completion of the project within

3    a certain time frame.

4              MS. STOREY:  I think that --

5              THE COURT:  So that the Secretary of the Interior

6    can decide whether to lift this or not lift.

7              MS. STOREY:  I think that's unnecessary, because

8    I think the agencies are moving forward to complete their

9    obligations.

10             THE COURT:  I think the people at these agencies

11   are lucky they haven't been deposed about their actions in

12   these -- in this matter.  I think they might find it very

13   awkward to be under oath and have to answer questions about

14   the speed at which they have performed their tasks here.

15   I think you'd be hard-pressed to defend that conduct.

16             MS. STOREY:  Your Honor, as I said --

17             THE COURT:  Hard-pressed.

18             MS. STOREY:  A lot of this is out of their

19   control.

20             THE COURT:  Well, I guess that's the question.

21   How much of it really is out of their control, and how much

22   of it can they really control.

23             MS. STOREY:  I think the thing that I can assure

24   the Court that at this point in time, they are -- they have

25   complied with the National Historic Preservation Act, with
```

 1   the requirements.  They're at the end of that process.

 2   The final step is to hear back from the advisory council as

 3   to their recommendations.

 4           THE COURT:  Who's on this advisory council?

 5   Who's on that?

 6           MS. STOREY:  It's a presidential appointed

 7   council.

 8           THE COURT:  It is?  Presidentially appointed?

 9           MS. STOREY:  Yeah.

10           Its not part the advisory council is not part of

11   Department of Interior.

12           THE COURT:  It's a presidentially-appointed

13   council?  Do you know who's on it?

14           MS. STOREY:  I don't, but I can certainly provide

15   that list for the Court.

16           THE COURT:  Yeah, make sure I get that too.

17           How often do they meet?

18           MS. STOREY:  I don't know.

19           THE COURT:  What if it should come to pass they

20   only meet once a year?  Hypothetically.  This company would

21   have to wait a whole other year.

22           MS. STOREY:  No.  They have staff.  And the

23   staff -- it was at the staff level that they participated in

24   the last consulting meeting.

25           THE COURT:  Do you have any idea when they last

1   met?

2            MS. STOREY:  No.

3            THE COURT:  No.

4            Might as well put that in the letter too.

5            Do you find any of this unsettling?

6            MS. STOREY:  Your Honor, again, I think that the

7   agencies have made real progress.  They have been working

8   diligently to try and bring this to a conclusion.

9            THE COURT:  How about the fact that Congress has

10  passed laws saying that mining and drilling for minerals on

11  these lands is an important priority and that we need to

12  take advantage of -- the country needs to take advantage of

13  the mineral -- the harvesting of minerals that are on these

14  lands?

15           MS. STOREY:  Congress also passed the National

16  Historic Preservation Act; and, in 1992, amended it to

17  emphasize the need to consult with tribes.

18           I mean, the agencies have no choice but to balance

19  those mandates.

20           THE COURT:  Are you aware of any other situation

21  that your clients, which are multifold here, I might add,

22  have dragged their feet this long?  Can you point this Court

23  to any example?

24           MS. STOREY:  I would have -- no.

25           THE COURT:  Any?

```
1              MS. STOREY:  I have no information on that.

2              If the Court has no further questions.

3              THE COURT:  Well, why don't you look into that one

4    too, and put that in the letter as well, because I'd like to

5    know if there is another example of agency recalcitrant that

6    even approximates, approximates what we're seeing here:

7    28 years to resolve these issues.  It's Kafkaesque.  I mean,

8    it really, really is troubling.  It's very troubling.

9              Well, let's see what the plaintiff's got to say

10   about all this.  They've been listening, taking notes.

11             Do you want anything added to the letter?

12             I got a letter coming that's going to have lots of

13   stuff in it.

14             MR. LECHNER:  I'll leave that to Ms. Storey.

15             THE COURT:  All right.

16             MR. LECHNER:  But I would like to direct the

17   Court's attention to one of the government's exhibits.

18   The Court asked about the process and how this TCD kept

19   expanding.  And it's filed at document 32-2, ECF page No. 16

20   of 29.  And it shows the progression of the TCD, where it

21   was originally 90,000 acres, and that was the decision made

22   in 2002.

23             THE COURT:  All right.

24             MR. LECHNER:  And then -- and this was a

25   designation agreed to by the tribe.
```

1          And then when Solenex indicated that it still

2    wanted to drill, the Forest Service goes, oh, that Solenex

3    drill site's outside the TCD.

4          So then they spent the next four years expanding

5    the TCD by another 30,000 acres to gobble up Solenex's drill

6    site, which is only going to affect the access road and the

7    well pad.  It's 23 acres of surface disturbance in what is

8    now as $165,000 -- 10,065,000-acre TCD.

9          And like I mentioned before, from 2006 to 2020

10   (sic), they were studying traditional cultural stuff 20

11   miles from the drill site.  It is physically impossible for

12   one little well to disturb something more than 20 miles

13   away.

14         So they're just down here wasting six years

15   studying other stuff that has nothing to do with any

16   potential effects that would occur from Solenex's well.

17         You know, another example of the shenanigans is

18   what I put in my brief, is the fact that when Solenex -- you

19   know, when they first started the national historic

20   preservation stuff in '96, '97 -- I don't know, it's --

21   well, it's been 18 years or something, they determined based

22   on scientific factors that the area of potential effects of

23   the well would be 5,000 acres.  That's not surface

24   disturbance but that's audible smell, whatever that word is.

25   That was 5,000 acres.

 1          And then when they reconvened after we sued them

 2     and they reconvened the consulting party status in January

 3     of 2014, they came in and said, okay, the area potentially

 4     affects 5,700 acres, because we're going to include the

 5     access road.  Okay.  That's fair.  It's scientific.  Okay.

 6          I mean, you have to realize that, you know, the

 7     highway and the railroad causes as much disturbance as the

 8     well would.  But anyway, that was January of 2014.  That was

 9     the first consulting meeting after we filed suit in June of

10     2013.  So that's good.

11          So we travel to Great Falls, we sit down, we talk

12     about what are the effects going to be in this 57,000-acre.

13          And then after that meeting is over, they come

14     back and say, well, now we've expanded the area of potential

15     effects to include the whole 165,000-acre TCD.

16          So that January 2014 meeting was a waste of

17     Solenex's money for me to attend, complete waste, because

18     they just, sua sponte, well, the Indians asked them to and

19     the Forest Service expanded to 165,000 acres.

20          It's physically impossible for drilling of the

21     well to affect something 20 miles away.

22          THE COURT:  Now, is that a final agency action,

23     making a decision like that?

24          MR. LECHNER:  It's close.  I thought about that.

25          So the whole January consulting party meeting was

1   a waste.  They just wasted our time, wasted taxpayer

2   dollars.

3             So then we come back and we had another meeting in

4   April of 2014.  This was the second meeting that Ms. Storey

5   mentioned.

6             Then we didn't have another meeting for a whole

7   year.  We had another meeting in April of 2015.

8   And I don't know what's going on.  We haven't -- the only

9   thing we've got since that meeting in April of 2015 was they

10  finished the minutes from the meeting.

11            And now, you know, Ms. Storey says, well, we might

12  have to do more NEPA, because it's been so long since we

13  finished NEPA the last time.  Of course, it's their own

14  fault.  Solenex shouldn't be penalized.

15            THE COURT:  Well, she said that initially when she

16  was thinking that NEPA covered or protected a cultural

17  artifacts and things.  But then she corrected herself and

18  realized that that's really Section 106 analysis.

19            So I don't know what's really changed from an

20  environmental perspective since they did their last NEPA

21  analysis, but probably not a whole heck of a lot.

22            That area out there in the country is pristine,

23  isn't it, pretty much?

24            MR. LECHNER:  No.

25            THE COURT:  It's not pristine?

```
 1                    MR. LECHNER:  There's a railroad.

 2                    THE COURT:  Well --

 3                    MR. LECHNER:  There's a highway.  There's private

 4      land.

 5                    THE COURT:  -- it's going through 160,000 acres.

 6                    MR. LECHNER:  Well, 20 miles away, I don't care

 7      what it looks like.  I'm talking about where -- we're up on

 8      the north end of the traditional cultural district, next to

 9      the private land, next to the railroad --

10                    THE COURT:  Okay.

11                    MR. LECHNER:  -- next to the highway.

12                    THE COURT:  And let's be candid here now.

13      And three miles from Glacier National Park, which is a

14      "sacred place" to a lot of people who are environmentalists.

15                    MR. LECHNER:  Well --

16                    THE COURT:  It's a national park.

17                    MR. LECHNER:  Well --

18                    THE COURT:  It's pretty famous.

19                    MR. LECHNER:  I understand that.

20                    THE COURT:  You don't want it disturbed.

21                    MR. LECHNER:  Well, we're not disturbing the park.

22      We're on National Forest land, which is multiple use lands.

23                    THE COURT:  Right.

24                    MR. LECHNER:  And Congress intended for oil and

25      gas drilling to occur on National Forest lands.
```

 1          And if this area -- you know, if this area was so

 2   important, they should have raised their complaint in 1980

 3   before the lease was issued.  Nobody said anything about

 4   this area being so important, and that it is now.

 5          And, in fact, as I wrote in my brief, in 1993, the

 6   tribe itself was hoping to secure some drilling ability in

 7   this area.

 8          THE COURT:  The tribe itself?

 9          MR. LECHNER:  The tribe wanted -- passed a

10   resolution to enter in a joint venture to extract the

11   hydrocarbons out of this area, where Solenex's lease is.

12          But now, it's the last religious bastion that they

13   have.  I just don't know how it got so important in 30

14   years.

15          And I still feel --

16          THE COURT:  That might be the subject of a

17   screenplay or a movie of some type.  But I can't deal with

18   that right now because I don't have a factual record that

19   deals with that issue.

20          MR. LECHNER:  Well, Your Honor, if you don't think

21   you have enough facts to decide whether Solenex has been

22   singled out for bad treatment, even though 21 other wells

23   have been drilled on federal lands in Montana since '85 --

24          THE COURT:  I didn't say that.  You're putting

25   words in my mouth.

1        I said I'm not in a position to explain how it is

2  that all of a sudden, land that had been subject to leasing

3  for this -- of this kind all of a sudden became a

4  traditionally, culturally protected area out of the blue.

5  That's the issue you raised.

6        Things changed dramatically from the time leases

7  were first authorized to the current day, to the tune of

8  160,000 acres.  That's a pretty big change.

9        MR. LECHNER:  Well, and if I hadn't sued, we don't

10 know how big it would be today.

11       THE COURT:  Anything you'd like to see in a

12 timetable?

13       MR. LECHNER:  Oh.  Well, I'm still looking for

14 that lifting of the suspension.

15       But we still don't even know what they have to

16 complete, because they keep -- they've been throwing the

17 NEPA stuff.  Even though it may not be focused on cultural

18 resources, they're going to find some endangered critter up

19 there that's going to trigger some new NEPA stuff.

20       THE COURT:  Well, we don't have any endangered

21 critters on this record right now, so I'm not going to

22 assume that.

23       But if this Court were to conclude that they had

24 unjustifiably and unfairly dragged their feet here, there's

25 got to be a remedy.

1           MR. LECHNER:  I think they can get --

2           THE COURT:  And it seems to me the remedy has to

3    include within it in some way, shape or form, a requirement

4    that the Forest Service complete its task within a certain

5    amount of time; or whatever the other tasks are they have.

6    So that then the Secretary of the Interior is in a position

7    to make a final decision as to whether to lift the

8    suspension or not lift the suspension.

9           Which decision would be reviewable in

10   federal court.  Probably this same court.

11          MR. LECHNER:  Well, I would ask Your Honor to

12   order the Forest Service to get all its work done so the

13   Secretary of Interior can make his decision by the end of

14   this year, by December 31st, 2015.  That'll give us, if,

15   you know, it's a final agency action, you know, if he -- we

16   might be able to get out there in July of 2016 in the

17   next -- for the next drilling season.

18          But I think that they can get -- certainly get

19   that work done in time.  Thank you, Your Honor.

20          THE COURT:  All right.

21          MS. STOREY:  Your Honor, again, I would just

22   reiterate that the agencies have been working diligently to

23   complete this process.  They have requirements.  They have

24   requirements under the National Historic Preservation Act,

25   under the Mineral Leasing Act.  They're trying to balance

1    those.  They're doing what they can do.

2          They're close to the very end of the national

3    historic preservation process, and they're committed to

4    completing it.

5          THE COURT:  So what happens when they get to the

6    end of that?

7          MS. STOREY:  When they get to the end of that,

8    then they will have to make a recommendation to the

9    Secretary of Interior on suspension.

10          THE COURT:  Right.

11          And then whatever that recommendation is, he'll

12    have to, or she, in this case, will have to act on it,

13    right?

14          MS. STOREY:  She'll make a decision either to

15    continue the suspension or not to continue the suspension.

16          THE COURT:  And that's a final agency action.

17    It's reviewable by a federal court, right?

18          MS. STOREY:  Yes.

19          THE COURT:  So I guess the question is, how do we

20    get from this point to that point, within a reasonably quick

21    point in time so that this 28-year nightmare can come to an

22    end?

23          MS. STOREY:  And I would contend that the agencies

24    are on their way there.

25          THE COURT:  You can't give me an estimate as to

1  when that will be, can you?

2          MS. STOREY:  I cannot.

3          Again --

4          THE COURT:  Well --

5          MS. STOREY:  -- it's dependent on factors outside

6  their control.

7          THE COURT:  How much you want to bet if I rule in

8  favor of the plaintiff and issue a timetable that they have

9  to get this done by the end of the year, hypothetically,

10  that you'll appeal it?  And that's a whole other year.

11          MS. STOREY:  Again, Your Honor, that's not my

12  decision.

13          THE COURT:  Oh, I know that's the Solicitor

14  General's Office.

15          MS. STOREY:  Okay.  If there are no further

16  questions?

17          THE COURT:  Don't forget my letter.

18          MS. STOREY:  I won't.

19          THE COURT:  If there's anything you need to follow

20  up on, you've got ten days to do it as well.  If you have

21  any added suggestions as to what should be in any timetable

22  or whatever, you can follow up with that as well.

23          I'm only half jesting when I say there's a

24  screenplay in this.  Maybe a novel.

25          But you can say one thing for sure:  This is no

1   way to run a government, no way to run a government.

2           The Congress of the United States spoke on the

3   issue of harvesting these minerals.  And for reasons that

4   are not clear and probably won't be clear ever, other

5   government agencies using other Congress-passed statutes are

6   frustrating that intention on Congress's part, and doing it

7   over a 28-year period.  And in the process, not only

8   frustrating these plaintiffs, frustrating the possible

9   benefits that can enure to the benefit of the country, but

10  causing all of this litigation.  It's kind of a sad state of

11  affairs, to be honest with you.

12          Stand in recess.

13          DEPUTY CLERK:  All rise.

14          This honorable court stands in recess until the

15  return of court.

16          (Proceedings concluded at 3:41 p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: June 13, 2015_____   /S/__William P. Zaremba_____

                         William P. Zaremba, RMR, CRR