# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Montana State Office
5001 Southgate Drive
Billings, Montana 59101-4669
www.blm.gov/mt

In Reply Refer To:

March 17, 2016

Solenex LLC
821 East Lakeview Drive
Baton Rouge, LA 70810

Dear Solenex:

After careful review of all the available information related to Lease No. MTM53323, the Bureau of Land Management (BLM) has determined, with concurrence from the Department of the Interior, that: (1) the application for permit to drill (APD) filed for Lease No. MTM53323 should be disapproved pursuant to 43 C.F.R. § 3162.3-1(h)(2); and (2) the lease should be cancelled pursuant to 43 C.F.R. § 3108.3(d)[1] because it was improperly issued. The reasons for these determinations are set forth below.

In 1982, BLM issued Lease No. MTM53323 to Sidney Longwell.[2] Lease No. MTM53323 is located in the Badger-Two Medicine area within the Lewis and Clark National Forest in northwestern Montana. In November 1983, the lease holder sought permission to drill an exploratory well to test and evaluate the oil and gas potential on a portion of the lease. The proposed drill site is approximately two miles southeast of U.S. Highway 2 and approximately nine miles southwest of East Glacier, Montana. The exploratory drilling and associated activities would disturb up to 23 acres. But, should the well prove productive, it is reasonably foreseeable that Solenex may apply for a permit to expand its operations within the leasehold.

In early 1985, BLM approved the 1983 APD. A number of organizations and individuals filed administrative appeals challenging the decision, claiming that BLM's approval violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., as well as other federal statutes. BLM's approval was set aside and remanded by the Interior Board of Land Appeals

---

[1] 43 C.F.R. § 3108.3(d) provides that "[l]eases shall be subject to cancellation if improperly issued."
[2] On July 1, 1983, Mr. Longwell assigned his 100% interest to America Petrofina Company of Texas (25%), Petrofina Delaware Inc. (25%), and AIG Petroleum Company Inc. (50%). In January 1986, America Petrofina Company of Texas changed its name to Fina Oil and Chemical Company. On July 1, 1987, AIG Petroleum assigned its interest (50%) to Fina Oil and Chemical Company, and on May 1, 1999, Petrofina Delaware, Inc. assigned its 25% interest to Fina Oil and Chemical Company. Then, on July 1, 2000, Fina Oil and Chemical Company assigned its 100% interest to Sidney Longwell. On January 10, 2005, Mr. Longwell incorporated Solenex LLC and then assigned his 100% interest to Solenex LLC, which is the current lease holder. Solenex LLC acquired the lease with full knowledge that lease operations were suspended in 1985 because of a legal challenge and they remain suspended to date. Solenex is not entitled to bona fide purchaser protection. See Winkler v. Andrus, 614 F.2d 707, 713 (10th Cir. 1980) (assignees are deemed to have constructive notice of all BLM records pertaining to the lease at the time of the assignment).

(IBLA) in August 1985, and lease operations were suspended at the lessee's request, effective October 1, 1985.  Lease operations have been suspended for various reasons since that date.

Solenex seeks to have the suspension lifted, but having re-examined the conditions under which Lease No. MTM53323 was approved, and subsequent factual and legal developments concerning the Badger-Two Medicine area, the BLM finds that Lease No. MTM53323 was improperly issued.  As discussed herein, the lease suffers from significant legal deficiencies, and it does not comport with Congress' express intent to protect this culturally significant area from mineral development as evidenced by P.L. 109-432, which withdrew the Badger-Two Medicine area from mineral development.  The Congressional withdrawal strengthened the Executive branch's long standing commitment to protect Indian sacred sites and ensure that adequate and meaningful consultation occurs when federal land management decisions have significant impacts on tribal religious and cultural practices.[3]  Considering these factors, among others, lease cancellation is the most appropriate course of action.

I.      **Facts**

A. Overview of Badger-Two Medicine Area

The Badger-Two Medicine area encompasses approximately 129,500 acres of land located within the Lewis and Clark National Forest along Montana's Rocky Mountain Front.  The area is adjacent to Glacier National Park, the Scapegoat and Bob Marshall Wilderness Areas, and the present-day Blackfeet Indian Reservation.  The area is on the northern end of the Rocky Mountain Front and is part of the headwaters of the Missouri River.

The Badger-Two Medicine area is a very remote and relatively pristine landscape of outstanding natural and cultural values.  The area consists of rugged mountainous terrain transitioning to prairie-mountain foothills on the eastern edge.  The area is vegetated by conifer forests mostly undisturbed by modern development.  Recognizing the remote and wild character of the land, in 2009 the United States Forest Service (USFS) adopted a travel management decision that banned motorized wheeled vehicles from all trails and prohibited snowmobiling in the Badger-Two Medicine region.  The area serves as a critical wildlife movement corridor for species that range into Glacier National Park and adjoining wilderness lands and is home to a number of wildlife species, including elk, grizzly bears, wolves, lynx, mountain goats, wolverines, west slope cutthroat trout, peregrine falcons, and bald eagles. The area also contains pure and unpolluted water as well as diverse and abundant plant life.

The Badger-Two Medicine area was once a part of the Blackfeet Tribe's reservation.  In 1896, the Blackfeet Tribe ceded a portion of its reservation, which included the Badger-Two Medicine area.  However, that area was and remains "one of the most cultural and religiously significant areas to the Blackfeet People since time immemorial."[4]  Recognizing the importance of the area to the Blackfeet people, in 2002 the Keeper of the National Register (Keeper) concurred in establishing about 89,000 acres of the Badger-Two Medicine area as a traditional cultural district (TCD).  In 2014, the Keeper considered additional documentation provided by the USFS and expanded the boundary of the TCD to include 165,588 acres, including acreage outside of the Badger-Two Medicine area.  As a result of the expansion, the TCD now encompasses the entire leasehold associated with Lease No. MTM53323.

---

[3] Exec. Order No. 13007.
[4] Blackfeet Tribal Resolution No. 260-2014 (2014).

B.  History of Leasing Decision and APD Consideration

In 1981, after completing an Environmental Assessment (EA) under NEPA, which did not include a "no lease" option, USFS authorized BLM to offer oil and gas leases within the Lewis and Clark National Forest, including the Badger-Two Medicine area.  Without further environmental analysis, BLM then issued oil and gas leases across much of the Forest, including Lease No. MTM53323.  Lease No. MTM53323 allows surface occupancy subject to applicable lease stipulations.  In issuing the lease, BLM and USFS contemplated that future surface-disturbing activities on lands within the lease would be analyzed in subsequent NEPA documents.

As noted above, in November 1983 the lease holder filed an APD for an exploratory well on a portion of the lease.  BLM prepared an EA pursuant to NEPA.  As the surface management agency, USFS was primarily responsible for NHPA consultation.  In 1985, BLM approved the 1983 APD on Lease No. MTM53323.  BLM's decision was appealed to IBLA by ten parties, including the Blackfeet Tribe.  IBLA set aside BLM's decision and remanded the case to BLM to: (i) study and address a cumulative effects determination for the proposed activity; (ii) consider the effects of the proposed activity on an archaeological site; and (iii) complete other necessary actions to comply with the U.S. Fish and Wildlife Service's "no jeopardy" opinion, which was contingent upon closing an access road in the area to all but drilling-related activity and implementing an active law enforcement program.[5]  At the lessee's request, BLM suspended operations and production on Lease No. MTM53323 following that decision in 1985.

In 1987, after addressing the remanded issues, BLM issued a Decision Notice and Finding of No Significant Impact, which reactivated the drilling permit for Lease No. MTM53323.  BLM determined that the preferred alternative in the earlier drilling EA remained the selected alternative.  The Blackfeet Tribe and other parties appealed BLM's approval decision on grounds that BLM failed to adequately address the remanded issues or consider new information on grizzly bear populations, a second APD in the area, and recent court decisions relating to oil and gas leasing in the National Forests.[6]  IBLA granted a temporary stay of BLM's approval and ordered the parties to brief the issue of whether the exclusion of the Blackfeet Tribe from portions of the leased lands violated treaty rights, implicated DOI's trust responsibility, or resulted in a compensable taking of property.[7]  Shortly thereafter, BLM moved to remand its 1987 decision to allow further review and action, which IBLA granted.  BLM continued the lease suspension, noting that the suspension would remain in effect until further environmental analysis could be completed by BLM and USFS.

BLM and USFS then agreed to analyze the APD for Lease No. MTM53323 in an Environmental Impact Statement (EIS) along with another APD filed for a separate lease within the Badger-Two Medicine area.[8]  The Final EIS (FEIS) for the APDs was issued in late 1990.  In early 1991, BLM approved the APD for Lease No. MTM53323, subject to lease stipulations and additional

---

[5] *Glacier-Two Medicine Alliance*, 88 IBLA 133, 150 (1985).

[6] These court decisions are discussed at pp. 8-9, below.

[7] *Glacier-Two Medicine Alliance*, IBLA 87-504, Order (June 29, 1987).

[8] In late 1985, an APD was submitted to BLM on one other lease in the Badger-Two Medicine area: Lease No. MTM25173.  Lease No. MTM25173 is one of ten currently active leases in the Badger Creek Unit, which is approximately ten miles south of the proposed well site for Lease No. MTM53323.  BLM and USFS initially determined that an EIS should be prepared to analyze the APD for Lease No. MTM25173 and suspended operations on all leases within the Badger Creek Unit until the environmental review was completed.

mitigation measures that were imposed as conditions of approval.[9]  Despite that approval, BLM continued the suspension for Lease No. MTM53323 at Solenex's request pending further notification from BLM to proceed. Several conservation organizations filed a third appeal with IBLA, arguing that BLM had failed to consider all phases of development in its consideration of effects on grizzly bears and had failed to take steps to aid in their recovery.

In August 1991, BLM requested, and IBLA granted, a remand of the 1991 APD approval. BLM then commenced and completed its own study of the surface-related issues. On January 14, 1993, an Assistant Secretary for DOI signed a Record of Decision authorizing approval of an APD for Lease No. MTM53323. In response, numerous groups filed a complaint in U.S. District Court for the District of Montana in April 1993 challenging the 1993 APD approval decision. The plaintiffs included conservation organizations as well as a tribal traditionalists association, an association of Blackfeet tribal members, and a Blackfeet tribal member.[10]  Plaintiffs alleged, among other things, that: (i) BLM violated NEPA by failing to complete an EIS before the lease was issued, which represented an irrevocable commitment of resources; (ii) BLM used an inadequate model to determine the cumulative effects of reasonably foreseeable activities on grizzly bear populations; and (iii) BLM violated the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996. Plaintiffs also claimed that BLM violated the National Historic Preservation Act (NHPA) and its trust responsibility to the Native American plaintiffs.

Also in April 1993, United States Senator Max Baucus of Montana introduced legislation (S.853, Badger-Two Medicine Protection Act) to provide special treatment for the Badger-Two Medicine area. In June 1993, the Secretary of the Interior suspended the 1993 APD approval decision for a year to provide Congress time to consider S.853. In response to a February 1994 request from Senator Baucus to the Secretary of the Interior, DOI extended the suspension for Lease No. MTM53323 through June 30, 1995. In the meantime, the United States moved to dismiss the lawsuit challenging the 1993 APD approval. The court denied the motion but stayed the proceedings in a series of orders until the case was administratively closed in 1997.[11]

For three years beginning in 1995, BLM extended the lease suspension annually for Lease No. MTM53323 to allow USFS to complete its historic property review of the Badger Two Medicine area under NHPA.[12]  In 1998, BLM determined that the lease suspension would remain in effect until the conclusion of the historic property review required by Section 106 of NHPA. The latest suspension remains in effect to this day.

In 2013, Solenex LLC brought an action in federal district court against the Departments of Interior and Agriculture and various officials alleging that they had unreasonably delayed action in their review of Solenex's APD.[13]  In July 2015, the court found that defendants had unreasonably delayed determining whether to lift the suspension. The court subsequently ordered defendants to notify the Court by November 23, 2015, of their decisions whether to initiate a process for lease cancellation or continue the Section 106 process for lifting the suspension of the lease.[14]  This decision is consistent with the representations made by the

---

[9] The APD for Lease No. MTM25173 has never been approved.

[10] *National Wildlife Federation, et al. v. Robertson, et al.*, CV 93-44 (D. Mont. 1993).

[11] Plaintiffs moved to reopen the case on October 30, 2015. The court has stayed briefing on the motion to reopen pending cancellation proceedings.

[12] The 1995 suspension was also put in place to provide time for Congress to consider whether to enact S.723, the proposed Badger-Two Medicine Protection Act introduced by Senator Baucus, which would have prohibited surface disturbance on existing oil and gas leases in the area until Congress determines otherwise.

[13] *Solenex LLC v. Jewell, et al.*, Civil Case No. 13-0993 (RJL).

[14] Memorandum Order (October 8, 2015).

United States on November 23, 2015, in response to that Order. On March 16, 2016, the court urged BLM to take final agency action within 24 hours.

### C. The NHPA Proceedings

To fulfill its duties under NHPA and other directives,[15] USFS undertook substantial efforts in the 1990s to document traditional practices in the Badger-Two Medicine area. The first ethnographic study of the Badger-Two Medicine area was completed in 1993.[16] In 1997, USFS defined a boundary for a TCD in the Badger Two Medicine area, which was south of the proposed drilling site for Lease No. MTM53323. As explained above, the Keeper determined that the TCD was eligible for listing in the National Register of Historic Places in 2002. In declaring the area eligible for designation, the Keeper found that Badger-Two Medicine is a "remote wilderness area [that] is associated with the significant oral traditions and cultural practices of the Blackfeet people, who have used the lands for traditional purposes for generations and continue to value the area as important to maintaining their community's continuing cultural identity."

USFS then initiated efforts to identify issues associated with the NHPA process and possible new information or changed conditions that would require supplemental NEPA analysis. In 2002, BLM confirmed that the lease suspension would continue until cultural resources issues and NEPA issues were resolved.

NHPA Section 106 consulting party meetings continued throughout 2003. Tribal representatives urged that the entire Badger-Two Medicine area should be included in the TCD, and USFS collected additional information from the Blackfeet Tribe. Thereafter, additional ethnographic studies guided by tribal knowledge of the area were prepared by the University of Arizona in 2006, 2007, 2008, and 2012.

A final report on the boundaries of the TCD was completed in 2012. In 2013, both the Montana State Historic Preservation Officer and the Blackfeet Tribal Historic Preservation Officer concurred with the TCD boundaries established by that report, which was followed by a concurrence from the Keeper in May 2014. The expanded TCD boundary includes the proposed well site location for Lease No. MTM53323. As result of the boundary expansion, NHPA consultation was re-initiated with the consulting parties to determine whether Solenex's drilling proposal would cause adverse effects on the TCD.

Consultation efforts in 2014 were unsuccessful in identifying any mitigation measures that would satisfy the Blackfeet Tribe and Solenex LLC. Therefore, in late 2014, USFS made a determination of adverse effects under NHPA. USFS then notified the Advisory Council on Historic Preservation (ACHP) of the adverse effects finding and asked ACHP for assistance and advice in continuing to seek ways to avoid, minimize, or mitigate the adverse effects. ACHP participated in a consultation meeting in April 2015.

---

[15] For example, in 1996 President Clinton issued Exec. Order No. 13007 concerning Indian sacred sites. *See* Exec. Order No. 13007, 61 Fed. Reg. 26771 (May 29, 1996). Exec. Order No. 13007 requires Federal land management agencies to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and to avoid adversely affecting the integrity of such sacred sites. Exec. Order No. 13007 also requires agencies to develop procedures for reasonable notification of proposed actions or land management policies that may restrict access to or ceremonial use of, or adversely affect, sacred sites. Generally, such requirements are integrated with review under the National Historic Preservation Act (NHPA). 36 C.F.R. § 800.2(c)(2)(ii).

[16] Greiser, S. and W. Greiser, *Blackfoot Culture, Religion, and Traditional Cultural Practices in the Badger-Two Medicine Area and Surrounding Mountains,* Heritage Research Associates, Inc. (July 9, 1993).

Despite all of these efforts, the Blackfeet Tribe and many others remain opposed to any development of the area, which is home to the Tribe's most sacred places and sites. These concerns led the Blackfeet Tribe to terminate NHPA Section 106 consultation on July 7, 2015. Following termination, ACHP held a field hearing on September 2, 2015. On September 21, 2015, ACHP provided comments on the impacts to the TCD if operations contemplated by the pending APD and reasonably foreseeable future operations are allowed to proceed. ACHP recommended that the Departments of Interior and Agriculture revoke the APD, cancel Lease No. MTM53323, and ensure that future mineral development does not occur. Specifically, ACHP found:

> If implemented, the Solenex exploratory well along with the reasonably foreseeable full field development would be so damaging to the TCD that the Blackfeet Tribe's ability to practice their religious and cultural traditions in this area as a part of their community life and development would be lost. The cumulative effects of full field development, even with the mitigation measures proposed by Solenex, would result in serious and irreparable degradation of the historic values of the TCD that sustain the Tribe.[17]

Upon reviewing the ACHP recommendation and other facts, the Secretary of Agriculture requested that the Secretary of the Interior cancel Lease No. MTM53323:

> After reviewing the Section 106 documentation and considering the ACHP's final comments, I agree that the Solenex APD in the Badger-Two Medicine TCD will pose adverse effects to the TCD in ways that cannot be fully mitigated. Based on this information gained through the full consideration of the spiritual and cultural significance of the Badger-Two Medicine TCD, the Forest Service's determination of adverse effects, ACHP's final comments, changes in land management priorities, and consideration of Solenex LLC's comments, I find that the balance of considerations weigh in favor of not lifting the suspension of operations and production. Therefore, I recommend that you take action as you deem consistent with your statutory and regulatory authorities to cancel the Solenex lease (MTM 053323).[18]

In accordance with 36 C.F.R. § 800.7(c)(4), The Department has notified the ACHP of its decision to disapprove Solenex's APD and cancel Lease No. MTM53323.

### D. Congressional and USFS Decisions Concerning Leasing Since 1982

In 1986, USFS issued a Record of Decision for the Lewis and Clark National Forest Plan EIS. The Record of Decision authorized leasing recommendations similar to those authorized in the 1981 EA and Decision Notice. The Record of Decision did not re-evaluate the terms and conditions for existing leases.

In 1997, BLM and USFS released the Lewis and Clark National Forest Oil and Gas Leasing EIS and Record of Decision. The 1997 Record of Decision declined to authorize further oil and gas leasing on approximately 356,000 acres of forest lands on the Rocky Mountain Front, including the Badger-Two Medicine area.

---

[17] *Comments of the [ACHP] Regarding the Release from Suspension of the Permit to Drill by Solenex LLC in Lewis and Clark National Forest, Montana* (September 21, 2015) at 7.
[18] *Letter to Secretary Sally Jewell from Secretary Thomas J. Vilsack* (October 30, 2015) at 2.

In 2001, based on a USFS recommendation, the Secretary of the Interior withdrew approximately 405,000 acres of forest lands from location and entry under federal mining law for a period of 20 years to preserve traditional cultural uses by Native Americans, threatened and endangered species, and the outstanding scenic values and roadless character of the lands, subject to valid existing rights.[19]  This withdrawal included the Badger-Two Medicine area.

In 2006, recognizing the abundant natural and cultural values in the Badger-Two Medicine area, Congress withdrew the area from oil and gas leasing and location and entry under the mining law, subject to valid existing rights.[20]  Congress provided tax incentives for existing lessees who voluntarily relinquished their leases.[21]  In discussing this withdrawal and voluntary lease relinquishment proposal, Senator Baucus noted that most Montanans strongly believe that oil and gas development should not occur on the Rocky Mountain Front because it is too wild and too precious to be subject to development activities.[22]  Senator Baucus described the voluntary lease relinquishment as a win-win proposal that provides leaseholders value for their investment while providing permanent protection for the Front.[23]  As a result of this legislation, 29 leases in the Badger-Two Medicine area were relinquished.  Lease No. MTM53323 was not relinquished.[24]

## II.   Lease Cancellation

### A.   The Secretary of the Interior's Authority to Cancel Leases

The Secretary of the Interior has inherent authority, under her general managerial power over public lands, to cancel leases issued in violation of a statute or regulation.  That authority is not superseded by the Mineral Leasing Act (MLA).[25]  That authority is reflected in MLA's implementing regulations.[26]  Under this inherent and regulatory authority, DOI may cancel leases if they were issued in violation of NEPA, NHPA, or other laws.[27]

IBLA has characterized as "void" and "a legal nullity" any lease issued for lands that were not legally available for leasing at the time they were issued.[28]  In contrast, it has characterized as "voidable" any lease issued in violation of a procedural requirement, such as NEPA, which does not compel any particular decision.[29]  In other words, a void lease is one that suffers from a substantive defect that BLM cannot cure, such as including lands that were not available for BLM to lease at the time the lease was issued.  A voidable lease is one that suffers from a procedural defect that BLM may be able to correct at its discretion with further action on its part.

---

[19] Public Land Order No. 7480.

[20] Tax Relief and Health Care Act of 2006, P.L. 109-432, § 403.

[21] *Id.* § 403(c).

[22] 151 Cong. Rec. S7389-90 (daily ed. June 24, 2005) (statement of Sen. Baucus).

[23] *Id.*

[24] Seventeen other leases were not relinquished.  Devon Energy Production Company LP presently holds 15 leases in the Badger-Two Medicine area, ten of which are within the Badger Creek Unit.  Seven of Devon's leases are also owned by Hess Corp., Fidelity Exploration and Production Co, and JMI Energy Inc.  W.A. Moncrief, Jr. holds one lease, and J.G. Kluthe Trust "A" holds one lease.  BLM has suspended lease operations on all of these leases.

[25] *Boesche v. Udall*, 373 U.S. 472 (1963) (MLA leaves unaffected Secretary's traditional administrative authority to cancel a lease on the basis of pre-lease factors).

[26] 43 C.F.R. § 3108.3(d) ("Leases shall be subject to cancellation if improperly issued.").

[27] *See, e.g., Clayton W. Williams, Jr. (Williams)*, 103 IBLA 192, 95 I.D. 102 (1988) (lease voidable if NEPA requirements not fully met prior to lease issuance).

[28] 103 IBLA at 202-03.

[29] *Id.* at 210-11.

B. Lease No. MTM53323 Was Improperly Issued and is Voidable

While the area covered by Lease No. MTM 53323 was open to leasing at the time of issuance, based on a close examination of the record, it is evident that USFS authorized, and BLM issued, Lease No. MTM53323 without properly complying with NEPA and NHPA. As discussed below, the agencies authorized and issued Lease No. MTM53323 without the benefit of an EIS to inform its decision making. The 1981 EA leading to approval of the lease provided that a NEPA analysis of the effects of surface-disturbing activities, including compliance with the requirements of NHPA, would be undertaken when surface-disturbing activities were proposed on a case-by-case basis. By authorizing surface disturbance on Lease No. MTM53323 without full prior analysis of the environmental consequences of such action, including a full analysis of impacts to natural and cultural resources, BLM and USFS violated NEPA and NHPA. Additionally, in proceeding without complete information about cultural resources, BLM and USFS failed to comport with the national policy to protect and preserve the rights of American Indians to exercise traditional religions, including access to important sites.[30]

Turning first to NEPA, the reliance by USFS and BLM on an EA for a leasing decision was illegal. Two judicial decisions addressing oil and gas leases issued in Montana during the same time period as Lease No. MTM53323 conclusively establish that a full EIS is required before issuing leases which do not prohibit all surface disturbing activities, such as Lease No. MTM53323. In *Conner v. Burford*, 605 F. Supp. 107 (D. Mont. 1985), plaintiffs challenged leases for oil and gas development in the Flathead and Gallatin National Forest that were issued after USFS conducted EAs under NEPA instead of an EIS. The federal district court granted summary judgment for the plaintiffs, finding that the sale of the leases without an EIS violated NEPA. On appeal, the Ninth Circuit held that the United States violated NEPA when it sold leases that did not preclude surface-disturbing activities before first completing an EIS.[31] Although the Ninth Circuit did not set aside the leases, the United States was enjoined from allowing any surface disturbing activity on lands already leased until the involved agencies fully complied with NEPA.[32]

In *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988), the Ninth Circuit considered a challenge to leases issued in an area south of the Badger-Two Medicine area based only on a 1980 EA that was similar to the 1981 EA prepared by USFS for the Badger-Two Medicine leasing decision. A federal district court found that the United States violated NEPA because it did not prepare an EIS prior to leasing and failed to consider a no-leasing alternative.[33] Relying on its holding in *Conner*, the Ninth Circuit held that the sale of leases required preparation of an EIS unless surface disturbance was "absolutely" prohibited without further government approval.[34] The Ninth Circuit also affirmed the district court's holding that USFS and BLM

---

[30] *See* AIRFA, 42 U.S.C. § 1996. In 1978, Congress passed a Joint Resolution, entitled the American Indian Religious Freedom Act, which provides as follows:

> Henceforth it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

Pub. L. No. 95-341, 92 Stat. 469 (Aug. 11, 1978), 42 U.S.C. § 1996, as amended.

[31] *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988).

[32] The court left open the possibility that it could potentially authorize surface-disturbing activities on many of the leased tracts once the government complied with NEPA. *Conner*, 848 F.2d at 1461.

[33] *Bob Marshall Alliance v. Watt*, 685 F. Supp. 1514 (D. Mont. 1986).

[34] *Bob Marshall Alliance*, 852 F.2d at 1227.

violated NEPA by failing to give the no-action alternative meaningful consideration.[35]  On remand from the Ninth Circuit, the district court determined that the proper remedy was lease cancellation because the federal agencies had failed to consider a no-leasing alternative at the lease issuance stage.[36]  The Court of Appeals for the D.C. Circuit had reached the same conclusion in 1983, holding that an EIS must be prepared when the leases are issued unless USFS retains authority to preclude all surface disturbing activities.[37]  That decision was cited with approval in both *Conner*[38] and *Bob Marshall Alliance*.[39]

These cases establish that Lease No. MTM53323, which was issued without the completion of an EIS, was issued in violation of NEPA.  Rather than undertaking a full environmental analysis before issuing the leases, as required by NEPA, the agencies attempted to defer their analysis of impacts until after the leases had been issued and an irretrievable and irreversible commitment of resources had taken place.  The 1981 EA leading to approval of the lease specifically anticipated that a thorough analysis of the effects of surface-disturbing activities, including compliance with the requirements of NHPA and AIRFA, would be undertaken only when surface-disturbing activities were proposed on a case-by-case basis.[40]  The *Conner* and *Bob Marshall Alliance* decisions establish, however, that this deferred analysis is a violation of NEPA.

Even if an EIS were not required before issuing the Solenex lease, the particular EA prepared by USFS is patently defective by failing to include a proper no-action alternative.[41]  The EA did not include a true "no-action" alternative (the alternative of not leasing the Badger-Two Medicine area).  Instead, the "no-action" alternative simply delayed recommendations on leasing until a Forest Plan was completed.[42]  USFS rejected that alternative because it was "contrary to present Forest Service Policy."[43]  Thus, instead of considering a "no-lease" alternative, the Badger-Two Medicine leasing EA considered only alternatives to lease all nonwilderness lands in the Forest, albeit with one alternative delaying lease recommendations and another alternative leasing all acreage with no-surface occupancy.

With respect to alternatives, NEPA requires an agency to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."[44]  As part of this analysis, agencies are required to "include the alternative of no action."[45]  "In requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo.  In other words, the current level of activity is used as a benchmark."[46]

---

[35] *Id.* at 1230.

[36] *Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292, 1297 (D. Mont. 1992).

[37] *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

[38] 848 F.2d at 1451.

[39] 852 F.2d at 1227.

[40] EA at 4.

[41] *See Bob Marshall Alliance*, 852 F.2d at 1230 (NEPA requires that alternatives, including a no-lease option, be given full and meaningful consideration).

[42] EA at 31.

[43] *Id.* at 61; *see also id.* at 31 (stating that taking no action on pending lease applications "is in conflict with National and Regional Forest Service policy").

[44] 40 C.F.R. § 1502.14.

[45] *Id.* at § 1502.14(d).

[46] *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (internal citations omitted).

In this case, the no-action alternative would be an alternative to forego leasing and thus maintain the status quo. As the Ninth Circuit made clear in the *Bob Marshall Alliance* case, the sale of leases, even no-surface occupancy leases, "involves conflicts as to the present and future uses" of the area, and "NEPA therefore requires that alternatives – including the no-leasing option – be given full and meaningful consideration."[47] The failure of the EA to include this alternative thus violated NEPA.

Finally, even if USFS had properly discharged its NEPA responsibilities, BLM violated NEPA by failing to properly adopt the EA prepared by USFS. In exercising its discretionary authority to lease national forest lands, BLM must independently consider whether the lease should issue.[48] Recommendations from USFS are important, but they are not conclusive.[49] Thus, the record must show that BLM independently considered whether issuance of an oil and gas lease would be in the public interest.[50] BLM may adopt USFS environmental documents as its own or rely on those documents in its own evaluation of environmental impacts.[51] In this instance, however, BLM neither adopted the USFS's EA nor conducted any environmental review of its own when deciding whether to make National Forest lands available for leasing. BLM's failure to adopt USFS's EA or prepare its own environmental analysis is a violation of NEPA, as IBLA has squarely held.[52]

In addition to violating NEPA, the decision to issue Solenex's lease violated NHPA, which requires federal agencies to take into account the effects of their undertakings on historic properties.[53] The consultation requirement for federal undertakings is often referred to as the Section 106 process.[54] "The [S]ection 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties ...."[55] "The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties."[56] Furthermore, NHPA regulations provide that appropriate NEPA scoping should include the identification of historic properties, assessment of effects upon them, and consultation leading to the resolution of any adverse effects."[57]

NHPA regulations also specifically address tribal concerns, requiring federal agencies "to consult with any Indian Tribe ... that attaches religious and cultural significance to historic properties that may be affected by an undertaking."[58] Further, federal agencies must make reasonable and good faith efforts to identify tribes that should be consulted and their concerns

---

[47] *Bob Marshall Alliance*, 852 F.2d at 1229.

[48] *Esdras K. Hartley*, 23 IBLA 102, 103 (1975).

[49] *Id.* at 103.

[50] *Id.* at 104.

[51] *See Colorado Environmental Coalition*, 125 IBLA 210, 215-16 (1993).

[52] *Board of Commissioners of Pitkin County, et al.*, 173 IBLA 173, 181 (2007). *See also State of Idaho v. ICC*, 35 F.3d 585, 595-96 (D.C. Cir. 1994) (agency cannot delegate its NEPA responsibilities to take a "hard look" at potential environmental impacts); *Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n.*, 449 F.2d 1109, 1123 (D.C. Cir. 1971) (relying entirely on environmental judgments of other agencies fundamentally conflicts with basic purpose of NEPA); *Anacostia Watershed Society v. Babbitt*, 871 F. Supp. 475, 483 (D. D.C. 1994) (NPS failed to properly adopt EA of National Capital Planning Commission).

[53] 54 U.S.C. § 300101, et seq.

[54] *Id.* at § 306108.

[55] 36 C.F.R. § 800.1(a).

[56] *Id.*

[57] *Id.* at § 800.8(a)(3).

[58] *Id.* at § 800.2(c)(ii).

about the undertaking, including an awareness that historic properties of religious and cultural significance may be located off tribal lands on ancestral, aboriginal, or ceded lands.[59]  An agency's failure to engage in a reasonable and good faith effort to identify historic properties of religious and cultural significance to a tribe is a violation of the NHPA.[60]

In this case, USFS and BLM failed to fully consider the effects of leasing, including all phases of oil and gas activities on cultural resources, including religious values and activities, within the Badger-Two Medicine area.  Although the NEPA analysis for the leasing action included some tribal consultation to comply with AIRFA,[61] because the leasing action did not immediately authorize surface disturbance, the agencies mistakenly delayed full compliance with NHPA and AIRFA until after lease issuance.  USFS recognized that "[s]urface disturbing operations associated with oil and gas activities may have an impact on cultural resources," but determined that compliance with the acts "will be required at the time soil disturbing activities are proposed."[62]  Thus, prior to issuing leases the USFS failed to inventory lease parcels to locate and record cultural resources and guarantee access and preservation of religious sites important to the Blackfeet people.

As the *Conner* decision makes clear, though, the sale of Lease No. MTM53323 was an irretrievable commitment of resources and required an analysis of surface disturbance and impacts to cultural resources caused by lease development.  In fact, as set forth earlier in this decision, the proper NHPA review did not start until the early 1990s and only concluded with the issuance of the Department of Agriculture's October 30, 2015, recommendation based on ACHP's final comments.  The full NHPA review now shows that the effects on the Blackfeet Tribe's cultural resources cannot be mitigated.

By violating these statutory duties prior to lease issuance, the agencies also failed to discharge their trust responsibilities to the Tribe.  Courts have held that federal agencies have a trust obligation to Indian tribes when their off-reservation actions may adversely affect the water quality/quantity, air quality, socioeconomic/cultural resources, or property of Indian reservations.[63]  This trust responsibility is discharged by an agency's compliance with general regulations and statutes, such as NEPA and NHPA.[64]  But when NEPA and NHPA compliance has not been achieved because impacts to American Indian religious values have not been properly considered prior to issuance of the surface occupancy lease, federal agencies have not properly discharged their trust obligations.

In summary, by issuing a surface occupancy lease without full prior analysis of the reasonably foreseeable environmental consequences of such action, including a full analysis of impacts to natural and cultural resources, BLM and USFS violated NEPA and NHPA.  Additionally, in

---

[59] *Id.* at § 800.2(c)(ii)(A) and (D).  *See also* 36 CFR §§ 800.3(f)(2) and 800.4(a)(4).

[60] *See Pueblo of Sandia v. U.S.*, 50 F.3d 856 (10th Cir. 1995) (USFS' evaluation of the Las Huertas Canyon for inclusion in the National Register was not reasonable or in good faith).

[61] In the fall of 1979, USFS attempted to comply with AIRFA by meeting with the Blackfeet Tribe. USFS learned that portions of the leasing area continued to hold spiritual importance to the Blackfeet people. 1981 EA at 28. However, USFS found that the Blackfeet people preferred to identify those areas on a project-by-project basis and developed only a cultural resources inventory of known sites. *Id.* USFS determined that a more intensive cultural evaluation would be completed only when there was a potential for surface disturbance.

[62] 1981 EA at 54.

[63] *See e.g., N. Cheyenne Tribe v. Hodel*, 12 Indian L. Rep. 3065 (D. Mont. 1985); *see also Island Mountain Protectors, et al.*, 144 IBLA 168, 183–85 (1998) (a Federal agency's trust obligation to a Tribe extends to actions it takes off a reservation which uniquely impact tribal members or property on a reservation).

[64] *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 574 (9th Cir. 1998).

proceeding without complete information about cultural resources, BLM and USFS failed to comport with the national policy to protect and preserve the rights of American Indians to exercise traditional religions, including access to important sites.[65] We now know that a proper review of cultural resources impacts prior to lease issuance would have disclosed adverse effects to those resources. These legal violations in the process leading to the issuance of Lease No. MTM53323 make the lease voidable.

### C. The Legal Violations in Issuing Lease No. MTM53323 Have Not Been Corrected

When there are defects in the process leading to the issuance of a lease, in certain instances BLM may undertake corrective action at its discretion to rectify the error rather than simply voiding the lease. The *Conner* decision explicitly endorsed this full range of agency authority. In this instance, however, the corrective work which was completed with respect to NHPA by the conclusion of the Section 106 consultation process has resulted in recommendations from the ACHP and the Department of Agriculture to cancel Lease No. MTM53323.

With regard to NEPA, although additional (and sometimes extensive) analyses have been completed, none of them attempted to correct the original NEPA deficiencies, including an analysis of a "no-lease" alternative, which the federal district court in *Bob Marshall Alliance* found to be a "fatal" flaw.[66] The EA conducted in 1985 to analyze an APD for Lease No. MTM53323 did not re-evaluate the 1981 EA for leasing. The 1986 EIS and Record of Decision for the Lewis and Clark National Forest Plan did not re-evaluate areas already leased or propose alternatives to current leasing terms or conditions. An FEIS issued by BLM and USFS in late 1990, analyzing the APD for Lease No. MTM53323 and an APD for Lease No. MTM25173, also failed to properly assess the surface impacts of their 1982 leasing decision on natural and cultural resources in the Badger-Two Medicine area.

Although the 1990 FEIS included a no-action alternative to consider denial of the surface use plans and the drilling permits to preclude surface occupancy, that same alternative allowed for consideration of future permit applications for Lease No. MTM53323. The 1990 FEIS recognized that, under its no-action alternative, previously issued leases would remain in place, and future applications for exploration and development could be submitted and considered. Thus, the 1990 FEIS' no-action alternative was not intended to correct the "no-lease" or "no surface occupancy" deficiency in the leasing decision. Rather the 1990 FEIS instead noted, incorrectly, that the agencies believed they lacked authority to cancel or change lease terms.[67]

In their 1991 and 1993 Records of Decision for the APD, BLM and USFS opined that the 1990 FEIS fully complied with NEPA. But, careful examination of the FEIS' no-action alternative reveals that it was not intended to be an environmental analysis of whether leases should have been issued across the Lewis and Clark National Forest in the first place and did not address the requirements set forth by the Ninth Circuit in *Conner* and *Bob Marshall Alliance*. Thus, the procedural and legal defects associated with the original lease decision, as identified by the Ninth

---

[65] *See* AIRFA, 42 U.S.C. § 1996. At a minimum, courts have required federal agencies to consider Indian religious values prior to adopting land uses that conflict with those values. And following such consideration, an agency must take steps to minimize impacts which would result from the planned activities. *See e.g. Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 455 (1988) (where an agency takes steps to minimize the impact on American Indian religious activities resulting from the planned action it complies with the AIRFA policy).
[66] *Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292, 1297 (1992) (lease cancellation is the only remedy which will effectively ensure NEPA's goal of ensuring that the agencies study, develop and describe alternatives, including a no-action alternative).
[67] FEIS, Ch. 2 at 13-14.

Circuit, have not been corrected, and the NHPA process has led to the finding that impacts to Tribal cultural resources cannot be mitigated. Thus, Lease No. MTM53323 remains voidable because the defects associated with lease issuance have never been corrected.

### D.  Corrective Action to Validate the Lease Cannot Be Taken in this Case

Under the unique facts associated with the lease sale decision for Lease No. MTM53323, BLM has determined that it cannot properly validate this voidable lease. First and foremost, since the issuance of the lease, Congress has permanently prohibited oil and gas leasing in the Badger-Two Medicine area. Unlike other situations where updated NEPA analysis could result in the validation and re-issuance of a voidable lease, the Congressional prohibition renders such additional analysis immaterial. Accordingly, under existing law it would be illegal to validate and in effect reissue Lease No. MTM53323. Additionally, even if BLM retained discretion to validate this lease here, the facts as discussed above do not warrant doing so. Cancellation is appropriate given the findings and recommendations made during the NHPA consultation. Consistent with the requirements of 36 C.F.R. §800.7(c)(4), BLM has reviewed ACHP's final comments and the Secretary of Agriculture's recommendation. BLM does not believe there is a basis for a memorandum of agreement to protect or mitigate impacts to the TCD properties and values associated with lease development. Therefore, BLM finds that the TCD will be adversely affected if the development contemplated under Lease No. MTM53323 is allowed. Accordingly, BLM concludes that Solenex's APD should be disapproved and Lease No. MTM53323 should be cancelled.

### III.   Conclusion

In consideration of all of the foregoing, BLM concludes, with concurrence from the Department, that: (1) Solenex's APD was improperly issued as result of BLM's and USFS' failure to comply with the applicable legal requirements, (2) those procedural defects cannot be corrected because the lease poses adverse effects to the TCD in ways that cannot be fully mitigated, and (3) validation of the lease would be inconsistent with an act of Congress.

Available information shows that, at the time of lease issuance, BLM and USFS mistakenly assumed that NEPA and NHPA compliance did not require an analysis of surface disturbance caused by oil and gas activities prior to lease issuance. The legal deficiencies with those assumptions were identified in litigation as early as 1985, and Lease No. MTM53323 could have been properly cancelled at that time. Instead, Lease No. MTM53323 was suspended to allow further environmental and historic property review. However, as explained above, none of those reviews corrected those fundamental defects. Based on those reviews and the administrative and Congressional protections that have been put in place for the Badger-Two Medicine area since then, the BLM and the Department have determined that surface disturbing activities are incompatible with the irreplaceable natural and cultural resources of the Badger-Two Medicine area. Those resources must be safeguarded from all future oil and gas activities.

Therefore, in accordance with 43 C.F.R. § 3162.3-1(h)(2), your APD is disapproved and returned to you. Further, in accordance with 43 C.F.R. § 3108.3(d), Lease No. MTM53323 is cancelled as being improperly issued in violation of NEPA and the NHPA. Lease cancellation does not trigger an obligation to comply with NEPA because cancellation will not alter the environmental status quo. Because Lease No. MTM53323 has never been developed, the environmental status

quo is not altered.[68]  Lease payments totaling $31,235.00 were made from May 20, 1982, through June 1, 1985, for Lease No. MTM53323.  Our cancellation of Lease No. MTM53323 entitles Solonex, as current owner of the lease, to a refund of that amount.

You are not entitled to interest on that amount because the United States cannot pay interest without statutory authorization.  The Royalty Simplification and Fairness Act (RSFA), 30 U.S.C. 1721(h), authorizes the United States to pay interest on "overpayments made" after February 1997.  RSFA also specifies that interest will "accrue from the date such overpayment was made."[69]  RSFA defines "overpayment" as "any payment . . . in excess of an amount legally required to be paid on an obligation[.]"[70]  Here, the rental payments were not overpayments when they were submitted because the lessee was legally obligated to make them.  The wording of the phrases "overpayments made" after February 1997 and "accrue from the date such overpayment was made" indicate that 30 U.S.C. 1721(h) authorizes interest when a payment made after February 1997 was an overpayment at the time it was made.  You made no payments after February 1997.  Moreover, RSFA does not appear to contemplate or authorize interest when an overpayment is created after the payment date, such as through voiding a lease upon which payments have already been made.

## IV.    Final Agency Action

It is my decision to disapprove Solonex LLC's APD and cancel Lease No. MTM53323.  The legal land description for Lease No. MTM53323 is attached.  As the current lease owner, you are entitled to a refund of lease payments totaling $31,235.00.  You are not entitled to interest on that amount.

_Aden L. Seidlitz_

Aden L. Seidlitz
Acting State Director
Montana Dakotas Office, BLM

I hereby approve the decision to disapprove Solonex's APD, cancel Lease No. MTM3323, and refund $31,235.00 in lease payments.  My approval of this decision constitutes the final decision of DOI and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 C.F.R. Part 4.  Any challenge to this final decision must be brought in an appropriate federal court.

Approved by:

Michael Connor
Deputy Secretary
Department of the Interior

---

[68] *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002)("NEPA's procedures do not apply to agency actions that maintain the environmental status quo").  *See also* the United States' Response to Court Order at 6-7 (November 23, 2015); Federal Defendants' Response to Plaintiff's Response to Defendants' November 23, 2015 Memorandum at 12-13 (March 4, 2016), both filed in *Solenex LLC v. Jewell*, Cause No. 13-993-RJL (D. D.C.)
[69] *Id.*
[70] 30 U.S.C. 1702(27).

Attachment (legal land description)

Federal Lease MTM 53323 legal land description:

MTM 53323

T. 30 N, R. 13 W, PMM, MT
SEC. 26 ALL;
SEC. 27 ALL;
SEC. 28 ALL EXCL HES 723, 1116;
SEC. 29 ALL EXCL HES 723 & LANDS WITHIN GLACIER NATIONAL PARK;
SEC. 30 ALL EXCL LANDS WITHIN GLACIER NATIONAL PARK;
SEC. 31 ALL EXCL LANDS WITHIN GLACIER NATIONAL PARK;
SEC. 32 ALL;
SEC. 33 ALL;
SEC. 34 ALL;
SEC. 35 ALL;
SEC. 36 ALL;
GLACIER COUNTY
6247.00 AC

The legal land description for lease MTM 53323 is written in accordance with the originally issued lease.