**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SOLENEX LLC, | ) | Civil Case No. 13-00993 (RJL) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| SALLY JEWELL, *et al*., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Steven J. Lechner, D.D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiff

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

GLOSSARY ....................................................................................... xiv

INTRODUCTION ................................................................................ 1

BACKGROUND .................................................................................. 1

I.  LEGAL BACKGROUND ............................................................ 1

II.  FACTUAL BACKGROUND ........................................................ 3

ARGUMENT ...................................................................................... 5

I.  STANDARD OF REVIEW ........................................................... 5

II.  THE SECRETARY'S CANCELLATION OF THE LEASE WAS
*ULTRA VIRES*................................................................................ 7

    A.  The Secretary Has No Authority To Cancel A Property Interest
Once Title Has Vested In A Private Party ............................. 7

    B.  *Boesche* Confirms That The Secretary Lacked Authority To
Cancel Solenex's Lease ..................................................... 14

III.  THE SECRETARY'S CANCELLATION OF THE LEASE WAS
UNLAWFUL BECAUSE SOLENEX IS ENTITLED TO *BONA FIDE*
PURCHASER PROTECTION ......................................................... 19

IV.  THE SECRETARY'S CANCELLATION OF THE LEASE WAS
BARRED BY THE PASSAGE OF TIME ......................................... 24

V.  THE SECRETARY IS ESTOPPED FROM ASSERTING THAT THE
LEASE WAS IMPROPERLY ISSUED AFTER REPEATEDLY
REPRESENTING THAT THE LEASE WAS VALID AND
PROPERLY ISSUED FOR MORE THAN 33 YEARS.............................. 26

VI.  CONTRARY TO THE SECRETARY'S NEW POSITION, THE
LEASE WAS PROPERLY ISSUED ................................................ 29

    A.  There Were No NEPA Violations In The Issuance Of The Lease ...... 29

    B.  There Were No NHPA Violations In The Issuance Of The Lease ...... 38

VII.    THE SECRETARY'S CANCELLATION OF THE LEASE WAS
        ARBITRARY AND CAPRICIOUS ................................................................    40

VIII.   THE SECRETARY'S DISAPPROVAL OF THE APPROVED APD
        WAS ARBITRARY AND CAPRICIOUS ........................................................    43

CONCLUSION .........................................................................................................    44

CERTIFICATE OF SERVICE ..................................................................................    45

## **TABLE OF AUTHORITIES**
(* denotes cases primarily relied upon)

**Page**

**Cases**

*3M Co. (Minn. Min. & Mfg.) v. Browner,*
    17 F.3d 1453 (D.C. Cir. 1994)................................................................. 25

*Am. Trucking Ass'ns v. Frisco Transp. Co.,*
    358 U.S. 133 (1958)........................................................................... 36

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors,*
    745 F.2d 677 (D.C. Cir. 1984)............................................................ 6, 41

*Baltimore Gas and Elec. Co. v. NRDC,*
    462 U.S. 87 (1983)............................................................................. 29

*Bell Oil & Gas Co. v. Wilbur,*
    50 F.2d 1070 (D.C. Cir. 1931)............................................................ 11

*Bob Marshall All. v. Hodel,*
    852 F.2d 1223 (9th Cir. 1988) ........................................... 31, 33, 34, 40

*Bob Marshall All. v. Lujan,*
    804 F. Supp. 1292 (D. Mont. 1992)..................................................... 40

*\*Boesche v. Udall,*
    373 U.S. 472 (1963).................................................... 7, 14, 15, 17, 18

*Bookman v. U.S.,*
    453 F.2d 1263 (Ct. Cl. 1972) ............................................................ 36

*Bordenkircher v. Hayes,*
    434 U.S. 357 (1978).......................................................................... 25

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974)........................................................................... 6

*Cal. Co. v. Udall,*
    296 F.2d 384 (D.C. Cir. 1961) ........................................................... 42

*Cal. v. Norton,*
    311 F.3d 1162 (9th Cir. 2002) ........................................................... 42

*Cal. ex rel. Cal. Coastal Comm'n v. Norton,*
    150 F. Supp. 2d 1046 (N.D. Cal. 2001) ............................................... 42

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971)............................................................... 5, 6

*Clearfield Trust Co. v. U.S.,*
  318 U.S. 363 (1943)............................................................... 25

*Colo. Coal & Iron Co. v. U.S.,*
  123 U.S. 307 (1887)............................................................... 19

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) ...............................30, 31, 35, 40, 41

*Consarc Corp. v. U.S. Treasury Dep't,*
  71 F.3d 909 (D.C. Cir. 1995) .................................................. 42

*Costello v. U. S.,*
  365 U.S. 265 (1961)............................................................... 26

*Del-Rio Drilling Programs, Inc. v. U.S.,*
  46 Fed. Cl. 683 (2000) .......................................................... 17

*Dickerson v. Colgrove,*
  100 U.S. 578 (1879)............................................................... 27

*FEC v. Nat'l Republican Senatorial Comm.,*
  877 F. Supp. 15 (D.D.C. 1995).............................................. 24–25

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,*
  426 U.S. 776 (1976)............................................................... 30

*Geosearch, Inc. v. Andrus,*
  508 F. Supp. 839 (D. Wyo. 1981)........................................... 43

*Geosearch, Inc. v. Watt,*
  721 F.2d 694 (10th Cir. 1983) ............................................... 21

*Gratehouse v. U.S.,*
  512 F.2d 1104 (Ct. Cl. 1975) ................................................ 36

*Hammond v. Norton,*
  370 F. Supp. 2d 226 (D.D.C. 2005)........................................ 33

*Harvey v. Udall,*
  384 F.2d 883 (10th Cir. 1967) ............................................... 2

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
  467 U.S. 51 (1984)..................................................................... 27

*Iceland S.S. Co. v. U.S. Dep't of the Army*,
  201 F.3d 451 (D.C. Cir. 2000)................................................. 36

*Ill. Commerce Comm'n v. ICC*,
  848 F.2d 1246 (D.C. Cir. 1988)............................................... 39

*Jama v. ICE*,
  543 U.S. 335 (2005).................................................................. 11

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986)................................................................... 6

*Lownsdale v. Portland*,
  15 F. Cas. 1036 (D. Or. 1861) .................................................. 2

*Lykins v. McGrath*,
  184 U.S. 169 (1902).................................................................. 22

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988).................................................................. 42

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*,
  297 U.S. 129 (1936).................................................................. 18

*McKay v. Wahlenmaier*,
  226 F.2d 35 (D.C. Cir. 1955)............................................... 13, 14

*Mich. v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001).................................................. 6

*Mobil Oil Expl. & Producing Se., Inc. v. U.S.*,
  530 U.S. 604 (2000)................................................................... 2

*Moore v. Robbins*,
  96 U.S. 530 (1877)..................................................................... 8

*Morris Commc'ns, Inc. v. FCC*,
  566 F.3d 184 (D.C. Cir. 2009)................................................. 29

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................. 7, 23

*MSLF v. Andrus,*
499 F. Supp. 383 (D. Wyo. 1980) ........................................................... 33

*Nat'l Indian Youth Council v. Andrus,*
501 F. Supp. 649 (D.N.M. 1980) ........................................................... 39

*Nat'l Indian Youth Council v. Watt,*
664 F.2d 220 (10th Cir. 1981) ............................................................... 39

*Nat'l Trust for Historic Pres. v. Blanck,*
938 F. Supp. 908 (D.D.C. 1996) ........................................................ 38–39

*Nat'l Trust for Historic Pres. v. Blanck,*
203 F.3d 53 (D.C. Cir. 1999) ................................................................. 39

*Nevada v. Dep't of Energy,*
457 F.3d 78 (D.C. Cir. 2006) ............................................................ 30, 40

*N.H. v. Maine,*
532 U.S. 742 (2001) ............................................................................... 28

*New York v. NRC,*
681 F.3d 471 (D.C. Cir. 2012) ............................................................... 30

*\*Noble v. Union River Logging R. Co.,*
147 U.S. 165 (1893) ............................................................................. 8, 9

*Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs,*
537 F. Supp. 2d 161 (D.D.C. 2008) ....................................................... 38

*\*Pan Am. Petroleum Corp. v. Pierson,*
284 F.2d 649 (10th Cir. 1960) .................................................. 3, 13, 14, 19

*\*Park County Res. Council, Inc. v. U.S. Dep't of Agric.,*
817 F.2d 609 (10th Cir. 1987) ............................................................... 31

*Patterson v. Hewitt,*
195 U.S. 309 (1904) ............................................................................... 26

*Pierce v. SEC,*
786 F.3d 1027 (D.C. Cir. 2015) ............................................................. 29

*Powell v. Zuckert,*
366 F.2d 634 (D.C. Cir. 1966) ............................................................... 25

*Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers,*
  367 U.S. 396 (1961)...........................................................................   11

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)...........................................................................   30

*S. Utah Wilderness All. v. U.S. Dep't of Interior,*
  No. 2:06-CV-342-DAK, 2007 WL 2220525 (D. Utah 2007)..........................   40–41

*Seaton v. Texas Company,*
  256 F.2d 718 (D.C. Cir. 1958).............................................................   13, 14

*Shaw v. Kellogg,*
  170 U.S. 312 (1898)...........................................................................   9

*Sierra Club v. Peterson,*
  717 F.2d 1409 (D.C. Cir. 1983)...........................................................   31

*Smiley v. Citibank (S. Dakota), N.A.,*
  517 U.S. 735 (1996)...........................................................................   35

*Spiller v. White,*
  352 F.3d 235 (5th Cir. 2003) ..............................................................   32

*Stockley v. U.S.,*
  260 U.S. 532 (1923)...........................................................................   41

*Sw. Petroleum Corp. v. Udall,*
  361 F.2d 650 (10th Cir. 1966) ............................................................   20, 23

*Tex. Oil & Gas Corp. v. Watt,*
  683 F.2d 427 (D.C. Cir. 1982).............................................................   35

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton,*
  433 F.3d 852 (D.C. Cir. 2006) ............................................................   33

*Union Oil Co. of Cal. v. Smith,*
  249 U.S. 337 (1919)...........................................................................   2

*U.S. v. 162.20 Acres of Land, More or Less, Etc.,*
  639 F.2d 299 (5th Cir. 1981) ..............................................................   39

*U.S. v. Burlington & M.R.R. Co.,*
  98 U.S. 334 (1878)............................................................................   19

*U.S. v. Eaton Shale Co.*,
   433 F. Supp. 1256 (D. Colo. 1977) ...................................................................... 28

*U.S. v. Georgia-Pacific Co.*,
   421 F.2d 92 (9th Cir. 1970) .................................................................................... 27

*U.S. v. Jenks*,
   129 F.3d 1348 (10th Cir. 1997) .............................................................................. 28

*U.S. v. One 1936 Model Ford V–8 De Luxe Coach*,
   307 U.S. 219 (1939) .................................................................................................. 2

*U.S. v. Parcel of Land, Bldgs., Appurtances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*,
   507 U.S. 111 (1993) ................................................................................................ 21

*U.S. v. Seatrain Lines*,
   329 U.S. 424 (1947) ................................................................................................ 36

*U.S. v. Stone*,
   69 U.S. 525 (1864) ............................................................................................... 7, 8

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978) ................................................................................................ 30

*Waskey v. Chambers*,
   224 U.S. 564 (1912) ................................................................................................ 21

*West v. Standard Oil Co.*,
   278 U.S. 200 (1929) ................................................................................................ 11

*Wilkinson v. Leland*,
   27 U.S. 627 (1829) .................................................................................................... 2

*Wilson v. Block*,
   708 F.2d 735 (D.C. Cir. 1983) ............................................................................... 40

*Winkler v. Andrus*,
   614 F.2d 707 (10th Cir. 1980) ......................................................................... 22, 23

*Witbeck v. Hardeman*,
   51 F.2d 450 (5th Cir. 1931) .................................................................................... 25

*Witbeck v. Hardeman*,
   286 U.S. 444 (1932) ................................................................................................ 25

**Administrative Decisions**

*Clayton W. Williams, Jr.*,
    103 IBLA 192 (1988)............................................................................ 18

*Floyd Higgins*,
    147 IBLA 343 (1999) ............................................................. 26, 27, 28–29

*Glacier–Two Medicine All.*,
    88 IBLA 133 (1985)........................................................................ 23, 34

*Home Petroleum Corp.*,
    54 IBLA 194 (1981)............................................................................ 21

*J. Penrod Toles*,
    68 Interior Dec. 285 (1961) ................................................................ 20

*\*The Melish Consol. Placer Oil Mining Co. v. Testerman*,
    53 Interior Dec. 205 (1930) ........................................................... 11, 12

**Constitutional Provisions**

U.S. Const. amend I ........................................................................ 41–42

U.S. Const. amend V......................................................................... 25

**Statutes**

29 Stat. 526 (1897)............................................................................... 2

41 Stat. 437 (1920).......................................................................... 1, 10

49 Stat. 674 (1935).......................................................................... 9, 12

Pub. L. No. 86-294, 73 Stat. 571 (1959) ................................................ 19

Pub. L. No. 86-705, 74 Stat. 781 (1960) ................................................ 19

Pub. L. No. 102-575, 106 Stat. 4600 (1992)............................................ 38

Pub. L. No. 109-432, 120 Stat. 2922 (2006)............................................ 41

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* .......................... 1, 5, 43

    5 U.S.C. § 551(8) ....................................................................... 43

5 U.S.C. § 558(c) ................................................................................ 43

5 U.S.C. § 706 ..................................................................................... 40

5 U.S.C. § 706(2) ................................................................................ 6

5 U.S.C. § 706(2)(A) .......................................................................... 6

5 U.S.C. §§ 706(2)(A)–(F) ................................................................ 5

5 U.S.C. § 706(2)(C) .......................................................................... 6

28 U.S.C. § 2462 ................................................................................. 24, 25

The Mineral Leasing Act of 1920, 30 U.S.C. §§ 181–287 ...................... *passim*

30 U.S.C. § 181 ................................................................................... 2

30 U.S.C. § 184 ................................................................................... 19

30 U.S.C. § 184(h)(1) ........................................................................ 10

30 U.S.C. § 184(h)(2) ........................................................................ 20

30 U.S.C. § 184(i) .............................................................................. 20

30 U.S.C. § 187a ................................................................................ 21

30 U.S.C. § 188(a) ............................................................................. 10, 15, 25

30 U.S.C. § 188(b) ............................................................................. 12, 15

30 U.S.C. § 209 ................................................................................... 23

30 U.S.C. § 226(a) ............................................................................. 2

30 U.S.C. § 226(b)(1)(A) ................................................................... 2

30 U.S.C. § 226-2 ............................................................................... 24

The Mining Law, 30 U.S.C. § 22 *et seq.* ............................................... 2

The American Indian Religious Freedom Act, 42 U.S.C. § 1996 ......................... 40

The National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.* ........................... *passim*

42 U.S.C. § 4331(a) ............................................................... 42

42 U.S.C. § 4332 ................................................................... 30

42 U.S.C. § 4332(C) ............................................................. 30, 42

42 U.S.C. § 4332(C)(v) ......................................................... 31, 42

The Energy Security Act of 1980, 42 U.S.C. § 8855............................. 33

The General Railroad Right-of-Way Act of 187, 43 U.S.C. §§ 934–39 .................. 9

43 U.S.C. § 1166 ................................................................... 25

The National Historic Preservation Act, 54 U.S.C. § 300101 *et seq*....................... 29, 38, 39, 40

54 U.S.C. § 300308................................................................. 38

54 U.S.C. § 306108................................................................. 38

**Regulations**

40 C.F.R. § 1501.3 ................................................................. 30

40 C.F.R. § 1501.4(b) ............................................................. 30

40 C.F.R. § 1501.4(c) ............................................................. 30

40 C.F.R. § 1501.4(e) ............................................................. 30

40 C.F.R. § 1508.9 ................................................................. 30

43 C.F.R. § 3101.1–2 .............................................................. 2

43 C.F.R. § 3108.3(d) ............................................................. 18

43 C.F.R. § 3108.4 ................................................................. 20

43 C.F.R. § 3162.3-1(h)(2) ........................................................ 43

**Legislative History**

H.R. Rep. No. 65-563 (January 3, 1916) ............................................. 11

H.R. Rep. No. 86-1062, *reprinted in* 1959 U.S.C.C.A.N. 2620 ................................ 19

S. Rep. No. 86-1549, *reprinted at* 1960 U.S.C.C.A.N. 3313 ................................. 24

58 Cong. Rec. 4168 (Aug. 22, 1919) ....................................................... 11

58 Cong Rec. 7604 (Oct. 27, 1919) ........................................................ 11

**<u>Other Authorities</u>**

2 Summers Oil and Gas § 12:14 (3d ed., Nov. 2015) ................................. 22

65 Fed. Reg. 77,698 (Dec. 12, 2000) ...................................................... 38

81 Fed. Reg. 51,936 (Aug. 5, 2016)........................................................ 42

Blair, *The Cancellation of Oil and Gas Leases:  An Administrative or Judicial Function?* 51 Geo. L.J. 221 (1963)............................................. 12, 13

Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567 (Feb. 6, 1963) .............. 15, 16, 17

Nelson, *Takings Law West of The Pecos:  Inverse Condemnation of Federal Oil and Gas Lease Rights*, 37 Nat. Resources J. 253 (1997).................................... 2

## **GLOSSARY**

AIRFA - American Indian Religious Freedom Act, 42 U.S.C. § 1996

APA - Administrative Procure Act, 5 U.S.C. § 551 *et seq.*

APD - Application for Permit to Drill

BFP - *Bona Fide* Purchaser

BLM - Bureau of Land Management

Department - U.S. Department of the Interior

DN - Decision Notice

EA - Environmental Assessment

EIS - Environmental Impact Statement

FONSI - Finding of No Significant Impact

Forest Service - U.S. Forest Service

IBLA - Interior Board of Land Appeals

MLA - The Mineral Leasing Act of 1920, 30 U.S.C. §§ 181–287

NEPA - The National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.*

NHPA - The National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*

NSO - No Surface Occupancy

PSOF - Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment

ROD - Record of Decision

Secretary - Secretary, U.S. Department of the Interior

TCD - Traditional Cultural District

## INTRODUCTION

Solenex previously owned a federal oil and gas lease, which was issued to Solenex's predecessor in 1982.  In 2013, Solenex initiated this case in an effort to compel Defendants to lift the suspension of the lease, which had been in place since 1985.  On July 27, 2015, this Court ruled that Defendants had unreasonably delayed as a matter of law and ordered Defendants to prepare a schedule for determining whether to lift the suspension on the lease.  Dkt. # 52 at 2–3, 5.[1]  In response, the Secretary of the Interior cancelled the 33-year-old lease on March 17, 2016.  Dkt. # 68-1.

Pursuant to the APA, Solenex seeks judicial review of the Secretary's unprecedented and egregious actions.  As demonstrated below, Solenex is entitled to summary judgment that the Secretary's actions were unlawful and must be set aside.  First, the Secretary's actions were *ultra vires* because the Secretary had no authority to cancel the lease, especially one that was issued in 1982.  Second, even if the Secretary had such authority, that authority was unlawfully exercised because Solenex is entitled to *bona fide* purchaser protection.  Third, the Secretary's actions are barred by the passage of time and equitable estoppel.  Finally, contrary to the Secretary's new position, the lease was not improperly issued in 1982.

## BACKGROUND

**I.     LEGAL BACKGROUND.**

The Mineral Leasing Act of 1920 ("MLA"), 41 Stat. 437–51 (1920) (codified, as amended, at 30 U.S.C. §§ 181–287), was the first act that provided for the leasing of the Nation's

---

[1] All page citations are to the page numbers assigned to the document by this Court's CM/ECF system.

oil and gas resources.[2]  The specific purpose of the MLA is "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States *through private enterprise*."  *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (quotation omitted) (emphasis added).  To accomplish this purpose, the MLA vests the Secretary, acting through the BLM, with the authority to issue leases covering oil and gas deposits "and lands containing such deposits owned by the United States, including those in national forests …."  30 U.S.C. §§ 181, 226(a).  A lease grants the lessee, *inter alia*, the "exclusive right" to drill for, mine, extract, remove, and dispose of all the oil and gas in the leased lands.  *See* 43 C.F.R. § 3101.1–2.  This exclusive right is conditioned upon the payment of a royalty to the United States.  30 U.S.C. § 226(b)(1)(A).

A federal oil and gas lease is both a conveyance of an interest in land and a contract.  *See* Nelson, *Takings Law West of The Pecos:  Inverse Condemnation of Federal Oil and Gas Lease Rights*, 37 Nat. Resources J. 253, 258–59 (1997) (federal oil and gas leases "are a unique hybrid of contract and real property rights."); *Mobil Oil Expl. & Producing Se., Inc. v. U.S.*, 530 U.S. 604, 609 (2000) (federal oil and gas lease is a contract).  The sanctity of private property and contracts in this country cannot be questioned.  *Wilkinson v. Leland*, 27 U.S. 627, 657 (1829) ("The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred."); *Lownsdale v. Portland*, 15 F. Cas. 1036, 1039 (D. Or. 1861) ("Security and certainty of title to real property are among the most important objects of the law in any civilized community."); *see U.S. v. One 1936 Model Ford V–8 De Luxe Coach*, 307 U.S. 219, 226 (1939) ("Forfeitures are not favored; they should be enforced only when within

---

[2] Prior to the MLA, federal lands containing oil and gas were privately acquired through "self-initiation," pursuant to the Mining Law.  30 U.S.C. § 22 *et seq*.; *see* 29 Stat. 526 (1897) (Oil Placer Act).  Under the Mining Law, citizens could freely enter upon federal lands to search for oil and gas, and after, *inter alia*, "discovery," "location," and payment of the purchase price, receive a patent conveying fee title to the land and minerals.  *See Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 344–49 (1919).

both letter and spirit of the law."). More importantly, security of title in federal oil and gas leases is necessary to fulfill Congress's purpose in passing the MLA. *See Pan Am. Petroleum Corp. v. Pierson*, 284 F.2d 649, 655 (10th Cir. 1960) ("Certainty of title is an elementary prerequisite for the sound development of any mineral resource.").

## II.    FACTUAL BACKGROUND.[3]

In 1981, the Forest Service, with the approval of the BLM as a cooperating agency, issued a comprehensive, 162-page, environmental assessment ("EA") for oil and gas leasing on non-wilderness lands administered by the Lewis and Clark National Forest ("1981 EA"). PSOF ¶¶ 1–9. On May 24, 1982, based upon the 1981 EA, the BLM issued the lease to Sidney M. Longwell. *Id.* ¶¶ 11–21. On June 2, 1983, Mr. Longwell assigned the lease to Fina. *Id.* ¶ 22. In making this assignment, Mr. Longwell reserved a production payment, which would be paid out of a percentage of the value of the oil and gas produced from the leased lands. *Id.* ¶

In November 1983, Fina submitted an Application for Permit to Drill ("APD"), to drill a single well on the lease. PSOF ¶¶ 23–26. In January 1985, the Forest Service and the BLM issued a 318-page EA for the APD ("1985 EA"). *Id.* ¶¶ 27–29. Based on the 1985 EA, the BLM approved the APD. *Id.* ¶ 30. On appeal, the IBLA upheld the BLM's actions in approving the APD based upon the 1985 EA, but remanded for further consideration of four issues. *Id.* ¶¶ 31–32.

---

[3] Only the essential facts are set forth herein. Filed concurrently herewith is a Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment ("PSOF"), which provides a detailed factual history, and supplements the factual history provided at Dkt. # 24-2. The facts are primarily based on the documents from Defendants' administrative record. *See* Dkt. # 84. Many of the documents were included in the previously filed appendix. *See* Dkt. ## 45, 48. To avoid duplication, the previously filed documents will be cited as Dkt. # ___ at ___. New documents will be cited as A0000:FS000000 (Forest Service), HC00000 (BLM), or a descriptive name will be used. Copies of the new documents will be filed with the Court in an appendix following completion of briefing. *See* Dkt. # 82.

After remand, Fina requested a temporary suspension of the lease to prevent the primary term of the lease from expiring while the BLM considered the four remanded issues.  PSOF ¶ 33. The BLM promptly granted Fina's request, but then unlawfully kept the lease in suspension for the next 30 years, until the Secretary cancelled the lease in March 2016.  PSOF ¶¶ 34, 86–95.

In 1987, after addressing the four remanded issues and considering the Forest Service's new 1986 Forest Plan and accompanying Final Environmental Impact Statement ("1986 FEIS") , the BLM reactivated the approved APD.  PSOF ¶¶ 35–37.  Through no fault of Fina, that decision was short lived.  PSOF ¶¶ 38–41.

Thereafter, the Forest Service and the BLM decided to re-analyze Fina's APD in conjunction with an APD submitted by Chevron for a nearby lease.  PSOF ¶¶ 43–44.  This analysis resulted in a comprehensive, 982-page, Final EIS, which was issued in December 1990 ("1990 FEIS").  *Id*. ¶ 45.  Based upon the 1990 FEIS, the BLM approved Fina's APD in 1991, and once again in 1993.  *Id*. ¶¶ 46–55.  This approval was subject to Fina complying with all lease stipulations, mitigation and monitoring requirements, and additional mitigation measures that were imposed as conditions of approval.  *Id*. ¶ 55–59.  Importantly, the 1993 Record of Decision ("1993 ROD") approving the APD was concurred in by the Assistant Secretary, Department of the Interior, which made it a final decision for the Secretary.  *Id*.

On June 4, 1993, right before the suspension was to be lifted, the new Secretary suspended the lease for another year.  PSOF ¶ 60.  Thereafter, one-year suspensions were imposed until the lease was indefinitely suspended in 1998.  *Id*. ¶¶ 61–67.

On April 5, 1999, Fina, "fed up with the …endless delay," assigned the lease back to Mr. Longwell.  PSOF ¶ 68.  In 2004, Mr. Longwell assigned the lease and concomitant rights under the

approved APD to Solenex, a Louisiana limited liability corporation Mr. Longwell had recently formed. *Id*. ¶ 73.

Despite persistent efforts by Solenex to exercise its valuable lease rights over the next nine years, the lease remained in suspension. *See* PSOF ¶¶ 74–78. As a result, in June 2013, Solenex initiated this case seeking to compel agency action "unreasonably delayed." Dkt. # 1. Defendants responded by arguing that this Court was powerless to do anything about their nearly three-decades-long delay. Dkt. # 34-1 at 22–25. In the alternative, Defendants argued that they had not unreasonably delayed in lifting the suspension. *Id*. at 25–28.

On July 27, 2015, this Court ruled that Defendants' 29-year delay was unreasonable as a matter of law. Dkt. # 52 at 2–3. Following that adverse ruling, Defendants suggested—for the first time—that the lease may have been improperly issued in 1982 and that they may seek to cancel the lease. PSOF ¶¶ 88–91. That new position was formalized on March 17, 2016, when the Secretary issued an unprecedented decision cancelling the 33-year-old lease and disapproving the 23-year-old approved APD. PSOF ¶¶ 94–95; Dkt. # 68-1.

## ARGUMENT

## I.   STANDARD OF REVIEW.

Under the APA, a reviewing court "shall" also "hold unlawful and set aside agency action, findings, and conclusions found" not to satisfy any one of the six listed standards. 5 U.S.C. §§ 706(2)(A)–(F). These standards require the reviewing court to engage in a "substantial inquiry." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("*Overton Park*"). And, although an agency's decision is generally entitled to a presumption of regularity, "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id*.

5

Two of these standards are of particular relevance in this case. First, the standard of review in 5 U.S.C. § 706(2)(C) is fairly straightforward. Whether an agency has acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" requires a determination of the scope of the authority delegated by Congress to the agency for "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Once the scope of the agency's delegated authority is determined, the reviewing court must decide whether the challenged agency action falls within that authority. If the agency acts in excess of its delegated authority, "then its action is plainly contrary to law and cannot stand." *Mich. v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

Second, the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard in 5 U.S.C. § 706(2)(A), which is commonly referred to as the "arbitrary and capricious" standard, serves as a "catch-all" that "pick[s] up administrative misconduct not covered by the other more specific" standards in 5 U.S.C. § 706(2). *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors*, 745 F.2d 677, 683 (D.C. Cir. 1984). Thus, an agency action that is within the agency's delegated authority may still be held unlawful as arbitrary and capricious. *See Overton Park*, 401 U.S. at 415–16. In addition, the arbitrary and capricious standard applies to both the factual basis for an agency's action, *Overton Park*, 401 U.S. at 416, and the reasoning employed by the agency. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc*., 419 U.S. 281, 285–86 (1974). Therefore, "an agency action which is supported by the required substantial evidence may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'—for example, because it is an abrupt and unexplained departure from agency precedent." *Ass'n of Data Processing*, 745 F.2d at 683. In general, agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

## II.    THE SECRETARY'S CANCELLATION OF THE LEASE WAS *ULTRA VIRES*.

It is undisputed that the Secretary's actions in administratively cancelling the lease were not based upon any express delegation of authority from Congress.  Dkt. # 68-1 at 7.  Instead, the Secretary claimed that she had inherent authority to do so based upon her general managerial power over the public lands and the Supreme Court's decision in *Boesche v. Udall*, 373 U.S. 472, 474 (1963).  Dkt. # 68-1 at 7.  As demonstrated below, the Secretary has never had any inherent authority to cancel a property interest after title thereto had been transferred into private ownership, and *Boesche* did not magically confer such authority on the Secretary.

### A.    The Secretary Has No Authority To Cancel A Property Interest Once Title Has Vested In A Private Party.

When Congress began debating a leasing system for oil and gas, it was established that the Secretary had no inherent authority to administratively cancel a property interest after title thereto had been transferred into private ownership through the final actions of the Secretary.  Instead, if a private party acquired title to a property interest by mistake or by fraud, the Secretary's only recourse was to seek a judicial cancellation of that title.  One of the earliest pronouncements of this principle occurred in *U.S. v. Stone*, 69 U.S. 525, 528 (1864), a case initiated by the United States to judicially cancel a patent that was issued by mistake as the lands were not open to patenting.  The patentee argued that the patent was unassailable except for fraud in the procurement.  *Id*. at 529–30.  In response, the United States argued that "the appropriate remedy of the United States, to set

aside and cancel patents issued by her officers, without due legal authority, is by bill in equity." *Id.*

at  532.  In sustaining the United States' suit to cancel the patent, the Court explained:

> A patent is the highest evidence of title, and is conclusive as against the Government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal….
>
> Nor is fraud in the patentee the only ground upon which a bill will be sustained. Patents are sometimes issued unadvisedly or by mistake, where the officer has no authority in law to grant them, or where another party has a higher equity and should have received the patent.  In such cases courts of law will pronounce them void.  The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially.  If he issues a patent for land reserved from sale by law, such patent is void for want of authority.  *But one officer of the land office is not competent to cancel or annul the act of his predecessor.  That is a judicial act, and requires the judgment of a court.*

*Id.* at 535 (emphasis added).

Thirteen years later, the Court further explained why the Secretary lacked that authority to

reverse a final act that had conveyed title to a private party:

> The functions of [the Executive D]epartment necessarily cease when the title has passed from the government.  And the title does so pass in every instance where, under the decisions of the officers having authority in the matter, a conveyance, generally called a patent, has been … delivered to and accepted by the grantee.  It is a matter of course that, after this is done, neither the secretary nor any other executive officer can entertain an appeal.  *He is absolutely without authority.  If this were not so, the titles derived from the United States, instead of being the safe and assured evidence of ownership which they are generally supposed to be, would be always subject to the fluctuating, and in many cases unreliable, action of the land-office.  No man could buy of the grantee with safety, because he could only convey subject to the right of the officers of the government to annul his title.*

*Moore v. Robbins*, 96 U.S. 530, 533–34 (1877) (emphasis added).

Following *Stone* and *Moore*, the Court consistently applied this principle—not only to fee

title, but to lesser property interests.  For example, in *Noble v. Union River Logging R. Co.*, 147

U.S. 165, 166–67 (1893), the Secretary sought to disapprove a previously approved map, the

approval of which had automatically conferred upon the plaintiff title to an easement for railroad

purposes under the General Railroad Right-of-Way Act of 1875, 43 U.S.C. §§ 934–39.  *Id*. at 172;

The plaintiff sued to enjoin the Secretary from administratively divesting it of its title, arguing that

the Secretary's only recourse was to institute a judicial proceeding for cancellation of the easement.

*Noble*, 147 U.S. at 165.  In affirming the lower court's issuance of the injunction, the Court ruled:

> The lands over which the right of way was granted were public lands, subject to the operation of the statute; and the question whether the plaintiff was entitled to the benefit of the grant was one which it was competent for the secretary … to decide, and, when decided, and his approval was noted upon the plats ... [t]he railroad company became at once vested with a right of property in these lands, of which they can only be deprived by a [judicial] proceeding taken directly for that purpose. If it were made to appear that the right of way had been obtained by fraud, a bill would doubtless lie by the United States for the cancellation and annulment of an approval thus obtained.  *A revocation of the approval of the secretary ..., however, by his successor in office, was an attempt to deprive the plaintiff of its property without due process of law, and was, therefore, void....  One officer of the land office is not competent to cancel or annul the act of his predecessor.  That is a judicial act, and requires the judgment of a court....*

*Id*. at 176–77 (internal citations and quotations omitted) (emphasis added); *see also Shaw v.

Kellogg*, 170 U.S. 312, 341 (1898) (When "the legal title passes, … by whatsoever instrument and

in whatsoever manner," it "passes out of the jurisdiction of the land department.  The grant has

then been complete, and the only remedy for any wrong in the transfer of such title is through the

courts, and not in the land department.").

It was against this legal background that Congress passed the MLA.  As originally enacted,

nothing in the MLA provided the Secretary with the authority to cancel a lease.[4]  Instead, as

reflected in Section 31 of the MLA, as originally enacted, Congress expressly provided that the

Secretary had to institute a judicial proceeding in order to forfeit or cancel a lease.

---

[4] Under the MLA, as originally enacted, lands within a proven area were generally leased on a competitive basis.  41 Stat. at 443.  Prospecting permits were issued for lands within unproven areas.  41 Stat. at 441.  A prospecting permit gave the permittee exclusive rights to explore the lands and, upon the discovery of a valuable deposit, the permittee was entitled to issuance of a lease.  41 Stat. at 441–42.  Prospecting permits for oil and gas were essentially eliminated by Congress in 1935 and replaced with noncompetitive leases.  *See* 49 Stat. 674–79 (1935).

> That any lease issued under the provision of this Act may be forfeited and
> canceled by an appropriate proceeding in the United States district court for the
> district in which the property … is located whenever the lessee fails to comply
> with any of the provisions of [the MLA], of the lease, or of the general regulations
> promulgated under [the MLA] and in force at the date of the lease ....

41 Stat. at 450.[5]  That intent was also reflected in Section 27 of the MLA, as originally enacted,

wherein Congress provided that a judicial proceeding had to be instituted to forfeit any interest in

a lease that was owned in excess of the maximum ownership limit.  41 Stat. at 448;[6] *see id.* at

443 (providing that a judicial proceeding had to be instituted to forfeit a lease if the prohibition

on drilling within 200 feet of the lease boundary was violated); *id.* at 449 (providing that a

judicial proceeding had to be instituted to forfeit a pipeline right-of-way granted under the

MLA).

 In contrast, Section 26 of the MLA, as originally enacted, did provide authority to the

Secretary to cancel a prospecting permit:

> [T]he Secretary of the Interior shall reserve and may exercise the authority to
> cancel any prospecting permit upon failure by the permittee to exercise due
> diligence in the prosecution of the prospecting work in accordance with the terms
> and conditions stated in the permit, *and shall insert in every such permit issued
> under the [MLA] appropriate provisions for its cancellation by him*.

41 Stat. at 448 (emphasis added).  That Congress expressly provided that prospecting permits

could be administratively cancelled demonstrates that, in passing the MLA, Congress did not

---

[5] This provision, as amended, is now codified at 30 U.S.C. § 188(a), and provides:

> Except as otherwise herein provided, any lease issued under the provisions of [the
> MLA] may be forfeited and canceled by an appropriate proceeding in the United
> States district court for the district in which the property … is located whenever
> the lessee fails to comply with any of the provisions of [the MLA], of the lease, or
> of the general regulations promulgated under [the MLA] and in force at the date
> of the lease ....

[6] This provision of Section 27, as amended, is now codified at 30 U.S.C. § 184(h)(1), and still
requires a judicial proceeding to cancel or forfeit a lease (or interest therein) held in violation of
the MLA.

intend for leases to be administratively cancelled.[7]  *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere … that it knows how to make such a requirement manifest.").

This conclusion was confirmed in 1930, when the Secretary ruled that a "lease once granted [is] beyond recall by the Secretary and is only subject to cancellation in the Federal courts …."[8]  *The Melish Consol. Placer Oil Mining Co. v. Testerman*, 53 Interior Dec. 205, 207 (1930).  The Secretary based his ruling on the aforementioned principle that once title vested in a private party through the Secretary's final actions that title was no longer subject to cancellation by the Secretary.  *Id*. at 207 (citing *West v. Standard Oil Co*., 278 U.S. 200, 218–19 (1929)).

One year after the Secretary's decision in *Melish*, the D.C. Circuit reached the same conclusion in *Bell Oil & Gas Co. v. Wilbur*, 50 F.2d 1070 (D.C. Cir. 1931).  In that case, the lessee sought to enjoin the Secretary from cancelling its leases over the lessee's failure to pay fifteen cents per barrel over the market price for the United States' royalty oil.  *Id*. at 256–57.  The D.C. Circuit affirmed the dismissal of the lessee's case on the ground that the lessee had an

---

[7] Although resort to the legislative history is unnecessary when the statutory language is so clear, the history confirms that Congress did not intend for the Secretary to cancel leases.  H.R. Rep. No. 65-563 at 26 (January 3, 1916, letter from the then-Secretary explaining that requiring judicial forfeiture proceedings "safeguards the interests of the lessee"); 58 Cong. Rec. 4168 (Aug. 22, 1919) (statements by Senators Lenroot and Smoot that a lease can only be cancelled through a judicial proceeding); 58 Cong Rec. 7604 (Oct. 27, 1919) (statement by Representative Sinnott that the "law abhors a forfeiture and there must be a showing made in court before the forfeiture [of a lease] can be secured.").

[8] This interpretation of the MLA is entitled to substantial deference because it "involve[d] a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."  *Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers,* 367 U.S. 396, 408 (1961) (quotation omitted).

adequate remedy at law because the Secretary could only cancel the leases through a judicial proceeding:

> *The Secretary, under the terms of the act, has no power by his own fiat to cancel these leases.*  He is required to go into a District Court of the United States to accomplish that result by a proceeding in equity.  In that proceeding, plaintiff can set up as a defense the action of the Secretary in attempting to exact the 15 cents per barrel over and above the market price, and the legality of the Secretary's action would then be for the determination of the court.

*Id*. at 257 (emphasis added).

In 1935, Congress reaffirmed that the Secretary lacked any inherent authority to cancel a lease when it amended the MLA.  Recognizing that prospecting permits were not achieving their goal, Congress amended the MLA by phasing out prospecting permits and replacing them with noncompetitive leases, which were issued for lands within unproven areas.  49 Stat. at 674–79.  At the same time, Congress conferred upon the Secretary limited authority to cancel a lease after notice for a violation committed by the lessee, so long as the lands covered by the lease were not known to contain valuable deposits of oil or gas.[9]  49 Stat. at 678.  If the Secretary already possessed inherent authority to administratively cancel a lease this amendment would have been largely superfluous.

Despite the limited delegation of authority, the Secretary soon reversed his earlier position, as reflected in *Melish*, and arrogated to himself the authority to cancel non-producing leases.  *See* Blair, *The Cancellation of Oil and Gas Leases:  An Administrative or Judicial*

---

[9] This provision, as amended, is now codified as Section 31(b) of the MLA and provides:

> Any lease issued after August 21, 1935, under [30 U.S.C. § 226] shall be subject to cancellation by the Secretary … after 30 days notice upon the failure of the lessee to comply with any of the provisions of the lease, unless or until the leasehold contains a well capable of production of oil or gas in paying quantities ….

30 U.S.C. § 188(b).

*Function?* 51 Geo. L.J. 221, 221–23 (1963).  To some, this arrogation of authority was endorsed by the D.C. Circuit in *McKay v. Wahlenmaier*, 226 F.2d 35, 41–47 (D.C. Cir. 1955), wherein the court, in a 2-1 decision, ordered the Secretary to cancel a lease and issue a new lease to a competing lease applicant.  Yet, in so doing, the majority simply suggested that the Secretary had a duty to cancel an improvidently granted lease *in an administrative appeal* brought by a competing lease applicant.  *Id*. at 42 n.11, 46.  A few years later, the D.C. Circuit impliedly suggested that the Secretary may have the inherent authority to cancel a lease when it ruled the Secretary had arbitrarily cancelled a lease.  *Seaton v. Texas Company*, 256 F.2d 718, 720–24 (D.C. Cir. 1958); *but see* Blair, 51 Geo. L.J. at 241–45 (explaining why *Wahlenmaier* and *Texas Company* are weak precedent for the Secretary's claimed inherent authority to cancel leases).

In 1960, the Tenth Circuit, however, emphatically rejected the Secretary's claimed inherent authority to cancel leases.  In *Pan Am. Petroleum*, a lessee brought suit to enjoin the Secretary from attempting to cancel numerous leases, the issuance of which had been allegedly procured by fraud.  284 F.2d at 651.  In reversing the district court's denial of the injunction, the Tenth Circuit first noted that the Secretary's claimed inherent authority would defeat the purpose of the MLA:

> If there may be administrative cancellation of an oil and gas lease for fraud in procurement, the practical operation of the [MLA] is seriously impaired.  It is common knowledge that exploration for oil and gas is costly.  The drilling of wells requires substantial financial risks and the expense of putting those wells on production and of marketing the product is burdensome.  If the continued existence of the granted leasehold estate is dependent upon the fluctuating policies of governmental departments uninhibited by any limitations upon time of action, the value of federal oil and gas leases as a title basis for oil and gas development is greatly diminished if not practically destroyed.  No prudent operator would be willing to accept the financial risks if he were subject to ouster because of some administrative decision based upon improper conduct of an assignor occurring at some distant time in the past.

13

> The Secretary … has no powers except those granted or those necessarily implied from granted powers…. The courts have repeatedly held that he is without power to annul a patent once it has issued. That power is reserved to the courts. In the absence of some statutory provision giving him power to annul leases under the [MLA], that power also is reserved to the courts. Otherwise the new system created by the [MLA] for the disposition of the mineral reserves found on the public lands fails of its purpose. Certainty of title is an elementary prerequisite for the sound development of any mineral resource.

*Id*. at 655 (footnotes omitted). The Tenth Circuit then ruled that the Secretary is "without statutory authority, either express or implied, to cancel or annul federal oil and gas leases by administrative proceedings taken after the issuance of such leases and because of any conduct of a lessee which preceded such issuance …." *Id*. at 656; *see id*. at 656–57 (rejecting the Secretary's reliance on *Wahlenmaier* and *Texas Company*).

As the foregoing demonstrates, except for an implied suggestion in *Texas Company*, it was largely recognized that the Secretary lacked any inherent authority to cancel a lease after title became vested in a lessee.

## B. *Boesche* Confirms That The Secretary Lacked Authority To Cancel Solenex's Lease.

Contrary to the Secretary's position, the Supreme Court's decision in *Boesche* did not magically confer authority on the Secretary to cancel a lease for alleged mistakes made by the BLM decades earlier. In *Boesche*, the petitioner had applied for an 80-acre noncompetitive lease, but neglected to include in his lease application an adjoining 40-acre tract that was available for leasing. 373 U.S. at 474. Following issuance of the lease to the petitioner, two competing lease applicants administratively appealed the rejection of their application on the ground that the petitioner's lease application violated an MLA regulation that provided no offer for a noncompetitive lease may be made for less than 640 acres, except where the lands covered by the application are surrounded by lands not available for leasing. *Id*. at 473–74. In deciding the

administrative appeal, the Secretary ruled that the petitioner's lease should be cancelled and a lease issued to the competing applicants. *Id*. at 474. After the Secretary's decision was affirmed upon judicial review, the Court granted certiorari on the narrow issue of whether the Secretary may cancel an improperly issued lease in an administrative appeal brought by a competing lease applicant. *Id*. at 473 ("The question presented in this case is whether the Secretary … has authority to cancel in an administrative proceeding a lease … issued under the [MLA], in circumstances where such lease was granted in violation of the Act and regulations promulgated thereunder."); *see* Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567, at *2 (Feb. 6, 1963) (Framing the question presented as: "Whether the Secretary … has authority to cancel an oil and gas lease issued in violation of the Department's regulations *and in derogation of a competing applicant's statutory preference rights*." (emphasis added)).

The petitioner argued that Section 31(b) of the MLA, 30 U.S.C. § 188(b), provides the exclusive means by which the Secretary may cancel a lease. *Boesche*, 373 U.S. at 475. Specifically, the petitioner argued that the Secretary may only cancel a lease if the lessee violates the terms of the lease and then only so long as the lands covered by the lease have not been determined to contain valuable deposits of oil and gas. *Id*. at 475. Because the petitioner had not violated the terms of the lease, but, at most, had merely violated an MLA regulation prior to lease issuance, the petitioner argued that the Secretary's sole remedy was to institute a judicial proceeding for lease cancellation pursuant to 30 U.S.C. § 188(a). *Id*. at 475–76.

In contrast, the Secretary argued that the provisions in Section 31(a) and (b) of the MLA, 30 U.S.C. §§ 188(a), (b), address only the authority to forfeit or cancel leases for violations occurring after lease issuance. *Boesche*, 373 U.S. at 476. The Secretary further argued that he has inherent authority to cancel leases for a pre-lease violation of the MLA and/or the regulations

promulgated thereunder when the rights of competing lease applicants are at stake. Brief for

Respondent, *Boesche v. Udall*, 1963 WL 105567, at *6–7 (arguing that the claimed inherent

authority "is essential both to protect the public interest and also to assure other applic[ants] the

benefit of their statutory rights"); *id*. at *36 ("the existence of some power of cancellation, at least

while timely conflicting applications are pending, is essential to secure the rights of competing

applicants"). The Secretary also stressed the limited nature of his claimed inherent authority:

> It must be emphasized that the authority, [sic] claimed is no broader than the
> necessities of practical administration. The Secretary claims no broad power to
> cancel any mineral lease for any cause.... The Secretary affirms only his
> responsibility to rescind leases *erroneously* granted, whether the error was
> fraudulently induced or resulted from inadvertence by his own subordinates. The
> claim, in short, is restricted to the correction of errors which affect the *initial
> validity* of the lease. <u>Furthermore, for the purposes of this case …, it is necessary to
> establish only that a lease issued on a defective application can be cancelled by the
> Secretary upon the timely appeal of a competing applicant taken from the denial of
> his application.</u>

*Id*. at *14 (italics in original, underlined added). Importantly, the Secretary also promised that the

claimed authority would not be abused. *Id*. at *18 ("Recognition of the power ... does not license

administrative abuses."); *id*. at *36–37 ("[I]n practice the Secretary has not used his [inherent]

power to cancel where the irregularity is minor unless necessary, as in the present case, *to prevent

prejudice to a competing applicant* whose application was on file before the lease was erroneously

issued." (emphasis added)).

In sustaining the Secretary's actions, the Court issued a very narrow holding that it felt was

necessary to protect the rights of competing lease applicants:

> [T]he power of cancellation, *at least while conflicting applications are pending*, is
> essential to secure the rights of competing applicants.
>
> We sanction no broader rule that is called for by the exigencies of the general
> situation and the circumstances of this particular case. We hold only that the
> Secretary has the power to correct administrative errors of the sort involved here by

cancellation of leases *in proceedings timely instituted by competing applicants for the same land.*

In so holding we do not open the door to administrative abuses.

*Boesche*, 373 U.S. at 485–86 (all emphasis added) (footnote omitted).

This holding proves that the Secretary's cancellation of Solenex's lease was *ultra vires*.[10] First, the petitioner in *Boesche* had submitted an application that violated an MLA regulation. 373 U.S. at 473–74. There is no suggestion that Solenex or its predecessors violated the MLA or the regulations promulgated thereunder either prior to or after lease issuance. Instead, the purported mistakes were made by the Secretary's own subordinates. Dkt. # 68-1 at 8–12. It is one thing for the Secretary to cancel a lease issued to one who violated the MLA; it quite another thing for the Secretary to cancel a lease because of purported mistakes made by a subordinate. In short, the Secretary should not be able punish Solenex for purported mistakes made by the Secretary's subordinate decades ago. *Cf. Del-Rio Drilling Programs, Inc. v. U.S.*, 46 Fed. Cl. 683, 689 (2000) (The government is asking this court "to punish plaintiffs for the government's failure to abide by its own record keeping requirements; we see no legal or equitable reason to do so.").

---

[10] This holding is consistent with the Court's earlier opinions upholding the authority of the Secretary to correct mistakes of subordinates before legal title had passed into private ownership. *See Boesche*, 373 U.S. at 477 (listing cases). As the Secretary noted in arguing the limited nature of his claimed authority, the existing regulations provided that a competing lease applicant had 30 days to appeal an adverse decision, which appeal could ultimately be heard by the Secretary. Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567, at *37–38. Thus, only after all appeals were exhausted "was the administrative action in any sense final." *Id*. at *38. Therefore, in light of these appeal procedures, the Secretary argued that legal title does not truly pass until all administrative appeals are exhausted because until then the successful applicant would be on notice that the award of the lease was still tentative. *Id*. at *38–40; *see also id*. at *41 ("[T]he cancellation *in this case* should be upheld as appellate action taken before the decision to award the lease to petitioner had become 'final' under the departmental practice pursuant to published regulations." (emphasis in original)). In contrast, the Department's actions in issuing Solenex's lease had been *final* for more than 33 years!

Second, there were competing lease applicants in *Boesche* who were prejudiced by the issuance of a lease based upon an unlawful application.  373 U.S. at 473–74.  It is undisputed that there are no competing lease applicants and no administrative appeals regarding issuance of Solenex's lease.  *See* Dkt. # 45-4 at 13.  Because the Secretary has no competing lease applicants to protect, *Boesche* provides no support for the Secretary's actions in this case.  *Boesche*, 373 U.S. at 485 ("We hold only that the Secretary has the power to correct administrative errors of the sort involved here by cancellation of leases in proceedings timely instituted by competing applicants for the same land.").

Therefore, contrary to the Secretary's argument, *Boesche* does not stand for the proposition that the Secretary had the inherent authority to cancel Solenex's lease.  Instead, *Boesche* proves that the Secretary's actions were *ultra vires*.  *See* Dkt. # 45-6 at 22 (Secretary recognizing the lack of authority to cancel the lease in 1993); 1990 FEIS Chapter II at 11–14, 37 (BLM recognizing the lack of authority to cancel the lease).  This is especially true because the Secretary's cancellation of a 33-year-old lease is an egregious abuse of any inherent authority the Secretary may possess.[11]

*See Boesche*, 373 U.S. at 485 ("In so holding we do not open the door to administrative abuses.").  Accordingly, this Court should hold unlawful and set aside the Secretary's decision.

---

[11] No agency may bestow authority upon itself by promulgating a regulation.  *See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134–35 (1936) (a regulation that exceeds an agency's delegated authority is a "nullity").  Therefore, to the extent that the Secretary's decision was based upon 43 C.F.R. § 3108.3(d), which provides that "[l]eases shall be subject to cancellation if improperly issued[,]" her decision was still *ultra vires* because the regulation is unlawful as applied in this case.  Similarly, a decision by a subordinate agency may not bestow more authority on the Secretary than that delegated by Congress.  Therefore, to the extent that the Secretary's decision was based on *Clayton W. Williams, Jr.*, 103 IBLA 192 (1988), her decision was still *ultra vires*.

III.   **THE SECRETARY'S CANCELLATION OF THE LEASE WAS UNLAWFUL BECAUSE SOLENEX IS ENTITLED TO *BONA FIDE* PURCHASER PROTECTION.**

Even if the Secretary had the inherent authority to cancel Solenex's lease, the Secretary's actions were unlawful because Solenex is entitled to *bona fide* purchaser ("BFP") protection.  In 1959, the Secretary initiated proceedings to cancel hundreds of leases that were held by the original lessees and their assignees.  *See* H.R. Rep. No. 86-1062, *reprinted in* 1959 U.S.C.C.A.N. 2620, 2621.  The asserted basis for these proceedings was that the original lessees of the challenged leases had fraudulently acquired their leases in furtherance of a scheme to evade the acreage limitations in the MLA.  *See generally Pan Am. Petroleum Corp*., 284 F.2d at 651 (describing aspects of the purported scheme).  In response to the Secretary's actions, Congress quickly passed emergency legislation to protect the interests of the assignees.  Pub. L. No. 86-294, 73 Stat. 571–72 (1959).  Specifically, Congress amended Section 27 of the MLA, 30 U.S.C. § 184, to provide statutory protection for BFPs from the Secretary's massive cancellation attempt.[12]  73 Stat. at 572; *see* H.R. Rep. No. 86-1062, *reprinted in* 1959 U.S.C.C.A.N. 2620, 2621 (explaining that the amendment to Section 27 of the MLA would remove the cloud placed on the titles of BFPs by the Secretary's action and encourage investment in developing the Nation's oil and gas resources).

One year later, Congress further strengthened the BFP protection in Section 27 of the MLA.  Pub. L. No. 86-705, § 3, 74 Stat. 781, 785–89 (1960).  As amended, Section 27(h)(2) now provides:

---

[12] This amendment may have been a "belt and suspenders" approach because the Supreme Court had long recognized that neither the Secretary nor the judiciary could cancel a previously conveyed property interest after that property interest had been transferred to a BFP.  *See, e.g.*, *Colo. Coal & Iron Co. v. U.S.*, 123 U.S. 307, 313–14 (1887) (a fraudulently obtained patent cannot be attacked by the United States after it has been transferred to a BFP); *U.S. v. Burlington & M.R.R. Co.*, 98 U.S. 334, 342 (1878) (noting that the United States "certainly could not insist upon [the] cancellation of … patents so as to affect innocent purchasers").

> The right to cancel or forfeit for violation of any of the provisions of [the MLA] shall not apply so as to affect adversely the title or interest of a bona fide purchaser of any lease …, which lease … was acquired and is held by a qualified person, association, or corporation in conformity with those provisions, even though the holdings of the person, association, or corporation from which the lease … was acquired, or of his predecessor in title (including the original lessee of the United States) may have been canceled or forfeited or may be or may have been subject to cancellation or forfeiture for any such violation.

30 U.S.C. § 184(h)(2); 30 U.S.C. § 184(i) (requiring BFPs to be "dismissed promptly" from any judicial proceeding for the cancellation of a lease (or an interest therein)).

These BFP provisions have been interpreted broadly to give full protection to all BFPs. *J. Penrod Toles*, 68 Interior Dec. 285, 289–91 (1961) (recognizing that the BFP amendments were passed in response to Congress's concern regarding the Secretary's attempt to cancel leases held in excess of the acreage limitation, but ruling that the language employed in the statute and in the legislative history is broad enough to cover other situations); 43 C.F.R. § 3108.4 ("A lease or interest therein shall not be cancelled to the extent that such action adversely affects the title or interest of a bona fide purchaser even though such lease or interest, when held by a predecessor in title, may have been subject to cancellation."). Thus, neither the Secretary nor the judiciary may cancel a lease owned by a BFP.

A BFP is generally described as one who acquired his interest in good faith, for valuable consideration, and without notice of any deficiency in his grantor's title. *Sw. Petroleum Corp. v. Udall*, 361 F.2d 650, 656 (10th Cir. 1966). As the evidence shows, Solenex is entitled to BFP protection. It is undisputed that Solenex and its predecessors acquired the lease in good faith and with no notice that the lease may have been improperly issued. In fact, the Secretary first suggested that the lease may have been improperly issued in 2015—after this Court granted summary judgment in favor of Solenex. Dkt. # 53 at 2. Notably, this suggestion arose 33 years after the BLM issued the lease and 11 years after Solenex was assigned the lease. Dkt. # 24-2 at

34.  It is further undisputed that valuable consideration had been paid for the lease after it was

originally issued.  In 1982, the BLM issued the lease to Sidney M. Longwell.  Dkt. # 24-2 at 4.  In

1983, Fina paid valuable consideration to Mr. Longwell for the assignment of the lease.  Dkt. # 24-

2 at 33 (indicating that the lease was assigned in return for a production payment);[13] *see Waskey v.*

*Chambers*, 224 U.S. 564, 566 (1912) (lessee who agreed to work the mine and remit to the lessor

30 percent of the minerals extracted paid valuable consideration for the lease).  In 1999, Fina—

tired of "Defendants' endless delays"— assigned the lease back to Mr. Longwell, who ultimately

assigned it to Solenex in 2004.  Dkt. # 24-2 at 33–34.  Thus, at a minimum, Solenex is entitled to

BFP protection based upon the fact that its predecessor, Fina, was a BFP.  *Home Petroleum Corp.*,

54 IBLA 194, 213–14 (1981) (successor in interest to a BFP may take advantage of its

predecessor's status as a BFP to prevent its lease from being cancelled), *aff'd sub nom*, *Geosearch*,

*Inc. v. Watt*, 721 F.2d 694, 699 (10th Cir. 1983); *U.S. v. Parcel of Land, Bldgs., Appurtenances &*

*Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 142 (1993) (Kennedy,

J., dissenting) ("[A] transferee who acquires property from a good-faith purchaser for value …

obtains good title, even if the transferee did not pay value or act in good faith.").

Solenex is also entitled to BFP protection in its own right.  Although Solenex did not pay

money to Mr. Longwell for the assignment of the lease, Solenex did assume Mr. Longwell's legal

obligations under the lease.  30 U.S.C. § 187a (indicating that an assignee assumes all the duties

and obligations in the lease).  In addition, after being assigned the lease, Solenex expended

substantial time and money seeking to fulfill its legal obligation under the lease, which included

initiating this case in an effort to end Defendants' interminable delay.  *See* Dkt. # 24-2 at 36

(indicating that Solenex incurred out-of-pocket expenses in seeking to develop the lease and has

---

[13] If required, Solenex can prove that Fina also paid money for the assignment of the lease.

posted a $10,000 bond for the lease); *see also* Dkt. # 77 to Dkt. # 77-3 (documenting time and expenses incurred in litigating this case prior to the Secretary's decision).  The expenditure of this time and money entitles Solenex to BFP protection.  *See Lykins v. McGrath*, 184 U.S. 169, 173 (1902) ("To enable the grantee to claim protection as a [BFP] he must have parted with something possessing an actual value, capable of being estimated in money, *or he must on the faith of the purchase have changed, to his detriment, some legal position that he before had occupied*." (emphasis added) (quotation omitted)); 2 Summers Oil and Gas § 12:14 (3d ed., Nov. 2015) ("[I]f the lessee has actually expended a substantial sum of money in drilling …, *or in the preparation therefor*, prior to notice of a prior conveyance … he should be considered as having paid value sufficient to make him a [BFP] for value." (emphasis added) (footnote omitted)).

The Secretary does not dispute Solenex's good faith or that Solenex acquired the lease for valuable consideration.  Instead, the Secretary argues that Solenex is not entitled to BFP protection solely on the grounds that Solenex had notice that the lease was suspended when it acquired the lease.  Dkt. 68-1 at 1 n.2 ("Solenex LLC acquired the lease with full knowledge that lease operations were suspended in 1985 because of a legal challenge and they remain suspended to date.").  The Secretary's argument borders on the frivolous.

First, the breadth of the Secretary's argument is truly amazing.  If an assignee of a suspended lease is not entitled BFP protection, the Secretary has rendered most, if not all, suspended leases worthless because no reasonable person would purchase a suspended lease without the BFP protection provided by the MLA.  *See Winkler v. Andrus*, 614 F.2d 707, 711 (10th Cir. 1980) (noting that the BFP protection was added to the MLA "to foster development of oil and gas resources on public lands and to protect innocent investors and operators").

22

Second, the notice that could deny an assignee BFP protection is notice of a defect in the assignor's title. *Sw. Petroleum Corp.*, 361 F.2d at 657 ("The [BFP] amendment [to the MLA] ... necessarily contemplates some inquiry be made into the *records pertaining to title*." (emphasis added). That a lease is suspended does not suggest that there is a defect in the title. *See* 30 U.S.C. § 209 (indicating that the Secretary may suspend operations and production "in the interest of conservation"). To be sure, an assignee may be charged with constructive notice of documents in the BLM's lease file. *See Winkler*, 614 F.2d at 713. But the Secretary failed to cite a single document in the BLM's lease file as of 2004 that would have put Solenex on notice that there was a purported defect in Mr. Longwell's title. Without citing any evidence, the Secretary's argument is unavailing. *See State Farm,* 463 U.S. at 43 (a court "may not supply a reasoned basis for the agency's action that the agency itself has not given" (quotation omitted)).

Finally, contrary to the Secretary's suggestion, Dkt. # 68-1 at 1 n.2, the so-called 1985 legal challenge would not have put Solenex on notice that there was a purported defect in the title of the lease. In November 1983, Fina submitted the APD. PSOF ¶ 23. In January 1985, the Forest Service and the BLM issued the 1985 EA with respect to the APD. *Id*. ¶¶ 29 –30. The conclusion of the two agencies was that the proposed project, as limited by the lease stipulations and the additional conditions of approval imposed by the agencies, could be performed without any adverse environmental effects. *Id*. ¶ 30. Thus, based upon the 1985 EA, the BLM approved the APD. *Id*. Clearly, the BLM would not have approved the APD if there were a defect in the title to the lease.

After the BLM's approval of the APD was appealed to the IBLA, the IBLA generally affirmed the BLM's use of an EA to approve the APD. *Glacier–Two Medicine All.*, 88 IBLA 133, 139–47 (1985). The IBLA did, however, set aside the approved APD and remand for

further consideration of four issues.  *Id.* at 148–55.  Noticeably absent from the appeals and the

IBLA's decision is any suggestion that the lease may have been improperly issued.  Thus,

contrary to the Secretary's suggestion, the so-called 1985 legal challenge would not have put

Solenex on notice that there was a purported defect in the title to the lease.

As the foregoing demonstrates, the Secretary's cancellation of the lease was unlawful

because Solenex is entitled to BFP protection.  Therefore, this Court should hold unlawful and

set aside the Secretary's decision.

## IV.   THE SECRETARY'S CANCELLATION OF THE LEASE WAS BARRED BY THE PASSAGE OF TIME.

Even if the Secretary had the authority to cancel Solenex's lease and assuming Solenex is

not entitled to BFP protection, the Secretary was still barred from cancelling the lease in light of

the passage of time.  Noticeably absent from the Secretary's decision is the citation to a single case

where the Secretary cancelled a lease more than three decades after it was issued.  This is not

surprising considering that 28 U.S.C. § 2462 bars such belated action:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for
> the enforcement of any civil fine, penalty, or *forfeiture*, pecuniary or otherwise,
> shall not be entertained unless commenced within five years from the date when the
> claim first accrued ….

(Emphasis added).  This section is a "a catch-all statute of limitations [for] situations where

Congress did not specifically include a time limitation in the statute."[14]  *FEC v. Nat'l Republican*

---

[14] The statute of limitations in the MLA provides that "[n]o action contesting a decision of the
Secretary involving any oil and gas lease shall be maintained unless such action is commenced
or taken within ninety days after the final decision of the Secretary relating to such matter."  30
U.S.C. § 226-2; *see* S. Rep. No. 86-1549, *reprinted at* 1960 U.S.C.C.A.N. 3313, 3316 (indicating
that this provision was added to the MLA in 1960 to provide lessees additional certainty of title).
This provision should bar the Secretary's actions because the Secretary is effectively contesting
her predecessor's decision to issue the lease in 1982.  At a minimum, this provision reveals that
Congress would not condone the Secretary's belated actions because, if the Secretary can cancel
a 33-year-old lease, no lease is safe.  That Congress would not condone the Secretary's belated

*Senatorial Comm.*, 877 F. Supp. 15, 17 (D.D.C. 1995).  As recognized by the D.C. Circuit, the 5-year limitation period in 28 U.S.C. § 2462 applies to both administrative and judicial proceedings.  *3M Co. (Minn. Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1457 (D.C. Cir. 1994).  Moreover, because Congress used forfeiture and cancellation interchangeably in the MLA, 30 U.S.C. § 188(a), the use of "forfeiture" in 28 U.S.C. § 2462 indicates that the Secretary's cancellation of Solenex's lease came 28 years too late.

This is especially true, considering that the Secretary's cancellation of Solenex's 33-year-old lease was "punitive" in nature.  Indeed, the Secretary never suggested that the lease may have been improperly issued until after this Court granted summary judgment in favor of Solenex.  Dkt. # 53 at 2.  Because the Secretary's' new position is in direct response to this Court's adverse ruling, 28 U.S.C. § 2462 and/or the Due Process Clause bar the Secretary's belated actions.  *Cf. Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort …, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional." (internal quotations and citations omitted)).

Even if the Secretary's belated actions are not statutorily time-barred, they are barred by laches.  *See Powell v. Zuckert*, 366 F.2d 634, 636 (D.C. Cir. 1966) ("The defense of laches stems from the principle that equity aids the vigilant, not those who slumber on their rights ...." (quotation omitted)).  The Supreme Court has recognized that laches is a valid defense to the dilatory actions of the federal government.  *Clearfield Trust Co. v. U.S.*, 318 U.S. 363, 369–70 (1943).  To establish a defense of laches a party must prove: "(1) lack of diligence by the party against whom

---

action is also proven by 43 U.S.C. § 1166, which provides that no suits "to vacate and annul any patent shall" be brought after six years of issuance.  *Cf. Witbeck v. Hardeman*, 51 F.2d 450, 452 (5th Cir. 1931) *aff'd*, 286 U.S. 444 (1932) (analogizing a lease to a patent because a "lease is the final action of [the Secretary] in "disposing of the land").

the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. U.S.*, 365 U.S. 265, 282 (1961).  These elements are easily satisfied in the instant case.

First, the Secretary waited more than 33 years before suggesting that the lease may have been improperly issued.  On its face, this delay is unconscionable, especially considering that title to an oil and gas lease is at stake.  *Cf. Patterson v. Hewitt*, 195 U.S. 309, 321 (1904) (noting that laches is strictly enforced when mining property is at stake).  Making this unconscionable delay even more egregious is that, if the lease were improperly issued as the Secretary now suggests, those facts were available since 1982.  *See* Dkt. # 68-1 at 8–12.

Second, the prejudice to Solenex caused by the Secretary's egregious delay is undisputed.  Indeed, if the Secretary had immediately cancelled the lease in 1982, Mr. Longwell would not have suffered through the subsequent three decades hoping to see the well drilled.  Dkt. # 24-2 at 32–35.  Nor would have Solenex invested all the time and money in an effort to get the suspension lifted so that it could exercise its valuable lease rights.  *See* Dkt. # 77 to Dkt. # 77–3.

As the foregoing demonstrates, the Secretary was barred from cancelling Solenex's 33-year-old lease by the passage of time.  Therefore, this Court should hold unlawful and set aside the Secretary's decision.

## V.   THE SECRETARY IS ESTOPPED FROM ASSERTING THAT THE LEASE WAS IMPROPERLY ISSUED AFTER REPEATEDLY REPRESENTING THAT THE LEASE WAS VALID AND PROPERLY ISSUED FOR MORE THAN 33 YEARS.

Assuming that the Secretary had the authority to cancel Solenex's lease and assuming the Secretary's actions are not otherwise barred, the Secretary is estopped from now asserting that the lease was improperly issued.  *See Floyd Higgins*, 147 IBLA 343, 347–48 (1999) (ruling that equitable estoppel applies against the government).  Estoppel is based upon the principle that:

> [H]e who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by

> disappointing the expectations upon which he acted.  Such a change of position is
> sternly forbiddden [sic].  It involves fraud and falsehood, and the law abhors both.
> This remedy is always so applied as to promote the ends of justice…. It
> accomplishes that which ought to be done between man and man, and is not
> permitted to go beyond this limit.

*Dickerson v. Colgrove*, 100 U.S. 578, 580–81 (1879); *see U.S. v. Georgia-Pacific Co.*, 421 F.2d

92, 95 (9th Cir. 1970) ("Equitable estoppel is a doctrine adjusting the relative rights of parties

based upon consideration of justice and good conscience."); *Heckler v. Cmty. Health Servs. of*

*Crawford Cnty., Inc.*, 467 U.S. 51, 60–61 (1984) (equitable estoppel should apply when necessary

to ensure that private parties are treated with a "minimum standard of decency, honor, and

reliability in their dealings with their Government").

    The elements for invoking estoppel against the government are:

> (1) The party to be estopped must know the facts; (2) he must intend that his
> conduct shall be acted on or must so act that the party asserting the estoppel has a
> right to believe it is so intended; (3) the latter must be ignorant of the facts; and (4)
> he must rely on the former's conduct to his injury.

*Floyd Higgins*, 147 IBLA at 347 (quoting *Georgia-Pacific*, 421 F.2d at 96).  These elements are

easily satisfied in the instant case.

    First, if one were to accept the Secretary's new position that the lease was improperly

issued, the Secretary and the BLM must be charged with knowing this fact in 1982.  *See* Dkt. # 68-

1 at 8 (Secretary suggesting that the lease was improperly issued based upon purported mistakes

made by the BLM in 1982).  Despite this knowledge, the Secretary and the BLM repeatedly

represented—through their actions and their official documents—that the lease was valid and

properly issued for more than 33 years.[15]  *See, e.g.,* Transcript of June 10, 2015 Oral Argument at

---

[15] For example, on April 19, 2002, in response to an inquiry from Mr. Longwell as to whether the
approved APD was still valid, the BLM responded:  "The answer is yes, you have a valid
permit."  Dkt. # 45-6 at 55; *see also* Dkt # 34-1 at 10.  An approved APD necessarily means that
the lease is valid and properly issued.

22:1–40:8 (Defendants arguing that they have not unreasonably delayed in lifting the suspension on the lease—a lease they now contend was improperly issued).[16]

Second, the Secretary and the BLM intended that Solenex and its predecessors would act on their representations that the lease was properly issued by investing time and money in seeking to develop the oil and gas resources, in accordance with the terms of the lease. *See* Dkt. # 24-2 at 32–36.

Third, Solenex and its predecessors had no knowledge that the Secretary and the BLM's repeated representations that the lease was valid and properly issued were—based upon the Secretary's new position—"misrepresentations." In fact, the Secretary first suggested that the lease may have been improperly issued only after this Court had ruled that Defendants' 29-year delay was unlawful. Dkt. # 53 at 2.

Finally, it is undisputed Solenex and its predecessors changed their position to their detriment in reasonable reliance on the Secretary and the BLM's repeated representations that the lease was valid and properly issued. *See*, *e.g.*, Dkt. # 24–2 at 33–34; Dkt. # 77 to Dkt. # 77–3.

As the foregoing demonstrates, the elements for applying estoppel against the Secretary are established.[17]  *See U.S. v. Eaton Shale Co*., 433 F. Supp. 1256, 1272 (D. Colo. 1977) ("[T]he

---

[16] Even if the Secretary is not equitably estopped, the Secretary should be judicially estopped from now suggesting that the lease was improperly issued after arguing to this Court that the 29-year delay was not unreasonable. *See N.H. v. Maine*, 532 U.S. 742, 749–51 (2001) (explaining that judicial estoppel is an equitable doctrine that protects the integrity of the judicial process by preventing parties from taking inconsistent positions). Arguing that the 29-year delay was not unreasonable is entirely inconsistent with the Secretary's new position that the lease was improperly issued. Moreover, if the Secretary had taken the position that the lease was improperly issued when this case was filed in 2013, it would have saved this Court a lot of time and would have saved Solenex both time and money. *See U.S. v. Jenks*, 129 F.3d 1348, 1352 (10th Cir. 1997) (the United States' "flip-flopping of its position … has resulted in an enormous waste of judicial resources" (quotation omitted)).

[17] Some authorities suggest that there must be "affirmative misconduct," such as misrepresentation or concealment of material facts, to estop the federal government. *Floyd*

government is estopped from asserting the invalidity of the patent.  The action taken by the government in granting the patent, and the consistent course of administrative conduct from the mid-1930's to the early 1960's, are persuasive grounds for application of the doctrine of estoppel.").  Therefore, this Court should hold that the Secretary is estopped from now asserting that Solenex's lease was improperly issued.  And, because that assertion was the only basis upon which the Secretary cancelled the lease, this Court should hold unlawful and set aside the Secretary's decision.

## VI.    CONTRARY TO THE SECRETARY'S NEW POSITION, THE LEASE WAS PROPERLY ISSUED.

Assuming that the Secretary had the authority to cancel Solenex's lease and assuming the Secretary is not otherwise barred from cancelling the lease, the Secretary's new position that the lease was improperly issued is erroneous.  According to the Secretary, the lease was issued in violation of, *inter alia*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq*. and the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq*.  Dkt. # 68-1 at 8–12.  As demonstrated below, the Secretary's arguments are fallacious.

### A.    There Were No NEPA Violations In The Issuance Of The Lease.

NEPA is a procedural statute designed to foster informed decision-making that does not impose any substantive requirements.  *Baltimore Gas and Elec. Co. v. NRDC*, 462 U.S. 87, 97–98 (1983).  Instead, "NEPA merely prohibits uninformed—rather than unwise—agency action."

---

*Higgins*, 147 IBLA at 347; *see Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009).  The D.C. Circuit has defined "affirmative misconduct" as acts or omissions "that can be characterized as misrepresentation or concealment," or behavior that "ha[s] or will cause an egregiously unfair result."  *Pierce v. SEC*, 786 F.3d 1027, 1038 (D.C. Cir. 2015) (quotation omitted).  Assuming "affirmative misconduct" must be shown, the facts in the case prove—if one were to accept the Secretary's new position—that the Secretary and the BLM engaged in a concerted pattern of "misrepresentation" and "concealment" regarding the true status of the lease for over 33 years.  To condone this dishonest behavior would "cause an egregiously unfair result," considering the time and money invested by Solenex in seeking to develop the lease.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989); *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) ("NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978))).  Moreover, federal agencies must comply with NEPA only "to the fullest extent possible[.]"  42 U.S.C. § 4332; *see Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 787–93 (1976) (NEPA compliance may be excused if it would conflict with another statutory mandate).

NEPA is triggered when an agency proposes a "major Federal action[.]"  42 U.S.C. § 4332(C).  All "major Federal actions," however, do not require a full-blown EIS.  In order to determine whether an EIS is required, an agency may prepare an EA.  40 C.F.R. §§ 1501.4(b), 1508.9.  If, based upon the EA, the agency concludes there would be no significant environmental effects, it may issue a Finding of No Significant Impact ("FONSI"), obviating the need to prepare an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9.  Moreover, when an agency provides a full and fair discussion of environmental impacts in a NEPA document, the agency has satisfied NEPA by taking the requisite "hard look" at environmental consequences.  *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

In suggesting that the lease was issued in violation of NEPA, the Secretary makes two primary arguments.  First, the Secretary argues that the lease was issued in violation of *Conner v. Burford*, 848 F.2d 1441, 1448–51 (9th Cir. 1988), which ruled that an EIS was required before a non-No Surface Occupancy ("NSO") lease may be issued.[18]  Dkt. # 68-1 at 8–10.  Second, the

---

[18] An NSO-lease includes a stipulation covering the entire lease that prohibits the lessee from using any of the surface without further governmental approval.  *Conner*, 848 F.2d at 1444.  Solenex's lease had an NSO stipulation that covered more than 18 percent of the lease.  Outside the area covered by the NSO stipulation, surface disturbing activities were prohibited without further governmental approval after full NEPA compliance.  Dkt. # 45-10 at 10-11.

Secretary argues, in the alternative, that the lease was issued in violation of *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1230 (9th Cir. 1988), which ruled that a no-action alternative must be considered before issuing a lease.  Dkt. # 68-1 at 8–10.  Neither of the Secretary's arguments holds water.

In *Conner*, the Ninth Circuit ruled that an EIS was required before issuance of a non-NSO lease because, according to the Ninth Circuit, the issuance of such a lease constitutes an "irreversible and irretrievable commitment" of resources.[19]  848 F.2d at 1446, 1448–51.  To be sure, the Ninth Circuit based its ruling on the D.C. Circuit's decision in *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983).  *Conner*, 848 F.2d at 1449.  But, with all due respect to the Ninth Circuit and the D.C. Circuit, the mere issuance of a non-NSO lease is not an "irreversible and irretrievable commitments of resources" and does not automatically require an EIS in all situations. *Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620–24 (10th Cir. 1987) (upholding the issuance of a non-NSO lease based upon an EA and a FONSI).  As explained by the 10th Circuit, this is because:

> [An] oil and gas lease, by itself, does not cause a change in the physical environment.  In order to work the lease, the lessee must submit site-specific proposals to the Forest Service and BLM who can then modify those plans to address any number of environmental considerations.  Each action is subject to continuing NEPA review.

*Id*. at 622.  The facts in this case prove the truth of the 10th Circuit's reasoning.

---

[19] The "'irreversible and irretrievable commitment of resources' criterion is derived from 42 U.S.C. § 4332(C)(v) which requires an EIS to include a statement of 'any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.'"  *Conner*, 848 F.2d at 1446 n.13.  The facts in this case demonstrate the fallacy of the suggestion that the mere issuance of Solenex's lease was an "irreversible and irretrievable commitment of resources."

On February 18, 1981, the Forest Service issued a Decision Notice ("DN") and FONSI, selecting Alternative 3 of the 1981 EA.[20]  Dkt. # 45-10 at 9–11.  Under this Alternative:

- Leases with surface occupancy would be issued only for accessible areas that could be protected;

- Lease denial or issuance of a NSO-lease would be recommended when the area cannot be adequately protected;

- Leases partially located in areas that cannot be protected would receive a NSO stipulation for those areas;

- All leases would be subject to:  (a) standard stipulations; (b) special stipulations, and (c) comprehensive surface use guidelines; and

- After lease issuance, any proposed oil and gas activities would be fully analyzed under NEPA.

*Id*. at 78.

Following the DN and FONSI, the Forest Service conducted additional site-specific analyses on the acres not recommended for lease denial to determine the specific stipulations and mitigation requirements to be applied on an acre-by-acre basis.  Dkt. # 45-4 at 13.  Based upon this site-specific analysis, special stipulations were attached to Solenex's lease to protect surface resources.  Dkt. # 45-12 at 3–9.  More importantly, in accordance with the 1981 EA, Solenex's APD was indeed subjected to comprehensive NEPA reviews.  PSOF ¶¶ 27–59.

The Secretary has not seriously attacked the sufficiency of the 1981 EA; instead, the Secretary makes the argument that the issuance of a non-NSO lease requires an EIS in each and every situation.  This argument, however, elevates form over substance.  This is especially true considering that the comprehensive, 162-page 1981 EA was the functional equivalent of a full-blown EIS.  *See Spiller v. White*, 352 F.3d 235, 240–45 (5th Cir. 2003) (upholding an agency's

---

[20] In the 1981 EA, six alternatives were considered in detail.  Dkt. # 45-10 at 48–49.  These alternatives included a no-action alternative (Alternative 1) and an alternative that would lease all acreage with an NSO stipulation (Alternative 4).

decision not to prepare an EIS when the EA was "akin to a full-blown EIS").  Because the

Secretary's argument would not succeed if raised by a third party challenging the 1981 EA in

light of the deference accorded to an agency's decision not to prepare an EIS, *see TOMAC,*

*Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 860–61 (D.C. Cir. 2006), the

Secretary's argument is nothing more than a pretext for cancelling Solenex's lease.

The Secretary's no-action alternative argument fairs no better.  The no-action alternative

was fully considered in the 1981 EA, which defined this alternative as to delay making

recommendations on all pending lease applications until completion of the forest plan.[21]  Dkt. #

45-10 at 48, 62.  This alternative was equivalent to a "no-lease" alternative because to delay

making lease recommendations has the same effect as making a decision not to lease.  *See MSLF*

*v. Andrus*, 499 F. Supp. 383, 386–395 (D. Wyo. 1980) (failure to make recommendations on

lease applications constituted an unlawful withdrawal).  Although this alternative would violate

the Energy Security Act of 1980, 42 U.S.C. § 8855, the environmental effects of this alternative

were fully compared to the effects of the other alternatives.  Dkt. # 45-10 at 62, 75–79.  That the

Secretary may now wish that the no-action alternative had been selected does not make the

analysis of the no-action alternative deficient.  *See Hammond v. Norton*, 370 F. Supp. 2d 226,

242 (D.D.C. 2005) (refusing to second-guess any agency's decision not to select the no-action

alternative).

This conclusion is confirmed by reviewing the EA at issue in *Bob Marshall*, which

addressed leasing in the Deep Creek RARE II Further Planning Area ("Deep Creek EA").[22]  852

---

[21] The selected alternative, Alternative 3, mandated "lease denial" or issuance of an NSO-lease for areas that could not be adequately protected.  Dkt. # 45-10 at 78.  Denying all lease applications was also considered as a component of Alternative 4.  Dkt. # 45-10 at 48.

[22] Importantly, the area around of Solenex's lease was not eligible for wilderness designation; whereas, the Deep Creek area was eligible.  *Compare* Dkt. # 45-2 at 31 *with Bob Marshall*, 852

F.2d at 1225–27; HC11590–756 (Deep Creek EA).  Under the no-action alternative in the Deep

Creek EA, no recommendations on pending lease applications would be made.  HC11646.  As

the Forest Service believed that such an alternative would be unlawful, it eliminated the no-

action alternative from further consideration.  HC11646, 11674–75.  Because the no-action

alternative had been eliminated from further consideration, it was not an available alternative

when it came time to select the preferred alternative.  HC11676–82.  Therefore, as the Ninth

Circuit found and the government admitted on appeal, the no-action alternative had not been

seriously considered.  *Bob Marshall*, 852 F.2d at 1228–29.

　　In contrast, the no-action alternative was fully considered in the 1981 EA and it was still

available for selection when Alternative 3 was selected.  Dkt. # 45-10 at 78–79.  Therefore,

because the no-action alternative was fully considered in the 1981 EA, the Secretary's reliance

on *Bob Marshall* is misplaced.

　　In any event, even if a violation of NEPA may have occurred prior to issuance of

Solenex's lease, it was subsequently corrected.  Since lease issuance, additional NEPA processes

were completed that thoroughly analyzed oil and gas leasing on the Lewis and Clark National

Forest and, in particular, the APD submitted by Solenex's predecessor in 1983.  The results of

these processes are reflected in the following documents:  (1) the 1985 EA;[23] (2) the 1986 Forest

Plan and the 1986 FEIS;[24] and (3) the 1990 FEIS (which comprehensively analyzed the effects of

---

F.2d at 1225–26; *see* 1990 FEIS, Appendix J-7 to J-11 (Blackfeet Tribe explaining that the area
around the lease is "not a 'roadless wild area'" and that designating the area as wilderness would
deny the lessees "their property rights ….").

[23] Importantly, the BLM was largely successful in defending its approval of the APD based upon
the 1985 EA.  *Glacier–Two Medicine All.*, 88 IBLA 133, 139–47 (1985).  Because the 1985 EA
supported approval of the APD, it would necessarily support issuance of the lease.  The 1985 EA
also expressly incorporated the 1981 EA.  A0003:FS000053, 57–58, 62, 70–71.

[24] Both the 1986 Forest Plan and the 1986 FEIS expressly incorporated the 1981 EA.  1986
Forest Plan at 1-10 to 1-11; 1986 FEIS at 2–82 to 2-84.

the APD).[25]  PSOF ¶¶ 29–30, 35–37, 45–46.  Based upon these documents, the BLM, with the

concurrence of the Assistant Secretary, issued the 1993 ROD approving the APD.  Dkt. # 45-5 at

40 to 45-6 at 33.  In the 1993 ROD, the Assistant Secretary officially determined that any NEPA

violation that may have occurred prior to lease issuance had been corrected by, *inter alia*, the

1990 FEIS and 1986 FEIS.  Dkt. # 45-6 at 21–24; PSOF ¶ 59 (quoting from the 1993 ROD).  In

making this determination, the Assistant Secretary expressly noted that the 1990 FEIS was

specifically prepared to meet the requirements set forth by the Ninth Circuit in *Conner*.  Dkt. #

45-6 at 22; PSOF ¶ 59.

More importantly, because the 1993 ROD was a final decision for the Secretary, it

constituted the official position of the Secretary for 23 years.  Thus, the Secretary's new position

that the lease was improperly issued in violation of NEPA is not only factually and legally

wrong—it is the epitome of arbitrariness.  *See Tex. Oil & Gas Corp. v. Watt*, 683 F.2d 427, 431–

34 (D.C. Cir. 1982) (reversing a lease cancellation decision that was based upon the Secretary's

"eleventh-hour" change in position, because to allow such a decision to stand "would be

sanctioning a retroactive exercise of discretion to which it is impossible to ascribe any rational

purpose").

It is anticipated that the Secretary will argue that she has the inherent authority to reverse

the position of her predecessor.   Even if that were true, well-established precedent and

fundamental fairness prevent the Secretary from "flip-flopping" under the facts in this case.  *See

Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (a change in position "that does

not take account of legitimate reliance on" the prior position may constitute arbitrary and

capricious action).

---

[25] The 1990 FEIS expressly incorporated the 1981 EA, as well as the 1986 Forest Plan and the
1986 FEIS.  Dkt. # 45-4 at 6–14; *see* Dkt. # 45-6 at 22.

Indeed, any inherent authority to change position cannot be exercised out of spite or based upon a current aversion to the earlier position. *See Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958) ("[T]he power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies."); *U.S. v. Seatrain Lines*, 329 U.S. 424, 428–33 (1947) (rejecting the federal government's attempt to revoke a certificate of convenience in light of a change in policy). Here, the only thing of substance that occurred between the 1993 ROD and the Secretary's new position was this Court's ruling that Defendants' 29-year delay was unlawful. *See* Dkt. # 52 at 2–3. It goes without saying that the Secretary should not be allowed to take her frustrations out on Solenex by reversing the position of her predecessor. *See Iceland S.S. Co. v. U.S. Dep't of the Army*, 201 F.3d 451, 461 (D.C. Cir. 2000) (agency action motivated by subjective bad faith is arbitrary and capricious).

In addition, any authority to change position must be exercised within a reasonable amount of time. *See Bookman v. U.S.*, 453 F.2d 1263, 1265 (Ct. Cl. 1972) ("[A]bsent contrary legislative intent or other affirmative evidence, this court will sustain the reconsidered decision of an agency, as long as the administrative action is conducted within a short and reasonable time period."). Here, the Secretary's 23-year delay in reversing the position of her predecessor is unreasonable under any definition. *Gratehouse v. U.S.*, 512 F.2d 1104, 1109 (Ct. Cl. 1975) ("What is a short and reasonable time period [for reconsideration] will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years."). Therefore, even if the Secretary has the inherent authority to change the position of her predecessor after 23 years, that authority cannot now be exercised under the facts in this case.

In a final desperate attempt to justify her egregious actions, the Secretary argues that the lease was issued improperly in violation of NEPA because, according to the Secretary, the BLM never adopted the 1981 EA.  Dkt. # 68-1 at 10.  Assuming that the BLM was required to adopt the Forest Service's 1981 EA, the Secretary cites no evidence that the BLM failed to do so.  *See* Dkt. # 68-1 at 10.  In any event, the BLM's actions prove that it did, indeed, adopt the 1981 EA.

First, the BLM participated in the preparation of the 1981 EA as a cooperating agency. Dkt. # 45-10 at 11.  Thus, the BLM was actively involved in all aspects of the decision-making process that culminated in the 1981 EA.  Dkt. # 45-10 at 80–82.

Second, in accordance with an existing Memorandum of Understanding ("MOU") between the Forest Service and the BLM,[26] upon receipt of the leasing recommendation by the Forest Service as to the acres at issue, the BLM reviewed both the recommendation and 1981 EA, and independently determined that the Forest Service's recommendation was "appropriate." *See* PSOF ¶¶ 6–8.  Based upon that independent determination, the BLM then:  (1) designated those acres as "Parcel No. MT 73"; (2) attached the required stipulations from the Forest Service's recommendation and 1981 EA to the applicable acres in Parcel No. MT 73; (3) posted Parcel No. MT 73 for the September 1981 noncompetitive lease drawing; (4) drew Mr. Longwell's application for Parcel No. MT 73; (5) accepted Mr. Longwell's money for the lease; (6) issued the lease to Mr. Longwell: and (7) treated the lease as valid and properly issued for the next 33 years.[27]  *See* PSOF ¶¶ 7–11.

Finally, as noted above, the BLM formally adopted the 1981 EA, by, *inter alia*, expressly incorporating it into both the 1985 EA and the 1990 FEIS.

---

[26] A copy of this MOU is attached hereto as Exhibit 1.

[27] This evidence belies the Secretary's suggestion, Dkt. # 68-1 at 10, that the BLM never determined that issuance of the lease was in the public interest.

In short, it strains credulity for the Secretary to suggest that the BLM did not adopt the 1981 EA.[28]

As the foregoing demonstrates, there were no NEPA violations associated with issuance of the lease.  Therefore, this Court should hold unlawful and set aside the Secretary's decision.

## B.     There Were No NHPA Violations In The Issuance Of The Lease.

Like her NEPA argument, the Secretary's NHPA argument is also devoid of merit.[29]  The NHPA is designed to identify potential conflicts between federal undertakings and historic properties and to provide a mechanism for attempting to resolve any purported conflicts.  Section 106 of the NHPA requires that an agency having jurisdiction over an undertaking "take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108; *see* 54 U.S.C. § 300308 (defining "historic property").  Like NEPA, the NHPA is a strictly procedural statute that neither confers a substantive right nor dictates a particular outcome.  *See Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs*, 537 F. Supp. 2d 161, 173 (D.D.C. 2008) ("'The case law in this and other circuits holds that an agency's duty to act under the NHPA … is procedural in nature.'" (quoting *Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C.

---

[28] This is especially true considering that the BLM issued leases covering more than 400,000 acres of the National Forest based upon the same 1981 EA.  Dkt. # 45-2 at 26.  Many of those leases were issued for lands near Solenex's lease and still exist today.  Dkt. # 68-1 at 7 n.24.

[29] Most of the Secretary's NHPA argument is based on changes that occurred after the lease was issued in 1982.  Dkt. # 68-1 at 2 ("subsequent factual and legal developments" indicate that the lease "was improperly issued."); *see id*. at 5–7, 10–11.  The major change, of course, was that this Court held that Defendants' 29-year delay was unlawful.  Dkt. # 52 at 2-3.  In addition, the NHPA was amended in 1992 to provide for more involvement by tribes and to provide that properties of religious importance to tribes may be determined eligible for inclusion on the National Register.  Pub. L. No. 102-575 § 4006, 106 Stat. 4600 (1992); 65 Fed. Reg. 77,698 (Dec. 12, 2000) (final rule amending regulations in light of 1992 statutory amendments); *see* Dkt. # 68-1 at 5 n.15 (Exec. Order No. 13007 issued in 1996); *see* Dkt. # 43 at 7 (Defendants arguing that the 1992 NHPA changes justified their unlawful delay); *see also* Dkt. # 68-1 at 5 (a purported traditional cultural district ("TCD") was discovered in 2002); *but see* PSOF ¶¶ 71–72 (no historic properties in 2004).  Legal and factual changes occurring after lease issuance cannot be used to support an argument that the lease was improperly issued in 1982.

1996), *aff'd* 203 F.3d 53 (D.C. Cir. 1999))).  Instead, the NHPA simply requires agencies to "stop, look, and listen" before proceeding with an undertaking.  *Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988) (quotation omitted); *see U.S. v. 162.20 Acres of Land, More or Less, Etc*., 639 F.2d 299, 302 (5th Cir. 1981) ("[Section 106] neither … forbid[s] the destruction of historic sites nor command[s] their preservation ….").

Assuming that the issuance of the lease was an "undertaking," it is undisputed that the mere issuance of the lease did not, and cannot, have an impact on historic properties.  Dkt. # 45-10 at 10 ("Lease issuance is an action which does not result in effects on the environment."); *see Nat'l Indian Youth Council v. Andrus*, 501 F. Supp. 649, 674–76 (D.N.M. 1980), *aff'd sub nom. Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir. 1981) (approval of a mining plan—not approval of a lease—requires compliance with the NHPA).  Accordingly, in the 1981 EA, it was determined that full NHPA compliance would be deferred until a specific surface-disturbing activity was proposed.  Dkt. # 45-10 at 54; *see also* Dkt. # 45-12 at 6 (lease stipulation for the protection of cultural resources).  The Secretary has not proven that this determination was in error.[30]  *See Nat'l Indian Youth*, 501 F. Supp. at 674–76 (approval of a coal lease did not trigger detailed NHPA compliance when compliance was to be performed before any mining activities would occur).  This is especially true considering that, in keeping with the 1981 EA, the NHPA was fully complied with after the APD was submitted.  Indeed, both the 1985 EA and the 1990 FEIS demonstrate full compliance with the NHPA.  HC06943–7042 (BLM explaining how both NEPA and the NHPA were complied with in approving the APD in 1985); Dkt. # 45-6 at 19–20

---

[30] The Secretary's suggestion, Dkt. # 68-1 at 11, that the more than 400,000 acres of nonwilderness lands on the National Forest should have been inventoried before any leases were issued is ridiculous.  *See Nat'l Indian Youth*, 664 F.2d at 228 ("The argument that a complete survey must be made of 40,000 acres before mining begins on eight acres borders on the absurd.").

(1993 ROD explaining that interviews with the Blackfeet Tribe did not result in the identification of any historic properties).  Therefore, the Secretary's NHPA argument is devoid of merit.

As the foregoing demonstrates, there were no NHPA violations associated with issuance of the lease.[31]  Therefore, this Court should hold unlawful and set aside the Secretary's decision.

## VII.   THE SECRETARY'S CANCELLATION OF THE LEASE WAS ARBITRARY AND CAPRICIOUS.

Assuming there are any uncorrected violations associated with issuance of the lease, those violations would not justify cancelling the lease.  Instead, these non-MLA, procedural violations would, at most, constitute "harmless error," which would not serve as a basis for a court to set aside the lease.  5 U.S.C. § 706 (the reviewing court "shall" take account of "the rule of prejudicial error"); *see Nevada*, 457 F.3d at 90–91 (applying the "harmless error" rule to NEPA violation).  Even if the "harmless error" rule does not apply, the Secretary should have fixed the violations while the lease was suspended, as is the standard practice in similar cases.[32]

*See S. Utah Wilderness All. v. U.S. Dep't of Interior*, No. 2:06-CV-342-DAK, 2007 WL

---

[31] Contrary to the Secretary's suggestion, Dkt. # 68–1 at 8, there were no American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996, violations associated with issuance of the lease.  The 1981 EA, the 1985 EA, and the 1990 FEIS all demonstrate compliance with the AIRFA.  Dkt. # 45-10 at 71, 81; 1985 EA at 128, 132–33, 140 [A003:FS000173, 177–78, 185]; Dkt. # 48-1 at 30–41 (demonstrating AIRFA compliance from 1972 to 1990); *see* HC06440–527 (demonstrating compliance with AIRFA in developing the 1986 Forest Plan) (margin notes by unknown author in original); *see also Wilson v. Block*, 708 F.2d 735, 747 (D.C. Cir. 1983) ("AIRFA requires federal agencies to consider, but not necessarily to defer to, Indian religious values.").  In addition, because there were no violations of NEPA, the NHPA, or the AIRFA associated with issuance of the lease, the Secretary's argument that the BLM violated a trust responsibility *vis-à-vis* activities on non-Indian lands is baseless.  *See* Dkt. # 68-1 at 11.

[32] In *Conner*, the Ninth Circuit refused to cancel the non-NSO leases, but merely suspended them pending compliance with NEPA.  848 F.2d at 1458–62; In *Bob Marshall*, the Ninth Circuit remanded for determination of an appropriate remedy for the NEPA violation.  852 F.2d at 1230.  On remand, the government argued that the leases should be suspended pending NEPA compliance.  *Bob Marshall All. v. Lujan*, 804 F. Supp. 1292, 1295, 1297–98 (D. Mont. 1992).  The lessee argued for cancellation.  *Id*. at 1295, 1298.  Influenced by the lessee's desire, the court cancelled the leases.  *Id*. at 1298.

2220525, at *1–2 (D. Utah 2007).  By failing to do so, the Secretary abused her discretion.  *See*

*Ass'n of Data Processing*, 745 F.2d at 683.

The Secretary argues, however, that Section 403 of Pub. L. No. 109-432, 120 Stat. 2922

(2006), which withdrew the area from future leasing, prevents her from correcting the purported

violations.  Dkt. # 68-1 at 13.  Yet, that withdrawal was made "subject to valid existing rights[.]"

Pub L. No. 109-432, § 403(b)(1).  Even if the Secretary were correct in suggesting that Solenex's

lease was voidable, Dkt. # 68-1 at 7, a voidable lease is a "valid existing right" under this saving

clause because these types of saving clauses protect similar interests, especially when money has

been paid for the interest.  *See, e.g.*, *Stockley v. U.S.*, 260 U.S. 532, 536, 543–44 (1923).

The Secretary also argues that correcting the violations would be futile because the

exercise of any lease rights would adversely affect the purported TCD.  Dkt. # 68-1 at 13.  Yet,

in correcting the purported violations, the relevant facts and laws are those in existence prior to

lease issuance, not those in existence in 2016.  *See Conner*, 848 F.2d at 1461 (in correcting the

NEPA violation, the agencies shall not consider the existence of the leases).  In any event, the

mere existence of a purported TCD "does not serve in any manner as a veto to uses of the

property[.]"  Dkt. # 32-2 at 18.  This is especially true considering that the purported TCD and

the purported finding of adverse effects were merely pretexts for Defendants' unlawful delay and

now the Secretary's cancellation of the lease.  *See* H0038:FS006507–31 (highlighting by

unknown person in original); Solenex's Comments (Sept. 4, 2015).  In addition, the stipulations,

mitigation and monitoring requirements, and conditions of approval that were incorporated into

the approved APD would adequately protect the purported TCD.  Solenex's Comments at 10–23.

Instead of objectively considering these protective measures, the Secretary simply capitulated to

the religious demands of the Blackfeet, in violation of the Establishment Clause.  U.S. Const.

amend I; Solenex's Comments at 20–23; *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451–53 (1988).

Finally, the Secretary failed to comply with NEPA before cancelling the lease. Cancelling a lease, or any property interest, is a "major Federal action[,]" that triggers NEPA.  42 U.S.C. § 4332(C); *see Cal. ex rel. Cal. Coastal Comm'n v. Norton*, 150 F. Supp. 2d 1046, 1055–58 (N.D. Cal. 2001) *aff'd sub nom. Cal. v. Norton*, 311 F.3d 1162, 1175–78 (9th Cir. 2002) (suspending offshore leases triggers NEPA).  In fact, in other situations, the BLM has complied with NEPA before making a decision to cancel leases.  *See* 81 Fed. Reg. 51,936 (Aug. 5, 2016) (notice of availability of a FEIS for cancelling previously issued leases).[33]  The Secretary's failure to comply with NEPA before cancelling the lease was necessarily unlawful.

The Secretary tries to justify her failure to comply with NEPA by arguing that cancelling the lease preserved the *status quo*.  Dkt. # 68-1 at 13–14.  This is not true because the *status quo* is "the last uncontested status which preceded the pending controversy." *Consarc Corp. v. U.S. Treasury Dep't*, 71 F.3d 909, 913 (D.C. Cir. 1995) (quotation omitted).  Prior to the Secretary's decision, Solenex owned the lease and the right to drill a well through the approved APD, Dkt. # 45-6 at 5–33, although activities under the approved APD were suspended.  Dkt. # 45-6 at 55.  In cancelling the lease, the Secretary altered the *status quo* by:  (a) destroying valuable property rights; (b) causing an "irreversible and irretrievable" loss of the oil and gas resources; and (c) denying "present and future generations of Americans" the benefits of the those resources.  42 U.S.C. § 4332(C)(v); 42 U.S.C. § 4331(a); *see Cal. Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961) ("The public does not benefit from resources that remain undeveloped, and the Secretary

---

[33] *See also* EA DOI-BLM-CO-N040-2015-0023 (Jan. 2015) (EA for the cancellation of leases on the Roan Plateau), available at:
http://www.blm.gov/co/st/en/BLM_Information/nepa/gsfo/completed_2015_nepa.html (last visited Sept. 8, 2016).

must administer the [MLA] so as to provide some incentive for development.").  The Secretary's

decision also puts a cloud on the title of all existing lessees and will have a chilling effect on all

prospective lessees.  This will destroy the onshore oil and gas leasing program and, thereby,

frustrate Congress's intent in passing the MLA.  *See Geosearch, Inc. v. Andrus*, 508 F. Supp.

839, 845 (D. Wyo. 1981) ("Predictability and certainty of title are mandatory to the entire oil and

gas leasing system.").  Because of the significant and controversial nature of her decision, the

Secretary was required to comply with NEPA so as to ensure her decision was well-informed,

and not simply a punitive response to this Court's adverse ruling.

For these reasons, the Secretary's cancellation of the lease was arbitrary and capricious.

Therefore, this Court should hold unlawful and set aside the Secretary's decision.

## VIII.   THE SECRETARY'S DISAPPROVAL OF THE APPROVED APD WAS ARBITRARY AND CAPRICIOUS.

As demonstrated above, the Secretary's cancellation of the lease was unlawful because

of, *inter alia*, the passage of time and equitable estoppel.  Similarly, the Secretary's disapproval

of the 23-year-old approved APD was unlawful for these same reasons.  In addition, the

regulation cited by the Secretary for the purported authority to disapprove the approved APD

does not support her actions.  *See* Dkt. # 68-1 at 13.  That regulation allows the Secretary to

disapprove an unapproved APD within 35 days of receipt of the APD.  43 C.F.R. § 3162.3-

1(h)(2).  Notwithstanding the fact that the Secretary's disapproval came 30 years too late,

nothing in that regulation allows the Secretary to disapprove an approved APD, especially one

that was approved by her predecessor 23 years earlier.

The Secretary's disapproval of the approved APD also violated the APA.  Under the

APA, the approved APD was a "license," 5 U.S.C. § 551(8), which could only be "withdraw[n],

revo[ked], or annul[led]" after notice and an opportunity to be heard.  5 U.S.C. § 558(c).  It is

undisputed that Solenex was not provided notice and an opportunity to be heard before the Secretary disapproved the 23-year-old approved APD.

For these reasons, the Secretary's disapproval of the approved APD was arbitrary and capricious.  Therefore, this Court should hold unlawful and set aside the Secretary's disapproval of the 23-year-old approved APD.

## **CONCLUSION**

This Court should grant summary judgment in Solenex's favor and hold unlawful and set aside the Secretary's decision that cancelled Solenex's 33-year-old lease and disapproved Solenex's 23-year-old approved APD.

DATED this 12th day of September 2016.

Respectfully submitted,

/s/ Steven J. Lechner
Steven J. Lechner, D.D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorney for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 12th day of September 2016, I electronically filed the

foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be

accomplished by this Court's CM/ECF system.

/s/ Steven J. Lechner       

Steven J. Lechner

# **<u>Exhibit 1</u>**

INTERIM
MEMORANDUM OF UNDERSTANDING
BETWEEN
THE BUREAU OF LAND MANAGEMENT
AND
THE FOREST SERVICE

The Bureau of Land Management, Department of the Interior, and the
Forest Service, Department of Agriculture, hereby agree that the
procedures set forth below shall be followed with respect to mineral
leasing, mineral lease applications, and mineral prospecting permit
applications as described below which involve National Forest System
lands.  These procedures are adopted to ensure cooperative, timely
and orderly action by the Bureau of Land Management and the Forest
Service with respect to such leasing and permitting activity consistent
with the assigned functional responsibilities of each agency.  The
agencies also agree to issue regulations which explain their respective
responsibilities.  This Memorandum will expire when final regulations
governing these procedures become effective.

I.  PURPOSE

This agreement establishes the procedures for recommendation or consent
by the Forest Service in the issuance of leases and prospecting permits
on National Forest System lands for all minerals except coal.

A.  Recommendation

Recommendations by the Forest Service are the mechanism established
by this agreement to allow the Forest Service, as surface managing
agency, to review potential leasing and permitting actions on National
Forest System lands, for all minerals except coal, under the Mineral
Leasing Act of 1920, 30 U.S.C. § 181 et seq.

B.  Consent

Consent by the Forest Service is statutorily required for potential
leasing and permitting actions on Forest Service lands under the
Mineral Leasing Act for Acquired Lands, 30 U.S.C. § 351 et seq.,
section 402 of Reorganization Plan No. 3 of 1946, 5 U.S.C. Appendix,
the Geothermal Steam Act of 1970, 30 U.S.C. § 1001 et seq., and any
statute creating a special area under Forest Service jurisdiction
which requires such consent (e.g. 30 U.S.C. § 192c).

II.   RESPONSIBILITIES

A.   Initiation - Bureau of Land Management

1.   Applications for noncompetitive leases and prospecting permits.
Noncompetitive oil and gas lease applications (43 CFR Subpart 3111),
noncompetitive geothermal lease applications (43 CFR Subpart
3210) and prospecting permit applications (43 CFR Subpart 3510)
shall be filed with the Bureau of Land Management.  After preliminary
adjudication, applications which involve National Forest System
lands will be submitted to the Forest Service for review as described
below in section II.B.

2.   Noncompetitive simultaneous leasing and competitive leasing.

Noncompetitive simultaneous leasing shall be conducted under the
procedures set out in 43 CFR Subparts 3112 and 3211.   Competitive
leasing shall be conducted in accordance with the procedures set
out in 43 CFR Subparts 3120 and 3220 and § 3521.2.  The Bureau of
Land Management will first identify parcels or areas which are
available for simultaneous or competitive leasing.  Descriptions
of these parcels or areas will then be submitted to the appropriate
Forest Service office for review as described below in section
II.B.

B.   Forest Service Review

1.   Basis for review.

The Forest Service will review mineral leasing and permitting sub-
mittals to determine the effect of the potential mineral activities
on other resource values and on the purposes for which the particular
lands are administered.  The Forest Service will be responsible
for compliance with the National Environmental Policy Act of 1969
with respect to activities being reviewed by that agency.

2.   Recommendation or consent.

Based on its review of the proposed leasing or permitting activities,
the Forest Service will either:

a.   Recommend, or consent to, the proposed activity with standard
stipulations included in the lease or permit and, if necessary,
add special stipulations to be included in the lease or permit in
order to protect other identified resource values, including a
prohibition against occupancy of the surface of all or part of the
lease or permit; or

b.  Recommend against, or refuse consent to, the proposed activity if it would seriously interfere with other resource values or with the purposes for which the lands are being administered, and special stipulations will not provide adequate mitigation.

3.  Completion of review.

Upon completion of review, the Forest Service will forward to the appropriate Bureau of Land Management office its recommendation, or its decision whether to consent, on the proposed leasing or permitting activity.

C.  Bureau of Land Management Action

1. Applications for noncompetitive leases and prospecting permits.

a.  Forest Service recommendation.  Where the Forest Service recommends a course of action for a particular lease or permit application, the Bureau of Land Management will review the Forest Service analysis and exercise its independent judgment whether the recommended special stipulations are appropriate or whether the lease or permit should not be issued.  Upon request from the Bureau of Land Management, the Forest Service will provide additional information or justification for its recommendation. If agreement cannot be reached, the matter will be submitted to the Washington, D.C., offices of both agencies.  If the Bureau of Land Management concurs in the recommendation of the Forest Service, it will notify the applicant at the appropriate time of the Forest Service recommendation and its basis and the decision of the Bureau of Land Management based upon its independent judgment.

b.  Forest Service consent.  Where the Forest Service forwards a decision concerning a particular lease or permit application based upon its statutory authority to consent to mineral leasing, the Bureau of Land Management will treat the parcel or area in accordance with the decision of the Forest Service.  The Bureau of Land Management will inform the applicant at the appropriate time of the Forest Service decision and its basis and the specific statutory authority of the Forest Service with regard to the particular application.

2.  Noncompetitive simultaneous leasing and competitive leasing

a.  Forest Service recommendation.  Where the Forest Service submits a recommendation concerning a  particular parcel or area, the Bureau of Land Management will review the analysis of the Forest Service to determine whether the recommendation is appropriate.  Upon request from the Bureau of Land Management, the Forest Service will provide additional information or justification for its recommendation. If agreement cannot be reached, the matter will be submitted to the Washington, D.C. office of both agencies. If a particular parcel or area is

made available for leasing, the Bureau of Land Management will
notify the prospective lessee at the appropriate time of the
Forest Service recommendation and its basis and the decision
of the Bureau of Land Management based upon its independent judg-
ment.

b.  Forest Service Consent.  Where the Forest Service forwards
a decision concerning a particular parcel or area based upon
its statutory authority to consent to mineral leasing, the
Bureau of Land Management will treat the parcel or area in
accordance with the decision of the Forest Service.  The Bureau
of Land Management will inform the applicant at the appropriate
time of the Forest Service decision and its basis and the specific
statutory authority of the Forest Service with regard to the
particular application.

3.  Further processing.

After the procedures described above are completed, the Bureau of
Land Management will process all mineral lease applications, all
prospecting permit applications, and the leasing of all parcels or
areas in accordance with the regulations set out in 43 CFR Subchapter
C and other relevant regulations, as supplemented by this agreement.

4.  Final authority.

a.  The Bureau of Land Management has the ultimate discretionary
authority to decide whether a particular mineral lease or prospecting
permit will be issued, except where the Forest Service exercises its
statutory authority and does not consent to leasing.

b.  It is the general practice of the Bureau of Land Management
to accept Forest Service recommendations.

III.    TIMELY PROCESSING

Each agency will strive to process applications in a timely manner.
Delays may occur, however, when a particular lease application
requires extensive review under the National Environmental Policy
Act of 1969 or when a particular office of either agency is
burdened with an unusually large number of applications.

IV.    EFFECT ON PRIOR AGREEMENTS

This Memorandum of Understanding implements the agreements contained
in (1) an exchange of letters between the Secretaries of Agriculture
and Interior in 1945 concerning leasing under the Mineral Leasing
Act of 1920 of lands under Forest Service administration, and
(2) a procedure, dated November 8, 1946, agreed to by the two
Secretaries concerning leasing under section 402 of Reorganization
Plan No. 3 of 1946.  This Memorandum supersedes, to the extent
inconsistent, the exchange of letters between the Acting Chief,

Forest Service, dated April 20, 1972, the Acting Director, Geological
Survey, dated July 7, 1942 and the Acting Director, Bureau of Land
Management, dated April 29, 1974.

Date: 12/24/80

Director, Bureau of Land Management

Date: 12/30/80

Chief, Forest Service