IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SOLENEX LLC,                              )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )
                                          )        Case No. 13-993-RJL
                                          )
S.M.R. JEWELL, Secretary                  )
U. S. Department of the Interior, *et al.*, )
                                          )
              Defendants.                 )

**MEMORANDUM OF POINTS AND AUTHORIES IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

I.    STATUTORY BACKGROUND ................................................................. 3

    A.    The Secretary's Plenary Land-Management Authority ......................... 3

    B.    Mineral Leasing on Public Lands .......................................................... 3

    C.    National Environmental Policy Act ....................................................... 4

    D.    National Historic Preservation Act ........................................................ 5

II.   FACTUAL BACKGROUND ................................................................... 6

    A.    Overview of Badger-Two Medicine Area ............................................. 6

    B.    Lease History ......................................................................................... 8

III.  STANDARD OF REVIEW .................................................................... 12

IV.   ARGUMENT ........................................................................................... 14

I.    The Secretary Had Authority to Cancel the Lease ...................................... 15

    A.    Congress Has Conferred on the Secretary a General Administrative Power
of Lease Cancellation ........................................................................... 15

    B.    Section 31 of the MLA Does Not Withdraw the Secretary's Authority to
Cancel Solenex's Lease ........................................................................ 16

    C.    Section 27(h) of the MLA (the "Bona Fide Purchaser" Provision) Does Not
Withdraw the Secretary's Authority to Cancel Solenex's Lease .......... 20

        1.   Section 27(h) Does Not Apply Here Because the Secretary Canceled
Solenex's Lease Based on Non-MLA Violations .................................... 20

        2.   Solenex Is Not a Bona Fide Purchaser For Value ..................................... 22

    D.    The Secretary's Lease-Cancellation Authority Is Not Time-Limited.................. 25

II.   The Secretary's Decision to Cancel the Lease Was Not Arbitrary or Capricious ............ 26

    A.    The Original Lease Was Legally Infirm ................................................. 27

        1.   The Lease Was Not Issued in Compliance with NEPA ............................ 27

        2.   The Lease Was Not Issued in Compliance With the NHPA .................... 28

3.     The Secretary is Not Estopped from Finding that the Lease Was
Issued in Violation of NEPA and the NHPA............................................ 29

B.     The Secretary Reasonably Concluded that She Lacked Discretion to Correct
the Deficiencies in the Lease ................................................................ 31

C.     The Decision to Deny the APD is Not Arbitrary or Capricious .......................... 32

III.   The Secretary is Not Required to Conduct a NEPA Analysis for the Cancellation
Decision ......................................................................................................... 33

V.     CONCLUSION.............................................................................................. 34

# Table of Authorities

## <u>Cases</u>

*Andrus v. Shell Oil Co.*,
446 U.S. 657 (1980) ........................................................................................................ 3

*Bd. of Comm'rs v. United States*,
308 U.S. 343 (1939) ...................................................................................................... 25

*Best v. Humboldt Placer Mining Co.*,
371 U.S. 334 (1963) ........................................................................................................ 4

*Bob Marshall Alliance v. Hodel (Bob Marshall Alliance)*,
852 F. 2d 1223 (9th Cir. 1988) ................................................................... 5, 22, 27

*Boesche v. Udall*,
373 U.S. 472 (1963) ....................................... 3, 14, 15, 16, 17, 18, 19, 20, 21,

*Chapman v. Sheridan-Wyoming Coal Co.*,
338 U.S. 621 (1950) ........................................................................................................ 4

*Chesapeake & Del. Canal Co. v. United States*,
250 U.S. 123 (1919) ...................................................................................................... 25

*Chevron U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) ...................................................................................................... 13

*City of Arlington v. FCC*,
133 S. Ct. 1863 (2013) .................................................................................................. 13

*City of Olmsted Falls, OH v. F.A.A.*,
292 F.3d 261 (D.C. Cir. 2002) ..................................................................................... 13

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ...................................................................................................... 33

*Clearfield Trust v. United States*,
318 U.S. 363 (1943) ...................................................................................................... 25

*Committee for Auto Responsibility v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) ..................................................................................... 34

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ...................................................................................................... 21

*Conner v. Burford*
848 F.2d 1441 (9th Cir. 1988) .......................................................................... 5, 22, 27

*Consumer Elecs. Ass'n v. FCC*,
347 F.3d 291 (D.C. Cir. 2003) ..................................................................................... 16

*D.M. Yates* 74 *Interior* 159 (IBLA 1983)*, Yates* 74 ............................................... 16

*Entergy Corp. v. Riverkeeper Inc.*,
  556 U.S. 208 (2009) ................................................................................................ 13, 16

*Fund for Animals, Inc. v. Thomas*,
  127 F.3d 80 (D.C. Cir. 1997) .............................................................................................. 3

*Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) ............................................................................................................... 5

*Griffin & Griffin Expl., LLC v. United States*,
  116 Fed. Cl. 163 (2014) .................................................................................................... 19

*Grynberg v. Kempthorne*,
  No. 06-cv-01878, 2008 WL 2445564 (D. Colo. June 16, 2008) ............................ 19

*Guaranty Trust Co. v. United States*,
  304 U.S. 126 (1938) .......................................................................................................... 25

*Hall v. McLaughlin*,
  864 F.2d 868 (D.C.Cir.1989) .......................................................................................... 13

*Hannifin v. Morton*,
  444 F.2d 200 (10th Cir. 1971) ................................................................................... 19, 20

*Heckler v. Cmty. Health Servs. Of Crawford Cty., Inc.*,
  467 U.S. 51 (1984) ............................................................................................................ 29

*Illinois Commerce Comm'n v. Interstate Commerce Comm'n*,
  848 F.2d 1246 (D.C. Cir. 1988) ........................................................................................ 5

*Keating v. FERC*,
  569 F.3d 427 (D.C. Cir. 2009) ........................................................................................ 30

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ............................................................................................................. 3

*Knight v. United States*,
  142 U.S. 161 (1891) .......................................................................................................... 16

*Kootenai Tribe v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002) ........................................................................................ 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ..................................................................................................... 33

*Lomak Petroleum, Inc. v. FERC*,
  206 F.3d 1193 (D.C. Cir. 2000) ...................................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ...................................................................................................... 12, 34

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................................................................. 4

*McKay v. Wahlenmaier,*
    226 F. 2d 35 (D.C. Cir. 1955) ............................................................................ 17

*Meeker v. Lehigh Valley R.R. Co.,*
    236 U.S. 412 (1915) ........................................................................................... 26

*Melish Consol. Placer Oil Mining Co v. Testerman,*
    53 Interior Dec. 205 (1930) .............................................................................. 14

*Metropolitan Edison Co. v. People Against Nuclear Energy,*
    460 U.S. 766 (1983) ........................................................................................... 33

*Moore v. Robbins,*
    96 U.S. 530 (1877) ............................................................................................. 18

*Morrow v. Clayton,*
    326 F.2d 36 (10th Cir. 1963) ............................................................................ 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) ....................................................................................... 13, 14

*Nat'l Petrochemical & Refiners Ass'n v. EPA,*
    287 F.3d 1130 (D.C. Cir. 2002) ........................................................................ 13

*Office of Personnel Mgmt. v. Richmond,*
    496 U.S. 414 (1990) ........................................................................................... 29

*Pan American Petroleum Corp. v. Pierson,*
    284 F.2d 649 (10th Cir. 1960) .......................................................................... 18

*Pierce v. SEC,*
    786 F.3d 1027 (D.C. Cir. 2015) ........................................................................ 30

*Powell v. Zuckert* 366 F.3d  (D.C. Cir. 1966) ...................................................... 25

*PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n,*
    419 F.3d 1194 (D.C. Cir. 2005) ........................................................................ 13

*Pueblo of Sandia v. United States,*
    50 F.3d 856 (10th Cir. 1995) ............................................................................ 29

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ............................................................................................. 4

*Sierra Club v. Peterson,*
    717 F.2d 1409 (D.C. Cir. 1983) ............................................................... 5, 22, 27

*Sw. Petroleum Corp. v. Udall,*
    361 F.2d 650 (10th Cir. 1966) ..................................................................... 22, 23

*Town of Stratford v. FAA,*
    285 F.3d 84 (D.C. Cir. 2002) ............................................................................ 33

*United States v. Beebe*,
   127 U.S. 338 (1888)..................................................................................... 25

*United States v. Eaton Shale Co.*,
   433 F. Supp. 1256 (D. Colo. 1977)............................................................... 28

*United States v. San Francisco*,
   310 U.S. 16 (1940)......................................................................................... 3

*United States v. Summerlin*,
   310 U.S. 414 (1940)..................................................................................... 25

*United States v. Verdier*,
   164 U.S. 213 (1896)..................................................................................... 25

*United States v. Wharton*,
   514 F.2d 406 (9th Cir. 1975) ........................................................................ 30

*Wallis v. Pan Am. Petroleum Corp.*,
   384 U.S. 63 (1966)....................................................................................... 20

*Wash. Legal Clinic for the Homeless v. Barry*,
   107 F.3d 32 (D.C. Cir. 1997) ....................................................................... 31

*WildEarth Guardians v. Salazar*,
   741 F. Supp. 2d 89 (D.D.C. 2010)................................................................ 13

*Wilderness Ass'n v. Fry*,
   310 F. Supp. 2d 1127 (D. Mont. 2004)........................................................... 6

*Winkler v. Andrus*,
   614 F.2d 707 (10th Cir. 1980) .................................................. 19, 20, 22, 24

*WorldCom, Inc. v. FCC*,
   238 F.3d 449 (D.C. Cir. 2001) ..................................................................... 29

**Statutes**

28 U.S.C. § 2462 ................................................................................................ 26

28 U.S.C. 1346 ................................................................................................... 30

28 U.S.C. 1491 ................................................................................................... 30

30 U.S.C. § 188 ............................................................................................ 15, 16

30 U.S.C. § 188(b) ............................................................................................. 17

30 U.S.C. § 189 ................................................................................................... 4

30 U.S.C. §§ 181-196 .......................................................................................... 3

30 U.S.C. §§ 184(h)(2) .................................................................... 4, 15, 20, 22

30 U.S.C. 226(g) .............................................................................................. 3, 4

42 U.S.C. § 4321 ................................................................................................................ 4

42 U.S.C. § 4332(2)(C) ..................................................................................................... 5

43 U.S.C. § 1166 ............................................................................................................. 26

43 U.S.C. § 1201 .............................................................................................................. 3

43 U.S.C. § 1457 .............................................................................................................. 3

43 U.S.C. § 2 ............................................................................................................... 3, 16

5 U.S.C. § 558 ................................................................................................................ 33

5 U.S.C. § 558(c) ............................................................................................................ 33

5 U.S.C. § 706(2)(A) ................................................................................................. 13, 14

5 U.S.C. § 706(2)(C) ....................................................................................................... 12

54  U.S.C. § 302706(b) ..................................................................................................... 6

54 U.S.C. § 306108 ...................................................................................................... 5, 6

54 U.S.C. §§ 300101 ......................................................................................................... 5

P.L. 109-432 ............................................................................................................... 7, 31

**Regulations**

36 C.F.R. § 800.16(v) ....................................................................................................... 5

43 C.F.R Part 3100 ........................................................................................................... 4

43 C.F.R. § 3108.3(d) .................................................................................................. 4, 12

43 C.F.R. § 3162.2-1(h)(2) ............................................................................................. 32

43 C.F.R. § 3162.3-1(h)(2) ............................................................................................. 11

On March 17, 2016, the Secretary of the Interior (Secretary) cancelled a mineral lease held by Solenex LLC in an area of the Lewis and Clark National Forest where Congress has permanently withdrawn from mineral leasing and development.  The Secretary explained that, although this lease had issued before the ban went into effect, the lease had been invalid from its inception due to noncompliance with multiple federal laws.  The Secretary reasoned that Congress's subsequent leasing ban left her without discretion to correct deficiencies in the lease, and that even if she had discretion to do so, she would not exercise that discretion because mineral development on the subject land would irreparably harm irreplaceable natural and cultural resources.  For the same reasons, and in the same decision, the Secretary also disapproved Solenex's Application for a Permit to Drill ("APD").

Solenex's amended complaint contests the Secretary's lease-cancellation and APD-disapproval decision.  ECF No. 73.  The company's summary-judgment brief presents two primary arguments.  ECF No. 89-1.  First, Solenex claims that the Secretary lacked authority to cancel this lease, for any reason.  ECF No. 89-1, at 7-29.  Second, Solenex contends that the Secretary's reasons for cancelling the lease and disapproving the APD were arbitrary and capricious, in violation of the Administrative Procedure Act ("APA").  *Id.* at 29-42, 43-44.  Solenex also makes a cursory argument that the Secretary did not comply with the National Environmental Policy Act ("NEPA") before cancelling the lease.  *Id.* at 42-43.  We explain herein why each of Solenex's arguments lacks merit, and why the Court should grant the Secretary's motion for summary judgment.

## I.   STATUTORY BACKGROUND

### A.   The Secretary's Plenary Land-Management Authority

The Property Clause of the Constitution vests Congress with "the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const., Art. IV, § 3, cl. 2.  "Congress exercises the powers both of a proprietor and of a legislature over the public domain," *Kleppe v. New Mexico*, 426 U.S. 529 (1976), and it has delegated its "general managerial powers" over public lands to the Secretary. *Boesche v. Udall*, 373 U.S. 472, 476 (1963).  Specifically, 43 U.S.C. § 2 directs the Secretary to perform "all executive duties … in anywise respecting such public lands."  Likewise, 43 U.S.C. § 1457 charges the Secretary "with the supervision of public business relating to. . . [p]ublic lands, including mines." *See also* 43 U.S.C. § 1201 (directing the Secretary "to enforce and carry into execution, by appropriate regulations, every part of the provisions of [Title 43] not otherwise specially provided for").  Under the aegis of these general enactments and other, more specific grants of statutory authority, the Secretary carries out the greater part of Congress's virtually unlimited power over federal lands.  *See United States v. San Francisco*, 310 U.S. 16, 29 (1940).

### B.   Mineral Leasing on Public Lands

The Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181-196, empowered the Secretary to lease the rights to federal minerals. *See Andrus v. Shell Oil Co.*, 446 U.S. 657, 659 (1980).  "[A] mineral lease does not give the lessee anything approaching the full ownership of a fee patentee, nor does it convey an unencumbered interest in the minerals."  *Boesche*, 373 U.S. at 478.  To the contrary, such leases are subject "to exacting restrictions and continuing supervision by the Secretary." *Id.* at 477-78; *see, e.g.*, 30 U.S.C. 226(g) (empowering the Secretary to "determine reclamation and other actions as required in the interest of conservation of surface

3

resources").  In other words, the Secretary exercises the "broad powers" of a "leasing agent for

the [United States]."  *Chapman v. Sheridan-Wyoming Coal Co.*, 338 U.S. 621, 627 (1950).

Before drilling for oil or gas, a lessee must obtain a "permit to drill" with the Secretary's

approval "of a plan of operations covering proposed surface‑disturbing activities."  30 U.S.C.

§ 226(g).

Pursuant to Congress's direction, the Secretary has issued regulations (codified at 43

C.F.R Part 3100) to implement its MLA authority.  *See* 30 U.S.C. § 189.  As relevant here, those

regulations provide that "[l]eases shall be subject to cancellation if improperly issued."  43

C.F.R. § 3108.3(d).  The Secretary's authority to cancel a mineral lease after issuance is part and

parcel of its general power over land management conferred by other statutes.  *See supra*, at I.

While the MLA curtails the Secretary's lease-cancellation authority in some respects, *see* 30

U.S.C. §§ 184(h)(2) and 188(b), none of those statutory limitations acted to prohibit the

cancellation of Solenex's lease.

### C. __National Environmental Policy Act__

NEPA serves the dual purpose of informing agency decision makers of the environmental

effects of proposed federal actions and ensuring that relevant information is made available to

the public so that they "may also play a role in both the decision making process and the

implementation of that decision."  *See Robertson v. Methow Valley Citizens Council,* 490 U.S.

332, 349 (1989).  NEPA imposes procedural rather than substantive requirements.  It focuses the

attention of federal agencies and the public on the environmental impacts of a proposed action so

that those impacts can be studied before the action is implemented. 42 U.S.C. § 4321; *Marsh v.

Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)*.*

Specifically, NEPA requires a federal agency to prepare an Environmental Impact

4

Statement ("EIS") if the agency proposes to undertake a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  In the context of oil and gas leasing, the Ninth Circuit Court of Appeals has held that an EIS must be prepared prior to issuing an oil and gas lease, unless the lease being sold contains a stipulation preventing all surface disturbing activities. *Conner v. Burford ("Conner")*, 848 F.2d 1441 (9th Cir. 1988); *Bob Marshall Alliance v. Hodel (Bob Marshall Alliance)*, 852 F. 2d 1223 (9th Cir. 1988).  The Court of Appeals for the D.C. Circuit reached the same conclusion. *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (holding that "if the [Forest Service] chooses not to retain authority to preclude all surface disturbing activities," an EIS must be prepared "when the leases are issued.")..

Judicial review of agency NEPA compliance is deferential.  *Marsh*, 490 U.S. at 375.  The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983).

### D.     National Historic Preservation Act

The National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101 *et seq*., requires federal agencies to consider the effects of their "undertakings" on historic properties, including traditional cultural properties.  54 U.S.C. § 306108.  NHPA consultation must occur before the agency undertakes its action.  *See Illinois Commerce Comm'n v. Interstate Commerce Comm'n*, 848 F.2d 1246, 1260 (D.C. Cir. 1988) (characterizing the NHPA as "a 'stop, look, and listen'" statute). An "undertaking" is defined as "a project, activity, or program . . . including . . . those requiring a Federal permit, license or approval."  36 C.F.R. § 800.16(v).  Leasing of public land

for oil and gas development qualifies as an NHPA undertaking.  *E.g., Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1151-53 (D. Mont. 2004).

The NHPA requires the Secretary, as the lease approver, to ensure that the appropriate entities are involved in the consultation process.  States are represented in the process by State Historic Preservation Officers ("SHPOs").  If an undertaking may affect property of "religious and cultural significance" to a federally recognized Indian tribe, the agency must also consult with interested tribes (whether or not the activity is directly occurring on tribal property). 54 U.S.C. § 306108; *see also* 54  U.S.C. § 302706(b).  Tribal governments participate in the NHPA process through Tribal Historic Preservation Officers ("THPOs").  Both SHPOs and THPOs assist the federal action agency in identifying historic properties, evaluating their significance, and formulating measures to protect significant properties.

## II.     FACTUAL BACKGROUND

### A.     Overview of Badger-Two Medicine Area

The Badger-Two Medicine area encompasses approximately 129,500 acres of land located within the Lewis and Clark National Forest along Montana's Rocky Mountain Front and is part of the headwaters of the Missouri River.  Defendant's Statement of Material Facts ("DSOMF") at1. The area is adjacent to Glacier National Park, the Scapegoat and Bob Marshall Wilderness Areas, and the present-day Blackfeet Indian Reservation.  *Id.*.

The Badger-Two Medicine area is a very remote and relatively pristine landscape of outstanding natural and cultural values. The area consists of rugged mountainous terrain transitioning to prairie-mountain foothills on the eastern edge. It is vegetated by conifer forests mostly undisturbed by modern development.  DSOMF at 2.. Recognizing the remote and wild character of the land, in 2009 the Forest Service adopted a travel management decision that

banned motorized wheeled vehicles from all trails and prohibited snowmobiling in the Badger-Two Medicine region.  *Id.*. The area serves as a critical wildlife movement corridor for species that range into Glacier National Park and adjoining wilderness lands and is home to a number of wildlife species, including elk, grizzly bears, wolves, lynx, mountain goats, wolverines, west slope cutthroat trout, peregrine falcons, and bald eagles. It also contains pure and unpolluted water as well as diverse and abundant plant life. *Id.*.

Given its unique characteristics, the area has for nearly 20 years been made unavailable for further oil and gas leasing.  In 1997, the BLM and USFS released the Lewis and Clark National Forest Oil and Gas Leasing EIS and Record of Decision.  The 1997 ROD declined to authorize further oil and gas leasing on approximately 356,000 acres of forest lands on the Rocky Mountain Front, including the Badger-Two Medicine area.  In 2001, based on a USFS recommendation, the Secretary of the Interior withdrew approximately 405,000 acres of forest lands from location and entry under federal mining law for a period of 20 years to preserve traditional cultural uses by Native Americans, threatened and endangered species, and the outstanding scenic values and roadless character of the lands.  Public Land Order No. 7480. This withdrawal included the Badger-Two Medicine area.

In 2006, recognizing the abundant natural and cultural values in the Badger-Two Medicine area, Congress withdrew the area from oil and gas leasing and location and entry under the mining law, subject to valid existing rights.  Tax Relief and Health Care Act of 2006, P.L. 109-432, § 403.  This action made permanent the withdrawal issued by the Secretary of Interior in Public Land Order No. 7480.  Congress provided tax incentives for existing lessees who voluntarily relinquished their leases.  *Id*. § 403(c).

The Badger-Two Medicine area was once a part of the Blackfeet Tribe's reservation. In 1896, the Blackfeet Tribe ceded a portion of its reservation, which included the Badger-Two Medicine area. DSOMF at 3. However, that area was and remains "one of the most cultural and religiously significant areas to the Blackfeet People since time immemorial."[1] Recognizing the importance of the area to the Blackfeet people, in 2002 the Keeper of the National Register ("Keeper") concurred in establishing about 89,000 acres of the Badger-Two Medicine area as a traditional cultural district ("TCD"). DSOMF at 35 . In 2014, the Keeper considered additional documentation provided by the Forest Service and expanded the boundary of the TCD to encompass 165,588 acres, including both acreage within and outside n of the Badger-Two Medicine area. DSOMF at 43. As a result of the expansion, the TCD now encompasses the entire leasehold associated with Lease M-53323. DSOMF at 44

**B.**    **Lease History**

On June 1, 1982, the BLM issued Sidney M. Longwell Lease M-53323, which covers approximately 6,247 acres in the Lewis and Clark National Forest in Montana. The lease was in the Badger-Two Medicine area. DSOMF at 7. In 1983, Mr. Longwell assigned Lease M-53323 to American Petrofina Company of Texas, which later became Fina Oil and Chemical Company, and others (collectively "Fina"). *Id*,

On November 18, 1983, BLM received Fina's APD for the Federal South Glacier #1-26 well on Lease M-53323 near Hall Creek in Section 26, T30N., R.13W, PMM, i.e., approximately two miles south of U.S. Highway 2. DSOMF at 10. In 1985, BLM approved Fina's APD without any additional environmental analysis. DSOMF at 11.

---

[1] Blackfeet Tribal Resolution No. 260-2014 (2014).

Environmental groups and the Blackfeet Tribe appealed BLM's decision to approve the APD to the Interior Board of Land Appeals ("IBLA"), and in 1985, the IBLA set aside BLM's decision and remanded the case to BLM to: study and address a cumulative effects determination for the proposed activity; consider the effects of the proposed activity on the archaeological site; and complete other necessary actions to comply with the U.S. Fish and Wildlife Service's "no jeopardy" opinion. DSOMF at 13.  Lease operations were suspended at the lessee's request. DSOMF at 14.  Lease operations have been suspended for various reasons since that date.

In 1987, after addressing the remand issues, BLM issued a Decision Notice and Finding of No Significant Impact, which reactivated the drilling permit for Lease M-53323.  DSOMF at 15.  That decision was again appealed to the IBLA by the Blackfeet Tribe and other parties.  *Id.* BLM then moved to remand its decision to allow further review and action.  *Id.*  BLM continued the lease suspension, noting that the suspension would remain in effect until further environmental analysis could be completed by BLM and the Forest Service on the issues identified by the IBLA.  DSOMF at 16.

BLM and the Forest Service then agreed to analyze the APD for Lease M-53323 in an EIS along with another APD filed for a separate lease within the Badger-Two Medicine area.[2] DSOMF at 17.  The Final EIS ("FEIS") for the APDs was issued in late 1990.  DSOMF at 18.  In early 1991, BLM approved the APD for the lease, subject to lease stipulations and additional mitigation measures that were imposed as conditions of approval.[3]  DSOMF at 19.  Despite that

---

[2]  In late 1985, an APD was submitted to BLM on one other lease in the Badger-Two Medicine area:  Lease M-25173.  Lease M-25173 is one of ten currently active leases in the Badger Creek Unit, which is approximately ten miles south of the proposed well site for Lease M-53323.  BLM and USFS initially determined that an EIS should be prepared to analyze the APD for Lease No. M-25173 and suspended operations on all leases within the Badger Creek Unit until the environmental review was completed.

[3] The APD for Lease No. M-25173 has never been approved.

approval, BLM continued the suspension for Lease M-53323 at Fina's request pending further notification from BLM to proceed.  *Id.*  Several conservation organizations filed a third appeal with IBLA, arguing that BLM had failed to consider all phases of development in its consideration of effects on grizzly bears and had failed to take steps to aid in their recovery. DSOMF at 20.

In August 1991, BLM requested, and IBLA granted, a remand of the 1991 APD approval. *Id.*  BLM then commenced and completed its own study of the surface-related issues.  *Id.* On January 14, 1993, an Assistant Secretary of the Interior signed a Record of Decision authorizing approval of an APD for Lease M-53323.  *Id.*  In response, numerous groups filed a complaint in U.S. District Court for the District of Montana in April 1993 challenging the 1993 APD approval decision. DSOMF at 22. The plaintiffs included conservation organizations as well as a tribal traditionalists association, an association of Blackfeet tribal members, and a Blackfeet tribal member.[4]  *Id.*  That case was administratively closed in 1997.  DSOMF at 27.

In 1999, Fina assigned its record title interest in Lease M-53323 to Mr. Longwell, effective July 1, 2000.  DSOMF at 7.  On July 15, 2004, BLM received an assignment transferring record title interest in Lease M-53323 from Mr. Longwell to Solenex LLC.  *Id.*  Mr. Longwell is the managing owner of Solenex.  *Id.*,

The lease is within the boundaries of an area that has cultural and religious significance to the Blackfeet Tribe, who consistently raised concerns about development of this area during the lifetime of this lease.  DSOMF at 3.  In 2013, the Forest Service initiated the closing steps of the NHPA Section 106 process in consultation with Solenex and the Blackfeet Tribe, in hopes of identifying mitigation measures that would allow the BLM to lift the suspension of the lease.

---

[4] *National Wildlife Federation, et al. v. Robertson, et al.*, CV 93-44 (D. Mont. 1993).

DSOMF at 42.  Those consultation efforts were unsuccessful in identifying any mitigation

measures that would satisfy both the Blackfeet Tribe and Solenex.  DSOMF at 45.  Therefore, in

late 2014, the Forest Service made a determination of adverse effects under NHPA.  DSOMF at

46.  The Forest Service notified the Advisory Council on Historic Preservation ("ACHP") of the

adverse effects findings and asked ACHP for assistance and advice in continuing to seek ways to

avoid, minimize, or mitigate the adverse effects.  DSOMF at 47.  On September 21, 2015, ACHP

commented on the impacts to the TCD of possible lease operations:

> If implemented, the Solenex exploratory well along with the reasonably foreseeable full
> field development would be so damaging to the TCD that the Blackfeet Tribe's ability to
> practice their religious and cultural traditions in this area as a part of their community life
> and development would be lost.  The cumulative effects of full field development, even
> with the mitigation measures proposed by Solenex, would result in serious and
> irreparable degradation of the historic values of the TCD that sustain the Tribe.

DSOMF at 49.

Because this consultation should have occurred prior to issuance of the lease, the

Secretary of Agriculture considered those comments and requested that the Secretary cancel the

lease.  DSOMF at 50.

In 2013, Solenex brought this action against Federal Defendants alleging that they had

unreasonably delayed action in their review of the suspension of Solenex's APD.  ECF No. 1.

Solenex sought an order from the Court lifting the suspension of the APD. *Id.*   In July 2015, the

Court found that the Federal Defendants had unreasonably delayed action on the suspension.

ECF No. 52.  The Court subsequently ordered Federal Defendants to notify the Court of the

decision whether to initiate a process for lease cancellation or continue the Section 106 process

for lifting the suspension of the lease.  *Id.*

On March 17, 2016, the Secretary of the Interior sent a letter to Solenex in which she (1)

disapproved Solenex's APD application for Lease No. MTMT53323 pursuant to 43 C.F.R. §

3162.3-1(h)(2) and (2) cancelled the lease pursuant to 43 C.F.R. § 3108.3(d) because it was improperly issued.  ECF No.68-1 at 1.  In that letter, the Secretary explained that she has authority, under her general managerial power over public lands, to cancel leases issued in violation of a statute or regulation.  ECF No.68-1 at 7.  And because the lease authorized surface disturbance without full prior analysis of the environmental consequences of such action, including a full analysis of impacts to natural and cultural resources, the Secretary concluded that BLM and the Forest Service violated NEPA and NHPA in issuing the lease.  ECF No.68-1 at 8. The Secretary further noted that based on her review and the administrative and Congressional protections that have been put in place for the Badger-Two Medicine area since the lease was issued, she determined that surface disturbing activities are incompatible with the irreplaceable natural and cultural resources of the Badger-Two Medicine area. Based on these considerations, the Secretary noted that (1) Solenex's lease was improperly issued as a result of BLM's and the Forest Service's failure to comply with the applicable legal requirements; (2) the agencies could not now correct the procedural defects because the potential harms to the TCD could not reasonably be mitigated; and (3) BLM could not validate the lease consistent with Congress' withdrawal of the area.  ECF No.68-1 at 13.  Solenex amended the complaint to challenge these decisions.  ECF No. 73.

## III.    STANDARD OF REVIEW

This Court reviews the Secretary's lease-cancellation and APD-disapproval decision using the standards for judicial review prescribed by the APA.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990).  First, the Secretary's decision may be set aside if she acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C). The Secretary's interpretation of the scope of her powers under a statute that she administers is

entitled to deference under *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).  *See City of Arlington v. FCC*, 133 S. Ct. 1863 (2013).  The Secretary's view of her authority "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the court[]."  *Entergy Corp. v. Riverkeeper Inc.*, 556 U.S. 208, 218 (2009).

Under the APA, an agency's decision can also be set aside upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This standard of review is "narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).  "To survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n,* 419 F.3d 1194, 1198 (D.C. Cir. 2005)) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).  A reviewing court "will uphold [an agency's] findings, though of less than ideal clarity, if the agency's path may be reasonably discerned . . . ." *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010) (quoting *Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C.Cir.1989)) (internal quotation marks omitted) (alterations in original).  "'[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof.'"  *City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)) (alteration in original).  And "[e]ven assuming [the agency] made missteps . . . the burden is on petitioners to demonstrate that [the agency's] ultimate conclusions are unreasonable."  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1146 (D.C. Cir. 2002).

## IV.    ARGUMENT

The Secretary's power "to cancel [a mineral] lease administratively for invalidity at its inception," *Boesche*, 373 U.S. at 476, is subsumed within her "plenary authority over the administration of public lands, including mineral lands."  *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963).  The Secretary's "general administrative power of cancellation" is circumscribed in only two respects.  *Boesche*, 373 U.S. at 478.  First, Congress may curtail the Secretary's lease-cancellation power by express statutory directive.  *Id.*  Second, the Secretary's discretion to cancel a lease is cabined by the familiar APA constraint that it must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Boesche*, 373 U.S. at 486 (noting that judicial recognition of the lease-cancellation power "do[es] not open the door to administrative abuses" because "final action by the Secretary … [is] subject to judicial review" under the APA).

This case thus presents two basic questions: (1) whether Congress, by statute, expressly withdrew the Secretary's plenary power to cancel Solenex's mineral lease; and (2) whether the Secretary's reasons for cancelling Solenex's Lease (and disapproving its APD) were arbitrary or capricious.  The answer to both questions is "no."  The Supreme Court unanimously recognized the existence and persistence of the Secretary's mineral-lease cancellation power in *Boesche v. Udall*, 373 U.S. 472 (1963), and Solenex's attempts to distinguish that case are unpersuasive.  And with respect to the second issue, Solenex has not shown that "the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Lastly, there is no merit to

Solenex's cursory allegation that the Secretary failed to comply with NEPA before deciding to cancel the company's mineral lease.

## I.      The Secretary Had Authority to Cancel the Lease

Solenex concedes that the Secretary has the statutory authority to administratively cancel invalid leases under some circumstances, but the company contends that the Secretary lacked the power to cancel this specific lease.  Solenex makes four arguments to this end.  First, it argues in effect, that the statutes granting the Secretary open-ended land-management authority and a "general administrative power of [lease] cancellation," *Boesche*, 373 U.S. at 478, silently exempt cancellation of leases of the sort at issue here.  Second, Solenex contends that Section 31 of the MLA, 30 U.S.C. § 188, bars the Secretary from cancelling certain mineral leases on the basis of certain pre-lease factors, notwithstanding the Supreme Court's pronouncement that "[Section] 31 … leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors." *Boesche*, 373 U.S. at 479.  Third, Solenex tries to cast itself as a "bona fide purchaser" whose lease cannot be cancelled by reason of invalidity, *see* 30 U.S.C. § 184(h)(2), even though the MLA's bona-fide-purchaser protection is limited to cancellation on the basis of MLA violations (as opposed to NEPA or NHPA violations).  Fourth, Solenex relies on the common-law doctrine of laches—which does not apply to administrative proceedings, or against the sovereign United States—to argue that the Secretary has no authority to cancel this lease.

### A.      Congress Has Conferred on the Secretary a General Administrative Power of Lease Cancellation

There is no dispute that the Secretary has authority to administratively cancel invalid leases, but Solenex contends that the Secretary lacked the authority to cancel this specific lease.  However, the statutes that grant the Secretary a "*general* administrative power of cancellation" do not distinguish among *specific* types of mineral leases.  *Boesche*, 373 U.S. at 478 (emphasis

added); *see also id.* at 476 n.6 (citing statutes that confer this authority).  "[S]tatutes written in broad, sweeping language should be given broad, sweeping application."  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (Roberts, J.).  It is thus reasonable and permissible under *Chevron* for the Secretary to interpret 43 U.S.C. § 2—which empowers her to "perform * * * all executive duties * * * in anywise respecting * * * public lands"—to enable her to "correct [an] error[]" of her predecessor, who violated NEPA and the NHPA when it issued a lease to Solenex's predecessor-in-interest.  *Boesche*, 373 U.S. at 478.  Moreover, the Secretary's longstanding, consistent use of her authority to cancel a variety of leases based on events that predate lease issuance "surely tends to show that the [agency's] current practice is a reasonable and hence legitimate exercise" of her power.  *Entergy*, 556 U.S. at 224; *see, e.g.*, *D.M. Yates* 74 IBLA 159 (1983); *Estate of Glenn F. Coy Resource Service Co., Inc.*, 52 IBLA 182 (1981); *Fortune Oil Co.,* 69 IBLA 13, (1982); *Penroc Oil Corp. et al*, 84 IBLA 36 (1984); *Sun Exploration and Production Co.*, 95 IBLA 140 (1987); *see generally Knight v. United States*, 142 U.S. 161, 182 (1891).

Nothing in the text or legislative history of those statutes supports Solenex's attempt to carve up the Secretary's cancellation power; its arguments are largely policy-driven and go to the *reasonableness* of the Secretary's exercise of her authority in this circumstance (a question reserved for Part II, *infra*).  But the fact that an administrative agency could exercise its power unreasonably provides no reason to hold that the power does not exist.

**B.**    **Section 31 of the MLA Does Not Withdraw the Secretary's Authority to Cancel Solenex's Lease**

Solenex contends that Section 31 of the MLA, 30 U.S.C. § 188, prohibits the Secretary from cancelling certain mineral leases on the basis of certain pre-lease factors.  This argument is foreclosed by the Supreme Court's unanimous decision in *Boesche*, which held that this specific

Case 1:13-cv-00993-RJL   Document 93-1   Filed 10/03/16   Page 24 of 42

MLA provision "leaves *unaffected* the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors." 373 U.S. at 479 (emphasis added). Section 31 circumscribes the Secretary's cancellation authority "upon the failure of the lessee to comply with any of the provisions of the lease," 30 U.S.C. § 188(b), *but not* upon the failure of a lease to issue lawfully in the first place. Contrary to Solenex's view, the differences between its lease and the lease at issue in *Boesche* are of no moment when it comes to the Secretary's statutory power; the salient point is that, in both instances, the Secretary cancelled the lease based on pre-lease factors, and Section 31 only covers cancellation based on post-lease factors. The reasonableness of the Secretary's reading of Section 31 is evident from the fact that it garnered the support of all nine Justices of the Supreme Court. *See Boesche,* 373 U.S. at 48 ("From the beginnings of the Mineral Leasing Act the Secretary has conceived that he had the power drawn in question here, and Congress has never interfered with its exercise."); *cf. McKay v. Wahlenmaier,* 226 F. 2d 35, 40 (D.C. Cir. 1955) (holding that the Secretary had interpreted his own authority to cancel a lease too narrowly when he did not cancel a lease issued in violation of the regulations).

In reaching this conclusion, the Supreme Court engaged in a detailed review of the MLA and its underlying purpose: "[T]o expand, not contract, the Secretary's control over the mineral lands of the United States." *Boesche*, 373 U.S. at 481. For that reason, the Court rejected the petitioner's argument—an argument that Solenex nevertheless reprises, *see* ECF No. 89-1 at 9-14—that the MLA demonstrated a Congressional intent to restrict the Secretary's administrative authority to cancel invalidly issued leases. *See Boesche,* 373 U.S. at 475 (explaining petitioner's arguments that section 31 of the MLA "is the exclusive source of the Secretary's power to forfeit a lease once it has been issued."); *id.* at 478-79 ("We believe that both the statute on its face and the legislative history of the enactment show that [section] 31 reaches only cancellations based

17

on post-lease events and leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors."). Accordingly, *Boesche* not only forecloses Solenex's narrow reading of the Secretary's lease-cancellation authority, *see* Part I.A, *supra*, but also its argument that Section 31 of the MLA bars cancellation of the company's lease.

Further, the Supreme Court in *Boesche* considered and rejected the two points now raised by Solenex in support of their position that the lease is a vested property interest not subject to cancellation by the Secretary. First, Solenex's contention that the Secretary lacks authority to cancel a lease by administrative proceeding (*see* ECF No. 89-1 at 13-14) was squarely rejected by *Boesche*, which abrogated the Tenth Circuit's decision in *Pan American Petroleum Corp. v. Pierson*, 284 F.2d 649 (10th Cir. 1960), holding to the contrary. 373 U.S. at 483; *see also United States v. Eaton Shale Co.*, 433 F. Supp. 1256, 1271 n.9 (D. Colo. 1977) ("*Boesche* reversed the position of the Tenth Circuit, which had held that a court order was required in order to annul or cancel an oil and gas lease."). Solenex's reliance on *Pan American Petroleum* for the very proposition that the Supreme Court rejected is therefore misplaced.

Second, the Supreme Court "was not persuaded" by the argument, which Solenex also makes here, *see* ECF 89-1 at 8-9, that *Moore v. Robbins*, 96 U.S. 530 (1877), and its progeny confined the Secretary's administrative cancellation power or counseled in favor of treating a lease like a fee title, see *Boesche,* 373 U.S. at 477. Instead, the Supreme Court made clear that "[u]nlike a land patent, which divests the Government of title, Congress under the Mineral Leasing Act has not only reserved to the United States the fee interest in the leased land, but has also subjected the lease to exacting restrictions and continuing supervision by the Secretary." *Id.* at 477-78. As a result, "[s]ince the Secretary's connection with the land continues to subsist, he should have the power, in a proper case, to correct his own errors." *Id.* at 478. Given the distinct

nature of MLA leases, which reserve the Secretary's title, control, and supervision over the land,
cases where the federal government relinquished its power over the land are inapposite.[5]

Solenex's claim also conflicts with the courts of appeals' uniformly broad interpretation
of the authority recognized in *Boesche. See, e.g.*, *Winkler v. Andrus*, 614 F.2d 707, 711 (10th
Cir. 1980) ("The Secretary has broad authority to cancel oil and gas leases for violations of the
Mineral Leasing Act and regulations thereunder, as well as for administrative errors committed
before the lease was issued."); *Hannifin v. Morton*, 444 F.2d 200, 202 (10th Cir. 1971) (applying
*Boesche* to recognize the Secretary's "broad authority" beyond that specifically granted in the
Sulphur Production Act); *Morrow v. Clayton*, 326 F.2d 36, 46 (10th Cir. 1963) (applying
*Boesche* to support the Secretary of Agriculture's authority to cancel fraudulently obtained
allotment transfers).

Finally, contrary to Solenex's claim that *Boesche* should apply only to situations where
the lessee violates an MLA regulation, *see* ECF No. 89-1at 17, courts have followed *Boesche*
where leases were issued based on mistakes made by the Secretary's subordinates. *See Griffin &
Griffin Expl., LLC v. United States,* 116 Fed. Cl. 163, 176 (2014) (recognizing the Secretary of
Interior's authority to "correct the mistakes of his subordinates" by cancelling a lease that was
invalidly issued due to a pre-existing lease); *Grynberg v. Kempthorne*, No. 06-cv-01878, 2008
WL 2445564, at *4 (D. Colo. June 16, 2008) (relying on *Boesche* to conclude the Secretary had
authority to cancel a lease that was issued without Forest Service review as required by
regulation). *Boesche* has also been applied to cases without competing lease applicants. *See*

---

[5] *Boesche* further forecloses Solenex's reliance on the Interior Department's post-MLA decision
in *The Melish Consol. Placer Oil Mining Co v. Testerman*, 53 Interior Dec. 205, 207 (1930), to
support limiting the Secretary's lease-cancellation authority. *See Boesche* 373 U.S. at 483 n.11
(dismissing the language Solenex quotes, ECF No. 89-1 at Pl. Br. 11, as inapposite "dictum").

*Hannifin*, 444 F.2d at 202 (recognizing the Secretary's authority to impose a fee on permit

applicants who applied for permits before the regulation was announced); *Grynberg*, 2008 WL

2445564, at *4.  Solenex's proposed limitations of *Boesche* do not withstand scrutiny.

### C.   Section 27(h) of the MLA (the "Bona Fide Purchaser" Provision) Does Not Withdraw the Secretary's Authority to Cancel Solenex's Lease

Solenex next argues (Br. 19-24) that the Secretary cannot cancel its mineral lease because

the company is a "bona fide purchaser" protected by Section 27(h)(2) of the MLA, 30 U.S.C.

§ 184(h)(2).  But that provision does not shield purchasers from lease cancellation based on

violations of statutes other than the MLA (like NEPA and the NHPA), and in any event, Solenex

would not qualify for bona-fide-purchaser protection under the unique facts of this case.

### 1.   Section 27(h) Does Not Apply Here Because the Secretary Canceled Solenex's Lease Based on Non-MLA Violations

Section 27(h)(2) of the MLA provides that "[t]he right to cancel or forfeit for violation of

any of the provisions of [the MLA] shall not apply so as to affect adversely the title or interest of

a bona fide purchaser of any lease."  30 U.S.C. § 184(h)(2).  By its terms, this provision applies

only in cases where the cancellation is "for violation of" the MLA.  *Id.*; *see Wallis v. Pan Am.

Petroleum Corp.*, 384 U.S. 63, 69 n.6 (1966) (noting that Section 184(h) protects the rights of

bona fide purchasers "if the Secretary seeks to cancel a lease *for violations of the Act*" (emphasis

added)); *Winkler*, 614 F.2d at 711 ("The Secretary has broad authority to cancel oil and gas

leases *for violations of the Mineral Leasing Act and regulations thereunder . . . .*" (emphasis

added)).  Section 27(h) says nothing about cancellation for violation of any other statute.  Where,

as here, the Secretary cancels a lease due to violation of NEPA and the NHPA prior to issuance,[6]

---

[6] The Secretary found that Solenex's lease was issued in violation of NEPA and the
NHPA because (1) the agencies failed to develop an Environmental Impact Statement, which is
required prior to issuance of lease that allows for surface disturbance; (2) the Environmental

*see* ECF No. 68-1 at 8, the bona-fide-purchaser provision simply does not apply.  This Court "must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  The Secretary's interpretation of the bona fide purchaser provision is certainly reasonable, if not compelled, in light of the statutory language.

Here again, the Supreme Court's decision in *Boesche* supports the Secretary's reading of the MLA.  The Court there observed that it would be absurd to read Section 31 of the Act as preventing the Secretary from cancelling a lease based on pre-lease errors, because this would leave the Secretary "wholly unable  . . . to remedy such illegal action." *Id.* at 479. The same is true here.  If Section 27(h) extends bona-fide-purchaser protections to situations in which the lease was issued in error, without compliance with non-MLA requirements of which a purchaser might be unaware, the Secretary might have to honor an illegally-issued lease and would have no opportunity to rectify its error.  The bona-fide-purchaser provision is intended to cover situations in which post-lease events lead to a violation of the MLA; it shields innocent purchasers from being penalized based on the bad acts of prior leaseholders.  As *Boesche* explained, "[i]t would . . . be surprising to find in the [MLA], which was intended to expand, not contract, the Secretary's control over the mineral lands of the United States, a restriction on the Secretary's

---

Assessment that the agencies relied upon in approving the lease was "defective" because it failed to include a true no-action alternative; (3) the Secretary did not formally adopt an Environmental Assessment prepared by the United States Forest Service or do an independent environmental review; and (4) the Secretary had not adequately considered impacts to cultural resources.  ECF No. 68-1, at 8-11.  The Secretary also found that, by issuing the lease without complying with NEPA and NHPA, the agency "failed to discharge [its] trust responsibilities to the [Blackfeet] Tribe."  *Id.* at 11.

power to cancel leases issued through administrative error—a power which was then already firmly established." 373 U.S. at 481.[7]

### 2. Solenex Is Not a Bona Fide Purchaser For Value

Even if the bona fide purchaser protections applied to situations in which the Secretary seeks to cancel a lease for failure to comply with NEPA and the NHPA, they do not apply here because Solenex is not a "bona fide purchaser." A bona fide purchaser is one who has "acquired his interest in good faith, for valuable consideration, and without notice of" any alleged defects in the lease. *Winkler*, 614 F.2d at 711; *Sw. Petroleum Corp. v. Udall*, 361 F.2d 650, 655 (10th Cir. 1966). Solenex is not a bona fide purchaser for two reasons: (1) it had notice of the legal issues surrounding the lease at the time of acquisition, and (2) it did not provide valuable consideration for the lease.

As to the first issue, Solenex had constructive knowledge that the Secretary had not completed an Environmental Impact Statement prior to lease issuance and that such a statement was required under the precedent of the District of Columbia and Ninth Circuit Courts of Appeals. *Sierra Club*, 717 F.2d at 1415; *accord Bob Marshall Alliance*, 852 F. 2d 1223; *Conner*, 848 F.2d 1441. A purchaser has constructive notice when "facts are sufficient to put an ordinarily prudent man on inquiry, an inquiry which, if followed with reasonable diligence,

---

[7] In *Clayton W. Williams, Jr.*, 103 IBLA 192 (1988), the Interior Board of Land Appeals observed that "whether a party qualifies for bona fide purchaser protection turns on the answers to "two discrete questions": (1) whether the land in question was eligible for mineral leasing at the time it was leased; and (2) whether the current leaseholder is "a bona fide purchaser for value." *Id.* at 211. But the Board neglected to answer the predicate question (apparently not presented) whether the lease was cancelled "for violation of any of the provisions of [the MLA]." 30 U.S.C. § 184(h)(2). The Board went on to hold that the Secretary had improperly cancelled a lease, on the basis of a NEPA violation, because the appellant was a bona fide purchaser. The Board's holding is not persuasive on this point, however, in light of its failure to address the underlying issue of statutory interpretation.

would lead to the discovery of defects in the title or of equitable rights of other affecting the property." *See Sw. Petroleum Corp*, 361 F.2d at 656.  Because Solenex is the creation of and is managed by the original lessee, Sidney Longwell, and because the absence of a timely Environmental Impact Statement was a matter of public record, Solenex had constructive notice of at least the NEPA violation.

In 1982, BLM issued the Lease to Sidney Longwell.  ECF No. 89-2 ¶ 11. Mr. Longwell then assigned his interest in the Lease to Fina Oil and Chemical Company in 1983. *Id.* ¶ 22.  He retained involvement with the Lease, however, because he reserved a percentage of the value of all oil and gas produced on the Lease. *Id.*  In 1985, BLM approved an Application for Permit to Drill ("APD") an exploratory well on the Lease, and a number of organizations and individuals appealed the decision to the IBLA on the grounds that BLM failed to comply with NEPA. *Id.* ¶ 30-31.  The IBLA set aside BLM's decision and remanded the case to BLM. *Id.* ¶ 32.  On October 1, 1985, at the lessee's request and because of the legal challenge, lease operations were suspended. *Id.* ¶ 33-34.  That suspension has never been lifted.  In 1993, following BLM's approval of the 1993 APD, several plaintiffs filed a complaint in U.S. District Court for the District of Montana asserting, among other things, that BLM violated NEPA by failing to complete an EIS before the Lease was issued.  That case, *National Wildlife Federation v. Robertson*, CV 93-44 (D. Mont. filed April 24, 1993), has never been resolved.[8]  On July 1, 2000, Fina Oil and Chemical Company assigned its interest in the lease back to Mr. Longwell and, on January 10, 2005, Mr. Longwell incorporated Solenex LLC and assigned his interest in the Lease to that company.  ECF No. 89-2 ¶¶ 68, 73.  Therefore, Solenex acquired the lease with

---

[8] The Secretary later suspended the 1993 APD approval and extended the lease suspension for the Lease every year until 1998, when the Secretary determined that the suspension would remain in effect until completion of the historic property review required by the NHPA.

full knowledge that operations were suspended in 1985 because of a legal challenge regarding the NEPA and NHPA analyses.   Solenex cannot credibly claim that it lacked constructive (or even actual) notice of the potential NEPA and NHPA violations in this case when it is a creation of Mr. Longwell, who has been involved with this Lease from its inception. *See Winkler*, 614 F.2d at 713 ("[A]ssignees of federal oil and gas leases who seek to qualify as bona fide purchasers are deemed to have constructive notice of all of the [agency] records pertaining to the lease at the time of the assignment.").

Second, Solenex cannot be a bona fide purchaser because it did not pay valuable consideration for the Lease.  Solenex was assigned the Lease by Mr. Longwell.  ECF No. 89-2 ¶ 73.  It paid no valuable consideration in exchange for the assignment.  Where a plaintiff has not provided any valuable consideration in exchange for a lease, the rationale for the bona fide purchaser protection does not apply.  The protection is intended to prevent innocent investors and operators from falling victim to the bad acts of prior leaseholders, thereby losing out on the consideration they put forward in exchange for the Lease. *See Winkler*, 614 F.2d at 711.  Here, Solenex has nothing to lose.  Solenex's attempt to stand in the shoes of Fina is disingenuous at best, given that Fina paid its consideration *to Mr. Longwell*, Solenex's creator and owner.  Under the company's logic, a lessee could manufacture bona-fide-purchaser protection by assigning the lease to a shell company "for value" and then directing the company to reassign it back to the original leaseholder.  Solenex does not (and cannot) cite any case allowing a lessee to shield itself in this manner.

Simply put, Mr. Longwell, through Solenex, is attempting to invoke the shield of the bona fide purchaser protection despite the fact that he himself was the original lessee and has remained aware of and involved with the Lease from its inception until now.  This Court should

not allow Solenex to abuse the protections of Section 27(h) at the expense of the public's and the Tribe's strong interest in protecting irreplaceable resources within the leased area.

### D.    The Secretary's Lease-Cancellation Authority Is Not Time-Limited

As argued above, the Secretary has the authority to cancel Solenex's lease and that authority persists absent express withdrawal by statue.  Solenex argues that the Secretary's action here is barred by laches, but the company cites no authority for the proposition that an agency's statutory authority can atrophy through disuse.[9]

Laches is inapplicable here for two reasons. First, laches is a common-law defense to a claim brought in court, not a weapon with which a plaintiff can challenge administrative action. Solenex does not point to any precedent holding that *agency action* (as opposed to *a claim in a lawsuit*) is barred by laches.  Second, and relatedly, the United States and its agencies are not subject to the equitable defense of laches when acting in a sovereign capacity.  "It has been established past all controversy or doubt" that the "United States are not . . . barred by any laches of their officers, however gross, in a suit . . . to enforce a public right, or to assert a public interest." *United States v. Beebe,* 127 U.S. 338, 344 (1888); see also, *e.g., Guaranty Trust Co. v. United States,* 304 U.S. 126, 132-133 (1938); *Chesapeake & Del. Canal Co. v. United States,* 250 U.S. 123,125 (1919); *United States v. Verdier,* 164 U.S. 213, 219 (1896); *United States v. Summerlin*, 310 U.S. 414 (1940).[10]  The immunity of the sovereign to a laches defense is historic and implied in all federal enactments unless expressly waived by statute.  *See Bd. of Comm'rs v. United States*, 308 U.S. 343, 351 (1939).  Solenex relies on *Clearfield Trust v. United States*, 318

---

[9] While the passage of time could be relevant to the reasonableness of a given lease cancellation, it cannot eliminate the statutory authority.

[10] Plaintiff's citation to *Powell v. Zuckert* is unavailing.  In that case, it was the government that sought to assert the defense of laches against a former employee.  366 F.3d 634 (D.C. Cir. 1966)

U.S. 363 (1943), but the federal government functioned as a mere commercial actor in that case, rather than in its sovereign capacity.

Solenex incorrectly contends that the Secretary cannot cancel its lease under 28 U.S.C. § 2462, ECF No. 89-1 at 24-26, which bars "an action, suit, or proceeding for the enforcement of any civil fine, penalty or forfeiture" brought more than 5 years after the accrual date.[11]  This provision is inapplicable because the Secretary's administrative decision to cancel Solenex's lease is not an enforcement proceeding.  Solenex suggests that the cancellation will result in a forfeiture, but forfeiture in this context means "something imposed in a punitive way for an infraction of a public law".  *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915).  The Secretary's decision to initiate a process to cancel the lease is not a punitive response to any infraction of law committed by Solenex.  It is, instead, an exercise of the Secretary's statutory authority to cancel a mineral lease.  The limitations in 28 U.S.C. § 2462 simply do not apply.[12]

## II.   The Secretary's Decision to Cancel the Lease Was Not Arbitrary or Capricious

Solenex contends that the Secretary's decision cancelling its lease was arbitrary and capricious in various respects.  First, the company argues that the original lease was issued in compliance with both NEPA and the NHPA (and that the Secretary is estopped from arguing otherwise).  Second, Solenex insists that the Secretary had discretion to correct legal infirmities stemming from the lease's issuance.  Notably, the company does not challenge the Secretary's independent and alternative finding that, "even if BLM retained discretion to validate this lease,"

---

[11] Proceedings in the *National Wildlife Federation v. Robertson* court case were stayed from 1993 until the case was administratively closed in 1997.  Plaintiffs moved to reopen the case on October 30, 2015.

[12] Likewise, Plaintiff's citation to 43 U.S.C. § 1166 is irrelevant to this case as that section applies to patents issued under the Mining Law of 1872.

cancellation would be proper in this situation.  ECF No. 68-1, at 13.  Third, Solenex argues that

the Secretary violated the APA and department regulations by cancelling the APD.  All three

arguments lack merit.

> **A**.      **The Original Lease Was Legally Infirm**
>
> **1.      The Lease Was Not Issued in Compliance with NEPA**

The Secretary's conclusion that the lease was issued without properly complying with

NEPA and the NHPA was well founded.  First, the Secretary did not comply with NEPA before

issuing the lease.  The Secretary must prepare an EIS before issuing a mineral lease "if the

[agency] chooses not to retain authority to preclude all surface disturbing activities."  *Sierra*

*Club*, 717 F.2d at 1415; *accord Bob Marshall Alliance*, 852 F. 2d 1223; *Conner*, 848 F.2d 1441

The lease at issue here allows surface occupancy subject to applicable lease stipulations *without*

an explicit prohibition on surface-disturbing activities.  The Secretary thus made an "irrevocable

commitment to allow *some* surface disturbing activities … without fully assessing the possible

environmental consequences."  *Peterson*, 717 F.2d at 1415.  Solenex interprets case law from the

Tenth Circuit to suggest otherwise, but the law of *the D.C. Circuit* compels this Court to hold

that the lease was issued in violation of NEPA.  *Id.*

Nor did any subsequent NEPA analysis correct this deficiency.  Solenex argues that in

both the 1991 and 1993 decisions to approve an APD, [13] the agencies found that any NEPA

violation had been cured by an EIS prepared in 1990.[14]  Solenex ignores the fact that neither the

---

[13] The 1991 APD was approved by the BLM.  The 1993 APD was approved by the BLM with the concurrence of the Assistant Secretary.

[14] The 1990 FEIS recognized that, under its no-action alternative, previously issued leases would remain in place, and future APDs could be submitted and considered.  ECF No. 45-3.  Thus, the no-action alternative was not intended to correct the "no-lease" or "no surface occupancy" deficiency of the leasing decision.  The BLM's previously stated opinion that the 1990 FEIS cured any NEPA violation is not supported by the relevant Ninth Circuit case law.

1991 nor the 1993 decision was implemented.  Rather, after numerous groups challenged the

1993 APD decision on NEPA and other grounds in District Court for the District of Montana, the

Secretary suspended the 1993 APD approval.  BLM then continued the suspension of lease

operations, which remains in place.  The agencies' suspended 1993 APD decision, therefore,

does not represent the final official position on the part of the Secretary that the lease was

properly issued.  Rather, the Secretary has now determined that the legal defects associated with

the original lease decision, as identified by the D.C. Circuit in *Peterson*, have not been corrected,

and that the lease is voidable.

### 2.     The Lease Was Not Issued in Compliance With the NHPA

BLM also determined that the lease was issued in violation of the NHPA because the

Forest Service and BLM failed to adequately consider the effects of oil and gas development on

cultural resources, including religious values and activities, within the Badger-Two Medicine

area prior to lease issuance.  Although the NEPA analysis for the leasing action included some

tribal consultation to comply with the American Indian Religious Freedom Act ("AIRFA"),

because the leasing action did not immediately authorize surface disturbance, the agencies

mistakenly delayed full compliance with NHPA.  The Forest Service recognized that "[s]urface

disturbing operations associated with oil and gas activities may have an impact on cultural

resources," but it determined that compliance with the NHPA and AIRFA "will be required at

the time soil disturbing activities are proposed."  EA at 54.

Such a deferral here was improper.  While Solenex is correct that agencies can sometimes

defer the NHPA process until surface disturbing activities are specifically contemplated (ECF

No.89-1 at 39), as the *Conner* decision explains, where, as here, the lease sale involves an

irretrievable commitment of resources, the agencies were required to undertake an analysis of

impacts to cultural resources before lease issuance.  Here the Forest Service here did not consult,

as required, to locate and record cultural resources and guarantee access and preservation of

religious sites.  An agency's failure to engage in a reasonable and good faith effort to identify

historic properties of religious and cultural significance is a violation of the NHPA.  *See Pueblo*

*of Sandia v. United States*, 50 F.3d 856, 862-63 (10th Cir. 1995) (USFS' evaluation of the Las

Huertas Canyon for inclusion in the National Register was not reasonable or in good faith).

### 3.     The Secretary is Not Estopped from Finding that the Lease Was Issued in Violation of NEPA and the NHPA

Solenex also argues that the Secretary is prohibited from cancelling the lease under the

doctrine of equitable estoppel.  ECF No. 89-1 at 26-28.  Solenex is wrong.  As with the doctrine

of laches, the dispositive question of whether the Secretary has the authority to cancel a lease

after issuance is not answered by looking at equitable principles; it is answered by looking at her

statutory authority to do so.  Solenex's reliance on the doctrine of equitable estoppel to

demonstrate that the Secretary is without authority to cancel the lease at this juncture is therefore

misplaced.  A federal agency is fully entitled to change its mind, *see, WorldCom, Inc. v. FCC*,

238 F.3d 449, 460 (D.C. Cir. 2001), especially when it reexamines an indisputably erroneous

decision.  It would be nonsensical to *prohibit* the Secretary from concluding that her own action

was legally infirm (and acting on that conclusion), when this Court would be *compelled* to reach

that same conclusion under binding circuit precedent.  *See Peterson*, 717 F.2d at 1415.

But even if equitable estoppel could apply in a case like this one, the facts do not support

it.  "From [its] earliest cases, [the Supreme Court] ha[s] recognized that equitable estoppel will

not lie against the Government as it lies against private litigants." *Office of Personnel Mgmt. v.*

*Richmond*, 496 U.S. 414, 419 (1990).  The Government "may not be estopped on the same terms

as any other litigant." *Heckler v. Cmty. Health Servs. Of Crawford Cty., Inc.*, 467 U.S. 51, 60

(1984).  While the Court has not reached the question whether estoppel may ever be appropriate against the Government, even in an extreme case, *Richmond*, 496 U.S. at 423, it has in fact "reversed every finding of estoppel that [it] ha[s] reviewed," *id.* at 422.

The traditional elements of estoppel require that: (1) the party to be estopped must know the facts; (2) he must intend that his conduct be acted upon; (3) the injured party must be ignorant of the true facts; and (4) the injured party must rely on the former party's conduct to his injury.[15]  *United States v. Wharton,* 514 F.2d 406, 412 (9th Cir. 1975).  If estoppel may ever be appropriate against the Government, a party seeking to estop the Government would at least also be required to show that: (1) the Government engaged in "affirmative misconduct"; (2) the Government's conduct threatens to result in a serious injustice; and (3) estoppel would not unduly damage the public interest.  *See Pierce v. SEC*, 786 F.3d 1027 (D.C. Cir. 2015); *Keating v. FERC*, 569 F.3d 427 (D.C. Cir. 2009).

Solenex cannot show that the Secretary engaged in "affirmative misconduct."  Rather, the Secretary has endeavored since 1985 to comply with all applicable statutes and regulations governing the lease and its operations.  Moreover, because lease operations have been suspended since 1985, Solenex has been under no legal or financial obligation to take action to develop the lease.  And, because the lease is cancelled, Solenex is entitled to a refund of amounts paid for the lease so the decision to cancel the lease would not cause serious injustice.  *See* ECF No. 68-1 14.

To the extent that Solenex contends that this Court should find the government estopped from cancelling its lease because the Secretary failed to consider any attendant harms to Solenex, that argument likewise fails.  The Department need not weigh the relative harms to Solenex

---

[15] Solenex has not alleged that the Secretary breached a contract or deprived the company of constitutionally-protected property rights; to make that claim, Solenex would need to proceed under the Tucker Act, 28 U.S.C. 1491, or the Little Tucker Act, 28 U.S.C. 1346.

against the harms to the environment and tribal cultural interests where such an inquiry would be futile. Solenex's suggestion in a footnote that the agency did not adequately "consider[] the time and money [it] invested … in seeking to develop the lease" implicates the Secretary's *reasoning*, not her *statutory authority*. ECF No. 89-1, at 28 n.17. But Solenex has not argued that the Secretary acted arbitrarily or capriciously by disregarding the company's reliance interests. This Court need not and should not consider any such argument because it has been forfeited. *See Mingo Logan Coal Co. v. EPA*, WL 3902663, at *8-*9 (D.C. Cir. July 19, 2016) (deeming APA reliance-interests argument forfeited); *see generally Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997) (holding that argument raised in a footnote was forfeited).

In sum, given the violations of NEPA and NHPA at the time of lease issuance, the BLM has reasonably concluded that the lease is voidable. That decision is neither arbitrary and capricious nor contrary to law.

**B.**    **The Secretary Reasonably Concluded that She Lacked Discretion to Correct the Deficiencies in the Lease**

Second, Solenex insists that the Secretary had discretion to correct legal infirmities stemming from the lease's issuance. ECF No. 89-1 at 40-41. While it may be true that the Secretary could engage in further NEPA analysis, such an analysis would be futile for two reasons.

First, as discussed above, Congress has permanently prohibited the issuance of new oil and gas leases in the Badger-Two Medicine area. Tax Relief and Health Care Act of 2006, P.L. 109-432, § 403. Given this prohibition, the Secretary concluded in its decision letter to Solenex that the "Congressional prohibition renders such additional [NEPA] analysis immaterial" and it would "be illegal to validate *and in effect reissue*" Solenex's lease. ECF No. 68-1 at 13

31

(emphasis added).  Second, the NHPA process led to the recommendation from the ACHP to revoke the APD, cancel the lease, and ensure that future mineral development does not occur because there was no way to satisfactorily mitigate the impacts of mineral development in the area.  *Id.* The Forest Service concurred in that recommendation.  Considering these factors, among others, the BLM concluded that administrative lease cancellation under its statutory authority to manage public lands is the most appropriate course of action.  Solenex's argument that correction not cancellation was the most appropriate course of action elides these essential facts.

Even if Solenex is correct that the Secretary had discretion to correct the legal infirmities associated with issuance of this lease, the company does not contest the Secretary's alternative finding that she would cancel the lease "even if BLM retained discretion to validate this lease here."  ECF No. 68-1, at 13.  Because that unchallenged finding constitutes an independent basis for the Secretary's lease-cancellation decision, this Court should uphold that decision whether or not the Secretary was correct in determining that she lacked discretion in this instance.

C.      **The Decision to Deny the APD is Not Arbitrary or Capricious**

Solenex briefly contends that that the Secretary violated the APA and department regulations by cancelling the APD.  These arguments largely rehash the company's previous theories (ECF No. 89-1 at 43), but a couple stand-alone arguments merit separate mention.  First, Solenex contends that the 35-day timeframe for APD disapproval in 43 C.F.R. § 3162.2-1(h)(2) applies here, rendering disapproval of the APD arbitrary and capricious.  ECF No. 89-1 at 43.  Not so.  Solenex's lease operations have been suspended since July 1, 1998 (B-0020:FS002438-2439).  Given this ongoing and uncontested suspension, the provisions in Section 3162.2-1

governing the timing of APD disapproval logically cannot apply.  Second, Solenex asserts the

APD is akin to a license and that it was denied "an opportunity to be heard" under 5 U.S.C. §

558(c).  ECF No. 89-1 at 43-444.  But Solenex has not shown that its APD is an "application"

made for a license required by law as contemplated by Section 558; nor does it cite any authority

extending this provision to analogous circumstances to those presented here.  5 U.S.C. § 558.  In

all events, Section 558 exempts cases like this one that involve the public interest.  Congress has

suspended the entire Badger-Two Medicine area from lease development, in a clear expression

of the strong public interest at stake.  5 U.S.C. § 558 (c).  In short, Solenex has not shown that

the Secretary's disapproval of the APD was arbitrary and capricious.

### III.      The Secretary is Not Required to Conduct a NEPA Analysis for the Cancellation Decision

The Secretary's cancellation of the lease was not a major federal action triggering NEPA

review because it does not change the environmental status quo.  Nonetheless, Solenex argues

that cancelling a property interest is a major federal action. ECF No. 89-1 at 42.

As a threshold matter, Solenex cannot challenge the Secretary's decision on NEPA

grounds because the company falls outside the zone of interests of that statute.  *See generally*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).  "Although

NEPA states its goals in sweeping terms of human health and welfare, these goals are *ends* that

Congress has chosen to pursue by means of *protecting the physical environment*." *Metropolitan*

*Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983) (emphasis altered).

Accordingly, "a NEPA claim may not be raised by a party with no claimed or apparent

environmental interest."  *Town of Stratford v. FAA,* 285 F.3d 84, 88 (D.C. Cir. 2002).  Here,

Solenex asserts only an *economic* interest in oil-and-gas development.  ECF No. 89-1, at 42.  If

vindicated, however, that interest would be "more likely to frustrate than to further [NEPA's]

statutory objectives" by *degrading* the physical environment. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987).  Solenex relies on the supposed purpose and intent of *the MLA*, but that has no bearing on whether the company has a cause of action under *NEPA*.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (explaining that a plaintiff must fall within the zone of interests of "the statute whose violation is the gravamen of" its claim).

Even if Solenex's NEPA claim is properly before the Court, it should be denied because it lacks merit.  The cancelled lease has never been developed, and thus its cancellation does not alter the environmental status quo.  To the contrary, the cancellation preserves what is currently an undeveloped and relatively remote place.  Where, as here, the agency action maintains the environmental status quo, NEPA's procedures simply do not apply.  *See, e.g.*, *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 1003 (D.C. Cir. 1979) (no EIS required when government leased pre-existing parking facility to management firm because there was no change in the status quo); *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997) ("Because the new national policy maintained the substantive *status quo,* it cannot be characterized as a 'major federal action" under NEPA."); *Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002) ("NEPA procedures do not apply to federal actions that maintain the environmental status quo").

## V.    CONCLUSION

For the foregoing reasons, the Court should grant the Secretary's cross-motion for summary judgment and deny Solenex's motion for summary judgment.

Dated October 3, 2016

Respectfully submitted,

JOHN C CRUDEN

Assistant Attorney General

/s/ Ruth Ann Storey
Ruth Ann Storey
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C.  20044
(202) 305-0493
ruth.ann.storey@usdoj.gov

Counsel of Record for Defendant