# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SOLENEX LLC, | ) | Civil Case No. 13-00993 (RJL) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| SALLY JEWELL, *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

---

**SOLENEX'S CONSOLIDATED OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SOLENEX'S MOTION FOR SUMMARY JUDGMENT**

---

Steven J. Lechner, D.D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiff

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iv

GLOSSARY .............................................................................................................. xiv

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.      THE SECRETARY'S CANCELLATION OF THE LEASE WAS
        *ULTRA VIRES*................................................................................................. 1

        A.      The Secretary Has No Inherent, Express, Or Implied Authority,
                To Administratively Cancel A Lease For An Alleged Pre-Lease
                Violation After Title Thereto Has Vested In A Private Party.............. 1

        B.      *Boesche* Confirms That The Secretary Lacked Authority To
                Cancel Solenex's Lease ........................................................................ 6

II.     THE SECRETARY'S CANCELLATION OF THE LEASE WAS
        UNLAWFUL BECAUSE SOLENEX IS ENTITLED TO *BONA FIDE*
        PURCHASER PROTECTION .......................................................................... 12

        A.      Solenex Is Entitled To BFP Protection Under The MLA And
                The Common Law.................................................................................. 13

        B.      Solenex Had No Notice Of Any Defects In The Title Of The
                Lease ...................................................................................................... 18

        C.      Solenex Provided Valuable Consideration Entitling It To BFP
                Protection............................................................................................... 24

III.    THE SECRETARY'S CANCELLATION OF THE LEASE WAS
        BARRED BY THE PASSAGE OF TIME ......................................................... 26

IV.     THE SECRETARY IS ESTOPPED FROM ASSERTING THAT THE
        LEASE WAS IMPROPERLY ISSUED AFTER REPEATEDLY
        REPRESENTING THAT THE LEASE WAS VALID AND
        PROPERLY ISSUED FOR MORE THAN 33 YEARS................................... 32

V.      CONTRARY TO THE SECRETARY'S NEW POSITION, THE
        LEASE WAS PROPERLY ISSUED................................................................. 37

        A.      There Were No NEPA Violations In The Issuance Of The Lease ...... 37

B.      There Were No NHPA Violations In The Issuance Of The Lease......   40

VI.     THE SECRETARY'S CANCELLATION OF THE LEASE WAS
        ARBITRARY AND CAPRICIOUS ...............................................................   43

VII.    THE SECRETARY'S DISAPPROVAL OF THE APPROVED APD
        WAS UNLAWFUL ......................................................................................   44

CONCLUSION .................................................................................................   45

CERTIFICATE OF SERVICE .................................................................................   46

# TABLE OF AUTHORITIES

(* denotes cases primarily relied upon)

**Page**

**Cases**

*3M Co. (Minn. Min. & Mfg.) v. Browner,*
    17 F.3d 1453 (D.C. Cir. 1994) ............................................................................... 28

*Adams v. Woods,*
    6 U.S. 336 (1805) ............................................................................... 27

*Air N. Am. v. Dep't of Transp.,*
    937 F.2d 1427 (9th Cir. 1991) ............................................................................... 45

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors,*
    745 F.2d 677 (D.C. Cir. 1984) ............................................................................... 37

*Best v. Humboldt Placer Min. Co.,*
    371 U.S. 334 (1963) ............................................................................... 9

*Block v. Pitney Bowes Inc.,*
    952 F.2d 1450 (D.C. Cir. 1992) ............................................................................... 43

*Bob Marshall All. v. Hodel,*
    852 F.2d 1223 (9th Cir. 1988) ............................................................................... 40

*\*Boesche v. Udall,*
    373 U.S. 472 (1963) ............................................................................... 7, 8, 9, 10

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974) ............................................................................... 19

*Brown v. Sheets,*
    148 S.E. 233 (N.C. 1929) ............................................................................... 26

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ............................................................................... 14

*California v. Nevada,*
    447 U.S. 125 (1980) ............................................................................... 30–31

*Cameron v. United States,*
    252 U.S. 450 (1920) ............................................................................... 9

*Cent. United Life Ins. Co. v. Burwell,*
    827 F.3d 70 (D.C. Cir. 2016) ............................................................................... 2

*Chapman v. Sheridan-Wyo. Coal Co.*,
    338 U.S. 621 (1950).................................................................................... 15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984).................................................................................... 4

*Chicago, B. & Q.R. Co. v. Chicago*,
    166 U.S. 226 (1897).................................................................................... 35

*Clarke v. Securities Indus. Ass'n*,
    479 U.S. 388 (1987).................................................................................... 36

*Colo. Coal & Iron Co. v. U.S.*,
    123 U.S. 307 (1887).................................................................................... 12

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ................................................................. 20, 23

*Cont'l Oil Co. v. United States*,
    184 F.2d 802 (9th Cir. 1950) ..................................................................... 31

*Costello v. United States*,
    365 U.S. 265 (1961).................................................................................... 30

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*,
    655 F.3d 1000 (9th Cir. 2011) ................................................................. 38

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981).................................................................................... 11

*Ewert v. Bluejacket*,
    259 U.S. 129 (1922).................................................................................... 31

*Fed. Crop Ins. Corp. v. Merrill*,
    332 U.S. 380 (1947).................................................................................... 21, 30

*Fox-Greenwald Sheet Metal Co. v. Markowitz Bros.*,
    452 F.2d 1346 (D.C. Cir. 1971).................................................................. 25

*Friends of Boundary Waters Wilderness v. Dombeck*,
    164 F.3d 1115 (8th Cir. 1999) ................................................................. 36

*FTC v. Manager, Retail Credit Co., Miami Branch Office*,
    515 F.2d 988 (D.C. Cir. 1975)................................................................... 5

*Fund For Animals v. Norton,*
   281 F. Supp. 2d 209 (D.D.C. 2003) ........................................................... 36

*Geosearch, Inc. v. Andrus,*
   508 F. Supp. 839 (D. Wyo. 1981) ............................................................. 14, 27

*Grynberg v. Kempthorne,*
   No. 06-cv-01878, 2008 WL 2445564 (D. Colo. 2008) ........................................ 12

*Harvey v. Udall,*
   384 F.2d 883 (10th Cir. 1967) ................................................................ 14

*Hartshorn v. Day,*
   60 U.S. 211 (1856) ........................................................................... 4

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,*
   467 U.S. 51 (1984) ........................................................................... 32

*Heffernan v. City of Paterson, N.J.,*
   136 S. Ct. 1412 (2016) ....................................................................... 30

*Hibbs v. Winn,*
   542 U.S. 88 (2004) ........................................................................... 5

*Johnson v. SEC,*
   87 F.3d 484 (D.C. Cir. 1996) ................................................................ 28

*Kansas v. Colorado,*
   514 U.S. 673 (1995) ......................................................................... 30

*Keating v. FERC,*
   569 F.3d 427 (D.C. Cir. 2009) ............................................................... 32, 33

*King v. Burwell,*
   135 S. Ct. 2480 (2015) ...................................................................... 15

*Lykins v. McGrath,*
   184 U.S. 169 (1902) ......................................................................... 25

*Lynch v. United States,*
   292 U.S. 571 (1934) ......................................................................... 10

*Marvin M. Brandt Revocable Trust v. United States,*
   134 S. Ct. 1257 (2014) ...................................................................... 11, 18

*Medellin v. Texas*,
  552 U.S. 491 (2008)................................................................  11

*Mich. v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001)..............................................  2

*Minney v. United States Office of Pers. Mgmt.*,
  130 F. Supp. 3d 225 (D.D.C. 2015) ........................................  36

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
  530 U.S. 604 (2000)................................................................  31

*Monongahela Navigation Co. v. United States*,
  148 U.S. 312 (1893)................................................................  35

*Moore v. Robbins*,
  96 U.S. 530 (1877)..................................................................  3

*Montana Wilderness Ass'n v. Fry*,
  310 F. Supp. 2d 1127 (D. Mont. 2004)....................................  20

*Motor Vehicle Mfrs. Ass'n of U.S. v. Ruckelshaus*,
  719 F.2d 1159 (D.C.Cir.1983)................................................  5

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................  *passim*

*Naartex Consulting Corp. v. Watt*,
  722 F.2d 779 (D.C. Cir. 1983)................................................  23

*Negusie v. Holder*,
  555 U.S. 511 (2009)................................................................  8

*N.Y. State Dep't of Social Servs. v. Dublino*,
  413 U.S. 405 (1973)................................................................  15

*\*Noble v. Union River Logging R. Co.*,
  147 U.S. 165 (1893)................................................................  10

*Occidental Life Ins. Co. of Cal. v. EEOC*,
  432 U.S. 355 (1977)................................................................  31

*Office of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990)................................................................  32, 35

*Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y. State*,
    470 U.S. 226 (1985)................................................................... 30

*Orion Reserves Ltd. P'ship v. Norton*,
    No. 04-cv-0791, 2006 WL 1126810 (D.D.C. Mar. 31, 2006)................................ 28, 29

*Orion Reserves Ltd. P'ship v. Salazar*,
    553 F.3d 697 (D.C. Cir. 2009)................................................................... 28

*\*Pan Am. Petroleum Corp. v. Pierson*,
    284 F.2d 649 (10th Cir. 1960) ................................................................... 4, 6, 7, 27

*Park County Res. Council, Inc. v. U.S. Dep't of Agric.*,
    817 F.2d 609 (10th Cir.1987) ................................................................... 16, 20, 38

*Pfister v. Cow Gulch Oil Co.*,
    189 F.2d 311 (10th Cir. 1951) ................................................................... 31

*Pierce v. SEC*,
    786 F.3d 1027 (D.C. Cir. 2015)................................................................... 32, 33

*Powell v. Zuckert*,
    366 F.2d 634 (D.C. Cir. 1966)................................................................... 29, 30

*Prewit v. Wilson*,
    103 U.S. 22 (1880)................................................................... 24

*Proffitt v. FDIC*,
    200 F.3d 855 (D.C. Cir. 2000)................................................................... 29

*Rhode Island v. Massachusetts*,
    45 U.S. 591 (1846)................................................................... 31

*Rocky Mountain Oil & Gas Ass'n v. Watt*,
    696 F.2d 734 (10th Cir. 1982) ................................................................... 4

*Root v. Shields*,
    20 F. Cas. 1160 (C.C. D. Neb. 1868) ................................................................... 20

*Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994)................................................................... 4

*Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
    38 F.3d 1224 (D.C. Cir. 1994)................................................................... 4

*S. Utah Wilderness Alliance v. U.S. Dep't of Interior,*
    No. 06-cv-342, 2007 WL 2220525 (D. Utah 2007)...............................................   43

*Sierra Club v. Peterson,*
    717 F.2d 1409 (D.C. Cir. 1983).........................................................................   4, 20

*Smiley v. Citibank (S. Dakota), N.A.,*
    517 U.S. 735 (1996).............................................................................................   37

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engin'rs,*
    531 U.S. 159 (2001).............................................................................................   2, 11

*Stanley v. Schwalby,*
    162 U.S. 255 (1896).............................................................................................   20, 24

*Stupak-Thrall v. United States,*
    89 F.3d 1269 (6th Cir. 1996) ..............................................................................   1

*Sw. Petroleum Corp. v. Udall,*
    361 F.2d 650 (10th Cir. 1966) ............................................................................   13, 20, 21

*Union Oil Co. of Cal. v. Smith,*
    249 U.S. 337 (1919).............................................................................................   9

*United States v. 92 Buena Vista Ave., Rumson, N.J.,*
    507 U.S. 111 (1993).............................................................................................   25

*United States v. Burlington & M.R.R. Co.,*
    98 U.S. 334 (1878)...............................................................................................   12

*United States v. Cal. & O. Land Co.,*
    148 U.S. 31 (1893)...............................................................................................   12

*United States v. Chem. Found.,*
    272 U.S. 1 (1926).................................................................................................   22

*United States v. Eaton Shale Co.,*
    433 F. Supp. 1256 (D. Colo. 1977)......................................................................   7

*United States v. Gen. Petroleum Corp. of Cal.,*
    73 F. Supp. 225 (S.D. Cal. 1946) ........................................................................   31

*United States v. Georgia-Pacific Co.,*
    421 F.2d 92 (1970)...............................................................................................   32

*United States v. Monia,*
    317 U.S. 424 (1943) .................................................................... 14

*United States v. Pan-Am. Petroleum Co.,*
    55 F.2d 753 (9th Cir. 1932) .......................................................... 18

*United States v. San Francisco,*
    310 U.S. 16 (1940) ....................................................................... 1

*United States v. Schurz,*
    102 U.S. 378 (1880) ...................................................................... 3

*United States v. Seatrain Lines,*
    329 U.S. 424 (1947) ...................................................................... 40

*United States v. Stone,*
    69 U.S. 525 (1864) ....................................................................... 11

*United States v. Winona & St. P. R. Co.,*
    165 U.S. 463 (1897) ............................................................. 12, 13, 18

*Waskey v. Chambers,*
    224 U.S. 564 (1912) ...................................................................... 24

**<u>Administrative Decisions</u>**

*Beverly M. Harris,*
    78 IBLA 251 (1984) ...................................................................... 16

*Champlin Petroleum Co.,*
    99 IBLA 278 (1987) ...................................................................... 16

*\*Clayton W. Williams, Jr.,*
    103 IBLA 192 (1988) ............................................................ 16, 17, 18

*Donna J. Vrooman,*
    186 IBLA 241 (2015) ..................................................................... 33

*E. M. Harrison,*
    49 Pub. Lands Dec. 139 (1922) ...................................................... 4

*Floyd Higgins,*
    147 IBLA 343 (1999) ..................................................................... 32

*Fortune Oil Co.,*
    69 IBLA 13 (1982) ........................................................................ 12

x

*Franco Western Oil Co.* (Supp.),
    5 Interior Dec. 427 (1958) ........................................................................... 20

*Home Petroleum Corp.*,
    54 IBLA 194 (1981).................................................................. 14, 20, 24, 25

*Penroc Oil Corp., et al,*
    84 IBLA 36 (1984)....................................................................... 11, 12

*Pueblo of San Francisco*,
    5 Pub. Lands Dec. 483 (1887) .......................................................... 3

*State of Wisconsin*,
    65 Interior Dec. 265 (1958) ............................................................. 3

*The Melish Consol. Placer Oil Min. Co. v. Testerman*,
    53 Interior Dec. 205 (1930) ............................................................. 10

**Constitutional Provisions**

U.S. Const. Art. IV § 3, cl. 2 ................................................................... 1

**Statutes**

2 Stat. 716 (1812) ...................................................................................... 2

9 Stat. 395 (1849) ...................................................................................... 2

41 Stat. 437 (1920)................................................................................ 3, 35

49 Stat. 674 (1935)..................................................................................... 5

5 U.S.C. § 551(8) ...................................................................................... 45

5 U.S.C. § 558(c) ...................................................................................... 45

5 U.S.C. § 706(2) ...................................................................................... 37

5 U.S.C. § 706(2)(A)............................................................................ 37, 43

28 U.S.C. § 2401(a) ................................................................................... 23

28 U.S.C. § 2462 .......................................................................... 27, 28, 29

30 U.S.C. § 21a .......................................................................................... 35

Mining Law, 30 U.S.C. § 22 *et seq*...................................................................................... 9

    30 U.S.C. § 22 ................................................................................................. 9

    30 U.S.C. § 29 ................................................................................................. 9

30 U.S.C. § 184(h)(2)................................................................................................ *passim*

30 U.S.C. § 184(i) .................................................................................................... 13

30 U.S.C. § 187a ...................................................................................................... 24

30 U.S.C. § 188(a) ................................................................................................... 29

30 U.S.C. § 188(b) ................................................................................................... 5

30 U.S.C. § 226-2 ..................................................................................................... 23, 27

42 U.S.C. § 8855 ...................................................................................................... 39

42 U.S.C. § 13401 .................................................................................................... 15

43 U.S.C. § 2 ............................................................................................................ 2, 3

General Railroad Right-of-Way Act of 1875, 43 U.S.C. §§ 934–39 .......................... 10

43 U.S.C. § 1201 ...................................................................................................... 2

43 U.S.C. § 1457 ...................................................................................................... 2

44 U.S.C. § 1507 ...................................................................................................... 21

Pub. L. No. 109-432, 120 Stat. 2922 (2006) ............................................................. 43

**<u>Federal Register</u>**

53 Fed. Reg. 5,290 (Feb 23, 1988) ........................................................................... 34

56 Fed. Reg. 9,935 (Mar. 8, 1991)............................................................................ 34

58 Fed. Reg. 7,241 (Feb. 5, 1993) ............................................................................ 34

**<u>Regulations</u>**

43 C.F.R. § 1810.3 .................................................................................................... 32

43 U.S.C. § 3108.4 ................................................................................................ 17

43 C.F.R. § 3162.3-1(h)(2) .................................................................................. 44, 45

**Legislative History**

H.R. Rep. No. 86-1062, *reprinted in* 1959 U.S.C.C.A.N. 2620 .............................. 15

S. Rep. No. 86-1549, *reprinted in* 1960 U.S.C.C.A.N. 3313 ................................... 15, 27

**Other Authorities**

2 Pomeroy's Equity Jurisprudence § 754 (4th ed.) ................................................. 26

BLACK'S LAW DICTIONARY (7th ed. 1999) ............................................................. 4, 29, 39

Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567 (Feb. 6, 1963) ................ 6, 7, 8

**GLOSSARY**

AIRFA - American Indian Religious Freedom Act, 42 U.S.C. § 1996

APA - Administrative Procure Act, 5 U.S.C. § 551 *et seq.*

APD - Application for Permit to Drill

BFP - *Bona Fide* Purchaser

BLM - Bureau of Land Management

Department - U.S. Department of the Interior

DN - Decision Notice

EA - Environmental Assessment

EIS - Environmental Impact Statement

FONSI - Finding of No Significant Impact

Forest Service - U.S. Forest Service

IBLA - Interior Board of Land Appeals

MLA - The Mineral Leasing Act of 1920, 30 U.S.C. §§ 181–287

NEPA - The National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.*

NHPA - The National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*

NSO - No Surface Occupancy

PSOF - Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment

PTA - Pikuni Traditionalist Association, *et al.*

ROD - Record of Decision

Secretary - Secretary, U.S. Department of the Interior

TCD - Traditional Cultural District

## INTRODUCTION

Plaintiff, Solenex LLC, hereby files this combined opposition to Defendants' Cross-Motion for Summary Judgment (Dkt. # 93-1) and reply in support of its own Motion for Summary Judgment.  Dkt. # 89.  Solenex also responds to the amicus curiae briefs filed by the Blackfeet Tribe (Dkt. # 96-1) and the Pikuni Traditionalist Association, *et al.* ("PTA").  Dkt. # 97-1.

## ARGUMENT

### I.   THE SECRETARY'S CANCELLATION OF THE LEASE WAS *ULTRA VIRES.*

The Secretary concedes that her cancellation of Solenex's 33 year-old lease was not based upon any express delegation of authority from Congress.  Dkt. # 68-1 at 7.  Instead, she maintains that she had the *inherent* authority to do so based on the Property Clause, her general managerial duties with respect to the public lands, and the Supreme Court's decision in *Boesche v. Udall*, 373 U.S. 472, 474 (1963).  Dkt. # 68-1 at 7; *see* Dkt. # 93-1 at 10, 21.  Yet, the Secretary has no inherent authority and has never had any express or implied authority to cancel a lease after title thereto has finally and conclusively vested in a private party.

### A.   The Secretary Has No Inherent, Express, Or Implied Authority, To Administratively Cancel A Lease For An Alleged Pre-Lease Violation After Title Thereto Has Vested In A Private Party.

The Property Clause provides:  "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States …."  U.S. Const. Art. IV § 3, cl. 2.  Although Congress's power under the Property Clause has been characterized as "without limitation[,]" *United States v. San Francisco*, 310 U.S. 16, 29 (1940), it is clear from its own terms that the Property Clause grants no authority to the Secretary. *Stupak-Thrall v. United States*, 89 F.3d 1269, 1282 (6th Cir. 1996) (en banc) (Boggs, J., dissenting) ("the Property Clause grants authority only to Congress").  Thus, the Secretary has no inherent

authority.  Instead, the Secretary, like administrative agencies, has only that authority conferred upon her by Congress.  *See Mich. v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (The "EPA is a federal agency—a creature of statute.  It has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress."); *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) ("Agencies may act only when and how Congress lets them.").

In 1812, Congress created the General Land Office, which was headed by a Commissioner, and was placed under the jurisdiction of the Department of the Treasury.  2 Stat. 716 (1812).  The Commissioner was authorized to "perform, all such acts and things, touching or respecting the public lands … and other lands patented or granted by the United States …."  *Id*.  In 1849, Congress created the Department of the Interior, "the head of which … shall be called the Secretary of the Interior …."  9 Stat. 395 (1849).  That act also authorized the Secretary to "perform all the duties in relation to the General Land Office …."  *Id*.  Today, the Secretary's general management duties are codified at 43 U.S.C. §§ 2, 1201, 1457.  Noticeably absent from these statutes is any express delegation of authority to administratively cancel a property interest after title thereto has been conclusively transferred into private ownership.  To be sure, these statutes may be characterized as granting the Secretary some implied authority over the public lands.  But that implied authority is not coextensive with Congress's Property Clause power.  *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engin'rs*, 531 U.S. 159, 172 (2001) ("*SWANCC*") (before a court may conclude that Congress delegated the full scope of one of its enumerated powers, there must be "a clear indication that Congress intended that result").

Nor is that implied authority broad enough to allow the Secretary to administratively cancel a property interest after title thereto has been conclusively transferred into private ownership.[1] *Moore v. Robbins*, 96 U.S. 530, 534 (1877) ("The existence of ... such power in the Land Department is utterly inconsistent with the universal principle on which the right of private property is founded.").  Indeed, the Supreme Court consistently enforced this limitation on the Secretary prior to passage of the MLA.  *See, e.g.*, *United States v. Schurz*, 102 U.S. 378, 401–402 (1880) (ruling that the Secretary had no authority to administratively cancel a voidable patent; instead, the Secretary had to seek judicial cancellation).  More importantly, the Secretary has expressly recognized this limitation.  *State of Wisconsin*, 65 Interior Dec. 265, 270 (1958) ("it has never been held that where … title has … actually vested the land department has the power to destroy it").

As a result, any express or implied authority to administratively cancel a lease must be found in the MLA itself.  Yet, nothing in the MLA, as originally enacted, provided the Secretary with the authority to administratively cancel a lease.  Dkt. # 89-1 at 23–25.  Instead, as reflected in Section 31 of the MLA, Congress expressly provided that the Secretary had to institute a judicial proceeding in order to forfeit or cancel a lease.  41 Stat. 437, 450 (1920).  To be sure, this provision is arguably limited to situations in which a lessee commits a post-lease violation of the MLA or the regulations promulgated thereunder.  *Id*.  But the express authority to institute a

---

[1] Counsel for the Secretary suggests that the Secretary has interpreted 43 U.S.C. § 2 as providing her with the authority to correct the error of her predecessor who issued the lease purportedly in violation of NEPA and the NHPA.  Dkt. # 93-1 at 23.  Yet, nothing in 43 U.S.C. § 2 implies that the Secretary has the authority to destroy a property interest after title thereto was conveyed into private ownership by her predecessor.  In fact, previous secretaries have disavowed such authority.  *Pueblo of San Francisco*, 5 Pub. Lands Dec. 483, 492 (1887) (The Land Office has no "right to recall a title that has once passed from it.  A recall cannot be accomplished except through regular judicial proceedings….  The almost uninterrupted current of authorities on this point sustains the general proposition that a Secretary has no power or authority to revise or reverse the final decree of his predecessor in a matter properly before him.").

judicial proceeding to cancel a lease for post-lease violations cannot be construed as an implied

delegation of authority to administratively cancel a lease for alleged pre-lease violations,

especially alleged violations committed by the Secretary's own subordinates.  Nor can the fact

that Congress did not expressly prohibit the Secretary from administratively cancelling leases for

alleged pre-lease violations be construed as an implied delegation of such authority.  *Ry. Labor*

*Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994), *amended*, 38 F.3d

1224 (D.C. Cir. 1994) ("Were courts to *presume* a delegation of power absent an express

*withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly

out of keeping with [*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984)]

and quite likely with the Constitution as well." (emphasis in original)).  Instead, Congress did not

intend to delegate such authority because it would be antithetical to the concept of a lease and

would defeat the purpose of the MLA, which was to encourage the development the Nation's oil

and gas resources.[2]  *E. M. Harrison*, 49 Pub. Lands Dec. 139, 144 (1922) ("The purpose of the

[MLA] act was to encourage the development of the mineral resources of the country under the

principle of permits for exploration and the leasing of the lands owned by the United States.");

---

[2] If a lease were subject to administrative cancellation for pre-lease violations it would be more
akin to a license.  BLACK'S LAW DICTIONARY 931 (7th ed. 1999) (defining license as "[a]
revocable permission to commit some act that would otherwise be unlawful"); *Hartshorn v. Day*,
60 U.S. 211, 216 (1856) ("a license is revocable at common law").  A holder of a license would
not make the substantial financial investment necessary to develop the Nation's oil and gas
resources.  *See Pan Am. Petroleum Corp. v. Pierson*, 284 F.2d 649, 655 (10th Cir. 1960) ("The
drilling of wells requires substantial financial risks and the expense of putting those wells on
production and of marketing the product is burdensome.  If the continued existence of the
granted leasehold estate is dependent upon the fluctuating policies of governmental departments
uninhibited by any limitations upon time of action, the value of federal oil and gas leases as a
title basis for oil and gas development is greatly diminished if not practically destroyed."
(footnote omitted)); *see Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 741–42 (10th
Cir. 1982) ("Many hundreds of thousands of dollars in exploration costs may be spent prior to a
company's decision to drill an exploratory well.  If the decision is made to drill, then a permit to
drill must be sought.  If an APD is granted, the well can then be drilled, at a cost ranging from
$3,000,000 to $4,000,000 for a wildcat well in the Rocky Mountain area.").

*see Motor Vehicle Mfrs. Ass'n of U.S. v. Ruckelshaus*, 719 F.2d 1159, 1165 (D.C. Cir. 1983) ("A statute should ordinarily be read to effectuate its purposes rather than to frustrate them.").

Similarly, nothing in the amendments to the MLA provide the Secretary with the authority to administratively cancel a lease.  In 1935, Congress amended the MLA by phasing out prospecting permits and replacing them with non-competitive leases, which were issued for lands within unproven areas.  49 Stat. 674–79 (1935).  At the same time, Congress conferred upon the Secretary limited authority to administratively cancel a lease for a post-lease violation committed by the lessee, so long as the lands covered by the lease were not known to contain valuable deposits of oil or gas.  49 Stat. at 678; *see* 30 U.S.C. § 188(b).  If the Secretary already possessed authority to administratively cancel a lease for a pre-lease violation, one would assume that she already possessed authority to administratively cancel a lease for a post-lease violation by a lessee.  But if that were true, the 1935 amendment would have been largely superfluous.  Passing meaningless legislation is not an act that can generally be ascribed to Congress.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ...." (quotation omitted)); *FTC v. Manager, Retail Credit Co., Miami Branch Office*, 515 F.2d 988, 994–95 (D.C. Cir. 1975) ("The presumption against interpreting a statute in a way which renders it ineffective is hornbook law....  In the face of a perfectly plausible and consistent alternative construction of the statute, [such an interpretation] is untenable.").

As the foregoing demonstrates, the Secretary has no inherent, express, or implied authority, to administratively cancel a lease for an alleged pre-lease violation after the lease has been issued and title thereto has conclusively vested in a private party.  Counsel for the Secretary

does not seriously dispute this analysis.  Instead, counsel essentially puts all her eggs in the
*Boesche* basket.  Yet, *Boesche* is not the panacea that counsel wishes it to be.

    **B.**     ***Boesche* Confirms That The Secretary Lacked Authority To Cancel
               Solenex's Lease.**

        The issue in *Boesche* was whether the Secretary had the authority to administratively
cancel a lease for a pre-lease violation of an MLA regulation in a timely appeal brought by a
competing lease applicant.  Dkt. # 89-1 at 28–32.  As framed by the Solicitor General, the question
presented in *Boesche* was "[w]hether the Secretary … has authority to cancel an oil and gas lease
issued in violation of the Department's regulations and *in derogation of a competing applicant's
statutory preference rights*."  Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567, at *2
(Feb. 6, 1963) (emphasis added); *id*. at *5–6 ("The exact question presented … is whether the
Secretary had the power to cancel petitioner's lease, under those circumstances and for the reasons
stated, or was powerless to correct the error *and award the competing applicants the lease to which
they were jointly entitled*." (emphasis added)).  The narrowness of the question presented is
important because three years prior to *Boesche* the Tenth Circuit had held that the Secretary had no
authority to administratively cancel leases for pre-lease violations, such as fraud.  *Pan Am.
Petroleum*, 284 F.2d at 657 ("[T]he Secretary and the defendant officials are without authority to
cancel an oil and gas lease for fraud of a lessee precedent to lease issuance."); *id*. at 655 ("If there
may be administrative cancellation of an oil and gas lease for fraud in procurement, the practical
operation of the [MLA] is seriously impaired.").  Yet, the Solicitor General expressly avoided a
confrontation with that decision by distinguishing *Pan Am. Petroleum* on the basis that there were
no competing lease applicants in that case who had administratively challenged the denial of their
lease applications:

> We may have been guilty of overgeneralization in asserting in our memorandum in response to the petition for certiorari that the decision below is in square conflict with *Pan American Petroleum Corp. v. Pierson*, 284 F. 2d 649, certiorari denied, 366 U.S. 936.  The reasoning in the two opinions is diametrically opposed.  Insofar as *Pen* [sic] *American* case rests upon the theory that Section 31 of the [MLA] withdrew from the Secretary of the Interior all power to cancel leases administratively, there may be no way of reconciling the decisions.  *In the Pan American case, however, the cancellation would not have been for the purpose of according a conflicting applicant his statutory priority, and the administrative proceedings involved were not the result of an appeal by another applicant from the denial of his application taken within the period allowed by departmental regulations.*

Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567, at *6 n.3 (emphasis added).

Accordingly, because the Solicitor General distinguished *Pan Am. Petroleum*, the Court issued a very narrow holding in *Boesche*:

> [T]he power of cancellation, at least while conflicting applications are pending, is essential to secure the rights of competing applicants.
>
> We sanction no broader rule tha[n] is called for by the exigencies of the general situation and the circumstances of this particular case.  *We hold only that the Secretary has the power to correct administrative errors of the sort involved here by cancellation of leases in proceedings timely instituted by competing applicants for the same land.*

*Boesche*, 373 U.S. at 485 (emphasis added) (footnote omitted).[3]

This holding was not groundbreaking, but was essentially a restatement of existing law.  *See* Dkt. # 89-1 at 31–32 & n.10.   As noted by the Court, the Secretary has always had the authority to correct mistakes of subordinates before legal title had finally and conclusively passed into private ownership.  *Boesche*, 373 U.S. at 477 (listing cases).

---

[3] Contrary to counsel for the Secretary's argument, *Boesche* did not *sub silentio* abrogate the Tenth Circuit's decision in *Pan Am. Petroleum*.  *See* Dkt. # 93-1 at 25.  Granted, the Court cited that decision as a basis for granting *certiorari*, *Boesche*, 373 U.S. at 473, but the Court never mentioned that decision again, presumably because the Solicitor General distinguished *Pan Am. Petroleum* during briefing on the merits.  *See* Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567, at *6 n.3.  And, contrary to counsel's argument, Dkt. # 93-1 at 23, dictum in *United States v. Eaton Shale Co.*, 433 F. Supp. 1256, 1271 n.9 (D. Colo. 1977)—a case involving the United States' failed attempt to judicially cancel a patent—does not change this conclusion.

This holding was also based on principles of fundamental fairness to competing lease applicants.  Brief for Respondent, *Boesche v. Udall*, 1963 WL 105567, at *35–36 (Solicitor General arguing that "if the [statutory] right of the first qualified applicant is to be effective, the Department must have an administrative power of revision to correct erroneous awards in derogation of that right."); *id*. at 36 ("[T]he existence of some power of cancellation, at least while timely conflicting applications are pending, is essential to secure the rights of competing applicants.").  More importantly, this narrow holding proves that the Secretary's cancellation of Solenex's lease was unlawful because there were no appeals or protests to the issuance of the lease and the decision issuing the lease had been final and conclusive for more than 33 years!  Dkt. # 89-1 at 30–32.

The Secretary and her counsel ignore the holding in *Boesche* and focus on other statements made by the Court.[4]  Those statements were largely irrelevant and mostly erroneous.  For example, counsel for the Secretary emphasizes the Court's mischaracterization of the issue in the case as whether Section 31 of the MLA "withdr[ew]" or limited the Secretary's authority to administratively cancel title once title had vested in a private party.  *Boesche*, 373 U.S at 476; Dkt. # 93-1 at 24–25.  Counsel also faults Solenex for seemingly framing the issue in the same manner.  Dkt. # 93-1 at 24.  Yet, Solenex is not arguing that the MLA "withdrew" or limited the Secretary's authority to administratively cancel a property interest after title has vested in a private party.  Instead, as demonstrated by Supreme Court precedent, the Secretary never had such authority.  Dkt. # 89-1 at 21–25.

---

[4] Neither the Secretary's nor her counsel's interpretation of *Boesche* is entitled to any deference. *See Negusie v. Holder*, 555 U.S. 511, 520–23 (2009) (denying *Chevron* deference where the agency's decision was based upon a mistaken assumption regarding a prior decision by the Court).

Counsel also emphasizes the Court's statement that "'[Section] 31… leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors.'"  Dkt. # 93-1 at 22 (quoting *Boesche*, 373 U.S. at 478–79).  Yet, this statement is only partly correct.  The Secretary had no "traditional administrative authority" vis-à-vis leases prior to the MLA because the MLA was the first Act that provided for the leasing of oil and gas resources.  Thus, the "traditional administrative authority" the Court must have been referring to was the "traditional administrative authority" vis-à-vis patents and lesser property interests, such as easements.[5]  Yet, as previously demonstrated, the Secretary had no authority to administratively cancel patents or easements after title to those interests were vested in a private party by final administrative action of the Secretary.  Dkt. # 89-1 at 21–23.  To be sure, the Secretary had the authority to reverse the decision of a subordinate, but that authority *ceased to exist* once title became vested in a private party.  To the extent the statement in *Boesche* reflected these principles, it was correct.  But to the extent the statement suggested that the Secretary has *carte blanche* to administratively cancel leases based upon pre-lease violations, that statement was clearly erroneous.

Counsel also argues that the Court in *Boesche* distinguished a lease from a patent.  Dkt. # 93-1 at 25; *Boesche*, 373 U.S. at 477–78.  Granted, the United States retains an

---

[5] To the extent that the Court believed this "traditional administrative authority" was reflected by the Secretary's power to declare invalid a mining claim located under Mining Law, 30 U.S.C. § 22 *et seq.*, that belief was erroneous.  *See Boesche*, 373 U.S. at 476–77.  The Mining Law is based on the right of "self-initiation," that is, a person may go out on unappropriated federal land and locate a mining claim, without any involvement or permission by the Secretary.  30 U.S.C. § 22; *see Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 344–49 (1919).  Thus, when the Secretary declares a mining claim invalid he is not cancelling title that was previously transferred or approved by the Secretary.  *See Cameron v. United States*, 252 U.S. 450, 459–64 (1920).  Instead, the Secretary is making a determination that the mining claimant did not satisfy all the requirements in the Mining Law to "perfect" his mining claim and, thereby, be entitled to a patent upon payment of the purchase price.  30 U.S.C. § 29; *see Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 335–37 (1963).

ownership interest in the lease lands and the Secretary has continuing supervision over a lessee's exercise of its lease rights; whereas, a patent generally conveys fee title.  Yet, with all due respect to the Court's decision in *Boesche*, the distinction between a lease and a fee does not merit bestowing authority on the Secretary to unilaterally cancel leases.[6]  This is especially true considering that both a lease and a fee are property interests that are fully protected by the Fifth Amendment.  *See Lynch v. United States*, 292 U.S. 571, 579 (1934) ("[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment").

More importantly, the distinction seemingly made by the Court in *Boesche* cannot be reconciled with its earlier precedent.  In *Noble v. Union River Logging R. Co*., 147 U.S. 165, 166–67, 172 (1893), the Secretary sought to revoke his predecessor's approval of a map, the approval of which had automatically conferred upon the plaintiff railroad company title to an easement under the General Railroad Right-of-Way Act of 1875, 43 U.S.C. §§ 934–39 ("1875 Act").  The plaintiff sued to enjoin the Secretary from administratively divesting it of its title, arguing that the Secretary's only recourse was to institute a judicial proceeding for cancellation of the easement.  *See Noble*, 147 U.S. at 165. In affirming the lower court's issuance of the injunction, the Court ruled that the Secretary had no authority to revoke the final action of his predecessor that had vested title to the easement in the railroad company.  *Id*. at 176 ("'One officer of the land office is not

---

[6] The Court also erroneously tried to distinguish between a competitive lease and a non-competitive lease by characterizing the ruling in *The Melish Consol. Placer Oil Min. Co. v. Testerman*, 53 Interior Dec. 205, 207 (1930) that a "lease once granted [is] beyond recall by the Secretary and is only subject to cancellation in the Federal courts" as dictum because that decision involved a competitive lease.  *Boesche*, 373 U.S. 483 n.11.  Although Congress replaced prospecting permits with non-competitive leases, *see* Dkt. # 89-1 at 26, there is no rational basis for treating non-competitive leases as mere permits.  A lease is a greater property interest than a permit whether the lease is non-competitive or competitive.

competent to cancel or annul the act of his predecessor.  That is a judicial act, and requires

the judgment of a court.'" (quoting *United States v. Stone,* 69 U.S. 525, 535 (1864)).

Importantly, the Court made this ruling even though the railroad easement did not confer

on the railroad company anything approaching fee title.  *Marvin M. Brandt Revocable

Trust v. United States*, 134 S. Ct. 1257, 1264 (2014) (reaffirming that the 1875 Act

conveyed only an easement, not a fee interest).  In addition, the United States retained a

substantial ownership interest in the lands traversed by the railroad easement, including the

right to the "full and unencumbered interest in the land[s,]" if the easement were

abandoned while the traversed lands were still owned by the United States.  *Id*. at 1265–66.

In short, there is no material difference between a fee and an easement on the one hand, and

a lease on the other hand, that would justify allowing the Secretary to reverse a final

decision of her predecessor and administratively cancel a lease.

Counsel also suggests that the Secretary's longstanding practice of administratively

cancelling leases under alleged similar circumstances somehow proves the existence of the

claimed authority.  Dkt. # 93-1 at 23.  But "'[p]ast practice does not, by itself, create

power.'"  *Medellin v. Texas*, 552 U.S. 491, 531–32 (2008) (alteration in original) (quoting

*Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981); *see SWANCC*, 531 U.S. at 169–71 &

n.5 (explaining the heavy burden the government must satisfy to prove that Congress has

acquiesced in an administrative practice or interpretation).  Moreover, the cases cited by

counsel do not support her assertion.  *See* Dkt. # 93-1 at 23, 26.  For example, in *Penroc

Oil Corp*., 84 IBLA 36, 37–38 (1984), the IBLA reversed a decision by the BLM that had

granted a third party a right-of-way to enter the appellant's lease and dispose of salt water

in a plugged well on the lease.  In so doing, the IBLA noted that lease granted the lessee "a

property interest enforceable against the Government," which must be honored by the

BLM because "once the Secretary has leased the land he may not deny or extinguish the

rights of the Federal oil and gas lessee …."  *Id*. at 40.  The other cases cited by counsel

generally stand for the proposition that the Secretary may administratively cancel a void

lease, *Fortune Oil Co.*, 69 IBLA 13, 14–15 (1982), or may cancel a lease before title has

conclusively vested.  *Grynberg v. Kempthorne*, No. 06-cv-01878, 2008 WL 2445564, at *3

(D. Colo. 2008) (administratively cancelling a lease before it became effective).  In short,

counsel cannot cite a single case that would tend to support the Secretary's unprecedented

and egregious decision to cancel a 33-year-old lease.

## II.    THE SECRETARY'S CANCELLATION OF THE LEASE WAS UNLAWFUL BECAUSE SOLENEX IS ENTITLED TO *BONA FIDE* PURCHASER PROTECTION.

Even if the Secretary had the authority to cancel Solenex's lease, the Secretary's actions

were unlawful because Solenex is entitled to *bona fide* purchaser ("BFP") protection.  Dkt. # 89-1

at 33–38.  Indeed, the Supreme Court had long accorded special status to BFPs.  *See, e.g.*, *United

States v. Cal. & O. Land Co.*, 148 U.S. 31, 40–41 (1893) (noting that a BFP "is one favored in the

law" and will prevail over one who may have equity on its side).  In light of this special status,

neither the Secretary nor the judiciary may cancel a previously conveyed property interest after that

property interest had been transferred to a BFP.  *Colo. Coal & Iron Co. v. United States*, 123 U.S.

307, 313–14 (1887) (ruling that a fraudulently obtained patent cannot be attacked by the United

States after it has been transferred to a BFP); *United States v. Burlington & M.R.R. Co.*, 98 U.S.

334, 342 (1878) (noting that the United States "certainly could not insist upon [the] cancellation of

… patents so as to affect innocent purchasers").  Importantly, this venerable common law principle

needs no authorizing legislation.  *United States v. Winona & St. P. R. Co.*, 165 U.S. 463, 478

12

(1897) ("*Winona*") (ruling Congress need not pass legislation to protect BFPs). In any event, as previously demonstrated, Congress took a "'belt and suspenders' approach" in 1959 and 1960 when it amended the MLA to expressly protect BFPs. Dkt. # 89-1 at 33–34 & n.12; 30 U.S.C. § 184(h)(2); *see also* 30 U.S.C. § 184(i) (requiring BFPs to be "dismissed promptly" from any judicial proceeding for the cancellation of a lease (or an interest therein)).

A BFP is generally described as one who acquired his interest in good faith, for valuable consideration, and without notice of any deficiency in his grantor's title. *Sw. Petroleum Corp. v. Udall*, 361 F.2d 650, 656 (10th Cir. 1966); *Winona*, 165 U.S. at 477 ("the essential elements which constitute a [BFP] are … a valuable consideration, the absence of notice, and presence of good faith" (quotation omitted)). As previously demonstrated, Solenex satisfies these three requirements. Dkt. # 89-1 at 35–34.

Counsel for the Secretary argues that Solenex should not be entitled to BFP protection because: (1) the BFP protection in the MLA only protects BFPs from pre-lease violations of the MLA and not from alleged pre-lease violations of other statutes, such as NEPA and the NHPA; (2) Solenex had constructive notice that the lease may have been issued in violation of NEPA and/or the NHPA; and (3) Solenex did not pay valuable consideration for the lease. None of these arguments hold water.

### A. Solenex Is Entitled To BFP Protection Under The MLA And The Common Law.

Counsel argues that Solenex should not be entitled to the BFP protection in the MLA because 30 U.S.C. § 184(h)(2) only protects BFPs from pre-lease violations of the MLA and not from alleged pre-lease violations of other statutes, such as NEPA. Dkt. # 93-1 at 27–29. Yet, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

50 (1983) ("*State Farm*").  In rejecting Solenex's status as a BFP, however, the Secretary based her

decision solely on her contention that Solenex had notice that the lease was under suspension.  Dkt.

# 68-1 at 1 n.1.  Therefore, counsel's argument is nothing more than an attempt at *post hoc*

rationalization which this Court must reject.  *Burlington Truck Lines, Inc. v. United States*, 371

U.S. 156, 168 (1962) ("courts may not accept appellate counsel's post hoc rationalizations for

agency action").

      Even if this Court were to entertain counsel's *post hoc* rationalization, counsel's

interpretation of 30 U.S.C. § 184(h)(2) is unavailing.  To be sure, 30 U.S.C. § 184(h)(2) provides:

"[t]he right to cancel or forfeit for violation of any of the provisions of [the MLA] shall not apply

so as to affect adversely the title or interest of a bona fide purchaser of any lease …."  But to limit

the BFP protection provided by 30 U.S.C. § 184(h)(2) to only pre-lease violations of the MLA

would frustrate the overall purpose of the MLA and the specific purpose of 30 U.S.C. § 184(h)(2).[7]

*See United States v. Monia*, 317 U.S. 424, 431 (1943) (Frankfurter, J., dissenting) ("This question

cannot be answered by closing our eyes to everything except the naked words of the Act ….  The

notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious

oversimplification.").  The overall purpose of the MLA was to develop the Nation's oil and gas

resources through private enterprise.  *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967);

---

[7] Under counsel's interpretation, the BFP purchaser protection in 30 U.S.C. § 184(h)(2) would
not cover violations of the MLA *regulations*.  Yet, even counsel admits that 30 U.S.C. §
184(h)(2) must be read to include violations of the MLA regulations.  Dkt. # 93-1 at 27;
*Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 843–44 (D. Wyo. 1981) (affirming the IBLA's
ruling that an assignee was entitled to the BFP protection provided by 30 U.S.C. § 184(h)(2),
even though its assignor acquired the lease in violation of MLA regulations).  If violations of the
MLA regulations may be read into 30 U.S.C. § 184(h)(2), there is no reason why violations of
NEPA and the NHPA may not also be read into the statute because doing so would "encourage
[the] purchase of lease interests without hesitancy or reluctance[,]" in accordance with
Congress's intent in passing the BFP amendments to the MLA.  *Home Petroleum Corp*., 54
IBLA 194, 214 (1981).

*Chapman v. Sheridan-Wyo. Coal Co.*, 338 U.S. 621, 628 (1950) (the "whole policy [of the MLA] seems to contemplate the opening of the public domain to competitive exploitation").  Similarly, the specific purpose of 30 U.S.C. § 184(h)(2) was to provide additional security of title to lessees and their assigns so that they would make the substantial private investment necessary to develop the Nation's oil and gas resources.  H.R. Rep. No. 86-1062, *reprinted in* 1959 U.S.C.C.A.N. 2620, 2620 (explaining that the 1959 BFP amendment to the MLA "has the single purpose of providing relief for innocent parties (bona fide purchasers) …."); *id*. at 2621–22 (noting that "[g]overnment receipts should be increased" by the 1959 BFP amendment to the MLA by strengthening security of title); S. Rep. No. 86-1549, *reprinted in* 1960 U.S.C.C.A.N. 3313, 3314–15 (Assistant Secretary noting that the 1959 BFP amendment to the MLA was in response to a "pressing need" to protect BFPs.).  Thus, limiting the BFP protection in 30 U.S.C. § 184(h)(2) to only pre-lease violations of the MLA would discourage the private investment necessary to fulfill the overall purpose of the MLA and would defeat Congress's specific intent in passing the 1959 and 1960 BFP amendments to the MLA.  This could not have been the result Congress intended.  *See King v. Burwell*, 135 S. Ct. 2480, 2493 (2015) ("'We cannot interpret federal statutes to negate their own stated purposes.'" (quoting *N.Y. State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973))).

In short, counsel's interpretation of 30 U.S.C. § 184(h)(2) would place a cloud on all leases not owned by the original lessee.  Worse yet, if counsel's interpretation were adopted, it would stymie the development of the Nation's oil and gas resources and place the Nation's energy independence and security at risk.  *See* S. Rep. No. 86-1549, *reprinted in* 1960 U.S.C.C.A.N. 3313, 3314–15 (noting that the development of the Nation's oil and gas resources is "necessary for our security in war and peace"); 42 U.S.C. § 13401 (declaring it to be a "goal of

the United States … to strengthen national energy security by reducing dependence on imported oil"); *Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987) ("It is the stated public policy of the United States to make public lands, including national forest land, available for mineral leasing in an effort to reduce our energy dependence on foreign sources and to protect our national security.").

Not surprisingly, counsel's interpretation of 30 U.S.C. § 184(h)(2) has already been rejected by the Secretary. *Beverly M. Harris*, 78 IBLA 251, 252–54 (1984) (recognizing that 30 U.S.C. § 184(h)(2) would protect a BFP from a pre-lease violation of *a BLM policy* regarding leasing in wilderness study areas); *Champlin Petroleum Co.*, 99 IBLA 278, 280 (1987) (same). For example, in *Clayton W. Williams, Jr.*, 103 IBLA 192, 198–99 (1988), the BLM administratively cancelled a lease at the request of the Forest Service based upon the Forest Service's allegation that it had failed to comply with NEPA before the BLM issued the lease. After the original lessee and its assignee filed an administrative appeal, the IBLA rejected the argument that a NEPA violation had occurred because the BLM and the Forest Service had submitted only "conclusory statements that further [NEPA] studies were needed ...." *Id*. at 209. The IBLA continued on to explain that, even if a NEPA violation had occurred, the lease would be merely voidable—not void:

> [E]ven were we to assume that the Forest Service and BLM were correct in their assertions that an inadequate NEPA review had been conducted prior to lease issuance, this would not render the lease void. *Rather, inasmuch as a lease might still issue after the completion of the environmental review, premature issuance of a lease renders the lease voidable*.

*Id.* at 212 (emphasis added).

As further explained by the IBLA, the distinction between a void lease and voidable lease "is of critical importance with respect to the applicability of the [BFP] protection afforded by 30

16

U.S.C. § 184(h)(2) (1982)." *Clayton W. Williams, Jr.*, 103 IBLA at 203.  And, after quoting 30

U.S.C. § 184(h)(2) and its implementing regulation, 43 C.F.R. § 3108.4, the IBLA concluded that

an assignee of a voidable lease is entitled to the full protection provided by 30 U.S.C. § 184(h)(2),

as long as the assignee qualifies as a BFP.  *Id*. at 210–11.  Then, after reviewing the *bona fides* of

the assignee, the IBLA ruled that it was indeed a BFP, and held "that the protection provided under

30 U.S.C. § 184(h)(2) (1982) precludes BLM from cancelling" the lease as to the assignee.  *Id*. at

216.

      Thus, *Clayton W. Williams, Jr.,* firmly stands for the principle that 30 U.S.C. § 184(h)(2)

protects BFPs for pre-lease violations of statutes other than the MLA, including NEPA.  Therefore,

this Court must reject counsel's interpretation of 30 U.S.C. § 184(h)(2).

      Counsel for the Secretary seeks to avoid this result by attacking *Clayton W. Williams, Jr.*:

> In *Clayton W. Williams, Jr.*, 103 IBLA 192 (1988), the [IBLA] observed that
> "[sic]whether a party qualifies for bona fide purchaser protection turns on the
> answers to "two discrete questions":  (1) whether the land in question was eligible
> for mineral leasing at the time it was leased; and (2) whether the current leaseholder
> is "a bona fide purchaser for value."  *Id*. at 211.  But the Board neglected to answer
> the predicate question (apparently not presented) whether the lease was cancelled
> "for violation of any of the provisions of [the MLA]."  30 U.S.C. § 184(h)(2).  The
> Board went on to hold that the Secretary had improperly cancelled a lease, on the
> basis of a NEPA violation, because the appellant was a bona fide purchaser.  The
> Board's holding is not persuasive on this point, however, in light of its failure to
> address the underlying issue of statutory interpretation.

Dkt. # 93-1 at 22 n.7.  For counsel to now attack *Clayton W. Williams, Jr.,* is truly brazen

considering that the Secretary relied on that decision in cancelling Solenex's lease, Dkt. # 68-1 at 7

n.27, and counsel previously cited that decision without any reservations.  Dkt. # 58 at 2; Dkt. # 67

at 6.

      Notwithstanding her previous reliance on *Clayton W. Williams, Jr.,* counsel's attack on that

decision is unjustified.  If counsel's interpretation of 30 U.S.C. § 180(h)(2) had been applied in

*Clayton W. Williams*, *Jr.*, a different outcome would have resulted because the assignee of the lease would have been denied BFP protection considering that the alleged pre-lease violation was not an MLA violation, but a NEPA violation.  Yet, it strains credulity to think that the IBLA could have missed what counsel characterizes as the "predicate question," *i.e.*, the so-called "underlying issue of statutory interpretation."  Instead, what *Clayton W. Williams, Jr.,* proves is that counsel's interpretation of 30 U.S.C. § 184(h)(2) is untenable.  *Marvin M. Brandt Revocable Trust*, 134 S. Ct. at 1266 (rejecting the government's "improbable (and self-serving) reading" of a statute).

Even if, by chance, this Court were to accept counsel's untenable interpretation of 30 U.S.C. § 184(h)(2), Solenex would still be entitled to BFP protection under the common law.  As noted by the Supreme Court, BFP protection is not solely a creature of statute.  In fact, the Court has been applying common law BFP principles against the United States for more than 100 years.  *Winona*, 165 U.S. at 478 (noting that "repeated decisions of this court" prove "there [is] no need of any legislation to protect a 'bona fide purchaser'"); *United States v. Pan-Am. Petroleum Co.*, 55 F.2d 753, 768–69 (9th Cir. 1932) (recognizing that common law principles would bar the cancellation of a federal oil and gas lease owned by a BFP).  In short, Solenex is entitled to BFP protection under 30 U.S.C. § 184(h)(2) and the common law.

### B.    Solenex Had No Notice Of Any Defects In The Title Of The Lease.

In her decision, the Secretary argued that Solenex was not entitled to BFP protection solely on the grounds that Solenex had notice that the lease was suspended when it acquired the lease.  Dkt. 68-1 at 1 n.2.  The Secretary's argument borders on the frivolous.  First, the mere fact that a lease is suspended cannot bar a subsequent assignee from qualifying as a BFP.  Dkt. # 89-1 at 36.  Second, that a lease is suspended is not an indication that there is a defect in the title so as to bar a subsequent assignee from qualifying as a BFP.  *Id.* at 37.  Finally, the so-called 1985 legal

challenge would not have put Solenex on notice that there was a purported defect in the title of the lease because that challenge was to the approval of the APD—not to the validity of the lease. *Id*. at 37–38.

Perhaps recognizing the weakness of the Secretary's argument, counsel for the Secretary argues that because Solenex was created by Mr. Longwell, who owned an interest in the lease from 1982 to 2004, when the lease was assigned to Solenex, Mr. Longwell's knowledge must be imputed to Solenex. Dkt. # 93-1 at 29–31. Counsel also suggests that the "absence of a timely [EIS] was a matter of public record[.]" *Id*. at 29–30. From these propositions, counsel surmises that Mr. Longwell's "constructive (or even actual) notice of *the potential* NEPA *and NHPA* violations" must be imputed to Solenex, thereby barring Solenex from claiming BFP status.[8] Dkt. # 93-1 at 31 (all emphasis added). As an initial matter, Solenex submits counsel's syllogism is mostly *post hoc* rationalization which this Court must reject. *See State Farm,* 463 U.S. at 50 (an agency's action may "be upheld, if at all," only "on the basis articulated by the agency itself"). To be sure, a court may uphold an agency decision "of less than ideal clarity if the agency's path may reasonably be discerned[,]" *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), but, here, counsel's attempt to bolster the Secretary's decision is premised upon factual and legal errors.

Assuming, *arguendo*, that Mr. Longwell's knowledge in 2004 may be imputed to Solenex, that knowledge would not bar Solenex from being a BFP. First, the BLM's issuance of the lease in

---

[8] Contrary to counsel's position, neither the absence of an EIS, nor a NEPA violation would prove a *NHPA* violation. Because this false equivalence is the only basis on which counsel contends Solenex should have had notice of a potential NHPA violation, Solenex cannot be charged with any notice of any alleged pre-lease violations of the NHPA.

1982 is strong evidence that it was valid and properly issued.[9]  *See Sw. Petroleum Corp*, 361 F.2d

at 657 (ruling that a prospective assignee may "presume regularity in the issuance of the lease");

*Home Petroleum*, 54 IBLA at 207 (issuance of a federal lease is *prima facie* evidence that a valid

leasehold interest was conveyed).

Second, the BLM treated the lease as valid and properly issued for the next 33 years,

including 11 years in which Solenex owned the lease.  *See generally* Dkt. # 89-2.  Because the

BLM treated the lease as valid and properly issued for 33 years, counsel cannot seriously suggest

that Mr. Longwell or Solenex should have known of "*potential* NEPA and NHPA violations[,]"

Dkt. # 93-1 at 31 (emphasis added), that may have occurred prior to lease issuance.  *Cf. Stanley v.*

*Schwalby*, 162 U.S. 255, 276 (1896) ("vague rumor or suspicion is not a sufficient foundation upon

which to charge [the United States] with knowledge of a title in a third person."); *Root v. Shields*,

20 F. Cas. 1160, 1167 (C.C. D. Neb. 1868) (notice that would disqualify a purchaser from attaining

BFP status is notice that the title is void).

---

[9] In 1982 the BLM believed that it issued the lease in full and complete compliance with NEPA.
In fact, it was more than one year after lease issuance when the D.C. Circuit suggested—over the
objection of the BLM—that an EIS should generally be prepared before issuing non-NSO leases
in an area that may be eligible for wilderness designation.  *Sierra Club v. Peterson*, 717 F.2d
1409, 1410–15 (D.C. Cir. 1983).  It was more than six years after lease issuance when the Ninth
Circuit seemingly extended this reasoning—over the objection of the BLM—to run-of-the-mill
national forest lands.  *Conner v. Burford*, 848 F.2d 1441, 1443–51 (9th Cir. 1988).  And, as
recent as 2004, the BLM was still arguing that an EIS was not required at the lease issuance
stage.  *See Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1145 (D. Mont. 2004) ("The
government notes that the Tenth Circuit has held that an EIS is not required at the lease sale
stage." (citing *Park County*, 817 F.2d at 621–22)).  Because it was the position of the BLM in
2004 that an EIS was not required at the lease issuance stage, neither Mr. Longwell nor Solenex
can be charged with knowing otherwise.  Moreover, to the extent that the Secretary has now
conveniently acquiesced to the ruling in *Conner*, as reflected by her argument in the instant case,
that change in policy should only be given prospective application.  *See Franco Western Oil Co.*
(Supp.), 65 Interior Dec. 427, 429–32 (1958) (ruling that a new interpretation of the MLA should
be given only prospective application).

Notwithstanding this impediment, counsel argues that because the "absence of a timely [EIS] was a matter of public record, Solenex had constructive notice of at least a NEPA violation." Dkt. # 93-1 at 30.  Yet, a person is generally only charged with constructive notice of that which is published in the *Federal Register*.  44 U.S.C. § 1507; *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) ("*Merrill*").  There is no evidence that the BLM published notice of its alleged NEPA violation in the *Federal Register*.  Moreover, even if a prospective assignee may be charged with that which is contained in the lease file, there is no principled basis to charge a prospective assignee with constructive notice of the underlying NEPA documents.[10]  *See Sw. Petroleum Corp.*, 361 F.2d at 657 (indicating that a prospective assignee should examine the lease file, but indicating the prospective assignee has no obligation to examine other files to search for a potential title defect).  In other words, it may be reasonable for a prospective assignee to hire a title attorney, but it is totally unreasonable to require a prospective assignee to hire a NEPA attorney.  *Cf. Merrill*, 332 U.S. at 387 (Jackson, J., dissenting ) ("[O]ne should not be expected to have to employ a lawyer to see whether his own Government is issuing him a[n] [insurance] policy which in case of loss would turn out to be no policy at all.").

Even if Mr. Longwell were a NEPA expert and assuming he should be charged with notice that an alleged NEPA violation may have occurred prior to lease issuance, he was certainly entitled to rely on the Assistant Secretary's 1993 determination that any pre-lease NEPA violation had been corrected:

> Based on the environmental effects disclosed in th[e] [1990] FEIS, I concur in the Forest Supervisor's determination not to select Alternative E (no action) which would deny the Fina Surface Use Plan.  *I also do not recommend lease cancellation or a change in lease terms to require 100 percent no surface*

---

[10] Although the underlying NEPA documents may be part of the present administrative record, there is no proof that the NEPA documents were in the lease file in 2004 when Solenex acquired the lease.

*occupancy*.  In making my decision, I considered the dual objectives of conservation of our physical and biological surface resources and providing for opportunity to explore and develop oil and gas resources.  I concluded that the selected alternative provides for meeting these dual objectives….

[The 1990 FEIS] is intended to fully meet the requirements stated in the Ninth Circuit Court's ruling in <u>Conner v. Burford</u>.  I [also] agree with the Forest Supervisor's determination that the requirements of <u>Conner v. Burford</u> are met by the [1986 FEIS] which considered additional leasing alternatives which did not take into consideration the commitments embodied in the existing leases ....

Dkt. # 45-6 at 22–23 (italics added).  Indeed, it is inconceivable that the Assistant Secretary would have approved the APD in 1993 if he believed that there was still an uncorrected, pre-lease NEPA violation, or any uncorrected violations for that matter.  *See United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").  More importantly, the approved APD was still valid when Mr. Longwell created Solenex and, in good faith, assigned the lease to Solenex in 2004.  In fact, just 2 years prior to the assignment, the BLM had expressly reaffirmed to Mr. Longwell that the approved APD was still valid.  Dkt. # 45-6 at 55 ("The answer is yes, you have a valid permit.").  An approved APD necessarily means that the underlying lease is valid.  Therefore, the undisputed facts show that neither Mr. Longwell, nor any reasonable person, could have suspected that there may have been an uncorrected, pre-lease NEPA violation existing in 2004.  Therefore, counsel's suggestion that Solenex had such notice so as to prevent it from claiming BFP status is unavailing.

Perhaps recognizing that the Assistant Secretary's 1993 approval of the APD destroys her argument, counsel reaches into her "bag of tricks" and cites a case filed shortly after the Assistant Secretary approved the APD and suggests that case somehow put Mr. Longwell on notice that there may still be an uncorrected, pre-lease NEPA violation.  Dkt. # 93-1 at 30 (citing

*NWF v. Roberston*, 93-cv-44 (D. Mont.)).  Yet, neither Fina nor Mr. Longwell were named as a

party in that case and there is no requirement that a prospective assignee must search the dockets

of federal courts to determine whether a pending case may be related to the lease.  Even if Mr.

Longwell were aware of that case in 2004, that case posed no risk to the lease.[11]  Indeed, the

applicable statutes of limitation would have barred any attempt by the plaintiffs in that case to

cancel the lease.  30 U.S.C. § 226-2 ("No action contesting a decision of the Secretary involving

any oil and gas lease shall be maintained unless such action is commenced or taken within ninety

days after the final decision of the Secretary relating to such matter."); 28 U.S.C. § 2401(a) (six-

year statute of limitations for suits against the United States).  In any event, because Fina and Mr.

Longwell were absent from that case, the court was powerless to cancel the lease, even if an

uncorrected, pre-lease NEPA violation were found to exist.  *Naartex Consulting Corp. v. Watt*,

722 F.2d 779, 788 (D.C. Cir. 1983) ("[P]arties who hold royalty interests, assignments, or

interests in the title of federal leases, in the absence of special circumstances not present here, are

indispensable parties in an action to cancel the lease or to try title to the lease."); *Conner*, 848

F.2d at 1458–62 (refusing to cancel leases for pre-lease NEPA violations because, *inter alia*, the

lessees were not named as defendants).

     Finally, even if the mere filing of that case somehow put Mr. Longwell on notice that

there was potentially an uncorrected, pre-lease NEPA violation, that fact would not have given

either Mr. Longwell or Solenex pause.  As the Secretary readily concedes, a pre-lease NEPA

violation would only make the lease voidable and a voidable lease is only subject to cancellation.

Yet, notice that a lease may be subject to cancellation in the future is not notice that would

---

[11] Although the plaintiffs in that case suggested that the lease may have been issued in violation
of NEPA, they only sought to set aside the approved APD.  Dkt. # 45-9 at 44–64.  In any event,
the case was administratively terminated on March 10, 1998, Dkt. # 45-5 at 38–39, and has
arguably been dismissed with prejudice.  *Id.*; *see* Dkt. # 39 at 36.

disqualify an assignee from being a BFP.  *Home Petroleum Corp.*, 54 IBLA at 209 (notice that

"there is a possibility that the validity of the lease someday might be subject to challenge" is not

notice that would disqualify an assignee from being a BFP).

    **C.**    **Solenex Provided Valuable Consideration Entitling It To BFP Protection.**

       Counsel for the Secretary also argues that Solenex is not entitled to BFP protection because

it did not pay money for the assignment of the lease.  As the Secretary did not make this argument,

this argument is simply counsel's *post hoc* rationalization which this Court may not accept.  Even

if this Court were to entertain this argument, Solenex provided valuable consideration for the lease.

       It is well established that "[a] valuable consideration may be other than the actual payment

of money, and may consist of acts to be done after the conveyance."  *Stanley*, 162 U.S. at 276

(ruling that the United States provided valuable consideration by agreeing to establish a "military

headquarters" on the property at issue); *see Waskey v. Chambers*, 224 U.S. 564, 566 (1912) (lessee

who agreed to work the mine and remit to the lessor 30 percent of the minerals extracted gave

valuable consideration for the lease); *Prewit v. Wilson*, 103 U.S. 22, 23–24 (1880) (good faith

marriage constituted valuable consideration).  Here, as assignee of the lease, Solenex assumed all

obligations under the lease, 30 U.S.C. § 187a, which would have included the drilling of the well

under the approved APD but for the BLM's unlawful delay, *see* Dkt. # 52 at 2, and the Secretary's

punitive cancellation of the lease.  Dkt. # 68-1.  Solenex also expended valuable time and money in

a good faith effort to fulfill its lease obligations, which included the posting of a $10,000 bond.[12]

Dkt. # 24-2 at 36; *see* Dkt. # 77.  By assuming the lease obligations and expending valuable time

---

[12] Before the BLM would approve the assignment from Fina to Mr. Longwell, Mr. Longwell had
to promise to increase the bond amount from $10,000 to $105,000 prior to initiating drilling
operations.  HC00042–43, HC00045–46.  Solenex had to make the same promise when it was
assigned the lease.  HC00032–35.

and money in an effort to develop the lease, Solenex is entitled to BFP protection.[13]  Dkt. # 89-1 at 35–36.

Even if this Court were to conclude that Solenex did not provide valuable consideration for the lease, Solenex would be still entitled to BFP protection because its predecessor, Fina, was indisputably a BFP.  Dkt. # 89-1 at 34–35.  As Justice Kennedy explained, "a transferee who acquires property from a [BFP] … obtains good title, even if the transferee did not pay value or act in good faith."  *United States v. 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 142 (1993) (Kennedy, J., dissenting); *see Home Petroleum Corp*., 54 IBLA at 213 ("It is a general rule that a remote purchaser of real estate whose purchase does not fulfil all the requisites for protection due a bona fide purchaser may nevertheless be accorded protection because of his purchase from one who is entitled thereto." (quotation omitted)).  Based on these principles, the BFP protection that Fina was indisputably entitled to was transferred to Mr. Longwell and then to Solenex through the assignments made in 1999 and 2004, respectively.[14]  *See Fox-Greenwald Sheet Metal Co. v. Markowitz Bros*., 452 F.2d 1346, 1358 n.69 (D.C. Cir. 1971) ("an assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed").

Counsel for the Secretary attacks this reasoning by arguing it would allow a lessee to "manufacture bona-fide-purchaser protection by assigning the lease to a shell company 'for value'

---

[13] PTA's argument that Solenex is a "mere volunteer" that should not be entitled to BFP protection, Dkt. # 97-1 at 15 n.4, is belied by the very case it cites, *Lykins v. McGrath*, 184 U.S. 169, 173 (1902), wherein the Court noted that a person is entitled to BFP protection if he "ha[s] parted with something possessing an actual value, capable of being estimated in money, *or he must on the faith of the purchase have changed, to his detriment, some legal position that he before had occupied*."  (Emphasis added) (quotation omitted).

[14] Because the 1999 assignment from Fina to Mr. Longwell and the 2004 assignment from Mr. Longwell to Solenex have not been located in the administrative record, copies will be provided in the appendix.

and then directing the company to reassign it back to the original leaseholder."  Dkt. # 93-1 at 31.

Yet, there was no "manufactur[ing]" in this case.  The good faith of Mr. Longwell, Fina, and

Solenex cannot be questioned and Mr. Longwell and Solenex take offense to the implication of

counsel's argument.  That being said, if the lessee in counsel's hypothetical did not acquire the

lease by fraud or other shenanigans, which would disqualify it from ever being a BFP, there is

nothing patently unlawful about counsel's hypothetical.  Indeed, as explained by the North

Carolina Supreme Court:

> There are two special rules on the subject which have been settled since an early
> day; one being a mere application of the general doctrine, and the other a necessary
> inference from it.  The first is, that if a second purchaser for value and without
> notice purchases from a first purchaser who is charged with notice, he thereby
> becomes a bona fide purchaser, and is entitled to protection.  This statement may be
> generalized.  If the title to land, having passed through successive grantees, and
> subject in the hands of each to prior outstanding equities, comes to a purchaser for
> value and without notice, it is at once freed from these equities; he obtains a valid
> title, and, with a single exception, the full power of disposition.  This exception is,
> that such a title, cannot be conveyed, free from the prior equities, back to a former
> owner who was charged with notice.  If A, holding a title affected with notice,
> conveys to B, a bona fide purchaser, and afterwards takes a reconveyance to
> himself, all the equities revive and attach to the land in his hands, since the doctrine
> requires not only valuable consideration and absence of notice, but also *good faith*.
> The second rule is, that if a second purchaser with notice acquires title from a first
> purchaser who was without notice, and bona fide, he succeeds to all the rights of his
> immediate grantor.  In fact, when land once comes, freed from equities, into the
> hands of a bona fide purchaser, he obtains a complete jus disponendi, with the
> exception last above mentioned, <u>and may transfer a perfect title even to volunteers</u>.

*Brown v. Sheets*, 148 S.E. 233, 235 (N.C. 1929) (quoting 2 Pomeroy's Equity Jurisprudence § 754

(4th ed.)) (underline added).  Thus, as the foregoing demonstrates, because Solenex is entitled to

BFP protection, this Court should hold unlawful and set aside the Secretary's decision.

## III.   THE SECRETARY'S CANCELLATION OF THE LEASE WAS BARRED BY THE PASSAGE OF TIME.

Even if the Secretary had the authority to cancel Solenex's lease and assuming Solenex is

not entitled to BFP protection, the Secretary was still barred from cancelling the 33-year-old lease

in light of the passage of time.  *See* Dkt. # 89-1 at 38–40.   Counsel for the Secretary makes the

bold argument that the Secretary's cancellation authority "is not time-limited."  Dkt. # 93-1 at 32–

33.   In addition to the fact that counsel's argument essentially places a cloud on all existing leases,

the argument lacks legal support.  *Cf. Adams v. Woods*, 6 U.S. 336, 342 (1805) ("In a country

where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed

that an individual would remain forever liable to a pecuniary forfeiture.").

    It is axiomatic that certainty in title is imperative to fulfill Congress's intent in passing the

MLA.  *See Geosearch*, 508 F. Supp. at 845 ("Predictability and certainty of title are mandatory to

the entire oil and gas leasing system."); *Pan Am. Petroleum*, 284 F.2d at 655 ("Certainty of title is

an elementary prerequisite for the sound development of any mineral resource.").  In order to

provide additional certainty of title to lessees, Congress amended the MLA in 1960 to add the

statute of limitations in 30 U.S.C. § 226-2; *see* S. Rep. No. 86-1549, *reprinted at* 1960

U.S.C.C.A.N. 3313, 3317 (indicating that this provision was added to provide lessees additional

certainty of title).  If the Secretary had instituted a judicial proceeding to cancel Solenex's lease as

Congress intended, this statute would apply.  Therefore, the statute of limitations in the MLA, in

and of itself, shows that the Secretary's action in cancelling the lease is untimely because the

Secretary is effectively "contesting" her predecessor's decision to issue the lease in 1982.  30

U.S.C. § 226-2.

    Similarly, the five-year limitations period in 28 U.S.C. § 2462 bars the Secretary's belated

action:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for
> the enforcement of any civil fine, penalty, or *forfeiture*, pecuniary or otherwise,
> shall not be entertained unless commenced within five years from the date when the
> claim first accrued ….

(Emphasis added); *see* Dkt. # 89-1 at 38–39.  Counsel for the Secretary, however, argues that 28 U.S.C. § 2462 is not applicable because the Secretary's decision to cancel Solenex's 33-year-old lease was not an "enforcement proceeding" and the cancellation was not a "forfeiture" within the meaning of the statute because the Secretary's action was not "punitive."  Dkt. # 93-1 at 33.  Counsel's arguments are unpersuasive.

First, neither counsel's nor the Secretary's interpretation of 28 U.S.C. § 2462 is entitled to any deference because the statute is one of general applicability.  *Johnson v. SEC*, 87 F.3d 484, 486 (D.C. Cir. 1996) ("Because [28 U.S.C.] § 2462 is a statute of general applicability rather than one whose primary administration has been delegated to the SEC, we interpret it *de novo*.").

Second, if the Secretary's action in administratively cancelling a 33-year-old lease is not an "enforcement proceeding" within the meaning of 28 U.S.C. § 2462, it is hard to imagine what would qualify.  *See Orion Reserves Ltd. P'ship v. Norton*, No. 04-cv-0791, 2006 WL 1126810, at *3 (D.D.C. Mar. 31, 2006) (suggesting that 28 U.S.C. § 2462 would apply to the Secretary's belated action in seeking forfeiture of mining claims, but for the fact that the argument had been waived), *rev'd on other grounds sub nom. Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697 (D.C. Cir. 2009); *3M Co. (Minn. Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1457 (D.C. Cir. 1994) ("Given the reasons why we have statutes of limitations, there is no discernible rationale for applying § 2462 when the penalty action or proceeding is brought in a court, but not when it is brought in an administrative agency.").  Moreover, if the Secretary had instituted a judicial proceeding to cancel Solenex's lease as Congress intended, 28 U.S.C. § 2462 would certainly apply.  Therefore, counsel's argument that the Secretary's action does not constitute an enforcement proceeding within 28 U.S.C. § 2462 is simply a red herring.

Finally, the Secretary's decision cancelling the lease effectuated a "forfeiture" within the meaning of 28 U.S.C. § 2462. *See* 30 U.S.C. § 188(a) (Congress using "forfeited" and "canceled" interchangeably). This is true, even if the cancellation/forfeiture must be "punitive" in nature, as suggested by counsel.[15] *See Orion Reserves* , 2006 WL 1126810, *3 n.3 (The Secretary's argument that the forfeiture of mining claims is "outside the realm of [28 U.S.C. § 2462]" because "it is not punitive by nature is disingenuous and inaccurate."). Here, the evidence shows that the Secretary cancelled Solenex's 33-year-old lease because Solenex wished to exercise its lease rights and had the gall to sue the Secretary in order to do so. Dkt. # 89-1 at 39. In fact, the Secretary only came up with the idea that the lease may have been improperly issued after this Court granted summary judgment in favor of Solenex. Dkt. # 89-2 at 20–25. Thus, the Secretary's decision to cancel the lease was, indeed, punitive and a violation of Solenex's right to due process. Dkt. # 89-1 at 39. This is especially true considering that if the lease was improperly issued in 1982, as is now suggested, the Secretary should have taken steps to cancel the lease decades ago. By her own delay, the Secretary has proven that the cancellation was punitive. *Proffitt v. FDIC*, 200 F.3d 855, 861 (D.C. Cir. 2000) (agency's six-year delay in seeking expulsion of a banking executive from the industry demonstrated punitive nature of its actions).

Even if the Secretary's belated actions are not statutorily time-barred, they are barred by laches. *See Powell v. Zuckert*, 366 F.2d 634, 636 (D.C. Cir. 1966) ("The defense of laches stems from the principle that equity aids the vigilant, not those who slumber on their rights ...." (quotation

---

[15] Although nothing in the language of 28 U.S.C. § 2462 suggests that a "forfeiture" must be punitive, it is hard to conceptualize a non-punitive forfeiture. *See* BLACK'S LAW DICTIONARY 661 (7th ed. 1999) (defining "forfeiture" as "[s]omething (esp. money or property) lost or confiscated by this process; a penalty.").

omitted)).[16]  To establish a defense of laches a party must prove:  "'(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Kansas v. Colorado*, 514 U.S. 673, 687 (1995) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).  These elements are satisfied in the instant case.  Dkt. # 89-1 at 39–40.

First, the Secretary waited more than 33 years before suggesting that the lease may have been improperly issued.  On its face, this delay is unconscionable.  Making this unconscionable delay even more egregious is that, if the lease were improperly issued as the Secretary now suggests, those facts were available in 1982.

Second, the prejudice to Solenex caused by the Secretary's egregious delay is undisputed.  Indeed, if the Secretary had immediately cancelled the lease in 1982, Mr. Longwell would not have suffered through the subsequent three decades hoping to see the well drilled.  Dkt. # 24-2 at 32–35.  Nor would Solenex have invested time and money in an effort to get the suspension lifted so that it could exercise its valuable lease rights.  *See* Dkt. # 77 to Dkt. # 77–3.

Counsel does not dispute that Solenex has proven the elements for invoking laches, instead counsel makes the archaic argument that laches does not apply against the federal government. *See* Dkt. # 93-1 at 32–33.   Yet, logic dictates that laches should be applied against the federal government, particularly when security of title is at stake.  *Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 255–69 (1985) (Stevens, J., dissenting) (opining that laches should apply to a sovereign's delay in seeking to upset title); *California v. Nevada*, 447 U.S. 125,

---

[16] Counsel criticizes Solenex's citation to *Powell* because that case involved the federal government's attempt to use laches against a civilian employee.  Dkt. # 93-1 at 32 n.10.  If the federal government can assert laches against its employees, there is no reason why Solenex should not be able to use it against the Secretary's attempt to cancel its lease.  "After all … what is sauce for the goose is normally sauce for the gander."  *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1418 (2016); *cf. Merrill*, 332 U.S. at 387–88 (Jackson, J., dissenting) ("It is very well to say that those who deal with the Government should turn square corners.  But there is no reason why the square corners should constitute a one-way street.").

131–32 (1980) ("California ... has always claimed all territory up to a specifically described boundary ....  If Nevada felt that those lines were inaccurate ... the time to object was when the surveys were conducted, not a century later." (footnote omitted));  *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 373 (1977) (suggesting that an employer may be able to assert laches against the EEOC.  This is especially true considering that when the federal government issues a lease it is acting in a proprietary—not a sovereign—capacity.  *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." (quotation omitted)); *United States v. Gen. Petroleum Corp. of Cal.*, 73 F. Supp. 225, 234 (S.D. Cal. 1946) ("Regardless of the type of lease Congress might authorize, a lease executed in accordance with what it has authorized becomes a private, contractual matter and is to be interpreted according to the general rules of law respecting contracts between individuals."), *aff'd sub nom. Cont'l Oil Co. v. United States*, 184 F.2d 802 (9th Cir. 1950); *see Pfister v. Cow Gulch Oil Co.*, 189 F.2d 311, 315 (10th Cir. 1951) (applying laches in the context of a private oil and gas lease).

Further support for this conclusion is that Solenex is not asserting laches to give life to a void lease.  *See Ewert v. Bluejacket*, 259 U.S. 129, 138 (1922) ("[T]he equitable doctrine of laches, developed and designed to protect goodfaith transactions against those who have slept upon their rights, with knowledge and ample opportunity to assert them, cannot properly have application to give vitality to a void deed ....").  Instead, Solenex is asserting the defense to protect a valid, 33-year old lease, that is, at worst, merely voidable.  *See Rhode Island v. Massachusetts*, 45 U.S. 591, 639 (1846) ("For the security of rights, whether of states or individuals, long possession under a claim of title is protected.").

In short, the Secretary was barred from cancelling Solenex's 33-year-old lease by the

passage of time.  Therefore, this Court should hold unlawful and set aside the Secretary's decision.

## IV.  THE SECRETARY IS ESTOPPED FROM ASSERTING THAT THE LEASE WAS IMPROPERLY ISSUED AFTER REPEATEDLY REPRESENTING THAT THE LEASE WAS VALID AND PROPERLY ISSUED FOR MORE THAN 33 YEARS.

Assuming that the Secretary had the authority to cancel Solenex's lease and assuming the

Secretary's actions are not otherwise barred, the Secretary is estopped from now asserting that the

lease was improperly issued.  The elements for invoking estoppel against the government are:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the facts; and (4) he must rely on the former's conduct to his injury.

*Floyd Higgins*, 147 IBLA 343, 347 (1999) (quoting *United States v. Georgia-Pacific Co.*, 421 F.2d

92, 96 (1970)).  These elements are satisfied in the instant case.[17]  Dkt. # 89-1 at 40–43.

Counsel does not dispute that Solenex has proven these four elements for invoking

estoppel.  *See* Dkt. # 93-1 at 36–37.  Instead, counsel argues that in order to estop the federal

government, Solenex must satisfy three additional requirements:  "(1) the Government engaged in

'affirmative misconduct'; (2) the Government's conduct threatens to result in a serious injustice;

and (3) estoppel would not unduly damage the public interest."[18]  Dkt. # 93-1 at 37 (citing *Pierce

v. SEC*, 786 F.3d 1027 (D.C. Cir. 2015) and *Keating v. FERC*, 569 F.3d 427 (D.C. Cir. 2009)).

---

[17] Because Solenex is not asserting estoppel or laches to give life to a void lease, PTA's citation to 43 C.F.R. § 1810.3 is misplaced, *see* Dkt. # 97-1 at 15-18, assuming that that regulation was incorporated into Solenex's lease and assuming that an agency could even lawfully promulgate such a regulation that attempts to immunize the agency from its own egregious behavior.

[18] Counsel also cites *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990) for the proposition that the Supreme Court has reversed "every finding of estoppel that [it] ha[s] reviewed."  Dkt. # 93-1 at 37.  Yet, the Court has not reviewed the Secretary's unprecedented and egregious actions in the instant case.  *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60–61 (1984) (equitable estoppel should apply when necessary to ensure that private parties are treated with a "minimum standard of decency, honor, and reliability in their

As an initial matter, counsel has embellished the cases she cites.  Although those cases
suggest that "affirmative misconduct must be shown to estop the federal government, the final two
requirements in counsel's conjunctive test are absent.  *Pierce,* 786 F.3d at 1038 ("Estoppel
generally requires that government agents engage—by commission or omission—in conduct that
can be characterized as misrepresentation or concealment, *or, at least, behave in ways that have or
will cause an egregiously unfair result*." (emphasis added) (quotation omitted); *Keating,* 569 F.3d
at 434 (including affirmative misconduct as an element).  Thus, contrary to counsel's
embellishment, *Pierce* and *Keating* merely suggest that a party asserting estoppel against the
federal government must demonstrate that the government engaged in "affirmative misconduct" *or*
"behave[d] in ways that have or will cause an egregiously unfair result."  *Pierce*, 786 F.3d at 1038;
*see* Dkt. # 89-1 at 42–43 & n.17 (demonstrating that this disjunctive test is satisfied).

In any event, assuming counsel's requirements are necessary, the facts show that they are
satisfied.  First, assuming that the lease may have been issued improperly in 1982, as the Secretary
now contends, then the evidence shows that the BLM and the Secretary engaged in a concerted
pattern of affirmative misconduct and concealment by falsely representing that the lease was valid
and properly issued for more than 33 years.  *See, e.g.*, Dkt. # 89-2 at 4–22.  Making matters worse,
this affirmative misconduct and concealment was not in the form of a few random oral statements
made by low-level bureaucrats.  *Donna J. Vrooman*, 186 IBLA 241, 250-51 (2015) (suggesting
that oral statements may not trigger estoppel).  Instead, this affirmative misconduct and
concealment was in the form of:  (1) written documents that were signed, and/or approved by high-
level officials; and (2) statements made to this Court.  *See, e.g.*, Dkt. # 45-6 at 2–33; Transcript of

---

dealings with their Government").  Nor has counsel explained why the Secretary should not be
judicially estopped from asserting that the lease was improperly issued after making the
contradictory argument to this Court that the 29-year delay was not unreasonable.  *See* Dkt. # 89-
1 at 42 n.16.

June 10, 2015 Oral Argument at 22:1–40:8 (counsel arguing that the Secretary had not unreasonably delayed in lifting the suspension on the lease—a lease they both now contend was improperly issued).

Counsel for the Secretary tries to downplay this concerted pattern of affirmative misconduct and concealment by arguing that "since 1985" the Secretary was simply "endeavor[ing]" to comply "with all applicable statutes and regulations governing the lease and its operations."  Dkt. # 93-1 at 37.  Yet, all those "endeavor[s]" were taken in an effort to approve the APD that was filed in 1983.  *See, e.g.*, Dkt. # 89-2 at 6–22; *see* 53 Fed. Reg. 5,290 (Feb. 23, 1988) (notice of intent to prepare an EIS for the APD); 56 Fed. Reg. 9,935 (Mar. 8, 1991) (notice of ROD approving the APD based upon 1990 FEIS); 58 Fed. Reg. 7,241 (Feb. 5, 1993) (notice of ROD approving the APD based upon 1990 FEIS)  If the lease was improperly issued, as the Secretary now contends, all the NEPA documents (consisting of thousands of pages), which probably took tens of thousands of hours to prepare, were needlessly generated at taxpayer expense because an approved APD requires a properly issued lease.

Second, if the Secretary is not estopped, Solenex will suffer "a serious injustice."  It is undisputed that between 1982 and 2016, Solenex and its predecessors expended substantial time and money in seeking to develop the lease in reasonable reliance that the lease was properly issued.  Dkt. # 24-2 at 32–36; Dkt. #77 to 77-3.  Not to be forgotten is the emotional turmoil inflicted on Mr. Longwell and Solenex due to the unlawful 29-year delay followed by the Secretary's punitive cancellation of the lease.  If the Secretary is allowed to get away with playing such a cruel joke, it would, indeed, be a "serious injustice."

Finally, the public interest would be damaged if estoppel is not applied.  By passing the MLA, Congress determined that the public interest would be served by developing the Nation's oil

and gas resources.  41 Stat. at 437 ("An Act To promote the mining of ... oil ... [and] gas ... on the

public domain."); *see* 30 U.S.C. § 21a ("The Congress declares that it is the continuing policy of

the Federal Government in the national interest to foster and encourage private enterprise in ... the

development of economically sound and stable domestic [oil and gas] ... industr[y] ....").  If the

Secretary is allowed to cancel Solenex's 33-year-old lease, no lease is safe and Congress's intent in

passing the MLA is defeated, contrary to the public interest.[19]  *See* Dkt. # 91-1 (Brief of Amici

Curiae Chamber of Commerce of the United States and the Montana Petroleum Association

demonstrating that the public interest is served by having the federal government honor its

contractual obligations.).

    As the foregoing demonstrates, the elements for applying estoppel against the Secretary are

established.  Notwithstanding this unmistakable conclusion, counsel argues that estoppel cannot

bar an agency from "chang[ing] its mind."  Dkt. # 93-1 at 36.  But this is just a thinly veiled

attempt at asking this Court to adopt a rule that estoppel can never be asserted against the

government.  Because the Supreme Court has consistently rejected the federal government's

obvious attempts to establish such a rule, *Richmond*, 496 U.S. at 423, this Court should likewise

reject counsel's thinly veiled attempt.

    In any event, the issue in this case is not whether an agency may simply "change its mind."

Instead, the issue in this case is whether the Secretary can reverse the longstanding position of her

---

[19] Arguably, NEPA and the NHPA may also reflect the public interest.  Yet, those statutes are
merely procedural, not substantive, and cannot trump the overarching public interest in
protecting private property.  *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 324
(1893) ("[I]n any society the fullness and sufficiency of the securities which surround the
individual in the use and enjoyment of his property constitute one of the most certain tests of the
character and value of the government."); *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226,
235–236 (1897) ("Due protection of the rights of property has been regarded as a vital principle
of republican institutions....  Indeed, in a free government, almost all other rights would become
worthless if the government possessed an uncontrollable power over [private property]."
(quotation omitted)).

predecessors in light of the facts in this case, including, Solenex's reasonable reliance interests. *See* Dkt. # 89-1 at 49–50.

Counsel responds by arguing that the Secretary had no obligation to consider Solenex's reliance interests because doing so would have been "futile[.]" Dkt. # 93-1 at 37–38. Yet, in freely admitting that the Secretary "failed to consider an important aspect of the problem," counsel has established that the Secretary's decision was arbitrary and capricious. *State Farm*, 463 U.S. at 43. In addition, the Secretary's failure to consider Solenex's reliance interests based upon an unsupported assertion that to do so would have been "futile" confirms that the Secretary's decision was arbitrary and capricious because, *inter alia*, it was predetermined.[20] *Cf. Minney v. United States Office of Pers. Mgmt.,* 130 F. Supp. 3d 225, 234 (D.D.C. 2015) (due process requires more than a "predetermined outcome"). Counsel tries to save the Secretary's decision by suggesting that Solenex did not argue that the Secretary's failure to consider Solenex's reliance interest renders her decision arbitrary and capricious. Dkt. # 93-1 at 38. This is not true because Solenex argued that its reliance interests prove both that the Secretary is estopped from cancelling the lease, Dkt. # 89-1 at 42 n.17, and that her decision was arbitrary and capricious. Dkt. # 89-1 at 49 ( "[A] change in position 'that does not take account of legitimate reliance on' the prior position may constitute

---

[20] Further evidence that the Secretary's decision was predetermined is the Secretary's failure to comply with NEPA before cancelling the lease. *See* Dkt. # 89-1 at 56–57; *cf. Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 229 (D.D.C. 2003) (agency decision predetermined when it issued permits before complying with NEPA). Counsel for the Secretary argues that Solenex lacks standing to raise a NEPA argument because Solenex cannot satisfy the zone-of-interest test. Dkt. # 93-1 at 40–41. Yet, the zone-of-interest test has limited applicability when the plaintiff is the "subject of the contested regulatory action," as Solenex is here. *See Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399–400 (1987). Therefore, Solenex's property and economic interests do not bar it from arguing that the Secretary's decision was arbitrary and capricious because she failed to comply with NEPA before cancelling the lease. Dkt. # 89-1 at 56–57; *see Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1125–27 (8th Cir. 1999) (economic interests of outfitters allowed them to challenge a flawed EIS that was the basis for the decision limiting their access to a wilderness area).

arbitrary and capricious action[.]" (quoting *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742

(1996)).  Nevertheless, whether this Court concludes that the Secretary is estopped from cancelling

the lease or that her cancellation decision was "arbitrary and capricious" is of no real moment

because either conclusion would require this Court to hold unlawful and set aside the Secretary's

decision under 5 U.S.C. § 706(2)(A).  *See Ass'n of Data Processing Serv. Orgs. v. Bd. of

Governors*, 745 F.2d 677, 683 (D.C. Cir. 1984) (noting that 5 U.S.C. § 706(2)(A) serves as a

"catch-all" that "pick[s] up administrative misconduct not covered by the other more specific"

standards in 5 U.S.C. § 706(2)).

## V.   CONTRARY TO THE SECRETARY'S NEW POSITION, THE LEASE WAS PROPERLY ISSUED.

Assuming that the Secretary had the authority to cancel Solenex's lease and assuming the

Secretary is not otherwise barred from cancelling the lease, the Secretary's new position that the

lease was improperly issued is erroneous.  According to the Secretary, the lease was improperly

issued more than 33 years ago in violation of NEPA and the NHPA.  Dkt. # 68-1 at 8–12.  As

previously demonstrated, Dkt. # 89-1 at 43–54, and as further demonstrated below, the Secretary's

arguments are fallacious.

### A.   There Were No NEPA Violations In The Issuance Of The Lease.

Issuance of the lease was based upon a comprehensive, 162-page environmental

assessment ("1981 EA") that fully analyzed six alternatives, including a no-action alternative.

Dkt. # 45-10 at 8 to Dkt. # 45-11 at 45; Dkt. # 89-1 at 46–47; Dkt. # 89-2 at 1–4.  Following

issuance of the lease, four more exhaustive NEPA processes were performed, which generated

the following comprehensive NEPA documents:

- The 1985 EA.  A comprehensive 318-page document that incorporated the 1981 EA and upon which the APD was first approved in 1985.  Dkt. # 45

at 31 to Dkt. # 45-1 at 12 (excerpts of 1985 EA); A0003:FS000037–354
(entire 1985 EA); Dkt. # 89-1 at 46–47; Dkt. # 89-2 at 1–4.

- The 1986 FEIS.  A document that was prepared in conjunction with the
  1986 Forest Plan that incorporated the 1981 EA and that fully analyzed the
  environmental effects of oil and gas exploration and development on the
  National Forest.  Dkt. # 45-2 at 27–28; Dkt. # 45-4 at 14; 1986 Forest Plan
  at 6–22; A0005:FS000379–1080 (1986 FEIS, Volume I). The APD was
  approved in 1987 based upon the 1986 FEIS, the 1985 EA, and the 1981
  EA.  Dkt. # 89-2 at 10.

- The 1990 FEIS.  A comprehensive, 982-page document that incorporated
  both the 1986 FEIS and the 1981 EA and that fully analyzed the
  environmental effects of operations under the APD.  Dkt. # 45-3 at 1 to
  Dkt. # 45-4 at 14 (excerpts of 1990 FEIS).  The APD was approved in
  1991 and 1993 based upon the 1990 FEIS, the 1986 FEIS, and the 1981
  EA.

Despite all the NEPA processes and documents, the Secretary and her counsel persist in

arguing that the lease was issued in violation of NEPA.  Yet, neither the Secretary nor her

counsel have identified a single, potential environmental effect that might have been overlooked

during these exhaustive NEPA processes or in preparing these comprehensive NEPA documents.

Instead, they argue that that an EIS must be prepared prior to the issuance of a non-NSO lease in

each and every situation.  Dkt. # 93-1 at 34; *but see Park County*, 817 F.2d at 620–24 (upholding

the issuance of a non-NSO lease based upon an EA).  Yet, this argument elevates form over

substance because the comprehensive, 162-page 1981 EA was the functional equivalent of a full-

blown EIS.  Dkt. # 89-1 at 46–47; *see Ctr. for Envtl. Law & Policy v. U.S. Bureau of

Reclamation*, 655 F.3d 1000, 1009 (9th Cir. 2011) (emphasizing that "it would impermissibly

elevate form over substance" to require a NEPA document to repeat its cumulative effects

analysis under a particular heading when it was adequately considered throughout the extensive

record).

Even if the 162-page 1981 EA was not the functional equivalent of an EIS, the four subsequent NEPA processes, which produced the 1985 EA, the 1986 FEIS, and the 1990 FEIS, corrected any NEPA deficiency, as the Assistant Secretary conclusively determined in the 1993 ROD.  Dkt. # 45-6 at 3–33; Dkt. # 89-2 at 14–17.  Counsel for the Secretary tries to sweep the 1993 ROD under the rug by arguing that the 1993 ROD was not a final decision because it was never implemented in light of the fact that the lease was suspended shortly after that decision.  Dkt. # 93-1 at 34–35.  That the 1993 ROD approving the APD was never implemented does not change the fact that the 1993 ROD constituted a final decision by Secretary.  And, contrary to counsel's misconception, that operations under the lease were *suspended* did not magically erase the 1993 ROD or the rights conferred thereby because a suspension does not abrogate rights; it temporarily prevents the exercise of rights.  *See* Dkt. # 45-6 at 34–34 (1993 suspension in which Secretary Babbitt expressly acknowledged the continued validity of the 1993 ROD that approved the APD); *see also* BLACK'S LAW DICTIONARY 1460 (7th ed. 1999) (defining "suspend" as "[t]o temporarily keep (a person) ... from exercising a right ....").

Counsel, like her client, also attempts to discredit the 1993 ROD by arguing that Assistant Secretary failed to consider that none of the underlying NEPA processes or documents properly considered a no-action, *i.e.*, a no leasing alternative.  Dkt. # 93-1 at 34 n.14.  This is not true.  The no-action alternative was fully considered in the 1981 EA, which defined this alternative as to delay making recommendations on all pending lease applications until completion of the forest plan.  Dkt. # 45-10 at 48, 62.  Under this alternative, no leases would be issued, just as if all lease applications were to be denied.  Although this alternative would violate the Energy Security Act of 1980, 42 U.S.C. § 8855, *see* Dkt. # 89-2 at 1–3, the environmental effects of this alternative were fully compared in the 1981 EA to the effects of the other

alternatives.[21]  Dkt. # 45-10 at 62 (concluding that the no-action alternative would have "no

effects"); Dkt. # 45-10 at 76 (spreadsheet comparing effects of all alternatives).  That the

Secretary may now wish that this alternative had been selected does not make the analysis of the

no-action alternative in the 1981 EA deficient or give the Secretary the right to cancel Solenex's

lease.  *See United States v. Seatrain Lines*, 329 U.S. 424, 427–32 (1947) (rejecting the federal

government's attempt to revoke a license in light of a change in policy).

###    B.    There Were No NHPA Violations In The Issuance Of The Lease.

As previously demonstrated, like NEPA, the NHPA was fully complied with prior to

lease issuance.  Dkt. # 89-1 at 52–64.  In response, counsel throws the agencies under the bus by

arguing that they failed to consult with the Tribe and failed to engage in a good faith effort to

identify cultural resources.  Dkt. # 93-1 at 35–36.  The facts prove otherwise.

"Extensive public involvement concerning oil and gas activity [was] conducted by the

Forest [Service] prior to" issuance of the 1981 EA.  Dkt. # 45-10 at 80.  This involvement

included consulting with the "Blackfeet Tribal Council" regarding the ongoing NEPA process.

Dkt. # 45-10 at 81; *see* Dkt. # 45-10 at 45 ("The Forest [Service] first engaged in AIRFA

compliance with the Blackfeet Tribe during the fall of 1979."); *see* 1985 EA at 127 (noting that

the Forest Service acknowledged the Tribe's reserved rights in the area in a 1979 letter to the

Tribe).  Based upon that consultation, the Forest Service acknowledged that oil and gas activities

"may have an impact on cultural resources."  Dkt. # 45-10 at 71.  Yet, the Tribe refused to

identify those resources at the leasing stage; instead, "prefer[ing] to identify the[] areas on a

---

[21] Because the no-action alternative was fully considered in the 1981 EA and could have been
selected, *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) is inapposite because
the EA in that case eliminated the no-action alternative from further consideration before a final
decision was made.  Dkt. # 89-1 at 47–48.  That *Bob Marshall* was inapposite probably explains
why the Assistant Secretary did not mention that case in the 1993 ROD.

project-by-project basis." Dkt. # 45-10 at 45.  Because the Tribe refused to identify any specific

sites, it cannot be said that they agencies did not put forth a good faith effort to identify cultural

resources prior to issuing the lease.

    The agencies put forth a similar good faith effort at the APD stage.  In the 1985 EA, the

agencies again acknowledged the Tribe's reserved rights in the area.  1985 EA at 126–27.  The

agencies also followed existing policies regarding the identification of religious sites in the area

and determined that "[n]o religious sites or activities were identified in the project area …."  *Id*.

at 128; *see id*. at 132–33 (noting that a draft of the 1985 EA was mailed to the Tribe and that the

Tribe participated in an on-site "tour" of the project area); *id*. at 140 (demonstrating further

consultation with the Tribe regarding the APD).[22]  The 1990 FEIS provides further evidence of

consultation, efforts to identify cultural resources, and concerns about impacts on cultural

resources and reserved rights.  1990 FEIS, Ch. 1 at 9–10; Ch. III at 63–73; Ch. IV at 77–82,150–

53, 167, 185; Ch. V at 11; Ch. VI at 3–4, Ch. VII at 4–5, Ch. VIII at 2, App. D at 24–26, 42–43,

App. G at 39–49; App. J at 1–18; App. M at 1–4; App. P at 46–50; App. R at 1–12 (documenting

consultation with the Tribe from 1972 to 1990).  More importantly, the Assistant Secretary

concluded in 1993 ROD:

> The identification effort for historic properties included a literature review, field
> inventory, and interviews with Blackfeet Traditionalists.  The interviews did not
> result in the identification of any properties having significance as traditional
> cultural properties as defined by the [NHPA].  These efforts, taken as a whole,
> resulted in a determination that no properties included on or eligible for inclusion
> to the National Register of Historic Places would be affected by the proposed
> actions.  The Montana State Historic Preservation Office commented on the

---

[22] *See also* HC00382 ("The Blackfeet Tribal Business Council Chairman was contacted on
February 9, 1984, by letter and informed of the project and asked to supply any information
regarding possible conflict with religious activities and sites in compliance with the requirements
of the [AIRFA].  No reply has been received from the Blackfeet Tribe regarding this notification
nor has any information been presented to us during the public review period regarding religious
sites and activities."); HC15374 (December 23, 1983 letter advising Tribe of APD).

identification effort and further stated that they had no information which
disputed this finding.  Compliance with the implementing regulations of Section
106 of the [NHPA] has, therefore, been completed.

Dkt. # 45-6 at 19; *see id*. at 10, 11, 13, 20, 24.

As the foregoing demonstrates, the agencies put forth a good faith effort to consult with

the Tribe and to identify cultural resources both prior to issuing the lease and prior to approving

the APD in 1985, 1987, 1991, and 1993.  More importantly, there is no evidence that further

consultation prior to lease issuance would have identified any important cultural resources,

especially given the Tribe's reluctance to identify those resources at that time.  Dkt. # 45-10 at

45.  In fact, it was years after lease issuance before the Tribe seriously began expressing a

religious concern about the area.  *Compare* Dkt. # 45-12 at 13–14 (1983 tribal resolution

expressing desire to develop the oil and gas resources in the area); Dkt. # 45-9 at 80 (1983 letter

from the Tribe suggesting that drilling would affect its reserved hunting rights); 1990 FEIS,

Appendix J-7 to J-11 (1986 letter from the Tribe asserting ownership to the oil and gas rights in

the area and explaining that designating the area as wilderness would deny the existing oil and

gas lessees "their property rights …."); June 23, 1987 Tribe Letter (commenting on proposed

legislation and asking that 100 percent of all royalty revenue from the existing leases be paid to

the Tribe (copy attached as Exhibit 1)); Dkt. # 39-1 at 2 (1988 letter from tribal member stating

that the area is not sacred); Dkt. # 45-9 at 33–38 (1991 Tribe appeal of APD claiming rights to

the mineral resources in area) *with* Dkt. # 45-9 at 66–67 (1993 tribal resolution stating area has

religious significance).  Yet, "factual and legal developments" occurring after the lease was

issued cannot be used to show that the lease was issued in violation of the NHPA.  Dkt. # 89-1

52 n.29 (Solenex describing those subsequent "factual and legal developments," including the

1992 amendments to the NHPA).  Therefore, because the lease was issued in full and complete

compliance with the NHPA, the Secretary's suggestion otherwise renders her decision arbitrary and capricious.  Dkt. # 89-1 at 52–54.

## VI.    THE SECRETARY'S CANCELLATION OF THE LEASE WAS ARBITRARY AND CAPRICIOUS.

Assuming that there are any non-harmless, uncorrected, pre-lease violations, the Secretary abused her discretion in not correcting them.  Dkt. # 89-1 at 54–56; *see Block v. Pitney Bowes Inc*., 952 F.2d 1450, 1454 & n.5 (D.C. Cir. 1992) (noting that the "distinction, if any, between 'arbitrary and capricious review' and review for 'abuse of discretion' is subtle" and they are usually combined into one "arbitrary and capricious" standard (citing 5 U.S.C. § 706(2)A)). This is especially true considering that correcting such violations is the Secretary's standard practice, *see S. Utah Wilderness Alliance v. U.S. Dep't of Interior*, No. 06-cv-342, 2007 WL 2220525, at **1–2 (D. Utah 2007), and, contrary to the Secretary's argument, Section 403 of Pub. L. No. 109-432, 120 Stat. 2922 (2006), does not prevent her for doing so because Solenex's lease is a "valid existing right."  Dkt. # 89-1 at 55.  Nor, contrary to the Secretary's suggestion, Dkt. # 68-1 at 13, would correcting the violations be futile or adversely affect the purported TCD.  *See* Dkt. # 89-1 at 55 (the relevant facts in correcting any pre-lease violations are those existing in 1982).  In fact, the evidence shows that the purported TCD and the purported finding of adverse effects were merely pretexts for the unlawful delay and now the Secretary's cancellation of the lease.  Dkt. # 89-1 at 55 (citing H0038:FS006507–31; Solenex's Comments (Sept. 4, 2015)).  In any event, the stipulations, mitigation and monitoring requirements, and conditions of approval that were incorporated into the approved APD would adequately protect the purported TCD.  Solenex's Comments at 10–23; *see also* Dkt. # 45-6 at 3–33 (1993 ROD). As the Secretary "failed to consider an important aspect of the problem," *i.e.*, the stipulations, mitigation and monitoring requirements, and conditions of approval that were incorporated into

the approved APD, and simply caved in to the recent religious demands of the Tribe, her decision was necessarily "arbitrary and capricious." *State Farm*, 463 U.S. at 43; Dkt. # 89-1 at 55–56.

## VII. THE SECRETARY'S DISAPPROVAL OF THE APPROVED APD WAS UNLAWFUL.

It is undisputed that the APD was approved in 1993. Dkt. # 45-6 at 2 ("I approve the Fina APD"); *id.* (Assistant Secretary declaring: "I hereby concur with approval of the Fina APD"). Notwithstanding this authoritative approval, the Secretary summarily disapproved the approved APD. Dkt. # 68-1 at 13. As previously demonstrated, the Secretary's disapproval of the approved APD was unlawful in light of, *inter alia*, the passage of time and Solenex's reasonable reliance interests. Dkt. # 89-1 at 57. In addition, the regulation cited by the Secretary as allegedly providing authority for disapproving the approved APD, 43 C.F.R. § 3162.3-1(h)(2), only allows the disapproval of an unapproved APD within 35 days of receipt of an APD. Because the Secretary's disapproval was vis-à-vis an approved APD and came three decades too late, the Secretary's disapproval violated the very regulation she relied upon. Dkt. # 89-1 at 65.

Counsel for the Secretary argues that the time restrictions in 43 C.F.R. § 3162.3-1(h)(2) for disapproving an APD do not apply because the lease had been suspended since 1998. Dkt. # 93-1 at 39–40. Yet, there is no way to read the regulation cited by the Secretary, 43 C.F.R. § 3162.3-1(h)(2), without applying the time restrictions expressly contained therein. Nor is there any way to read the regulation as applying to approved APDs. *See* HC01183–84 (BLM document providing that "[n]o case law exists regarding Secretarial action to alter an APD after it's been issued, but ramifications in terms of 'takings' are pretty clear …."). And, contrary to counsel's suggestion, that operations under the lease were *suspended* does not magically turn an approved APD into a pending APD that may be disapproved under 43 C.F.R. § 3162.3-1(h)(2).

Even if counsel's indefensible reading of 43 C.F.R. § 3162.3-1(h)(2), were accepted, the Secretary violated 5 U.S.C. § 558(c) in disapproving the approved APD without providing Solenex notice and an opportunity to be heard.  Dkt. # 89-1 at 57–58.  Counsel argues that this provision of the APA does not apply because Solenex has not proven that an APD is a license as that term is used in the APA.  Yet, the term "license" in the APA "includes the whole or a part of an agency permit ... or other form of permission[.]"  5 U.S.C. § 551(8); *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1437 (9th Cir. 1991) ("the definition of license in the APA is extremely broad").  Counsel cannot seriously suggest that an approved "Application for *Permit* to Drill" is not "an agency permit ... or other form of permission."  Therefore, because the Secretary disapproved Solenex's approved APD without complying with 5 U.S.C. § 558(c), her actions are unlawful and must set aside.

## CONCLUSION

This Court should grant summary judgment in Solenex's favor, deny the Secretary's cross-motion for summary judgment, and hold unlawful and set aside the Secretary's decision that cancelled Solenex's 33-year-old lease and disapproved Solenex's 23-year-old approved APD.

DATED this 10th day of November 2016.

Respectfully submitted,

/s/ Steven J. Lechner
Steven J. Lechner, D.D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorney for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 10th day of November 2016, I electronically filed the

foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be

accomplished by this Court's CM/ECF system.

/s/ Steven J. Lechner        
Steven J. Lechner

# Exhibit 1

# BLACKFEET NATION

EXECUTIVE COMMITTEE

EARL OLD PERSON, CHAIRMAN
ARCHIE ST. GODDARD, VICE CHAIRMAN
MARVIN WEATHERWAX, SECRETARY
ELOUISE C. COBELL, TREASURER

## P.O. BOX 850
### BROWNING, MONTANA 59417
(406)338-7179

1
TRIBAL COUNCIL

EARL OLD PERSON
ARCHIE ST. GODDARD
MARVIN D. WEATHERWAX
ROLAND F. KENNERLY
LANE KENNEDY
BERNARD ST. GODDARD
LEE WILSON
GEORGE KICKINGWOMAN
TED WILLIAMSON

June 23, 1987

CONFIDENTIAL

Honorable Senator John Melcher
U.S. Senator, Montana
730 Hart Building
Washington, D.C.  20510

Dear John:

The Blackfeet Tribe very much appreciates your concern regarding the implementation of our treaty rights in the Lewis and Clark National Forest.   The Council is most pleased that you are proposing to clarify our rights through legislation.   I do however, have a number of concerns regarding the proposed bill as presently drafted.

Our initial concern is that the bill proposes to call the area "Badger-Two Medicine".   Badger-Two Medicine is the name of a Bear Management Unit which extends from the Forest Service Unit onto a portion of the Reservation.   The area's present official name is the North End Geographic Unit.   In July of 1985, the Forest Service agreed to change the name to "Blackfeet Unit", unfortunately, it was by then too late to change the printing of the Forest Plan.   The Forest Service has now agreed to call the area "Blackfeet Unit" for negotiation purposes  and to change the name officially when the Forest Plan is revised, which will probably be in ten years.   The Tribe would like for the bill to legislatively change the name to "Blackfeet Unit".

## JOINT MANAGEMENT PLAN

Section 1 of the proposed bill mandates the creation of a joint management plan.  The Tribe and the Forest Service are presently working to develop such a plan under the present forest plan provision which states that the Forest Service will:

> "Establish a working group with representatives of the Blackfeet Tribe and the Bureau of Indian Affairs in order to negotiate agreements which will enable both the Forest Service and the Blackfeet Tribe to share in the management of those resources reserved by the Blackfeet Tribe. An agreement under this guideline need not affect

002280

the legal status of those reserved rights."
(Management Standard H-1(3), page 2-60). A series of informal agreements have already been reached and negotiations are continuing.

The proposed bill states in Section 1(a) that the joint plan would comply "to the extent practicable" with the Tribe's treaty rights. The Tribe's rights under the Agreement of 1896 (29 Stat. 321, 353-354) would then be down-graded to a status less than the one they presently have as a congressional enactment equal to the 1976 Forest Management Act. The language of the proposed bill should be changed to state that the plan will comply with both.

The present negotiations to develop a plan have involved the Forest Service and the Tribe, but not the public. The proposed bill would require public involvement in developing the joint plan. The Tribe does not feel that the public should be involved in the development of a plan to implement treaty rights which were reserved by the government of the Blackfeet Tribe. These negotiations should be conducted on a government to government basis.

The proposed bill gives no time table for the development of the joint plan. Informally, the Forest Service and the Tribe have been aiming at developing such a plan by the time of the next forest plan. Such a length of time is necessary because the Tribe presently does not have the same technical capabilities as the Forest Service. It is understood in the negotiations, that as the Tribe develops land and water management standards for the Reservation, these standards would become the standards for the Unit. The Unit would then be managed in a manner compatible with the adjoining reservation lands.

The proposed bill appears to give the Secretary of Agriculture power to develop such a plan without requiring the consent of the Tribe. He would only have to consult with the Tribe. This negates the concept of "joint". The bill should require Tribal approval of the plan. Incidentally, the Section 1 reference to the Council, should refer to the Tribe.

<u>TIMBER</u>

Under our current negotiations with the Forest Service, tribal members are harvesting wood in the Unit using free use permits which are distributed through the Bureau of Indian Affairs Agency in Browning. The Tribe, through the Agency Forester, is trying to develop short and long range plans for timber use in the Unit. No commercial timber sales are planned in the area, although we understand that it is possible for the Tribe to request a sale if one would

benefit the Tribe or its members. The negotiations have recognized the Tribe's right to cut and remove timber.

The Timber Section in the proposed bill does not refer to the right to cut and remove timber under the 1896 Agreement. In the Agreement the right to cut and remove wood and timber is reserved both to the Tribe and its members. The proposed bill ignores the tribal right, but would expand the member right beyond domestic use to allow the sale of timber. The proposed bill would be better if it stated that in addition to the rights reserved to the Tribe and its members in the 1896 Agreement, tribal members shall have the right to harvest timber for sale.

Section 2, Part (a) would require a means test for tribal members to sell wood. The test would be that the income from the wood would be "essential to the livelihood" of the member. The Tribe would prefer that no means test be included. The determination of tribal membership should be in accordance with tribal law as that is what is presently recognized by the federal government.

Section 3, Part (c) provides that state law and regulations would apply. It is our understanding that timber gathering on federal lands presently includes state law only for purposes of transport (that is the setting of road load limits) and in order to apply state rates under federal law for trespass. If the intent of this Section is to apply state law in those two instances, then the Section should be restricted to those instances. If the intent was to apply other state laws, we would like to know which laws are referred to. The same section also states that neither the Tribe nor its members will be allowed to harvest wood until the Council and the Forest Service agreed on the operating plan. Wood harvesting is presently taking place under the current negotiations, and it should continue.

Part (d) of Section 3 would treat the Tribe as if the Tribe were a timber company requesting a permit for a commercial timber sale. The Tribe reserved this right in the Agreement. The Tribe should not be required to pay to exercise the right. The entire part should be deleted.

## RELIGIOUS USE

This proposed Section would provide less protection than does the Forest Plan. Management Standard H-2(3), Page 2-61 states that the Forest Service will:

> "Implement a special use permit system for needed temporary area special closures, to enable Native Americans to exercise their religious rights without inference."

In the current negotiations on the Forest Plan, the Forest Service and the Tribe are discussing the closing of some trails in the southern part of the Unit to motorized vehicles during part of the year in order to provide for religious use as well as animal habitat management.

This Section should, at a minimum, provide the same protection as does the Forest Plan.

## HUNTING AND FISHING

This Section should authorize the Tribe to control hunting and fishing in the Unit.

## RECREATION USE

Existing recreation uses are the subject of the current travel plan negotiations. My earlier comment regarding Tribal approval of the Joint Plan would also apply here.

## MULTIPLE-USE MANAGEMENT

I agree that the Unit should not be considered for wilderness designation.

## GRAZING

The intent of Section 7(a) appears to be to slowly change the grazing permits in the Unit over to the Tribe or its members. It is difficult to see how this would be accomplished in reality if valid existing rights are allowed to continue. The Section should provide that the grazing permits be offered to the Tribe and its members notwithstanding the right of renewal of existing permittees.

Informally, the Forest Service agreed during last years negotiations to notify the Tribe of any vacancies in the permits, and in fact one permittee could not use his entire allotment this season, and the rest of the allotment was offered to a tribal member.

The Tribe is aware that a portion of the permit fees go to a special fund for range improvements. If the Tribe received all of the grazing fees, which we understand to be around $1,000.00 per year, how would range improvements be financed?

Grazing permits should be free to the Tribe or its members.

## OIL AND GAS REVENUES

I would prefer that the bill state that 100 per-centum of the revenues be paid to the Tribe.

002283

5

<u>BADGER CANYON DAM AND RESERVOIR</u>

The proposed study should include a study of the hydroelectric potential of the site.

In conclusion, I feel that further discussion is needed on the particular sections referred to in these recommendations prior to the introduction of the bill. These discussions should take place soon. Please contact me so that proper arrangements can be made.

Sincerely,


EARL OLD PERSON, Chairman
Blackfeet Tribal Business Council

EOP/tag

# DRAFT

## A  B I L L

To provide for the management of the Badger Two Medicine Area of the Lewis and Clark National Forest, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Badger Two Medicine Area, as depicted on the map entitled "Badger Two Medicine Area" dated March 1987, within *Want name changed to Blackft Unit.* the Lewis and Clark National Forest shall be managed in accordance with a Joint Badger Two Medicine Management Plan (herein identified as the "Plan") developed by the Secretary of Agriculture in "consultation" with *want changed to "consent"* the Blackfeet Tribal Council (herein identified as the "Council").

(a) The Plan shall comply with the National Forest Management Act of 1976 and all "other Federal laws" and regulations; and, to the extent *Concerned at public involum do not support* practicable, will be compatible with the treaty rights of the Blackfeet Indians.

(b) The Plan shall be called the Joint Badger Two Medicine Management Plan and will be incorporated into the Lewis and Clark National Forest Land and Resource Management Plan.  The development, implementation, revision, amendment, and incorporation of the Plan shall be deemed not to be a significant amendment under 16 U.S.C. 1604 (f)(4) of the Lewis and Clark National Forest Land and Resource Management Plan.

(c) In the development and subsequent revisions or amendment of the Plan, the Secretary of Agriculture shall provide for public involvement

DRAFT

0002285

# DRAFT

2

and utilize, to the maximum extent practicable, information gathered during the development of the Lewis and Clark Land and Resource Management Plan.

(d)  Amendments and revisions made to the Plan shall become part of the Lewis and Clark Land and Resource Management Plan.  Amendments will be made under the same procedures as are used for Land and Resource Management Plans in accordance with 16 U.S.C. 1604 (f)(4), except that the amendments shall be deemed not to be significant from the standpoint of the entire Lewis and Clark National Forest Land and Resource Management Plan.

Section 2. Timber Utilization.

(a)  The Secretary of Agriculture shall authorize, in accordance with reasonable terms and conditions, including an approved <u>operating plan,</u> *ok* Tribal members to harvest timber within the Badger Two Medicine Area for domestic purposes and to generate income for domestic purposes. "Domestic purposes" is defined as personal use or consumption and "income for domestic purposes" is defined as moneys or other valuable considerations received from the sale of timber resources, that are essential to the livelihood of the Tribal member.  Tribal members *Requires a Mea Test ? Do no understan* shall be determined in accordance with regulations of the Secretary of the Interior.

(b)  The Secretary of Agriculture shall require in the Plan and any authorization to harvest timber that the timber be harvested on a sustained yield basis.

002286



DRAFT                                    3

(c) Any operating plan for timber utilization authorized by this Act
    shall be consistent with the Plan, meet the requirements of the
    National Forest Management Act of 1976 and other applicable Federal
    and State laws and regulations, and incorporate standards and
    guidelines applied to timber sales on other areas of the Lewis and
    Clark National Forest." No timber will be harvested by the Tribe or
    Tribal members prior to approval of an operating plan by the Council
    and subsequently the Forest Service." *Does this stop all personal use for Treaty Rights.?*

(d) The Tribe will reimburse the United States for all costs incurred by   *will requ*
    the Forest Service in the administration of the timber utilization   *Tribe to pay for their own*
    provisions of this Act.  The Forest Service may require a performance   *Tribe opp*
    or other bond to insure compliance with the requirements of any
    operating plan and timber utilization." The Tribe shall deposit with   *Tribe obl*
    the Secretary of the Treasury such amounts as are required by existing   *to payment*
    law for Trust Fund activities and 25 per cent payments to States and
    counties."

Section 3.  Religious Use.

    Blackfeet Tribal members shall have free access to the Badger Two
    Medicine Area for religious and cultural purposes:  Provided, That
    the public shall "not be precluded" from the occupancy and use of the
    Area due to such religious and cultural purposes.   *Want use of sp. use permits to exclude public —*

DRAFT                                    002287

# DRAFT

4

Section 4.  Hunting and Fishing.

All hunting and fishing within the Badger Two Medicine Area
shall be in accordance with the laws of the United States and
*Tribe objects*
the State of Montana, except that Tribal members shall have
first right to hunt and fish should the State of Montana
limit or otherwise restrict hunting and fishing.

Section 5.  Recreation Use.

Existing recreation uses will be allowed to continue at the
*Tribe wan more contr of both exist + new.*
discretion of the Forest Service.  New recreation uses may be
permitted in accordance with the Plan after consultation with
the Council.

Section 6. Multiple Use Management. *= "a code word for Wilderness."*

(a)  The Congress finds that--

   (1)  the Department of Agriculture has completed the second roadless
        area review and evaluation program (RARE II); and

   (2)  the Congress has made its own review and examination of National
        Forest System roadless areas in the Badger Two Medicine Area of
        the Lewis and Clark National Forest and of the environmental
        impacts associated with alternative allocations of such areas.

(b)  On the basis of such review, the Congress hereby determines and
     directs that--

   (1)  without passing on the question of the legal and factual
        sufficiency of the RARE II final environmental statement (dated
        January 1979) with respect to National Forest System lands in the
        State of Montana; such statement shall not be subject to judicial

0002288

# DRAFT

5

review with respect to the National Forest System lands in the
Badger Two Medicine Area of the Lewis and Clark National Forest
in the State of Montana;

(2) with respect to the National Forest System lands in the Badger
Two Medicine Area of the Lewis and Clark National Forest in the
State of Montana which were reviewed by the Department of
Agriculture in the second roadless area review and evaluation
(RARE II), that review and evaluation or reference shall be
deemed for the purposes of the initial land management plans
required for such lands by the Forest and Rangeland Renewable
Management Act of 1974, and the Plan required pursuant to this
Act, to be an adequate consideration of the suitability of such
lands for inclusion in the National Wilderness Preservation
Resources Planning Act of 1974, as amended by the National Forest
System, and the Department of Agriculture shall not be required
to review the wilderness option;

(3) the Badger Two Medicine Area of the Lewis and Clark National
Forest in the State of Montana shall be managed for multiple uses
in accordance with the Plan prepared pursuant to this Act:
Provided, That the area need not be managed for the purpose of
protecting its suitability for wilderness designation during the
revision of the initial Plan;

(4) unless expressly authorized by Congress, the Department of
Agriculture shall not conduct any further roadless area review
and evaluation of the Badger Two Medicine Area of the Lewis and

002289

DRAFT

DRAFT

6

Clark National Forest in the State of Montana for the purpose of determining its suitability for inclusion in the National Wilderness Preservaton System.

Section 7.  Grazing.

*A change from today.*

(a)  Subject to valid existing rights, grazing permits within the Bader Two Medicine Area that expire five years after enactment of this Act shall be offered first to the Tribe and Tribal members.  Permits shall be subject to the rules and regulations applicable to grazing on the National Forest System.

(b)  Notwithstanding any other provision of law, beginning with the first full fiscal year after the date of enactment of this Act, the Secretary of the Treasury shall pay all revenues from existing and future grazing permits within the Badger Two Medicine Area to the Tribe.

(c)  Grazing fees within the Badger Two Medicine Area shall continue to be set by the Secretary of Agriculture, at a rate commensurate with fees charged elsewhere on the Lewis and Clark National Forest.

Section 8.  Oil and Gas Revenues.

(a)  Deposits of oil and gas, and lands containing such deposits, which are within the Badger Two Medicine Area, shall be subject to the provisions of the Act of February 25, 1920, as amended (30 U.S.C. 181 et seq.), except as provided in this section.

DRAFT

002290

# DRAFT

7

(b)   All money received from oil and gas leases issued within the Badger
Two Medicine Area after enactment of this Act, which are subject to
disposition under Section 35 of the Act of February 25, 1920
(30 U.S.C. 191), shall be disposed of in the form and manner
provided in Section 35 except that the Secretary of the Treasury
shall pay 50 per centum of such money to the Council and 50 per
centum to the State of Montana.

(c)   All oil and gas leases issued within the Badger Two Medicine Area and
which are in effect on the date of enactment of this Act shall
continue in full force and effect.

(d)   All oil and gas leases issued within the Badger Two Medicine Area
shall be subject to the terms of the Plan except that leases in effect
on the date of enactment of this Act shall be subject to the Plan when
not inconsistent with any express or specific provision of the lease.

Section 9. Badger Canyon Dam and Reservoir.

The Secretary of the Interior shall review the report prepared by the
Bureau of Indian Affairs entitled "Preliminary Report on the Proposed Badger
Canyon Dam and Reservoir, United States Department of the Interior, Bureau of
Indian Affairs, September 1968" and shall provide the Congress within one year
after enactment of this Act a report on the costs and feasibility of
constructing such dam and reservoir.

# DRAFT

002291