IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SOLENEX, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. Action No. 13-993 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| S.M.R. JEWELL, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**THE BLACKFEET TRIBE'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

JOEL WEST WILLIAMS
D.C. Bar No.1023016
HEATHER WHITEMAN RUNS HIM
KIM JEROME GOTTSCHALK
NATIVE AMERICAN RIGHTS FUND
1514 P Street, NW (Rear), Suite D
Washington, D.C. 20005
Telephone (202) 785-4166
Facsimile: (202) 822-0068
Williams@narf.org
*Attorney for Proposed Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS…………………………………………………………………..i

TABLE OF AUTHORITIES……………………………………………..…………………………ii

IDENTITY AND INTEREST OF AMICUS………………………..………………………1

INTRODUCTION…………………………………………….…………………………..2

ARGUMENT………………………………………………………………………....…3

     I.     The Law and Policy Underlying the Requirement of Tribal Consultation Fully
             Support the Bureau of Land Management's Decision That the Lease was Invalidly
             Issued and Must be Canceled………………….…………………………………..3

          A.   Cancellation of the Lease was Appropriate Because BLM Failed to Consider
               Impacts on the Tribe's Treaty Rights During the NEPA Process..……………8

          B.   Cancellation of the Lease was Appropriate Because the BLM Failed to
               Consult With the Tribe Pursuant to the National Historic Preservation Act and
               Consider Effects on Historic and Cultural Resources in the Badger-Two
               Medicine Area…………………………………………..……………………11

     II.    Cancellation of the Lease Fits Well Within the Bounds of the Establishment
             Clause………………………………………………………………………15

CONCLUSION…………..………………………………………………….………………20

# TABLE OF AUTHORITIES

**CASES**

*Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814 (10th Cir. 1999)................................. 16

*Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) .............................................. 8, 9

*Buono v. Norton,* 371 F.3d at 543 (9th Cir. 2004) ....................................................................... 19

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831) ............................................................................ 4

*Choate v. Trapp*, 224 U.S. 665 (1912)......................................................................................... 3

*Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969 (9th Cir. 2004) ...................................... 18, 19, 20

*Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988)…………………………………………….9

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)................................................................................... 18

*Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781 (9th Cir. 2001).............................................. 8

*Havasupai Tribe v. U.S.*, 752 F.Supp. 1471 (D.Ariz.1990), *affirmed* 943 F.2d 32 ...................... 17

*Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987)................................... 18

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013).............................................................. 17

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754 (9th Cir.1996) .................. 8

*Island Mountain Protectors, Nat'l Wildlife Fed'n, Assiniboine & Gros Ventre Tribes, & Fort Belknap Cmty. Council,* 144 IBLA 168 (May 29, 1998) ............................................................. 9

*Johnson v. M'Intosh*, 21 U.S. 543 (1823) ..................................................................................... 4

*Kong v. Scully,* 341 F.3d 1132 (9th Cir.2003) ............................................................................ 18

*Lands Council v. Powell,* 395 F.3d 1019 (9th Cir.2005) ............................................................ 8-9

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .................................................................................. 17

*Lynch v. Donnelly*, 465 U.S. 668 (1984)..................................................................................... 18

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) .............................. 18

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) .................................. 3

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1985) ......................................................................... 3

*Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007) ............................... 17

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999)........................ 9, 11

*Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233 (9th Cir.2005)........................... 8

*Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir. 1979) ...................................... 5

*Okanogan Highlands All. v. Williams*, 236 F.3d 468 (9th Cir. 2000) ........................................... 8

*Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006) .................................. 8, 11, 15

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)..................................................................... 1

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ....................................................... 9, 10

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010)...................................................................................................... 9

*Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011)........................................................ 18

*United States v. Peterson*, 121 F. Supp. 2d 1309 (D. Mont. 2000) ............................................... 3

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
443 U.S. 658................................................................................................................................ 3

*Worcester v. Georgia*, 31 U.S. 515 (1832) .................................................................................... 4

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. XIV, § 2............................................................................................... 4

U.S. CONST. art. 1, § 2, cl. 3 ................................................................................................ 4

U.S. CONST. art. 1, § 8…………………………..………………………………………..…4

## LEGISLATIVE MATERIALS

16 U.S.C. § 470f (1982).......................................................................................................... 12

25 U.S.C. § 71 ................................................................................................................. 2

42 U.S.C. § 4332(E) ....................................................................................................... 9

54 U.S.C. § 306108 (2016) ............................................................................... 5, 12, 17

78 Cong. Rec. 11,125 (1934)………………………………………………………..4-5

Act of May 1, 1888, 25 Stat.  113 ................................................................................ 2

Act of June 10, 1896, 29 Stat. 321…………………………….………………………..1,2

American Indian Religious Freedom Act, 42 U.S.C. §1996a.................................... 5, 17

Archeological Resource Protection Act, 16 U.S.C. §§470aa. ................................... 5, 17

Bald Eagle and Golden Eagle Protection Act, 16 U.S.C. §§668 .................................. 17

Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203
    (1975) (codified as amended at 25 U.S.C. §§ 450-458ddd-2 (2006)) ........................ 5

National Historic Preservation Act, 16 U.S.C. §470 ................................................... 12

Native American Graves Protection and Repatriation Act, 25 U.S.C. §§3001. ....... 5, 17

Pub. L. 109-432, 120 Stat. 2922 ................................................................................... 1

Religious Freedom Restoration Act, 42 USC §§2000bb. ............................................. 17

The Indian Arts and Crafts Act of 1990, 25 U.S.C. §§3005. ....................................... 17

Treaty of October 17, 1855, 11 Stat. 736 ..................................................................... 2

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Bureau of Land Management Manual 8120, Glossary (12/03/04) (Tribal Consultation) ............ 10

Bureau of Land Management Manual Handbook H-8120-1, Guidelines for Conducting Tribal
    Consultation. ....................................................................................................... 6

Bureau of Land Management, Tribal Consultation,
    http://www.blm.gov/wo/st/en/prog/more/CRM/tribal_consultation.html (last visited Oct. 7,
    2016) ................................................................................................................. 10

Executive Order 13175, 65 Fed. Reg. 67,249 (November 6, 2000)……………..……….……..4, 6

Executive Order 13007 (May 24, 1996)……….…………………………………………………6

Memorandum for the Heads of Executive Departments and Agencies,
  59 Fed. Reg. 22, 951 (April 29, 1994) ................................................................................... 6

Memorandum for the Heads of Executive Departments and Agencies,
  74 Fed. Reg. 57, 881 (Nov. 9, 2009)………………………………………………………6

President George W. Bush, Memorandum on Government-to-Government Relationship with
  Tribal Governments, 2 Pub. Papers 2177 (Sept. 23, 2004) ........................................................ 6

Richard M. Nixon, Special Message on Indian Affairs in DOCUMENTS OF UNITED STATES INDIAN
  POLICY 256 (Francis Paul Prucha ed., 2000) ............................................................................. 5

United States Dep't of Interior, American Indian Religious Freedom Act Task Force Report
  (1979)…………………………………………………………………………………..17

## REGULATIONS

40 C.F.R. § 1500.1(c) .............................................................................................................. 9

40 C.F.R. § 1501.2 ..................................................................................................................... .10

40 C.F.R. § 1508.9(b) .............................................................................................................. 8

## OTHER AUTHORITIES

Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous
  Peoples  (2010)…………………………………………………………………………………7

Colette Routel & Jeffrey K. Holth, *Toward Genuine Tribal Consultation in the 21st Century*,
  46 U. Mich. J. of L. Reform 417 (2013) ................................................................................. 5

Jill E. Martin, *Constitutional Rights and Indian Rites: An Uneasy Balance*, 3:2 Western Legal
  History 245 (Summer/Fall 1990) ......................................................................................... 16

Kristen A. Carpenter, *Limiting Principles and Empowering Practices in American Indian
  Religious Freedoms*, 45 Conn. L. Rev. 387 (2012) ................................................................. 16

Senator Daniel K. Inouye, *Discrimination and Native American Religion*,
   23 UWLA L.Rev. 3 (1992) ..................................................................................................... 16

United Nations Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc.
   A/RES/61/295 (Sept. 13, 2007)........................................................................................... 6-7, 7

## IDENTITY AND INTEREST OF AMICUS[1]

The Blackfeet Tribe of the Blackfeet Indian Reservation of Montana (Tribe) is a federally-recognized tribe whose sovereignty predates that of the United States itself. *Cf. Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978). The Tribe and the United States negotiated what is known as the 1895 Agreement, which included the cession by the Tribe of an area sometimes referred to as the Ceded Strip or the Ceded Area. This Agreement was ratified by Congress by the Act of June 10, 1896, 29 Stat. 321. In that Agreement, the Tribe reserved rights to access the Ceded Area for broad purposes which encompass spiritual and cultural values. The Plaintiff seeks to drill an exploratory well in a portion of the original Ceded Area known as the Badger-Two Medicine area, an area of immense cultural and spiritual importance to the Tribe. The Plaintiff's proposed activities pose a grave danger to the rights which the Tribe holds in that area and the Tribe seeks to ensure that its rights are protected through the required federal processes in which the Tribe, the Plaintiff, Defendants and others are engaged, but which Plaintiff wishes to abort.[2] In 2015, Secretary Sally Jewell (Secretary) canceled the lease issued to Plaintiff's predecessor, which had been in suspension for a number of years while the federal government evaluated and studied the actual impacts to resources that would result from the lease and subsequent drilling. The Badger-Two Medicine Area has been sacred and invaluable to the Tribe from time immemorial.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

[2] Supporting the Tribe's concerns are numerous environmental groups and other entities as well as Congress, which, subject to existing rights, has closed the area to future oil and gas development. Pub. L. 109-432, 120 Stat. 2922, 3050 (2006). This legislation is further confirmation of the special nature of the area and the need to preserve it.

## INTRODUCTION

The Tribe's amicus brief supports Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment. Rather than repeat Defendants' arguments, the Tribe details its interest in the lands at issue, the importance of the laws requiring that its interests be adequately and meaningfully considered, and the facts surrounding its efforts, in conjunction with Defendants, to have its interests adequately and appropriately considered and protected.  The Tribe's discussion addresses certain misconceptions in Plaintiff's Memorandum of Points And Authorities In Support Of Plaintiff's Motion for Summary Judgment (Plaintiff's Memorandum), and demonstrates that the Secretary's decision to cancel the lease as invalidly issued to Plaintiff's predecessor was reasonable and rested on sound legal principles.

The Blackfeet Nation has significant reserved treaty rights in the Badger-Two Medicine area. The Tribe entered into treaty relations with the United States on several occasions. *See, e.g.,* Treaty of October 17, 1855, 11 Stat. 736 (establishing Blackfeet Reservation). Even after 1871, when the ordinary treaty process with tribes was ended by legislation, 25 U.S.C. § 71, the Tribe continued to negotiate with the United States and enter into agreements in all respects the equivalent of treaties.[3] The 1895 Agreement, ratified by the Act of June 10, 1896, 29 Stat. 321, is one such agreement and is central to the Tribe's interest in the present action. The 1895 Agreement, after ceding to the United States certain interests in land, including the Badger-Two Medicine area, provides:[4]

---

[3] Agreements of December 28, 1886 and January 21, 1887, ratified by Congress on May 1, 1888, 25 Stat.  113 (1888 Agreement).

[4] It has been the consistent position of the Tribe that the Agreement was not a permanent cession and that  the Tribe retains ownership of the area.  The Tribe retains at a minimum the rights set forth above. Letter,  Earl Old Person, Tribal Chair, December 9, 1993 to Forest Supervisor.  FS 003246-247.

2

That said Indians shall have, and do hereby reserve to themselves, the right to go upon any portion of the lands hereby conveyed so long as the same shall remain public lands of the United States, and to cut and remove therefrom wood and timber for agency and school purposes, and for their personal uses for houses, fences, and all other domestic purpose: *And provided further*, That the said Indians hereby reserve and retain the right to hunt upon said lands and to fish in the streams thereof so long as the same shall remain public lands of the United States….

This Agreement is essentially a contract between two sovereign nations. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675-76 (1979). In interpreting the Agreement, "standard principles of statutory interpretation do not have their usual force…." *Cf. Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). Treaties and statutes are to be interpreted as they would have "been understood by the Indians." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Choate v. Trapp*, 224 U.S. 665 (1912) (agreement and statute); *United States v. Peterson*, 121 F. Supp. 2d 1309, 1315 (D. Mont. 2000) (canons designed to recognize the government's unique Indian trust relationship).

## ARGUMENT

I.  **The Law and Policy Underlying the Requirement of Tribal Consultation Fully Support the Bureau of Land Management's Decision That the Lease was Invalidly Issued and Must be Canceled.**

Plaintiff focuses its argument heavily on the Mineral Leasing Act and private individual property rights. However, there is a broader legal framework that must be understood in order to correctly evaluate the reasonableness of the Secretary's decision to cancel the lease and the determination that it was not validly issued. These laws set out a process through which federal agencies inform themselves about the potential impacts of an undertaking on Indian tribes and their treaty rights, and on historically significant sites and cultural resources.  Tribal consultation is rooted in the legal principles of the government-to-government relationship between the United States and federally recognized tribes. The federal government, including federal

3

agencies, has a trust responsibility to tribes that creates unique burdens and responsibilities for federal agencies, which were initially disregarded in the process at issue. Full understanding of the consultation requirement necessitates an understanding of its origins and how it evolved into an integral part of agency decision-making.

The United States has a unique legal relationship with Native American and Alaska Native Tribes tracing to the Constitution itself.[5]  These specific provisions in the Constitution grant the federal government the power to make treaties and engage in commerce with tribes as foreign governments, recognize the pre-existing sovereignty of the tribes and create a trust responsibility toward tribes. The trust responsibility is the foundation of federal Indian law and the wellspring of all other laws benefitting tribes. Uniquely applicable to tribes, American Indians, and Alaska Natives, the trust responsibility derives from the foundational cases in the Marshall Court. Called the Marshall Trilogy, the three cases that established the foundation for the trust responsibility and the government-to-government relationship are: *Johnson v. M'Intosh*, 21 U.S. 543 (1823); *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831), and *Worcester v. Georgia*, 31 U.S. 515 (1832). Today, the United States government still deals with tribes as sovereigns through a government-to-government relationship including government-to-government consultation.[6]

Over the next century, federal Indian policy vacillated from assimilation to the modern era of self-determination, the hallmark of which is to "get away from the bureaucratic control of the Indian Department . . . [by giving] Indians control over their own affairs." 78 Cong. Rec.

---

[5] "Indian tribes" are acknowledged three times in the U.S. Constitution.  U.S. Const. art. I, § 2, cl. 3; U.S. Const. art. I, § 8 (the "Indian commerce clause" that treats Tribes as separate from the federal government and states); U.S. Const. amend. XIV, § 2 (amending art. I, § 2).

[6]  Modern Presidents still issue orders directing all executive agencies to consult with Tribes on a government-to-government basis. See, e.g., Executive Order 13175, 65 Fed. Reg. 67,249 (Nov. 6, 2000) (Consultation and Coordination with Indian Tribal Governments).

11,125 (1934) (statement of Senator Wheeler, proponent of the Indian Reorganization Act). In 1970, President Nixon delivered a speech urging Congress to adopt a legislative program in which the "Indian future is determined by Indian acts and Indian decisions." Richard M. Nixon, Special Message on Indian Affairs in DOCUMENTS OF UNITED STATES INDIAN POLICY 256, 257 (Francis Paul Prucha ed., 2000). Subsequently, the first consultation policies were born.

The trust responsibility imposes at least three general duties on the federal government: (1) to provide federal services to tribal members, such as health care and education; (2) to protect tribal resources, including cultural and natural resources; and (3) to protect tribal sovereignty, the oldest duty and the root of the government's relationship to tribes. Colette Routel & Jeffrey K. Holth, *Toward Genuine Tribal Consultation in the 21st Century*, 46 U. Mich. J. of L. Reform 417, 430-35 (2013) (explaining this line of reasoning and the development of three distinct duties). Government-to-government consultation is essential to the fulfillment of the federal trust responsibilities.

The Bureau of Indian Affairs (BIA) enacted the first consultation policy in 1970 and it led to several successful lawsuits by tribes to enforce its provisions. *Id*. at 436-37 (citing *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 709-10 (8th Cir. 1979)). Although this first policy only applied to BIA personnel issues, consultation itself first expanded in statute,[7] and in practice to include protection of tribal cultural resources. *Id.* at 439-41 (describing the consultation mechanisms in the Archaeological Resources Protection Act, the Native American Graves Protection and Repatriation Act, the National Historic Preservation Act, and the American Indian Religious Freedom Act). That was the first target of statutory and regulatory

---

[7] The first statute to require consultation was the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203 (1975) (codified as amended at 25 U.S.C. §§ 450-458ddd-2 (2006)).

consultation. It was not until President Clinton issued several executive memoranda and orders,[8]

culminating in Executive Order 13175, that there was an across-the-board agency

acknowledgment that it was the "unique legal relationship with Native American tribal

governments,"—the trust responsibility—that mandated consultation.  President Bush re-

affirmed this policy,[9] and President Obama issued a similar memorandum in 2009—again, citing

the "special relationship"—and requiring each agency to designate a contact person, develop a

consultation plan and report back annually on their progress. Memorandum for the Heads of

Executive Departments and Agencies, 74 Fed. Reg. 57, 881 (Nov. 9, 2009).

The Bureau of Land Management (BLM) has developed its own consultation guidelines,

which are found in BLM Manual Handbook H-8120-1, Guidelines for Conducting Tribal

Consultation.

www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handboo

k.Par.38741.File.dat/H-8120-1.pdf, last accessed Oct. 7, 2016. The BLM Handbook notes the

need for meaningful and direct dialogue with tribes, and establishes that "treating tribal

information as a necessary factor in defining the range of acceptable public-land management

options" is critical. *Id.* at I-2.

These policies, designed to reverse centuries of colonialism, are recognized at the

international level as well.  In 2007, the United Nations adopted the Declaration on the Rights of

Indigenous Peoples. United Nations Declaration on the Rights of Indigenous Peoples, G.A. Res.

---

[8] Memorandum for the Heads of Executive Departments and Agencies, Government-to-Government Relations with Native American Tribal Governments, 59 Fed. Reg. 22, 951 (April 29, 1994); Exec. Order 13007 (May 24, 1996) (Indian Sacred Sites).

[9] President George W. Bush, Memorandum on Government-to-Government Relationship with Tribal Governments, 2 Pub. Papers 2177 (Sept. 23, 2004).

61/295, U.N. Doc. A/RES/61/295 (Sept. 13, 2007).  President Obama announced United States'

endorsement of the Declaration in 2010. Announcement of U.S. Support for the United Nations

Declaration on the Rights of Indigenous Peoples (2010),

http://www.state.gov/documents/organization/184099.pdf.  More than 150 Nation States have

now endorsed the Declaration as "providing the minimum standards for the survival, dignity and

well-being of the indigenous peoples of the world." U.N. Declaration at Article 43. Article 25 of

the Declaration provides that "Indigenous peoples have the right to maintain and strengthen their

distinctive spiritual relationship with their traditionally owned…lands, territories, waters…and

other resources and to uphold their responsibilities to future generations in this regard."  United

Nations Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc.

A/RES/61/295 (Sept. 13, 2007). Article 18 recognizes the right of Indigenous peoples to

participate in decision-making affecting them and Article 19 provides that "States shall consult

and cooperate in good faith with the indigenous peoples concerned through their own

representative institutions in order to obtain their free, prior, and informed consent before

adopting and implementing legislative or administrative measures that may affect them."

   The Tribe thus has rights which must, under federal law and policy and international

standards, be taken into account and protected.  Plaintiff objects to the fact that the Tribe and the

federal government are taking those rights seriously and are finally ensuring they are protected as

required by law.  After finally committing the effort to become fully informed as required by

multiple federal laws and regulations, the Secretary was able to evaluate the true impact of oil

and gas development on the resources of this tremendously significant area.  After taking the

requisite hard look at the complete facts, the federal government decided correctly to cancel the

lease that should never have been issued in the first place.

A.   **Cancellation of the Lease was Appropriate Because BLM Failed to Consider Impacts on the Tribe's Treaty Rights During the NEPA Process.**

The lease's impact on environmental resources and the Tribe's reserved treaty rights are inextricably tied together. As their trustee, the federal government owes a fiduciary obligation to Indian tribes. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006). At a minimum, this fiduciary obligation "requires the government to demonstrate compliance with general obligations and statutes not specifically aimed at protecting Indian tribes." *Id.* Hence, violation of NEPA's requirements constitutes a failure of the federal government to meet its minimum fiduciary obligations to Indian tribes. *Id.*

A component of NEPA's requirement to consider the environmental consequences of a proposed action is that an agency must take a "hard look" at issues affecting a tribe's reserved rights. *See Okanogan Highlands All. v. Williams*, 236 F.3d 468, 480 (9th Cir. 2000) (holding the Forest Service took the requisite "hard look" at the issues that will affect Colville's reserved rights); *Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 7829 (9th Cir. 2001) (holding that EIS adequately considered impacts of Inupiat subsistence). The hard look doctrine requires an agency's EA discuss and give full and meaningful consideration to all reasonable alternatives, including an alternative that preserves the status quo, such as no development in an area that is not currently developed. *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1245 (9th Cir.2005); *see also* 40 C.F.R. § 1508.9(b). These requirements serve the dual purpose of ensuring an agency has adequate information to inform its decisions and disclosing considerations given a "hard look" by the agency in order to facilitate informed public comment on the proposed action and alternatives that might be pursued with less environmental harm. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996); *Lands Council v. Powell,* 395 F.3d

8

1019, 1027 (9th Cir.2005); *see* 42 U.S.C. § 4332(E) (requiring agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources"); 40 C.F.R. § 1500.1(c); *see also Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 601–02 (9th Cir. 2010).

While an agency may sometimes fulfill its NEPA obligations by preparing an EA, where a lease allows for surface occupancy, a full EIS is required prior to lease issuance. *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983); *Connor v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988); *Bob Marshall Alliance*, 852 F.2d at 1229. An EIS must contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," which includes consideration of a tribe's reserved rights. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th Cir. 1999). Where its decisions impact reserved treaty rights, BLM is required "to consult with Tribes and to identify, protect, and conserve trust resources, trust assets, and Tribal health and safety" in making its decisions. *Island Mountain Protectors, Nat'l Wildlife Fed'n, Assiniboine & Gros Ventre Tribes, & Fort Belknap Cmty. Council,* 144 IBLA 168, 185 (May 29, 1998).

In the case at bar, the BLM did not conduct *any* environmental analysis prior to lease issuance, let alone consider how to protect the Tribe's reserved rights. While the Forest Service prepared an EA, the BLM never adopted it or performed its own independent analysis of the proposed agency action on the Tribe's reserved rights. Moreover, the Forest Service's EA never mentions the Tribe's reserved rights, much less considers how issuing leases in the Badger-Two Medicine area would impact the Tribe's reserved rights.

The lack of consideration of the Tribe's rights is highlighted by Section 10 of the Forest Service's EA, which describes the consultation process utilized by the Forest Service. Notably, neither the Tribe nor the BIA, were consulted. And while the EA says the Tribe was "notified," this falls well short of the required tribal consultation.[10] *See* 40 C.F.R. § 1501.2 (requiring federal agencies to consult with Indian tribes at the earliest stages of the NEPA process).

The Forest Service EA also failed to analyze a true "no action" alternative that would have preserved the status quo and not opened the area for leasing.[11] This fundamental NEPA requirement is particularly appropriate where tribal reserved rights may be affected. Yet, under pressure to clear a backlog of applications, the Forest Service and BLM only considered various ways to issue leases and never considered a no-leasing alternative.

Having skirted NEPA's requirements in its decision to open the area for leasing, BLM further violated NEPA by issuing Plaintiff a non-NSO lease in an area where the Tribe possesses reserved rights without developing an EIS.[12] Consequently, the BLM "irreversibly and irretrievably" committed agency resources without preparing an EIS or considering the

---

[10] BLM itself defines tribal consultation as a bilateral activity: "Consultation: the process of identifying and seeking input from appropriate tribal governing bodies, considering their issues and concerns, and documenting the manner in which the input affected the specific management decision(s) at issue." BLM Manual 8120, Glossary (12/03/04) (Tribal Consultation), *available at*: http://www.blm.gov/style/medialib/blm/wo/Planning_and_Renewable_Resources/coop_agencies /cr_publications.Par.44865.File.dat/Binder2-2.pdf; *see also* Bureau of Land Management, Tribal Consultation, http://www.blm.gov/wo/st/en/prog/more/CRM/tribal_consultation.html (last visited Oct. 7, 2016).

[11] While the EA refers to a "no action" alternative, that alternative is merely an option to delay lease issuance, and does not consider the option of not issuing the lease. ECF Doc. 45-10, Vol. IV at 78 (1980 Leasing Environmental Assessment at 61).

[12] Plaintiff's lease does contain an NSO stipulation for 18% of the leased area. ECF 45-12 at 7 (Plaintiff Lease). However, the NSO stipulation only applies to areas with slopes greater than 60%. Thus, Plaintiff's lease allows surface occupancy on more than 5,122 acres — the vast majority of the leased area.

effects on the Tribe's reserved rights. *See Peterson,* 717 F.2d at 1412-15. This lack of thoroughly considering the consequences of agency action is precisely what NEPA's procedural requirements are designed to avoid.

Although the scope and extent of the Tribe's rights were delineated in subsequent studies, this does not remedy the fundamental error: that the BLM did not consider them during the initial decision of whether to open the area for leasing. Thus, these subsequent reports are falsely premised on the notion that Plaintiff was issued a valid lease in the first instance, and, therefore, cannot substitute for an EIS examining whether the lease should be issued at all. *See Pit River Tribe*, 469 F.3d at 787.

The persistent failure to comply with NEPA's requirements constituted a breach of the federal government's minimum fiduciary obligation to the Blackfeet to preserve and protect its reserved resources. Under these circumstances, BLM was well within its authority to cancel the lease as unlawfully issued.

   **B.    Cancellation of the Lease was Appropriate Because BLM Failed to Consult With the Tribe Pursuant to the National Historic Preservation Act and Consider Effects on Historic and Cultural Resources in the Badger-Two Medicine Area.**

Adherence to NHPA requirements is also necessary for BLM to fulfill its minimum fiduciary obligations to Indian tribes. *Pit River Tribe*, 469 F.3d at 788. The NHPA and its detailed implementing regulations – as well as BLM and the Department of Interior's own policies and instructions – required BLM to consult early in the process and directly with the Tribe's leadership.  The NHPA was passed in 1966 and amended numerous times to create a comprehensive program "for the protection of national, State and local historic resources." Like NEPA, the NHPA is described as a "stop, look and listen" provision that "requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe*, 177 F.3d at 805.

11

Importantly, the NHPA has a broad requirement that federal agencies "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." 16 U.S.C. § 470f (1982) (now codified as 54 U.S.C. § 306108). Additionally, "the head of the federal agency [considering the undertaking] shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking." *Id.*

Thus, BLM was required to take into account the effect issuing the lease would have on sites that could be eligible for inclusion in the National Register, and to consult with the Tribe about potentially eligible sites before making any decision. BLM did not engage in any of this analysis prior to issuing Plaintiff's lease. The Forest Service EA acknowledges extensive Native American cultural, historic and religious resources in the area. EA at 27-28. Yet, prior to issuing Plaintiff's lease, BLM neither determined potential adverse impacts on those resources nor identified methods of mitigation. Had the agencies properly engaged in this process prior to lease issuance, they would have discovered — as they did years later — that there are extensive tribal cultural and historic resources in the Badger-Two Medicine Area and the effects upon them by oil and gas development cannot be mitigated. ECF No. 68-1 at 13.

From early on, the Tribe asserted these important interests. For example, on May 16, 1984, the Tribe wrote to the forest supervisor and joined in the comments of the Montana Wilderness Association raising numerous broad arguments as to why the APD should be denied at that time.  HC 04131; HC14126-04128.  On April 5, 1985, in the first of several IBLA appeals concerning Plaintiff's APD, the Tribe filed a brief making four arguments against the granting of the permit, all related to concerns over tribal rights in the area.  In 1993, the Tribe passed Resolution 89-93 referencing the Tribe's access, hunting, fishing, and timbering rights in

Badger-Two Medicine, the use of the area to "actively practice their religious, cultural and traditional rights in the area commonly known as the Badger/Two Medicine area" and its longstanding and continuing opposition to development of the area "until the issues relating to the issuance of permits can be re-examined in light of the effect of such development on the religious, cultural and traditional rights of the Blackfeet Tribe and its members." HC 01705-06.

After the 1992 amendments to the NHPA and its 106 process to include Tribes and tribal areas, on December 9, 1993, the Tribe wrote to the Forest Supervisor, supporting in principle the designation of a Traditional Cultural District (while stressing it could not diminish any rights under the 1895 Agreement). In reference to a 1993 study setting forth proposed boundaries, the Tribe stated: "While we agree with the recommendation in the report as far as it goes, the Blackfeet Tribal Business Council believes that the entire RM-1 Unit should be designated as a Blackfeet Traditional Cultural District ("TCD") and that additional interviews should be undertaken before the report is finalized." FS 003246-247. In addition, a letter dated January 8, 2004, from the former forest supervisor, written to the Tribe, makes clear that the Tribe never viewed previous versions of the TCD boundaries as final and adequate. She states the following, in part, about a meeting with the Tribe to discuss previous proposed boundaries:

> The purpose of the meeting was to gain concurrence from the Blackfeet Nation to proceed with the submission of the eligibility determination request to the Keeper of the National Register of Historic Places.
> I distinctly remember that the Council in general and the Elders in particular were not comfortable with the notion of a convoluted boundary that did not include the entirety of the Badger-Two Medicine….
> …I fully understood that the Blackfeet Council and Elders believed the whole area should be included (albeit willing to exclude private lands) but were concurring because this would begin the formal recognition process of the significance and potentially the ownership of this very special land.

FS 004027-29.

13

Thus, from the beginning, the Tribe expressed concern about the proper boundaries of the TCD, and urged for a far more expansive protected area.

A March 5, 2002 letter from the Forest Service to the Tribal Chair responded to the question about who started the nomination process for the TCD.  The response was that the question of eligibility as a Traditional Cultural District was raised in May of 1997 "in response to a legally mandated agency review for oil and gas proposals…We are very interested in continuing this close coordination with the Council as we consider a potential to list the district and avenues to protect traditional values."  FS 003528-531.  In an April 12, 2002 letter, the forest service informed the Tribal Chair that the Application for a Permit to Drill is an "undertaking" subject to review under the NHPA. "Under the new regulations, Tribes are specifically identified as participants in the Cultural Resource Review also known as the Section 106 Review."  The letter explains, "Under NHPA, federal agencies must identify historic and cultural sites, consult with others, develop an area of potential effect and if there are adverse effects, develop mitigation measures."  FS 003590-591.

The Tribe was concerned from early on that previous studies were incomplete.  The Tribe prepared an updated report, dated January 4, 2004, which documented the inadequacy of the previous studies.  FS 005235-005328.  A 2004 Tribal Resolution called for additional study of the area to define the TCD, along with a handwritten memo expressing concern that sufficient time was needed to do the study so as to avoid the weaknesses of previous studies.  FS 004225-228.  Funding to further study the area became available, and the resulting studies justify including the entire Badger-Two Medicine area in a Traditional Cultural District.  See studies at FS 005466-5605; FS 005606; FS 005608-0005729.  A 2005 Tribal Resolution calls for the

"entire Badger-Two Medicine area be nominated to the National Registry of Historic Places as a Blackfeet Traditional Cultural District and Ethnographic Cultural Landscape." FS 004243-45.

These documents demonstrate the insufficiency of the early cultural review process and how ill-informed the BLM's early decisions were. Crucially, the NHPA review for the APD, which should have been conducted prior to lease issuance, reveals that the effects on the Blackfeet Tribe's cultural resources cannot be mitigated. Pursuant to *Pit River*, these subsequent studies do not cure BLM's initial failure to conduct NHPA analysis in the first instance. *Pit River Tribe*, 469 F.3d at 787 ("[L]ater NHPA review cannot cure the earlier violation, because it did not deal with the question of whether the land should have been leased at all.").

Additionally, the documentation undercuts the Plaintiff's arguments that concerns over the Tribe's cultural and historic resources are a manufactured pretext for lease cancelation. The record unquestionably demonstrates the importance of the Badger-Two Medicine to the Tribe, and its constant efforts to protect its rights there —although it also reflects an inconsistent response from the BLM and Forest Service. Nevertheless, once the federal agencies appropriately reviewed the procedural history of the lease and noted lapses where they should have identified eligible resources as well as sought and received the Tribe's input, the Secretary correctly decided to cancel the lease. This decision was entirely reasonable and was not based on any "purported" values held by the Tribe.

## II.     Cancellation of the Lease Fits Well Within the Bounds of the Establishment Clause.

Plaintiff asserts that the Secretary "simply capitulated to the religious demands of the Blackfeet, in violation of the Establishment Clause" when she decided to cancel the lease, but does not elaborate further on this misguided proposition. Plaintiff's Memorandum at 41. In fact, as discussed above, the cultural and spiritual significance of federal lands, such as the Badger-

15

Two Medicine, to tribes is an important and legally required factor for consideration in federal decision making.

Federal laws aimed at protecting Native American religious practices were enacted to remedy a long and shameful legacy of religious discrimination against Native Americans. From the earliest days of the republic, "federal lawmakers quickly grasped that the eradication of Indian cultures was a key step in 'breaking up the tribal mass' and paving the way for political and geographic domination by states and the federal government." Kristen A. Carpenter, *Limiting Principles and Empowering Practices in American Indian Religious Freedoms*, 45 Conn. L. Rev. 387, 408 (2012); *see also Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999) ("[The] past federal policy was to assimilate Native Americans into United States culture, in part by deliberately suppressing, and even destroying, traditional tribal religions and culture in the 19th and early 20th centuries."); Jill E. Martin, *Constitutional Rights and Indian Rites: An Uneasy Balance*, 3:2 Western Legal History 245, 255-64 (Summer/Fall 1990). Additionally, government officials crafted policies encouraging Native Americans to "put aside all savage ways" and "achieve salvation through Christianity." Carpenter, *supra*, at 408. In the early Twentieth Century, these calculated efforts to extinguish Native culture, led the United States to outlaw traditional religious practices and ceremonies, punishing disobedient practitioners with imprisonment and starvation. Senator Daniel K. Inouye, *Discrimination and Native American Religion*, 23 UWLA L.Rev. 3, 14 (1992); Kristen A. Carpenter, *supra*, at 407-09.

16

Reversal of these abhorrent policies necessitated a succession of laws affirmatively protecting Native American culture and religious liberty.[13] One of these, the American Indian Religious Freedom Act of 1978, 42 U.S.C. § 1996 (AIRFA), requires federal agencies to evaluate their policies and procedures with goal of protecting Indian religious freedom, to refrain from prohibiting access, possession and use of religious objects and performance of religious ceremonies, and to consult with Indian organizations regarding proposed agency actions. *Havasupai Tribe v. U.S.*, 752 F.Supp. 1471 (D.Ariz.1990), *affirmed* 943 F.2d 32. In the wake of AIRFA's passage, the federal government eventually recognized that significant burdens on Native American free exercise persisted in the form of federal actions, policies and regulations, particularly with regard to federal land use. United States Dep't of Interior, American Indian Religious Freedom Act Task Force Report at i (1979) ("Sacred sites have been needlessly and thoughtlessly put to other uses which have desecrated them."), *available at*: http://files.eric.ed.gov/fulltext/ED190329.pdf.

AIRFA poses no conflict with the Establishment Clause. Under a familiar three-part test set forth by the Supreme Court, an action will be found Constitutional under the Establishment Clause if it: 1) has a secular purpose; 2) does not have a principal or primary effect of advancing or inhibiting religion; and 3) does not foster excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 758 (D.C. Cir. 2007).

---

[13] Among these were the Native American Graves Protection and Repatriation Act, 25 U.S.C. §§3001 *et seq.*, the Indian Arts and Crafts Act of 1990, 25 U.S.C. §§3005, *et seq.*, the National Historic Preservation Act, 54 U.S.C. § 306108, *et seq.*, the Bald Eagle and Golden Eagle Protection Act, 16 U.S.C. §§668, *et seq.*, the Religious Freedom Restoration Act, 42 USC §§2000bb, *et seq.* and the Archeological Resource Protection Act, 16 U.S.C. §§470aa, *et seq.* Additionally, subsequent amendments to AIRFA explicitly recognized that the First Amendment failed to protect Native American religious practices, thus requiring a specific federal law preserving their religious rights. 42 U.S.C. §1996a.

The Constitution does not "require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *see Trunk v. City of San Diego*, 629 F.3d 1099, 1106 (9th Cir. 2011).  In other words, "the government may (and sometimes must) accommodate religious practices and [] it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987).  It is clear that "there is room for play in the joints between the [Free Exercise and Establishment] Clauses, some space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005) (citations omitted).  The Supreme Court in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, a case involving a Free Exercise challenge by an Indian organization and individual Native Americans to a Forest Service decision, specifically recognized this distinction:

> Nothing in our opinion should be read to encourage governmental insensitivity to the religious needs of any citizen.  The Government's rights to the use of its own land, for example, need not and should not discourage it from accommodating religious practices like those engaged in by the Indian respondents.

485 U.S. 439, 453-54 (1988) (citations omitted).

BLM's reliance on AIRFA as part of the reason for cancellation of Plaintiff's lease easily passes the *Lemon* test. First, accommodation of Native American religions to relieve burdens is a legitimate, secular purpose.  *Cholla Ready Mix, Inc.*, 382 F.3d 969, 975 (9th Cir. 2004); *Kong v. Scully,* 341 F.3d 1132, 1140 (9th Cir.2003) ("Accommodation of a religious minority to let them practice their religion without penalty is a lawful secular purpose."). Additionally, Plaintiff's lease was canceled in order to ensure NEPA and NHPA compliance, which furthers other secular objectives, such as the Tribe's right to consultation as well as preserving the environmental, aesthetic, cultural and historic values of the area for all citizens.

Second, the lease cancelation neither advances nor inhibits religion. The principal motivation of the lease cancelation was to correct an error: that the initial decision opening the area for leasing violated NEPA and NHPA. Ergo, the primary effects of the lease cancellation are NEPA and NHPA compliance (and concomitant preservation of environmental and historic resources). The mere fact that AIRFA's protection and accommodation objectives may be achieved through the NHPA Section 106 process does not render the BLM's lease cancelation an impermissible advancement of religion, but instead prevents unnecessary interference with religion. *See Cholla Ready Mix*, 382 F. 3d at 976.  Moreover, there is no suggestion here that the government favors tribal religion over other religions or that they would not protect sites of historical, cultural, and religious importance to other groups. *See, e.g., Buono v. Norton,* 371 F.3d at 543, 549-550 (9th Cir. 2004) (holding that permitting display of cross on public land but denying similar displays to other groups violates establishment clause). There are irreplaceable cultural and historic values at stake in this case and they should not be cast aside merely because they have a nexus with Native American religious practices.[14]

Third, the decision to cancel the lease does not entangle BLM with religion. As the Supreme Court carefully instructed in *Lyng*, considering impacts on Native American religious exercise and accommodations in the course of federal land use decisions is not problematic. Additionally, mere contact and consultation with religiously affiliated groups does not constitute

---

[14] In fact, the United States extends special protections to numerous non-Native American religious sites. As the Ninth Circuit observed, "Native American sacred sites of historical value are entitled to the same protection as the many Judeo–Christian religious sites that are protected on the NRHP, including the National Cathedral in Washington, D.C.; the Touro Synagogue, America's oldest standing synagogue, dedicated in 1763; and numerous churches that played a pivotal role in the Civil Rights Movement, including the Sixteenth Street Baptist Church in Birmingham, Alabama." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 976 (9th Cir. 2004).

"excessive" entanglement. *Cholla Ready Mix, Inc.*, 382 F.3d at 976-77. Most importantly, there is simply no evidence here of governmental participation in or monitoring of tribal religious practices, which would constitute the types of entanglement that courts have traditionally been concerned about. *See id.*

In enacting AIRFA, Congress sought to remedy burdens on Native American free exercise that had become embedded in federal policies. In cancelling Plaintiff's lease, BLM was following Congress' mandate and simply avoiding unnecessary infringement on Native American religious liberty. The mere fact that the government sees value in religious practice and seeks to preserve and protect it is a far cry from establishing a religion. This is particularly true in the instance of Native American religion, where AIRFA seeks to reverse and remedy past federal policies of explicit religious discrimination.

## CONCLUSION

For the forgoing reasons, Defendants' Cross Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied.

Respectfully submitted this 7th day of October, 2016.


*/s/ Joel West Williams*

JOEL WEST WILLIAMS
D.C. Bar No. 1023016
HEATHER WHITEMAN RUNS HIM
KIM J. GOTTSCHALK
Native American Rights Fund
1514 P Street, NW (Rear) Suite D
Washington, DC 20005
Tel: (202) 785-4166
Fax: (202) 822-0068
williams@narf.org
*Attorney for Proposed Amicus Curiae*