IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

SOLENEX, LLC,                          )
                                       )
                                       )      CV No. 13-993-RJL
          Plaintiff,                   )
                                       )      Washington, D.C.
          vs.                          )      March 14, 2018
                                       )      3:45 p.m.
S.M.R. JEWELL, ET AL.,                 )
                                       )
          Defendants.                  )
_____)


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Steven J. Lechner
                            MOUNTAIN STATES
                            LEGAL FOUNDATION
                            2596 South Lewis Way
                            Lakewood, CO 80227
                            (303) 292-2021
                            Lechner@mountainstateslegal.com

APPEARANCES CONTINUED

```
For Intervenor Defendants:    John S. Most
                              DEPARTMENT OF JUSTICE
                              Land & Natural Resources Div.
                              Ben Franklin Station
                              P.O. Box 7611
                              Washington, D.C. 20044-1420
                              (202) 616-3353
                              john.most@usdoj.gov

                              Aurora R. Janke
                              Timothy Preso
                              EARTHJUSTICE
                              313 East Main Street
                              Bozeman, MT 59715
                              (406) 586-9699
                              ajanke@earthjustice.org
                              tpreso@earthjustice.org

Court Reporter:               William P. Zaremba
                              Registered Merit Reporter
                              Certified Realtime Reporter
                              Official Court Reporter
                              U.S. Courthouse
                              333 Constitution Avenue, NW
                              Room 6511
                              Washington, D.C. 20001
                              (202) 354-3249
```

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

1          DEPUTY CLERK:  All rise.  The United States

2    District Court for the District of Columbia is now in

3    session, the Honorable Richard J. Leon presiding.  God save

4    the United States and this Honorable Court.  Please be

5    seated and come to order.

6          Good afternoon.  This afternoon, we have Civil

7    Action No. 13-993, Solenex, LLC, versus Ryan Zinke, et al.

8          Will counsel for the parties please approach the

9    lectern and identify yourself for the record and the party

10   or parties that you represent.

11         MR. LECHNER:  Steve Lechner representing the

12   plaintiff, Solenex, LLC.

13         THE COURT:  Welcome back.

14         MR. MOST:  Good afternoon, Your Honor.  John Most

15   for federal defendants.

16         THE COURT:  Welcome.

17         MR. MOST:  Thank you.

18         MR. PRESO:  Good afternoon, Your Honor.

19   Timothy Preso on behalf of defendant intervenors, and I'm

20   joined by Aurora Janke.

21         THE COURT:  Welcome.

22         All right, Counsel.  We're here for your

23   cross-motion arguments on summary judgment.  Both sides can

24   have a half hour.  The defendants can split it.  I'll let

1    you decide how you want to split it.

2          MR. LECHNER:  May it please the Court.

3          Sydney Longwell, the original lessee and the

4    manager of Solenex, is not healthy enough to travel here

5    today, but with me at counsel table is two members of

6    Solenex, Kelly Longwell, Sydney Longwell's daughter, and

7    Sonny Cranch.

8          THE COURT:  Welcome.

9          MR. LECHNER:  We appreciate this Court scheduling

10   this hearing and allowing Solenex to present its case.  The

11   facts here are fairly straightforward and largely

12   undisputed.

13         In June 1982, defendant issued an oil and gas

14   lease to Mr. Longwell, which conveyed a property interest

15   and is also a contract.  For the next 33 years, defendants

16   treated the lease as valid and properly issued, as

17   demonstrated by the positions they took during the first two

18   years of this case.

19         In 1983, Mr. Longwell assigned a lease to FENA and

20   reserved a production payment.  Later that year, FENA

21   submitted an application for permit to drill, to drill one

22   well on the lease.

23         In 1985, after complying -- after more fully

24   complying with the National Environmental Policy Act and the

25   National Historic Preservation Act, defendants approved the

 1   application for permit to drill.

 2           Then after further studies, they approved it again

 3   in 1987, 1991, and, finally, for the fourth time, in 1993.

 4           An approved APD necessarily means that the

 5   underlying lease is valid and properly issued.

 6           Although the APD was approved four times and the

 7   1993 approved APB remained in effect, defendants prevented

 8   the drilling of the well because they held the lease in

 9   suspension since 1985.

10           2003, Solenex instituted this case, seeking to

11   lift the suspension that had been in place for almost three

12   decades.

13           In July of 2015, this Court held that the

14   defendants' 29-year delay was unlawful as a matter of law,

15   and ordered them to come up with a schedule about lifting

16   the suspension.

17           Instead of lifting the suspensions, defendants

18   canceled the lease and disapproved the 23-year-old approved

19   APD, and that was in March of 2016.

20           The Secretary's actions were unlawful for five

21   main reasons:  One, the Secretary lacked the authority to

22   cancel a lease after title had already been transferred into

23   private ownership; two, the Secretary lacked authority to

24   cancel a lease that was held by a bona fide purchaser,

25   Solenex; three, the passage of time barred the Secretary's

1    actions; four, principles of equitable estoppel and judicial

2    estoppel prevented the Secretary from canceling the lease

3    after representing it was valid and properly issued for more

4    than three decades; and, finally, there's no authority for

5    the Secretary to disapprove an approved APD, especially one

6    that had been approved for 23 years.

7           As to the authority, the property clause only

8    grants Congress power to manage Federal lands and minerals;

9    therefore, for the Secretary to have any ability to manage

10   the Federal lands and minerals, there must be a delegation

11   of authority.

12          Although Congress has charged the Secretary with

13   general responsibility for the disposal of Federal lands and

14   minerals, Congress never authorized the Secretary to cancel

15   a property interest after that interest had been transferred

16   into private ownership.  Instead, the Secretary's only

17   recourse was to seek a cancelation in court.

18          That was established by Supreme Court cases

19   *United States v. Stone* and *Moore v. Robbins*, the two

20   prominent Supreme Court cases on that issue.

21          THE COURT:  Who's the secretary that canceled the

22   lease again?

23          MR. LECHNER:  Secretary Jewell.

24          THE COURT:  Jewell.

25          And she did it just as she was leaving office?

1          MR. LECHNER:  She canceled it on March 17th, 2016.

2    So she still had --

3          THE COURT:  She still had a --

4          MR. LECHNER:  Few months, nine months.

5          THE COURT:  -- a few months, nine months left to

6    go?  Okay.

7          MR. LECHNER:  Yeah.

8          THE COURT:  Was there any effort to get her to

9    reconsider her decision?  I don't remember.

10          MR. LECHNER:  I amended the complaint to challenge

11    the cancelation decision.

12          THE COURT:  Okay.

13          MR. LECHNER:  As originally enacted, the Mineral

14    Leasing Act, pursuant to which this lease was issued, did

15    not authorize the Secretary to cancel the lease; instead,

16    even under the Mineral Leasing Act, the Secretary had to go

17    to court to cancel the lease; and the Secretary recognized

18    that in the 1930 decision from the *Department of Interior,*

19    *Melish Consolidated Plaster Oil Mining Company*.

20          However, in 1935, Congress granted the Secretary

21    limited authority to cancel a lease based on a post-lease

22    violation.

23          But if the Secretary has the inherent authority to

24    cancel the lease as suggested by the Secretary in her

25    decision, there would have been no reason for Congress to

1   write a statute that said the Secretary could cancel a lease

2   for a post-lease violation.

3           So despite this lack of inherent authority, the

4   Secretary relies on Supreme Court's decision in *Boesche v.*

5   *Udall*, 1963 decision, for the proposition that a Secretary

6   has the inherent authority to cancel a lease that was

7   allegedly and properly issued.

8           However, that case, there was a very limited

9   holding.

10          At the urging of the Solicitor General,

11  Archibald Cox, the Supreme Court merely held that the

12  Secretary has the power to correct administrative errors by

13  canceling leases in proceedings timely instituted by

14  competing applicants for the same land.

15          That was the holding, express limited holding

16  based upon the Solicitor General's framing of the question

17  presented.

18          That was the holding here, we have no lease --

19  competing lease applicants.

20          The lease was issued in 1982, there were no

21  protests, no appeals of issuance of the lease.  There's no

22  competing lease applicant to protect.

23          THE COURT:  And it's reauthorized three or four

24  times?

25          MR. LECHNER:  Four times it's been approved, the

1   drilling permit.

2          THE COURT:  Four times.

3          MR. LECHNER:  So we submit that *Boesche* holding is

4   inapplicable to the situation here, because the Secretary

5   didn't cancel it in an administrative proceeding brought by

6   a competing lease applicant.

7          Instead, the Secretary canceled the lease only

8   after treating it as valid and properly issued for 33 years.

9          We originated this case to lift the suspension,

10  and the government defended on the principle, as this Court

11  is powerless, to order us to lift the suspension.  And even

12  if this Court had that power, our 29-year delay was not

13  unreasonable.

14         So by defending their suspension and then turning

15  180 degrees, and say, well, the lease was invalid since its

16  inception in 1982, it's totally inconsistent.

17         The Secretary also relies on a regulation that's

18  been promulgated.  43 C.F.R. 3108.3(d) relies on that

19  regulation for the authority to cancel.  And that regulation

20  says, leases shall be subject to cancelations if improperly

21  issued.

22         But the Secretary cannot bestow upon herself any

23  more authority than the statute does.  So this regulation

24  has to be interpreted in accordance with the Mineral Leasing

25  Act, which says nothing about canceling an improperly issued

1   lease, and it also has to be interpreted in context with the

2   Supreme Court's decision in *Boesche*, I'm not sure how it's

3   pronounced, but...

4            THE COURT:  That's all right.

5            MR. LECHNER:  And that means it's very limited.

6            While there's an administrative proceeding pending

7   over a lease, the Secretary can cancel it, because while

8   that administrative proceeding is pending, title has not

9   transferred.  But here in our case, title has been

10  transferred for more than 30 years.

11           So in short, the Secretary lacked the authority,

12  whether she calls it inherent, express, implied, to cancel

13  the lease; and, therefore, her decision should be held

14  unlawful and set aside.

15           Even if the Secretary has some authority to cancel

16  the lease under these situations, she is powerless because

17  Solenex is entitled to bona fide purchaser protection.

18           The Supreme Court has long recognized that the

19  Federal Government cannot take back property interest once

20  that property interest is held by a bonafide purchaser, and

21  a bona fide purchaser is one who acquired the property

22  interest in good faith for valuable consideration and

23  without any notice of defect in his grantor's title.

24           Here, it's undisputed that Solenex acquired the

25  lease in good faith and provided valuable consideration for

1    the lease.  And there is no way for Solenex to know that the

2    lease was improperly issued, because the Secretary didn't

3    come up with that story until late 2015, early 2016, after

4    this Court already granted summary judgment for Solenex.

5         Because this arose 33 years after the lease was

6    issued and 11 years after Solenex acquired the lease and

7    approved APD in 2004, Solenex is entitled to bona fide

8    purchase protection.

9         It's also undisputed that valuable consideration

10   had been paid for the lease after it was originally issued,

11   because, in 1983, FENA paid valuable consideration to

12   Mr. Longwell for the assignment of the lease, by promising

13   to pay Mr. Longwell a production payment; therefore, Solenex

14   is entitled to bona fide protection status based on itself

15   and also based on the fact that its predecessor was a bona

16   fide purchaser.

17        And I refer this Court to the Interior Board of

18   Land Appeals' decision in *Home Petroleum Corporation*,

19   54 IBLA 194 (1981), where the Secretary of -- the IBLA makes

20   decisions for the Secretary of Interior.

21        In there, the IBLA specifically recognized that a

22   remote purchaser, who can -- a remote purchaser can benefit

23   from the status that its grantor was a bona fide purchaser.

24   So Solenex has it on its own, and also has it through FENA.

25        The Secretary said, in her cancelation decision,

1    well, Solenex can't claim bona fide purchaser because it

2    knew the lease was on -- was under suspension when it

3    acquired the lease in 2004.

4              But a suspended lease would put nobody on notice

5    that there was a defect in the title.  If it did, it would

6    put all suspended leases in jeopardy.

7              And it's hard for Solenex to know that there was a

8    defect in the title in 2004, when, I said before, the

9    Secretary only came up with that story after this Court

10   granted summary judgment.

11             The Secretary also tries to defend -- or argue

12   that Solenex lacks bona fide purchaser protection because

13   the alleged violation was not a violation of the Mineral

14   Leasing Act, but an alleged NEPA violation back in 1982 when

15   the lease was issued.

16             However, again, the Secretary, in *Clayton*

17   *W. Williams, Jr.*, 103 IBLA 102 (1986), recognized that a

18   bona fide purchaser can be fully protected for an alleged

19   NEPA violation, because, there, the IBLA tried to cancel a

20   lease that had been issued based on alleged NEPA violation,

21   and the Interior Board of Land Appeals board ruled that

22   Exxon was a bona fide purchaser, and they couldn't cancel

23   the lease for the alleged NEPA violation.

24             The passage of time also says that the Secretary

25   is barred.

1          It's well-established that certainty and title is

2   imperative to fulfill Congress's intent with the Mineral

3   Leasing Act, because nobody has title, nobody is going to

4   drill wells and produce the natural resources Congress

5   intended.

6          And to ensure this certainty of title, Congress

7   added the statute of limitations to the Mineral Leasing Act

8   at 30 U.S.C. 226-2, which said that people had 90 days to

9   challenge the lease issued by the Secretary.

10         If private parties have 90 days, that should also

11  apply to the Secretary, because, here, the Secretary

12  basically challenged the decision of her predecessor that

13  was issued back in 1982.

14         Also, 28 U.S.C. 2462 provides for a five-year

15  statute of limitations for the government to seek a

16  forfeiture.

17         Here, a canceling lease is nearly identical to a

18  forfeiture.

19         In fact, the Mineral Leasing Act uses

20  "cancelation" and "forfeiture" interchangeably.

21         So here, the Secretary missed the five-year

22  statute of limitations in that statute by almost 30 years.

23         The Secretary argues, well, that doesn't apply,

24  because that only -- that statute of limitations only

25  applies to punitive measures.

1          Well, we submit here, because they're canceling a

2    lease which is a forfeiture -- all forfeitures are

3    essentially punitive.

4          And, moreover, we think it's punitive because the

5    Secretary only took the position that it was invalidly

6    canceled after Solenex exercised its right to seek judicial

7    review of the unlawful delay.

8          We also have elements of estoppel in our favor,

9    both equitable and judicial.  We certainly -- Solenex

10   certainly changed its position, reliance on the Secretary's

11   repeated assertions that the lease was valid, proving it

12   four times would speak for itself.

13         The Bureau of Land Management, in response to a

14   letter that Mr. Longwell wrote in 2002, asking if his permit

15   was still valid, the BLM responded, yes, you have a valid

16   permit.  That's at docket No. 45-6, page 55.

17         So we have principles of equitable estoppel and

18   judicial estoppel, because, for two years, they were

19   defending their delay.

20         But if the lease was invalid since 1982, they

21   probably should have told this Court in a more timely manner

22   that they thought the lease was invalid.  But, instead, they

23   defended their 29-year delay.

24         So I think under principles of judicial estoppel,

25   the Secretary's's decision has to be held unlawful or

1  equitable -- and also, both of those fall under the

2  arbitrary-and-capricious standard of review.

3            Finally, there's no authority for the Secretary to

4  disapprove an approved APD, especially one that's been

5  approved for 23 -- four times, and the last approval was for

6  23 years.

7            The regulation that the Secretary cited in her

8  cancelation decision for this purported authority provides

9  only that the Secretary can disapprove an unapproved APD

10 within 35 days of receipt.  Well, she missed that by 33

11 years, Your Honor.

12           And, therefore, Solenex respectfully requests that

13 this Court hold unlawful and set aside the Secretary's

14 decision to cancel Solenex's lease, 33-year-old lease, and

15 the Secretary's decision to disapprove the 23-year-old

16 approved APD.

17           Solenex further requests that this Court order the

18 defendants to immediately lift the suspension on the lease,

19 after the lease is reinstated, lift the suspension on the

20 lease and the approved APD so that Solenex can exercise its

21 valuable lease and contract rights, beginning July 1st of

22 this year, when the drilling window under the approved APD

23 kicks in.

24           Thank you, Your Honor.

25           THE COURT:  Thank you very much.

1          You can use the remainder of -- you have ten

2   minutes left.  You can use that for rebuttal, if you wish,

3   later --

4          MR. LECHNER:  Thank you, Your Honor.

5          THE COURT:  -- if you'd like to.

6          Welcome.

7          MR. MOST:  Thank you, Your Honor.  Good afternoon.

8          I want to just take one moment to introduce some

9   agency personnel who are here today, and I did not introduce

10  them because they're not at counsel's table.

11         But from the Bureau of Land Management, we have

12  Mr. Lorenzo Trimble, he's the Acting Chief of the Fluid

13  Minerals Division.

14         THE COURT:  Welcome.

15         MR. MOST:  And from the Forest Service, we have

16  Mr. Greg Perkins, and Mr. Joel Strong from the Service's

17  Ecosystem Management and Coordination Office.

18         THE COURT:  Welcome, everyone.

19         How do you want to split your half hour?

20         MR. MOST:  I think my prepared remarks take about

21  ten minutes, and maybe 12 with questions or what have you,

22  15.

23         And then I'll leave ten minutes for intervenors.

24  And, perhaps, if there's a necessity to have a rebuttal, a

25  couple minutes at the end.

 1              THE COURT:  Well, I'll budget 15 for you and then
 2    15 for your colleague.
 3              MR. MOST:  Okay.
 4              THE COURT:  And then whatever is left over, we'll
 5    just -- you can do a rebuttal.
 6              You may proceed.
 7              MR. MOST:  Thank you, Your Honor.
 8              We just heard that the plaintiffs basically make
 9    five arguments, and two of them they put particular emphasis
10    on; one is the cancelation authority, and the other is the
11    bona fide purchaser protection.
12              Unless the Court prefers to hear about any one of
13    these in particular first, I'll just start with the two big
14    ones --
15              THE COURT:  Sure.
16              MR. MOST:  -- and work my way down.
17              THE COURT:  Makes sense.
18              MR. MOST:  Your Honor, the Court's decision in --
19    Supreme Court decision in *Boesche v. Udall* clearly
20    establishes that the Secretary does, indeed, possess a right
21    of a power to cancel leases as part of his broad powers
22    under the general land laws.
23              This is not something that -- we are not arguing
24    that this power derives from the Constitution with a
25    property clause but from Title 2 of -- Section 2 of Title

1   43.   And that's what the Supreme Court found.

2          And it recognized, when faced with a Circuit

3   split, that the Secretary has a traditional administrative

4   authority to cancel on the basis of pre-lease factors.

5          They used a broad term:  "Factors."  It wasn't

6   limited to any particular circumstance.  It was an

7   acknowledgment that there could exist any number of

8   instances where the cancelation -- where cancelation may be

9   appropriate.  And rather than try to project and announce

10  and make an exhaustive list, they used a broad term.

11         THE COURT:  So it's based on events that have

12  occurred after the lease was authorized?  Conduct on the

13  part of the --

14         MR. MOST:  This was conduct pre-lease.

15         THE COURT:  Oh, this is pre-lease?

16         MR. MOST:  Based on pre-lease factors, is what the

17  *Boesche* Court held.

18         THE COURT:  So in that situation, the Secretary

19  basically is re-evaluating the earlier decision to authorize

20  the lease?

21         MR. MOST:  Well --

22         THE COURT:  Is it like a re-evaluation?

23         MR. MOST:  I see how you could consider it that

24  way.

25         THE COURT:  Because I think plaintiff's counsel

1    said it was based on events that occurred after the lease

2    had been authorized.

3          You disagree with that interpretation?

4          MR. MOST:  The legal errors that are identified in

5    the cancelation decision are:  Failure to undertake the

6    historic preservation process and failure to comply with

7    certain aspects of NEPA.

8          THE COURT:  I see.

9          MR. MOST:  And those failures, those shortcomings,

10   those deficiencies occurred before the lease was issued.

11         And, of course, the cancelation, that wouldn't,

12   the cancelation was post-leasing, necessarily would have to

13   be.

14         In addition, since 1963 when *Boesche* was decided,

15   the agency engaged in a formal rule-making under the Mineral

16   Leasing Act, invoking Section 2 of Title 43, and promulgated

17   a reg. through formal rule-making that says that leases

18   shall be subject to cancelation if properly issued.

19         Plaintiff seeks to avoid the *Boesche* decision by

20   treating the lease as an instrument conveying title to

21   public land into private ownership.  He referred in his

22   opening remarks to transferring a property interest into

23   private ownership.  And that's not exactly what's happened

24   here.

25         They rely on the case of *U.S. v. Stone*.  That was

1   a title case, a patent case, I believe, but it involved

2   transfer of title, and that was 1864.  And in that case, the

3   Court said, in ruling that a judicial order was needed for

4   the cancelation, that the functions of the department

5   necessarily cease when the title has passed from the

6   government.  And that is true, and we understand that and

7   recognize that, but it points out an important distinction

8   that's relevant here.

9           THE COURT:  So what was Secretary Jewell focusing

10  on here?  What were the pre-lease problems that she was

11  relying upon as the basis to cancel a lease that had already

12  been reauthorized on three or four occasions?

13          MR. MOST:  Well, the lease wasn't reauthorized;

14  the APD was.

15          The approval of the application for permit to

16  drill was issued on, I believe that's right, four separate

17  occasions.

18          But we also were confronted with four challenges.

19          The first challenge in 1985 BLM's decision was

20  appealed to the IBLA by ten parties.

21          In 1987, another IBLA appeal.

22          In 1991, a third IBLA appeal.

23          THE COURT:  Say IBLA.

24          MR. MOST:  I'm sorry, the Interior Board of Land

25  Appeals.

1          THE COURT:  So 1985.

2          MR. MOST:  '85, '87, and '91.

3          And then in '93, after the APD was issued, the

4    matter -- the decision was, again -- when another APD

5    decision was made, the decision was appealed to the District

6    Court.

7          And that case got stayed by the District of

8    Montana for some indefinite period of time, and it never

9    reactivated.  There was a motion to re-open it at one point,

10   but then I believe the cancelation decision bended that.

11         These challenges were not insignificant.  There

12   were many parties who were interested in the first appeal to

13   the IBLA, ten parties appealed, 11 parties appealed the

14   second decision.

15         THE COURT:  What was their concern?  What was

16   their problem?

17         MR. MOST:  They were opposed to the drilling

18   decision because of the lack of study of the cultural and

19   religious resources.

20         THE COURT:  What do you mean the "cultural

21   resources"?  Neighboring Indian tribes?

22         MR. MOST:  Yeah, that are sacred to the Indian

23   tribes.  That wasn't considered.

24         The NHPA decision hadn't been made.

25         That process continued, Your Honor, until 2015.

1          So just to digress slightly, one of the things --

2    we're accused of 33 years of delay, but we were hit with

3    four legal challenges in this time, and a very protracted

4    situation, where the forces of conservationism and industry

5    were pitted against each other in a way that was almost

6    irreconcilable.

7          I know Your Honor found that we delayed

8    unlawfully.  And we're not asking you to reconsider, but

9    I would emphasize --

10          THE COURT:  That wouldn't be prudent.  You

11    wouldn't do that.

12          MR. MOST:  No, no.

13          But I will say that --

14          THE COURT:  Would you agree there comes a time

15    where enough's enough and too much time has passed, and

16    fairness dictates that the party be redressed for what's

17    happened?

18          There has to be a point, right?

19          MR. MOST:  Yes.

20          THE COURT:  I mean, the D.C. Circuit has itself

21    recognized that.

22          MR. MOST:  We're not seeking reconsideration on

23    that point.

24          THE COURT:  Good.

25          MR. MOST:  I agree there does come a time.

1          THE COURT:  So this is one of those rare cases

2     that comes along, thankfully rare, where so much time has

3     elapsed over such a long period of time, and all of this

4     administrative back and forth has been going on for decades

5     and decades.

6          You know, where it comes a point where a court is

7     basically put to the question:  What is a fair resolution of

8     this problem, in light of all this background noise and

9     challenges and fighting and indecision in the face of

10    drilling reauthorizations, et cetera?  That's where the

11    problem lies, I think.

12         MR. MOST:  I understand.

13         I just wish to convey to the Court that some of

14    the delay over these years were dictated by necessary

15    process, and some of it was delayed by legal challenges.

16         THE COURT:  Some of it was delayed by politics.

17         MR. MOST:  And by politics too.

18         THE COURT:  Which is unfortunate that that should

19    be a driving force.

20         But it appears that changes in administration and

21    changes in administration's attitudes towards certain issues

22    might have been a factor in what was going on here.  It's

23    hard to say, but it looks that way, wouldn't you agree?

24         MR. MOST:  There is some indication of that.

25         THE COURT:  Yeah.

1          MR. MOST:  The suspension, the most recent

2  suspension occurred in the Clinton administration.

3          The Obama administration was at the helm when the

4  lease was suspended.

5          But I'm advised by the Solicitor's Office that the

6  Secretary, the current Secretary fully supports this

7  decision, and that's why I'm here today defending it.

8          THE COURT:  Mr. Zinke supports this completely,

9  huh?

10          MR. MOST:  Yes, he does.

11          THE COURT:  Okay.

12          MR. MOST:  So that's --

13          THE COURT:  I'm glad you're bringing that to my

14  attention.

15          MR. MOST:  Thank you.

16          Certainly.

17          THE COURT:  So he thinks he has this authority?

18  Which the plaintiffs think he doesn't have.

19          MR. MOST:  That's right.

20          THE COURT:  Which I guess I have to decide whether

21  he does or he doesn't.

22          MR. MOST:  That's right.

23          We digress slightly.

24          And I'll just close out the one point I was in the

25  middle of --

1          THE COURT:  Sure.  Go ahead.

2          MR. MOST:  -- which was the historical element

3  here.

4          THE COURT:  Yeah.

5          MR. MOST:  The Mineral Leasing Act represented a

6  sea change in American management of its resources.

7          Prior to 1920, for the most part, statutes that

8  Congress passed that affected the use and development of the

9  nation's resources were based on a policy of disposition.

10  You had the mining law of 1872, where, if you staked out a

11  claim and demonstrated to the land office that it was

12  economically viable, you could get a patent to that land.

13  And likewise with the Homestead Act, you could get title to

14  your land if you met the statutory requirements.

15          By 1920, there was a shift in thinking as our

16  nation grew and the idea of retaining control in the

17  Secretary, control over land, promoting development but at

18  the same time retaining control and ownership in the Federal

19  Government.

20          THE COURT:  But they wanted to encourage drilling?

21          MR. MOST:  Yes, they did.

22          THE COURT:  Congress wanted to encourage drilling,

23  in part, if not in whole, because they wanted the

24  United States Treasury to share in the profiting from the

25  drilling, is that not right?

1          MR. MOST:  That what the law says; that we --

2          THE COURT:  Exactly.

3          MR. MOST:  -- make --

4          THE COURT:  Right.

5          MR. MOST:  -- the resources available for fair

6    market value.

7          THE COURT:  I mean, we've had some situations,

8    which we won't dwell on today, where the mineral management

9    agency wasn't adequately protecting the country's interest

10   in the drilling that was going on public lands.  We've had

11   those situations.

12         The IG, Mr. Devaney, issued some very strong

13   investigative reports on that very issue that unmasked some

14   very inappropriate conduct that was taking place, and

15   denying, in essence, the Treasury of the United States from

16   its entitled profits from drilling.

17         So we have a clear statutory situation here, where

18   people who have otherwise lawful permits are supposed to be

19   encouraged to go forward and do their drilling, and that's

20   running head-on into this other faction of concerns, which

21   are, I guess you'd say, embodied in the Historic

22   Preservation Act's protection of Indian tribal, cultural

23   items or ideas --

24         MR. MOST:  Resources.

25         THE COURT:  -- resources, yeah.

1           So that's what this case poses, a head-to-head

2      battle between those two interests, competing interests.

3           And it's troubling, to say the least, that this

4      has gone on so long and put an otherwise lawful drilling

5      operation in suspension for so long, and then finally the

6      rug is pulled out from under them.  It's very troubling.

7           MR. MOST:  I can understood that, Your Honor.

8           And I have to acknowledge that over the years, we

9      did treat the lease as still valid.

10          The agencies, in fact, did everything they could

11     do to try to find a way to come up with mitigation that

12     would be agreeable to the various stakeholders.

13          THE COURT:  Well, somebody had to make a hard

14     choice.

15          Hard choices weren't being made when they should

16     have been made, and people have expended resources and money

17     and hopes and expectations on following through on these

18     otherwise lawful drilling permits, and they were being held

19     in the suspended state of uncertainty --

20          MR. MOST:  Yes.

21          THE COURT:  -- from year in and year out, year in

22     and year out.

23          MR. MOST:  Things weren't done right in the

24     beginning.

25          THE COURT:  That's not the way things are supposed

1   to be done in this country.  Certainly, that's not the way

2   Congress envisioned it.

3           I can't imagine anyone standing at that podium and

4   telling me that that's what Congress envisioned.

5           MR. MOST:  I'm not going to do that.

6           THE COURT:  No one is going to argue that.

7           I doubt your colleague is going to argue that.

8   And if he tries it, he'll have a hard time at the podium.

9           That's not what Congress envisioned.  That's not

10  what the American people want.

11          So how do we square it with what Congress wants?

12          And the Secretary acted, even if she had the

13  authority, which they claim she doesn't have, how do you

14  square it with fairness?  What's fair?

15          If you can't come to the Federal Courts to get an

16  answer to the question of whether someone's being treated

17  fairly or not, where can you go?  Is there any place to go?

18          MR. MOST:  Claims Court.

19          THE COURT:  Yeah.

20          Well, I think we're a little too far down the road

21  to send this over to the Claims Court.

22          MR. MOST:  Well, if you were to assist -- yeah,

23  I understand what you're saying.

24          THE COURT:  I think this is the last stop on this

25  train.

1           We're going to have to figure it out.

2           It's not exactly an easy question, because it's

3    basically uncharted territory.

4           You know, we've got a Supreme Court decision that

5    is not on factually directly analogous circumstances.

6           MR. MOST:  But we also have a regulation,

7    Your Honor.

8           THE COURT:  Well, now.

9           MR. MOST:  And we also have a statute, the

10   Historic Preservation Act, which says that we have to look

11   at the interests of the Indian tribe.

12          THE COURT:  Oh, I know we do.

13          MR. MOST:  These have to be taken into account.

14          THE COURT:  But you know this courthouse is a

15   courthouse where we deal with conflicting regulations and

16   conflicting statutory interests every day.  That's the

17   business we're in here.

18          MR. MOST:  I understand.

19          THE COURT:  Yeah.  So we'll figure that part out.

20          MR. MOST:  Okay.  Thank you, Your Honor.

21          The D.C. Circuit held, in 1983, *Sierra Club v.*

22   *Peterson*, that an oil and gas leak must be issued with

23   having first done an EIS.

24          And the Ninth Circuit has also so held in the

25   '80s.

1          And that didn't occur here.

2          And the reason for that ruling was that leasing

3    represents an irretrievable commitment of resources.  And

4    that's NEPA terminology for considering when something rises

5    to the level of a major federal action, for purposes of

6    NEPA.  So I think that's an important factor.

7               THE COURT:  Why wasn't the EIS done?

8          Why didn't the agency say, well, we've got to do

9    an EIS, let's get it done?

10              MR. MOST:  Your Honor, I wish they had.

11              THE COURT:  Well, they have to help themselves out

12   in that respect.

13         They reauthorized the permits all those times.

14   Nobody at the agency was saying, hey, we should have --

15   let's get that EIS done.

16              MR. MOST:  At each successive juncture, it became

17   clear that there were things that were not looked at, and

18   there was a very long and protracted NHPA process, the

19   Historic Preservation Act process.

20         There were, over the years, four different

21   ethnographic studies to try to get this right.

22         If the agency made a decision to go one way or the

23   other on the APD, they were going to get sued no matter

24   what.  So instead what they tried to do is to run this

25   circumstance through the full gamut of the administrative

1    process and do a fair and full-blown NHPA process.

2            And they did that and that process took a long

3    time because of the studies that were done.  There was one

4    in the '90s, there were three more in the middle of 2000s.

5            THE COURT:  Well, that's a separate problem:  How

6    long it takes to do these studies.

7            They built the Empire State Building in one year.

8            MR. MOST:  They didn't have to deal with NEPA.

9            THE COURT:  Yeah, our country is not heading in

10   the right direction in that regard, I can tell you that

11   right now.

12           MR. MOST:  I understand.

13           It wasn't until 2014 that the NHPA process

14   continued, and that was after this lawsuit was filed.

15           And the decision wasn't made in the wake of your

16   adverse ruling, Your Honor.  The decision to consider

17   cancellation began to be studied earlier than that.

18           There was a -- as I understand it, there was a

19   one-day turnaround from the order, from your order or the

20   hearing, I forget which, and we canceled it.  That 11-page

21   decision was not written overnight.  And it's just not true

22   that we did that as a reaction.  It was under consideration

23   prior to that.

24           THE COURT:  Well, you used up 20 minutes.  What do

25   you think, you want to give your colleague ten?

1          MR. MOST:  Well, one quick point, if you don't

2    mind, Your Honor, on modified purchaser.

3          THE COURT:  Make one quick point.

4          MR. MOST:  To be a bona fide purchaser -- well, to

5    qualify for the protections, it has to be for a violation of

6    the Mineral Leasing Act.

7          And I know there's this *Williams v.* -- *Clayton*

8    *W. Williams* case that the IBLA decided.

9          And on that, I'm just going to say, the issue of

10   the plain language of the statute never came up; it was

11   never considered.  And even -- so that ruling really cannot

12   preempt the plain language of the MLA provision.  Thank you,

13   Your Honor.

14         THE COURT:  All right.  Very good.  Thank you.

15         You can have ten minutes, sir.

16         MR. PRESO:  Thank you.  Good afternoon,

17   Your Honor.  And thank you for the opportunity to present

18   argument this afternoon.

19         I'd like to begin by just introducing for the

20   Court two members of the Blackfeet tribal government who've

21   traveled here from Montana to attend the hearing today.

22         THE COURT:  Sure.

23         MR. PRESO:  A member of the tribal -- governing

24   body of the Tribal Business Council, Tyson Running Wolf; and

25   the Tribal Preservation Officer, Mr. John Murray.

1          THE COURT:  Welcome.

2          MR. PRESO:  And, you know, their presence here

3   this afternoon, I think, illustrates what the Court was just

4   talking about, their interests at stake in this case

5   obviously that are on both sides of the issue.

6          THE COURT:  Both sides.

7          MR. PRESO:  And in that regard, Your Honor, the

8   Court, I know, has expressed frustration at the amount of

9   delay that occurred in this case.

10          But, of course, we're at a stage in this case

11   where the issue is not delay, the Court has ruled

12   dispositively on that question.  The issue is the lawfulness

13   of a cancelation decision.

14          THE COURT:  Right.

15          MR. PRESO:  On that point, Your Honor has

16   expressed concern about a fair --

17          THE COURT:  It's a question of first impression,

18   is it not?

19          MR. PRESO:  Your Honor, I don't think it is.

20          THE COURT:  Has the D.C. Circuit -- has the

21   D.C. Circuit ever addressed the issue of the Secretary's

22   authority to do this under circumstances analogous to this?

23          MR. PRESO:  I don't know that it's been factually

24   on all fours.

25          But what I would say is this, Your Honor.  The

1    *Boesche* case itself, the reasoning of the Supreme Court in

2    that case, the analytical reasoning that got them to that

3    result, applies equally here.

4              THE COURT:  Very different kind of case.

5              MR. PRESO:  You're right that --

6              THE COURT:  Factually night and day.

7              MR. PRESO:  I agree that they're very different

8    facts.

9              THE COURT:  Night and day.

10             MR. PRESO:  I would just say there's two building

11   blocks of that decision.  The first is that the Secretary

12   has a general administrative power to cancel leases under

13   their -- the Secretary's broad delegated authority over the

14   public lands.

15             THE COURT:  And Zinke, apparently, thinks that's

16   the case here.

17             MR. PRESO:  That is what I understand.

18             THE COURT:  Apparently.  Okay.

19             MR. PRESO:  And the second building block is that

20   the Mineral Leasing Act did not constrain that authority.

21             Those are the two principal foundations upon which

22   the *Boesche* holding is built.

23             And Your Honor's absolutely right, the facts were

24   different.

25             THE COURT:  You know what it sounds like:

 1   No matter how I rule, this is going to the Supreme Court,

 2   because this is factually very different.

 3            MR. PRESO:  It is, Your Honor.

 4            THE COURT:  It couldn't be more different.

 5            This is a case that is, from a dynamic point of

 6   view, very different, and calls out for an equitable relief

 7   on its face.

 8            MR. PRESO:  Well, Your Honor, I think there's some

 9   similarities.

10            Both cases involve the Secretary's authority to

11   cancel for pre-leasing errors, not the errors of the

12   leaseholder after lease issuance, but errors of the

13   government in issuing a lease.

14            THE COURT:  Uh-huh.

15            For a 30-year period of dragging things out?

16            MR. PRESO:  There was not, Your Honor, but that's

17   where these other interests come into the picture.

18            The intervenors in this case, throughout that

19   period, were asking the government to take action to correct

20   the error made in that leasing decision.

21            We regret that it took the government so long to

22   do that.  But it did.  And in so doing, it was acting to

23   address the public interest, the public interest that was

24   not only just advocated by the Blackfeet interests and the

25   others that are defendant intervenors before the Court, but

1   also the public interest that was recognized by a number of

2   executive and legislative actions with respect to this area,

3   the Badger-Two medicine area, which is adjacent to Glacier

4   National Park, where the lease is located, and those include

5   the congressional action to withdraw that area from mineral

6   leasing in 2006.

7                THE COURT:  That never happened.

8                MR. PRESO:  Excuse me?

9                THE COURT:  That never happened, did it?

10               MR. PRESO:  It did, Your Honor.

11               Congress passed a law in 2006 which withdrew the

12   area from future mineral leasing.  Granted, the Solenex

13   lease was an existing lease on the landscape at that time.

14               THE COURT:  Right.

15               MR. PRESO:  At that time, Congress provided tax

16   incentives for leaseholders within the withdrawal area to

17   relinquish their leases, essentially in exchange for tax

18   benefits.

19               Major oil companies, including BP, and, most

20   recently, Devon Energy, relinquished 44 leases in the area

21   in response to that incentive.  Solenex chose not to

22   participate.

23               But in terms of a fair outcome, I think it's also

24   fair to point out to the Court there have been other

25   opportunities to get a recovery on this lease.

1          Another one -- and the Court -- I just want to

2    return to a point the Court addressed earlier with respect

3    to Court of Claims.

4          The Court of Claims' decision that we've cited in

5    our brief, *Griffin and Griffin versus the Federal*

6    *Government*, holds that in a situation, whereas here, a lease

7    is canceled by the Secretary due to pre-leasing errors, the

8    leaseholder has the opportunity for a contractual recovery

9    against the government for the promises that were made in

10   the lease that a lease would convey a valid right.

11         So I respectfully would submit to Your Honor that

12   there actually is an opportunity for this leaseholder to

13   obtain damages recovery in the Court of Claims.

14         And so in terms of a fair outcome, the way the

15   plaintiff has presented this to the Court is, they have to

16   get relief in this case before Your Honor, or as they have

17   put it, their lease is not worth the paper it is written on.

18         But that is not so.  There are other

19   opportunities.  There was the opportunity with the 2006

20   legislation.  There's an opportunity in the Court of Claims.

21         And the other opportunity, which is reflected in

22   the Advisory Council on Historic Preservation findings that

23   were before the Court, the Blackfeet offered to exchange the

24   Solenex lease for a lease in a less-sensitive area on the

25   Blackfeet Indian reservation itself, and Solenex declined to

1   pursue that.

2          Obviously, it's their right to make those choices.

3   But when they then come to this Court and ask the Court to

4   reinstate their lease within the most sacred cultural area

5   of the Blackfeet, it's significant, as the Court considers a

6   fair outcome, that there were and still are other

7   opportunities that have not been pursued.

8          I want to turn, I know -- I want to be, obviously,

9   faithful to the time limitation the Court has imposed, so

10  just quickly a few points.

11         On the *Boesche* case, I've already talked about how

12  Your Honor is absolutely right, factual distinctions.  But

13  we would submit that the building blocks, the analytical

14  building blocks of that ruling apply equally here:

15  Secretary has this general backdrop of authority, Mineral

16  Leasing Act did not restrict it.  So we would submit to

17  Your Honor that *Boesche* forecloses that authority claim on

18  the part of the plaintiff.

19         With respect to the bona fide purchaser defense,

20  the Mineral Leasing Act's plain language provides a bona

21  fide purchaser defense only where cancelation is undertaken

22  for violations of the Mineral Leasing Act brought by the

23  predecessor in interest of the current leaseholder.  That is

24  the plain language of the statutory provision at issue.

25  It's section 27(h)(2) of the Mineral Leasing Act.  And in

1    that circumstance, that provision is simply inapplicable.

2            We're not in a situation here where cancelation

3    was based on violation of the Mineral Leasing Act and not as

4    a result of any assertion of fault on the part of Solenex's

5    predecessor in interest.  It's an assertion of fault, an

6    admission of fault, by the leasing agency itself.

7            With respect to laches and estoppel, the

8    Supreme Court, in the case of *Utah Power and Light versus*

9    *United States* in 1917, held very clearly that laches is no

10   defense, where, as here, the government acts to enforce a

11   public right or protect a government interest.

12           And, of course, the reason is, in that situation,

13   fairness to the party who's claiming to be aggrieved has to

14   be balanced against the fact that the government is acting

15   in the interest of a broader public whose interests should

16   not be sacrificed because the government dragged its feet

17   improperly.

18           Yes, there's a concern about how the government

19   conducted itself, but always important is to recognize that

20   standing behind the government are all these people living

21   on the Blackfeet reservation and otherwise who have been

22   clamoring at the government to take this action -- and from

23   our perspective as well the government dragged its feet and

24   wouldn't take the action that was called for in time.

25           With respect to estoppel, I'm sure the Court is

1   well-aware, estoppel against the government is a highly

2   disfavored doctrine.

3           THE COURT:  True.

4           MR. PRESO:  And with respect to estoppel, the

5   D.C. Circuit has held, in the *ATC Petroleum* case from 1988,

6   that if it's available at all against the government -- and,

7   by the way, the D.C. Circuit has never found estoppel

8   against the government, nor has the Supreme Court -- but if

9   it's available at all, it is only in the situation where

10  estoppel will not do undue damage to the public interest.

11          Here, applying estoppel to reinstate this lease

12  would do damage to all the interests that we've talked about

13  that are on the other side of this case that have been

14  recognized, both in terms of Congress's enactment of NEPA

15  and the National Historic Preservation Act.  Obviously,

16  those reflect the finding of public interest.  But also the

17  public interest that's expressed in the congressional

18  mineral withdrawal from 2006, which is not just some general

19  enactment but a specific enactment about the geography at

20  issue in this case.  And so that's a concern.

21          With respect to NEPA and the NHPA -- and I'll

22  conclude on this point -- just to echo the point that

23  Mr. Most made:  Again, the argument that Solenex is

24  advancing is foreclosed by controlling authority, *Sierra*

25  *Club v. Peterson* held in 1983 that a lease for surface

1   occupancy issued in the absence of a pre-leasing EIS

2   violates NEPA.

3            Here, the Solenex lease authorizes surface

4   occupancy of the leasehold.  There was no EIS prior to its

5   issuance.  So just based on a plain application of *Sierra*

6   *Club v. Peterson*, the Secretary's finding of a NEPA

7   violation is right on target under controlling D.C. Circuit

8   authority.

9            I'll just close by saying, Your Honor, obviously,

10  the Court's concerned about fair outcomes and we wouldn't

11  want it any other way, because we're often plaintiffs before

12  the Courts as well.

13           But I would just say that fairness in this case

14  does not require reinstating an unlawfully issued lease in

15  the midst of the most culturally and spiritually significant

16  landscape for the Blackfeet people.  There are other

17  opportunities.  There have been other opportunities.  And

18  even today, there's an opportunity for a contractual

19  recovery by this leaseholder.

20           So we ask you to reject the claims of the

21  plaintiff, and thank you for the opportunity to argue today.

22           THE COURT:  Thank you.

23           You've got ten minutes left.

24           MR. LECHNER:  With respect to counsel's mention of

25  the public interest, I mean, this country was founded on the

1  protection of property rights, such as oil and gas leases.

2         So reinstating an oil and gas lease would be fully

3  consistent with the public interest in the frameworks

4  intended of protecting public property, and the government

5  was formed to protect that property.

6         With respect to NEPA violations, in the 1980

7  Energy Security Act, Congress said, we want the Forest

8  Service to act on lease applications without waiting for a

9  forest plan and the accompanying EIS, because here in this

10 forest, there were 200 lease applications pending in 1980.

11        So Congress, in 4288.55, basically told the Forest

12 Service to start issuing the leases and processing those

13 applications, and NEPA only has to be complied with to the

14 extent -- maximum extent practicable.

15        So Congress put a mandate.  If the agency had not

16 processed the applications, they would have been unlawful,

17 because that would have been an unlawful withdrawal under

18 FLPMA, following the precedent established in *Mountain*

19 *States Legal Foundation v. Anders*.

20        So the Forest Service had to act and they did act

21 by preparing that 162-page EA for the leasing, which fully

22 analyzed all the alternatives, analyzed the no-action

23 alternative, which was to delay action until the forest plan

24 came out.  So that's essentially no action.

25        They chose an alternative that provided for

1   leasing.

2           And really what the Secretary is saying is, well,

3   we should have picked the no-action alternative.  Well, that

4   train has left the station.

5           Moreover, following the 1981 leasing EA, the

6   Forest Service and the BLM then prepared a 318-page EA for

7   the first APD approval.

8           Then following that in '86, they did another EIS,

9   which fully analyzed the oil and gas drilling on the forest,

10  and issued that EIS with the 1986 forest plan.

11          Then after the forest plan, then they did a

12  specific 982 Environmental Impact Statement for this APD at

13  issue and another APD that had been proposed by Chevron.

14  They never approved Chevron's APD.

15          But based on that 900-page Environmental Impact

16  Statement that fully analyzed all aspects of oil and gas,

17  the Assistant Secretary approved the APD in the 1993 Record

18  of Decision.

19          THE COURT:  Now, what about the Blackfeet Indians'

20  concerns?  What about an analysis or evaluation of their

21  interests?

22          MR. LECHNER:  Well, we've got to go back to before

23  the lease.

24          THE COURT:  Okay.

25          MR. LECHNER:  Before the lease, the lease was

1    issued, nobody complained.

2              The leasing EA came out, nobody appealed that.

3              Then 1983, the Blackfeet Tribal Council passed a

4    resolution, 94-84, which is found at Docket No. 45-12,

5    page 13, they passed a resolution to seek to develop the oil

6    and gas in the area where Solenex leases.

7              And all this -- they talk about all these cultural

8    studies that were done.  All those cultural studies were

9    done based upon the 1992 amendments to the National Historic

10   Preservation Act.

11             In those amendments, they did give the tribes more

12   rights, more say in the National Historic Preservation Act

13   process, and they came up with the idea that traditional

14   cultural district is what they were using.  But that was ten

15   years after the lease issued.

16             So all this stuff they're talking about the

17   National Historic Preservation Act is everything from '92

18   forward when they did all these cultural studies.  But that

19   doesn't show the lease was improperly issued in '82.

20             THE COURT:  So it's your position that it's

21   post-lease events that is the real basis for the cancelation

22   by Jewell?

23             MR. LECHNER:  Yeah, because when the lease was

24   issued, nobody cared.

25             THE COURT:  Not pre-lease events --

45

1            MR. LECHNER:  Yeah.

2            THE COURT:  -- like in the Supreme Court case

3      that's been cited here.

4            MR. LECHNER:  Well, they're using post-lease facts

5      to somehow say that the lease was improperly issued, in

6      violation of NHPA, the National Historic Preservation Act.

7            But you can't look at post-lease facts.  It

8      can't -- because it's all subjective now.  It's like, oh,

9      well, we all want to protect it.

10           THE COURT:  Has the Supreme Court ever said that

11     post-lease facts are appropriate and a proper basis to

12     cancel a lease after the fact?

13           MR. LECHNER:  If post-lease act could justify

14     canceling a lease, no lease is was worth anything.  Nobody

15     is going to buy a lease.

16           THE COURT:  So the short answer is, no, the

17     Supreme Court has never said that.

18           MR. LECHNER:  Has never said that.

19           THE COURT:  Right.

20           So if you're right, and I were to agree with you,

21     this would be a case of first impression under any scenario?

22           MR. LECHNER:  Well --

23           THE COURT:  There's no case really quite like this

24     one, is there, where post-lease events that arose in the

25     context of a statutory amendment are now being used as the

1    basis decades later by a Secretary to cancel a lease from

2    25, 30 years earlier, whatever the number he uses.

3              This is the first time it's ever happened, right?

4              MR. LECHNER:  Well, nobody would -- nobody

5    would --

6              THE COURT:  I think the short answer is:  "Yes."

7              MR. LECHNER:  It's yes.

8              THE COURT:  Have you heard of anything like it?

9              MR. LECHNER:  I couldn't even imagine anybody

10   thinking about post-lease facts to cancel a lease based on

11   alleged pre-lease errors.  It doesn't make sense; it doesn't

12   hold water.

13             THE COURT:  Yeah.

14             MR. LECHNER:  With respect to the 2006 legislation

15   where they gave tax incentives --

16             THE COURT:  Yeah.

17             MR. LECHNER:  -- to all the existing lessees --

18             THE COURT:  Uh-huh.

19             MR. LECHNER:  -- Congress wouldn't have done that

20   if all these leases were invalid when they were originally

21   issued, which is their position now.

22             So somebody told Congress, we've got to get these

23   leases out of there.  If they were invalid, they should have

24   told Congress they were invalid.  Instead, they allowed

25   Congress to give tax credits to all the people who were

1   available to tax credit for what, essentially, are invalid

2   leases.

3            THE COURT:  So you'd be arguing, in essence, that

4   the Secretary would be limited in her analysis to whether or

5   not the lease was suspendible or cancelable to the events

6   that preceded the entry of the lease?

7            MR. LECHNER:  Absolutely.

8            THE COURT:  Anything that happened afterwards

9   is --

10           MR. LECHNER:  Water under the bridge.

11           THE COURT:  Tough luck.

12           MR. LECHNER:  And moreover --

13           THE COURT:  Right?  Tough luck?

14           MR. LECHNER:  Well, they be -- yeah, you've got to

15   honor your contracts.  You promise somebody, you issue it to

16   them in '82, and you've got to stand beside it.

17           And if there was any violations, the Assistant

18   Secretary of the 1993 Record of Decision said all those

19   violations had been corrected based on the four subsequent

20   NHPA processes.

21           So I, again, urge the Court to hold unlawful and

22   set aside the Secretary's cancelation decision and reinstate

23   the lease, reinstate the disapproved approved APD and order

24   the defendants to lift the suspension.  Thank you.

25           THE COURT:  Well -- huh-uh, you had your time.

1          MR. MOST:  Sorry.

2          THE COURT:  It doesn't take long when you go to

3    law school to learn the expression:  Hard facts make bad

4    law.  It's an old expression for a reason.  And, boy, if

5    there ever was a case that had hard facts, this is it.

6          Now, I don't know where I'm going to come out on

7    it, but I do know this:  Starting Monday, I have a six- to

8    eight-week trial:  AT&T-Time Warner merger.  Largest

9    antitrust lawsuit in the last 50 years.  Six to eight weeks.

10   Do the math.  That's mid-May, at the earliest, when it's

11   done.

12         And then I've got to turn out probably something

13   in the order of a 250- to 300-page opinion in the next two

14   months after that.  Do the math.  That's June, at the

15   earliest.

16         And in June, I have an eight-week criminal trial,

17   all of June and all of July.  White-collar crime case.  Very

18   complicated.  A lot of documents.

19         So I don't want anyone to have any false

20   understanding of what's going on here.

21         I won't be looking at this case, to make a

22   decision and write an opinion, till summertime, at the

23   earliest.  So don't get any false expectations as to when

24   this is going to get resolved.

25         I wanted to have the benefit of your arguments so

1    I could start working on it, but there won't be an opinion

2    before summer, and that's early.  So don't get any false

3    hopes.

4              It will get my attention, but I've got AT&T-Time

5    Warner and I've got an eight-week criminal trial.  And those

6    are starting right now.  I'm literally in the works on the

7    AT&T case right now.

8              So you'll get an opinion, hopefully, in the summer

9    sometime.  I'm not going to tell you when because I have no

10   idea myself.  But I'll do my best to get to it as soon as

11   possible.

12             Both of these things standing in front of me are

13   very large and very complicated and very difficult.

14             So this will help.  It helps me to have your

15   arguments, to have the transcript of it, to have your

16   briefs.

17             This is a case where there's hard facts and we've

18   got to figure out how to avoid making bad law.

19             We'll stand in recess.

20             DEPUTY CLERK:  All rise.

21             This Honorable Court will stand in recess until

22   the return of court.

23             (Proceedings concluded at 4:47 p.m.)

24

25

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: March 24, 2018_____    /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR