**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SOLENEX LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 13-00993 (RJL) |
| | ) | |
| DAVID BERNHARDT | ) | |
| Secretary | ) | |
| U.S. Department of the Interior, | ) | |
| | ) | |
| KATHARINE MACGREGOR | ) | |
| Deputy Secretary | ) | |
| U.S. Department of the Interior | ) | |
| | ) | |
| WILLIAM PERRY PENDLEY | ) | |
| Deputy Director, Parks and Programs | ) | |
| Bureau of Land Management | ) | |
| | ) | |
| JOHN MEHLHOFF | ) | |
| State Director | ) | |
| Montana State Office | ) | |
| Bureau of Land Management | ) | |
| | ) | |
| SONNY PERDUE | ) | |
| Secretary | ) | |
| U.S. Department of Agriculture | ) | |
| | ) | |
| VICKI CHRISTIANSEN | ) | |
| Chief | ) | |
| U.S. Forest Service | ) | |
| | ) | |
| TOM SCHMIDT | ) | |
| Regional Forester | ) | |
| U.S. Forest Service – Region 1 | ) | |
| | ) | |
| WILLIAM AVEY | ) | |
| Forest Supervisor | ) | |
| Lewis and Clark National Forest | ) | |
| | ) | |
| JOY BEASLEY | ) | |
| Keeper of the National Register of Historic | ) | |
| Places | ) | |
| | ) | |

|                                        |     |
|----------------------------------------|-----|
| Defendants,                            | )   |
|                                        | )   |
| and                                    | )   |
|                                        | )   |
| BLACKFEET HEADWATERS ALLIANCE          | )   |
|                                        | )   |
| GLACIER-TWO MEDICINE ALLIANCE          | )   |
|                                        | )   |
| MONTANA WILDERNESS                     | )   |
| ASSOCIATION                            | )   |
|                                        | )   |
| NATIONAL PARKS CONSERVATION            | )   |
| ASSOCIATION                            | )   |
|                                        | )   |
| WILDERNESS SOCIETY                     | )   |
|                                        | )   |
| PIKUNI TRADITIONALIST                  | )   |
| ASSOCIATION                            | )   |
|                                        | )   |
| Intervenor-Defendants.                 | )   |
|                                        | )   |

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Solenex LLC files this Second Amended and Supplemental Complaint against the above-named Defendants, and alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this case, pursuant to 28 U.S.C. § 1331, because the matter in controversy arises under the laws of the United States, including, but not limited to: (a) the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; and (b) the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181, *et seq.*

2.     Venue rests properly in this District, pursuant to 28 U.S.C. § 1391(e)(1), because Defendant David Bernhardt, Secretary, U.S. Department of the Interior ("DOI"), resides in this judicial district.

## PARTIES

3.      Solenex is a limited liability company organized under the laws of the State of Louisiana, with its principal place of business in Baton Rouge, Louisiana.  Sidney M. Longwell was the Manager of Solenex until he passed away in April 2020—during this case—at the age of 81.  Mr. Longwell's estate ceded his interest in Solenex to his daughter, Kelly Longwell.  Solenex owned the Federal Oil and Gas Lease M-53323 and the concomitant rights under an approved Application for Permit to Drill ("APD") until Defendants issued the decisions that Solenex is challenging in this case.

4.      David Bernhardt is the Secretary of the DOI.  He is automatically substituted for his predecessor, Secretary of the DOI Sally Jewel, who was responsible for administering the MLA.  Fed. R. Civ. P. 25(d).  Secretary Bernhardt is responsible for the actions of his subordinates, including the actions of his subordinates complained of here.  Solenex is suing Bernhardt in his official capacity.

5.      Katharine MacGregor is the Deputy Secretary of the DOI.  She is automatically substituted for her predecessor, Deputy Secretary of the DOI, Michael Connor, who approved the decision that cancelled the Lease and disapproved the previously approved APD.  *Id.*  Solenex is suing Deputy Secretary MacGregor in her official capacity.

6.      William Perry Pendley is the Deputy Director, Parks and Programs, of the Bureau of Land Management ("BLM").  He is automatically substituted for his predecessors, Acting Director, BLM, Neil Kornze and Acting Director, BLM, Mike Pool.  *Id.*  Director Pendley was responsible for administering the MLA, subject to the supervision of Secretary Jewel.  Solenex is suing Director Pendley in his official capacity.

7.     John Mehlhoff is the State Director of the BLM's Montana State Office.  State Director Mehlohoff is automatically substituted for his predecessor State Director, Montana State Office, BLM, Jamie Connell.  *Id.* State Director Connell was responsible for administering the MLA within the State of Montana, subject to the supervision of Secretary Jewell and Director Kornze.  Solenex is suing State Director Mehlhoff in his official capacity.

8.     Sonny Perdue is the Secretary of the U.S. Department of Agriculture.  Secretary Perdue is automatically substituted for his predecessor Secretary of the U.S. Department of Agriculture Tom Vilsack.  *Id.* Secretary Vilsack was responsible for managing and approving surface uses on federal oil and gas leases within the national forests.  Solenex is suing Secretary Perdue in his official capacity.

9.     Vicki Christiansen is the Chief of the U.S. Forest Service.  Chief Christiansen is automatically substituted for her predecessor, Chief, Forest Service, Tom Tidwell.  *Id.* Chief Tidwell was responsible for managing and approving surface uses on federal oil and gas leases within the national forests, subject to the supervision of Secretary Vilsack.  Solenex is suing Chief Christiansen in her official capacity.

10.     Tom Schmidt is the Regional Forester for the Forest Service's Region 1.  Regional Forester Schmidt is automatically substituted for his predecessor, Faye Krueger. *Id.* Regional Forester Kruger was responsible for managing and approving surface uses on federal oil and gas leases within the Lewis and Clark National Forest, subject to the supervision of Secretary Perdue and Chief Christiansen.  Solenex is suing Regional Forester Schmidt in his official capacity.

11.     William Avey is the Forest Supervisor for the Lewis and Clark National Forest. Forest Supervisor Avey is responsible for managing and approving surface uses on federal oil and gas leases within the Lewis and Clark National Forest, subject to the supervision of Secretary

4

Vilsack, Chief Tidwell, and Marten .  Solenex is suing Forest Supervisor Avey in his official capacity.

12.     Joy Beasley is the Keeper of the National Register of Historic Places.  Keeper Beasley is substituted for her predecessor, Keeper of the National Register, Stephanie Toothman. *Id.*  Keeper Toothman was responsible for administering the National Register of Historic Places. Solenex is suing Keeper Beasley in her official capacity.

## LEGAL BACKGROUND

### A.     The Mineral Leasing Act.

13.     The MLA was the first statute that provided for the leasing of the Nation's minerals. The specific purpose of the MLA is "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States *through private enterprise*."  *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (emphasis added) (quotation omitted).

14.     To accomplish this purpose, the MLA vests the Secretary of the Interior, acting through the BLM, with the authority to issue leases covering oil and gas deposits "and lands containing such deposits owned by the United States, including those in national forests . . . ."  30 U.S.C. § 181; *see Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1469 (D. Wyo. 1987) (noting that the Secretary has delegated this authority to the BLM).

15.     A lease issued under the MLA constitutes a contract and conveys valuable property rights and interests that are protected by the Fifth Amendment to the United States Constitution.  *See Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 609 (2000); *Lynch v. United States*, 292 U.S. 571, 579 (1934).

16.     Certainty of title in leases is critical in order to accomplish Congress's purpose in passing the MLA.  *See Pan Am. Petroleum Corp. v. Pierson*, 284 F.2d 649, 655 (10th Cir. 1960); *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 845 (D. Wyo. 1981).

17.     A lease issued under the MLA grants the lessee the exclusive right to drill for, mine, extract, remove, and dispose of all the oil and gas in the leased lands together with the right to build and maintain necessary improvements thereon.  *See* 43 C.F.R. § 3101.1–2.  This exclusive right "shall be for a primary term of 10 years" and "shall continue so long after its primary term as oil and gas is produced in paying quantities."  30 U.S.C. § 226(e).  This exclusive right is "conditioned upon the payment of a royalty at a rate of not less than 12.5 percent in amount or value of the production removed or sold from the lease."  *Id*. § 226(b)(1)(A).  Prior to the drilling of a well capable of producing in paying quantities, a lessee must pay annual rentals during the primary term.  *Id*. § 226(d).  After a paying well is drilled, but before the well is placed into production, a lessee must pay minimum royalties in lieu of rentals of not less than the applicable rental rate.  *Id*.

18.     When a lease is issued, it predates and is wholly separate from an APD. An oil and gas lease grants its lessee the exclusive right to mine; but, prior to mining, the lessee must comply with applicable laws and regulations.  43 C.F.R. § 3162.1(a) (1984).  "To commence operations under a lease, an operator must submit an [APD]."  *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 602 (2014) *aff'd*, 805 F.3d 1049 (Fed. Cir. 2015); *see also* 43 C.F.R. § 3162.3-1 (2018).

19.     Even if a lease has an associated APD that is not valid or approved, the lessee still owns the underlying oil and gas lease.  The validity of the APD has no bearing on the validity of the lease.  An approved APD simply permits the lessee to drill or mine on that property in accordance with the terms of the application and approval. *See Barlow & Haun, Inc.*, 118 Fed. Cl. at 618–19,

(discussing the difference between the right to drill under a lease and permission to drill under an APD).

20.     Granting a lease and approving an APD are wholly separate agency actions and the existence of a lease does not depend on the existence of an APD.  However, the existence of an approved APD requires the existence of a valid lease.

21.     Under limited circumstances, the Secretary may temporarily suspend "operations and production" under a lease.  30 U.S.C. § 209.  During such a suspension, the obligation to pay rentals or minimum royalties is suspended and the primary term of the lease is "extended by adding any suspension period thereto."  *Id.*

22.     In 1987, Congress provided the Secretary of Agriculture, acting through the Forest Service, statutory authority to manage surface-disturbing activities on lands leased under the MLA within the national forests:

> The Secretary of the Interior, or for National Forest lands, the Secretary of Agriculture, shall regulate all surface-disturbing activities conducted pursuant to any lease issued under [the MLA], and shall determine reclamation and other actions as required in the interest of conservation of surface resources.  No permit to drill on an oil and gas lease issued under [the MLA] may be granted without the analysis and approval by the Secretary concerned of a plan of operations covering proposed surface-disturbing activities within the lease area.

30 U.S.C. § 226(g).  In short, the Forest Service administers surface-disturbing activities on national forest lands, while the BLM administers subsurface or "downhole" activities, such as drilling, casing, and completion operations on those lands.  Thus, before commencing drilling operations on national forest lands, a lessee must submit a surface use plan to the Forest Service and concurrently submit an APD to the BLM.  Congress intended that the Forest Service would expeditiously process all surface use plans and that the BLM would expeditiously process all APDs.  *See*, *e.g*., 42 U.S.C. § 15921(a).

**B.     The National Environmental Policy Act.**

23.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq*., is a procedural statute designed to foster informed decision-making that does not impose any substantive requirements. *Balt. Gas and Elec. Co. v. Natural Res. Def. Council, Inc*., 462 U.S. 87, 97–98 (1983). Instead, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989); *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) ("NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*., 435 U.S. 519, 558 (1978))).  Federal agencies must comply with NEPA only "to the fullest extent possible."  42 U.S.C. § 4332.

24.     Whenever an agency proposes a "major Federal action," NEPA generally requires that the agency prepare an environmental impact statement ("EIS").  42 U.S.C. § 4332(C).  However, not all "major Federal actions," require a full-blown EIS.  In order to determine whether an EIS is required, an agency may prepare an environmental assessment ("EA").  40 C.F.R. § 1501.4(b).  An EA is a "concise public document" that "[b]riefly" describes the proposal, examines alternatives, considers impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9 (2000).  If, based upon the EA, the agency concludes there will be no significant environmental effects, it may issue a Finding of No Significant Impact, obviating the need to prepare an EIS.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355–56 (9th Cir. 1994).  When an agency provides a full and fair discussion of environmental impacts in a NEPA document, the agency has satisfied NEPA by taking the requisite "hard look" at environmental consequences.  *Lands Council v. McNair*, 537 F.3d 981, 1000–01 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7 (2008); *see Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

25.     Agencies shall not hide behind NEPA to avoid making decisions, even decisions they may dislike.  *See* 40 C.F.R. § 1500.5 (listing methods by which agencies "shall reduce delay"); 40 C.F.R. § 1500.4 (listing methods by which agencies "shall reduce excessive paperwork"); 40 C.F.R. § 1500.1 ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."); *see also* 42 U.S.C. § 4331(a) (national policy "to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, *and fulfill the social, economic, and other requirements of present and future generations of Americans*" (emphasis added)).  Nor may agencies use NEPA as a pretext for denying federal oil and gas lessees the ability to exercise their valuable contract and property rights or as a pretext for cancelling oil and gas leases.

**C.     The National Historic Preservation Act.**

26.     The National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq*., is designed to identify potential conflicts between federal undertakings and historic properties and to provide a mechanism for attempting to resolve any purported conflicts.  Section 106 of the NHPA requires that an agency having jurisdiction over an undertaking prior to the issuance of a license "take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108.  Like NEPA, the NHPA is a strictly procedural statute that neither confers a substantive right nor dictates a particular outcome.  *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019) (quoting *Valley Cmty. Pres. Com'n v. Mineta*, 272 F.3d 1078, 1085 (10th Cir. 2019) ("Section 106 process does not demand a particular result, however, because 'Section 106 is essentially a procedural statute and does not impose a substantive mandate' on the agencies

governed by it."); *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd*., 252 F.3d 246, 252 (3d Cir. 2001) ("The NHPA is a procedural statute designed to ensure that, as part of the planning process for properties under the jurisdiction of a federal agency, the agency takes into account any adverse effects on historical places from actions concerning that property."); *Oglala Sioux Tribe v. U.S. Army Corps of Engineers*, 537 F. Supp. 2d 161, 173 (D.D.C. 2008) ("'The case law in this and other circuits holds that an agency's duty to act under the NHPA . . . is procedural in nature.'" (quoting *Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996), *aff'd* 203 F.3d 53 (D.C. Cir. 1999))).

27.     Instead, the NHPA simply requires agencies to "stop, look, and listen" before proceeding with an undertaking. *Ill. Commerce Comm'n v. I.C.C*., 848 F.2d 1246, 1261 (D.C. Cir. 1988); *see Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1291 (4th Cir. 1992) ("Congress did not intend [Section 106] to impose general obligations on federal agencies to affirmatively protect preservation interests."); *Connecticut Trust for Historic Preservation v. I.C.C.*, 841 F.2d 479, 484 (2d Cir. 1988) ("NHPA require[s] only that agencies acquire information before acting."); *United States v. 162.20 Acres of Land, More or Less, Etc*., 639 F.2d 299, 302 (5th Cir. 1981) ("[Section 106] neither . . . forbid[s] the destruction of historic sites nor command[s] their preservation . . . ."). As with NEPA, agencies cannot hide behind the NHPA to avoid making decisions. *See Apache Survival Coal. v. United States,* 21 F.3d 895, 906 (9th Cir. 1994) ("[T]he [NEPA and NHPA] statutory schemes are closely related."); 36 C.F.R. § 800.3(b) (mandating that agencies "coordinate the steps of the section 106 process, as appropriate, with the overall planning schedule for the undertaking and with any reviews required under other authorities such as [NEPA]"). Nor may agencies use the NHPA as a pretext for denying federal oil and gas lessees the ability to exercise their valuable contract and property rights or as a pretext for cancelling oil

and gas leases.  In fact, issuance of an oil and gas lease simply does not have an impact on historic properties.  *See Nat'l Indian Youth Council v. Andrus*, 501 F. Supp. 649, 674–76 (D.N.M. 1980), *aff'd sub nom. Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir. 1981) (approval of a mining plan–not approval of a lease–requires compliance with the NHPA).

28.     In 1966, when originally passed, the NHPA did not apply to or mention tribes.  Pub. L. No. 89-665, 80 Stat. 915 (1966).   However, subsequent amendments in 1980 mention cooperation with other nations and with tribes. National Historic Preservation Act of 1966, Pub. L. No. 96-515, 94 Stat. 2987 (1980). Nothing in the 1980 Amendments of the NHPA requires the preparation of an EIS unless NEPA requires such an EIS. *Id.*

29.     The 1980 NHPA Amendment applicable to Solenex's Lease only mentions "Indian tribes" in six places, and only one of which is relevant to this present case.  In 16 U.S.C. § 470-1, the 1980 NHPA Amendment states "It shall be the policy of the Federal Government, in cooperation with . . . Indian tribes . . . to, (1) use measures, including financial and technical assistance, to foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations[.]"  16 U.S.C. § 470-1(2)(1) (1980).

30.     Before 1992, the NHPA never allowed for nor required the creation of a Traditional Cultural District ("TCD").  The 1992 Amendments include, for the first time, an express tribal role in the NHPA process.

31.     The 1992 Amendments to the NHPA do not have retroactive effect on leases granted before the enacting date.

### 1.     Section 106 Process

32.     NHPA compliance is defined by compliance with § 106 of the Act.

33. Compliance with the NHPA requires a four-step process: first, an agency must define the area of potential effect ("APE") of an undertaking; second, it identifies historic properties in the APE; third, if there are historic properties in the APE, the agency must determine whether the proposed undertaking will adversely affect those properties (if there are no historic properties, the NHPA process ends); and finally, if the undertaking may cause adverse effects, the agency must attempt to mitigate those adverse effects. GEORGE CAMERON COGGINS & ROBERT L. GLICKSMAN, PUBLIC NATURAL RESOURCES LAW § 28:10 (2d ed. 2020); *Dine Citizens*, 923 F.3d at 846 (10th Cir. 2019).

34. The first step requires the agency to define the APE. 36 C.F.R. § 800.4(a); *Dine Citizens*, 923 F.3d at 846. The Code of Federal Regulations has defined an APE as follows:

> Area of potential effects means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

36 C.F.R. § 800.16(d).

35. After defining the APE, an agency identifies historic properties within the APE. 36 C.F.R. § 800.4(b); *Dine Citizens*, 923 F.3d at 846. A historic property is "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on the National Register [of Historic Places.] 54 U.S.C. § 300308.

36. If an agency does not identify any historic properties within the APE, the NHPA has been satisfied and no further analysis is necessary. GEORGE CAMERON COGGINS & ROBERT L. GLICKSMAN, PUBLIC NATURAL RESOURCES LAW § 28:10 (2d ed. 2020).

37.     Where historic properties are identified within the APE, the agency must determine whether the proposed undertaking will adversely affect those properties.  36 C.F.R. § 800.5; *Dine Citizens*, 923 F.3d at 846.  The criteria for a finding of adverse effect are as follows:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

36 C.F.R. § 800.5(a)(1).

38.     If the agency determines an undertaking may cause an adverse effect on the historic properties within the APE, it must "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."  36 C.F.R. § 800.6; *Dine Citizens*, 923 F.3d at 846.

### 2.     Mitigation

39.     When an undertaking has an APE that encompasses a historic property, "[t]he agency official *shall* consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations to *develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects* on historic properties."  36 C.F.R. § 800.6 (emphasis added).  The regulation is clear, if an undertaking may cause an adverse effect on the historic properties within the APE, the agency *must* "develop and evaluate alternatives . . . ."  *Dine Citizens*, 923 F.3d at 846 (quoting 36 C.F.R. § 800.6(a)).

40.     Courts in this circuit and in many other circuits have required agencies to at least contemplate mitigation efforts.  *See, e.g.*, *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 874 (D.C.

Cir. 1999) (agency acted properly where it offered plans to mitigate damages on an undertaking); *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 267 (agency must consider mitigation and related comments); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 808–09 (9th Cir. 1999) (mitigation is required). While Plaintiff could find no case expressly stating an agency must contemplate mitigation prior to rejecting an undertaking under the NHPA, such a conclusion follows from the purpose of the statute. *Ill. Commerce Comm'n*, 848 F.2d at 1261 (the NHPA requires agencies to "stop, look, and listen" before proceeding with an undertaking); *Conn. Tr. for Historic Pres.*, 841 F.2d at 484 ("NHPA require[s] only that agencies acquire information before acting."). If the NHPA requires an agency to engage in informed decisionmaking, then it naturally follows an agency must consider alternatives to mitigate potential harms.

**D.     The Administrative Procedure Act.**

41.     The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

42.     The APA also provides, "[A]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704.

43.     The APA requires that the reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

44.     The APA further mandates that the reviewing court shall:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)    hold unlawful and set aside agency action, findings, and conclusions found to be—

        (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B)    contrary to constitutional right, power, privilege, or immunity;

        (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

        (D)    without observance of procedure required by law[.]

5 U.S.C. § 706.

## FACTUAL BACKGROUND

**A.    The BLM Approved the Lease in 1982 as a Final Agency Action. The Lease's Validity Remained Undisputed by the Government for Nearly 34 Years.**

45.    In 1980, Congress passed the Energy Security Act, which provides, *inter alia*:

It is the intent of the Congress that the Secretary of Agriculture shall process applications for leases of National Forest System lands and for permits to explore, drill, and develop resources on land leased from the Forest Service, notwithstanding the current status of any plan being prepared under [the National Forest Management Act of 1976].

42 U.S.C. § 8855.

46.    At that time, the Lewis and Clark National Forest in Montana had a backlog of over 200 oil and gas lease applications, some of which had been pending since 1971.

47.    To alleviate this backlog of applications and to comply with the 1980 Energy Security Act, the Forest Service prepared, in conjunction with the BLM, a comprehensive, 165-page EA for oil and gas leasing on non-wilderness lands administered by the Lewis and Clark National Forest ("Leasing EA").  In issuing the Leasing EA, both the Forest Service and the BLM satisfied NEPA.

48.     In the Leasing EA, six alternatives were considered.  ECF No. 45-10 at 48–49.[1]

These alternatives included a no-action alternative.  *Id*.  The denial of all lease applications was

also considered.  Memo. Op., ECF No. 130 at 6 ("The 1981 EA considered the effects on the

environment of various alternatives to leasing, including "no action" alternatives."); Leasing EA

at 31; ECF No. 45-10 at 48.

49.     Alternative 3 was selected.  ECF No. 45-10 at 78; Leasing EA at 61.  Under this

Alternative:

- Leases with surface occupancy would be issued only for accessible areas that could be protected;

- Lease denial or issuance of a no-surface occupancy ("NSO") lease would be recommended when an application is located entirely within an area that cannot be adequately protected;

- Leases partially located in areas that cannot be protected would receive a NSO stipulation for those areas;

- All leases would be subject to the standard stipulations (listed in Appendix A of the Leasing EA); additional stipulations (listed in Appendix B of the Leasing EA), and the comprehensive surface use guidelines in Sections 6C and 6D of the Leasing EA; and

- After lease issuance, any proposed oil and gas activities would be fully analyzed under NEPA.

*Id*.

50.     On February 18, 1981, the Forest Service issued a Decision Notice and Finding of

No Significant Impact, approving the implementation of Alternative 3.  Adversely affected parties

had 45 days to file an appeal.  No appeals were filed.

---

[1] All page citations are to the page numbers assigned to the document by this Court's CM/ECF system.

51.     On June 9, 1981, based upon the Leasing EA, the Forest Service and the BLM grouped 6,247 acres from expiring leases to form lease tract NW-21 for the upcoming lease drawing.  On April 6, 1982, the BLM advised Sidney M. Longwell that his application for lease tract NW-21 obtained a priority at the lease drawing.  The BLM further advised that the application would become an offer to lease upon Mr. Longwell's payment of the first year's rental for $1 per acre, *i.e.*, $6,247.00 (worth $17,133.50 in September 2020).[2]

52.     On May 24, 1982, after receiving Mr. Longwell's payment of the first year's rental, the BLM accepted Mr. Longwell's offer to lease and issued the Lease to Mr. Longwell.

53.      By accepting Mr. Longwell's offer to lease and issuing the Lease, the BLM *per se* determined that issuance of the Lease was in the public interest.

54.     The BLM's issuance of the Lease complied with all applicable statutes, regulations, policies, and trust responsibilities, including NEPA and the NHPA.  No protests or appeals were filed challenging the issuance of the Lease to Mr. Longwell.

55.     The approval and issuance of the Lease was a final agency action. Per the Mineral Leasing Act, any opposed party could appeal issuance of the Lease for ninety (90) days. 30 U.S.C. § 226–2.

56.     Mr. Longwell was 44 years old when he was issued the Lease.

57.     Mr. Longwell passed away in April 2020 at the age of 81.

58.     When he passed away, he had never been able to develop his Lease; having been denied the use and benefit of his property interest for nearly four decades.  After his passing,

---

[2] *CPI Inflation Calculator*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/data/inflation_calculator.htm (last visited November 10, 2020) ($6,247 in April 1982 has the same buying power as $17,133.50 in September 2020).

Mr. Longwell's position as Managing Member of Solenex was transferred to his daughter Kelly Longwell.

59.     The Lease became effective on June 1, 1982, and covers 6,247 contiguous acres in Glacier and Flathead Counties, Montana.  The leased acres are surrounded primarily by the Lewis and Clark National Forest, although Glacier National Park forms part of the western boundary, and private lands form part of the northern boundary.  The Lease is located on land ceded by the Blackfeet Tribe to the United States by treaty in 1895 for the express purpose of developing the land's mineral resources.

60.     The Lease provides:

This oil and gas lease is issued for a period of ten (10) years . . . pursuant and subject to the provisions of the [MLA] and subject to all rules and regulations of the Secretary of the Interior now or hereafter in force when not inconsistent with any express and specific provisions herein, which are made a part hereof.

61.     Section 1 of Lease grants the:

[E]xclusive right and privilege to drill for, mine, extract, remove and dispose of all of the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil and gas is produced in paying quantities . . . .

62.     Section 2(j) of the Lease obligates the lessee to "exercise reasonable diligence in drilling and producing the wells herein provided for unless consent to *suspend operations temporarily* is granted by the lessor . . . ."  (emphasis added).

63.     Section 2(q) of the Lease obligates the lessee "to take such reasonable steps as may be needed to prevent operations on the leased lands from unnecessarily" damaging the surface, natural resources and improvements, including objects of historic value.

64.     The Lease is subject to standard stipulations for the protections of the surface, cultural and paleontological resources, endangered and threatened species, esthetics, etc.

65.     The Lease is also subject to a surface disturbance stipulation and a stipulation for lands under the jurisdiction of the Department of Agriculture.

66.     In accordance with the Leasing EA, the Lease is also subject to the following special stipulations:

- Eighteen percent of the leased acreage is subject to a No Surface Occupancy ("NSO") stipulation, including within 400 feet of the Summit Campground.

- Forty-eight percent of the Lease is subject to a surface use timing stipulation for elk winter range.  Under this stipulation, surface occupancy for pre-production activities, such as drilling, would be allowed only from May 1 to December 1.

- Fifty-seven percent of the Lease is subjected to a limited surface use stipulation, which strictly controls surface use or occupancy within identified areas.

- One hundred percent of the Lease is subject to an activity coordination stipulation, which allows the imposition of special time and space conditions to be imposed on activities for the protection of threatened and endangered species.

**B.      The Application for Permit to Drill on the Lease was Filed in 1983.**

67.     On June 2, 1983, Mr. Longwell assigned the Lease to America Petrofina Company of Texas (25%), Petrofina Delaware, Inc. (25%), and AGIP Petroleum Company, Inc. (50%) (collectively and individually referred to as "Fina") for valuable consideration, which included Fina's agreement to pay Mr. Longwell a production payment "out of five percent of ninety-five percent (5% of 95%) of the value of all the oil and gas which is produced and sold from lands covered by the lease . . . ."  The BLM approved this assignment on December 9, 1983, effective July 1, 1983.

19

68.     In or around November 1983, and in full compliance with all applicable statutes and regulations, Fina submitted a surface use plan and an APD to drill the Federal South Glacier #1-26 well on the Lease in Section 26, T30N, R13N, PMM, Glacier County, Montana.   The proposed well site was approximately two miles from private land, approximately three miles southeast of the Great Northern Railroad, U.S. Highway 2, and Glacier National Park, and approximately nine miles southwest of East Glacier, Montana.   Specifically, Fina proposed drilling a 13,510-foot exploratory well.

69.     Contemporaneously, Fina submitted a cultural resource inventory report, prepared by Historical Research Associates, that documented the survey for cultural resources performed on the well site and the three proposed access routes.   No cultural resources were located during the survey.

70.     The proposed well site has a very high potential for discovery of natural gas and a somewhat lesser potential for discovery of oil.

71.     In November 1983, the Forest Service and the BLM began reviewing the surface use plan and APD in accordance with all applicable statutes, regulations, policies, and trust responsibilities.

**C.     The Forest Service and BLM Approved the APD, Necessarily Affirming the Validity of the Lease in 1985. Intervenors Appealed and the BLM Suspended the Lease.**

72.     In January 1985, the Forest Service and the BLM issued a joint, 324-page EA with respect to the surface use plan and the APD.   The conclusion of the two agencies was that the proposed project, as limited by the lease stipulations and the additional conditions of approval imposed by the agencies, could be performed without any adverse environmental effects.   Thus, based upon the comprehensive EA, the Forest Service approved the surface use plan and the BLM approved the APD.   In so doing, the agencies fully complied with all applicable statutes,

regulations, policies, and trust responsibilities.  In addition, by approving the surface use plan and APD, both the Forest Service and the BLM reaffirmed that the Lease was in the public interest, validly issued, and a binding contract.

73.     In March 1985, the BLM's approval of the APD was appealed to the Interior Board of Land Appeals ("IBLA") because the Blackfeet Tribe claimed ownership to the land. *Glacier-Two Medicine All.*, 88 IBLA 133, 148–49 (1985). At that time the Tribe did not claim historic use of the land.

74.     At that time, the Tribe did not challenge the Lease.

75.     On August 9, 1985, the IBLA rejected most of the appeal issues.  *Glacier–Two Medicine All.*, 88 IBLA at 156.  However, the IBLA set aside the BLM's decision and remanded with instructions for the BLM to further consider four issues, none of which concerned validity of the Lease or NHPA compliance.  *Id*. at 150–55.

76.     On August 16, 1985, in light of the IBLA's decision, Fina requested a temporary suspension of operations and production to toll the running of the primary term of the Lease while the BLM addressed the remanded issues.

77.     On November 13, 1985, the BLM suspended the Lease, effective October 1, 1985.

78.     The DOI/BLM then kept the Lease in suspension for the next thirty years.

79.     On May 15, 1986, the BLM advised Fina that there would be six years and eight months remaining on the ten-year primary term of the Lease when the suspension would be lifted.

80.     In June 1986, the Forest Service approved the land and resource management plan for the Lewis and Clark National Forest ("1986 Forest Plan").  Approval of the 1986 Forest Plan was based upon a comprehensive Final EIS ("1986 Final EIS").  The 1986 Forest Plan established goals, management direction, and resource standards and stipulations to minimize any effects of

oil and gas related activity on the Lewis and Clark National Forest, including the area where the Lease is located.  In approving the 1986 Forest Plan, the Forest Service concluded that exploration for oil and gas was in the public interest and should continue because of these protective measures.

**D.     The Forest Service and BLM Approved the APD for a Second Time in 1987.**

81.     On April 13, 1987, after addressing the remanded issues, the Forest Service and the BLM approved the surface use plan and APD for the second time. As the Lease is separate from the APD, its validity was never at issue.  However, to approve the APD, the Lease must be valid, so the Lease was confirmed valid in 1987.  In so doing, the agencies fully complied with all applicable statutes, regulations, policies, and trust responsibilities.  The agencies also based their decisions on the 1986 Forest Plan and 1986 Final EIS, in which the Forest Service had thoroughly evaluated the environmental effects of oil and gas exploration and development on the Lewis and Clark National Forest, including the area where the Lease is located.  The agencies also "carefully reviewed" the district court's decisions in *Conner v. Burford*, 605 F. Supp. 107 (D. Mont. 1985), *aff'd in part, rev'd in part*, 836 F.2d 1521 (9th Cir. 1988), *superseded by*, 848 F.2d 1441 (9th Cir. 1988) and *Bob Marshall All. v. Watt*, 685 F. Supp. 1514 (D. Mont. 1986), *aff'd in part, rev'd in part sub nom*. *Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988), and determined that their actions in granting the Lease and approving the APD were consistent with those decisions.

82.     The BLM's decision to reapprove the APD was appealed to the IBLA.

83.     On July 10, 1987, the Forest Service asked the BLM to move the IBLA for a voluntary remand of the approved APD.

84.     On July 28, 1987, based upon the Forest Service's request, the BLM filed a motion for a voluntary remand of the approved APD.

85.     On July 31, 1987, the IBLA granted the BLM's motion and vacated the BLM's decision approving the APD and remanded to the BLM for further action.

86.     On August 14, 1987, the BLM advised Fina that the suspension would remain in effect until the completion of an additional environmental analysis of drilling specific to the Fina proposal.

87.     On February 23, 1988, notice was published in the *Federal Register* that the Forest Service decided to combine the study for Fina's surface use plan and APD with an APD submitted by Chevron on a nearby lease.  53 Fed. Reg. 5,290 (Feb. 23, 1988).  The notice further provided that a draft EIS was expected to be released for public comment within twelve months, and that a Final EIS was expected by April 1989.  *Id*.

88.     On October 23, 1989, Notice of Availability of the draft EIS was published in the *Federal Register*.  54 Fed. Reg. 43,188 (Oct. 23, 1989).  The notice solicited comments and advised that the draft EIS:

> [A]nalyzes the impacts of proposed drilling applications submitted by Chevron USA, near Badger Creek, and Fina Oil and Chemical Company, near Hall Creek. Based on the issues and concerns identified during the scoping process, the [draft EIS] focuses on impacts to water resources, air quality, Glacier National Park resources, adjacent Bob Marshall and Great Bear Wilderness, the Badger-Two Medicine Roadless area, wildlife and fisheries (including the grizzly bear), vegetation, outdoor recreation and visual resources, archaeological resources, Blackfeet Tribe reserved rights and traditional religious practices, local economic and social conditions, including public health and safety associated with the drilling proposals.

> The analysis addresses 33 combinations of alternatives, including roaded access, helicopter mobilization of the drilling projects, and no action.  The [draft] EIS also addresses each of the exploration proposals independently.  The [draft] EIS preferred alternative is to permit the exploration projects, utilizing roaded access and mitigation requirements that minimize adverse environmental effects.

*Id*. at 43, 188–89.

**E.      The Forest Service and BLM Approved the APD for a Third Time in 1990.**

89.      On December 4, 1990, after all the comments were considered, a comprehensive, 982-page, Final EIS for the Fina and Chevron proposals was issued ("1990 Final EIS").  Based upon the 1990 Final EIS, the Forest Service and the BLM issued a joint Record of Decision approving Fina's surface use plan and APD.  In so doing, the agencies fully complied with all applicable statutes, regulations, policies, and trust responsibilities.

90.      By approving the surface use plan and APD, the Forest Service and the BLM again affirmed that the Lease was in the public interest and validly issued.

91.      On March 8, 1991, notice that the Forest Service and the BLM had approved Fina's surface use plan and APD was published in the *Federal Register*.  56 Fed. Reg. 9,935, 9,936 (Mar. 8, 1991).  This was the *third* time the Forest Service and BLM approved the APD. The notice further provided that Chevron's APD had not been approved.  *Id*.

92.      Around April 1991, the BLM received requests for state director review of the BLM's approval of the APD.  These requests were denied.  Appeals were then filed with the IBLA. On July 18, 1991, the BLM once again moved for a voluntary remand.

93.      On August 5, 1991, the IBLA granted the BLM's motion for voluntary remand, dismissed the appeal without prejudice, and remanded for further proceedings.

94.      On August 30, 1991, the BLM reversed its decision approving the APD and began its own independent study of the surface-related issues, even though it had previously adopted the Forest Service's approval of the surface use plan, which was still in effect and valid.

95.      The Forest Service's approval of the surface use plan is still in effect and valid today.

**F.      The Forest Service and BLM Approved the APD for a Fourth Time in 1993 with Secretarial-Level Approval.**

96.      On December 4, 1992, after the BLM completed its independent study of the surface-related issues regarding Fina's APD, the BLM asked for secretarial-level approval of Fina's APD because of the unreasonable delay that had already occurred:

> We would like to get the issues involved in this case resolved once and for all.  *The decisions concerning the Fina well have been delayed long enough.*  A timely resolution would benefit all parties involved, including the applicant, the Federal government, the appellants and the American taxpayers.  We would like the Secretary to render the final decision for the Fina [Record of Decision], thereby allowing all remaining issues to be addressed in Federal District Court.

(emphasis added).

97.      On January 14, 1993, the Assistant Secretary of the DOI concurred in the Record of Decision issued by the BLM approving Fina's APD.  This was the *fourth time* the APD was approved.  In approving the APD, the BLM fully complied with all applicable statutes, regulations, policies, and trust responsibilities.  In concurring in the BLM's approval of the APD, the Assistant Secretary implicitly affirmed that the Lease was in the public interest and validly issued.  The Assistant Secretary's concurrence also constituted a final decision for the Secretary.

98.      The 1993 Record of Decision ("1993 ROD") allowed:

> Fina to build 4.5 miles of access road on National Forest Land to drill a single exploratory well to determine if geologic structures contain accumulations of oil and/or natural gas.  If the well is dry, the access road and well pad will be reclaimed to as near natural conditions as possible.  Should the well encounter commercial quantities of oil and/or gas, additional environmental analysis will be conducted.

1993 ROD, Dear Reader Letter.

99.      The approval provided by the 1993 ROD was subject to Fina complying with all lease stipulations, mitigation and monitoring requirements, and additional mitigation measures that were imposed as conditions of approval.  The conditions of approval limited development

activities to July 1 through November 30 each year, to minimize the effects on wildlife. These conditions of approval included measures to protect any cultural and religious resources.

100.    Activities under the approved surface use plan and the approved APD and would not affect any identified cultural/religious resources or the Blackfeet Tribe's reserved rights:

> I agree with the Forest Supervisor's finding that [the selected] alternative . . . will result in no effect to identified sites or properties that are eligible for listing on the National Register of Historic Places. The identification effort for historic properties included a literature review, field inventory, and interviews with Blackfeet Traditionalists. *The interviews did not result in the identification of any properties having significance as traditional cultural properties as defined by the National Historic Preservation Act.* These efforts, taken as a whole, resulted in a determination that no properties included on or eligible for inclusion to the National Register of Historic Places would be affected by the proposed action. The Montana State Historic Preservation Office commented on the identification effort and further stated that they had no information which disputed this finding. *Compliance with the implementing regulations of Section 106 of the National Historic Preservation Act has, therefore, been completed.*

> Like the Forest Supervisor, I also recognize that the area is used by some members of the Blackfeet Tribe for religious purposes and for other uses, including the exercise of rights reserved in the Agreement of 1896. Past use includes motorized access for hunting, wood cutting and recreation. Other uses of the area include motorized winter recreation by snowmobiles. Not until 1988, with implementation of the Forest Travel Plan, were vehicle restrictions imposed in the area. As stated in the [1990 Final EIS] (Chapter IV-150), Blackfeet traditionalists view all action alternatives as negatively impacting their culture and religion. However, they have been reluctant to discuss any specific potential effects caused by the project to the practice and belief in their traditional religion ([1990 Final EIS], Chapter IV-152). I have considered what actions could be undertaken to reduce the impact of the project on traditional practitioners. Mitigation measures that will minimize visual, auditory, and physical changes have been developed and are included in Appendix A of this ROD.

> In case traditional practitioners choose to use the area around the wellsite regardless of the disturbance, notice will be made in local newspapers of planned drilling activity. This will enable religious practitioners to plan their activities so they can be conducted at locations and during time periods when the effects of the project are not evident.

> Visual intrusions which might affect traditional religious practices will be minimized by employing a professional landscape architect to review all project location plans and to develop mitigation measures.

26

In summary, I concur with the Forest Supervisor's decision to allow roaded access to the wellsite, recognizing that there may be some unavoidable impacts to traditional religious practitioners.  I agree with the Forest Supervisor's determination that this decision does not change a person's freedom of religious belief.  Mitigation measures that limit access and reduce noise levels will help to reduce project impacts on those who choose to practice traditional religion in the general area of the well site.

1993 ROD at 15–16 (all emphasis added).

101.    By concurring in the 1993 ROD, the Assistant Secretary, on behalf of the Secretary, also officially acknowledged that any violations that may have occurred prior to lease issuance had been corrected by, *inter alia*, the 1990 Final EIS and the 1986 Final EIS:

I agree with the Forest Supervisor's [1991] response that no court has held the Fina lease invalid.  Until such action occurs or there is some other administrative action by the [DOI-BLM] which issued the lease, the Forest Service must recognize the rights of the leaseholder.  Furthermore, even if subsequent litigation on Fina's lease resulted in a holding similar to the holding in Conner v. Burford, that holding would not invalidate the leases but would rather require full compliance with NEPA . . . prior to any surface-disturbing activities.  *This has been clearly accomplished with the comprehensive analysis in [the 1990 Final EIS] as tiered to the [1986 Final EIS]* . . . .

The [1990 Final EIS] analyzed the effects of numerous alternatives, including alternatives which would require changes to the existing lease terms and conditions of approval, and analyzed the effects of the No Action alternative . . . .  By analyzing the effects of the no action alternative in relation to the effects of action alternatives, including the effects of exploration as well as possible future production and development, I have been able to consider whether I should recommend, in addition to denying the current proposal, that lease terms be changed or the lease cancelled. I have no authority to make a decision to cancel or change lease terms, but I can recommend that these actions be considered based on this environmental review. Under Alternative E (APD Not Approved) Fina's APD would be denied.  *Should the Government determine to cancel the Fina lease, three courses of action could be taken to secure from the lessee any rights granted in the original lease transaction.  These include buying back the leases, condemning the leases, and enacting legislation.*

In a buy back situation, the government would offer the lessees (in this case Fina) a cash settlement for relinquishing the leases.  Condemnation proceedings could be initiated by the Government to prevent enjoyment of lease rights.  It would have to be shown that proposed operations were environmentally unacceptable before

initiating condemnation proceedings.  Lastly, legislation could be enacted by Congress to stop lease development.

Based on the environmental effects disclosed in th[e] [1990] Final EIS, I concur in the Forest Supervisor's determination not to select Alternative E (No Action) which would deny the Fina Surface Use Plan.  *I also do not recommend lease cancellation or a change in lease terms to require 100 percent No Surface Occupancy.  In making my decision, I considered the dual objectives of conservation of our physical and biological surface resources and providing for opportunity to explore and develop oil and gas resources.  I conclude that the selected alternative provides for meeting these dual objectives . . . .*

[The 1990 Final EIS] is intended to fully meet the requirements stated in the Ninth Circuit Court's ruling in <u>Conner v. Burford</u>.  I [also] agree with the Forest Supervisor's determination that the requirements of <u>Connor v. Burford</u> are met by the [1986 Final EIS] which considered additional leasing alternatives which did not take into consideration the commitments embodied in the existing leases . . . .

1993 ROD at 18–19 (all italics added).

## G.    After a Change in Administrations, the Defendants Suddenly Changed Course.

102.    On June 4, 1993, after a change in administrations, the new Secretary of the Interior, Bruce Babbitt, unlawfully sought to reverse what his predecessor had done for policy reasons.  For example, despite the approved APD, then-Secretary Babbitt advised Fina that he was continuing the suspension of the Lease and approved APD.  Then-Secretary Babbitt further advised that the suspension would remain in effect for one year.  The stated purpose for continuing the suspension was in aid of proposed legislation regarding the area where the Lease is located.  *See* Letter from Bruce Babbitt to Wes Franklin (June 4, 1993).  By prolonging the suspension, the Secretary continued to unlawfully deny Fina the ability to exercise its valuable contract and property rights.

103.    On May 4, 1994, although no action had been taken on any proposed legislation regarding the area where the Lease is located, the DOI/BLM unlawfully continued the suspension of the Lease and approved APD for another year.

104.    On May 19, 1995, although no action had been taken on any proposed legislation regarding the area where the Lease is located, the DOI/BLM unlawfully continued the suspension of the Lease and approved APD for another year.

105.    On June 11, 1996, the DOI/BLM unlawfully continued the suspension of the Lease and approved APD for another year.

106.    On April 18, 1997, the DOI/BLM unlawfully continued the suspension of the Lease and approved APD for another year.

107.    On July 15, 1998, the DOI/BLM indefinitely suspended the Lease and approved APD.  The stated purpose for this indefinite suspension was to allow the Forest Service time to comply with the NHPA.

**H.     The Defendants Began Using the NHPA as a Guise to Deny the APD.**

108.    By no later than 1995, under the guidance of Forest Supervisor Gloria Flora, the Defendants began their process of undermining and then thwarting the Lease.

109.    Forest Supervisor Flora became "the very embodiment of the 'new' Forest Service . . . ." Joseph L. Sax & Robert B. Keiter, *The Realities of Regional Resource Management: Glacier National Park and Its Neighbors Revisited*, 33 ECOLOGY L. Q. 233, 275 (2006).

110.    With the Badger-Two Medicine leases suspended, Forest Supervisor Flora shifted her attention "to the broader landscape of the Rocky Mountain Division of the forest that was within the Rocky Mountain Front." *Id.*

111.    In 1992 and 1993, in anticipation of and in conjunction with the 1992 amendments expanding the NPHA to include tribal involvement, the Forest Service obtained ethnographic studies of the Badger-Two Medicine area.

112.    On October 23, 1995, Forest Supervisor Flora seized upon the new changes to the NHPA as a means to avoid development.

113.    In a letter to Richard Hopkins, Forest Supervisor Flora stated that the Forest Service was researching Blackfoot culture, religion, and traditional practices and ordered further suspension of the Lease until Section 106 compliance was completed. *See* Letter from Gloria Flora to Richard Hopkins regarding further suspension of the Fina Lease (Oct. 23, 1995) (HC 00078).

114.    In May 1996, Forest Supervisor Flora informed the BLM that a Forest Service contractor had supplied an NHPA study and the Lease should be further suspended because part of the road to the proposed drill site may be in an area eligible for the designation on the National Register of Historic Places.

115.    The Forest Service, under the direction of Gloria Flora, utilized every resource it could to avoid honoring its contractual lease obligation. According to an article in Ecology Law Quarterly, "[a] Blackfeet interviewee, Jeanne Whiteing, suggested another interesting way of looking at the Flora decision.  'The local Forest Service,' we were told, 'uses tribal issues to achieve goals they want, free of Washington, and can use tribal issues to advance their own (non-developmental) desires.'"   Sax & Keiter, *The Realities of Regional Resource Management: Glacier National Park and Its Neighbors Revisited*, 33 ECOLOGY L. Q. at 277 n. 201.

116.     In early 1997, Forest Supervisor Flora recommended to the Blackfeet that they accept and support an 89,000-acre TCD that the Forest Service was proposing for the Badger-Two Medicine area.

117.    Aware that the Blackfeet claimed and sought ownership in the area, Forest Supervisor Flora told the Blackfeet that creating a TCD would give the Blackfeet a greater degree

of control over the area.  According to the record, the Blackfeet accepted Flora's suggestion, at least in part, as a means toward potential ownership of the land.

118.    Having won the support of the Blackfeet, later in 1997 the Forest Service submitted a nomination form to the Keeper of the National Register of Historic Places ("Keeper") to have approximately 89,000 acres in the Badger-Two Medicine area designated as a Traditional Cultural District.

119.    In the meanwhile, on April 5, 1999, Fina, fed up with the endless delay, assigned the Lease back to Mr. Longwell.  The BLM approved this assignment on June 15, 2000, effective July 1, 2000.

120.    On October 11, 2001, in response to a congressional inquiry, the BLM advised: "[w]e recognize that environmental reviews, and administrative and judicial review processes have extended resolution of action on Mr. Longwell's APD *way beyond any reasonable time line*." (emphasis added).  The BLM further advised: "[w]e realize that an attempt to reach closure on this case has taken many years *and share Mr. Longwell's frustration with the extraordinary delays involved in the process*."  (emphasis added).

121.    On April 19, 2002, in response to an inquiry by Mr. Longwell, the BLM confirmed that the approved APD was still valid: "you have a valid permit."  By acknowledging the validity of the APD, the BLM necessarily acknowledged that the Lease was in the public interest and validly issued.

I.    **The Forest Service Approved Construction of a Pipeline Running Through the Lease, Finding No Religious or Cultural Significance in the Area.**

122.    In June 2003, the Forest Service began the scoping process for NorthWestern Corporation's proposal to construct a 12-inch gas pipeline parallel to its existing 8-inch gas pipeline along the northwest boundary of the Lewis and Clark National Forest.  The new pipeline

would be buried 30 feet south of an existing line and would cross approximately three miles of the Lewis and Clark National Forest and approximately two miles of the Lease. One year later, in June 2004, the Forest Service issued a Decision Notice and Finding of No Significant Impact approving construction of the NorthWestern Corporation's pipeline. Importantly, the Forest Service determined that construction of the pipeline "w[ould] not have an adverse effect on any known or listed or eligible historic places." In fact, the Forest Service advised that consultation with the Blackfeet Tribe "identified no properties of traditional cultural interest to the tribe on the pipeline route or temporary construction sites." That the "pipeline route" and "temporary construction sites" had no religious/cultural significance to the Tribe demonstrates that the Forest Service was using the NHPA process as a pretext to deny Mr. Longwell the ability to exercise his valuable contract and property rights. This is especially true considering the "lightning speed" at which the Forest Service approved the pipeline.

123. The Forest Service's approach to the pipeline is all the more perplexing because the Forest Service was still seeking protection for Badger-Two Medicine Traditional Cultural District. In 1998, the Keeper of the National Historic Register suggested that the district proposed by the Forest Service in 1997 included ineligible developed and private land. In 2000, the Forest Service proposed new boundaries to the Traditional Cultural District. Conveniently, however, the Forest Service submission was again deficient and the Keeper did not act on it.

124. In 2002, the Keeper confirmed that the approximately 89,000 acre Traditional Cultural District was eligible for listing on the National Register of Historic Places because of its association with oral traditional and cultural practices of the Blackfoot people and because it was associated with culturally important spirits, heroes, and historic figures central to Blackfoot

religion and traditional lifeways and practices.  The Forest Service then informed Mr. Longwell

that it could now proceed with assessing the effects of the previously approved APD.

**J.      Forest Service Seeks to Expand Traditional Cultural District to Further Inhibit Drilling.**

125.      In September 2003, the Forest Service held a Section 106 consulting party meeting

in Montana to "consider visual, atmospheric, and audible impacts" of the proposed well and well

access on the Traditional Cultural District.

126.      Previously when the APD had been approved the Area of Potential Effects for the

well had been a strip consisting of approximately five miles of the proposed access route and the

four-acre proposed well pad plus a 200-foot buffer.  In light of the creation of the Traditional

Cultural District, the Forest Service was redefining the Area of Potential Effects and currently

believed the Area of Potential Effect may stretch over 1,000 acres.

127.      During the 2003 meeting the Blackfeet representatives asked that the Traditional

Cultural District be expanded.  Specifically the Blackfeet sought to have all of the land they had

ceded in their 1895 Treaty placed in the District because, in part, they believed their reserved

rights, for example to hunt and cut timber, could not be separated from the cultural importance of

the area.

128.      The Forest Service assured the Blackfeet that if the Blackfeet could provide new

information to support changing the boundaries of the Traditional Cultural District, it could be

expanded.

129.      In 2004, Mr. Longwell, relying on the representations of the BLM about the validity

of the Lease and APD, formed Solenex LLC, a Louisiana limited liability corporation.  On July 9,

2004, based upon the BLM's repeated representations, Mr. Longwell assigned the Lease and

33

concomitant rights under the approved APD to Solenex.  The BLM approved the assignment, effective February 1, 2005.

130.     Between 2005 and 2013, the Forest Service and the BLM continued their use of the NHPA as a pretext for not lifting the suspension on the Lease and approved APD and as a pretext for denying Solenex the ability to exercise its valuable contract and property rights.

131.     In fact, in 2006, a boundary study proposed that the entire Solenex Lease be included in the District as the entire District should be expanded north.  The Forest Service conducted or commissioned a number of additional studies over more than three years to support the expansion of the Traditional Cultural District so that the Lease would be completely encompassed within its boundaries.

**K.     In 2011, the Forest Service Initially Communicated that the Lease May Be in A TCD.**

132.     On April 15, 2011, Solenex sent a letter to the Forest Service reminding the Forest Service that the Lease was a valid contract, the approved APD remained valid, and that Solenex wished to commence drilling.

**1.     In May 2011, the Forest Service Advised Solenex that the Lease May Now be in a TCD.**

133.     On May 27, 2011, the Forest Service responded to Solenex's April 15, 2011 letter advising that the Lease was now itself allegedly in an area potentially eligible for listing as a TCD on the National Register of Historic Places.  The Forest Service further represented that it was preparing a determination of eligibility to submit to the state historic preservation officer ("SHPO") for a concurrence.

134.     On February 16, 2012, Solenex sent a letter to the Forest Service expressing its desire to develop the Lease under the approved APD and again requesting a timeline for when drilling operations may commence.  Solenex further explained:

34

> [I]t is important to proceed with development of this lease based on the amount of drilling activity in the area, including that on the nearby Blackfeet reservation, as well as the need to develop domestic energy resources on both public and private lands as outlined by President Obama in his State of the Union Address.

135.    On March 27, 2012, in response to Solenex's February 16, 2012 letter, the Forest Service advised that the Lease is allegedly in an area potentially eligible for listing as a TCD. Like it did in its May 27, 2011 letter, the Forest Service represented that it was preparing a determination of eligibility to submit to the SHPO for a concurrence. The Forest Service did not seek this concurrence until June 2013, after Solenex gave notice of its intent to seek judicial review of Forest Service's and the BLM's unreasonable delay holding the Lease in suspension.

### 2.    In December 2012, the Forest Service Proposed the Current TCD.

136.    In December 2012, the Forest Service, relying on the newly conducted interviews and cultural studies, accepted a recommendation from an ethnographic contractor that the boundaries of the TCD expand to approximately 165,000 acres. The boundaries of the proposed 165,000-acre TCD not only included the added northern area proposed in 2006, but were conveniently drawn to add thousands of acres much further south to match closely with the boundaries of the Ceded Strip where the Blackfeet sought to have their ownership recognized or returned.

137.    The creation of the proposed 165,000-acre TCD was part of the Forest Service plan to prevent Solenex from exercising its valuable contract and property rights.

138.    Between January 2013 and May 23, 2013, the Forest Service and the BLM took no action toward completing the purported NHPA process for the new proposed adjustments to the TCD.

35

139.    On May 21, 2013, counsel for Solenex sent letters to the BLM and the Forest Service describing the extraordinary and unlawful delay in lifting the suspension and advising that Solenex would seek judicial review if the suspension was not lifted in 30 days.

140.    On June 7, 2013, after receiving Solenex's notice of intent to sue, the Forest Service transmitted the boundaries of a proposed 165,000-acre TCD to the Blackfeet Tribal Business Council and asked whether the Council concurred with the boundaries.

141.    On June 18, 2013, the Forest Service responded to counsel for Solenex's letter and suggested it had transmitted the boundaries of a proposed 165,000-acre TCD to the SHPO for comment.  The Forest Service, however, did not transmit the boundaries of a proposed 165,000-acre TCD to the SHPO for comment until June 20, 2013.

## L.    In 2013, After Over 30 Years of Delay, Solenex Initiated This Suit.

### 1.    Solenex Filed this Case to Compel Agency Action.

142.    On June 28, 2013, Solenex filed this case against Defendants seeking to compel agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1).  ECF No. 1 at 7–10.  Solenex requested either an order compelling Defendants to immediately lift the suspension of the Lease or an order compelling Defendants to complete any remaining administrative action necessary to lift the suspension within 30 days.  *Id.*

143.     By late August 2013, the Blackfeet and the Montana historic preservation officers unsurprisingly agreed with the 165,000 acre TCD proposed by the Forest Service.

144.    On September 9, 2013, Defendants filed an Answer to Solenex's Complaint.  In answering Solenex's Complaint, Defendants never suggested or hinted that the Lease may have been issued prematurely in violation of any applicable statute, regulation, policy, or trust responsibility.

145.    In January 2014 and April 2014, Defendants forced Solenex to travel to Montana—at considerable expense to Solenex—to attend additional Section 106 NHPA meetings that Defendants represented were necessary before the suspension could be lifted.  Solenex attended these meetings relying on the Defendants' good faith in attempting to restore Solenex's APD.  During those meetings, Defendants never suggested or hinted that the Lease may have been issued prematurely in violation of any applicable statute, regulation, policy, or trust responsibility.

146.    At and shortly after the January 2014 Section 106 meeting, the Forest Service proposed and sought the parties' acceptance for an approximately 5,000-acre APE.

147.    The Blackfeet tribe, however, proposed that the entire 165,00 TCD be including the Area of Potential Effects.  Shortly thereafter the Forest Service proposed that the entire TCD be part of the APE.

148.    On July 7, 2014, Solenex filed a motion for summary judgment and supporting memorandum demonstrating that Defendants had unreasonably delayed lifting the then 29-year-long suspension.  ECF Nos. 24, 24-1.

149.    On August 26, 2014, Defendants filed their own motion for summary judgment and supporting memorandum.   ECF Nos. 32, 33.   In their motion and supporting memorandum, Defendants argued that this Court was powerless to do anything about their 29-year-long suspension.  In the alternative, Defendants argued that they had not unreasonably delayed lifting the suspension.  In their summary judgment filings, Defendants never suggested or hinted that the Lease may have been issued prematurely in violation of any applicable statute, regulation, policy, or trust responsibility.

150.    In September 2014, the Forest Service tentatively found that the proposed well and drilling on the Lease would have adverse effects on the TCD.  In November 2014, Solenex objected

to this finding.  On or about December 3, 2014, the Forest Service finalized its determination that

the proposed Solenex well would cause adverse effects to the entire TCD.  ECF No. 93-2 at 12.  This

determination is a final agency action, subject to challenge under the APA.

151.     In April 2015, Defendants forced Solenex to travel to Montana again—at

considerable expense to Solenex—to attend another NHPA meeting that Defendants represented was

necessary before the suspension could be lifted.  Allegedly the purpose of the meeting was to discuss

the potential adverse effects of the well and drilling on the Lease and see if those effects could be

mitigated.  During that meeting, Defendants never suggested or hinted that the Lease may have been

issued prematurely in violation of any applicable statute, regulation, policy, or trust responsibility.

152.     On June 10, 2015, this Court heard oral arguments on the then-pending motions for

summary judgment.  During that hearing, Defendants continued to maintain their position that this

Court was powerless to do anything about their 29-year-long suspension.  Defendants also continued

to maintain their position that they had not unreasonably delayed lifting the suspension.  At no time

during that hearing did Defendants suggest or hint that the Lease may have been issued prematurely

in violation of any applicable statute, regulation, policy, or trust responsibility.

153.     On July 7, 2015, the Blackfeet terminated their participation in the Section 106

process, declaring that no oil and gas development within the TCD would be acceptable to the Tribe.

> **2.     This Court Determined the Defendants' Egregious Delay was Unreasonable;  Defendants Respond by Recommending and Requesting Cancellation of Solenex's Lease.**

154.     On July 27, 2015, this Court ruled that Defendants' 29-year delay was unreasonable

as a matter of law:

> [S]ince the APD was first approved in 1985, the lease has been suspended for more than 29 years!  No combination of excuses could possibly justify such ineptitude or recalcitrance for such an epic period of time.

Under the APA, administrative agencies have a *duty* to decide issues presented to them within a reasonable time, 5 U.S.C. § 555(b), and reviewing courts have a *duty* to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1) . . . .  By any measure, defendants' 29-year delay in reviewing plaintiff's suspended lease, and reaching a final determination, is "unreasonable delay" within the meaning of the APA.

ECF No. 52 at 2–3 (all emphasis in original) (footnote omitted).

155.    Based upon this ruling, this Court granted summary judgment in favor of Solenex and ordered Defendants to submit, within 21 days, "a schedule for the orderly, expeditious resolution of the decision whether to lift the suspension of plaintiff's lease."  ECF No. 52 at 5.  This Court further advised that:

This schedule shall include (1) the defendants' proposed tasks remaining to be completed and rationales for why those tasks are legally necessary, and (2) an accelerated timetable for completing those tasks still necessary to expeditiously resolve the issues regarding plaintiff's suspended lease.

*Id*.

156.    On August 17, 2015, Defendants submitted their proposed schedule.  ECF No. 53. In their proposed schedule, Defendants suggested—*for the first time*—that they may initiate a process for cancelling the Lease, which they claimed could be completed by March 30, 2016.  *Id*. at 2.  In the alternative, Defendants suggested that they would need almost two more years to complete a fifth NEPA process before they could lift the suspension.  *Id.*

157.    On September 21, 2015, *after* Defendants suggested to the Court that they may consider cancelling the Lease, the National Historic Advisory Council adopted the Blackfeet position that the effects of a well on the TCD could not be mitigated.  Then, going far beyond their mandate and area of agency expertise, the Advisory Council recommended that the previously approved APD be revoked and the Lease be cancelled.

158.    After Solenex filed a response demonstrating that Defendants' proposed schedule was a pretext for further unlawful delay, ECF No. 54, this Court held a status conference on October 6, 2015.  Following that status conference, this Court ruled that Defendants' proposed schedule was "clearly unacceptable" because it "would not only draw out this process another two years potentially, but also lacked rationales for the necessity of certain proposed steps as ordered."  ECF No. 57 at 2.  Accordingly, this Court ordered Defendants to file a memorandum by November 23, 2015:

> [T]hat sets forth their decisions, and the factual and legal bases therefore, regarding: (1) whether to initiate the process for cancellation of the lease; (2) whether to continue the [NHPA] process for lifting the suspension of the lease; (3) if so, whether any additional NEPA compliance is necessary before lifting the suspension; and (4) a proposed *accelerated* schedule that sets forth the tasks remaining to be completed—either under the process for cancellation, or under NEPA before lifting the suspension—and the rationales for their necessity.

ECF No. 57 at 4 (emphasis in original).

159.    During all of this, on October 30, 2015, the Secretary of Agriculture adopted the Advisory Council's adoption of the Blackfeet position, and again going beyond their area of expertise and lawful action, requested that the Lease, in place since 1982, be cancelled.

160.    On November 23, 2015, Defendants filed their memorandum.  ECF No. 58.  Although Defendants stated that they "ha[d] not yet made a final cancellation decision," *id*. at 2, they were prepared to cancel the Lease "as early as December 11, 2015 or as soon thereafter as th[is] Court approves the proposed schedule."  *Id*. at 1.  After repeatedly reaffirming the validity of the Lease for over 33 years, Defendants suggested that they may have issued the Lease prematurely in violation of NEPA.  *Id*. at 4.  Defendants also suggested that they may have issued the Lease prematurely in violation of the NHPA, *id*. at 4–5, but that the alleged NHPA "defect has now been corrected . . . ."  *Id*. at 5.  Defendants also suggested that a lease issued prematurely in violation of

NEPA makes a lease voidable and that the Secretary has the inherent authority to administratively cancel a voidable lease under the facts in this case.  *Id*. at 2–3, 5.

161.   Solenex timely filed its response and demonstrated that there was no factual or legal support for Defendants' proposed course of action of cancelling the Lease.  ECF No. 63 at 15–36. Specifically, Solenex demonstrated that the Secretary lacked the authority to administratively cancel the Lease.  *Id*. at 15–26.  In the alternative, Solenex demonstrated that, even if the Secretary possessed such authority, the exercise of that authority under the facts in this case would be unlawful. *Id*. at 27–36.  Because Defendants intended to embark on a course of action that would be *ultra vires* and unlawful, and that was simply a pretext for further unlawful delay, Solenex requested that this Court reject Defendants' proposed course of action, enjoin Defendants from taking any further steps toward administratively cancelling Solenex's Lease, and order Defendants to lift the suspension on Solenex's Lease immediately.  *Id*. at 43.

### 3.   Defendants Cancelled the Lease and Disapproved the APD.

162.   At another status conference on March 16, 2016, this Court "request[ed]" that Defendants act "within 24 hours."  Transcript of Status Conference at 9:17–20, *Solenex LLC v. Bernhardt*, 962 F.3d 520 (D.C. Cir. Mar. 16, 2016).

163.   On March 17, 2016, the BLM issued a decision administratively cancelling the Lease and disapproving the approved APD. ECF No. 68-1.  According to the BLM the Lease was issued prematurely in violation of, *inter alia*, NEPA and the NHPA and was voidable.  ECF No. 68-1 at 7–14.  This decision was also the BLM's final determination/agreement with the other Defendants that the effects of the proposed well on the TCD could not be mitigated.

164.    Defendant Connor approved the decisions such that they constituted final decisions for the Secretary and are subject to judicial review under the APA.  *See* ECF No. 68-1 at 14; *see also* 5 U.S.C. § 704.

### 4.    After the Defendants Cancelled the Lease and APD, This Court Granted Solenex's Motion for Summary Judgement

165.    On September 24, 2018, this Court granted Solenex's motion for summary judgement, stating that the Secretary's decision to cancel the Solenex's Lease was arbitrary and capricious.  ECF Nos. 130 at 16, 131.

166.    After this Court granted Solenex's Motion for Summary Judgement, Federal Defendants and Defendant-Intervenors appealed.  ECF Nos. 135, 133.

**M.    On Appeal, the Case was Remanded for Further Consideration of Solenex's Claims.**

167.    Solenex requested the D.C. Circuit affirm this Court's ruling that the 30-year delay in cancelling the Lease was a violation of the APA.  Alternatively, Solenex requested the D.C. Circuit affirm this Court's ruling on the grounds that the Secretary did not have the legal authority to cancel the Lease, that the agencies relied on improper factors, and Defendants and Solenex (or its predecessors) had cured any deficiencies in the Lease.

168.    The D.C. Circuit reversed the Court's holding that agency delay and Interior's asserted complete failure to consider Solenex's reliance alone were sufficient to render the cancellation and withdrawal decisions arbitrary and capricious.  *Solenex LLC v. Bernhardt*, 962 F.3d 520, 527 (D.C. Cir. 2020).

169.    Because Solenex is adversely affected and/or aggrieved by the cancellation of its Lease, by the disapproval of its approved APD, by the decision that its proposed well would affect 165,000 acres, and the decision that those effects could be mitigated, it is entitled to judicial review of these decisions.  *See* 5 U.S.C. § 702.

## FIRST CLAIM FOR RELIEF

### (THE SECRETARY LACKED THE AUTHORITY TO ADMINISTRATIVELY CANCEL THE LEASE)

170.     Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

171.     The Department of the Interior issued the Lease in full compliance with the MLA, or, if there were any deficiencies with the issuance of the Lease, those were subsequently cured by joint efforts between the DOI/BLM, Forest Service, Solenex, and its predecessors.

172.     To cancel a lease, a deficiency as defined in the MLA must exist and the Agency must cancel the lease by instituting legal proceedings in a United States District Court that has jurisdiction over the matter.  *See* 30 U.S.C. § 181, *et seq*.

173.     The Secretary cancelled the Lease without any of the deficiencies required by the MLA.  Additionally, the Secretary cancelled the Lease without instituting a judicial proceeding, again violating the MLA.

174.     Congress did not intend to grant leases so tenuous in nature that the Secretary could cancel them at will.  Without congressional authorization, the Secretary has no intrinsic powers of condemnation.  Had Congress wanted to cancel the Lease, it alone would order the cancellation, subject to the payment of just compensation.  Congress did the exact opposite and recognized valid existing rights in its 2006 statute.

175.     Neither Solenex nor its predecessors ever violated the terms of the Lease, which under some statutes authorizes cancellation of a lease.

176.     The Secretary did not institute a judicial proceeding prior to cancelling the Lease.

177.   The Secretary's actions in administratively cancelling the Lease do not comply with his express statutory authority.   Nor does the Secretary have the inherent authority to cancel Solenex's Lease.

178.   Whatever authority the Secretary may have to breach, buy-back, or condemn an oil and gas lease as part of his management of public lands, he does not have authority to simply and unilaterally cancel such lease depriving the lessee of contractual or other property remedies.

179.   In justifying the cancellation decision, the Agency may not rely on events that occurred after the Lease was issued.

180.   The Secretary's decision represents an about-face from the Defendants' long-held positions and contradicts the Defendants' prior statements upon which Solenex, and its predecessors, relied to their detriment.

181.   Accepting the Defendants' broad interpretation of their inherent powers would vest in them power far beyond that which is expressly permitted to them by Congress, which the Court should not allow.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374–75 (1986) (an agency may not expand its power "in the face of a congressional limitation").

182.   The Secretary cites 43 C.F.R § 3108.3(d) to bolster his authority to cancel the Lease. However, that regulation post-dates the Lease and does not apply in this case.

183.   The Agencies' contractual duties "are governed generally by the law applicable to contracts between private individuals."  *See Mobil Oil*, 530 U.S. at 607.  This includes the duty to act in good faith.

184.   A strong social policy supports the need for certainty in government contracts.

185.     The Secretary argues that the Lease was "voidable"; even assuming the Lease was voidable in 1982 for contractual or regulatory reasons; by 2016, the Defendants had repeatedly affirmed the Lease and disavowed or cured any defects and it was no longer voidable.

186.     Mr. Longwell and the BLM/DOI entered into a valid contract to lease the mineral rights on the Lease in 1982. Moreover, this contract required good faith dealing between the parties to determine the approval of the APD.

187.     Mr. Longwell transferred interest in the valid contract to Solenex.

188.     No government entity may "cancel" a contract that has been recognized, relied upon, and has existed for over 30 years. The Secretary, BLM, and DOI did exactly that.

189.     While agencies may have limited authority to reconsider past decisions or correct errors within a reasonable time, no precedent comes close to allowing reconsideration or correction after 30 years, and numerous courts have prohibited reconsideration/correction after only a fraction of that time. *See* Memorandum Opinion, ECF No. 130 at 12–13.

190.     Because the Secretary's decision exceeds both express and any implied powers granted to him by Congress, the decision was made contrary to the process explicitly required by law, and the decision was made after an unreasonable amount of time, this Court should enjoin or vacate the cancellation of Solenex's Lease.

## SECOND CLAIM FOR RELIEF

### (THE SECRETARY'S DECISION TO CANCEL THE LEASE IS NOT IN ACCORDANCE WITH LAW)

191.     Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

192.     The Department of the Interior issued the Lease in full compliance with the MLA, NEPA, and NHPA, or, if there were any deficiencies with the issuance of the Lease, those were

subsequently cured by joint efforts between the DOI/BLM, Forest Service, Solenex, and its predecessors.

193.    The Agencies' contractual duties "are governed generally by the law applicable to contracts between private individuals." *See Mobil Oil*, 530 U.S. at 607.  This includes the duty to act in good faith.

194.    Mr. Longwell and the BLM/DOI entered into a valid contract to lease the mineral rights on the Lease in 1982.  Moreover, this contract required good faith dealing between the parties to determine the approval of the APD.

195.    This Lease may only be cancelled if the BLM/DOI complies with the MLA, and the MLA only permits cancellation if the permittee fails to "exercise due diligence in the prosecution of the prospecting work in accordance with the terms and conditions stated in the permit." 30 U.S.C. § 183.  Furthermore, the MLA requires cancellation through court proceedings. 30 U.S.C. § 184(h).

196.    Neither Solenex, nor its predecessors, violated any of the terms of the Lease.  Nor did any agency institute the cancellation process through judicial proceedings as required by the MLA. *Id.*

197.    The reasoning for the BLM's cancellation of the Lease is not in accordance with law.  The issuance of the Lease complied with NEPA, NHPA, and the MLA.

198.    Therefore, the Lease must be a validly issued contract.

199.    Mr. Longwell transferred interest in that valid contract to Solenex.

200.    No government entity may cancel a contract that has been recognized, relied upon, and has existed for over 30 years.  The Secretary, BLM, and DOI did exactly that.

### THIRD CLAIM FOR RELIEF

### (THE SECRETARY'S DECISION TO CANCEL THE LEASE IS ARBITRARY AND CAPRICIOUS UNDER 5 U.S.C. § 706)

201.    Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

202.    The Secretary's decision to cancel Solenex's Lease constitutes "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

203.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

204.    The Secretary's decision to cancel Solenex's Lease is "arbitrary and capricious."

205.    Agency action is "arbitrary and capricious" "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (emphasis added). Under the "arbitrary and capricious" standard a reviewing court must analyze both the factual basis for an agency's action, *id.* at 416, as well as the reasoning employed by the agency.  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

206.    The "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of review in the APA, 5 U.S.C. § 706(2)(A) also serves as a "catch-all" that "pick[s] up administrative misconduct not covered by the other more specific" standards of review in 5 U.S.C. § 706(2).  *Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of*

*Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (explaining that the standards of review in 5 U.S.C. § 706(2) "are cumulative").  Thus, even an agency action that is within the agency's authority may still be held unlawful as "arbitrary, capricious, [or] an abuse of discretion…." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

207.    The Challenged Decision is arbitrary, capricious, or an abuse of discretion because the Defendants:

    a.   relied on factors which Congress had not intended them to consider including but not limited to:

        i.   changes in policy and associated regulations that post-date the issuance of and creation of a property right in the Lease and that are not appropriately considered in evaluating a lease issued in 1982. *See Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958) ("[T]he power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies."); *United States v. Seatrain Lines*, 329 U.S. 424, 428–33 (1947) (rejecting the federal government's attempt to revoke a certificate of convenience in light of a change in policy);

        ii.   the political pressure leading to the policy changes above including the pressure to stop oil and gas development in the area and/or the pressure to grant concessions in the Ceded Strip;

        iii.   misreading Section 403 of the Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, to provide support for cancelling the Lease and

disapproving the approved APD. In passing that provision Congress expressly preserved all "valid existing rights," which includes both the Lease and the approved APD.  Nor does Section 403 prohibit Defendants from correcting any violations they may have committed prior to issuing the Lease;

iv.   unprovable, unmeasurable, *ipse dixit* conclusions about a well's or oil and gas development's adverse effect on the environment or an adverse effect on any purported religious/cultural resources;

b.   entirely failed to consider an important aspect of the problem including but not limited to:

i.   Congress's intent in passing the MLA, the Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a, and numerous other acts passed by Congress to encourage the development of the oil and gas resources on federal lands;

ii.   whether policy and regulatory changes post dating the Lease issuance could impair the Lease;

iii.   the applicable statute of limitations including the 5-year statute of limitations in 28 U.S.C. § 2462;

iv.   how the passage of time limited the Secretary's discretion;

v.   reliance interests developed since the Lease was issued;

vi.   whether and how any alleged adverse effects from the well or Lease development could be mitigated;

vii.   the environmental impacts of its decision to cancel the Lease and disapprove the APD;

viii.  the importance of the finality and reliability of interests in federal oil and
gas leases;

c.  offered an explanation for its decision that runs counter to the evidence before the
agency including but not limited to evidence that:

i.  the Lease was issued in full compliance with all applicable statutes,
regulations, policies, and trust responsibilities;

ii.  the APD was properly approved in accordance with all applicable statutes,
regulations, policies, and trust responsibilities;

iii.  any regulatory violations occurring at or prior to Lease issuance have been
corrected;

iv.  in passing the Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432
Congress expressly preserved all "valid existing rights," which includes
both the Lease and the approved APD.

d.  and/or made a decision and reasoning so implausible that it could not be ascribed
to a difference in view or the product of agency expertise, for example because:

i.  the TCD was documented and created primarily to foreclose Solenex's
Lease rights, not for its own intrinsic attributes;

ii.  the Challenged Decision is in direct and irreconcilable conflict with the
1993 ROD, which the Secretary and her predecessors treated as final and
conclusive for 23 years. *See Texas Oil & Gas Corp. v. Watt*, 683 F.2d 427,
431–34 (D.C. Cir. 1982) (reversing a lease cancellation decision that was
based upon the Secretary's "eleventh-hour" change in position, because to
allow such a decision to stand "would be sanctioning a retroactive exercise

50

of discretion to which it is impossible to ascribe any rational purpose");
*State Farm*, 463 U.S. at 46–57 (agency action is arbitrary and capricious if
a change from a previous position is not adequately explained).  This is
especially true considering that Solenex and its predecessors changed their
position in reasonable reliance on the 1993 ROD.  *See Smiley v. Citibank
(S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (a change in position "that does
not take account of legitimate reliance on" the prior position may constitute
arbitrary and capricious action);

iii. the Challenged Decision is not based on agency expertise, but is
inappropriately based upon a change in policy that cannot be applied
retroactively to an existing Lease. *See Am. Trucking Ass'ns v. Frisco Transp.
Co.*, 358 U.S. 133, 146 (1958) ("[T]he power to correct inadvertent
ministerial errors may not be used as a guise for changing previous decisions
because the wisdom of those decisions appears doubtful in the light of
changing policies."); *United States v. Seatrain Lines*, 329 U.S. 424, 428–33
(1947) (rejecting the federal government's attempt to revoke a certificate of
convenience in light of a change in policy);

iv. the Challenged Decision was issued out of spite or was a vindictive response
to Solenex being granted summary judgment on its original claims for relief.
*See Iceland S.S. Co. v. United States Dep't of the Army*, 201 F.3d 451, 461
(D.C. Cir. 2000) (agency action motivated by subjective bad faith is
arbitrary and capricious); *cf. Bordenkircher v. Hayes*, 434 U.S. 357, 363
(1978) ("To punish a person because he has done what the law plainly

51

allows him to do is a due process violation of the most basic sort …, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional." (internal quotations and citations omitted)); and

v.  Defendants completely abdicated their responsibility to determine whether adverse effects on the TCD, if any, could be mitigated.

208.    When an agency has previously held one view and then changes its positions, it must "explain its reasons for doing so." *State Farm*, 463 U.S. at 56; *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display an awareness that it *is* changing position.").

209.    The DOI/BLM never acknowledged a switch from their original position where they recognized the valid Lease since its origination.  In 2015, however, the Agencies for the first time contended that the Lease was invalidly issued so the Secretary could administratively cancel it.

210.    The DOI/BLM relied on factors they were not supposed to consider.  *State Farm*, 463 U.S. at 43.  The Agencies relied on political pressure and judicial simplicity when they cancelled the Lease, both of which should not be considered in determining the validity mineral Lease.  *See Texas Oil & Gas*, 683 F.2d 427 (1982).

211.    Moreover, the DOI/BLM's decision to cancel Solenex's Lease "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 556 U.S. at 43. Namely, the DOI/BLM failed to consider the important public policy that leases should be final and should convey a property right. A lease that can be cancelled at any point after issuance for a procedural infirmity,

especially after both parties have gone to great lengths to cure that infirmity, conveys no right in property and encourages parties to not cure such infirmities.

212.    Solenex has been and will continue to be impacted by the Secretary's decision to cancel the Lease.

### FOURTH CLAIM FOR RELIEF

### (THE FOREST SERVICE'S DECISION THAT SOLENEX'S WELL WOULD HAVE ADVERSE EFFECTS ON THE ENTIRE TCD IS ARBITRARY AND CAPRICIOUS UNDER 5 U.S.C. § 706)

213.    Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

214.    The Secretary's decision that Solenex's proposed well would have adverse effects on the entire TCD constitutes "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

215.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

216.    The Defendant's decision that Solenex's APE encompassed and that the well would have negative effects on the entire TCD is "arbitrary and capricious."

217.    When an agency has previously held one view and then changes its positions, it must "explain its reasons for doing so." *State Farm*, 463 U.S. at 56 (1983); *Fox Television Stations*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display an awareness that it *is* changing position.").

218.    Originally, the APE for Solenex's proposed well included a strip consisting of approximately five miles of the proposed access route and the four-acre proposed well pad plus a

200-foot buffer.  After the creation of the TCD, the Forest Service suggested the APE could extend beyond 1,000 acres.  Then, after Solenex initiated legal proceedings, the Forest Service revised its proposal to 5,000 acres.  Once the Blackfeet Tribe proposed that the entire 165,000-acre TCD be included in the APE, the Forest Service quickly followed suit. In explaining its decision to drastically expand the APE, the Forest Service simply parroted the Blackfeet Tribe's position that, since all things are connected in their worldview, any negative effect a secular activity may have in one part of the TCD (though, notably, not on nearby reservation land), regardless of how small, could "potentially affect other places in untold and negative ways."  The Forest Service repeatedly expanded the size of the APE for Solenex to drill an exploratory well, in response to litigation and political pressure from the Blackfeet Tribe, in a clear effort to justify the continued suspension of Solenex's APD and ultimate cancellation of Solenex's Lease.  At no point did the Forest Service attempt to explain, beyond broadly referencing the Blackfeet Tribe's assertions regarding interconnectivity within the TCD, how the drilling of a single exploratory well would impact 165,000 acres of land, which falls far short of the agency's responsibility under the APA to adequately explain its decisions. *See Earth Power Resources v. GFS*, 181 IBLA 94, 110–11 (2011) (remanding decision to BLM for additional analysis because general references to an EA and an ethnographic study did not constitute reasoned, well-supported analysis).

219.    The Forest Service also relied on factors it was not supposed to consider.  *State Farm*, 463 U.S. at 43.  The Forest Service relied on political pressure in deciding to expand the APE to the entire 165,000-acre TCD.  Political pressure from the Blackfeet Tribe during the Section 106 process repeatedly resulted in the Forest Service uncritically adopting the contested position of the Tribe.  Political pressure should not be considered when making a decision related to a mineral lease. *Texas Oil & Gas*, 683 F.2d at 433.  And while the Forest Service is statutorily

required to consult with the Blackfeet Tribe, it is also obligated to engage in its own reasoned analysis; not simply defer to what is effectively a tribal veto. *See Narragansett Indian Tribe v. Warwick Sewer Authority*, 334 F.3d 161, 168 (1st Cir. 2003) ("[T]here is no tribal veto").

220.    Finally, the Forest Service's decision to expand the APE to the entire 165,000 acre TCD is arbitrary and capricious because its justification for its decision is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  An Area of Potential Effect is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16.  "The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* 165,000 acres is far in excess of what can be considered a normal or standard size APE for an oil well. *See Dine Citizens*, 923 F.3d at 847–48 (describing a "standard" APE (for direct effects) for a well pad project as "the well pad and construction zone plus 100[ ] [feet] on each side from the edge of the construction zone," and referring to distances of "8.5 miles," "11 miles," and "within a mile" when discussing the theoretical extent of indirect effects).  Only four years ago, this Court refused to accept the Standing Rock Sioux Tribe's argument that consideration of indirect effects required consideration of a pipeline's entire route rather than only the areas surrounding the permitted activity. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4, 30–32 (D.D.C. 2016).

221.    Because the Forest Service's decision to expand the APE to the entire 165,000-acre TCD and that the well would negatively affect the entire TCD was arbitrary and capricious, its decision violates the APA and is therefore entitled to reversal.  5 U.S.C. § 706.

222.    Solenex has been and will continue to be impacted by the Forest Service's decision to expand the APE and decision that its proposed well would have a negative effect on the entire TCD.

### FIFTH CLAIM FOR RELIEF

### (THE FOREST SERVICE'S DECISION THAT THE NEGATIVE CULTURAL IMPACTS OF DEVELOPING SOLENEX'S LEASE COULD IN NO WAY BE MITIGATED IS ARBITRARY AND CAPRICIOUS UNDER 5 U.S.C. § 706)

223.    Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

224.    The Forest Service's decision that the negative cultural impacts of developing Solenex's Lease could in no way be mitigated constitutes "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

225.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

226.    The Forest Service's decision that the negative cultural impacts of developing Solenex's Lease could in no way be mitigated is "arbitrary and capricious."

227.    The Forest Service relied on factors it was not supposed to consider while simultaneously ignoring important aspects of the problem before it.  *State Farm*, 463 U.S. at 43. The NHPA requires that the Forest Service consult with the Blackfeet Tribe, but does not permit the Forest Service to simply outsource its research and decision-making functions to the Tribe; Tribes are vital participants in the Section 106 process, but they do not possess the authority to unilaterally veto any development that may indirectly affect their cultural resources.  *See Narragansett Indian Tribe*, 334 F.3d at 168 ("[T]here is no tribal veto").  The Blackfeet Tribe's

decision to throw up its hands, declare *any* development of an oil and gas lease anywhere in the TCD unacceptable, and refuse to work in good faith with Solenex to mitigate any potential negative impacts stemming from Solenex's APD does not somehow obligate or authorize the Forest Service to similarly throw its hands up in defeat and declare those impacts forever and under all circumstances unmitigatable.  The NHPA does not require absolute protection of TCDs, and the mere fact that an oil well may impact a TCD in some non-distinct way is not sufficient reason, standing alone, to deny the right to drill.  *See Earth Power Resources, Inc.*, 181 IBLA at 110–11 ("A BLM decision exercising the agency's discretionary authority to reject a geothermal lease application must do more than implicitly favor one public interest over another.  It must clearly reflect and articulate a reasonable public interest analysis, supported in the record.").

228.    The arbitrariness of the Forest Service's decision is further evidenced by the fact that, while the Forest Service was uncritically adopting wholesale the positions of the Blackfeet Tribe, it was deliberately keeping Solenex in the dark.  As a consulting party under Section 106, Solenex was entitled to be informed of developments as they were occurring and to have input into the question of whether and how any impacts on cultural resources could be mitigated.  The Forest Service, however, failed to keep Solenex informed as to what facts and circumstances contributed to the determination of the APE and that mitigation was impossible.

229.    Finally, the Forest Service's decision that any adverse effects of Solenex's APD could under no circumstances be mitigated is arbitrary and capricious because its justification for its decision is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.  The area within and surrounding Solenex's Lease is far from pristine, untainted wilderness.  The proposed well site is approximately 3 miles southeast of the Great Northern Railroad and U.S. Highway 2, multiple pipelines run within 2

miles of the Lease, and the nearby Blackfeet Reservation itself has several well sites within its borders.  Somehow, none of these other developments are so disruptive that they cannot be permitted to exist, but Solenex's proposed exploratory well is beyond the pale.  The prejudice Solenex's proposed development has faced is wildly disproportionate to its relative impact on the TCD, and there is nothing rational, logical, consistent, or objective about the way Solenex has been singled out for poor treatment.

230.    Because the Forest Service's decision that the potential impacts of the development of Solenex's Lease could under no circumstances be mitigated was arbitrary and capricious, its decision violates the APA and is therefore entitled to reversal.  5 U.S.C. § 706.

231.    Solenex has been and will continue to be impacted by the Forest Service's arbitrary decision that mitigation would impossible.

## SIXTH CLAIM FOR RELIEF

### (THE SECRETARY'S DECISION TO DISAPPROVE THE APD IS ARBITRARY AND CAPRICIOUS UNDER 5 U.S.C. § 706)

232.    Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

233.    The Department of the Interior granted the APD in full compliance with the MLA, NEPA, and NHPA, or, if there were any deficiencies with the issuance of the APD, those were subsequently cured by joint efforts between the DOI/BLM, Forest Service, Solenex, and its predecessors.

234.    The Secretary's decision to disapprove Solenex's previously approved APD constitutes "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

235.     Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

236.     The Defendant's decision to deny Solenex's previously approved APD is "arbitrary and capricious."

237.     When an agency has previously held one view and then changes its positions, it must "explain its reasons for doing so." *State Farm*, 463 U.S. at 56 (1983); *Fox Television Stations*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display an awareness that it *is* changing position.").

238.     The BLM originally recognized the valid APD and actively attempted to approve the leaseholder's ability to drill until 1993.  However, unexplained by the BLM, it decided to suspend the APD until 2001.  In 2001, the BLM *again* reconsidered its position and tried to approve the APD.  In 2011, after broadly expanding a previously determined TCD, the BLM inexplicably changed its stance a *third* time, leading to the current disapproval of the APD.  The BLM has failed to explain its about-face deviation from its own determinations in violation of the *State Farm* and *Fox Television* standards multiple times.

239.     The Forest Service, BLM, DOI, and Secretary relied on factors they were not supposed to consider.  *State Farm*, 463 U.S. at 43.  The Agency and Secretary relied on political pressure in deciding to cancel the APD when it decided that would be the best course of action.  In 1993, then-Secretary Babbitt admitted that the suspension of the Lease was in aid of proposed legislation regarding the area where the Lease is located.  *See* 1993 Suspension Letter from Bruce Babbitt to Wes Franklin. Political pressure should not be considered when making a decision related to a mineral Lease. *Texas Oil & Gas*, 683 F.2d at 433.

240.    The Secretary, BLM, and DOI also relied on the 1992 NHPA applying retroactively to deny the APD.

241.    Moreover, the Secretary's decision to cancel Solenex's APD "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 556 U.S. at 43.

242.    The Secretary failed to consider the importance of oil and gas development to domestic energy resources and to the American economy.

243.    The Secretary also failed to consider the arbitrariness of denying the APD while simultaneously approving an oil and gas pipeline that runs through two miles of the Lease because the Forest Service found "no significant impact."  This double standard evinces arbitrary decision-making or favoritism.

244.    Clearly, the BLM recognizes the value of oil and gas development in the Lewis and Clark National Forest, since it allowed an oil pipeline to be installed through approximately two miles of the Lease.

245.    Furthermore, the BLM failed to attempt to mitigate the potential harm caused by the undertaking.

246.    By utilizing the NHPA as a front to administratively cancel Solenex's APD, the BLM failed to consider any reasonable alternatives and, therefore, failed to engage in informed decision making about the APD.

247.    By failing to consider potential alternatives to mitigate the damages, the BLM violated the NHPA.

248.    Because the BLM's denial of the previously issued APD was in violation of the NHPA, the BLM's decision is not in accordance with law.

249.    Because the BLM's decision is not in accordance with law, its decision violates the APA and is therefore entitled to reversal.  5 U.S.C. § 706.

250.    Solenex has been and will continue to be impacted by the Secretary's decision to disapprove the APD.

## SEVENTH CLAIM FOR RELIEF

## (SOLENEX IS ENTITLED TO BONA FIDE PURCHASER PROTECTIONS)

251.    Solenex incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

252.    Neither Solenex, nor its predecessors, were aware of any fraud or violation of any of the provisions or regulations of the MLA.

253.    Solenex, and all its predecessors, acquired their interests in good faith.

254.    Solenex, and all its predecessors, acquired their interests in the Lease for valuable consideration.

255.    Solenex, and its predecessors, were all without notice of the purported violation of departmental regulations cited in the Cancellation Decision.

256.    On at least five occasions, the BLM affirmed the validity of Solenex's Lease.

   a.    When the Lease was originally issued, it was issued by the BLM under the presupposition that the Lease was valid.

   b.    When Mr. Longwell assigned the Lease to Fina in 1983, the BLM approved the assignment, necessarily certifying the validity of the Lease.

   c.    When Fina assigned the Lease to Mr. Longwell in 1999, the BLM again approved the assignment, necessarily certifying the validity of the Lease.

d. In 2002, when asked by Mr. Longwell about the validity of the APD, the BLM replied "you have a valid permit." This necessarily certifies the validity of the Lease.

e. When Mr. Longwell assigned the Lease to Solenex in 2004, the BLM approved the assignment, necessarily certifying the validity of the Lease.

257. Solenex qualifies as a bona fide purchaser under the MLA. 30 U.S.C. 184(i). Accordingly, Solenex is entitled to bona fide purchaser protections and the Defendants may not challenge the validity of Solenex's Lease.

258. Solenex is also entitled to the bona fide purchaser status of its predecessors' in interest, such as Fina.

259. This Court should enjoin or vacate the Secretary's decision to administratively cancel the Lease, dismiss any case the Defendants make to cancel the Lease, and reinstate the Lease.

## PRAYER FOR RELIEF

**WHEREFORE**, Solenex prays:

(1) That it be declared and adjudged that the cancellation of Solenex's Lease is in excess of statutory, inherent, and regulatory authority.

(2) That it be declared and adjudged that the cancellation of Solenex's Lease is unlawful because the Defendants' decision to cancel the Lease is not in accordance with the law.

(3) That it be declared and adjudged that the cancellation of Solenex's Lease is unlawful because Solenex is entitled to bona fide purchaser protection.

(4)     That it be declared and adjudged that the cancellation of Solenex's Lease was, *inter alia*:  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and/or without observance of procedure required by law.

(5)     That the cancellation of Solenex's Lease be held unlawful and set aside.

(6)     That the Lease be reinstated.

(7)     That it be declared and adjudged that the Forest Service's decision that the Area of Potential Effect for Solenex's proposed well constitutes the entire 165,000 acre TCD was, *inter alia*:  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and/or without observance of procedure required by law;

(8)     That it be declared and adjudged that the Forest Service's decision that the potential adverse cultural impacts of Solenex's proposed well could under no circumstances be mitigated was, *inter alia*:  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and/or without observance of procedure required by law;

(9)     That the denial of Solenex's previously approved APD be held unlawful and set aside.

(10)     That the approved APD be reinstated.

(11)     That Defendants be ordered to immediately lift the suspension on the Lease and approved APD so that Solenex may exercise its valuable contract and property rights.

(12)     That Solenex be awarded costs and attorneys' fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412.

(13)     That Solenex be awarded such further relief as this Court deems just and equitable.

DATED this 2nd day of December 2020.

Respectfully submitted,

*/s/ Zhonette M. Brown*
Zhonette M. Brown, D.C. Bar No. 463407
David McDonald, D.C. Bar No. CO0079
  MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
zhonette@mslegal.org
dmcdonald@mslegal.org

*Attorneys for Plaintiff*