# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SOLENEX, LLC,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 13-993 (RJL)** |
| | ) | |
| **DEB HAALAND, in her Official** | ) | |
| **Capacity as Secretary of the Interior,**[1] **et** | ) | |
| **al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION
September 9, 2022 [Dkts. # 156, 162, 164]

Plaintiff Solenex, LLC ("Solenex") holds a federal oil and gas lease in Montana first issued in 1982. Yet even though the responsible federal agencies first approved a proposal to initiate drilling on the land in 1985, a never-ending series of administrative reviews have precluded any activity for nearly forty years. How Kafkaesque! Finally, in 2013, Solenex brought this suit against the Secretary of the Interior, the Secretary of Agriculture, the Director of the Bureau of Land Management, the Chief of the Forest Service, and other subordinate federal officials (collectively, "federal defendants" or "the Government") to compel the Government to validate their already-approved drilling permit. In 2016, after much litigation, I ordered the Government to render a final decision on Solenex's application. Amazingly, the Government responded by *cancelling* the underlying lease—

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Interior Deb Haaland is substituted as the lead defendant.

the validity of which was not in dispute before this litigation arose—and disapproving the permit to drill. And now, six years and a trip to our Circuit Court later, I am finally in a position to address the merits of that decision. Now before this Court are cross-motions for summary judgment by Solenex, the Government, and six non-profit organizations that have intervened as of right in this matter (collectively, "intervenors").[2]   Because the Government lacked legal authority to rescind the lease and its withdrawal of the approved permit to drill was arbitrary and capricious, I will **GRANT** Solenex's motion for summary judgment [Dkt. # 156], **DENY** the Government and intervenors' motions for summary judgment [Dkts. # 164, 162], **VACATE** the Secretary's March 17, 2016 decision rescinding the lease and disapproving the Application for Permit to Drill, and **REMAND** this case to the Secretary of the Interior to reinstate the lease and previously approved Application for Permit to Drill.

## BACKGROUND

I. **Regulatory Landscape**

A. **Mineral Leasing Act**

The Mineral Leasing Act of 1920 ( "MLA") authorizes the Secretary of the Interior (the "Secretary") to issue leases for "[a]ll lands subject to disposition under this Act which are known or believed to contain oil or gas deposits." 30 U.S.C. § 226(a). The Secretary exercises authority over those leases, and the underlying land, pursuant to the MLA, its

---

[2] Intervenors are the Pikuni Traditionalist Association, the Blackfeet Headwaters Alliance, the Glacier-Two Medicine Alliance, the Montana Wilderness Association, the National Parks Conservation Association, and the Wilderness Society.

implementing regulations, and the Secretary's inherent authority as the legal steward of public lands. *Silver State Land, LLC v. Schneider*, 843 F.3d 982, 986 (D.C. Cir. 2016). But that authority is not unbounded: once a lease has been issued, the MLA authorizes the Secretary to bring a civil action to cancel the lease in only three circumstances: (1) if the lease is in violation of the MLA, unless the current leaseholder is a bona fide purchaser, 30 U.S.C. §§ 184(h)(1), (h)(2); (2) if the lessee has violated the statute, regulations, or terms of the lease, *id.* at § 188(a); or (3) on 30 days' notice, upon violations of the lease's provisions if the lease is not producing, *id.* at § 188(b).  The Secretary has also issued regulations authorizing the administrative cancellation of (1) any lease for the lessee's failure "to comply with any of the provisions of the law, the regulations issued thereunder, or the lease," upon 30 days' notice, 43 C.F.R. § 3108.3(a), or (2) any lease that was "improperly issued," *id.* at § 3108.3(d).  Finally, the Supreme Court has recognized that the Secretary holds "authority to cancel [a] lease administratively for invalidity at its inception." *Boesche v. Udall*, 373 U.S. 472, 476 (1963).

### B.    National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires agencies to take a "hard look" at the environmental consequences of certain agency actions before taking an action that could significantly affect the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  To ensure that "hard look," NEPA requires agencies to compile a detailed Environmental Impact Statement ("EIS") for those "major federal actions" that "significantly affect[ ] the quality of the human environment." *Mayo v. Reynolds*, 875 F.3d

3

11, 15 (D.C. Cir. 2017) (quoting 42 U.S.C. § 4332(2)(C)). NEPA is essentially a procedural statute and neither prohibits, nor requires, particular courses of action an agency may consider in preparing an EIS. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). Nor is an EIS required for *every* federal action. For example, the issuance of a comprehensive EIS is unnecessary if the agency makes a finding of no significant impact on the environment after it "carefully considered the [ ] proposal, was well informed on the problems presented, identified the relevant areas of environmental concern, and weighed the likely [environmental] impacts." *Cabinet Mtns. Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682–83 (D.C. Cir. 1982); *accord Am. Bird Conservancy v. FCC*, 516 F.3d 1027, 1034 (D.C. Cir. 2008) (citing *Cabinet Mtns.*, 685 F.2d at 682). In the context of federal leases under the MLA, an EIS is only necessary "if the [agency] chooses not to retain the authority to preclude all surface disturbing activities." *Sierra Club v. Peterson*, 717 F.2d 1409, 1412 (D.C. Cir. 1983).

### C.   National Historic Preservation Act

Like NEPA, the National Historic Preservation Act ("NHPA") is essentially a procedural statute. *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003). While it does not dictate outcomes, NEPA requires an agency to "stop, look, and listen" before undertaking a course of action. *Ill. Com. Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988). And just as NEPA only applies to a subset of government actions, NHPA has only ever applied to government "undertaking[s]." *See* 16 U.S.C. § 470f (1981); 54 U.S.C. § 306108 (2022). In 1982, NHPA defined "undertaking" as "any action as described in Section 106." 43 U.S.C. § 1601(7) (1981). Section 106, in turn, imposed

4

requirements on the responsible federal officials "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." National Historic Preservation Act, Pub. L. No. 89-665, § 106, 80 Stat. 915, 917 (1966). Absent an expenditure of federal funds or the grant of a federal license, § 106 did not, and does not, apply to a project. *Nat'l Mining Ass'n*, 324 F.3d at 759 (quoting *Sheridan Kalorama Hist. Ass'n v. Christopher*, 49 F.3d 750, 755–56 (D.C. Cir. 1995).

In cases in which it applies, NHPA requires the relevant agency to "take into account the effect of [an] undertaking on any historic property." 54 U.S.C. § 306108. To conduct a review under NHPA, the agency first identifies the relevant "Area of Potential Effects" ("APE"), defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. § 800.16(d). The agency then determines whether the APE contains any "historic properties" that are either listed in, or eligible for, the National Register of Historic Places. *Id.* at § 800.4. If any such properties exist, the agency evaluates whether the proposed undertaking will cause any "adverse effects," as defined in the regulations, on that property or properties. *Id.* at § 800.5. If so, the agency considers whether those effects can be resolved, minimized, or otherwise mitigated. *Id.* at § 800.6.

As originally enacted in 1966, NHPA neither required, nor contemplated, consultation with Native American tribes. *See generally* National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966). However, Congress amended NHPA in 1980 to express a general policy that the federal government ought to coordinate with Native American tribes to accomplish the purposes of the legislation but did not require such

5

consultation at that time. An Act to Amend the National Historic Preservation Act of 1966, Pub. L. No. 96-515, 94 Stat 2987 (1980), *codified at* 16 U.S.C. § 470-1 (1980). In 1992, NHPA was amended again to require consultation with tribes if an undertaking may affect property of "religious and cultural significance" to a federally recognized tribe. Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. No. 102–575, 106 Stat 4600.

## II.   Procedural History

Certain elements of this case's factual background have been set forth in this Court's previous opinion, *see Solenex LLC v. Jewell* (*Solenex I*), 334 F. Supp. 3d 174 (D.D.C. 2018), and that of our Circuit Court, *see Solenex LLC. v. Barnhardt* (*Solenex II*), 962 F.3d 520 (D.C. Cir. 2020). Accordingly, I will limit my recitation of the facts to the issues directly relevant at hand.

In February 1981, in anticipation of the issuance of nearly 200 pending leases in the Badger Two Medicine area of the Lewis and Clark National Forest in Montana, the United States Forest Service ("Forest Service"), part of the Department of Agriculture, jointly issued a 165-page Environmental Assessment ("EA"). Env'tl Assessment, App. Vol. IV [Dkt. # 45-10] at 8 *et seq.* The Bureau of Land Management ("BLM"), a component of the Department of the Interior and the agency responsible for issuing the contemplated leases, cooperated in the production of the report. *Id.* at 11. The EA considered six alternatives, "rang[ing] from denial of all lease applications to leasing all applied for lands with appropriate stipulations to protect surface resources and land uses." *Id.* at 13; *see also id.* at 48–49. The Forest Service selected the third alternative, under which "occupancy

leasing would only be recommended for accessible areas which can be adequately protected during oil and gas activity." *Id.* at 11. In light of that policy choice and a specific finding that any "surface disturbing activities" to be conducted in support of oil and gas drilling would be subject to further analysis and approvals, the Forest Service issued a "finding of no significant impact." *Id.* at 10.

While the primary purpose of the EA was to comply with NEPA, the Government also initiated a review of relevant historic properties that could be impacted by the proposed leases. Specifically, the EA included a review of "Cultural (Archeological, Historic, and Religious) Resources." *Id.* at 44. The EA further noted that the Forest Service began to engage with the Blackfeet Tribe in the fall of 1979, as required under the American Indian Religious Freedom Act, but noted that "the Blackfeet people prefer to identify" areas of spiritual importance "on a project-by-project basis." *Id.* at 45.

More than a year later, in June 1982, the Government issued the lease now held by Solenex (the "Lease") to Mr. Sidney Longwell. Attached to the lease were a set of "Surface Disturbance Stipulations" that required the leaseholder to obtain "prior approval" for any surface disturbing operation." Lease M-53323, Admin. Record ("A.R."), Vol. VIII, Part 2 (HC 00886) [Dkt. # 114-1] at 7. As our Circuit Court noted, "Longwell was required to obtain permission from both [BLM] and the Forest Service before drilling could occur." *Solenex II*, 962 F.3d at 523. Longwell subsequently assigned his interest in the lease to three Texas companies, America Petrofina Company of Texas, Petrofina Delaware, Inc., and AGIP Petroleum Company (collectively, "Fina"). Fina filed an Application for Permit

to Drill ("APD") in November 1983, and, after issuing a second EA, the Government approved that application in January 1985. *Id.*

In response, the Blackfeet Tribe and several conservation groups filed an administrative appeal in 1985 with the Interior Board of Land Appeals ("IBLA") alleging that approval of the APD violated several federal statutes, including NEPA and the NHPA. *Id.* Repeatedly finding no violation existed, the Government would ultimately approve Fina's application three more times, in 1987, 1991, and 1993, but remanded the approval each time for further consideration. *Id.* at 524. Most importantly, the Government "undertook a comprehensive environmental, cultural, and historical study" and issued a 982-page, full-blown Environmental Impact Statement ("EIS") in 1990. *Id.* In 1993, the BLM stayed the latest approval due to proposed legislation to close the Two Medicine Area to oil and gas exploration. *Id.* That legislation never passed, but while it was pending, the Forest Service determined the presence of a property eligible for the National Register of Historic Places within the Two Medicine Area and further stayed the approval for additional review. *Id.* That determination led to yet more review by the Forest Service.

Four developments arising from the ongoing NHPA review during this period merit attention. First, in 2002, the Forest Service designated the more than 165,000 acres of the Badger-Two Medicine Blackfoot Traditional Cultural District ("TCD"), including the entire land area covered by the Lease, as eligible for listing in the National Register of Historic Places. *Id.* Second, in 2003, the Forest Service designated approximately 5,000 acres surrounding Solenex's proposed drilling operation as the relevant APE. Forest Service Memorandum regarding The Area of Potential Effect (APE), Longwell

8

Consultation, App. Vol. II, Part 1 [Dkt. # 45-7] at 41–42 (FS 003785–86); Letter from

Forest Supervisor Rolando Ortegon re: 106 Consulting Process (July 18, 2003), App. Vol.

V, Part 2 [Dkt. # 48-2] ("Ortegon Letter") at 74–75 (FS 003730–31).  In evaluating the

APE, the Forest Service, relying on well-established methods, determined the physical

perimeter beyond which a person could not see, hear, or smell any trace of the proposed

activities.  Ortegon Letter, App. Vol. V, Part 2 at 74–75.  The proposed APE covered a

small fraction of the newly designated TCD. *See id.* at 77–78 (FS 003733–34).  Third, the

Forest Service also commissioned multiple ethnographic studies, including a 2012 study

on which the Government would later rely in reaching its final decision to disapprove

Solenex's application.  Lease Decision, A.R. Vol. X, Part 8 [Dkt. # 116-7] at 46

(SUPP.AR000388).  Finally, after nearly twenty years of frustration, Fina reassigned the

Lease to Longwell who, in turn, assigned the Lease to Solenex.  *Id.* at 42 n.2

(SUPP.AR000384).

In 2013, more than three decades after the Lease first issued, Solenex brought this

suit against the Government to compel resolution of the long-pending application to drill.

*See generally* Compl. [Dkt. # 1].  In April 2014, while the suit was pending, the Forest

Service dramatically revised the 2003 APE, determining instead that the proper APE for

the Solenex venture was the entire 165,000-acre TCD first designated in 2002.  Lease

Decision, A.R. Vol. X, Part 8 [Dkt. # 116-7] at 46 (SUPP.AR000388).  In making this

determination, the Forest Service relied on statements by the Blackfeet Tribal Historic

Preservation Officer ("THPO") ascribing great significance to the spiritual and religious

power of the Two Medicine Area.  Memorandum from Mark Bodily, Forest Archeologist (Apr. 3, 2014), App. Vol. XI [Dkt. # 177] at 237 (FS 006398).

Meanwhile, the proceedings in this Court continued.  As described more fully in both this Court's decision and that of our Circuit Court, I ultimately ordered the Government to reach a final decision on the Lease in 2016.  The Government did so, cancelling the Lease and disapproving the application for permit to drill.  *See Solenex I*, 334 F. Supp. 3d at 180.  Solenex challenged that decision on the grounds that the Secretary failed to consider Solenex's reliance interests.  *Id.* at 182–84.  I granted Solenex's motion for summary judgment and vacated the Government's decision on those grounds, *see id.* at 184, and our Circuit Court reversed and remanded, *see Solenex II*, 962 F.3d at 528–30.

On remand, Solenex amended its complaint to challenge the Lease Decision on the merits.  *See* Second Am. and Suppl. Compl. ("Compl.") [Dkt. # 151].  The parties and intervenors have filed cross-motions for summary judgment.  *See* Pls.' Mot. for Summ. J. ("Pls.' Mot.") [Dkt. # 156]; Def.-Intervenors' Mot. for Summ. J. ("Def.-Int.'s Mot.") [Dkt. # 162]; Federal Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot. for Summ. J.") [Dkt. # 164].  These motions have been fully briefed.  *See* Pls. Mot. for Summ. J. Reply and Opp'n to Fed. Defs.' Cross-Mot. ("Pls.' Opp'n to Fed. Defs.") [Dkt. # 170]; Pls. Reply In Supp. of Mot. for Summ. J. and Opp'n to Def.-Intervenors' Cross-Mot. ("Pls.' Opp'n to Def.-Ints.") [Dkt. # 172]; Federal Defs. Reply in Supp. of Their Cross-Mot. for Summ. J. ("Fed. Defs.' Reply") [Dkt. # 175]; Def.-Intervenors' Reply in Supp. of Cross-Mot. for Summ. J. ("Def.-Ints.' Reply") [Dkt. # 176].  Finally, the Blackfeet Tribe has filed an amicus brief in support of defendants and intervenors.  *See* The Blackfeet Tribe's *Amicus Curiae* Br. Supporting

10

Defs.' Cross-Mot. for Summ. J. and Def.-Intervenors Mot. for Summ. J. and in Opp'n to

Pl.'s Mot. for Summ. J. ("Amicus Br.") [Dkt. # 168].


## LEGAL STANDARD

This case comes before the Court on the parties' cross-motions for summary

judgment.  Under Federal Rule of Civil Procedure 56(a), "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When

evaluating cross-motions for summary judgment, "the court shall grant summary judgment

only if one of the moving parties is entitled to judgment as a matter of law upon material

facts that are not genuinely disputed. Summary judgment is also appropriate where, as here,

review is on the administrative record." *Select Specialty Hosp.-Bloomington, Inc. v.

Sebelius*, 774 F. Supp. 2d 332, 338 (D.D.C. 2011) (citation omitted).

In reviewing a challenge to agency action brought under the Administrative

Procedure Act, the Court must determine "whether the agency acted within the scope of its

legal authority . . . explained its decision, . . . relied [on facts that] have some basis in the

record, and . . . considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp.

96, 105 (D.D.C. 1995) (citing *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

While a reviewing court may not "substitute its judgment for that of the agency," *Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), the court must

set aside agency action upon a showing that it was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  Finally, the

11

Court may only uphold agency action for the reasons provided in taking that action. *Michigan v. EPA*, 576 U.S. 743, 758 (2015).

## DISCUSSION

### I.   The rescission of the Lease must be vacated

The Secretary lacked authority to cancel the Lease because the Secretary only has the power to administratively cancel improperly issued leases, which the Lease here was not. Issuance of the Lease violated neither NEPA nor NHPA. And even if the Lease did suffer from some legal infirmity that would have made the Lease voidable in 1982, the Government subsequently affirmed the Lease and, as such, waived any right to cancel it before 2016. Therefore, the decision to rescind the Lease must be set aside.

#### A.   The Secretary lacks authority to cancel a lease valid when issued

The existence of a legal defect is a necessary precondition to the Secretary exercising her authority to administratively cancel the lease. The Government here, however, has identified no authority for the proposition that the Secretary may unilaterally cancel a lease that was *properly* issued. Instead, the Government has shown, at most, that the Secretary may have authority to administratively cancel a lease that was invalid when it was issued.

Indeed, the Government concedes that the Secretary did not rely on the statutory provisions of the MLA to cancel the Lease. *See* Defs.' Mot. for Summ. J. at 14. But the MLA's scheme allowing for the Secretary to cancel certain leases is nonetheless instructive. The MLA identifies three circumstances in which the Secretary may

12

administratively cancel a lease: (1) upon violation of the MLA, unless the current leaseholder is a bona fide purchaser, 30 U.S.C. §§ 184(h)(1), (h)(2); (2) upon violation of the statute, regulations, or terms of the lease, *id.* at § 188(a); or (3) on 30 days' notice, upon violations of the lease's provisions if the lease is not producing, *id.* at § 188(b). Each requires the Secretary to show a violation of the statute, regulations, or terms of the lease. Nowhere does the statute contemplate granting the Secretary unfettered discretion to cancel a validly issued lease without showing a subsequent statutory, regulatory, or contractual violation.

Nor does the Secretary's inherent authority extend to the power to cancel a valid lease. That authority is limited, at most, to cases in which the lease suffered from some legal defect when first issued. *Boesche v. Udall*, which the Secretary cites as supporting this expansive authority, stands only for the proposition that a lease that was "invalid[ ] at its inception" could be voided. 373 U.S. at 476. Indeed, our Circuit Court has consistently read *Boesche* to extend no further. *E.g.*, *Silver State Land, LLC*, 843 F.3d at 990; *see also Ivy Sports Med. v. Burwell*, 767 F.3d 81, 93 (D.C. Cir. 2014) (Pillard, J., dissenting) (same); *Texaco, Inc. v. Hickel*, 437 F.2d 636, 641 (D.C. Cir. 1970) (same); *Udall v. Littell*, 366 F.2d 668, 672 n.10 (D.C. Cir. 1966) (same).

For the same reasons that *Boesche* does not authorize the Secretary to cancel a valid lease, neither do the regulations cited by the Government and intervenors. The Secretary argues that she had authority to cancel the lease because the MLA's implementing regulations at 43 C.F.R. § 3108.3(d) allow the Secretary to cancel any lease that was

"improperly issued."[3]  *See* Defs.' Mot. for Summ. J. at 24 (citing *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 167 (Fed. Cl. 2014)).  But the regulation merely codified "existing practice in considering specific situations," which by its own terms extends no further than whatever authority the Supreme Court recognized in *Boesche*.  *See* Minerals Management and Oil and Gas Leasing; Amendments to the Regulations Covering Oil and Gas Leasing on Federal Lands, 48 Fed. Reg. 33648, 33655 (July 22, 1983).  As such, the regulations provide no basis to rescind a properly issued lease.

### B.    The Lease was valid when issued

The parties disagree whether a violation of NEPA or NHPA prior to issuance of a lease would render the lease "invalid" such that it could be administratively canceled under either the Secretary's inherent authority or 43 C.F.R. § 3108.3(d).  While no circuit court appears to have addressed this precise question, the 10th Circuit has characterized the Secretary's power as the "authority to cancel oil and gas leases *for violations of the Mineral Leasing Act and regulations thereunder . . . .*"  *Winkler v. Andrus*, 614 F.2d 707, 711 (10th Cir. 1980) (emphasis added).  In the nearly forty years since the regulation was

---

[3] Solenex contests the applicability of this regulation because it was not promulgated until after the lease was issued.  But the lease was issued "subject to all rules and regulations of the Secretary of the Interior now or hereinafter in force, when not inconsistent with any express and specific provisions herein."  Lease M-53323, A.R., Vol. VIII, Part 2 [Dkt. # 114-1] at 5 (HC 00884).  This language on the face of the lease is probably sufficient to find that the later-enacted regulation applies to the lease.  *Cf. Mobil Oil Expl. & Producing Se., Inc., v. United States*, 530 U.S. 604, 616 (2000) (holding lease was not subject to later-issued regulation because only future regulations issued under named statutes were incorporated in the text of the lease).  But the Court need not resolve this question, because the Government can't rescind the lease even if the Lease is subject to the later-enacted regulation.

promulgated in 1983, no court has found that a violation of a different statute, like NEPA or NHPA, has formed the basis for cancellation under the authorities the Secretary cited in cancelling the Lease.  Nonetheless, because neither NEPA nor NHPA were violated, the Court need not resolve this question.  I will therefore assume, without deciding, that a violation of either statute would provide grounds for cancellation.

NEPA and NHPA impose procedural requirements with which government agencies must comply before acting, but neither requires that the agency elevate the preservation of environmental or historical resources above other priorities.  Instead, both statutes only require the agency to take a "hard look" at the impact of a particular course of government action to ensure "fully informed and well-considered decision[s]."  *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012) (citation omitted); *Ill. Com. Comm'n*, 848 F.2d at 1260–61 ("Like section 102 of NEPA, section 106 of the Historic Preservation Act is a 'stop, look, and listen' provision . . . .").  The Government has met that standard here.  How so?

### 1.      The Government complied with NEPA

The Government complied with NEPA prior to issuing the Solenex lease.  NEPA does not require the agency to conduct a full EIS before issuing a lease in every instance.  Instead, under our Circuit Court's precedent, if an agency issues a finding of "no significant impact" after it "carefully considered the [ ] proposal, was well informed on the problems presented, identified the relevant areas of environmental concern, and weighed the likely impacts," a full-blown EIS is *unnecessary*.  *Cabinet Mtns.*, 685 F.2d at 683; *accord Am. Bird Conservancy*, 516 F.3d at 1034 (citing *Cabinet Mtns.*, 685 F.2d at 683); *Wyo. Outdoor*

*Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999).  The Government met that

standard here.  It reviewed six alternative courses of action, carefully considered the

environmental issues, determined that a full-blown EIS was unnecessary, and produced a

161-page Environmental Assessment ("EA") in 1981, *before* the lease was issued.  Env'tl

Assessment, App. Vol. IV [Dkt. # 45-10] at 8 *et seq*.  That was sufficient to satisfy NEPA.

And, for more than thirty years, the Government consistently maintained that it had

complied with NEPA in issuing the Lease.  In fact, the Government first raised any

concerns that NEPA was violated in 2015, more than two years *after* this suit was filed,

when the Government represented to this Court that the BLM "has tentatively concluded

the Lease was issued without properly complying with NEPA . . . ."  Resp. to Ct. Order

[Dkt. # 58] at 3.

The Government and intervenors now challenge the sufficiency of the EA on the

theory that the Government failed to adequately consider a no action alternative.  *See* Defs.'

Mot. for Summ. J. at 33; Def.-Int.'s Mot. at 30.  Please!  As an initial matter, and as this

Court previously found, the Government *did* consider a no-action alternative in the EA

before issuing the Lease.  *Solenex I*, 334 F. Supp. 3d at 179; *see also* Env'tl Assessment,

App. Vol. IV [Dkt. # 45-10] at 13 (noting that the EA considered alternatives "rang[ing]

from denial of all lease applications to leasing all applied for lands with appropriate

stipulations"); *id.* at 48 ("No Action on Lease Applications at this Time").  Ultimately,

however, the Government rejected that alternative on the grounds that it was "in conflict

with National and Regional Forest Service policy." *Id.* at 48.  That analysis was sufficient.

An EA requires only a "brief discussion[ ]" of reasonable alternatives to the proposed

action that "need not be as rigorous as the consideration of alternatives in an EIS." *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (citing 40 C.F.R. § 1508.9(b)).   In evaluating the alternatives before it in 1982, the Government assessed the no-action alternative and reasonably eliminated it in light of countervailing policy considerations. Env't Assessment, App. Vol. IV [Dkt. # 45-10] at 48.   The Government and intervenors' arguments seeking to apply the standards that govern an EIS to an EA are unavailing.

The Government and intervenors also argue the Government could not rely on an EA because the Secretary must prepare an EIS before issuing a mineral lease "if the [agency] chooses not to retain the authority to preclude all surface disturbing activities." *Sierra Club*, 717 F.2d at 1415; *see* Defs.' Mot. for Summ. J. at 32.   But this misreads the record!   As our Circuit Court already found, the leaseholder "was required to obtain permission from both the Bureau and the Forest Service before drilling could occur." *Solenex II*, 962 F.3d at 523.   The "Surface Disturbance Stipulations" attached to the Lease require "prior approval" in the form of an approved APD before any "surface disturbing operation."   Lease M-53323, A.R., Vol. VIII, Part 2 [Dkt. # 114-1] at 7 (HC 00886). Moreover, the "Activity Coordination Stipulation" attached to the Lease required prior approval before commencing "surface disturbance activities" across the entirety of the Lease. *Id.* at 12 (HC 00891).   As required under the *Sierra Club* standard, the Government retained "both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental

consequences are unacceptable." 717 F.2d at 1415. The Government did just that, so no EIS was necessary before issuance of the Lease. *Id.* at 1412.

The Government offers three arguments why the language of the Lease barring surface-disturbing activities doesn't mean what it says. *See* Fed. Defs.' Reply at 12–15. In short, the Government argues that the no-surface occupancy provisions of the Lease only cover a small proportion of the total Lease, other terms of the Lease not present in the lease at issue in the *Sierra Club* case are insufficient to distinguish the Lease from the general rule drawn from that case, and a provision in the Lease in which the Government retained authority to disallow surface occupancy to ensure compliance with the Endangered Species Act failed to meet the *Sierra Club* standard because it was not specific to NEPA. *Id.* But, as Solenex notes in response, that interpretation is inconsistent with the record in this case. Crucially, in *Sierra Club*, both the Secretary and Sierra Club agreed that the Government could not preclude surface occupancy. *Sierra Club*, 717 F.2d at 1414 n.7. In this case, on the other hand, the Government both held and exercised the authority to preclude Solenex and its predecessors in interest from occupying the Lease to allow the Government to determine whether "the environmental consequences" of proposed mineral exploration activities "were unacceptable." *Id.* at 1415; *see also* Statement of Material Facts in Supp. of Defs.' Cross-Mot. for Summ. J. [Dkt. # 93-2] ¶ 13 (noting that the IBLA set aside BLM's 1985 approval of Fina's APD on the Lease to resolve various issues "before authorizing any activity"); *id.* ¶ 16 (noting that the Lease was again suspended in 1987 "to allow additional environmental analysis").

### 2.    The Government complied with NHPA

Nor did the Department violate NHPA in issuing the lease.  First, NHPA did not apply to the issuance of the lease.   Second, even if it had, NHPA did not require consultation with the Blackfeet Tribe in 1982.  And finally, even if NHPA required consultation with the Blackfeet Tribe in 1982, the Government did so.

NHPA's implementing regulations require federal agencies to complete the Section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."  36 C.F.R. § 800.1(c).  But the regulations do not restrict "nondestructive project planning activities" before this review has been completed.  *Id.*; *see also City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1509 (D.C. Cir. 1994) (holding that agency action that did not authorize expenditure of funds did not require NHPA approval).  Instead, NHPA precludes government agencies from taking any actions that could disturb the physical environment (or permit private parties to disturb the physical environment) without the statutorily required review.  Other circuits have reached the same conclusion.  *See Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir. 1981) (holding that NHPA's requirements do not attach to the issuance of a mineral lease that requires subsequent approval for surface disturbing activities).

These limitations follow logically from the text of the statute.  At all relevant times, Section 106 of NHPA only imposed procedural requirements on federal "undertaking[s]."  54 U.S.C. § 306108 (2022); 16 U.S.C. § 470f (1981).  Prior to 1992, including when the Lease was issued in 1982, an agency action was only an "undertaking" within the meaning

of NHPA if a federal agency expended funds or licensed some action by another party.
*Sheridan Kalorama Ass'n*, 49 F.3d at 754; *see also Lee v. Thornburgh*, 877 F.2d 1053,
1056 (D.C. Cir. 1989). But *no* federal funds were expended in the issuance of the lease.
Nor is a lease a license: A lease is a "contract by which a rightful possessor of real property
conveys the right to use and occupy the property in exchange for consideration," *Lease*,
*Black's Law Dictionary* (11th ed. 2019), while a license is a "permission, usually
revocable, to commit some act that would otherwise be unlawful," or a "permit," *License*,
*Black's Law Dictionary* (11th ed. 2019). It follows that a lease is not an "undertaking"
within the meaning of the statute; the Government neither expends funds nor licenses any
otherwise unlawful activity by issuance of a lease. Therefore, Section 106 does not apply
to the issuance of a lease.

Further, even if issuance of the Lease was an undertaking, the Government was not
obligated to consult with the Blackfeet Tribe at that time. True, as the Government and
intervenors note, the 1980 amendments to NHPA contemplated a role for Native American
tribes. *See* Defs.' Mot. for Summ. J. at 37; Def.-Int.'s Mot. at 35. But the provision of the
statute envisioning a role for Native American tribes only states a broad policy; it did not
obligate the Government to take specific steps to consult with tribes to comply with NHPA.
*See* Pub. L. No. 96-515, § 101, 94 Stat 2987, 2988 (1980) ("It shall be the policy of the
Federal Government, in cooperation with other nations and in partnership with the States,
local governments, Indian tribes, and private organizations and individuals to" take certain
actions in support of preserving historic properties); *see also Cont'l Air Lines, Inc. v. Dep't
of Transp.*, 843 F.2d 1444, 1451 (D.C. Cir. 1988) ("Application of 'broad purposes' of

legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.") (citation omitted). Further, adopting the Government and intervenors' preferred reading of the 1980 NHPA amendments would render the 1992 amendment requiring consultation as surplusage. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Ore.*, 515 U.S. 687, 698 (1995) (noting that courts should show "reluctance to treat statutory terms as surplusage" in reviewing statutes).

Even if NHPA's requirements were triggered upon issuance of the lease, the record shows that the Government complied. The regulations in effect at the time directed the agency to undertake efforts to "determine what historic and cultural properties are known to be within the area of the undertaking's potential environmental impact." 36 C.F.R. § 800.4(a)(1) (1979). The Government did so. The 1981 EA inventoried historically important properties before the lease was issued. Env'tl Assessment, App. Vol. IV [Dkt. #45-10] at 44–45. And, the Government's claims that the Forest Service "failed to consult with the Blackfeet Tribe" notwithstanding, Defs.' Mot. for Summ. J. at 36, the EA specifically noted it consulted with the Blackfeet Tribe in an effort to identify sites of particular significance, Env'tl Assessment, App. Vol. IV [Dkt. #45-10] at 45. But the Blackfeet "preferred to identify these areas on a project-by-project basis."[4] *Id.* The fact that the Blackfeet decided not to cooperate more fully with the assessment informing the

---

[4] The Blackfeet evidently shared the commonsense understanding of NHPA's requirements described here; that NHPA compliance was tied to specific "projects" likely to physically disturb the land.

1981 EA does not mean that the Government failed to take a "hard look."  To hold otherwise would incentivize private parties to withhold information from the Government during NHPA consultations in order to bolster future litigation prospects.

Of course, Solenex's venture was still ultimately subject to NHPA.  As Solenex concedes, Pl.'s Mot. at 53, the statute requires the Government to conduct its assessment prior to issuing a license to conduct surface-disturbing activities like Solenex's proposed oil and gas drilling operations, which the parties agree is an "undertaking" within the meaning of NHPA.  *See Wilson v. Block*, 708 F.2d 735, 754 (D.C. Cir. 1983) (holding that NHPA requires federal agencies only to survey properties that "may be affected by the project").  And the Government was obligated to consult with Native American tribes for those proceedings that occurred after the passage of the 1992 NHPA amendments.  But, again, the operative government action that triggers the Government's obligations under NHPA is the approval of those surface disturbing activities by approval of the APD.[5]  The out-of-circuit cases cited by the Government and intervenors for the proposition that leases are undertakings as defined by NHPA cannot overcome the plain text of the statute!

C.      **Even if the Lease were voidable, the Government ratified it**

The lease was valid when issued.  But even if the lease were voidable at issuance, the Government subsequently ratified the lease and thereby waived any right to rescind it.

_____

[5] In 1992, Congress expanded the definition to include projects "permitted" by a federal agency.  *Sheridan Kalorama Hist. Ass'n*, 49 F.3d at 755.  Even if that definition were to apply retroactively, which it likely does not, *see id.* at 754–55, issuance of a lease *still* would not qualify as an undertaking.  The relevant federal undertaking is still approval of the Application for *Permit* to Drill.

Mineral leases issued by the United States are governed by the basic principles of contract law. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08 (2000) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (citation omitted).  And a contract may be voidable as the result of mistake if one party entered into the contract due to a mistaken factual belief. *See* Restatement (Second) of Contracts §§ 152–53 (Am. L. Inst. 1981).  But a party that ratifies a voidable contract after learning of the underlying mistake waives that right. *Id.* at § 7 ("A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, *or by ratification of the contract to extinguish the power of avoidance*.") (emphasis added).  These principles also bind the Government; if the Government ratifies a previously voidable contract, it has waived any right it may have had to later void the contract. *See Godley v. United States,* 5 F.3d 1473, 1476 (Fed. Cir. 1993) (a counterparty can enforce a voidable contract against the United States if the United States subsequently ratified the contract).

The near-contemporaneous Federal Register notice announcing the regulation on which the Government now relies reflects the same interpretation.  The rule, as initially proposed, would have rendered an improperly issued lease "cancelled," but the Government revised the rule to make such a lease only "subject to cancellation."  48 Fed. Reg. 33648, 33655 (July 22, 1983) (to be codified at 43 C.F.R. pts. 3000, 3100). Referencing its inherent authority as reflected in *Boesche*, the Government noted that the

"modification reflects the Department of the Interior's existing practice in considering specific situations."[6]  *Id.*

As noted above, the Secretary has identified only two potential legal bases on which the lease might be invalid: NEPA and NHPA.  And under the Government and intervenors' interpretation of the regulations, a lease that failed to comply with NEPA or NHPA that was nonetheless issued is "subject to cancellation." 43 C.F.R. § 3108.3(d).  In fact, the Government framed its decision to terminate the Lease in contractual terms, characterizing the Lease as "voidable" in its 2016 Lease Decision.  Lease Decision, A.R., Vol. X, Part 8 [Dkt. # 116-7] at 49 (SUPP.AR000391).  According to the Government, the lease failed to comply with NEPA and NHPA at the time it was issued in 1982.  *Id.* at 49–53.  But in 1982, both the Government and the lessee, Mr. Longwell, believed that the Government had complied with all NEPA and NHPA obligations.  If that belief were inaccurate, it was a mistake.  In other words, the Lease was, at most, voidable.

However, even if the Lease were voidable in 1982, the Government waived any right to cancellation because the Government ratified the lease after learning of the alleged imperfection.  The Government was aware of claimed violations of NEPA and NHPA no later than 1985, when the lease was challenged on those grounds.  Defs.' Mot. for Summ. J. at 7.  But the Government formally reaffirmed the validity of the lease in 1987, 1991,

---

[6] On its face, the reference to the Government's "existing practice" contemplates the procedures upheld in *Boesche*.  The Government agrees, having cited the same Federal Register entry for the proposition that § 3108.3(d) "merely codified [the Government]'s exercise of the Secretary's inherent power to cancel a lease that issued without observance of law." Defs.' Mot. for Summ. J. at 22.  Therefore, the voidability analysis under *Boesche* yields the same result.

1992, 1993, and 2002.  *See* Defs.' Mot. for Summ. J. at 7–8; Letter from Donato J. Judice

to Sidney Longwell (Apr. 19, 2002), App. Vol. I, Part 7 [Dkt. # 45-6] at 55 (FS 002811).

As to NEPA, in 1990, the Department issued a 982-page, full-blown EIS that considered

and definitively resolved any infirmities under that statute.  *See* Final Environmental

Impact Statement for Exploratory Oil and Gas Wells (Oct. 1990), App. Vol. I, Part 1 [Dkt.

# 45-3] at 1 *et seq.* (FS 001165); *see also* Pls.' Mot. at 51.

    Nor is there any question whether the Government has failed to comply with NHPA.

As an initial matter, even if the EIS did not conclusively satisfy the Government's NHPA

obligations, the Government also went on to complete multiple cultural inventories,

consultations with impacted Native American tribes, and in-depth studies conducted by

ethnographers in considering the pending APD.  Lease Decision, Administrative Record

("A.R.") Vol. X, Part 8 [Dkt. # 116-7] at 46–47 (SUPP.AR000388–89).  During the

intervening years—more than three decades—Solenex (and its predecessors in interest)

were barred from taking any action that could cause any "adverse effects" within the

meaning of NHPA.  Finally, the Government represented to this Court in 2015 that, while

it believed that "the Lease was issued prematurely" in violation of NEPA and NHPA, "the

NHPA procedural defect *has now been corrected* by completing the consultation process."

Response to Court Order [Dkt. # 58] at 5 (emphasis added).

    According to the Government, Solenex is precluded from even raising these

arguments in this suit because the cancellation of the Lease was an exercise of inherent

authority rather than contractual authority, and any claims sounding in contract should be

brought in the Court of Federal Claims. Defs.' Mot. for Summ. J. at 45–46. As to the first

25

argument, it was the Government, not Solenex, that initially characterized the cancellation in contractual terms by characterizing the Lease as "voidable" in the Lease Decision. Lease Decision, A.R., Vol. X, Part 8 [Dkt. # 116-7] at 49 (SUPP.AR000391). The Government implicitly concedes as much in its argument, writing "the Lease remained voidable" because "the errors had not been corrected." Defs.' Mot. for Summ. J. at 39. Having framed the Secretary's decision in contractual language, the Government cannot preclude Solenex from arguing on those terms. And with respect to this Court's jurisdiction, the argument that the Tucker Act bars Solenex from raising these arguments in this proceeding is groundless. Solenex seeks less than $10,000 in damages, so jurisdiction over its claim to vacate the Secretary's decision rightly lies in district court. 28 U.S.C. §§ 1331, 1346(a)(2); *see also* Compl. [Dkt. # 151] at 62–63.

If it ever held any right to void the Lease, the Government waived that right by correcting any outstanding deficiencies and therefore ratifying the lease. As such, the lease was not voidable in 2016 when the Lease Decision was issued.

### D.    The Secretary acted without authority in cancelling the lease

The Court must "hold unlawful and set aside" any agency action "not in accordance with law." 5 U.S.C. § 706(2), (2)(A). And the Court may uphold agency action only for the reasons the agency provided in taking that action. *Michigan*, 576 U.S. at 758. The only basis for rescission of the lease was the Government's legal conclusion that issuance of the lease violated NEPA and NHPA.[7] For the reasons previously discussed, that

---

[7] Intervenors, although not the Government, also argue that a 2006 law withdrawing the Badger-Two Medicine area from mineral leasing precludes the Secretary from

decision was predicated on an incorrect interpretation of the law.  Therefore, it must be set aside.

## II.    The Secretary's revocation of the APD must be set aside

The rescission of the APD in the Lease Decision also must be set aside as arbitrary and capricious.  The Secretary identified three grounds for rescission: the invalidity of the underlying lease, a finding that impacts to Tribal cultural resources "cannot be fully mitigated," and a finding that "validation of the lease would be inconsistent with" the 2006 legislation.  Lease Decision, A.R. Vol. X, Part 8 [Dkt. # 116-7] at 54 (SUPP.AR000396).  The first and third premises cannot support the Secretary's decision because they are wrong as a matter of law for the reasons explained above.  5 U.S.C. §§ 706(2), (2)(A).  As to the second, the Secretary's determination that the adverse effects to Tribal cultural resources could not be mitigated was predicated on the Government's designation of a 165,000-acre "Area of Potential Effects" and the decision to recognize "adverse effects" not contemplated in NHPA's implementing regulations.  Those decisions were arbitrary and capricious because the Government: (1) considered improper factors, (2) failed to consider an important aspect of the problem, and (3) offered an explanation that ran counter to the record.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Having done so, the Government's withdrawal of the approval of the

---

validating the Lease.  Def.-Ints.' Mot. at 22–23.  It does not.  As Solenex notes, the withdrawal of those lands from future leases was made "[s]ubject to valid existing rights." Tax Relief & Health Care Act of 2006, Pub. L. 109-432, § 403, 120 Stat. 2922, 109th Cong. 2nd Sess. (2006).  The lease was valid for the reasons already noted, so Solenex held "valid existing rights."

APD was invalid and must be vacated. *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

### A.     The designation of a 165,000-acre Area of Potential Effects was arbitrary and capricious

The Government's decision to designate the entire 165,000-acre TCD as the APE for its NHPA analysis was arbitrary and capricious because it failed to consider an important aspect of the problem and is not supported by the record.

The Secretary's failure to evaluate adverse effects caused by the relevant "undertaking" in establishing the APE render her decision as arbitrary and capricious. The Government argued that the entire TCD was properly designated as the APE because the Forest Archeologist appropriately considered the Blackfeet Tribal Historic Preservation Officer's explanation that the entire TCD "possesses spiritual and religious power for the Blackfeet." Defs.' Mot. for Summ. J at 51. But this justification is not "influenced" by the "nature of the undertaking"; it relies entirely on the existence of the TCD without regard for the nature of the proposed activity. Other tribunals have rejected such an expansive approach, finding that reliance on the mere existence of a TCD to reject a permit for energy development is insufficient: "NHPA does not require absolute protection for a [TCD]." *Earth Power Resources, Inc.*, 181 IBLA 94, 111 (2011).

The Government knows how to define an appropriate APE for a proposed oil drilling site that considers the "nature of the undertaking." Indeed, it had already done so in this case, establishing an approximately 5,000-acre APE in mid-2003 that accounted for visual, audible, and emissions-based effects of Solenex's proposed venture on the

surrounding area.  Some version of this APE remained in effect as late as January 2014, only two months before the designation of the entire TCD as the APE.  *See* Map of Badger-Two Medicine Traditional Cultural District, Solenex LLC APD and Area of Potential Effects (Jan. 29, 2014), App. Vol. II, Part 1 [Dkt. # 45-7] at 90 (FS 004742).  The original APE identified the precise locations of the roads, well pads, and other equipment that would be constructed and operated in the course of Solenex's venture.  Forest Service Memorandum regarding The Area of Potential Effect (APE), Longwell Consultation, App. Vol. II, Part 1 [Dkt. # 45-7] at 41–42 (FS 003785–86).  The Government then calculated the maximum distance at which an observer could see, hear, or smell those operations.  *Id.*; Letter re: 106 Consulting Process, App. Vol. V, Part 2 [Dkt. # 48-2] at 74–75 (FS 003730–31).  That outer perimeter, plus a buffer zone, constituted the original, smaller APE.  Letter re: 106 Consulting Process, App. Vol. V, Part 2 at 74–75 (FS 003730–31)  The Forest Service's analysis revealed that only a small fraction of the larger TCD would plausibly be affected by Solenex's proposed drilling activities.  *See id.* at 77–78 (FS 003733–34); Map of Badger-Two Medicine Traditional Cultural District Solenex LLC APD and Area of Potential Effect, App. Vol. II, Part 1 [Dkt. # 45-7] at 90–91 (FS 004742–43).  Those adverse effects—physical effects that can be seen, heard, or smelled—are precisely the kinds of potential harms contemplated in the NHPA's implementing regulations, and the Government properly considered them in establishing the APE.  *See* 36 C.F.R. § 800.5(a) (defining and providing examples of "adverse effects"); *id.* at § 800.16(d) (defining "Area of potential effects" as "the geographic area or areas within which an undertaking may directly or indirectly cause" different kind of effects).

29

Conceding that direct physical effects alone cannot explain the expanded APE, the Government and intervenors argue that the Government properly considered "indirect and cumulative effects" of the Solenex venture. Defs.' Mot. for Summ. J. at 51; *see also* Def.-Int.'s Mot. at 40.  But in announcing the expanded APE in early 2014, the Forest Service did not even attempt to establish a linkage between that larger APE and the Solenex undertaking, the physical ramifications of which had been well-established for more than a decade by that point.  *See* Determination of Adverse Effects, App. Vol. XI [Dkt. # 177] at 286–87 (FS 006535–36).  Nor could it have.  Instead, the Forest Service adopted wholesale the Blackfeet Tribe's position that allowing the Solenex venture had "the potential to adversely affect the power and spirituality of the entire district" without explaining what those effects were or how they flowed from Solenex' proposal. Memorandum from Mark Bodily, Forest Archeologist (Apr. 3, 2014) [Dkt. # 177] at 237 (FS 006398).  The State Historic Preservation Officer ("SHPO") expressly conceded that the smaller APE addressed physical effects, writing that "[t]he [Forest Service] has noted and *correctly proposed different APE areas for direct ground disturbance, visuals and auditory effects.*"  Letter from Stan Wilmoth, SHPO, to Mark Bodily, U.S. Forest Serv. (Feb. 26, 2014), App. Vol. XI [Dkt. # 177] at 232 (FS 006387). (emphasis added).   But the SHPO went on to assert that the Solenex venture could compromise the "values and characteristics of the larger entity: the Traditional Cultural District as a whole."  *Id.*  Again, that argument does not relate to the nature of the proposed undertaking.  Nor, as explained in greater detail below, did the NHPA consultations identify *any* adverse effects recognized in the regulations.

Seeking to justify the changed APE, the Government claims that it is supported by new information available to the Forest Service in the form of a 2012 ethnographic study of the area. *See* Defs.' Mot. for Summ. J. at 52; Def.-Int.'s Mot. at 40.  The record reflects that the Government did, in fact, rely on that study in reaching its conclusion.  *See* Lease Decision, A.R., Vol. X, Part 8 [Dkt. # 116-7] at 46 (SUPP.AR000388).  But that study itself limited the "area of potential effects of the Longwell lease" to the "headwaters of the South Fork of Two Medicine River."  Badger-Two Medicine Traditional Cultural District, Lewis & Clark National Forest, Montana: Boundary Expansion Study, App. Vol. XI [Dkt. # 177] at 88.  By its own terms, that does not refer to the entire 165,000-acre APE. According to the same study, the TCD includes, in addition to the headwaters of the South Fork of Two Medicine River, other geographic features such as Badger Creek, Mowitch Basin, Birch Creek, and passes across the Continental Divide.  *Id.* at 50–52.  Maps of the TCD prepared by the Forest Service reveal that those geographic features are separated from the Lease by miles of rugged terrain.  *See* Map of Badger-Two Medicine Traditional Cultural District, Solenex LLC APD and Area of Potential Effect (Jan. 29, 2014), App. Vol. II, Part 1 [Dkt. # 45-7] at 90 (FS 004742).  When considered alongside the Forest Service's 2003 adverse effects analysis, the record simply does not support the Government's sweeping finding that "impacts to Tribal cultural resources"—across the entire TCD—"cannot be mitigated."

### B.    The adverse effects determination was arbitrary and capricious

The Government found that approving Solenex's APD had "the potential to adversely affect the power and spirituality of the entire district." Memorandum from Mark

Bodily, Forest Archeologist (Apr. 3, 2014) [Dkt. # 177] at 237 (FS 006398).  Because the Government improperly considered prospective harms that are not "adverse effects" within the meaning of the NHPA and its implementing regulations, that determination was also arbitrary and capricious.

NHPA does not define "adverse effects."  Nonetheless, the Government has since issued regulations to define that term. *See* 36 C.F.R. § 800.5(a), (a)(2)(i)–(vii).  And the Government is bound by its own regulations. *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 258 (1977).  The relevant regulations identify seven categories of "adverse effects" that the Government must consider in evaluating the impacts to "historic properties within the area of potential effects."  36 C.F.R. § 800.5(a), (a)(2)(i)–(vii).  Six of the seven examples of adverse effects relate to quantifiable and objective changes to the physical environment. *Id.* § 800.5(a)(2)(i) ("Physical destruction"); *id.* § 800.5(a)(2)(ii) ("alteration"); *id.* § 800.5(a)(2)(iii) ("removal"); *id.* § 800.5(a)(2)(iv) ("change of the . . . property's use or of physical features"); *id.* § 800.5(a)(2)(v) ("Introduction of visual, atmospheric or audible elements"); *id.* § 800.5(a)(2)(vi) ("Neglect of a property which causes its deterioration").  The seventh relates to loss of federal control over the property "without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance." *Id.* at § 800.5(a)(2)(vii).

The regulations also grant the Government latitude to consider types of adverse effects not expressly identified, 36 C.F.R. § 800.5(a)(2), but, by choosing to provide a lengthy list of prototypical examples of "adverse effects," the Government cabined its discretion as to the kinds of potential harms that qualify.  The fact that every enumerated

example describes a physical effect on the historic property suggests that the regulations contemplate only those harms.  And the Government and intervenors have identified no authority for the proposition that the Government may consider factors that are impossible to physically observe or measure.  In fact, the Government has rejected the suggestion that similar disturbances qualify as "adverse effects" in the past, finding that deer hunting near Gettysburg National Military Park would not cause any adverse effects because the disturbance of the "quiet contemplative atmosphere" at the battlefield was not an "adverse factor" under the NHPA.  *Davis v. Latschar*, 83 F. Supp. 2d 1, 14 (D.D.C. 1998), *aff'd*, 202 F.3d 359 (D.C. Cir. 2000).

The Government argues that the Forest Service properly considered "both subjective and objective" factors "in its direct, indirect, and cumulative impacts analyses." Defs.' Mot. for Summ. J. at 57.  According to the Government, this is permissible because the regulations contemplate the "effects of an undertaking on the 'integrity of the property's location, . . . feeling, or association.'"  *Id.* (quoting 36 C.F.R § 800.5(a)(1)).  But, for the reasons explained above, the subjective factors the Government considered—factors like "power" and "spirituality"—are categorically distinct from the types of factors contemplated by the regulations.  These concerns are not new: public comments to the proposed definition of "adverse effects" yielded concerns that "feeling" and "association" were "impermissibly vague and overbroad terms."  65 Fed. Reg. 77698, 77707 (Dec. 12, 2000).  Responding to those and similar comments, the Government maintained that those terms would only be interpreted within the scope of their meaning as defined in National

Register Bulletin 15, writing "adverse criteria are linked specifically to objective National Register criteria published by the National Park Service." *Id.*

Turning to National Register Bulletin 15, it is apparent that the Government has erred in this case by adopting freewheeling, inherently subjective definitions of those terms unmoored from their grounding in physically verifiable effects. The Bulletin recognizes "feeling" and association" as two of the seven elements of integrity, but notes: "Like feeling, association requires the presence of *physical features* that convey a property's historic character." U.S. Dep't of the Interior, National Park Serv., National Register Bulletin 15 (1997), https://www.nps.gov/subjects/nationalregister/upload/NRB-15_web508.pdf at 45 (emphasis added). The Bulletin goes on to state, "Because feeling and association depend on individual perceptions, their retention *alone* is never sufficient to support eligibility of a property for the National Register." *Id.* (emphasis in original). Moreover, each of the four steps the National Park Service prescribes to "Assess[ ] Integrity in Properties" expressly or implicitly references the "essential physical features" of the property. *Id.* Nor do the Government's guidelines make an exception for Native American sites in this regard. The Bulletin also provides specific guidance related to defining Native American sites that may be eligible for inclusion due to their association with "Traditional Cultural Values." *Id.* at 26. The Park Service notes that "It is critical, however, . . . that the associations not be so diffuse that the physical resource cannot be adequately defined." *Id.* at 27. But in this case, that is exactly what the Government did! By adopting a broad definition of "adverse effects" unmoored from both the language of

the regulations and its conceptual underpinnings, the Government considered improper factors and was therefore arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

The Government did not find that Solenex's proposed drilling would cause any adverse effects recognized by the regulations. Lease Decision, A.R. Vol. X, Part 8 [Dkt. # 116-7] at 47 (SUPP.AR000389); *see also* Memorandum from Mark Bodily, Forest Archeologist (Apr. 3, 2014) [Dkt. # 177] at 237 (FS0056398). Nor would the record have supported such a finding. Indeed, the Blackfeet never claimed that the Solenex drilling operation would cause those kinds of adverse effects. Letter from John Murray, Blackfeet Tribe THPO, to Mark Bodily, U.S. Forest Serv. (Feb. 28, 2014) [Dkt. # 177] at 234 (FS 006894). And while I do not dispute the sincerity of the belief that "ANY oil and gas exploration venture by Solenex will negatively and cumulatively affect the religious and cultural quality of the expanded district," that assertion does not *identify* an "adverse effect" recognized by the NHPA regulations. *Id.*; *see also* Amicus Br. at 2.

The Government's identification of the entire 165,000-acre TCD as the relevant APE and its recognition as relevant adverse effects a variety of harms not contemplated by the regulations were arbitrary and capricious. Therefore, the disapproval of the APD must be vacated.

## CONCLUSION

For the reasons given above, it is time to put an end to this interminable, and insufferable, bureaucratic chess match. The Court finds that the Secretary lacked authority to rescind the Lease, and that the Secretary further acted in an arbitrary and capricious

manner in disapproving the previously approved Application for Permit to Drill. Accordingly, Plaintiff Solenex LLC's Motion for Summary Judgment [Dkt. # 156] will be **GRANTED**, the Government's Cross-Motion for Summary Judgment [Dkt. # 164] will be **DENIED**, and intervenors' Motion for Summary Judgment [Dkt. # 162] will be **DENIED**. An Order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge